**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| Craigville Telephone Co. d/b/a AdamsWells Internet Telecom TV 2351 N. Main Street Craigville, IN 46731 | Case No. 1:19-cv-07190 |
| and | |
| Consolidated Telephone Company d/b/a CTC 1102 Madison St. Brainerd, MN 56401 | |
| Individually and on behalf of a class of similarly situated companies, | **FIRST AMENDED CLASS ACTION COMPLAINT AND JURY DEMAND** |
| *Plaintiffs*, | |
| v. | |
| T-Mobile USA, Inc. 12920 SE 38th St. Bellevue, WA 98006 | |
| Serve: Illinois Corporation Service Co. 801 Adlai Stevenson Drive Springfield, IL 62703 | |
| and | |
| Inteliquent, Inc. 550 W Adams St. Fl. 9 Chicago, IL 60661 | |
| Serve: Cogency Global, Inc. 600 S. Second Street, Suite 404 Springfield, IL 62704 | |
| Does 1 - 10, | |
| *Defendants*. | |

**Table of Contents**

I.     NATURE OF THE CASE ................................................................................... 1

II.    THE PARTIES ................................................................................................... 6

    A.     Plaintiffs ................................................................................................ 6

    B.     Defendants ............................................................................................. 6

III.   JURISDICTION AND VENUE ....................................................................... 7

IV.    FACTUAL ALLEGATIONS ........................................................................... 8

    A.     Universal Service Is The Paramount Objective For Regulation Of The
        Telecommunications Industry ............................................................... 8

    B.     The Intercarrier Compensation System .............................................. 10

        i.       Local Exchange Carriers (LECs) ............................................. 10

        ii.      Interexchange Carriers (IXCs) ................................................. 14

        iii.     Mobile Carriers (CMRS) ......................................................... 14

        iv.      Intermediate Providers ............................................................. 15

    C.     How Calls Are Routed ........................................................................ 16

    D.     Intercarrier Compensation .................................................................. 17

    E.     A Confluence Of Rate Structures, The Evolving Nature Of The Long Distance
        Market And Corrupt Adaptations By Market Players Presented Incentives For
        Carriers To Degrade Or Limit Rural Call Completion. ....................... 20

        i.       Access Rates in Rural Areas .................................................... 20

        ii.      Evolving Nature Of The Interexchange And Wireless Marketplace ........ 21

        iii.     Corrupted Adaptation By Market Players ................................. 23

    F.     The FCC Requires Carriers To Complete Calls Placed To Customers Of LECs
        And Prohibits Practices That Restrict Traffic, Including Fake Ring Tone Schemes
        ........................................................................................................... 26

        i.       2001 – The FCC Addresses Carriers' Threats Or Refusals To Deliver
            Traffic To CLECs ..................................................................... 26

        ii.      2007 – The FCC Issues Its Call Blocking Declaratory Ruling ................ 27

        iii.     2011 – The FCC Hosts A Rural Call Completion Workshop .................. 27

        iv.      November 2011 – FCC Issues The Connect America Fund Order ......... 28

        v.       2012 – FCC Issues Its Rural Call Completion Declaratory Ruling ......... 29

        vi.      2013 – The FCC Issues A Rule Prohibiting Fake Ring Tones And A Rural
            Call Completion Enforcement Advisory ................................... 32

vii.    From 2013 Through 2016, FCC Takes Limited Enforcement Actions Related To Call Quality And Failure To Oversee Intermediaries ........... 36

G.    Congress Acts To Address The Rural Call Completion Problems Plaguing Rural America .............................................................................................................. 37

H.    T-Mobile Was Incentivized To Reduce Intercarrier Compensation Payments At The Expense Of Rural Carriers And Consumers Nationwide .............................. 43

I.    T-Mobile Admits To Engaging In An Illegal Fake Ring Tone Scheme That Impacted Hundreds Of Millions Of Calls Annually And Pays A $40,000,000 Fine To The U.S. Treasury .......................................................................................... 46

J.    Inserting Fake Ring Tones On Hundreds Of Millions Of T-Mobile's Customers' Calls Per Year Required Sophisticated Technological Support And A Centralized Policy Server .............................................................................................................. 49

K.    T-Mobile Used Its Association With Inteliquent For Legitimate Business Purposes And For The Illicit Purpose Of Carrying Out The Fake Ring Tone Scheme ...................................................................................................................... 58

    i.    Inteliquent Provides Legitimate Intermediary Carrier Services To T-Mobile ........................................................................................................ 58

    ii.    Inteliquent Provides Illegitimate Intermediary Carrier Services To T-Mobile ........................................................................................................ 59

    iii.    T-Mobile And Inteliquent Knew Fake Ring Tones Were Unlawful And That They Had The Duty To Deliver Calls To All LECs, Including Those In Rural Areas .................................................................................... 60

    iv.    Inteliquent Has Collaborated With T-Mobile On A Different Scheme To Deter Completion Of Certain Calls Placed By T-Mobile Customers ....... 62

L.    T-Mobile Has Been Blocking Plaintiffs' Access To Evidence Of Its Illegal Conduct In Pending FOIA Litigation ..................................................................... 66

M.    T-Mobile's Actions Show No Remorse ................................................................. 70

N.    Factual Allegations Relating To Named Plaintiffs ............................................... 84

    i.    Plaintiff Craigville Telephone Co. Experienced T-Mobile Call Completion Problems Consistent With The Fake Ring Tone Scheme ......................... 84

    ii.    Plaintiff Consolidated Telephone Company Experienced T-Mobile Call Completion Problems Consistent With The Fake Ring Tone Scheme ..... 90

V.    CLASS ALLEGATIONS ................................................................................................. 96

VI.    CLAIMS .......................................................................................................................... 99

COUNT I Violation Of Section 201(b) Of The Communications Act Of 1934, As Amended  (Against T-Mobile) (Fake Ring Tones) ............................................... 99

COUNT II Violation Of Section 201(b) Of The Communications Act Of 1934, As Amended (Against T-Mobile, Inteliquent, and Certain Doe Defendants) (Failure to Ensure Delivery of Calls) ............................................................................. 100

COUNT III Violation Of Section 202(a) Of The Communications Act Of 1934, As Amended (Against T-Mobile, Inteliquent, and Certain Doe Defendants) .......... 102

COUNT IV Violation Of RICO, 18 U.S.C. § 1962(c) (Against All Defendants) .......... 103

COUNT V Violation Of RICO, 18 U.S.C. § 1962(d) (Against All Defendants) ........... 111

COUNT VI Tortious Interference With Contract (Illinois Law) (Against T-Mobile) ... 113

COUNT VII Violation Of Illinois Consumer Fraud And Deceptive Business Practice Act, 815 ILCS 505/1 *et seq.* (Against All Defendants) ..................................... 114

COUNT VIII Civil Conspiracy (Against All Defendants) ........................................... 115

**FIRST AMENDED CLASS ACTION COMPLAINT AND JURY DEMAND**

This is Craigville Telephone Co. and Consolidated Telephone Company's First Amended Class Action Complaint and Jury Demand,[1] filed individually and on behalf of a class of similarly situated companies, for damages against defendants (i) T-Mobile USA, Inc. ("T-Mobile"); (ii) Inteliquent, Inc. ("Inteliquent"); and (iii) Doe Defendants 1-10.

I.    **NATURE OF THE CASE**

1.    T-Mobile tells the world that it is the "Un-carrier" and brags that it has "disrupted the wireless communication services industry by listening to our customers and providing them with added value and an exceptional experience, including implementing signature initiatives that changed the wireless industry forever." T-Mobile certainly is a disruptive force; one of its signature initiatives has been to illegally disrupt billions of calls as part of a nationwide fraud perpetuated against its own customers in order to deter them from making phone calls to rural America.

2.    In April 2018, T-Mobile admitted that it engaged in a protracted and illegal scheme which cheated its customers, and carriers like Plaintiffs comprising a nationwide class, impacting hundreds of millions of calls annually. T-Mobile has also admitted that this protracted scheme included a cover up - the insertion of fake ring tones into calls before the calls were connected to the intended recipient of the calls. This practice has the effect of confusing the caller into wrongfully believing their call has been successfully connected but that the recipient of the call is simply not answering. T-Mobile consciously used this illegal practice to mask its intermediate

---

[1]    The Complaint is amended to reflect facts learned as the result of the Federal Communications Commission's production of approximately 500 pages of additional documents on November 6, 2019 in response to a FOIA demand and related litigation brought by Plaintiffs' counsel against the FCC, which is ongoing.

carriers' routine failure to deliver high cost calls routed to rural areas of the United States that created a negative margin for T-Mobile. The use of the fake ring tones deceived customers into believing the calls were reaching their intended destination and thereby shifted blame for those call failures onto local phone companies, particularly rural carriers, even though the calls never even made it to these rural carriers' networks.

3.     T-Mobile's fake ring tone scheme injured the class members' businesses in multiple ways, including: lost opportunities to seek intercarrier compensation for calls the scheme blocked from connecting to the Plaintiffs' switches, lost profits and revenue, reputational harm caused by Plaintiffs' customers' false impression that their local rural carrier was responsible for call completion failures, loss of good will with customers, lost time value of labor hours associated with investigating and responding to customer complaints, loss of revenue due to discounts and monetary concessions the class members have made to appease and retain their disgruntled customers, and industry wide harm to the reputations and business opportunities for local rural phone companies.

4.     T-Mobile has admitted that its conduct violated rules expressly adopted by the Federal Communications Commission ("FCC" or "Commission") that prohibit these practices, an admission that it also violated the Communications Act of 1934.

5.      T-Mobile conceded its misconduct in an April 2018 consent decree with the FCC, which included payment of a $40 million penalty to the U.S. Treasury. *See In the Matter of T-Mobile USA, Inc.*, Order and *Consent Decree*, DA 18-373, 33 F.C.C. Rcd. 3737 (2018) ("*Consent Decree*") (attached hereto as Exhibit 1). T-Mobile's conduct represents one of the largest telecommunications frauds ever perpetrated against the American people. In comparison to T-

Mobile's 2018 net profits of $2.88 billion and $43.3 billion in total revenue, however, a $40 million penalty represents but a slap on the wrist.

6.     The FCC's *Consent Decree* did nothing to compensate any of the consumers that were victims of T-Mobile's fake ring tone scheme and deceptive trade practices. T-Mobile made no public statements apologizing for its conduct and did nothing to atone to its consumers or the local and predominantly rural carriers it harmed by failing to deliver calls. (T-Mobile's customers have little avenue for redress in light of binding arbitration and class action waiver provisions in T-Mobile's consumer terms and conditions.)

7.     In fact, when questioned by Congress about the *Consent Decree*, T-Mobile's CEO John Legere went so far as to deny that the company had admitted to wrongdoing.

8.     The FCC's *Consent Decree* also did not compensate the carriers that were harmed by T-Mobile's conduct. Here, however, the FCC acted to ensure that impacted carriers could obtain appropriate compensation by picking up where the Commission left off to ensure that T-Mobile does not profit from its illegal conduct. Specifically, by declaring the use of false ring tones and the failure to oversee intermediate providers to both qualify as "unjust and unreasonable practices" that violate Section 201(b) of the Communications Act of 1934, and by extracting admissions from T-Mobile that it engaged in these illegal practices, the Commission ensured that carrier-victims would have a clear and efficient path to the courthouse to obtain recovery for T-Mobile's illegal conduct. *See, e.g.,* 47 U.S.C. § 201(b); 47 U.S.C. §§ 206-207.

9.     Also not adequately addressed by the *Consent Decree* is the role of T-Mobile's co-conspirators in the massive fraud. On information and belief, after T-Mobile and Defendant Inteliquent entered into a Master Services Agreement in 2015 in which Inteliquent was to become the exclusive carrier to transit and terminate traffic for T-Mobile, the evidence will reveal that

Inteliquent was losing money on the contract and became desperate to reduce one of its primary costs, known as access charges, which Inteliquent was required to pay on T-Mobile's behalf to local phone companies for the privilege of using their networks to terminate calls made by T-Mobile's subscribers. As a result, T-Mobile and Inteliquent began to actively conspire to develop strategies to deter or prevent customers from making phone calls for which there are high per-minute costs to complete.

10. One of the ways in which T-Mobile's intermediate providers who failed to deliver calls (whether Inteliquent or other Doe Defendants) created savings was to route calls to other parties that were not equipped to deliver the traffic to its intended destination in a reliable manner, to the point of creating significant volumes of call failures. Inteliquent and Doe Defendant intermediate providers may have also intentionally dropped or failed to deliver calls. Moreover, Plaintiffs believe that discovery will reveal that the fake ring tone scheme was hatched jointly by T-Mobile and Inteliquent.

11. The *Consent Decree* describes how T-Mobile expanded the use of fake ring tones on a nationwide basis, *after* the FCC expressly declared the practice unlawful in January 2014. This admission of such egregious conduct is astounding, even for an "Un-carrier" like T-Mobile, which prides itself on breaking the rules in the name of competition. What is particularly noteworthy about T-Mobile's astonishing admission, however, is that the expanded use of the fake ring tones coincides with T-Mobile's expanded reliance on Inteliquent to deliver almost all domestic calls that leave the T-Mobile network destined to other carriers. Plaintiffs assert that this is not mere coincidence, but rather a direct result of Inteliquent's need to cut costs so that it could avoid the financial ramifications of a poorly-negotiated contract that made T-Mobile not only its largest, but also its riskiest, customer.

4

12. Indeed, in February 2016, Inteliquent's CEO at the time, Matthew Carter, made clear that the company would consider even "crazy hair ball ideas" to counteract the financial impact of its contract with T-Mobile. Just a few months later, in the early summer, the FCC began receiving a flood of complaints about T-Mobile calls not completing to rural areas and the potential use of fake ring tones, which prompted its investigation and the *Consent Decree*.

13. In furtherance of their illegal scheme, Defendants and their fake ring tone enterprise have committed multiple acts of wire fraud and engaged in a pattern of racketeering activity in violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"). The defendants perpetrated their scheme in furtherance of an association-in-fact enterprise consisting of (1) defendant T-Mobile; (2) defendant Inteliquent; (3) any other intermediate provider whose delivery of calls to consumers in certain rural operating company numbers ("OCNs") T-Mobile admitted in the *Consent Decree* it failed to correct; (4) one or more key individuals working specifically with these other co-conspirators to achieve these ends; and (5) on information and belief, several currently unidentified Doe Defendant co-conspirators that will be added to this lawsuit as facts are developed and their identities become known.

14. In addition to violating the Communications Act and RICO, Defendants have also violated Illinois law. Specifically, T-Mobile has tortiously interfered with Plaintiffs' business relationships, and both T-Mobile and Inteliquent, as well as the Doe Defendants, have violated the Illinois Consumer Fraud and Deceptive Business Practice Act, 815 ILCS 505/1 *et seq.*, by deceiving consumers and Plaintiffs with the use of fake ring tones in order to mask their shoddy service and unscrupulous practices aimed at avoiding completion of high cost calls. Plaintiffs have been damaged through the loss of access charge revenues, significant time and resources expended in trying to investigate and resolve these issues, and damage to their reputations, as consumers

have placed blame on Plaintiffs, rather than Defendants where it belongs. All along, T-Mobile, Inteliquent, and T-Mobile's other intermediaries participating in the scheme either remained silent, repeatedly failing to inform T-Mobile's customers that their secretly employed illegal practices were the cause of countless call completion inquiries they received from consumers and rural carriers who could never diagnose the root cause because it was covertly buried within the fake ring tone enterprise's networks and confidential business practices; or, they expressly placed blame on rural carriers.

15.     Through this action, Plaintiffs seek damages, including the disgorgement of the illegal savings generated by the Defendants, triple damages, punitive damages, and attorneys' fees. Companies like T-Mobile, Inteliquent, and Doe Defendant co-conspirators can no longer be allowed to believe that they can break the law and get away with it by entering into a *Consent Decree* and paying a tiny fine. Justice demands more. The American people and businesses serving rural American communities deserve better.

## II.     THE PARTIES

### A.     Plaintiffs

16.     Craigville Telephone Company, Inc. d/b/a AdamsWells Internet Telecom TV ("AdamsWells") is an Indiana corporation with its principle place of business in Craigville, Indiana.

17.     Consolidated Telephone Company d/b/a CTC ("CTC") is a Minnesota corporation with its principle place of business in Brainerd, Minnesota.

### B.     Defendants

18.     Defendant T-Mobile USA, Inc. is a Delaware corporation, with its principal place of business in Bellevue, Washington. T-Mobile USA, Inc., is a member of the T-Mobile

International group, one of the world's largest mobile communications companies, and is the United States mobile telecommunications subsidiary of Deutsche Telekom AG. As of the first quarter of 2019, T-Mobile had a total of about 81.3 million subscribers, making it the third largest wireless carrier in the United States with approximately 18% market share.

19.     Defendant Inteliquent, Inc. is a Delaware corporation with its principal place of business in Chicago, Illinois.

20.     Doe Defendants 1-10 are unnamed co-conspirators of the Defendants, who may include intermediate providers whose delivery of calls to consumers in certain rural OCNs T-Mobile admitted in the *Consent Decree* it failed to correct, or other technology support providers. The Doe Defendants' involvement and culpability in the fake ring tone enterprise, will be determined through discovery.

## III.     JURISDICTION AND VENUE

21.     The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1332(d) and 47 U.S.C. §§ 206-207.

22.     The Court also has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(d) because this is a class action in which a member of the class of plaintiffs is a citizen of a state different than a defendant, there is more than $5 million in controversy, and the number of proposed class members exceeds 100.

23.     The Court has supplemental jurisdiction over the state law claims because they form part of the same case or controversy. 28 U.S.C. § 1367.

24.     The Court has personal jurisdiction over all Defendants pursuant to Fed. R. Civ. P. 4(k)(1)(A), 735 ILCS 5/2-209, and 18 U.S.C. § 1965(b).

25.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b)(1), 28 U.S.C. § 1391(b)(2), and 28 U.S.C. § 1391 because all Defendants are corporations that reside in this district pursuant to 28 U.S.C. § 1391(c)(2), and because a substantial part of the events or omissions giving rise to the claim occurred in or near Chicago, Illinois.

## IV.     FACTUAL ALLEGATIONS

### A.     Universal Service Is The Paramount Objective For Regulation Of The Telecommunications Industry.

26.     While most Americans take it for granted, the notion of universal access to residential telephone services was not a foregone conclusion in this country; nor was it a foregone conclusion that the American people would enjoy the benefits of competition in the telecommunications marketplace, while simultaneously being able to reach friends, families, and businesses that subscribed to the services of another telecommunications provider.  Today, however, a ubiquitous, interconnected telecommunications system is core to the economic prosperity and security of our nation.

27.     Early in the twentieth century, after the expiration of the Bell telephone patents in 1894, new carriers began to enter the market.  Initially these independent phone companies were not interconnected with, and could not exchange calls with, the Bell telephone networks.  This required many businesses to maintain subscriptions with more than one phone company in order to receive calls from customers who subscribed to a different service provider.

28.     Universal service in telecommunications was established as U.S. national policy by the Communications Act of 1934 (the "Act") in which Congress declared its intention "to make available, so far as possible, to all the people of the United States, a rapid, efficient, Nationwide, and world-wide wire and radio communication service with adequate facilities at reasonable charges."  47 U.S.C. § 151.  The law combined the Federal Radio Commission with the Interstate

Commerce Commission's wire communications powers to create the FCC which has greater powers over both radio and wire communications than these predecessor commissions.

29.    As the Commission has long recognized, "the ubiquity and reliability of the nation's telecommunications network is of paramount importance to the explicit goals of the Communications Act of 1934, as amended . . . ." *See, e.g., In the Matter of Establishing Just & Reasonable Rates for Local Exch. Carriers*, Declaratory Ruling and Order, 22 F.C.C. Rcd. 11629, ¶ 1 (2007) ("*2007 Call Blocking Declaratory Ruling*") (attached hereto as Exhibit 2).

30.    The goal of universal and reliable telecommunications service has underscored much of the nation's telecommunications policies in the intervening decades.  Central to those policies has been an unbending conviction that the nation must eliminate the inherent inequities in rural America that would inevitably arise if the free market was left unrestrained.  For example, Congress prohibited telecommunications carriers from engaging in "unjust or unreasonable discrimination in charges, practices, classifications, regulations, facilities, or services for or in connection with like communication service" and "undue or reasonable preference or advantage" among "localit[ies]."  47 U.S.C. § 202(a).  Congress also required providers of interstate long-distance services to ensure that "subscribers in rural and high areas" are charged "no higher than the rates charged by each such provider to its subscribers in urban areas."  47 U.S.C. § 254(g).

31.    The Commission took steps to further the Congressional mandate and ensure reliable service in rural America by, *inter alia*, creating a "universal service fund."  Under the universal service regime, the Commission collects fees from all telecommunications carriers, which are generally passed on to consumers, in order to make funds available to deploy infrastructure in unserved and underserved areas.  The Commission also created and maintains a system of intercarrier compensation payments known as "access charges" by which companies

providing interexchange or long-distance services pay local telephone companies for the network facilities they maintain, and the switching and transport services they provide, which are necessary to transit and terminate calls to the customers of the local telephone companies. While multiple factors impact the access charges a local carrier may collect, and while terminating charges have been decreased in recent years, the Commission's policies have historically been designed to allow rural carriers to collect a much higher level of access rates than their urban counterparts in order to recover the proportionately higher costs attributable to providing service in very low density markets.

**B.** **The Intercarrier Compensation System**

32. T-Mobile's illegal fake ring tone scheme demonstrates its greed and willingness to "break the rules" to increase profits in any way possible, even if that means harming its own customers.

33. In order to understand the financial incentives that led to T-Mobile's fake ring tone scheme and the rural call completion failures central to this case, it is necessary to understand how telephone calls are delivered to and among different telecommunications carriers and the intercarrier compensation system. The following paragraphs explain the various carriers that may be involved in the delivery of telephone calls to rural America.

**i.** *Local Exchange Carriers (LECs)*

34. The delivery of telephone calls in the United States often requires the involvement of numerous carriers, each of which carries the calls for a portion of the route. With regard to calls originating on or terminating to a traditional landline telephone, the company providing the portion of the route closest to the calling and called parties is referred to as the local exchange carrier or

10

"LEC." LECs typically own or lease the phone lines that connect directly to homes and businesses within their defined service territories.

35. Pursuant to the Communications Act, "[t]he term 'local exchange carrier' means any person that is engaged in the provision of telephone exchange service or exchange access." 47 U.S.C. § 153(32). As described further below, LECs come in various types and their regulatory classification may vary depending on the area in which they provide service.

36. All Plaintiffs are LECs.

37. Incumbent Local Exchange Carriers or "ILECs" are those local exchange carriers that existed before 1996 (when Congress adopted the Telecommunications Act of 1996, which opened local telephone markets to competition), insofar as they are providing service in their original territories. Specifically, the FCC has defined an ILEC as:

> Incumbent Local Exchange Carrier (Incumbent LEC). With respect to an area, the local exchange carrier that:
> (1) On February 8, 1996, provided telephone exchange service in such area; and
> (2)(i) On February 8, 1996, was deemed to be a member of the exchange carrier association pursuant to § 69.601(b) of this chapter; or
> (ii) Is a person or entity that, on or after February 8, 1996, became a successor or assign of a member described in paragraph (2)(i) of this section.

47 C.F.R. § 51.5.

38. Competitive Local Exchange Carriers or "CLECs" are generally competitive market entrants, or more specifically, those local exchange carriers that were not providing telephone exchange service in a particular geographic area as of February 8, 1996.

39. Notably, a carrier that meets the definition of ILEC, but which expanded its services into other geographic areas, would not be considered an ILEC with regard to those expanded service territories. Rather, in that expanded service territory, it would be a CLEC.

11

40.     In a traditional legacy ILEC network, an ILEC would deploy a series of interconnected switches throughout its service territory to enable the exchange of traffic within the markets it serves.   Networks maintained by ILECs may include a variety of switching equipment. Simplistically speaking, switches provide features, such as the dial tone and/or the network intelligence, needed to route a call between one customer's premises to another.   Historically, telecommunications networks have been organized in a hierarchical fashion defined by differing switch types.   For example, the lines from many customers of local service are aggregated to a local or end office switch.   In turn, end-office switches would be aggregated into a tandem switch. End office switches are those switches that directly connect or "switch" calls to individual homes and businesses and provide local dial tone and associated services, while tandem switches are switches that do not provide discrete services to customers.   Because it is often not practical or economical for long-distance carriers to interconnect at each end office, such carriers generally interconnect at the tandem switch, which serves a concentration and distribution function between those long-distance carriers and the end office switches.

41.     After the introduction of competition in the long-distance marketplace, some carriers chose to focus primarily on providing tandem switching services, without focusing on the provision of end office services directly to consumers.   These carriers may serve a variety of ILECs and CLECs that provide services directly to consumers, making it easier for rural areas to enjoy the benefits of competition in the long-distance marketplace.   ILECs, CLECs, and tandem providers may collaborate to provide originating and terminating exchange access.

42.     One specific type of tandem provider is a centralized equal access provider or "CEA provider."   CEA providers are "a specialized type of intermediate carrier authorized by the Commission in the late 1980s to implement long distance equal access obligations (permitting end

12

users to use 1+ dialing to reach the interexchange carrier (IXC) of their choice) and to aggregate traffic for connection between rural incumbent LECs and other networks, particularly those of IXCs." *In the Matter of Iowa Network Access Div. Tariff F.C.C. No. 1*, 33 F.C.C. Rcd. 3825, 3827, ¶ 7 (2018). CEA Providers fit within the definition of CLEC. *AT&T Corp. v. Iowa Network Services, Inc. d/b/a Aureon Network Services*, 32 F.C.C. Rcd. 9677, ¶ 25 (2017).

43.     The Communications Act also includes a separate definition for a subclass of ILECs or CLECs known as "rural telephone company," that provide service in particularly rural areas, and that are also referred to as a Rural LECs or RLECs:

> The term "rural telephone company" means a local exchange carrier operating entity to the extent that such entity--
>
> (A) provides common carrier service to any local exchange carrier study area that does not include either--
>
> (i) any incorporated place of 10,000 inhabitants or more, or any part thereof, based on the most recently available population statistics of the Bureau of the Census; or
>
> (ii) any territory, incorporated or unincorporated, included in an urbanized area, as defined by the Bureau of the Census as of August 10, 1993;
>
> (B) provides telephone exchange service, including exchange access, to fewer than 50,000 access lines;
>
> (C) provides telephone exchange service to any local exchange carrier study area with fewer than 100,000 access lines; or
>
> (D) has less than 15 percent of its access lines in communities of more than 50,000 on February 8, 1996.

47 U.S.C.A. § 153(44).

44.     Thus, a LEC may qualify as a rural telephone company or RLEC in situations in which it provides service in certain low-density geographic areas, while not qualifying as an RLEC when providing service in more urban areas.

### ii. *Interexchange Carriers (IXCs)*

45.     With regard to what is generally referred to as long-distance telephone calls, once a call is originated on a LEC's network, the LEC (often in connection with a tandem provider) delivers that traffic to the long-distance carrier of the customer's choosing at a point of interconnection known as a meet point.  *See* 47 C.F.R. § 51.5 ("A meet point is a point of interconnection between two networks, designated by two telecommunications carriers, at which one carrier's responsibility for service begins and the other carrier's responsibility ends.").

46.     Long-distance carriers are known in the telecommunications industry as interexchange carriers or "IXCs".  The FCC has defined interexchange carrier as "a telephone company that provides telephone toll service.  An interexchange carrier does not include commercial mobile radio service providers as defined by federal law."  47 C.F.R. § 64.4001(d).

### iii. *Mobile Carriers (CMRS)*

47.     Mobile phone service providers are a distinct class of telecommunications provider known formally as a "commercial mobile radio service" provider or "CMRS provider."  *See* 47 U.S.C. § 332(d)(1).

48.     Defendant T-Mobile is a CMRS provider.

49.     For purposes of a call originating on a mobile phone, the call originates on a user's handset and is transmitted over a radio signal to the nearby wireless tower.  From there, the call is generally routed on wireline facilities to a corresponding mobile telephone switching office ("MTSO") that directs the call towards its intended destination on the public switched telephone network ("PSTN").

### iv. *Intermediate Providers*

50. Because CMRS providers generally do not build and operate wireline networks throughout the country, they rely either on an affiliated wireline provider (*e.g.*, AT&T wireless would rely on AT&T's long-distance network) or on the networks of unaffiliated intermediate providers ("Intermediate Providers") to provide the transport services required to transport their traffic and ultimately deliver their subscriber's call to the terminating LEC, Voice-over-IP provider, or CMRS provider to which the called party has directed their call.

51. Intermediate Providers have been defined by the FCC to mean:

any entity that—

(1) Enters into a business arrangement with a covered provider or other intermediate provider for the specific purpose of carrying, routing, or transmitting voice traffic that is generated from the placement of a call placed—

(i) From an end user connection using a North American Numbering Plan resource; or

(ii) To an end user connection using such a numbering resource; and

(2) Does not itself, either directly or in conjunction with an affiliate, serve as a covered provider in the context of originating or terminating a given call.

47 C.F.R. § 64.2101.

52. In turn, a "covered provider" is defined as:

The term "covered provider" means a provider of long-distance voice service that makes the initial long-distance call path choice for more than 100,000 domestic retail subscriber lines, counting the total of all business and residential fixed subscriber lines and mobile phones and aggregated over all of the providers' affiliates. A covered provider may be a local exchange carrier as defined in § 64.4001(e), an interexchange carrier as defined in § 64.4001(d), a provider of commercial mobile radio service as defined in § 20.3 of this chapter, a provider of interconnected voice over Internet Protocol (VoIP) service as defined in 47 U.S.C. 153(25), or a provider of non-interconnected VoIP service as defined in 47 U.S.C.

15

153(36) to the extent such a provider offers the capability to place calls to the public switched telephone network.

*Id.*

53. Defendant Inteliquent is, *inter alia*, an Intermediate Provider.

54. Defendant T-Mobile is a Covered Provider.

**C.  How Calls Are Routed**

55. To illustrate the interconnected nature of the PSTN, a call originated by a T-Mobile subscriber in Chicago and intended for a rural subscriber in Indiana may be routed as follows: (1) from the subscriber's handset to T-Mobile's nearest tower in Chicago; (2) from T-Mobile's tower to a meet point with Inteliquent; (3) from the T-Mobile-Inteliquent meet point to Inteliquent's meet point with another Intermediate Provider that is connected to the terminating LEC's tandem provider; (4) from the LEC's tandem provider to the LEC's end office; and (5) from the terminating LEC's end office to the called party's home or business in Indiana.

56. Below is a diagram of this simplified call flow for illustrative purposes:



16

57.     Thus, a call originated by a T-Mobile subscriber and terminating to a rural LEC will travel through the networks of three or four carriers at a minimum.  It is often the case, however, that a call will pass through multiple Intermediate Providers before reaching its intended destination, using a process known as "least-cost routing" in an effort to deliver the call in the cheapest possible way.

### D.     Intercarrier Compensation

58.     As discussed above, LECs, as the local phone companies, own or lease the phone lines that connect directly to residences and businesses within their service territories.  IXCs and Intermediate Providers, on the other hand, do not own these lines and, therefore, must access them in order to receive or deliver interexchange (long-distance) calls.  In order to compensate the LECs for the use of the local lines for the origination and termination of interexchange calls, the IXCs have traditionally paid the LECs a fee known as "access charges.  The FCC established such charges in order to allow LECs to recover a share of the costs associated with deploying and maintaining local communications infrastructure.  (End user customers are also assessed local connection charges which are also designed to recover a portion of the costs necessary to maintain their connection to the local exchange network.an access recovery.)  Access charges are made up of a variety of rate elements that reflect the services performed.  Those rate elements can be a combination of a fixed flat-monthly fee, per-minute charges, and mileage-sensitive charges for transport services.  For example, end office switching would typically be charged per-minute of traffic originated or terminated by the LEC on the IXC's behalf.  Transport between the tandem switch and the end office switch, however, would be a fee that is multiplied by the total miles that the traffic is carried and multiplied again by the minutes of traffic originated or terminated (rate x miles x minutes).

59.     The specific rate that a carrier would charge for access services depends on a variety of factors.  For example, while the FCC generally has oversight over the fees assessed on **interstate** and international long-distance calls, state utility commissions were historically responsible for setting the rates for **intrastate** access charges applicable to interstate long-distance calling.  (As discussed more fully below, this stopped being completely true in 2011.)  But, even within the FCC's domain over interstate long-distance, different rules apply to different types of carriers.  For example, some carriers are rate-of-return carriers that set their access charges based on their historic and projected costs with the intent of earning a designated rate-of-return for their investment.  Some of those rate-of-return carriers participate in the National Exchange Carrier Association ("NECA") pool in which the members pool their revenues, or settlements, for interstate telecommunications services based on a series of statistical formulas and forecasts based on historical call data, approved by the FCC, that approximate the amounts received by a similar cost company.  Others are average schedule companies, whose rates and revenues are determined using a set of formulas of costs incurred by similar cost companies.

60.     CLECs have typically set their rates by benchmarking their access charges to the ILEC with which they compete.  In 2001, the Commission determined that CLECs could provide an IXC with, and charge for, interstate switched access services in one of two ways.  First, a CLEC may tariff interstate access charges if its rates are no higher than the rates charged for such services by the competing ILEC (the benchmark rule).  Second, as an alternative to tariffing interstate access services, CLECs may enter into contracts, governed by state law, with an IXC to charge rates higher than those permitted under the benchmark rule.  *See, e.g., In the Matter of AT&T Corp. v. Iowa Network Services*, 32 F.C.C. Rcd. 9677 (2017).

61.     In November 2011, the FCC began a comprehensive reform of the intercarrier compensation regime, establishing as the ultimate end goal the complete phase out of access charges through the adoption of a bill-and-keep regime in which carriers do not exchange payments for access charges. *See In re: Connect America Fund, et al.,* Report and Order and Further Notice of Proposed Rulemaking, 26 F.C.C. Rcd. 17663, FCC 11-161 (Nov. 18, 2011), *aff'd In re: FCC 11-161*, 753 F.3d 1015 (10th Cir. 2014) ("*Connect America Fund Order*").  As part of the *Connect America Fund Order*, the Commission acted to ensure that intrastate terminating access charges would be on par with interstate terminating access charges, eliminating the historical role of state utility commissions to set intrastate terminating access rates.  Further, the Commission resolved a long-standing controversy about whether Voice-over-IP ("VoIP") traffic was subject to access charge regimes, concluding that this traffic should be treated equally with traditional telecommunications traffic originating and terminating in time-division multiplexing ("TDM") protocol.  The Commission also began a multi-year phased reduction of all interstate and intrastate *terminating end office* access charges.  Despite the reduction of certain access charges, other rate elements, including terminating tandem switching and transport charges, may still be assessed by LECs in certain circumstances.  Thus, calls terminating to rural America continue to generally cost more than calls terminating in more urban areas.

62.     Long-distance traffic originating on a CMRS provider's network and terminating to a LEC is subject to the intercarrier compensation system.  *See, e.g., Connect America Fund,* 26 F.C.C. Rcd. 17663, ¶¶ 769, 779, 806.  Unless alternative arrangements are made by contract, those access charges would be paid by the last Intermediate Provider to hand the traffic off to the terminating LEC based on the rates in the terminating LEC's federally-filed tariff.  *Id.* at ¶ 812.  Thus, an Intermediate Provider like Inteliquent would tender the payment for terminating access

19

charges to the LEC, it would recoup that payment from T-Mobile, which would pay the charges from the monthly fees paid by subscribers.

**E. A Confluence Of Rate Structures, The Evolving Nature Of The Long Distance Market And Corrupt Adaptations By Market Players Presented Incentives For Carriers To Degrade Or Limit Rural Call Completion.**

63. In 1996, Congress adopted the Telecommunications Act of 1996 with the goal of promoting competition in the delivery of telecommunications services. Over time, this has meant a gradual relaxation of the heavy regulations that typically governed telecommunications services. At times, as discussed more fully below, the deregulated nature of certain services, like long-distance service, has clashed with the continued regulation of other parts of the telecommunications market, such as access charges. These disparate regulatory regimes create perverse incentives for carriers to curtail the delivery of traffic to more expensive rural areas of the country in order to maximize the profitability of long-distance services.

**i. *Access Rates in Rural Areas***

64. As discussed above, access rates are not one-size-fits-all. Rather, they vary based on the type of carrier and often depend on the geographic location of the carrier, as well as the density of the market(s) it serves. Urban areas, with high density and small distances between homes and businesses, are, generally speaking, the most economical markets to serve.

65. Access rates charged in rural areas, on the other hand, have traditionally been significantly higher than those rates charged by their more urban counterparts. These higher rates in rural areas reflect a variety of factors, including:

   a. Longer distances to deliver traffic in rural areas increase the costs for infrastructure deployment compared to more urban areas;

b. Smaller entities operating in rural areas may incur higher costs due to fewer opportunities to generate cost savings through competition among suppliers;

c. Difficult terrain such as mountains, valleys, forests, tundra, swamps and deserts as well as harsh weather conditions and long winters involving snow and ice also increase costs;

d. Lower population density means that those costs are spread over fewer subscribers;

e. Lower population also means lower call density over which to spread out the costs;

f. Governmental policies designed to help ensure that RLECs are able to remain in business and serve these remote areas as part of the effort to maintain universal service, by requiring fair treatment from purely profit-motivated companies which may otherwise find it more economical to not provide service in these remote areas.

66. Thus, IXCs and CMRS providers delivering a call to a rural carrier will generally experience higher costs than if it delivered a call of equal duration to a major urban area.

**ii.** ***Evolving Nature Of The Interexchange And Wireless Marketplace***

67. Historically, long-distance charges were a separate set of charges from those associated with local service. Charges were assessed on a per-minute basis with calls to certain long-distance areas costing more as a reflection of the increased cost of delivering the call to that destination.

68. For many years, long-distance service was a highly profitable segment of the telecommunications market with a virtual guarantee of profit for each minute called. Thus, while cost was certainly a competitive factor, long-distance companies also had incentive to provide the best quality service in order to keep their customers on the phone talking for as long as possible.

69.    Over time, however, policy changes and a competitive market began to change this market dynamic, producing an environment in which IXCs and CMRS providers faced a powerful financial incentive to reduce or eliminate calls to higher costs areas of the country.   Three evolutions in the long-distance telecommunications marketplace are chiefly to blame:

a.   **Rate Averaging Policy** – The Telecommunications Act of 1996 added 47 U.S.C. § 254(g), which required the FCC to "adopt rules to require that the rates charged by providers of interexchange telecommunications services to subscribers in rural and high cost areas shall be no higher than the rates charged by each such provider to its subscribers in urban areas."   Thus, following the adoption of these rules, an IXC was restricted from charging more to deliver calls to rural Nebraska than it did to Los Angeles, even though the incremental costs continued to differ.

b.   **Increasing Competition from Other Services** – AT&T, the traditional IXC, began to experience increasing competition on a variety of fronts.   First, other landline IXCs began to compete, particularly in more urban areas, often picking off the most lucrative accounts.   Then CMRS providers began to bundle their local and long-distance services, drawing additional accounts away from AT&T.   Eventually, the popularity of cellular service led many consumers to "cut the cord," resulting in declining subscribership for residential telephone service.   Finally, with the advent of VoIP services, people began replacing traditional landline phones with alternative services that rely on this more modern technology.

c.   **Bundled Rate Designs** – As competition increased, IXCs and CMRS providers competed head-to-head for consumers by beginning to provide new product offerings.   These product innovations included "bucket" plans, where a consumer

22

could make a certain volume of calls to any part of the country for a flat fee, and, eventually, unlimited long distance plans, in which a subscriber could make unlimited long distance calls to anywhere in the nation for one flat fee. As a result of these evolutions, many carriers now have a fixed revenue stream for a service that still includes the payment of incremental costs in the form of access charges. With tightening margins and competitive pressures to avoid raising rates to consumers, IXCs and CMRS providers became increasingly focused on the incremental costs associated with terminating access charges.

70.     As a matter of pure economics, when confronted with this situation, one of the only ways for IXCs and CMRS providers to increase profit margins is to reduce the volume of traffic that their subscribers make to higher cost areas.

### iii.     *Corrupted Adaptation By Market Players*

71.     As competition increased, so did the complexity of call routing. Historically, call routing was a relatively straightforward affair and was limited to routing a call based on the most direct path between Point A and Point B.

72.     With a ballooning number of IXCs and Intermediate Providers, as well as the deployment of IP networks in which carriers can route traffic through alternative paths, the options for delivering a call to a particular destination also increased.

73.     Over time, routing algorithms became more sophisticated, and began to include decision points such as the cost of termination. Increased computing power also meant that sophisticated computers could be applied to consider a variety of different routing scenarios. And, as long-distance became ever more commoditized, carriers increasingly sought to improve margins

through route optimization, which included employing routing algorithms to avoid paying tariffed access charges to rural termination locations.

### a. Ascension Of Least Cost Routing (LCR)

74.     Once carriers realized that the cost of rural terminations was a drain on profits, "Least Cost Routing" ("LRC") was used to aggressively minimize the cost associated with terminating traffic to rural destinations. LCR is the process of selecting the path of outbound communications traffic based on cost. LCR systems can select a route from dozens of potential carrier options for a given route.

75.     LCR software relates a destination to a series of available rates from a diverse set of carriers and allows calls to be routed in real time based on a defined set of parameters. An LCR table can be populated with a series of high quality carriers – carriers which complete virtually every call in a high quality way (which historically resulted in relatively higher costs) or low quality carriers that will complete a minority of the calls handed to it with resulting quality being inconsistent at best (but the calls that do go through are significantly cheaper).

76.     It is not uncommon for carriers like T-Mobile and Inteliquent to look for the cheapest route for their traffic. However, if an Intermediate Provider is offering a rate that is materially below prevailing rates for a particular destination, it should raise concerns that the Intermediate Provider is engaged in potential fraud, will have degraded service due to insufficient capacity to handle the calls, or that the call will be "looped," rather than completing. Nevertheless, companies like Defendants continue to route traffic without ensuring adequate call quality in order to save money. They engage in these practices with full awareness of the harmful effects it will have on their consumers and rural carriers.

77.     Carriers like T-Mobile and Inteliquent could virtually eliminate rural call completion issues by relying on routes with carriers that are proven effective and by proactively monitoring for call completion problems.  Instead, T-Mobile chooses to act as the "Un-carrier," allowing these problems to persist because it is more profitable for them to do so.  T-Mobile's thirst for profit and willingness to operate beyond the boundaries is brazen, including when it publicly exclaims that "We won't stop breaking the rules of wireless."

        **b.     Evolution Of The Use Of Fake Ring Tones To Mask Excessive LCR Or Deter Call Completion**

78.     At the same time that the number of options and use of LCR was on the rise, so too was the increased use of IP technology, with TDM technology gradually beginning to be phased out.  While the use of IP technology presents tremendous opportunities for increased efficiency and flexibility in network architecture, it also presented new challenges.

79.     In its earliest days, at least, there were not a set of rigorous, definitive standards that were uniformly adopted across the industry for how IP technology would be routed or how to interpret the call signaling information that accompanies the calls.  The result was that some carriers interpreted signaling information on IP traffic differently than other carriers did, causing confusion and the potential for call failures to occur.

80.     Call failures can also occur because of errors in the routing tables; insufficient capacity between carriers to handle large, unplanned surges in traffic; or improper IP addresses.  For example, a phenomena known as "looping" occurs when a call becomes trapped in an infinite routing loop caused by a regenerating call path between carriers.  Simplistically, a carrier in an LCR routing table (Carrier X), redirects the call to a previous carrier (Carrier Y), which in turn routes the call, either directly or indirectly, back to (Carrier X) trapping the call in an infinite loop.

81. Call failures can also occur, however, when a carrier willfully or intentionally blocks a call, rather than completing it to its intended destination, or drops the call after it has been connected for a short period of time. In short, one bad carrier in the call path can intentionally or unintentionally lead to a call not being completed to its intended destination or result in poor call quality.

82. While ring tones should only be heard by the calling party when the call has reached the network of its intended destination, fake ring tones are heard by the calling party before the called party's phone rings. Fake ring tones obscure the delay in finding a route to the called party, or prevents the calling party from learning that the call failed. In other words, fake ring tones mask post dial delay (PDD) and/or failed calls.

**F.    The FCC Requires Carriers To Complete Calls Placed To Customers Of LECs And Prohibits Practices That Restrict Traffic, Including Fake Ring Tone Schemes**

83. Despite efforts to ensure universal service, the Commission has, for many years, had to combat the practices of unscrupulous carriers who were intent on reducing the intercarrier compensations charges they paid to rural carriers. While the FCC has made repeated efforts to prevent rural call completion problems and punish those responsible, its efforts have not been forceful enough to deters carriers like T-Mobile from continuing to cheat the system.

**i.    2001 – The FCC Addresses Carriers' Threats Or Refusals To Deliver Traffic To CLECs**

84. In 2001, the Commission acted to address situations in which IXCs were threatening or refusing to deliver traffic to CLECs:

> IXCs have threatened to stop delivering traffic to, or accepting it from, certain CLECs that they view as over-priced. Thus, AT&T has notified a number of CLECs that it refused to exchange originating or terminating traffic. In some instances, AT&T has terminated its relationship with CLECs and is blocking traffic, thus raising various consumer and service quality issues. These practices threaten to compromise the ubiquity and

26

> seamlessness of the nation's telecommunications network and could result in consumer confusion. Once one or more IXCs refuse to do business with a CLEC, it will become impossible for that CLEC's end users to reach, or receive calls from, some parties outside of the local calling area. If such refusals to exchange traffic were to become a routine bargaining tool, callers might never be assured that their calls would go through. We are particularly concerned with preventing such a degradation of the country's telecommunications network. It is not difficult to foresee instances in which the failure of a call to go through would represent a serious problem, and, in certain circumstances, it could be life-threatening.

*In Re Access Charge Reform*, Seventh Report and Order and Further Notice of Proposed Rulemaking, 16 F.C.C. Rcd. 9923, 9932–33, ¶ 24 (2001).

### ii. *2007 – The FCC Issues Its Call Blocking Declaratory Ruling*

85.    Acting on its own volition, the Commission's Wireline Competition Bureau issued the *2007 Call Blocking Declaratory Ruling* to "remove any uncertainty about the scope of the Commission's general prohibition on call blocking and to clarify the obligation of interexchange carriers (IXCs) and commercial mobile radio service (CMRS) providers (collectively carriers) to complete their customers' interexchange calls." Ex. 2, *2007 Call Blocking Declaratory Ruling*, ¶ 1. In that order, the Bureau concluded that carriers "may not engage in self-help actions such as call blocking." *Id.* It reiterated Commission policy that "the practice of call blocking, coupled with a failure to provide adequate consumer information, is unjust and unreasonable in violation of Section 201(b) of the Act." *Id.* ¶ 6 (quoting *In the Matter of Telecommunications Research and Action Center and Consumer Action v. Central Corporation et al.*, File Nos. E-88-104-108, Memorandum Opinion and Order, 4 F.C.C. Rcd. 2157 (1989)).

### iii. *2011 – The FCC Hosts A Rural Call Completion Workshop*

86.    In 2011, the Commission became alarmed about a rise in complaints from consumers and rural carriers about poor call quality and repeated challenges to receiving long-distance phone calls. On September 26, 2011, the Commission announced the creation of a Rural

Call Completion Task Force to investigate and address the growing problem of calls to rural customers being delayed or failing to connect.[2]  The Commission also held a workshop on October 18, 2011 to identify causes and discuss potential solutions with key stakeholders.[3]

### iv.    *November 2011 – FCC Issues The Connect America Fund Order*

87.    In November of that year, the Commission released an order of great significance to the telecommunication industry, in which it began a process of revising and modernizing the intercarrier compensation regime.  *See In the Matter of Connect Am. Fund A Nat'l Broadband Plan for Our Future Establishing Just & Reasonable Rates for Local Exch. Carriers High-Cost Universal Serv. Support Developing an Unified Intercarrier Comp. Regime Fed.-State Joint Bd. on Universal Serv. Lifeline & Link-Up Universal Serv. Reform -- Mobility Fund,* Report and Order and Further Notice of Proposed Rulemaking, FCC 11-161, 26 F.C.C. Rcd. 17663 (Nov. 18, 2011), *aff'd In re FCC 11-161*, 753 F.3d 1015 (10th Cir. 2014) ("Connect America Fund Order") (attached hereto as Exhibit 3).  Among other things, the Commission adopted rules that began to transition access rates to a "bill-and-keep" model, essentially with the aim of eliminating them. Specifically, the order commenced a phased-in reduction of terminating end office access charges over time, but does not eliminate all costs for terminating traffic in rural America.

88.    In the *Connect America Fund Order*, the Commission reiterated its "longstanding prohibition on call blocking," while rejecting a proposal to "allow selective call blocking."  *Id.* ¶ 734.  The Commission also extended the prohibition to traffic exchanged as VoIP traffic.  *See id.*, ¶ 972.

---

[2]    *See, e.g.*, FCC Documents, *FCC Launches Rural Call Completion Task Force, Sets Oct. 18 Workshop* (Sept. 26, 2011), https://www.fcc.gov/document/fcc-launches-rural-call-completion-task-force-sets-oct-18-workshop (last visited Oct. 10, 2019).
[3]    *See* FCC Events, *Rural Call Completion Workshop* (Oct. 18, 2011), https://www.fcc.gov/news-events/events/2011/10/rural-call-completion-workshop (last visited Oct. 10, 2019).

89.     The Commission again recognized that "blocking or the refusal to deliver voice telephone traffic, whether as a means of 'self help' to address perceived unreasonable intercarrier compensation charges or otherwise, risks 'degradation of the country's telecommunications network'" and reiterated that "call blocking is an unjust and unreasonable practice under section 201(b) of the Act." *Id.*

### v.     *2012 – FCC Issues Its Rural Call Completion Declaratory Ruling*

90.     A few months later, on February 12, 2012, the Wireline Competition Bureau ("WCB"), acting on "evidence that there is a pattern of call completion and service quality problems on long distance calls to certain rural areas, and in response to numerous requests," issued a declaratory ruling "to clarify the scope of the Commission's prohibition on blocking, choking, reducing, or restricting telephone traffic" in response to complaints about rural call completion issues from rural associations, state utility commissions, and consumers. *In the Matter of Developing an Unified Intercarrier Comp. Regime Establishing Just & Reasonable Rates for Local Exch. Carriers*, Declaratory Ruling, 27 F.C.C. Rcd. 1351, ¶ 1 (2012) ("*2012 Declaratory Ruling*") (attached hereto as Exhibit 4).  The WCB observed that there were reports of a "sharp increase in complaints that long distance calls and faxes are not reaching" rural locations and that consumers were complaining of "poor call quality, as well as of calls that ring for a prolonged period for the caller but that do not ring, or ring on an extremely delayed basis, on the receiving end." *Id.* ¶ 2.

91.     The *2012 Declaratory Ruling* documented significant detrimental effects associated with rural call completion problems:

> Small businesses can lose customers who get frustrated when their calls don't go through.  Urgent long distance calls from friends or family can be missed.  Schools may be unable to reach parents with critical alerts,

29

> including school closings due to extreme weather. And those in need of help may be unable to reach public safety officials.

*Id.*

92.     The *2012 Declaratory Ruling* took several actions to put an end to the unlawful practices of carriers who were interfering with the delivery of calls to rural America, which "adversely affect the ubiquity and reliability of the nation's communications network and threaten commerce, public safety, and the ability of consumers, businesses, and public health and safety officials in rural America to access and use a reliable network." *Id.* ¶ 11.

93.     First, the order made clear that it is "an unjust and unreasonable practice in violation of section 201 of the Act for a carrier that knows or should know that it is providing degraded service to certain areas to fail to correct the problem or to fail to ensure that Intermediate Providers, least-cost routers, or other entities acting for or employed by the carrier are performing adequately." *Id.* ¶ 12. This clarification is important because it requires carriers to ensure the delivery of their calls even when they use third-parties, such as Intermediate Providers that engage in least cost routing, to deliver the traffic for some of the route, rather than handing off the call directly to the local phone company that will terminate the call. In connection with this declaration, the WCB also provided examples of the types of "degraded service" that constitute an unjust and unreasonable practice in violation of the Act, 47 U.S.C. § 201(b):

> This could include, inter alia, unreasonable delay to connect a call, as manifested by prolonged silence ("dead air") and/or prolonged ***ringing in advance of the called phone being alerted***. Prolonged ringing occurs when callers are provided with prolonged audible ringing well before the called party's phone has even been alerted. This causes a caller to hang up because they believe the called entity's phone rang and no one is available to answer. *See, e.g.*, Fritz Hendricks, Onvoy Voice Service, "When a person calls a customer in a rural market the [caller's] phone will ring 8 to 10 times before the end office of the ILEC is ever signaled - if it is signaled at all." and "[The caller] will hear ring but the far end will never ring; that is the trouble in approximately 60 to 65 per cent of the time." Rural Call Termination Workshop Video at 13:40, 41:20, viewable at

30

> http://www.fcc.gov/events/rural-call-completion-workshop. *See also* Washington Call Termination Issues, Washington Independent Telecommunications Association, presented to WUTC Workshop on Call Termination Issues held August 8, 2011, WUTC docket UT-110866, ("Customer call completion issues: [1] Ring tone with no answer - rings 10-20 times - caller hangs up.") available at http://www.wutc.wa.gov/rms2.nsf/177d98baa5918c7388256a550064a61e/93037ed14bb0cb6f882578e7007442ae! OpenDocument

*Id.* at ¶ 12, n.35 (emphasis added). Thus, carriers were on notice by at least 2012 that the use of prolonged fake ring tones was prohibited.

94. Next, the *2012 Declaratory Ruling* clarified that it is an unjust and unreasonable practice in violation of Section 201(b) of the Act for a carrier to "inform a caller that a number is not reachable or is out of service when the number is, in fact, reachable and in service." *Id.* ¶ 13.

95. Third, citing the Communication Act's prohibition against unjust or unreasonable discrimination, the *2012 Declaratory Ruling* concluded that "adopting or perpetuating routing practices that result in lower quality service to rural or high-cost localities than like service to urban or lower cost localities (including other lower cost rural areas) may, in the absence of a persuasive explanation, constitute unjust or unreasonable discrimination in practices, facilities, or services and violate section 202 of the Act." *Id.* ¶ 14 (citing 47 U.S.C. § 202).

96. Fourth, and finally, the *2012 Declaratory Ruling* made it inescapably clear that carriers could no longer turn a blind eye to the call completion problems plaguing rural America by passing off their call traffic to an unregulated Intermediate Provider. Specifically, the Commission declared:

> Section 217 of the Act states that a carrier is liable for the acts, omissions, or failures of its agent or other person acting for or employed by the carrier.[ ] Therefore, if an underlying provider is blocking, choking, or otherwise restricting traffic, employing other unjust or unreasonable practices in violation of section 201, engaging in unjust or unreasonable discrimination in violation of section 202, or otherwise not complying with the Act or Commission rules, the carrier using that underlying provider to deliver

31

traffic is liable for those actions if the underlying provider is an agent or other person acting for or employed by the carrier.

*Id.* ¶ 15 (citing 47 U.S.C. § 217).

> ### vi. *2013 – The FCC Issues A Rule Prohibiting Fake Ring Tones And A Rural Call Completion Enforcement Advisory*

97.     A year later, on February 7, 2013, with rural completion problems still rampant, the Commission issued a Notice of Proposed Rulemaking, observing that Intermediate Providers "may be failing to deliver a significant number of calls to rural telephone company customers" and that evidence suggested that "retail long-distance providers may not be adequately examining the resultant rural call completion performance." *In the Matter of Rural Call Completion*, Notice of Proposed Rulemaking, 28 F.C.C. Rcd. 1569, ¶ 1 (2013) (attached hereto as Exhibit 5). The Commission reiterated that these rural call competition issues "manifest themselves in lengthy periods of dead air on the calling party's end after dialing a number, audible ringing tones on the calling party's end when the called party's telephone never rings at all, false busy signals, inaccurate intercept messages, and the inability of one or both parties to hear the other when the call does go through." *Id.* ¶ 2. The Commission proposed reporting and data retention requirements that would "aid enforcement action" and permit "review [of] a long distance provider's call performance to specific areas." *Id.* ¶ 3.

98.     Citing its authority to prohibit unjust and unreasonable practices, 47 U.S.C.§ 201(b), the Commission also proposed rules to eliminate entirely the use of "false audible ringing," (*i.e.*, fake ring tones) in which "the originating provider or an intermediate provider prematurely triggers the audible ring tone to the caller before the call setup request has actually reached the terminating rural provide." *Id.* ¶ 39.

99.     While the Commission gathered and evaluated public comments, it also continued to put carriers on notice of its intention to enforce the rules already in place.  On July 19, 2013, the Commission issued an FCC Enforcement Advisory in which it called out carriers who were not adequately investigating and responding to consumer complaints about rural call completion problems.  *See FCC Enforcement Advisory,* Public Notice, 28 F.C.C. Rcd. 10347, (2013) (attached hereto as Exhibit 8).

100.    Particularly problematic, according to the Commission, were carriers that would "assert, without any explanation, that the called party's rural telephone company is the source of any problems."  *Id.*  The Commission put carriers on notice that inadequate or insufficient responses to consumer complaints would "provide the basis for further Commission investigation and enforcement action, which may include monetary fines."  *Id.* at 10349.  The Commission also reiterated that, "a provider's failure to investigate and satisfy such complaints may trigger separate liability under section 201(b) and constitute the basis for additional penalties."  *Id.*

101.    Notably, Inteliquent was one of the only parties to argue against the Commission's proposal to prohibit fake ring tones.  For example, on both September 26, 2013 and September 30, 2013, Inteliquent met with Commission staff addressing rural call completion issues and made the following assertions:

> With respect to rules addressing "false ringing," we noted that, when the call party is a wireless customer roaming on another provider's network, completing the call may take longer than calls terminating to wireline customers.  While the wireless carrier is processing the call and locating the called party, presenting the caller with ringing provides comfort that the call has been dialed correctly and is being processed.

Letter from John Harrington, Inteliquent, to Marlene H. Dortch, Secretary, Federal Communications Commission, WC Docket No. 13-39 (Oct. 1, 2013) (attached hereto as Exhibit 6); Letter from John Harrington, Inteliquent, to Marlene H. Dortch, Secretary, Federal

Communications Commission, WC Docket No. 13-39 (Oct. 18, 2013) (attached hereto as Exhibit 7).

102.    On September 30, 2013, the same day that Inteliquent was lobbying for the use of fake ringtones, the Commission announced that its Tentative Agenda for its October 2013 Open Meeting included adoption of a Report and Order and Further Notice of Proposed Rulemaking "to address problems associated with completion of long distance calls to rural areas." *See* FCC News Release, *FCC Announces Tentative Agenda for October Open Meeting* (Sept. 30, 2013), *available at*: https://docs.fcc.gov/public/attachments/DOC-323564A1.pdf (last viewed Nov. 13, 2019).

103.    On October 17, 2013, the Commission published its final agenda for the October 28, 2013 Open Meeting. *See Commission Meeting Agenda, FCC to Hold Open Commission Meeting Monday, October 28, 2013* (Oct. 17, 2013), *available at:* https://docs.fcc.gov/public/attachments/DOC-323581A1.pdf (last viewed Nov. 13, 2019).

104.    Upon information and belief, Inteliquent's lobbying in favor of fake ringtones in late September 2013 was in response to being informed that the Commission intended to move forward with adopting the proposed rules to prohibit the practice.

105.    Upon information and belief, between September 30, 2013 and the adoption of the order on October 28, 2013, T-Mobile's lobbyist and/or FCC lawyers would also have learned that the FCC's order would include a prohibition against the use of fake ring tones and conveyed this information to T-Mobile.

106.    The Commission adopted the Report and Order and Further Notice of Proposed Rulemaking on October 28, 2013. *See In the Matter of Rural Call Completion*, Report and Order and Further Notice of Proposed Rulemaking, 28 F.C.C. Rcd. 16154, 16163 (2013) ("*2013 Rural Call Completion Order*") (attached hereto as Exhibit 9).  The Commission concluded that poor

34

call quality in rural parts of the country was directly attributable to carriers seeking to end run the

Commission's policies on payment of access charges:

> One key reason for the increased problems in rural areas is that a call to a
> rural area is often handled by numerous different providers in the call's path.
> Given the particularly high rates long-distance providers incur to terminate
> long-distance calls to rural rate-of-return carriers, long-distance providers
> have additional incentives to reduce the per-minute cost of calls. For
> example, the disparity between interstate rates can be 5-6 cents per minute
> for rate-of-return areas and just over half a cent per minute for price cap
> areas. As a result, there is greater incentive for the long-distance provider
> to hand off the call to an intermediate provider that is offering to deliver it
> cheaply—and potentially less incentive to ensure that calls to rural areas are
> actually completed properly. The prevalence of these problems accords with
> providers' incentives to engage in blocking or degrading traffic, or similar
> behavior, in an effort to minimize their intercarrier compensation payments,
> which has been long recognized by the Commission. While the
> Commission's comprehensive reform of intercarrier compensation will
> alleviate some of these price differences in the long-term, it likely will
> continue to be more costly to complete calls to rate-of-return carriers while
> the transition to bill-and-keep is implemented over the next several years.

*Id.* ¶ 17.

107.    The Commission described the use of fake ring tones as deceptive, explaining that

"[f]alse audible ringing can [ ] make it appear to the caller that the terminating rural provider is

responsible for the call failure, instead of the originating or intermediate provider," *id.* at ¶ 111,

and that codifying the rule was intended to address the harm that "consumers mistakenly believe

that the terminating rural provider is responsible for the call failure," *id.* at ¶ 114.

108.    In the *2013 Rural Call Completion Order*, the Commission adopted its proposal to

prohibit the use of fake ring tones, codifying the rules as follows:

> (a) A long-distance voice service provider shall not convey a ringing
> indication to the calling party until the terminating provider has signaled
> that the called party is being alerted to an incoming call, such as by ringing.
>
> (1) If the terminating provider signals that the called party is being alerted
> and provides an audio tone or announcement, originating providers must

cease any locally generated audible tone or announcement and convey the terminating provider's tone or announcement to the calling party.

(2) The requirements in this paragraph apply to all voice call signaling and transmission technologies and to all long-distance voice service providers, including local exchange carriers as defined in § 64.4001(e), interexchange carriers as defined in § 64.4001(d), providers of commercial mobile radio service as defined in § 20.3 of this chapter, providers of interconnected voice over Internet Protocol (VoIP) service as defined in 47 U.S.C. 153(25), and providers of non-interconnected VoIP service as defined in 47 U.S.C. 153(36) to the extent such providers offer the capability to place calls to or receive calls from the public switched telephone network.

47 C.F.R. § 64.2201.

### vii.    *From 2013 Through 2016, FCC Takes Limited Enforcement Actions Related To Call Quality And Failure To Oversee Intermediaries*

109.    Following adoption of the *2012 Declaratory Ruling* and *2013 Rural Call Completion Order*, the FCC took limited enforcement actions against carriers for failing to comply with the rural call completion obligations.

110.    In total, five carriers entered into *Consent Decrees* with the FCC between 2013 and 2016, agreeing to fines between $100,000 and $5 million.   T-Mobile and Inteliquent were undoubtedly aware of their illegal conduct but the FCC's limited enforcement efforts and modest penalties in the *Consent Decree*s emboldened them to conclude that their fake ring tone scheme would nevertheless pay off.

111.    Indeed, during negotiations with the FCC regarding the amount of penalty that the FCC was considering imposing on T-Mobile, T-Mobile expressly relied on its expectation that its exposure, if caught violating the fake ring tone prohibition, would be limited to a few million dollars, arguing:

Enforcement action of the magnitude contemplated by the Bureau here is entirely inconsistent with Commission precedent.  Prior Commission rural call completion enforcement actions ranged from $100,000 to $5 million. . . .  In other words, rural call completion actions topped out at $5 million,

36

> even though each of the actions involved threatened or actual sub-par rural call completion performance. A forefeiture [redacted by T-Mobile] times higher than the maximum rural call completion penalty imposed by Chairmen Genachowski and Wheeler has no basis here, particularly given T-Mobile's strong rural call completion record.

Supplemental Response of T-Mobile USA, Inc., File No. EB-IHD-16-00023247, at 7 (Sept. 8, 2017), attached hereto as Exhibit 18. Its reprehensible conduct having been discovered, T-Mobile sought to protect the only thing it truly cares about: T-Mobile's money and profits.

### G. Congress Acts To Address The Rural Call Completion Problems Plaguing Rural America

112. The FCC, acting alone, has not been successful in eradicating rural call completion problems, in part because it lacks the tools and resources necessary to police the conduct of Intermediate Providers like Inteliquent. Therefore, rural carriers and constituents alike turned to their elected representatives.

113. In February 2018, Congress adopted, and President Trump signed into law, the Improving Rural Call Quality and Reliability Act of 2017, Pub. L. No. 115-129, 132 Stat 329 (2018) ("RCC Act"). The bill was proposed by a bi-partisan group of representatives from rural states, including Rep. David Young (R-IA), Rep. Peter Welch (D-VT), Rep. David Loesback (D-IA), Rep. Sean Duffy (R-WI), Rep. Mark Pocan (D-WI), Rep. Robert Latta (R-OH), Rep. Ron Kind (D-WI), Rep. Richard Nolan (D-MN), Rep. Kristi Noem (R-SD), Rep. Kevin Cramer (R-ND), and Rep. Blaine Luetkemer (R-MO) in the House of Representatives. In the Senate, the RCC Act was sponsored by Sen. Amy Klobuchar (D-MN), Sen. John Thune (R-SD), Sen. Jon Tester (D-MT), Sen. Angus King (I-ME), Sen. Chuck Grassley (R-IA), Sen Joni Ernst (R-IA), Sen. Al Franken (D-MN), Sen. Mike Round (R-SD), and Sen. Claire McCaskill (D-MO). Marking its overwhelming bi-partisan support, the bill passed the Senate on unanimous consent and in the House by a unanimous voice vote.

37

114.    Among other things, the RCC Act directed the FCC to adopt rules requiring Intermediate Providers to register with the Commission and abide by certain service quality standards, while also prohibiting Covered Providers from using Intermediate Providers that were not registered.

115.    As demonstrated by the Congressional records, the insertion of fake ring tones and the unscrupulous practices of Intermediate Providers was a clear impetus for the adoption of the RCC Act.  For example, the Committee Report on the bill authored by the Senate Committee on Commerce, Science, and Transportation states:

> The FCC has found that there is a frequent and pervasive inability to properly complete long-distance calls to rural areas. The problem, known as ''rural call completion,'' results in lengthy periods of dead air on the calling party's end after dialing a number, ***audible ringing tones on the calling party's end when the called party's telephone never rings at all***, false busy signals, inaccurate intercept messages, and the inability of one or both parties to hear the other when the call does go through. The Commission has received examples of life-threatening call failures, including a situation where an on-call surgeon was unable to receive a call from a hospital for emergency surgery and a 9-1-1 call center was unable to complete emergency call backs.  In rural and small-town America, call completion failures have created '''dire consequences' to consumers, economic development, and public safety across the Nation.''

> The FCC has determined that one of the main causes of the rural call completion problem is that intermediate providers, companies often hired by long distance providers to route and deliver calls to local telephone providers serving rural areas, are not completing the calls. Higher-than-average rates charged to transport and terminate long-distance calls to rural areas create an incentive for long-distance providers to hand off these calls to intermediate providers that offer to deliver them cheaply.  ***Those high rates, though, also create an incentive for those intermediate providers not to complete the calls properly, to avoid paying those higher-than-average transport and termination charges when it is not profitable to do so.***

> Practices used for routing calls to rural areas that lead to call termination and quality problems may violate the Communications Act of 1934.  The Commission has clarified the applicability of its rules and imposed additional reporting and data retention requirements for local telephone

> exchange carriers, interexchange carriers (i.e., long distance providers), commercial mobile radio service providers (i.e., cellular providers), and voice over Internet protocol providers, but call completion problems remain.

Report of the Committee on Commerce, Science and Transportation on the Improving Rural Call Quality and Reliability Act of 2017 (S.96) (Mar. 21, 2017) (emphasis added).

116.    The issues were addressed repeatedly during floor debate as well.  For example, Representative Young of Iowa, a co-drafter of the bill, stated:

> Mr. Speaker, I rise in support of H.R. 460, the bipartisan Improving Rural Call Quality and Reliability Act, legislation I introduced with my colleague from Vermont, Congressman Welch.
>
> This bill helps fix the significant problems rural Iowans and other rural Americans face from dropped and poor quality calls.  Reliable communication is critical for our constituents to live their lives, for our businesses to succeed, and for our communities to thrive.  Yet, in rural States and areas across America, phone calls are not getting through or the connection and quality are poor.
>
> Telephone companies often rely on intermediate providers, who are paid to route calls from larger networks to local service providers.  Much of the time, this is to mixed results.
>
> There simply is no excuse for these intermediate providers to not fulfill their contracts and leave our rural constituents with unreliable communication service.  Dropped, looped, or poor quality calls hurt rural America's quality of life, impacting our small businesses, farmers, consumers, and our families who are in need of emergency assistance and public services.  It also gives unfair blame to our essential local service providers when they are not the problem, they are the solution.
>
> A family in rural America should not be disadvantaged because of where they live.  Iowa businesses should have the same communication access to conduct daily businesses as those in urban areas.
>
> Improving rural call completion rates and quality are important to ensuring the survival of small towns and granting Americans the choice to live and thrive in whatever community is best for them and their family, rural, urban, or anywhere in between.

> Our bill will help address this problem by requiring providers to register with the FCC in order to meet quality standards and ensure reliable phone service in rural areas. It also prohibits providers from using intermediary routing services not registered with the FCC.

Congressional Record Vol. 163, No. 12 (Jan. 23, 2017).

117.     Representative Welch of Vermont, the second co-drafter, stated:

> We often focus on rural broadband accessibility and affordability so that the next generation of technological innovation does not skip rural America and leave it behind. The promise of innovation, like the Internet of things, should not be earmarked just for urban and suburban America, which is why it is backwards and unfortunate that we are still talking about finding ways to ensure that traditional landline telephone calls can be completed without interruption on a consistent basis, but that is exactly what this bill that I worked on with Representative Young is getting at.

> Our bill would require the FCC, the Federal Communications Commission, to establish rules that require third-party providers--or least cost routers, as they are called, which is the problem in the call chain--to register their companies, for the first time, with the FCC and, therefore, have to comply with FCC service quality regulations, just like other companies.

> This legislation would make it easier for the FCC to hold accountable third-party providers. The FCC will finally know who they are and make them comply with those quality standards.

> This is really important in rural areas because we have got companies that do business with urban America. In Vermont, Dakin Farm had rural call completion problems during their busiest times in 2012. That was the Thanksgiving to Christmas holiday period.

> It really hurt their bottom line. It put them at a competitive disadvantage. When people call in and the call is dropped, they think it is bad service from Dakin Farm or the company that they are calling, when it is not. Those folks have to then deal with the reputational harm that is caused.

> It is important in rural school districts like Camels Hump in Vermont that rely on these calls when there is a snowstorm or ice storm--and there is one coming tonight--to check whether, in fact, they have got to get their kids to school or not. So it is a big deal when they need it.

*Id.*

118.     Representative Lance of New Jersey also explained the harm caused by unscrupulous Intermediate Providers and the need to hold them accountable:

> Consumers expect to be able to pick up the telephone and be connected with businesses, friends, and loved ones across the country. In today's connected world, that should not be a tall request. Unfortunately, for many constituents across the country, particularly in rural areas, call quality and reliability are just not up to par compared to their urban counterparts.
>
> This is due, partly, because of the call routing process where long distance and wireless providers use so-called least cost routers. These inexpensive third-party intermediate providers try to complete calls for the lowest possible price, without taking measures to ensure the call actually goes through.
>
> I am sure that most of us have experienced the annoyance of at least one failed or dropped call. You make a call to someone and it rings over and over again but no one, not even the voicemail, picks up. Or, maybe you place a call, only to hear a prerecorded message telling you that the number you dialed is not in service, even though you know you have the right number. Even in cases where you are able to connect, the sound might be distorted or delayed.
>
> For many constituents, this is more than just an annoyance. These missed connections have significant consequences.
>
> Folks rely on the networks for more than just staying in touch with loved ones. Our constituents count on reliable networks to run their businesses and receive messages from our community institutions. A failed call can mean a lost sale for a small rural business. Another failed call might mean that a message from your child's school or your medical provider goes undelivered. These are real and harmful impacts. This bill will address this situation through commonsense improvements.
>
> For the most part, consumers are unaware of these intermediate providers, which has allowed them to be held unaccountable. H.R. 460 takes measured steps to bring these intermediate providers out from the shadows and into the light so that we can hold them accountable to the consuming public.

*Id.*

119.     Representative Michael Doyle of Pennsylvania stated:

> We know that problems with call completion are often related to intermediate providers--the middlemen hired to route calls. This bill

41

> requires intermediate providers to register with the FCC and comply with service quality standards. These commonsense steps should make it easier to figure out when providers are cutting corners or not doing their jobs.

Congressional Record Vol. 164, No. 25 (Feb. 8, 2018).

120. Representative Kristi Noem of South Dakota articulated well how Intermediate Providers interrupt calls specifically for the purpose of saving money and the frustration of people living in rural parts of our country:

> Mr. Speaker, I rise today to support the Improving Rural Call Quality and Reliability Act.
>
> Most Americans can rely on their phone service to keep in touch with loved ones. They can respond to urgent work when away from their place of business and respond to emergencies. But many of my constituents in South Dakota continue to have these critical calls dropped with absolutely no warning.
>
> More specifically, companies in the business of routing voice calls sometimes purposely drop long-distance calls headed for remote areas as a way to save money.
>
> While this is inexcusable just for the sheer inconvenience, some of these calls involve emergencies, leaving families in unnecessarily dangerous situations.
>
> The provisions within this bill are simple. We simply direct the FCC to establish basic quality standards for providers that transmit voice calls. This will help ensure businesses, families, and emergency responders can count on phone calls being completed.
>
> Mr. Speaker, I love living in a small town in America. It is where I grew up, and it is where I have chosen to raise my family.
>
> Dependable phone service shouldn't be a question for those who make the choice to live in wide-open spaces, especially when we are making new, amazing technological advances on a daily basis.
>
> Mr. Speaker, I urge my colleagues to pass this legislation and ensure that those in South Dakota and rural areas across the country can rely on their phone calls going through.

*Id.*

121.     Since adoption of the RCC Act, the FCC has adopted rules implementing it.  *See In the Matter of Rural Call Completion*, Third Report and Order and Order, 33 F.C.C. Rcd. 8400 (2018).   Among other things, those rules require the registration of Intermediate Providers and require Covered Providers to know specifically which Intermediate Providers are delivering their traffic to its intended destination.

### H.     T-Mobile Was Incentivized To Reduce Intercarrier Compensation Payments At The Expense Of Rural Carriers And Consumers Nationwide

122.     The conclusion reached by the FCC in the *2013 Rural Call Completion Order* that some carriers are willing to engage in "blocking or degrading traffic" to rural America "in an effort to minimize their intercarrier compensation payments" comes as little surprise.  Ex. 9, *2013 Rural Call Completion Order* at 16163, ¶ 17.

123.     Defendant T-Mobile, like many of its competitors, adopted an "unlimited" long-distance plan model.  *See, e.g.,* T-Mobile Cell Phone Plans, https://www.t-mobile.com/cell-phone-plans (last visited Oct. 1, 2019).  It advertises those plans as "A whole lot more than just talk-at no extra cost."  *See, e.g.,* T-Mobile Home Page, https://www.t-mobile.com/ (last visited Aug. 23, 2019).

124.     While T-Mobile's service is widely available, T-Mobile has focused significant attention on marketing its services to lower-income and elderly people.  *See, e.g*., Chairman Frank Pallone, Jr., *Memorandum to Committee on Energy & Commerce, to Subcommittee on Communications and Technology Members and Staff,* (Feb. 8, 2019) at 3, https://energycommerce.house.gov/sites/democrats.energycommerce.house.gov/files/documents/ CAT%20Briefing%20Memo%20for%20Hearing%20on%20Merger%20of%20T-Mobile%20and%20Sprint_2019.02.13_UPDATE_0.pdf (last visited Oct. 15, 2019); T-Mobile Senior Discount Unlimited Plans, https://www.t-mobile.com/cell-phone-plans/unlimited-55-senior-

discount-plans (last visited Oct. 1, 2019) ("T-Mobile and Sprint are competitors in the prepaid market, mostly populated by low-income consumers and those with poor credit, and each company has a significant share of the market."); Douglas A. McIntrye, *T-Mobile Offers Plan for Old People*, YAHOO! FINANCE (Aug. 8, 2017), https://finance.yahoo.com/news/t-mobile-offers-plan-old-102048853.html (last visited Oct. 1, 2019).

125.     For example, T-Mobile purchased MetroPCS, a brand that focuses heavily on the prepaid market segment in 2013. *See, e.g.,* City of New York, *City Sues T-Mobile for Violating Consumer Protection Law* (Sept. 5, 2019), https://www1.nyc.gov/office-of-the-mayor/news/415-19/city-sues-t-mobile-violating-consumer-protection-law (last visited Sep. 9, 2019). T-Mobile also receives federal funds under the Lifeline program to subsidize service to low income individuals. *See, e.g*., Joan Engebretson, *T-Mobile, Cleartalk Get Go-Ahead on Low-Income Services*, TELECOMPETITOR (Aug. 20, 2012), https://www.telecompetitor.com/t-mobile-cleartalk-get-go-ahead-on-low-income-services/ (last visited Oct. 1, 2019).

126.     Unlimited calling plans are clearly attractive to consumers, but these fixed cost plans fail to reflect the realities of T-Mobile's cost structure. That is, while T-Mobile receives a fixed fee from its consumers, access charges reflect a variable cost that is paid to terminate the calls.

127.     As a result, one of the most effective means for T-Mobile to increase profit margins is to decrease the variable costs it pays by blocking or degrading its customers' high cost calls.

128.     This strategy is particularly effective for calls to rural areas where consumers are likely to assume that any problems with call quality or call completion are the fault of the much smaller and generally locally owned rural telephone company, rather than a corporate behemoth like T-Mobile.

129.     The practice of blocking and degrading calls to rural areas is particularly pernicious because of the ripple effects that are experienced by others in the industry.  First, when a consumer regularly experiences difficulty in reaching family, friends, or businesses in rural areas, over time they become trained to not make those calls using that service.  So, for example, when a T-Mobile consumer cannot reach their elderly parents in rural Indiana on her T-Mobile phone, she may be conditioned to start making those calls using a landline or other alternative service provider.  This saves T-Mobile the expense of the access charges associated with the calls, even though T-Mobile continues to collect its full monthly subscription fee from its customers.

130.     Second, it often causes consumers to place blame for the failure on the rural telephone company, rather than the carrier that originated the call.  Here again, when T-Mobile does not deliver its calls to rural areas, most consumers assume that the problem lies with the rural carrier, not with the nationally-known and well-funded carrier.

131.     Third, and finally, by failing to abide by the same rules that other mobile carriers are required to follow, T-Mobile is able to unfairly compete by offering lower fees for its monthly subscriptions.  Thus, by illegally reducing its costs, T-Mobile covertly manipulated a unique competitive advantage, allowing itself to compete unfairly in the marketplace.  And, while T-Mobile has repeatedly touted its "unlimited" long distance plan and assured consumers that it has a comparable, if not superior, product offering to its competitors, the reality is that T-Mobile has offered consumers an inferior product and acted unlawfully to cheat its way to a competitive advantage.

I. **T-Mobile Admits To Engaging In An Illegal Fake Ring Tone Scheme That Impacted Hundreds Of Millions Of Calls Annually And Pays A $40,000,000 Fine To The U.S. Treasury**

132. On April 16, 2018, the FCC's Enforcement Bureau ("EB") announced that it had entered into the *Consent Decree* with T-Mobile in which T-Mobile admitted to violating the Commission's rural call completion rules by insert false ring tones into hundreds of millions of calls annually and for failing to supervise its Intermediate Providers delivering calls to rural areas. *See* Ex. 1, *Consent Decree.*

133. T-Mobile voluntarily agreed to pay a $40 million civil penalty to the United States Treasury. *See id.* ¶ 24.

134. Beginning in June and continuing through the summer of 2016, the FCC received complaints from three rural incumbent LECs in Wisconsin. *Id.* ¶ 7. These complaints, which were filed in the Commission's rural call completion e-mail box, alleged over 40 incidents in which T-Mobile customers were unable to complete calls to consumers served by these three rural providers. *Id.* Many of the complaints reported that the calling party heard ring tones on call attempts that failed to reach the rural customers. *Id.*

135. "The [EB] served these complaints on T-Mobile and requested that [T-Mobile] contact the complainants, investigate and resolve the problems, and submit reports of its investigations to the [EB]." *Id.*

136. "In two instances, the [EB] pointed out to T-Mobile that the Commission's rules prohibit sending ring tones to the calling party before the called party is alerted to an incoming call." *Id.*

137. "T-Mobile subsequently filed with the Bureau reports of its investigations of the complaints. In each instance, T-Mobile reported that it had handed the call off to an Intermediate

Provider for delivery, and that any reported problems had been 'resolved.' T-Mobile stated that it believed that the actions taken by Intermediate Providers in response to each complaint had remedied all problems." *Id.* ¶ 8.

138.    In its original responses to the EB, T-Mobile did not specifically address the ring tone issue raised in some of the complaints. *See id.*

139.    In addition to the rural carrier complaints filed in the Commission's rural call completion e-mail box, in August 2016, three T-Mobile customers filed informal complaints against [T-Mobile] with the Commission's Consumer and Governmental Affairs Bureau ("CGB"). *Id.* ¶ 9. CGB served these informal complaints on T-Mobile pursuant to Section 208 of the Act and Section 1.717 of the Commission's Rules. *See id.* All three complaints described ongoing problems reaching landline phones in a particular exchange. *See id.* Records subsequently obtained by the EB from T-Mobile show that these consumers called T-Mobile at least 13 times between June 5 and August 18. *See id.*

140.    On December 27, 2016, the Bureau issued a Letter of Inquiry ("LOI") to T-Mobile. *Id.* ¶ 10. The purpose of the LOI was to investigate whether T-Mobile violated the Commission's Rules governing rural call completion, including whether [T-Mobile] may have provided degraded telephone service on calls placed to rural areas and conveyed false ring tones to its customers. *See id.*

141.    "The Bureau issued a Supplemental LOI on April 3, 2017, to clarify responses provided by [T-Mobile]." *Id.*

142.    "With respect to the fake ring tones, T-Mobile reported that in 2007 it began using servers that included a 'Local Ring Back Tone' ("LRBT") for calls from certain customers that took more than a certain amount of time to complete." *Id.* ¶ 11.

47

143. "[T-Mobile] further reported that in 2013, as it migrated to different servers, it began using the LRBT only for out-of-network calls from its customers that were routed via Session Initiation Protocol ("SIP") trunks and that took more than a certain amount of time to complete." *Id.* The use of SIP trunks is synonymous with traffic being routed using IP protocol.

144. T-Mobile admitted that it continued its practice of using fake ring tones on such calls after the FCC's rules expressly prohibiting the practice went into effect in January 2014. *See id.*

145. T-Mobile admitted that it expanded the use of fake ring tones to calls on additional SIP routes sometime after the practice became unequivocally illegal in January 2014. *See id.*

146. T-Mobile admitted that it used fake ring tones on a nationwide basis. *Id.*

147. "Because T-Mobile applied this practice to out-of-network calls from its customers on SIP routes that took more than a certain amount of time on a nationwide basis and without regard to time of day, T-Mobile admitted that the LRBT was likely injected into hundreds of millions of calls each year." *Id.*

148. It was not until the release of the FCC's *Consent Decree* that any of the Plaintiffs learned that T-Mobile was responsible (directly or indirectly) for inserting fake ring tones on calls originated by T-Mobile subscribers.

149. In response to an LOI inquiry requesting details of any complaints received in 2016 regarding problems with T-Mobile customer calls completing to rural areas that the Company had received from sources independent of the Commission, T-Mobile submitted a list of complaints that had been made directly to it by its customers and rural carriers related to problems with calls placed on behalf of its customers completing to rural areas, some which involved concerns

addressed by the Rural Call Completion Rules. *Id.* ¶ 12. T-Mobile later supplemented this list. *Id.*

150. The list of complaints T-Mobile provided to the EB revealed, among other things, that during the time period from June 9 to October 5, 2016, T-Mobile had received 71 complaints about problems with calls completing to just one of the three Wisconsin LECs that had filed complaints with the Commission. *See id.* at n. 27.

151. The EB sorted these complaints by the individual rural ILEC's OCNs that are published in the annual NECA list. In evaluating the complaint data, the EB found patterns of complaints alleging the failure of T-Mobile to complete calls to numbers within at least seven rural OCNs, in addition to the three Wisconsin OCNs that had been the subject of the complaints filed with the Commission by rural carriers and consumers during the summer of 2016. *Id.*

152. The seven rural OCNs identified by the EB have not been identified publicly.

153. T-Mobile admitted that it violated the prohibition against the insertion of fake ring tones codified at 47 C.F.R. § 64.2201. *Id.* ¶ 17.

154. T-Mobile also admitted that it "did not correct problems with its Intermediate Providers' delivery of calls to consumers in certain rural OCNs," which the 2012 Rural Call Completion Declaratory Ruling declared an unjust and unreasonable practice. *Id.*

**J. Inserting Fake Ring Tones On Hundreds Of Millions Of T-Mobile's Customers' Calls Per Year Required Sophisticated Technological Support And A Centralized Policy Server**

155. Upon information and belief, and as described in more detail below, the failure to deliver calls to rural areas and the effort to mask these failures by the expanded use of fake ring tones was a scheme developed and implemented with knowledge and participation of Defendants

T-Mobile, Inteliquent and other Doe Defendants in order to mask the excessive use of LCR with the ultimate goal of reducing costs and improving profit margins.

156.    The facts set forth in the *Consent Decree* regarding the insertion of fake ring tones can be correlated to publicly available regarding T-Mobile's relationship with Inteliquent.

157.    First, according to the *Consent Decree*, T-Mobile reported that it began inserting ring tones "for calls from certain customers that took more than a certain amount of time to complete" in 2007. *Id.* ¶ 11. According to a revised Form S-1 filed by Inteliquent's predecessor Neutral Tandem, Inc. ("Neutral Tandem") with the Securities and Exchange Commission on March 27, 2008, in preparation for becoming a publicly-traded company, T-Mobile was one of 78 major competitive carriers and non-carriers connected to Neutral Tandem's network as of December 31, 2007. T-Mobile represented 14% of Neutral Tandem's total revenue for 2007. Neutral Tandem's Amended Form S-1 at 15 (Mar. 27, 2008) (attached hereto as Exhibit 10).

158.    Based on total reported traffic volumes, Plaintiffs estimate that Neutral Tandem carried approximately 6.88 billion minutes of traffic for T-Mobile in 2007.

159.    According to the Master Services Agreement between T-Mobile and Neutral Tandem ("NT MSA"), which was also filed with the SEC by Neutral Tandem, Neutral Tandem agreed to "provide transit and access services to [T-Mobile] under this Agreement." NT MSA, "Services" (attached hereto as Exhibit 11.)

160.    Transit Service is defined, in pertinent part, as "a local or intraLATA call." NT MSA, Service Order Exhibit 1 – Chicago Market. LATA is an acronym for Local access and transport area, a term used in U.S. telecommunications regulation that previously reflected an area in which a divested Regional Bell Operating Company offered local phone service. Typically, calls that originate and terminate in the same LATA (intraLATA) are included in a customer's

local calling area.  Thus, Transit Service relate to the delivery of what is commonly understood as a "local" call.

161.    Access Service is defined in pertinent part as "any interLATA call."  NT MSA, Service Order Exhibit 1 – Chicago Market.  Calls that originate and terminate in different LATAs (interLATA) have historically been treated as long-distance calls for which consumers paid separate long-distance fees.  Thus, Access Service relates to the delivery of what is commonly understood as "long-distance traffic."

162.    The NT MSA states that "[T-Mobile] agrees that it will . . . (f) **accept** terminating traffic properly bound for [T-Mobile] (*e.g.* LNP dip accomplished) from [Neutral Tandem] within 30 days of notice from [Neutral Tandem] that the connection with [Neutral Tandem] is operational; . . . [and] (h) **send to** [Neutral Tandem] only Authorized Transit and Access Services ("Services"), as defined in [Neutral Tandem Tariffs] and shall not terminate non-Authorized traffic to [Neutral Tandem], including but not limited to: 911, 411, 976, 311, 611, 500, 950, 700, Directory Assistance, 0+ local. . . ."  NT MSA, <u>Customer Obligations</u>.  Thus, the NT MSA contemplates that: (1) Neutral Tandem will deliver calls to T-Mobile that were originated by other carriers and intended for T-Mobile's customers; and (2) that Neutral Tandem will pick up calls from T-Mobile that are originated by T-Mobile's subscribers and intended for another carrier.  Pursuant to clause (h) of this paragraph, the calls that Neutral Tandem would pick up from T-Mobile were either "Transit" or "Access Services" traffic.  Thus, Neutral Tandem contracted to pick up from T-Mobile both local *and* long-distance calls for delivery to other carriers.

163.    The Service Order Exhibits to the NT MSA, which are arranged based on various geographic markets, reveal that the only geographic market in which "Access Service" (*i.e.,* long-distance traffic) would be picked up by Neutral Tandem under the NT MSA was the Chicago,

Illinois market. In other geographic markets, only "transit services" (*i.e.*, local calls) were to be exchanged. Thus, the NT MSA established Chicago, Illinois as the sole place in which Neutral Tandem could pick up long-distance traffic originated by T-Mobile subscribers for delivery to carriers nationwide.

164.    Second, according to the *Consent Decree*, T-Mobile reported that, "in 2013, as it migrated to different servers, it began using the LRBT only for out-of-network calls from its customers that were routed via SIP trunks and that took more than a certain amount of time to complete." Ex. 1, *Consent Decree*, ¶ 11.

165.    By this point in time, Inteliquent's annual 10-K reported that it "provide[d] voice telecommunications services primarily on a wholesale basis . . . using an all-IP network." Inteliquent, Inc.'s Form 10-K ("2013 Form 10-K") at 3 (Dec. 31, 2013), https://www.sec.gov/Archives/edgar/data/1292653/000119312514093913/d667806d10k.htm (last visited Oct 10, 2019) (attached hereto as Exhibit 12). Inteliquent described how its "managed service offering includes technologically advanced IP switching platforms manufactured by Sonus Networks, Inc. linked together by an IP backbone." *Id.* at 5. Inteliquent also stated that it utilized "a patented proprietary software tool . . . to manage the complicated routing scenarios required to terminate traffic to hundreds of millions of telephone numbers and support our network. The software allows us to quickly identify new routing opportunities between carriers and to help optimize our customers' interconnection costs . . . ." *Id.* at 6.

166.    During this same time period, Inteliquent publicly advocated for use of fake ring tones as part of the FCC's RCC rulemaking process. Specifically, in a filing made by Inteliquent with the FCC on October 18, 2013, summarizing *ex parte* conversations Inteliquent had with FCC staff in September 2013, Inteliquent stated in relevant part as follows:

> With respect to rules addressing "false ringing," we noted that, when the called party is a wireless customer roaming on another provider's network, completing the call may take longer than calls terminating to wireline customers. While the wireless carrier is processing the call and locating the called party, presenting the caller with ringing provides comfort that the call has been dialed correctly and is being processed.

Ex. 7, Letter from Inteliquent to Marlene H. Dortch at 2.

167.    Upon information and belief, Inteliquent's FCC advocacy reflected both its technical ability to insert fake ring tones and its desire to use fake ring tones to mask extended call setup times.

168.    Third, according to the *Consent Decree*, T-Mobile reported that at some unspecified time after the FCC's rules expressly prohibiting fake ring tones became effective in January 2014, it *expanded* the use of fake ring tones on more routes. *Consent Decree*, ¶ 11.

169.    The FCC's November 6, 2019 FOIA production confirms that the expanded use of fake ring tones occurred in September 2015. However, these materials fail to provide any additional details regarding the expanded use of fake ringtones on "all remaining SIP routes". The only substantive declaration from any T-Mobile employee included in the FOIA production, that of Kathleen Foster, T-Mobile's Director of Network Technology, omits entirely any discussion of the expanded use of fake ringtones in September 2015.

170.    In the second half of 2015, T-Mobile was engaged in a major network transition in which its out-of-network traffic would be routed through Inteliquent, whose network relies almost exclusively on SIP trunking. On June 23, 2015, Defendants T-Mobile and Inteliquent entered into a new contract whereby Inteliquent would become the nearly-exclusive router of T-Mobile's out-of-network traffic. On August 17, 2015, lnteliquent publicly announced the new three-year Telecom Master Services Agreement and a related services agreement ("PSTN Agreement," or, collectively with the Master Services Agreement, the "2015 MSA") with T-Mobile, under which

Inteliquent would provide a range of services to carry local, long distance and toll-free voice traffic between T-Mobile's network and the PSTN (attached hereto as Exhibit 13).

171.    The 2015 MSA provided that T-Mobile would generally use Inteliquent as its sole provider of voice interconnection services for all calls exchanged between T-Mobile and nearly all other voice providers in the United States, with limited exception.  Accordingly, Inteliquent expected the 2015 MSA to result in a significant increase in the volume of traffic that it carried on its network for T-Mobile.

172.    According to a sworn declaration provided by T-Mobile's Senior Manager for Revenue Assurance, Adrian Lazar Adler, "[s]tarting in 2015 and through present . . . [a]lmost all domestic calls that leave the T-Mobile network destined to other carriers are routed through Inteliquent.  Inteliquent is responsible for completing the calls, and Inteliquent bills T-Mobile for the services it provides under a contract between the two companies."  *Inteliquent, Inc. v. Free Conferencing Corporation, et al.*, Declaration of Adrian Lazar Adler, No. 1:16-cv-06976, ¶ 10 (Feb. 18, 2019 N.D. Ill.) (ECF. No. 503-2) ("Adler Declaration") (attached hereto as Exhibit 14).

173.    Fourth, according to the *Consent Decree*, the fake ring tones were still in effect on a nationwide basis in June and continuing through the summer of 2016 when the FCC received numerous complaints and began its investigation of T-Mobile's practices.  *Consent Decree* ¶¶ 7-9.

174.    Therefore, fake ring tones were in effect on SIP routes on a nationwide basis after Inteliquent told the SEC that "T-Mobile will generally use Inteliquent as its sole provider of voice interconnection services for all calls exchanged between T-Mobile and nearly all other voice providers in the United States (excluding certain traffic, including among other things, that is exchanged with other providers over peering arrangements, etc.)."  Inteliquent, Inc.'s Form 8-K at

Item 1.01 (Aug. 13, 2015), https://www.sec.gov/Archives/edgar/data/1292653/000119312515293613/d54428d8k.htm (last visited Oct. 10, 2019) (attached hereto as Exhibit 15).

175.     In 2015, T-Mobile accounted for 14% of Inteliquent's revenues.  However, the total traffic volumes that Inteliquent carried in 2015 far exceeded the volumes that Neutral Tandem had carried in 2007.  Plaintiffs estimate that Inteliquent may have carried as much as 21.8 billion minutes of traffic for T-Mobile in 2015.

176.     Thus, the expanded use of the fake ring tones on T-Mobile traffic coincided with T-Mobile's decision to use Inteliquent to deliver "[a]lmost all domestic calls that leave the T-Mobile network destined to other carriers. . . ."  Ex. 14, Adler Declaration, ¶ 10.

177.     Also potentially relevant is the statement in Inteliquent's 10-K that it had deployed "advanced IP switching platforms manufactured by Sonus Networks, Inc."  2013 Form 10-K at 5 (Exh. 12).  Sonus Networks, Inc. ("Sonus"), now known as Ribbon Communications ("Ribbon"), has developed perhaps the world's most sophisticated IP switching equipment.  The equipment developed by Sonus/Ribbon is capable of inserting "Local Ring Back Tones" or LRBTs on calls that have not reached their intended destination.  Indeed, Sonus/Ribbon uses the exact same terminology T-Mobile used when describing its illegal fake ring tone scheme, as reflected in the FCC's *Consent Decree*.

178.     One of the products Ribbon offers is a "PSX Policy Server."  According to a news release available on Ribbon Communication's website, Neutral Tandem (now Inteliquent) installed a "full suite of Sonus' IMS (IP Multimedia Subsystem)-ready solutions, including the GSX9000™, the PSX™ Policy Server, and the Sonus Insight™ Management System."[4]

---

[4]     Ribbon Press Releases, *Neutral Tandem to Complete IP Voice Network Transformation with Sonus Networks Next Generation IP Voice Network Now Serves 100 Markets in the United States* (Feb. 24, 2009), https://ribboncommunications.com/company/media-center/press-releases/neutral-tandem-complete-ip-voice-network-transformation-sonus-networks (last visited Oct. 10, 2019).

179.    A PSX Policy Server "provides a single, central point of provisioning for all routing and policy in either a service provider or enterprise network, greatly simplifying network management while offering unmatched scalability," according to Ribbon Communications materials. *The Ribbon Communications Centralized Policy Server* (2017), https://www.videnda.ie/download/Ribbon-PSX_DL1.pdf (last visited Oct. 10, 2019).

180.    A PSX Policy Server could be utilized to direct the injection of fake ring tones on hundreds of millions of calls annually on a nationwide basis from a single, centralized location. The insertion of fake ring tones would be activated merely by toggling a switch on the Tone and Announcement Profile section of the Ribbon user interface:



181.    Upon information and belief, insertion of fake ring tones into this volume of calls on a nationwide basis could be performed by Inteliquent from its primary data center near Chicago, Illinois.  First, a centralized or "master" PSX Policy Server would be programmed by a human to effectuate the fake ring tone scheme.  The master PSX Policy Server, in turn, would push those instructions out to "slave" policy servers, which would be located at geographic points throughout the network.  The slave policy servers would then operate in connection with Session Border Controllers ("SBCs"), which are roughly equivalent to the IP version of TDM switches, to insert the fake ring tones when call setup is being delayed or the call has failed.

182.    Upon information and belief, Inteliquent operates a network capable of inserting fake ring tones on hundreds of millions of calls annually.

183.    Upon information and belief, whether or not Inteliquent directly inserted the fake ring tones or not, it was Inteliquent's routing practices that T-Mobile sought to mask through its use of illegal fake ring tones.  T-Mobile's admission that it "did not correct problems with its Intermediate Providers' delivery of calls to consumers in certain rural OCNs" is an admission that Inteliquent engaged in, or participated in, routing practices that impeded the delivery of calls to rural America.

184.    Even if additional Doe Defendant intermediate providers to which Inteliquent handed off T-Mobile calls engaged in tactics that caused T-Mobile to also insert fake ring tones and/or not complete, as the primary Intermediate Provider carrying "almost all" of T-Mobile's long distance traffic, Inteliquent knew or should have known that grossly disproportional numbers of calls placed by T-Mobile customers to high cost rural areas were not being completed, as compared to lower cost traffic in urban or more heavily populated areas, to the economic benefit of both T-Mobile and Inteliquent.

**K.    T-Mobile Used Its Association With Inteliquent For Legitimate Business Purposes And For The Illicit Purpose Of Carrying Out The Fake Ring Tone Scheme**

185.    As described in the section below, T-Mobile's association with Inteliquent has been used for both legitimate and illegitimate purposes, namely to carry out the fake ring tone scheme.

**i.    *Inteliquent Provides Legitimate Intermediary Carrier Services To T-Mobile***

186.    Inteliquent provides reporting and measurement services to T-Mobile, in addition to its Intermediate Provider carrier services.  According to the Adler Declaration:

> Starting in 2015 and through the present, Inteliquent has served as an independent vendor to T-Mobile.  Almost all domestic calls that leave the T-Mobile network destined to other carriers are routed through Inteliquent. Inteliquent is responsible for completing the calls, and Inteliquent bills T-Mobile for the services it provides under a contract between the two companies.  In addition, calls routed through the public switched network towards T-Mobile numbers are routed through the Inteliquent network and then delivered to T-Mobile.

Ex. 14, Adler Decl. ¶ 10.

187.    "Inteliquent is T-Mobile's key network vendor for domestic voice traffic."  *Id.* ¶ 11.

188.    On the face of this relationship, the association is for the legitimate purpose of facilitating T-Mobile's completion of long-distance traffic and Inteliquent acting as an ordinary Intermediate Provider.

189.    As part of this relationship, Inteliquent provides T-Mobile with call detail records ("CDR").  "There is a T-Mobile database that receives a download of Inteliquent CDRs for all domestic long distance calls."  *Id.* ¶ 14.  Upon information and belief, Inteliquent transmits these CDRs to T-Mobile electronically via a wire.

190.    Upon information and belief, Inteliquent's copies of the T-Mobile CDRs is maintained in its primary data center located in or near Elgin, Illinois.

58

191.    The senior manager on T-Mobile's revenue assurance group interacts regularly with counterparts at Inteliquent and often relies on information and analyses that Inteliquent provides. *See id.* ¶ 16.

192.    T-Mobile has asserted that its costs for calls are "dependent on the rates billed by Inteliquent." *Id.* "High cost traffic has a negative margin" for T-Mobile. *Id.* ¶18. "One of the costs is the rate that T-Mobile paid to Inteliquent to deliver outbound domestic long-distance calls." *Id.* T-Mobile has also asserted that "[u]nder [T-Mobile's] agreement with Inteliquent, the rates [T-Mobile] paid differed depending on the percentage of calls" T-Mobile subscribers placed to certain high cost rural OCNs. *Id.*

193.    Upon information and belief, however, T-Mobile's 2015 MSA with Inteliquent has not always allowed Inteliquent to recoup its costs for termination of calls to certain high cost rural OCNs. As a result, Inteliquent lost money, or stood to lose money, on its contract with T-Mobile when too much traffic terminated to high cost areas.

### ii.    *Inteliquent Provides Illegitimate Intermediary Carrier Services To T-Mobile*

194.    T-Mobile has a "Revenue Assurance Team [that] analyzes T-Mobile's revenues and margins, with the goal of helping the Company be more profitable." *Id.* ¶ 2. Areas of focus for this team include "negative margin" and "high-cost, domestic calls." *Id.* Negative margin calls can be any of the following: (1) "calls for which there are high per-minute costs to complete" the call; (2) calls that generate high volumes of minutes; or (3) a combination of both high per-minute costs and high volumes. *Id.*

195.    Because "high-cost calls have historically not produced incremental revenue and created a negative margin," T-Mobile has "focused on identifying ways to reduce [its] costs or increase [its] revenues with respect to this traffic." *Id.*

59

196.    After Inteliquent became "responsible for completing" "[a]lmost all domestic calls that leave the T-Mobile network" in 2015, *id.* at ¶ 10, T-Mobile and Inteliquent began to have "weekly calls," *id.* at ¶ 22.  Those calls focused on at least four distinct issues: (1) fraud; (2) a practice known as "traffic pumping;" (3) prevention of inbound scam and robocalls; and (4) "***high-cost traffic in various forms***."  *Id.* (emphasis added).

197.    The senior manager on T-Mobile's revenue assurance group "regularly communicated with [her] counterparts at Inteliquent about things that would impact the volumes of calls that T-Mobile routed to Inteliquent."  *Id.* ¶ 19.  "Inteliquent was focused on the quantity of calls because it impacted its costs relating to network planning and management."  *Id.* ¶ 18.

198.    Upon information and belief, among the topics that T-Mobile employees discussed with Inteliquent was measures that either or both parties could take to reduce the volume of T-Mobile traffic terminating to areas with higher terminating access rates.

199.    Upon information and belief, these measures included the use of fake ring tones to reduce the volume of calls routed to areas with higher terminating access rates and/or mask call completion failures.

### iii.    *T-Mobile And Inteliquent Knew Fake Ring Tones Were Unlawful And That They Had The Duty To Deliver Calls To All LECs, Including Those In Rural Areas*

200.    Upon information and belief, T-Mobile and Inteliquent employees discussed the use of fake ring tones despite knowing that any form of the practice had been expressly declared unlawful by the FCC in January 2014.

201.    Both T-Mobile and Inteliquent were active participants in matters before the FCC and regularly utilize outside counsel and lobbyists to advocate for policy changes at the FCC.

Thus, both were well aware that fake ring tone schemes were unlawful and of the FCC's efforts to address rural call completion problems.

202.     As discussed above, Inteliquent directly argued in the FCC's RCC Rulemaking docket in favor of permitting the use of fake ring tones to provide "comfort" to callers.

203.     Moreover, the 2015 MSA specifically referenced the FCC's order which made it unlawful to use fake ring tones, imposing reporting and compliance obligations on Inteliquent:

> In addition to, and without limiting, any other obligation of [Inteliquent] under the GTCs or SA, Provider shall, as soon as reasonably possible, provide T-Mobile with a copy of any report or form filed, or prepared for filing, with the Federal Communications Commission ("FCC") to comply with the FCC's rural call completion rules, including, but not limited to, the requirements set forth *In the Matter of Rural Call Completion*, Report and Order and Further Notice of Proposed Rulemaking, WC Docket No. 13-30 (rel. Nov. 8, 2013), including, but not limited to, filing the mandated quarterly reports with the FCC that contain, at a minimum, the following information:
>
> i.      For each Rural OCN:
>
>   (1) The OCN and the state, and
>
>   (2) For attempted interstate calls: the total number of attempted calls, the number of attempted calls that were answered, the number of attempted calls that were not answered (reported separately for call attempts signed as busy, ring no answer, or unassigned number).
>   (3) For attempted intrastate calls: the total number of attempted calls, the number of attempted calls that were answered, the number of attempted calls that were not answered (reported separately for call attempts signed as busy, ring no answer, or unassigned number).
>
> ii.     For each non-Rural OCN, the aggregate information for attempted intrastate calls: the total number of attempted calls, the number of attempted calls that were answered, the number of attempted calls that were not answered (reported separately for call attempts signed as busy, ring no answer, or unassigned number).
>
> For purposes of this SA, the term "Rural OCN" means the Operating Carrier Number ("OCN") associated with an end office switch of a rural local exchange carrier ("RLEC") that is identified on the list published by the

National Exchange Carrier Association ("NECA"), as updated from time to time, excluding any OCNs mutually agreed to by the Parties.

\*        \*        \*

[Inteliquent] shall provide T-Mobile with a draft of any report or form that [Inteliquent] intends to file with the FCC or any other governmental authority as soon as possible but no later than five (5) business days before the intended filing date (unless the deadline is shorter than five (5) business days) if the filing of such draft report might reasonably be interpreted as evidence that T-Mobile may not be in full compliance with applicable Law; *provided, however*, that [Inteliquent] shall provide T-Mobile with written notice of intent to file a report pursuant to this Section if [Inteliquent] will not, for any reason, be able to provide T-Mobile with the draft of such report five (5) business days before the filing deadline.

Ex. 13, PSTN at 11-12.

204.     Accordingly, T-Mobile and Inteliquent were both aware of and shared joint responsibility for complying with the FCC's rural call completion orders.

### iv.     *Inteliquent Has Collaborated With T-Mobile On A Different Scheme To Deter Completion Of Certain Calls Placed By T-Mobile Customers*

205.     The fake ring tone scheme is not the only way Inteliquent has worked with T-Mobile on a strategy to reduce the volume of high cost calls placed by T-Mobile subscribers.

206.     Inteliquent is currently a party to litigation pending in this Court involving claims that Inteliquent and T-Mobile jointly developed and instituted a scheme to deter T-Mobile subscribers from completing calls to certain high volume, and/or high cost, phone numbers tied to rural OCNs.  *See Inteliquent, Inc. v. Free Conferencing Corp. et al*., Case No. 1:16-CV-06976 ("Inteliquent Litigation").

207.     The scheme at issue in the Inteliquent Litigation is called the "One-Cent Policy," which involved T-Mobile and Inteliquent interrupting calls placed by T-Mobile subscribers to intentionally selected telephone numbers and inserting a message advising the caller that they would be charged a penny a minute if they completed the call.

208.    The purpose of this message was to confuse the caller and coerce T-Mobile's subscribers to hang up high cost calls before they were connected.

209.    According to court documents, the parties in the Inteliquent Litigation estimate that tens of thousands of telephone numbers were subject to the One-Cent Policy. *See id*., Dkt. No. 491, at 11 n.10.

210.    The defendants in the Inteliquent Litigation served third party subpoenas on T-Mobile seeking, among other things, documents that would reflect Inteliquent's involvement and participation in the execution of the One-Cent Policy.

211.    The subpoenas to T-Mobile included requests for information T-Mobile submitted to the FCC in the *Consent Decree* investigation.  The parties issuing the subpoenas contend the call blocking to high cost rural OCNs at issue in the Inteliquent Litigation overlaps with the *Consent Decree*'s finding that T-Mobile failed to oversee its Intermediate Providers (*i.e.* Inteliquent).  Those parties contend the *Consent Decree* investigation documents are relevant to the One-Cent Policy because both practices have the same purpose: to confuse callers and coerce them to hang up.

212.    T-Mobile filed a Motion to Quash in the Inteliquent Litigation and has vigorously contested production of any of the materials it submitted to the FCC in the *Consent Decree* investigation.

213.    T-Mobile also moved for relief from producing any documents that might reveal its collaboration with Inteliquent on either the One-Cent Policy or fake ring tone scheme, claiming Inteliquent was not involved in the development and implementation of the One-Cent Policy and that all information submitted to the Commission is confidential.

214.     T-Mobile's Motion to Quash was supported by an affidavit of Mike Taylor, a T-Mobile upper management employee, who attested, in at least ten different ways, that Inteliquent had nothing to do with the One-Cent Policy, and he appears to have testified to the same at his deposition.  *See id.*, Dkt. No. 491 at 4 (summarizing statements); *see also id.*, Dkt. No. 491 at 6 (discussing a second Taylor affidavit contending T-Mobile acted independently from Inteliquent in the One-Cent Policy).

215.     T-Mobile's lawyers also argued to this Court that Inteliquent had nothing to do with the One-Cent Policy.  *See id.*, Dkt. No. 491 at 5.

216.     Just sixteen days before the close of discovery in the Inteliquent Litigation, an Inteliquent employee revealed the truth in her deposition – Inteliquent and T-Mobile witnesses who testified before her that there was no collaboration between Inteliquent and T-Mobile on the One-Cent Policy were lying.  *See generally id.*, Dkt. No. 485.  This witness exposed that Inteliquent and T-Mobile had over one hundred meetings discussing the One-Cent Policy and that there were meeting notes concerning this collaboration that had not been produced previously by Inteliquent or T-Mobile in discovery.

217.     This led to discovery of additional documents about these meetings and collaboration on the One-Cent Policy that T-Mobile and Inteliquent had been concealing.

218.     Inteliquent also attempted, unsuccessfully, to move for a protective order preventing discovery of its communications with Mobileum, a third party software vendor T-Mobile hired in connection with the One-Cent Policy.  Discovery from Mobileum further confirmed that T-Mobile and Inteliquent set up an FTP site or other file transfer mechanism for T-Mobile to access call data directly from Inteliquent to facilitate the One-Cent Policy.

64

219.     Though much of the information in the Inteliquent Litigation has been filed under seal or appears to be subject to protective orders or confidentiality agreements, publicly available evidence reflects that shortly after Inteliquent entered into the 2015 MSA with T-Mobile, it became apparent to Inteliquent that the MSA was not going to generate the financial performance Inteliquent expected and would quickly become unprofitable.  As a result, Inteliquent, at the behest of its Board, embarked on business strategies aggressively aimed at preventing completion of high cost traffic.

220.     Some information from the case has become public, including portions of an email from the CEO of Inteliquent in February 2016, Matthew Carter, which states:

> As it relates to peering, I understand we have no direct control over this outcome.  If TMO is going to potentially cost us $6-9MM in EBITDA, what are the alternative solutions we are looking at to make up for this lost (*sic*)? I think we should at least identify, from the mundane to crazy hair ball ideas, how to chip away at this variance.  This does not mean we will sign up as a commitment for low probability initiatives but I don't think we should accept as a given this outcome either.

Stephen Wald, *Letter to FCC Secretary Marlene Dortch*, NATIONAL EXCHANGE CARRIER ASSOCIATION (Aug. 7, 2018), https://prodnet.www.neca.org/publicationsdocs/ wwpdf/8718carrier.pdf (last visited Oct 10, 2019) (attached hereto as Exhibit 16).

221.     On March 23, 2016, CEO Carter wrote:

> [T]his is a quick update on our ongoing negotiations with TMO and other related EBITDA impacting activities.

> Last week the team met with TMO to discuss options to improve the current high costs destination codes and understanding their timeline on peering. The options that are under consideration are:

> - Implement a cost+ model whereas we charge above the costs to protect ourselves from unprofitable traffic.

> - Limit the number of high destination codes by 50% by TMO cutting off the first minute of this traffic.  The goal would be to eventually

eliminate as much as 80% by forcing those calls to listen to a recording asking for a credit card to continue the call.

*Id.*

222.    On March 29, 2016, Ian Neale, a Senior Vice President at Inteliquent, wrote:

[A]s I discussed with [Mike Taylor of T-Mobile] on Friday, we are currently developing a series of strategies/initiatives to more aggressively work with you all to contain the volume of traffic to high costs codes, we plan to have a document finalized that we can share with you both early next week. I am confident that we will bring much more focus to this issue going forward and I am sure that our collaborative efforts will yield a reduction in volume to these codes . . . .

*Id.*

223.    Inteliquent's participation in failing to deliver calls to their intended destination, and masking this failure through the use of fake ring tones is consistent with its Board's directive to reduce the volume of high cost traffic it completes for T-Mobile.

224.    T-Mobile's apparent collusion with Inteliquent to hide the evidence of their joint participation in the One-Cent Policy, and further efforts in this Court to block discovery of evidence of the *Consent Decree* investigation, is yet another indicator of Defendants' high degree of moral culpability, deliberate oppression and wonton disregard of the rights of others.

**L.    T-Mobile Has Been Blocking Plaintiffs' Access To Evidence Of Its Illegal Conduct In Pending FOIA Litigation**

225.    On February 25, 2019, Plaintiffs' counsel, as Requestor, acting on behalf of Plaintiffs and over seventy-five rural carriers, submitted a FOIA Request to the Commission requesting that the Commission disclose three categories of documents related to the *Consent Decree*: (1) all documents in the Commission's *Consent Decree* file; (2) all compliance reports submitted by T-Mobile to the Commission pursuant to the *Consent Decree*; and (3) all Form 480

Reports (Rural Call Completion Data Filing) and supporting information submitted by T-Mobile to the Commission.

226.    On March 22, 2019, the Commission notified T-Mobile of the FOIA Request because it previously requested confidential treatment of the *Consent Decree* investigation files pursuant to various FOIA exemptions.

227.    On April 1, 2019, T-Mobile filed its response to the FOIA Request with the Commission, asserting its grounds for requesting confidential treatment of all documents in the Commission's file.   T-Mobile initially only agreed that one post-*Consent Decree* compliance report was not exempt.

228.    T-Mobile's April 1 letter to the Commission reflects that, among the documents and information it submitted to the Commission, there was evidence concerning the amount of T-Mobile calls answered or completed from April 2016 through December 2016, names of T-Mobile's Intermediate Providers, the specific percentages of T-Mobile out-of-network traffic sent via trunks using SIP technology for periods between 2013 and 2016, and other data concerning calls attempted by T-Mobile customers sent via trunks using SIP technology taking more than four seconds for call setup.   T-Mobile's descriptions of the documents it submitted to the Commission reflect that evidence of T-Mobile's and Inteliquent's participation in the fake ring tone scheme should be found within the FCC's *Consent Decree* file.

229.    T-Mobile's April 1 letter to the Commission also asserted that documents that disclosed the identities of T-Mobile's Intermediate Providers warrant confidential treatment because T-Mobile supposedly treats the identity of its intermediaries as confidential.

230.    On April 11, 2019, Requestor served a response to T-Mobile's response to the FOIA Request, rebutting each of T-Mobile's purported justifications for its requests for

confidential treatment. Among its rebuttal points, Requestor pointed out to the Commission that the identity of T-Mobile's primary intermediary, Inteliquent, is not at all confidential but is publicly available information that was disclosed by Inteliquent via press releases as well as in an SEC filing.

231. The Commission took no further action on the FOIA Request, so on June 10, 2019, Plaintiffs' counsel filed a Complaint for Declaratory Relief Pursuant to FOIA Compelling the Production Of Documents Related To T-Mobile USA Inc.'s Unjust And Unreasonable Rural Call Completion Practices in the United States District Court for the District of Columbia. *See Womble Bond Dickinson (US) LLP v. FCC*, No. 1:19-cv-01690-RDM (D.D.C.) ("FOIA Litigation").

232. T-Mobile did not concede that the identity of its primary Intermediate Provider is not confidential information until months later, in a July 9, 2019 submission to the Commission. Nevertheless, T-Mobile continues to claim confidentiality over substantial portions of the evidence it submitted to the Commission related to the fake ring tone scheme.

233. By doing so, T-Mobile suppressed Plaintiffs' access to information about the precise OCNs affected by its illegal practices, the identities and roles of each participant in this scheme, how many calls were impacted, precisely how the fake ring tones were inserted, and the economic magnitude of its illegal practice.

234. On October 8, 2019, the Commission produced the following two categories of documents pursuant to an agreement between the Commission and Plaintiffs' counsel concerning resolution of the FOIA disputes: (1) T-Mobile's post-*Consent Decree* compliance reports; and (2) documents sufficient to identify T-Mobile's intermediate carriers. The latter category was produced in the form of a chart that T-Mobile produced to the Commission during the

investigation, which lists a series of 2017 customer complaints T-Mobile received reporting failures of calls placed to rural call recipients.

235. The only Intermediate Providers identified by T-Mobile's customer complaint chart during the time period relevant to the Commission's investigation were Inteliquent and Level 3 Communications LLC ("Level 3"), which was acquired in or about November 2017 by CenturyLink, Inc. ("CenturyLink"), which, upon information and belief is now Level 3's parent company. Inteliquent is mentioned in the majority of the customer complaint log entries as T-Mobile's "long-distance carrier partner" while Level 3 is only referenced in two of the call complaint log entries produced. In one instance, Level 3 was identified as "the LEC that was immediately before Loretto in the call chain" and in the other, T-Mobile refers to Level 3 as its "long-distance carrier partner." The complaint logs reflect a pattern of customer complaints being resolved by Inteliquent, and in only one case Level 3, "changing the route used to terminate the call to the rural carrier." These descriptions of Inteliquent's role in resolving rural call completion complaints show that Inteliquent had the capacity to change the routes used to terminate calls to rural carriers and was routinely the resource T-Mobile relied upon to resolve rural call completion failures that its customers were able to identify.

236. The role of Level 3 in the fake ring tone scheme, and whether it is one of the Intermediate Providers whose problems with delivery of calls to consumers in certain rural OCN's T-Mobile admitted it failed to correct, remains to be seen, but it appears that Level 3 may also be a co-conspirator, or one of the Doe Defendants, which Plaintiffs will investigate further in discovery and reserve the right to accordingly amend their pleadings.

237. The November 6, 2019 FOIA production reveals that on August 2, 2017, in response to a Supplemental Letter of Inquiry which, *inter alia*, asked about specific instances of

69

call completion problems, T-Mobile informed the FCC that calls were routed through "Inteliquent and West." Upon information and belief, the reference by T-Mobile to West refers to West Corporation, a telecommunications service provider based in Omaha, Nebraska. The specific role of West in the fake ring tone scheme, and whether it was responsible for rural call completion failures that T-Mobile failed to correct, is not explained in the FOIA production, but West may also be a co-conspirator, or one of the Doe Defendants, which Plaintiffs will investigate further in discovery and reserve the right to accordingly amend their pleadings.

238.     The November 6, 2019 FOIA Production also reveals that T-Mobile informed the Commission that fake ring tones were implemented by Ericsson on Ericsson Mobile Switching Centers at T-Mobile's direction. *See* Declaration of Kathleen Foster (Exhibit 19), ¶ 7. The Foster Declaration does not explain: (1) why Ericsson would agree to implement fake ringtones in October 2013, the same time that the FCC announced it was prepared to adopt an order, which would ultimately codify the prohibiton of using fake ringtones; (2) whether Ericsson was aware of T-Mobile's continued use of the fake ring tones after the FCC's *2013 Rural Call Completion Order* became effective; and (3) whether Ericsson had any role in the expanded use of fake ringtones in September 2015. Ericsson may also be a co-conspirator, or one of the Doe Defendants, which Plaintiffs will investigate further in discovery and reserve the right to accordingly amend their pleadings.

**M.     T-Mobile's Actions Show No Remorse**

239.     T-Mobile's CEO, John Legere often refers to its competitors, AT&T and Verizon, as dumb and dumber. He says that they are not "interested in their customers." *T-Mobile's Legere on Customer Growth, Strategy and Competition*, YOUTUBE (Feb. 8, 2018), https://www.youtube.com/watch?v=NSEph9pCX5Y (last visited Oct. 10, 2019). Legere makes

these types of statements while simultaneously downplaying or refusing to discuss T-Mobile's fraudulent conduct that harms its own customers.

240. For example, during testimony before the House Energy and Commerce Committee, the following exchange between Legere and Congressman Peter Welch of Vermont took place:

> REP. WELCH: Last February Congress passed and the president signed some bi-partisan legislation that I worked on with David Young – improving rural call quality. And it turned out that shortly after that bill became law T-Mobile and Sprint – the FCC announced that T-Mobile agreed to pay forty million dollars. Forty million dollars in a fine for violating FCC rules with a practice of faking ring tones. I mean, this is a big deal for us in Vermont. Dacon farms and the Christmas season depends on those calls. Camel's Hump School gets the word out that it's been cancelled because weather. And in the settlement T-Mobile acknowledged that it had injected false ring tones into hundreds of millions of calls. I mean that's really upsetting to us and I'm struggling to see how this past gives me confidence about the future so Mr. Legere can you explain how T-Mobile did fail to abide by the basic call quality standards and not connecting hundreds of millions of calls in rural America but very briefly because we don't have much time.

> LEGERE: Yeah, so you know the details associated with the settlement associated with that action are far more complex and I'm not sure we could go into the process here.

> REP. WELCH: Maybe offline we could do that.

> LEGERE: I'd be glad to.

> REP. WELCH: Because that's incredible. What is – your admitting to, T-Mobile admitted to is that actually had the system of false ring tones.

> LEGERE: ***There was no admission to a willingness participation of any kind***.

> REP. WELCH: Well that's, you and I both know that's sort of the deal but it happened.

House Committee on Energy & Commerce, Subcommittee on Communications and Technology,

*Hearing on "Protecting Consumers and Competition: An Examination of the T-Mobile and Sprint*

*Merger"* (Feb. 13, 2019), https://energycommerce.house.gov/committee-activity/hearings/hearing-on-protecting-consumers-and-competition-an-examination-of-the-t (last visited Oct. 10, 2019) (emphasis added).

241.    T-Mobile refers to itself as the "Un-carrier" to suggest that it is different and better than its competitors.  It pledges to operate as a "maverick."  Memorandum from Chairman Frank Pallone, Jr., Committee on Energy & Commerce, to Subcommittee on Communications and Technology Members and Staff at 3 (Feb. 8, 2019).

242.    In reality, however, T-Mobile has repeatedly engaged in unfair and deceptive practices.  For example, in addition to its fake ring tone scheme and rural call completion failures, T-Mobile previously agreed to pay a $90 million fine and restitutions to settle an investigation by the FCC into its wireless cramming practices, in which T-Mobile charged consumers for third party services that the customers had not authorized.  *See* FCC Documents, *T-Mobile to Pay $90M to Settle Wireless Cramming Investigation* (Dec. 19, 2014), https://www.fcc.gov/document/t-mobile-pay-90m-settle-wireless-cramming-investigation (last visited Oct. 10, 2019).  Recently, the City of New York announced that it had sued T-Mobile and its MetroPCS brand in New York for engaging in "multiple deceptive practices, including selling used phones as new, enrolling customers in expensive financing plans without their consent, deceiving consumers about its refund policy, overcharging customers and failing to provide customers with legal receipts City of New York, *City Sues T-Mobile for Violating Consumer Protection Law* (Sept. 5, 2019), https://www1.nyc.gov/office-of-the-mayor/news/415-19/city-sues-t-mobile-violating-consumer-protection-law (last visited Oct. 10, 2019).

243.    T-Mobile is "intent on kicking the asses of [its] competitors."  *John Legere, CEO of T-Mobile, The Brave Ones* at 14:50-57, YOUTUBE (Oct. 28, 2017),

https://www.youtube.com/watch?v=U nb5JJeIgJI (last visited Oct. 10, 2019). T-Mobile's CEO, John Legere, has accused other wireless carriers of "raping" their customers "for every penny" and "hat[ing]" people. *Id.* at 14:17-26. According to Legere, other "Carriers just want to screw [people]," while T-Mobile "just want[s] to take you to dinner and a movie." *E.g.*, *id.* at 20:48-54. Far from taking its customers to dinner and a movie, however, T-Mobile has taken its customers for a ride, taking their hard earned money while intentionally failing to deliver their calls to their intended destination and intentionally and fraudulently deceiving them through the use of fake ring tones.

244. Legere has cultivated an image as a rule-breaker. *See, e.g.*, Lucy Handley, *The Brave Ones, John Leger: T-Mobile's rule breaker*, CNBC (Nov. 27, 2017), https://www.cnbc.com/2017/11/24/t-mobile-ceo-john-legere-on-twitter-his-rivals-and-being-an-uncarrier.html (last visited Oct. 10, 2019). This mentality that it is ok to break the rules, even the law, permeates T-Mobile's culture. And, the company has utilized aggressive class action waivers and arbitration provisions in its service agreements to avoid being held responsible by its customers for this fraudulent conduct. *See, e.g.*, T-Mobile Terms and Conditions ("By accepting these T&Cs, you are agreeing to resolve any dispute with us through binding arbitration or small claims dispute procedures (unless you opt out), and to waive your rights to a jury trial and to participate in any class action suit."), https://www.t-mobile.com/responsibility/legal/terms-and-conditions (last visited Oct. 10, 2019).

245. Thus, despite the $40 million forfeiture paid to the U.S. Treasury as a result of the *Consent Decree*, and its admission of wrongdoing, T-Mobile has undertaken no effort to compensate affected customers. *See, e.g.*, Jon Brodkin, *T-Mobile deceived customers with "false ring tones" on failed phone calls*, ARS TECHNICA (Apr. 16, 2018, 6:30 PM),

https://arstechnica.com/information- technology/2018/04/t-mobile-deceived-customers-with-false-ring-tones-on-failed-phone-calls/ (last visited Oct. 10, 2019).  It did not even issue a press release to apologize to its customers for its unlawful conduct.

246.    Indeed, Commissioner Mignon Clyburn took issue with the *Consent Decree* for this very reason, stating, in relevant part:

> I wish that I could celebrate today's settlement as a victory for consumers and a moment in which the Commission championed consumer protection. Unfortunately, I cannot.  With today's item, the Chairman has missed an opportunity to protect consumers and betrayed his own self-professed values when it comes to process.
>
> Today's *Consent Decree* attempts to address massively deceptive and harmful violations of the Commission's rules likely impacting billions— yes, billions—of telephone calls to rural areas over the past several years. According to the *Consent Decree*, T-Mobile admits to inserting false ringtones into calls that failed to connect.  This may have affected 'hundreds of millions of calls each year' after the practice was expressly prohibited by the Commission in January 2014.[5]  This meant that consumers making calls to certain rural areas would hear ringing on their end even if the call was not actually connecting and the phone was not actually ringing at the called party's premises.  The deception made it difficult to pinpoint the problem and resolve it—consumers would think that their service was working and that the person at the other end just did not pick up.
>
> How many times was a loved one calling to check on the wellbeing of an elderly relative, only to have the phone ring and ring with no answer?  How many times did a consumer try calling his or her doctor for an urgent refill of an important prescription, only to think that nobody was picking up on the other end of the call?  Childcare providers, employers, local businesses, old friends—what critical information was missed?
>
> How did the Commission address this situation?  With a severely mismatched *Consent Decree*, negotiated by the Chairman's office.  The $40 million civil penalty, which will be paid to the U.S. Treasury, is dwarfed by larger, unpaid fines recently proposed against individual robocallers—and the volume of potential violations here outpaces any robocalling action the Commission has taken.  And the compliance plan does not contain any concessions that would explain such a massive discount.

---

[5]      *T-Mobile USA, Inc.*, Order and Consent Decree, DA 18-373 (Apr. 2018).

> Perhaps most importantly, there is absolutely nothing in this *Consent Decree* to compensate consumers. Prior *Consent Decree*s have included direct-to-consumer benefits, such as refunds or discounts, or notifications to customers who have been impacted.[6] Despite demonstrating a clear and tangible consumer harm, in this *Consent Decree*, consumers are treated as a mere afterthought.

(Attached hereto as Exhibit 17, Commissioner Clyburn Statement of False Ringtones *Consent Decree* (Apr. 16, 2018).)

247. On November 6, 2019, following T-Mobile's objections to the FCC's production of almost every document in the Commission's investigatory file, the Commission produced 501 additional pages of documents in response to the FOIA request. Several of the documents include redactions. According to the Commission, prior to disclosing the documents to requestors, T-Mobile was given an opportunity to request modifications to those redactions and the Commission acquiesced to T-Mobile's changes. The Commission has also withheld 376 pages of relevant materials in full. However, the Commission has failed to catalog those materials or provided justification for why specific documents are not subject to public production. The FOIA Litigation remains pending. Plaintiffs therefore also reserve the right to amend and supplement this Complaint as rulings are made in the FOIA Litigation and requested documents regarding the *Consent Decree* and the fake ring tone scheme are produced by the Commission.

248. The November 6, 2019 FOIA Production also reveals that T-Mobile repeatedly provided false, incomplete, or misleading information to the Commission during the course of its investigation. For example, two key documents produced by the FCC illustrate that T-Mobile tried to hide key information from the FCC and proffered implausible excuses for its egregious violation

---

[6]    *See, e.g., T-Mobile USA, Inc.*, Order and Consent Decree, 31 F.C.C .Rcd .11410 (EB 2016); *Birch Communications, Inc.*, Order and Consent Decree, 31 F.C.C. Rcd. 13510 (EB 2016); *AT&T Services, Inc.*, Order and Consent Decree, 31 F.C.C. Rcd. 8540 (EB 2016); *AT&T Mobility LLC*, Order and Consent Decree, 29 F.C.C. Rcd. 11803 (EB 2014).

of the FCC's ban on the use of fake ring tones. The first document is T-Mobile's July 12, 2017 response to the Enforcement Bureau's April 3, 2017 Supplemental Letter of Inqury ("LOI"), attached hereto as Exhibit 20 ("July LOI Response"). In the July LOI Response, T-Mobile revised the response it previously provided to the Commission about its use of fake ring tones.

249. T-Mobile's July LOI Response explained T-Mobile's intentional activation and use of the fake ring tones as follows:

> In 2007, T-Mobile began using Alcatel Lucent call servers that included as a default a five-second Local Ring Back Tone ("LRBT"). That LRBT covered **all** traffic originating on T-Mobile networks. In late 2008, T-Mobile began using Ericsson call servers in Puerto Rico and North and South Carolina, and in early 2009 it began using Ericsson call servers in New York and California. In July 2013, T-Mobile began migrating its remaining markets to Ericsson call servers, a migration that T-Mobile completed in July 2014. The Ericsson call servers did not initially include LBRT (*sic*). However, **at T-Mobile's request, Ericsson modified the call servers by adding a four-second LRBT feature. The rollout of the four-second LRBT on Ericsson equipment began in October 2013 and was likely completed by the end of 2013.** The four-second LRBT on Ericsson equipment **applied to all** out-of-network traffic originating on T-Mobile networks (i.e., calls from T-Mobile customers to non-T-Mobile customers) that was routed via Session Initiation Protocol (SIP) trunks. By the end of July 2015, MetroPCS traffic had fully migrated to the T-Mobile networks and was thus subject to the four-second LRBT on out-of-network traffic routed via SIP trunks. **In September 2015**, after T-Mobile determined that the four-second LRBT was not in service on all SIP routes, T-Mobile **implemented it on all remaining** SIP routes.

*Id.* (emphasis added).

250. The second is a declaration from Kathleen Foster dated September 8, 2017 and attached hereto as Exhibit 19. Ms. Foster was a Senior Manager of Core Network Engineering until she became Director of Network Technology in May 2015. *Id.*

251. Ms. Foster's declaration states in relevant part as follows:

> 5. In my current role, I oversee the engineers who design and manage the operation of the voice core of T-Mobile's Network, including the Mobile Switching Centers (MSCs). In that role, I was responsible for the

76

integration of Ericsson MSCs (servers) into T-Mobile's Network, including the addition to those servers, and continued use on those servers, of the "early ringing tone" (also referred to as "Local Ring Back Tone," or LRBT) parameter during the 2013-January 2017 period.

6.    During the period in which T-Mobile began to swap its Alcatel - Lucent (ALU) MSCs for those provided by Ericsson, an inter-networking problem arose such that, for certain calls originating on Ericsson servers but connecting using ALU servers, no ring tone was transmitted back to the calling party even after a call was delivered to the terminating carrier and the called party received a ring tone.  Specifically, for certain calls, the calling party did not hear a ring tone even when the call had been delivered to the terminating carrier and the called party's phone was ringing.  Rather, the calling party heard dead air until the called party answered the call or the call went to the called party's voice mail.

7.    To address this problem, **on or about October 14, 2013, we made a request to Ericsson that the early ringing tone be implemented in the Ericsson MSCs**.  The **LRBT parameter was expanded** after the completion of the ALU-Ericsson migration, consistent with the company's practice of having various features and parameters uniformly applied throughout its network to the extent possible.

8.    **I now realize that I and others on my team had received notifications beginning in early 2014 about the FCC's 2013 Rural Call Completion Order (RCC Order) and its contents, including the ban on early ringtone use for voice calls.**  At that time, my team and I were very focused on the reporting and recordkeeping aspects of the RCC Order because the company itself was focused on ensuring that it would be ready to collect and report the required data when the record- keeping, reporting, and retention requirements became effective.  T-Mobile did not have mechanisms in place to report this data when the RCC Order was released in 2013.  **Over the course of the next two years, I and other T-Mobile personnel expended considerable time and resources to develop the systems necessary to collect and report such data**.

9.    When I was contacted internally about the FCC's Letter of Inquiry in early January 2017, I focused for the first time on the RCC Order's early ringing tone ban.  We immediately began to disable the LRBT parameter.

10.    That **neither I nor anyone on my team became consciously aware of the RCC Order's early ringtone ban** after it went into effect in 2014 was the result of a good-faith mistake.  T-Mobile's use of the LRBT parameter was not the result of any malice, ill -intent or conscious scheme to harm consumers.  I had no intent to ignore or circumvent the early

ringtone rule, nor was I ever asked or directed to do so by anyone at T-Mobile.

*Id.* (emphasis added).

252.    When reviewed together, the July LOI Response and Foster Declaration show the following:

- T-Mobile's engineering team affirmatively asked Ericsson to implement the fake ring tones on its Ericsson servers in October 2013, and Ericsson complied with this requests, despite publication about the Commission's proposal to ban fake ring tones and its announcement that the issue was on the October 2013 agenda. Upon information and belief, T-Mobile's, as well as Ericsson's, legal and regulatory compliance professionals must have been aware of the impending fake ring tone ban. It made no sense to implement fake ring tones on all out of network T-Mobile traffic during the last three months of 2013 when the practice was being banned. The timing of T-Mobile's implementation of the fake ring tones, with the assistance of Ericsson, reflects willful intent by T-Mobile to violate the ban.

- T-Mobile omitted material information from its LOI responses concerning how it expanded the use of the fake ring tones in September 2015, and who else was involved. T-Mobile told the FCC it implemented the fake ring tones on "all" out-of-network traffic originating on T-Mobile networks in 2014, but separately and inconsistently reported that "[i]n September 2015, after T-Mobile determined that the four-second LRBT was ***not*** in service on ***all*** SIP routes, T-Mobile implemented it on all remaining SIP routes". (Emphasis added). Yet T-Mobile's LOI Response does not indicate whether this "implementation" of the fake ring tones was done over more Ericsson servers or through some other servers, perhaps Inteliquent's

78

servers. It also fails to speak to whether the September 2015 "implementation" of the fake ring tones on more SIP routes coincides with Inteliquent becoming T-Mobile's exclusive nationwide intermediate provider on SIP routes under the PSTN Agreement at the same time. T-Mobile's failure to provide any details to the FCC about who, where, and why fake ring tones were expanded in September 2015 obfuscated the identity of a co-conspirator.

- Ms. Foster's testimony to the FCC proffers an implausible excuse for T-Mobile's violation of the fake ring tone ban – her entire team was too focused on developing systems to comply with the Commission's rural call completion reporting requirements for anyone to notice that they had to stop using fake ring tones, despite multiple "notification*s*" regarding the ban. In addition to it being unfathomable that T-Mobile overlooked the fake ring tone ban, given its presumptive keen awareness of the ban through its highly competent inside and outside legal, regulatory and compliance staff, Ms. Foster's excuse is incompatible with the PSTN Agreement's delegation of responsibility for collecting the data required to comply with the rural call completion reporting requirements to Inteliquent.

253. The FOIA production also revealed for the first time that in addition to the call routing and fake ringtone issues, the FCC's investigation into T-Mobile also included investigation of T-Mobile providing false information on the Form 480 rural call completion reports that T-Mobile submitted to the FCC. Specifically, T-Mobile's Form 480 reports represented that there were zero call attempts made to some of the rural LECs in Wisconsin who were experiencing significant call compeletion issues, which had prompted the FCC's investigation. T-Mobile admitted that "algorithms used to compute call attempts by T-Mobile customers for purposes of

generating its quarterly Form 480 reports contained errors that results in the reports for the second and third quarters of 2016 reporting zero call attempts to certain rural OCNs."  According to subsequent responses from T-Mobile, T-Mobile eventually admitted that *all* of its Form 480 reports prior to the FCC's investigation included inaccurate information.

254.    In another instance, it became clear that T-Mobile's original response to the FCC's Letter of Inquiry omitted complaints from MetroPCS subscribers.  By this time, however, MetroPCS had been acquired by T-Mobile, its traffic had migrated to T-Mobile's network, and the issues experienced by T-Mobile subscribers impacted MetroPCS subscribers as well.  The failure to include complaint information related to MetroPCS subscribers concealed the impact on those consumers.

255.    The FCC proposed slapping "one of the highest proposed forefeitures in the agency's history" on T-Mobile in response to its flagrant violation of FCC's rules.  In order to avoid such a significant forfeiture penalty, T-Mobile's lawyers argued that T-Mobile's "behavior did not cause consumer harm of the type the [fake ringtone rule] was designed to prevent."  *See* Supplemental Response of T-Mobile USA, Inc. (Sept. 8, 2017), Exhibit 18, at 4-5.  This argument is specious.  As the Commission concluded in the *2013 Rural Call Completion Order*, a consumer is harmed any time he or she is deceived into believing that his or her call has reached the intended destination when, in fact, it has not, or when a consumer wrongly concludes that the rural carrier is responsible for the call failure.  And, as T-Mobile admitted, "early audible ringing is by its nature deceptive."  *Id.* at 12, n.54.  The ban against the use of fake ring tones was specifically intended to avoid deceiving consumers into believing that "the terminating rural provider is responsible for the call failure."  *2013 Rural Call Completion Order*, ¶ 114.

256.    The evidence demonstrates that even after the FCC's fake ringtone ban was implemented, T-Mobile not only defied the FCC's rules but also continued to falsely represent to its customers that rural carriers like Plaintiffs were to blame for call failures.  Thus, T-Mobile appears to have engaged in deception during the course of the Commission's investigation in an effort order to avoid "the highest proposed forefeitures in the agency's history."

257.    T-Mobile has undertaken no effort to compensate the carriers that it harmed by its defiance of the Commission's rules.

258.    In contrast to its potential exposure of violations of the FCC's rules, the $40 million T-Mobile paid to the U.S Treasury is a paltry sum.  Congress has invested the Commission with substantial power to impose steep forfeiture penalties.  *See* 47 U.S.C. § 503.

259.    In 2018, a common carrier could be assessed a forfeiture of $196,387 *per violation*. *See* 47 C.F.R. § 1.80(b)(9)(i)-(ii); *In the Matter of Amendment of Section 1.80(B) of the Commission's Rules*, 33 FCC Rcd. 46 (Jan. 5 2018) (Attachment A; 2018 Maximum Forfeiture Penalty for 47 U.S.C. § 503(b)(2)(B)).

260.    CMRS providers, like T-Mobile, "will be treated as common carriers for purposes of Section 503 of the Act and [the Commission's] forfeiture guidelines."  *In the Matter of the Commission's Forfeiture Policy Statement and Amendment of Section 1.89 of the Rules to Incorporate the Forfeiture Guidelines*, Report and Order, 12 F.C.C. Rcd. 17087, 17096, ¶ 16 (July 28, 1997).

261.    The Commission has adopted a series of "base forfeiture amounts," for specific violations while recognizing that the list is not exhaustive and that for "large or highly profitable communications entities, the base forfeiture amounts . . . are generally low."  *Id.* at 17099, ¶¶ 22-24.  The Commission has recognized, therefore, the forfeitures generally should be higher for

larger entities in order to ensure that "forfeitures issued against large or highly profitable entities are not considered merely an affordable cost of doing business." *Id.* at 17099, ¶ 24. The Commission will "take into account the subject violator's ability to pay in determining the amount of a forfeiture" and forfeitures against them will "in many cases be above, or even well above, the relevant base amount." *Id.* at 17099-17100, ¶ 24.

262. In establishing a forfeiture, the Commission will also "consider factors such as 'the degree of culpability, any history of prior offenses, ability to pay, and such other factors as justice may require." *Id.* at 17100, ¶ 27 (quoting 47 U.S.C. § 503(b)(2)(E)).

263. Based on Commission precedent, each insertion of a fake ringtone by T-Mobile would constitute a separate violation of the Commission's rule and the Communication Act that could result in a separate forfeiture penalty.

264. The Communications Act also provides that "any carrier who knowingly violates" 47 U.S.C. § 202(a)'s prohibition against unjust or unreasonable discrimination shall "forfeit to the United States the sum of $[12,081] for each such offense." 47 U.S.C. § 202(c); 47 C.F.R. § 1.80(b)(9)(ii) (adjusted for inflation).

265. In comparison to the meager $40 million T-Mobile voluntarily paid, the Commission recently imposed a fine of $120 million against a company and its founder after concluding that that company had made more than 96 million spoofed robocalls during a three-month period in violation of the Truth in Caller ID Act of 2009. *See In the Matter of Adrian Abramovich, et al.*, Notice of Apparent Liability for Forfeiture, 32 F.C.C. Rcd. 5418 (June 22, 2017) ("*NAL*"); *In the Matter of Adrian Abrmovich, et al.*, Forfeiture Order, 33 F.C.C. Rcd. 4663 (May 10, 2018) ("*Forfeiture Order*"). In calculating this amount, the Commission considered that it had specifically examined 80,000 calls that involved unlawful caller ID spoofing and applied a

base forfeiture amount of $1,000 per spoofed call, totaling $80 million, "well below the maximum" that it could have imposed. *NAL*, 32 F.C.C. Rcd. at 5426, ¶ 25. Then, the Commission determined that the "circumstances in this case merit a significant upward adjustment," and concluded that an additional $40 million forfeiture should be added. *Id.* at 5427, ¶ 26. The Commission rejected arguments from Abramovich that the forfeiture violated his due process rights or was excessive in light of his inability to pay. *See Forfeiture Order*, ¶¶ 23 – 30.

266.   T-Mobile argued to the FCC that it should not have a similar penalty imposed on it. *See* Supplemental Response of T-Mobile USA, Inc. (Sept. 8, 2017), Exhibit 18, at 7-10. According to T-Mobile, Abramovich's conduct was more egregious because it included false representations and misled consumers. *Id.* As T-Mobile has admitted, however, "early adubile ringing is by its nature deceptive." *Id*. at 12, n.54. T-Mobile deceived consumers, tricked them into blaming rural carriers, and did so all in order to retain subscribers who, had they known the reality of the poor service T-Mobile and Inteliquent offered, may well have decided to take their business elsewhere. This selfish, self-serving, and deceptive conduct is all the more despicable for a company that utilizes the public airwaves to provide its services and is already making billions of dollars annually. It is pure greed.

267.   Indeed, according to recent news reports, T-Mobile's CEO John Lagere, despite overseeing illegal conduct and what appears to have been the largest fraud ever perpetuated against telcomunications subscribers, unexpectedly announced shortly after this case was filed that he will soon leave his post with the company. But, rather than publicly condemning his failures, T-Mobile's board is apparently rewarding him with a $96 million exit package according to news reports.

268.    Given the magnitude and longevity of T-Mobile's illegal conduct, its high degree of moral culpability, its substantially greater ability to pay, and the fact that it violated both 47 U.S.C. § 201 and 47 U.S.C. § 202, T-Mobile could have easily faced penalties totaling hundreds of billions of dollars.

269.    While T-Mobile did not incur proportionate penalties at the FCC, the FCC extracted something far more valuable from T-Mobile, its admission of violation of the Commission's rules, which opens the door to the courthouse for the Plaintiffs so they may recover for the harm that T-Mobile and Inteliquent have caused.

## N.    Factual Allegations Relating To Named Plaintiffs

### i.    *Plaintiff Craigville Telephone Co. Experienced T-Mobile Call Completion Problems Consistent With The Fake Ring Tone Scheme*

270.    Plaintiff Craigville Telephone Company operates both an ILEC and a CLEC in northeastern Indiana.  Craigville does business as AdamsWells Internet Telecom TV in and around Craigville, Indiana.  The ILEC serves about 50 square miles with approximately 800 customers. Its CLEC servers an adjoining area to the north with about 2,000 customers.

271.    AdamsWells has worked to combat systemic RCC problems for many years.  As AdamsWells's General Manager wrote in a letter to the FCC's Commissioners in 2013:

> My wife's father, grandfather, and great-grandfather (and their wives) all worked extremely hard to keep this small rural company alive.  Now, will this FCC promote or kill rural communications?  In your hands is great responsibility.
>
> Literally, our survival depends on whether our business customers can receive calls from their customers.  By your lack of enforcement of **"rural call termination"** you may single-handedly destroy the viability of our company and others like us.  If business customers pull their service from our network, the end will come for us and there is not one thing I can do to stop it.

I have spent much of this week in meetings, or on the phone, with business owners trying to explain our dilemma – I can't make a carrier (least cost router) deliver a call to you. They almost don't believe me!

*     *     *

One of our largest business customers (300+ employees) informed me this week that they can no longer accept not receiving calls from their customers. They plan to move their telecom services back to a large national carrier. If this continues rural communications (and life in general) for our company and employees will never be the same.

272.     As relayed by Larry Landis, a Commissioner on the Indiana Utility Regulatory Commission, in a letter to the FCC Commissioners dated October 24, 2013:

> Increasingly, rural providers are having to resort to extraordinary 'workarounds' in order to assure that the calls directed to them are ultimately delivered to their customers. In a last ditch effort for business customers bedeviled by call termination problems, Craigville Telephone has ported about 30 of its customer numbers to Indigital Telecom (Craigville is a minor shareholder) in Fort Wayne, Indiana. (Indigital Telecom has a Certificate of Territorial Authority from the IURC to operate as a CLEC, toll reseller, and wireless provider in Indiana.) The General Manger explains that Indigital call forwards a newly assigned (temporary) number back to the Craigville Telephone switching network and Craigville delivers the call to the customer. While this is a painful and time consuming process, they have no other alternative which will assure call delivery for these customers.

> There is no other way to describe the actions of the manipulative least cost routers than to characterize them for what they are: a perversion to the marketplace, illegal activity motivated by greed and reckless disregard for those attempting to play by the rules. Such activity must be crushed.

273.     AdamsWells had significant and prolonged problems with calls originating on T-Mobile's network. During the period of February 2015 to April 2016, a T-Mobile subscriber located in Minneapolis, Minnesota experienced significant problems reaching her elderly parents who resided in Bluffton, Indiana and were subscribers to AdamsWells's telephone service. The T-Mobile subscriber maintained detailed records of her call completion problems, logging a total of 109 call attempts during this time period. Of those 109 call attempts, 56 of the calls were not

completed.  Several of the calls that were completed were dropped in less than a minute, according to the call logs maintained by the T-Mobile subscriber.

274.    The T-Mobile subscriber reported several events that were consistent with the fake ring tone scheme.  For example, the caller informed T-Mobile and AdamsWells that:

> I have to make repeated attempts to connect hearing one or two rings and dead air, ring no answer with no rings on my Parent's end, sometimes a single ring on their end and then no one or a dial tone, music, messages such as "you are unable to make long distance calls", and faint dial tones. Often when I do connect, the calls drop after a very short time and there are long delays such that we are speaking over one another.

275.    On March 14, 2015, the T-Mobile subscriber reported that she had "not received a call back from T-Mobile after contacting them regarding this issue for the 4th time."

276.    On March 16, 2015, the T-Mobile subscriber again reported her problems to T-Mobile.  According to an email sent by the T-Mobile subscriber to AdamsWells, T-Mobile suggested "one of the carriers between T-Mobile and Adamswells" may be responsible:

> I contacted T-Mobile again and my ticket was escalated to the Solutions Center and I spoke with Daniel.  He spoke with the engineers and returned my call.  They are contacting one of the carriers between T-Mobile and Adamswells where the calls are being routed to see if they can resolve this issue.

277.    When the T-Mobile subscriber did not receive an adequate response from T-Mobile, AdamsWells submitted a rural call completion ticket on her behalf to the FCC on March 17, 2015.

278.    On March 24, 2015, Leah Tokar, part of the Executive Response team in the Office of T-Mobile's President/CEO, John Legere, wrote to Kurt Oliver at AdamsWells in response to the complaint submitted by AdamsWells on behalf of the T-Mobile subscriber, summarizing a conversation that occurred that same day.  According to the letter, "T-Mobile engineering is working with a third party, Incomm in resolving" the concerns.

86

279. On April 6, 2015, the T-Mobile subscriber spoke with Jordan at T-Mobile. According to notes provided by the T-Mobile subscriber:

> [Jordan] explained how calls are passed to intermediary parties to make the connection. He worked with a company called InComm. We did a test call where it rang 9 times and then failed. My parent's said their phone rang twice and when they picked it up no one was there.

280. Routing changes made by Jordan seemed to resolve the issue for a period of time. However, a few days later, on April 18, 2015, the T-Mobile subscriber reported that the problems had returned. She reported several call attempts with "rings and dead air". The T-Mobile subscriber also reported escalating her concerns to "Leah at the executive office of T-Mobile."

281. On June 1, 2015, the T-Mobile subscriber reported additional problems and a new trouble ticket was opened by T-Mobile. When AdamsWells staff contacted T-Mobile to try to trouble shoot these issues, Jesse, a T-Mobile technician, was unable to assist, could not provide contact information for an escalation department, and suggested AdamsWells proceed with filing another complaint with the FCC. As a result, AdamsWells filed another complaint with the FCC on behalf of the T-Mobile subscriber.

282. One June 12, 2015, the T-Mobile subscriber called T-Mobile and spoke with an individual named Brian. According to notes maintained by the T-Mobile subscriber,

> [Brian] stated that Engineering had a successful test and closed the ticket and directed me to a retail store to check the sim card on my phone but it was most likely a network routing issue and re-opened a ticket. He said he would return my call the next day at 9AM which did not happen. Up until this point, T-Mobile seemed genuinely interested to attempting to resolve this issue even given how frustrating it had been. I have remained professional with T-Mobile throughout this process.

283. On June 22, 2015, the T-Mobile subscriber again spoke with a T-Mobile representative. This representative provided false and misleading information about the ring tones,

failed to acknowledge T-Mobile's fake ring tone scheme that inserts ring tones before the call

reaches the terminating carrier's network, and also placed blame on AdamsWells:

> I received a call from Stephanie at T-Mobile as a result of them sending a Customer Satisfaction Survey and being concerned with the results.
>
> She made a test call from her business cell phone to my parents number and after a few attempts was able to connect. ***She said once the phone starts ringing, the call is within [AdamsWell's] network.*** Just because I hear a phone ringing, does not mean my parent's phone is ringing. She researched my issue and indicated that their engineering team have done numerous tests and troubleshooting and have found no issues with the T-Mobile Network. ***They are pointing the issue towards Adamswells stating that I am not the only one in my family with this issue, and this is a known issue with other members of the Adamswells network according to some web research***. I am the only one in my family that uses T-Mobile. Others include AT&T, Sprint, and Cellular One. ***T-Mobile have closed my issue and are not going to provide me with further support on this matter***. I expressed my frustration with the ongoing problems since February and their failure to reply back from 3 members of their team since June 1st. I requested a letter in writing, which I will forward if you would like to have a copy for your records.
>
> Stephanie made 3 attempts to contact my parent's number at approximately 5:30 CST. She did not provide me with the number she called from. On one of the attempts, she heard one ring and then a recorded message to leave a voicemail message. The other attempt was ring no answer. I informed her that my parent's do not have an electronic prompt greeting, but my father's voice.
>
> I called my parents at 5:42 CST and the call dropped after 34 seconds. again at 5:43 that dropped after 32 seconds, again at 5:45 that dropped after 7 seconds, and again at 6:09 with ring no answer. These are some examples you should be able to research on your end.

284.     In other notes regarding this call, the T-Mobile subscriber wrote:

> 6/22 - Stephanie from T-Mobile 651-674-3238 called me in response to the customer satisfaction survey. I was on the phone with her for approximately 1 hour. She had 3 failed attempts in reaching my parents with rings and dead air as well as recorded messages and succeeded on the 4 try. She also had me on hold while speaking with other contacts at T-Mobile. ***Her response to me was this was this was a known issue with Adamswells and there is not a problem with the T-Mobile Network. She said once the phone starts ringing, it is out of T-Mobile's network and is not their***

88

*problem. She said this issue was closed with T-Mobile and I was to make no further problem requests regarding this issue.* I requested a letter in writing explaining what T-Mobile had done to resolve this issue so I had something to work with as I was not provided with any contact information with the intermediary parties. She placed me on hold while speaking with her manager and replied stating that I should receive a letter within 7 business days. She offered me 1 month of service at no charge which was done.

285. In a series of email exchanges in August 2015, T-Mobile personnel reported to the T-Mobile subscriber, among other things, that they were:

- "open[ing] a ticket with our long distance carrier";

- "mak[ing] sure the problematic carriers are identified and then circumvented to alleviate these issues";

- having "[its] carrier investigate" and that the carrier "made changes";

- "continu[ing] to drive this matter with [T-Mobile's] carrier until this issue is permanently resolved."

286. On September 4, 2015, T-Mobile reported to its subscriber that "[a]s of now, we have all of this traffic routing over a different carrier." Later that day, T-Mobile wrote that "the routing over this new carrier is now in place permanently. The only time that it may default back to the other carrier is in the event of congestion or other network outage affect the new carrier, but that would be very rare."

287. In early 2016, the T-Mobile subscriber's problems resurfaced again. On April 1, 2016, the T-Mobile subscriber informed T-Mobile and AdamsWells of several call issues in reaching her parents in February and March 2016. William Rowe at T-Mobile pulled call records for five calls attempted on April 1, 2016. AdamsWells reviewed its call records as well. AdamsWells's records revealed that only one of the five calls actually reached its switch, meaning the other four call attempts were never delivered to AdamsWells.

89

288.     Staff at AdamsWells spent considerable time and resources attempting to trouble shoot the problems identified by the T-Mobile subscriber, responding to emails and calls from the subscribers as well as T-Mobile, and reporting issues to the FCC.

289.     A review of call detail records reveals that some of the T-Mobile subscriber's calls that did reach AdamsWells and were delivered to the caller's parents were carried by Inteliquent as T-Mobile's Intermediate Provider.  Accordingly, upon information and belief, many of the calls that did not reach their intended destination, but which were subjected to fake ring tones, were also carried by Defendant Inteliquent.

290.     AdamsWells does not have any means of knowing how many calls made by other T-Mobile subscribers to an AdamsWells subscriber were never delivered to its network.

291.     AdamsWells did not know until the *Consent Decree* was released by the FCC that T-Mobile was responsible for the insertion of fake ring tones on calls destined for AdamsWells's subscribers and that T-Mobile had failed to correct known problems with its Intermediate Providers' delivery and completion of calls.

> **ii.     *Plaintiff Consolidated Telephone Company Experienced T-Mobile Call Completion Problems Consistent With The Fake Ring Tone Scheme***

292.     CTC is located in Brainerd, Minnesota and operates in both CLEC and ILEC areas. It serves over 7,000 business phone lines, and almost 1,700 residential phone lines, in its CLEC area.  It serves approximately 650 business phone lines, and approximately 5,600 residential phone lines, in its ILEC area.  As a whole, CTC has approximately 15,000 access lines, of which approximately half are business customers.

293.     CTC's CLEC area includes Brainerd, Baxter and communities with a larger business presence than the ILEC area, so its business strategies always focus on growing the

number of subscribers, and in particular businesses customers, in the CLEC area where there is opportunity to compete for new business.

294.    CTC struggled for years with poor call completion of inbound calls to its subscribers in both the CLEC and ILEC areas.  However, complaints from business customers, particularly in the CLEC area, regarding call completion problems were the most prevalent.

295.    For example, on November 22, 2013, CTC received a customer complaint from the owner of a barbeque take out restaurant called Louie's Bucket of Bones located in Ironton, Minnesota.  Louie's Bucket of Bones was a small business serving a rural community and was a CTC subscriber in its CLEC area.

296.    The owner of Louie's Bucket of Bones reported to CTC that a patron came into her restaurant and said that she had been trying to call all day regarding an order she wanted to place, but her calls were not connecting.  The patron was a T-Mobile customer and had been using her T-Mobile wireless service to place calls to Louie's Bucket of Bones.

297.    The owner of Louie's Bucket of Bones called CTC about this problem and was extremely upset with CTC over this interference with her business which depended upon receiving calls for carryout, catering and delivery orders.  The owner reported that some calls from her customers connected to her business, but others did not.

298.    CTC obtained the phone number of the patron whose calls to Louie's Bucket of Bones did not connect, and CTC determined that no calls from her phone number hit CTC's switch, indicating these calls were being halted upstream from CTC.

299.    CTC advised the owner of Louie's Bucket of Bones and its patron to call T-Mobile about the call failure.  They reported back to CTC that T-Mobile claimed it made multiple test calls and they all went through to Louie's Bucket of Bones.  Nevertheless, the patron reported that

when she had called Louie's Bucket of Bones, she heard a message indicating the number was out of reach. T-Mobile resolved the issue for Louie's Bucket of Bones without sharing why the T-Mobile customer's call failed to complete or how the issue was resolved.

300. The Louie's Bucket of Bones incident was but one of many such instances. Prior to and throughout 2013, CTC observed that apparent call blocking to rural OCNs had become a prevalent practice, not only by T-Mobile, but by other carriers as well. This imposed tremendous economic and reputational burden on CTC, which had to dedicate the full time of 1.5 employees to respond to customer complaints dominated by rural call completion failures.

301. CTC, like all other impacted carriers, had no way of determining how many times a T-Mobile customer may have attempted to place a call to one of its customers that was not completed, nor was there any way for CTC to know whether T-Mobile was using fake messages, or other call blocking tactics, to deter completion of certain calls. Such information has been kept confidential by T-Mobile.

302. Kevin Beyer, General Manager of Minnesota's Federated Telephone Cooperative, once described the industry's inability to determine why rural calls are dropped in a 2015 article, stating, "you know where the call originated, but you can't tell where it went to [in] Never Neverland." Jim Spencer, *Rural phone woes persist in Minnesota, across the country*, STAR TRIBUNE (Apr. 18, 2015, 12:35 PM) ("Star Tribune Article"), http://www.startribune.com/rural-phone-woes-persist-in-minnesota-across-the-country/300369541/ (last visited Oct. 10, 2019).

303. CTC submitted complaints to the FCC pursuant to its rural call completion complaint portal.

304. CTC felt discriminated against due to the imbalance of power and leverage the large carriers like T-Mobile appeared to be exerting over rural carriers like CTC.

92

305.    Months before the Louie's Bucket of Bones incident, in or about April 2013, CTC

had begun working on troubleshooting its call completion problems with Onvoy, Inc. ("Onvoy"),

which at the time was a wholesale provider of telecommunications services to other carriers,

resellers and service providers.  Onvoy's then President, Fritz Hendricks, worked directly with

CTC on this project.  Mr. Hendricks developed, participated in, and oversaw a call testing process

that included testing calls placed to CTC phone lines from T-Mobile test lines, as well as test calls

from other carriers' test lines.

306.    For some test calls Onvoy and CTC placed to CTC's customers, they heard no ring

back tone and the call did not complete.  For others, calls would initially have no sound for up to

ten seconds, then they would hear a ring tone without the calls hitting CTC's switch.  Sometimes

the test calls resulted in the caller hearing a message in Spanish with the call not completing.

307.    CTC believes T-Mobile and other carriers engaging in these types of call blocking

strategies did not want to complete calls to its OCNs to avoid high cost intercarrier compensation

payments.  Mr. Hendricks told CTC he shared in this belief.

308.    Unable to solve the call completion problems themselves, Mr. Hendricks and CTC

developed a work-around solution.  Since they perceived that calls placed to CTC's OCNs were

being intentionally blocked or deterred from completion by upstream carriers, CTC ported

hundreds of its business customers' phone numbers to Onvoy to make it look to the large carriers

like these business customer phone numbers were owned by Onvoy, which had lower intercarrier

compensation rates.  Doing so dramatically reduced CTC's call completion complaints and the

man-hours CTC was devoting to customer call completion complaints.

309.    CTC had to pay Onvoy for this work-around service and it reduced the volume of

calls for which CTC could otherwise seek intercarrier compensation revenue.  CTC felt it had no

better alternative due to the significant man-hours it was devoting to call completion complaints that it could not resolve, the harm being imposed on its business reputation and the loss of customer goodwill resulting from the prevalent call completion failures.

310.     CTC believes many other LECs in Minnesota adopted the same practice of porting their customer's numbers to Onvoy for a fee and surrendering the opportunity to collect inter-carrier compensation revenue to Onvoy.  CTC presently continues this practice.

311.     Two years prior to this trouble-shooting project, Mr. Hendricks spoke at the 2011 Rural Call Completion workshop and was critical of carriers engaged in rural call blocking or fake ring tone practices.  As he explained at the workshop:

> When a person calls a customer in a rural market the [caller's] phone will ring 8 to 10 times before the end office of the ILEC is ever signaled – if it is signaled at all. . .  [The caller] will hear [] ring but the far end will never ring; that is the trouble in approximately 60 to 65 per cent of the time.

And:

> The originating carrier is not owning the service responsibility to deliver to the consumer that purchased it from them.  Rather, the worse yet, we've found that the originating carrier is deflecting the responsibility for the service quality to a rural carrier that has not even been called in the troubleshooting process to help identify what went wrong on a particular call the customer called them about – *and it vilifies the LEC*.

*See* 2012 Rural Call Completion Declaratory Ruling at nn. 35, 40 (emphasis added).

312.     Mr. Hendricks's quotes were so influential, they were included in the footnotes of the *2012 Rural Call Completion Declaratory Ruling*.

313.     In 2015, Mr. Hendricks, still President of what by then had become Onvoy, LLC, was quoted in an article discussing the lack of oversight and regulation of intermediaries that may drop calls, as saying, "you can go buy a computer any place and publish a long-distance rate deck, and it will be used[.]"  *See* Star Tribune Article.  He also confirmed that among the ways companies

try to avoid connecting rural calls is by what Mr. Hendricks called, "false ring-backs," explaining further, "Carriers provide ringing before you are connected on the far end . . . . It's actually not ringing where you're trying to call, but you've heard it ring nine or ten times. So you think the person is not in." *Id.*

314. On February 10, 2017, GTCR, a private equity firm that owns Onvoy, LLC, created a wholly owned single purpose entity that merged with Inteliquent. The surviving company maintained the Inteliquent name. Inteliquent became wholly owned by Onvoy, LLC.

315. In connection with the Inteliquent/Onvoy merger, Fritz Hendricks became the President of Inteliquent and remains its President today. Therefore, Inteliquent's current President is a fact witness in this case because, *inter alia*, he: (1) investigated suspected call blocking strategies used by T-Mobile during the same time period in which T-Mobile used fake ring tones to mask Inteliquent's rural call completion failures; and (2) has provided regulatory testimony regarding the tremendous harm experienced by rural carriers as a result of rural call blocking strategies, including the use of fake ring tones.

316. CTC continues to have hundreds of business phone numbers ported to Inteliquent, which took over the ported numbers following the merger. To this day, CTC and likely many other rural LECs who ported their numbers to Onvoy pay Inteliquent to receive its business customers' calls to avoid inbound long distance call completion problems. Thus, Inteliquent and T-Mobile continue to benefit from the fruits of their fake ring tone and call blocking scheme at the expense of small rural carriers.

317. Inteliquent's retention of the phone numbers ported to its OCN and continued collection of revenue from CTC and other similarly situated LECs who implemented the same

work-around reflects the Defendants' high degree of moral culpability, deliberate oppression and wonton disregard of the rights of others.

## V.    **CLASS ALLEGATIONS**

318.    Plaintiffs bring this action on behalf of themselves and as a class action, pursuant to the provisions of Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure, on behalf of the following class (collectively, the "Class"):

> All local exchange carriers that had calls placed to their customers from a T-Mobile customer which had fake ring tones inserted into the call that masked the blocked or delayed delivery of the call to the local exchange carrier's network.

319.    Plaintiffs reserve the right to propose subclasses or modify the above class definition based on the evidence adduced in discovery, or as necessary and appropriate.

320.    Excluded from the Class are T-Mobile and Inteliquent and any of their subsidiaries and affiliates; and all entities who make a timely election to be excluded from the Class.  Plaintiffs reserve the right to revise the Class definition based upon information learned through discovery.

321.     Certification of Plaintiffs' claims for class-wide treatment is appropriate because Plaintiffs can prove the elements of their claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claim.

322.    This action has been brought and may be properly maintained on behalf of the Class proposed herein under Federal Rule of Civil Procedure 23.

323.    *Numerosity*. Federal Rule of Civil Procedure 23(a)(1): The members of the Class are so numerous and geographically dispersed that individual joinder of all Class members is impracticable.  For purposes of this complaint, Plaintiffs allege that there are estimated to be over 2,000 local exchange carriers operating within the United States.  The precise number of Class members is unknown to Plaintiffs but may be ascertained from records possessed by the

Commission and/or Defendants. Class members may be notified of the pendency of this action by recognized, Court-approved notice dissemination methods, which may include U.S. Mail, electronic mail, Internet postings, and/or published notice.

324. ***Commonality and Predominance:*** Federal Rule of Civil Procedure 23(a)(2) and 23(b)(3): This action involves common questions of law and fact, which predominate over any questions affecting individual Class members, including, without limitation:

a. Whether T-Mobile and Inteliquent jointly violated the Commission's rule prohibiting the insertion of false or fake ring tones, 47 C.F.R. § 64.2201;

b. Whether T-Mobile failed to correct problems or delays associated with its Intermediate Providers' delivery of calls in violation of the Commission's 2012 Declaratory Ruling;

c. Whether T-Mobile, Inteliquent and/or Doe Defendants inserted fake ring tones in calls placed to subscribers of Plaintiffs and which fake ring tones masked calls either being delayed or not completed;

d. Whether T-Mobile, Inteliquent and/or Doe Defendants are liable to Plaintiffs for violations of the Communications Act of 1934, as amended, including but not limited to 47 U.S.C. § 201(b) and 47 U.S.C. § 202(a);

e. Whether T-Mobile's, Inteliquent's or Doe Defendants' conduct violates the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962(c);

f. Whether T-Mobile's, Inteliquent's and/or Doe Defendants' conduct violates the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962(d);

g.   Whether T-Mobile, Inteliquent and/or Doe Defendants unlawfully conspired to reduce costs associated with the delivery of high cost calls and relied on the use of fake ring tones to mask those efforts;

h.   Whether T-Mobile is liable and responsible for the acts of Inteliquent and/or Doe Defendants as authorized agents and/or pursuant to 47 U.S.C. § 217;

i.   Whether T-Mobile's, Inteliquent's and/or Doe Defendants' conduct constitutes tortious interference with contracts under Illinois law;

j.   Whether T-Mobile's, Inteliquent's and/or Doe Defendants' conduct violated the Illinois Consumer Fraud & Deceptive Business Practices Act, 815 Ill. Comp. Stat. 505/1 *et seq*. (20YR).

k.   Whether Plaintiffs and the Class are entitled to compensatory and treble and/or punitive damages, attorneys' fees, and other monetary relief and, if so, in what amount.

325.   ***Typicality:***  Federal Rule of Civil Procedure 23(a)(3): Plaintiffs' claims are typical of the other Class members' claims because, among other things, all Class members were comparably injured through T-Mobile's, Inteliquent's and/or Doe Defendants' wrongful conduct as described herein.

326.   No individual inquiry is necessary since the focus is only on T-Mobile, Intelligent and/or Doe Defendants' wrongful conduct.

327.   ***Adequacy:*** Federal Rule of Civil Procedure 23(a)(4): Plaintiffs are adequate Class representatives because their interests do not conflict with the interests of the other members of the Class they seek to represent; Plaintiffs have retained counsel competent and experienced in telecommunications law, complex litigation and class action litigation; and Plaintiffs intend to

prosecute this action vigorously. The Class's interests will be fairly and adequately protected by Plaintiffs and their counsel.

328. *Superiority:* Federal Rule of Civil Procedure 23(b)(3): A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The damages or other financial detriment suffered by Plaintiffs and the other Class members are relatively small compared to the burden and expense that would be required to individually litigate their claims against T-Mobile and Inteliquent, so it would be impracticable for the members of the Class to individually seek redress for their wrongful conduct. Even if Class members could afford individual litigation, the court system could not. Individualized litigation creates a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

## VI.  **CLAIMS**

### COUNT I
### Violation Of Section 201(b) Of The Communications Act Of 1934, As Amended
### (Against T-Mobile) (Fake Ring Tones)

329. The allegations of paragraphs 1 - 328 are incorporated by reference as though fully set forth herein.

330. Section 201(b) of the Act makes it unlawful for any carrier to assess any "charge" or engage in any "practice, classification, or regulation that is unjust or unreasonable . . . ." 47 U.S.C. § 201(b).

99

331. The insertion of fake ring tones is a practice that the Commission has declared to be unjust and unreasonable in accordance with section 201(b) of the Act. Ex. 9, *Rural Call Completion Order* at 16200, ¶ 116.

332. T-Mobile has admitted that it violated the Commission's prohibition against the insertion of fake ring tones, 47 C.F.R. § 64.2201. *See* Ex. 1, *Consent Decree*, ¶ 17.

333. T-Mobile's admission to violating the Commission's prohibition against the insertion of fake ring tones is also an admission that it violated Section 201(b) of the Act.

334. Insofar as those fake ring tones were inserted directly or indirectly by one or more of T-Mobile's agents, including, but not limited to Inteliquent, Level 3, Ericsson or Doe Defendants, T-Mobile is fully liable for the acts, omissions, or failures of those agents pursuant to Section 217 of the Act. 47 U.S.C. § 217.

335. T-Mobile's unjust and unreasonable practices have damaged Plaintiffs.

WHEREFORE, Plaintiffs request that the Court enter judgment against the Defendants, and award Plaintiffs damages, including recovery of attorneys' fees, as well as any other relief that may be available to remedy the Defendants' actions.

## COUNT II
### Violation Of Section 201(b) Of The Communications Act Of 1934, As Amended (Against T-Mobile, Inteliquent, and Certain Doe Defendants) (Failure to Ensure Delivery of Calls)

336. The allegations of paragraphs 1 - 335 are incorporated by reference as though fully set forth herein.

337. Section 201(b) of the Act makes it unlawful for any carrier to assess any "charge" or engage in any "practice, classification, or regulation that is unjust or unreasonable. . . ." 47 U.S.C. § 201(b).

100

338. "[A] carrier that knows or should know that calls are not being completed to certain areas, and that engages in acts (or omissions) that allow or effectively allow these conditions to persist, may be liable for a violation of section 201 of the Act." Ex. 4, *Rural Call Completion Declaratory Ruling* at 1355, ¶ 11. Moreover, "it is an unjust and unreasonable practice in violation of section 201 of the Act for a carrier that knows or should know that it is providing degraded service to certain areas to fail to correct the problem or to fail to ensure that intermediate providers, least-cost routers, or other entities acting for or employed by the carrier are adequately." *Id.* at 1355-56, ¶ 12.

339. T-Mobile has admitted that it did not correct problems with its Intermediate Providers' delivery of calls to consumers in rural areas. *See* Ex. 1, *Consent Decree*, ¶ 17. T-Mobile's admission that it failed to correct problems with its Intermediate Providers' delivery of calls to consumers is also an admission that it violated Section 201(b) of the Act.

340. According to the sworn declaration of Adrian Adler, "[s]ince 2015 . . . [a]lmost all domestic calls that leave Inteliquent's network destined to other carriers are routed through Inteliquent" and "Inteliquent is responsible for completing the calls." Ex. 14, Adler Declaration, ¶ 10. Thus, upon information and belief, T-Mobile's admission of failing to ensure that its Intermediate Provider delivered traffic in accordance with the FCC's requirements relates directly to Inteliquent's degraded service.

341. Moreover, T-Mobile's rural call completion complaint log produced by the FCC confirms Inteliquent's ability to manipulate the route used to terminate calls to rural carriers, and easily change the routing to an effective path when a T-Mobile customer complained. Therefore, Inteliquent failed to deliver T-Mobile's calls to consumers in rural areas and engaged in an unjust and unreasonable practice.

342.    T-Mobile is fully liable for the acts, omissions, or failures of those Intermediate Providers, including, but not limited to Inteliquent, Level 3, or any other Doe Defendants who are Intermediate Provider, pursuant to Section 217 of the Act.  47 U.S.C. § 217.

343.    Defendants' unjust and unreasonable practices have damaged Plaintiffs.

WHEREFORE, Plaintiffs request that the Court enter judgment against the Defendants, and award Plaintiffs damages, including recovery of attorneys' fees, as well as any other relief that may be available to remedy the Defendants' actions.

**COUNT III**
**Violation Of Section 202(a) Of The Communications Act Of 1934, As Amended**
**(Against T-Mobile, Inteliquent, and Certain Doe Defendants)**

344.    The allegations of paragraphs 1 - 343 are incorporated by reference as though fully set forth herein.

345.    Section 202(a) of the Act makes it "unlawful for any common carrier to make any unjust or unreasonable discrimination in charges, practices, classifications, regulations, facilities, or services . . . or to make or give any undue or unreasonable preference or advantage to any particular person, class of persons, or locality, or to subject any particular person, class of persons, or locality to any undue or unreasonable prejudice or disadvantage."  47 U.S.C. § 202(a).

346.    The Commission has declared that "[p]ractices that lead to rural call completion problems . . . may violate carriers' duty under Section 202(a) to refrain from unjust or unreasonable discrimination in practices, facilities, or services."  *In the Matter of Rural Call Completion,* 32 F.C.C. Rcd. 6047, 6057, ¶ 23 (July 14, 2017).

347.    T-Mobile has admitted that it did not correct problems with its Intermediate Providers' delivery of calls to consumers in rural areas.  *See* Ex. 1, *Consent Decree,* ¶ 17.

348.     According to the sworn declaration of Adrian Adler, "[s]tarting in 2015 . . . [a]lmost all domestic calls that leave the T-Mobile network destined to other carriers are routed through Inteliquent" and "Inteliquent is responsible for completing the calls." Ex. 14, Adler Declaration, ¶ 10. Therefore, Inteliquent failed to deliver T-Mobile's calls to consumers in rural areas and engaged in unjust and unreasonable discrimination against those rural areas.

349.     T-Mobile's admission that it failed to correct problems with its Intermediate Providers' delivery of calls to consumers is also an admission that it violated Section 201(b) of the Act.

350.     T-Mobile is fully liable for the acts, omissions, or failures of those Intermediate Providers, including, but not limited to Inteliquent, Level 3, or any other Doe Defendants who are Intermediate Providers, pursuant to Section 217 of the Act. 47 U.S.C. § 217.

351.     Defendants' unjustly and unreasonably discriminatory practices have damaged Plaintiffs.

WHEREFORE, Plaintiffs request that the Court enter judgment against the Defendants, and award Plaintiffs damages, including recovery of attorneys' fees, as well as any other relief that may be available to remedy the Defendants' actions.

## COUNT IV
### Violation Of RICO, 18 U.S.C. § 1962(c)
### (Against All Defendants)

352.     The allegations of paragraphs 1 - 351 are incorporated by reference as though fully set forth herein.

353.     Plaintiffs bring this Count on behalf of themselves and on behalf of the Nationwide RICO Class against Defendants T-Mobile, Inteliquent and Doe Defendants 1-10 (collectively "RICO Defendants").

354.    At all relevant times, the RICO Defendants were and are "persons" within the meaning of 18 U.S.C. § 1961(3) because they are capable of holding, and do hold, "a legal or beneficial interest in property."

355.    At all relevant times, the Plaintiffs, and all members of the putative Class, were and are persons injured in their business or property by reasons of the RICO Defendants' violations of 18 U.S.C. § 1962(c) and are therefore entitled to pursue civil remedies against the RICO Defendants pursuant to 18 U.S.C. § 1964(c).

356.    Section 1962(c) makes it "unlawful for any person employed by or associated with any enterprise engaged in, or other activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity."

### The Fake Ring Tone Enterprise

357.    The Fake Ring Tone Enterprise consisted of at least the following entities: T-Mobile, Inteliquent, and Doe Defendants 1-10 (hereinafter "Enterprise"), who may include but are not limited to Level 3, West, other Intermediate Providers, Ericsson or other technology vendors or software providers.

358.    At all times, each member of the Enterprise has had a separate existence from the Enterprise and the other members of the Enterprise, including distinct legal statuses, different offices, different officers, directors and employees, and separate bank accounts and financial statements.

359.    At all relevant times, the Enterprise was separate and distinct from the pattern of racketeering activity in which the RICO Defendants engaged.

360.    Each and every member of the Enterprise conducted and/or participated in the illegal conduct described in the *Consent Decree* and about which T-Mobile made "Admissions" in paragraph 17 of the *Consent Decree*.

361.    Plaintiffs believe that each member of the Enterprise played a role, as alleged herein, in inserting false ring tones into hundreds of millions, or even billions, of calls, and/or conducted or participated in other call blocking practices underlying T-Mobile's admission that it failed to correct problems with its Intermediate Providers' delivery of calls to consumers in certain rural OCNs.

362.    In addition to the unlawful activities of the Enterprise alleged herein, the RICO Defendants also utilized the identical contractual and business relationships, computer systems and telecommunications networks for legitimate and lawful purposes of delivering telephone calls initiated by T-Mobile customers to the intended recipients of the calls.

363.    The entities described as participating in the Enterprise are members of, and constitute, an association in fact enterprise.  This association in fact Enterprise has structure centered around T-Mobile's contractual and services relationships with Inteliquent and the Doe Defendants.

364.    The purposes of T-Mobile's association with the other members of the Enterprise were both legitimate and illegitimate.

365.    The association also had the illegitimate purpose of fraudulently reducing T-Mobile's liability for call termination fees to high cost OCNs by either (i) inserting fake ring tones into calls that were not connected to the recipient to confuse the caller and influence them to hang up; (ii) by engaging in other call blocking practices that prevented calls to high cost OCNs from

completing; or, (iii) by using a combination of both illegal practices to thwart completion of high cost calls.

366.    This common purpose allowed T-Mobile to avoid payment of high cost inter-carrier compensation charges LECs would otherwise have been entitled to charge, and T-Mobile and its Intermediate Providers would otherwise be required to fund, and it allowed Inteliquent to improve the failing profit margins of its intermediary services agreements with T-Mobile.

367.    The RICO Defendants achieved their common purpose by repeatedly targeting calls placed to high cost OCNs to be disrupted by fake ring tones and other illegal call blocking tactics which T-Mobile admitted in the *Consent Decree* it failed to correct.

368.    To achieve the common purpose of the Enterprise, the RICO Defendants hid from their customers, the members of the putative Class, the Commission and the general public, the unlawfulness of their call completion practices, and obfuscated the true cause of rampant rural call completion failures, even in the face of call completion complaints lodged by customers, LECs and third parties who did not receive their calls.

369.    T-Mobile's association with the members of the Enterprise during which the Enterprise engaged in racketeering activity was at least a three-year relationship. And, the *Consent Decree*'s disclosure, based on less than one years' worth of data collected from T-Mobile for 2016, that over 100,000,000 calls were impacted, shows the longevity of the scheme and supports structure of the Enterprise.

370.    Without the RICO Defendants' willing participation in the fake ring tone scheme, the Enterprise's fake ring tone scheme and common course of conduct would not have been successful.

**The RICO Defendants' Pattern Of Racketeering Activity**

371.    18 U.S.C. § 1961 defines "racketeering activities" as any one of dozens of federal crimes enumerated by Section 1961.  Among the definition of racketeering activities is wire fraud, 18 U.S.C. § 1343.

372.    Each of the RICO Defendants, having devised or intending to devise a scheme or artifice to defraud T-Mobile's customers, Plaintiffs and the members of the putative Class, and the intended recipients of calls that they prevented from completion as described herein, acting with the intent to defraud, both affirmatively or by concealment of material facts, transmitted or caused to be transmitted by means of wire communication in interstate or foreign commerce, writings, signs or signals for the purpose of executing such scheme or artifice to defraud, including by:

   a.  inserting hundreds of millions of false messages into telephonic wire transmissions, in the form of LRBTs, even though the calls had not been connected to the intended recipient of the call, thereby fraudulently misrepresenting to the caller that the recipient of the call was not answering the phone and fraudulently inducing the caller to prematurely hang up the call or be deterred from using T-Mobile's wireless service to call the rural call recipient;

   b.  emails or other forms of wire transmittals of billing communications by and among the members of the putative Class, whose invoices and submissions for intercarrier compensation were fraudulently reduced by the tactics of the fake ring tone scheme;

   c.  emails or other forms of wire transmittals exchanged between T-Mobile and its subscribers related to T-Mobile's purported resolution of call complaints submitted to the email address CallComplaints@TMobile.com, to which T-Mobile responded via emails or wire transmittals that fraudulently omitted that T-Mobile falsely

107

contended the issues were caused by downstream routers, and fraudulently omitted that completion failures were intentionally caused by T-Mobile's fake ring tone scheme;

d.  emails or other forms of wire transmittals, including billing communications and transmittals of payments, by and among T-Mobile and Inteliquent pursuant to their services agreements; and

e.  T-Mobile's quarterly submission of its Form 480 rural call completion reports submitted to the Commission via wires, which, upon information and belief, fraudulently omitted from the "Explanations" worksheet that the rural call completion data T-Mobile was submitting was tainted by the fake ring tone scheme.

373.  The insertion of hundreds of millions of false messages into wires with the intent to defraud and deceive is one of the most explicit and extraordinary forms of wire fraud alleged in a telecommunications case.  These incidences are far too numerous to identify the date, time and place of each such instance, and, since T-Mobile is obstructing Plaintiffs' FOIA requests seeking such data from the Commission, to which T-Mobile provided such information, and T-Mobile and Inteliquent are also engaged in myriad sealing motions in the Inteliquent Litigation, obscuring information about the *Consent Decree* investigation from public view in that proceeding as well, Plaintiffs should be entitled to supplement and amend these wire fraud allegations when the full scope and details of the RICO Defendants' wire fraud activities are produced in either the FOIA Litigation or in discovery.

374.  In addition to the foregoing, Plaintiffs are informed and believe that RICO Defendants used the wires in conjunction with reaching the agreements among the members of the

Enterprise with respect to their participation in the fake ring tone scheme and compensation for their various roles in the conspiracy.

375. The multiple acts of racketeering activity committed by the Enterprise had the same purpose, caused the same results of fraudulently preventing completion of calls to high cost OCNs, involved the same participants, involved the same genre of targeted victims described by the Class definition set forth herein, used the same methods of commission and were interrelated and not isolated events.

376. The acts of racketeering activity, at all times, constituted a threat of continuing racketeering activity.

377. The Enterprise is characterized by closed-ended continuity because the RICO Defendants engaged in hundreds of millions of instances of racketeering activity per year that began on a date currently unknown to Plaintiffs, but which likely have occurred for over a ten-year period of time, such that the continuing threat of future harm was implicit. T-Mobile's admission that its fake ring tone practice was in effect for the seven years prior to the ban on them going into effect on January 1, 2014, and its continued use of them through at least 2016, further establishes closed-ended continuity.

378. The Enterprise is also characterized by open-ended continuity because: the threat of continued racketeering activity was apparent from repetition of the fake ring tone scheme practices; the fake ring tone scheme tactics were a regular way of conducting an ongoing otherwise legitimate business; and, the predicate acts could be attributed to the RICO Defendants operating as part of a long-term association that exits for criminal purposes.

**The Activities Of The Enterprise Affected Interstate Commerce**

379.     The Enterprise engaged in activities that affected interstate and foreign commerce because it involved commercial activities – the delivery of telecommunications services across state boundaries – and the receipt of monies and exchange of payments by and among the member of the Enterprise across state boundaries.

380.     The Enterprise also affected interstate and foreign commerce because it impeded and restricted commercial activities of T-Mobile wireless customers who attempted to place calls across state boundaries for commercial purposes but were restricted from doing so by the fake ring tone scheme.

**Injury To Plaintiffs And Putative Class Members In Their Business Or Property By Reason Of The Pattern Of Racketeering Activity.**

381.     The acts of racketeering activity described above caused Plaintiffs and the members of the putative Class to be injured in their businesses in multiple ways, including but not limited to:

382.     Lost opportunities to seek intercarrier compensation for calls the Enterprise prevented from connecting to the Plaintiffs' switches;

383.     Lost profits and revenue;

384.     Reputational harm due to LEC customers' false impression that the LEC was responsible for call completion failures caused by the fake ring tone scheme;

385.     Loss of good will with LEC customers;

386.     Lost time value of labor hours devoted to investigating customer complaints resulting from the fake ring tone scheme;

387.     Direct and consequential damages related to customer concessions demanded by LEC customers threatening to terminate service due to the Enterprise's fake ring tone scheme and illegal call blocking practices;

388.     Losses due to interferences with business relationships between LECs and their customers and prospective customers;

389.     Industry wide harm to the reputations and business opportunities for rural LECs.

390.     Punitive damages should also be awarded because the RICO Defendants' conduct evinces a high degree of moral culpability, their conduct was committed with fraud, actual malice, deliberate oppression, and they acted willfully and with wanton disregard of the rights of others.

WHEREFORE, Plaintiffs request that the Court declare that the Defendants have violated 18 U.S.C. § 1962(c) and enter judgment against the Defendants, including for treble damages, attorneys' fees, as well as any other relief that may be available to remedy the Defendants' actions.

### COUNT V
### Violation Of RICO, 18 U.S.C. § 1962(d)
### (Against All Defendants)

391.     The allegations of paragraphs 1 - 390 are incorporated by reference as though fully set forth herein.

392.     18 U.S.C. § 1962(d) makes it unlawful for "any person to conspire to violate" any other subsection of Section 1962, including Section 1962(c).

393.     The RICO Defendants agreed to participate in an endeavor, which if completed would violate, and in fact did violate, a substantive provision of Section 1962.

394.     Each RICO Defendant agreed to participate in the conspiracy and knew about the essential scope and nature of the conspiracy as illustrated by the factual allegations herein.

395.     Each RICO Defendant agreed with each other and with third parties to carry out the Enterprise alleged above and to violate 18 U.S.C. § 1962(c), as alleged above, in violation of 18 U.S.C. § 1962(d).  Each RICO Defendant has knowingly aided, assisted and abetted the others in carrying out and attempting to carry out the Enterprise.

396.     As alleged above, each RICO Defendant, by words or action, manifested an agreement to commit two or more predicate acts in furtherance of the common purpose of the RICO Enterprise.

397.     As alleged above, each RICO Defendant knew of the conspiracy's goals and agreed to facilitate and/or to aid, assist and abet the others in carrying out the conspiracy by, among other things, engaging in hundreds of millions of acts of wire fraud.

398.     The RICO and Doe Defendants' conspiracy to violate Section 1962 caused Plaintiffs and the members of the putative Class to be injured in their businesses in the ways alleged above.

399.     Pursuant to 18 U.S.C. § 1964(c), Plaintiffs and members of the putative Class are entitled to recover treble damages, costs of this suit and reasonable attorneys' fees.

400.     Punitive damages should also be awarded because the RICO Defendants' conduct evinces a high degree of moral culpability, their conduct was committed with fraud, actual malice, deliberate oppression, and they acted willfully and with wanton disregard of the rights of others.

WHEREFORE, Plaintiffs request that the Court declare that the Defendants have violated 18 U.S.C. § 1962(d) and enter judgment against the Defendants, including for treble damages, attorneys' fees, as well as any other relief that may be available to remedy the Defendants' actions.

## COUNT VI
### Tortious Interference With Contract (Illinois Law)
### (Against T-Mobile)

401.    The allegations of paragraphs 1 - 400 are incorporated by reference as though fully set forth herein.

402.    Plaintiffs have valid and enforceable contracts, in the form of federally-filed tariffs or commercial agreements, that require the payment of terminating access charges for the delivery of long-distance traffic for termination to Plaintiff's end users.

403.    T-Mobile is aware of these contracts and the relationships between Plaintiffs and the carriers that pay the terminating access charges.

404.    By directing or causing the insertion of fake ring tones and failing to adequately supervise its Intermediate Providers, T-Mobile intentionally and unjustifiably interfered with those carriers' delivery of calls to Plaintiffs by reducing or eliminating the volume of calls terminated, thereby reducing the amount of terminating access charges paid to Plaintiffs.

405.    T-Mobile's conduct causes damages to Plaintiffs.

406.    Punitive damages should be awarded because the Defendants' conduct evinces a high degree of moral culpability, their conduct was committed with fraud, actual malice, deliberate oppression, and they acted willfully and with wanton disregard of the rights of others.

WHEREFORE, Plaintiffs request that the Court enter judgment against the Defendants and award Plaintiffs damages and all available relief as a result of the Defendants' tortious interference, which damages may include, but are not necessarily limited to, the amounts Defendants retained as a result of their unlawful conduct.

## COUNT VII
### Violation Of Illinois Consumer Fraud And
### Deceptive Business Practice Act, 815 ILCS 505/1 *et seq.*
### (Against All Defendants)

407.     The allegations of paragraphs 1 - 406 are incorporated by reference as though fully set forth herein.

408.     The Illinois Consumer Fraud and Deceptive Business Practice Act, 815 ILCS 505/1 *et seq.*, prohibits fraud, unfair methods of competition, and unfair or deceptive practices in the conduct of trade or business.

409.     The Defendants have engaged in deceptive acts and practices by participating in a scheme to avoid high cost terminating access fees by inserting fake ring tones into calls that were delayed or not completed and that masked excessive least cost routing practices or routing practices designed to prevent calls from ever completing.

410.     The deceptive acts were material.

411.     The Defendants intended that their deceptions be relied upon.

412.     The deceptions occurred in the course of conduct involving trade and commerce.

413.     Plaintiffs suffered actual damages from the deception.

414.     The deception imposed harms upon the public and consumers at large, especially T-Mobile subscribers and those that did not receive calls from T-Mobile's subscribers.

415.     Inteliquent is based in Illinois and substantial portions of the Defendants' actions occurred in Illinois.

416.     Punitive damages should also be awarded because the Defendants' conduct evinces a high degree of moral culpability, their conduct was committed with fraud, actual malice, deliberate oppression, and they acted willfully and with wanton disregard of the rights of others.

WHEREFORE, Plaintiffs request that the Court enter judgment against the Defendants and award Plaintiffs damages and all relief available under the Illinois Consumer Fraud and Deceptive Business Practices Act, including all compensatory and monetary relief permitted by statute, attorneys' fees and costs, as well as punitive damages to the fullest extent possible.

## COUNT VIII
### Civil Conspiracy
### (Against All Defendants)

417. The allegations of paragraphs 1 - 416 are incorporated by reference as though fully set forth herein.

418. The Defendants agreed to perpetrate the scheme against Plaintiffs and those similarly situated.

419. The Defendants agreed on the objective and method to perpetrate their scheme.

420. The scheme was unlawful.

421. Each Defendant committed an overt act in furtherance of the scheme.

422. Plaintiffs have been injured by the conspiracy.

423. Punitive damages should be awarded because the Defendants' conduct evinces a high degree of moral culpability, their conduct was committed with fraud, actual malice, deliberate oppression, and they acted willfully and with wanton disregard of the rights of others.

WHEREFORE, Plaintiffs request that the Court enter judgment against the Defendants and award Plaintiffs damages and all available relief as a result of the conspiracy, as well as any other relief that may be available to remedy the Defendants' actions.

**Prayer for Relief**

WHEREFORE, Plaintiffs and the class request the following relief:

1.      That the Court enter an order certifying the Class and appointing either or both Plaintiffs as the representative(s) of the Class, and appointing counsel for Plaintiffs as lead counsel for the respective class;

2.      That the Court enter judgment against all Defendants jointly and severally, in an amount no less than $750,000,000, premised on the requests for relief set forth herein;

3.      That the Court enter judgment against all Defendants and in favor of Plaintiffs and the Class, for all economic, monetary, actual, consequential and compensatory damages caused by their wrongful conduct;

4.      That the Court enter judgment against all Defendants and in favor of Plaintiffs and the Class in an amount sufficient to disgorge Defendants of the significant costs and expenses they avoided by their wrongful conduct;

5.      That the Court award Plaintiffs and the Class treble damages;

6.      That the Court award Plaintiffs and the Class punitive damages;

7.      That the Court award Plaintiffs and the Class the costs and expenses, as well as reasonable attorneys' fees, they incurred in prosecuting this action;

8.      That the Court award Plaintiffs and the Class pre- and post-judgment interest;

9.      That the Court award such other and further relief as may be necessary or appropriate.

**Trial By Jury**

Plaintiffs demand trial by jury on all Counts where trial by jury is available.

Dated:  November 25, 2019               Respectfully submitted,

  /s/ David T.B. Audley           
David T.B. Audley (Bar No. 6190602)
Mia D. D'Andrea (Bar No. 6307966)
Chapman and Cutler LLP
111 West Monroe Street
Chicago, IL  60603-4080
Telephone:  312-845-2971
Facsimile:  312-516-3971
Email:  audley@chapman.com
Email:  dandrea@chapman.com

Cathy A. Hinger (*pro hac vice*)
G. David Carter (*pro hac vice*)
Womble Bond Dickinson (US) LLP
1200 19th Street, NW, Suite 500
Washington, DC  20036
Telephone:  202-857-4489
Facsimile:  202-261-0029
Email:  cathy.hinger@wbd-us.com
Email:  david.carter@wbd-us.com

Kurt Weaver (*pro hac vice*)
Womble Bond Dickinson (US) LLP
555 Fayetteville Street, Suite 1100
Raleigh, NC  27601
Telephone:  919-755-8163
Facsimile:  919-755-6770
Email:  kurt.weaver@wbd-us.com

*Counsel for Plaintiffs*