THE UNITED STATES DISTRICT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| CRAIGVILLE TELEPHONE CO. d/b/a ADAMSWELLS; and CONSOLIDATED TELEPHONE COMPANY d/b/a CTC | ) ) ) ) | |
| Plaintiff, | ) ) | No. 1:19-cv-07190 |
| vs. | ) ) | Judge John Z. Lee |
| T-MOBILE USA, INC.; and INTELIQUENT, INC. | ) ) ) | |
| Defendants. | ) | |

## PLAINTIFFS' INITIAL STATUS REPORT

Plaintiffs, Craigville Telephone Co. d/b/a AdamsWells and Consolidated Telephone Company d/b/a CTC, on behalf of themselves and a class of similarly-situated companies, as and for Plaintiffs' Initial Status Report, respectfully state as follows:

### I. INITIAL STATEMENT

In compliance with the Court's November 6, 2019 Minute Entry (ECF No. 10), Plaintiffs have endeavored to prepare a Joint Initial Status Report, inviting Defendants T-Mobile USA, Inc. and Inteliquent, Inc. to provide their views and engage in a substantive meet and confer process. During a telephone call on January 7, 2020, Defendants' counsel declined the invitation to participate in the preparation of a Joint Initial Status Report, citing language on the Court's website and noting that they understood this language to supersede the Court's Minute Entry because Defendants have indicated their intention to file Motions to Dismiss on January 15, 2020. Accordingly, the information set forth herein expresses solely the views of the Plaintiffs.

### II. THE NATURE OF THE CASE

**A. Identify the attorneys of record for each party, including the lead trial attorney.**

Counsel for Plaintiffs
David T.B. Audley (Bar No. 6190602)
Mia D. D'Andrea (Bar No. 6307966)
Chapman and Cutler LLP
111 West Monroe Street

Counsel for Defendant T-Mobile, Inc.
Nigel F. Telman
Proskauer Rose LLP
Three First National Plaza
70 West Madison, Suite 3800

Chicago, IL 60603-4080
Tel. 312-845-2971
Fax: 312-516-3971
Email: audley@chapman.com
Email: dandrea@chapman.com

Cathy A. Hinger (*pro hac vice*)
G. David Carter (pro hac vice)
Womble Bond Dickinson (US) LLP
1200 19th Street, NW, Suite 500
Washington, DC 20036
Tel.: 202-857-4489
Fax: 202-261-0029
Email: cathy.hinger@wbd-us.com
Email: david.carter@wbd-us.com

Kurt D. Weaver (*pro hac vice*)
Womble Bond Dickinson (US) LLP
555 Fayetteville Street, Suite 1100
Raleigh, NC 27601
Telephone: 919-755-8163
Facsimile: 919-755-6770
Email: kurt.weaver@wbd-us.com

Chicago, IL 60602
(312) 962-3550
(312) 962-3551 (fax)
Email: ntelman@proskauer.com

Baldassare Vinti (*pro hac vice*)
Bradley I. Ruskin (*pro hac vice*)
Proskauer Rose LLP
Eleven Times Square
New York, NY 10036-8299
Tel.: 212.969.3249
Fax: 212.969.2900
Email: bvinti@proskauer.com

Counsel for Defendant Inteliquent, Inc.
John J. Hamill
Michael S. Pullos
Devin Carpenter
DLA PIPER LLP (US)
444 West Lake Street, Suite 900
Chicago, Illinois 60606
Tel: 312.368.7036/2176
Fax: 312.251.5809
Email: john.hamill@dlapiper.com
Email: michael.pullos@us.dlapiper.com
Email: devin.carpenter@us.dlapiper.com

**B. State the basis for federal jurisdiction.**

Plaintiffs have pled that the Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 (federal question) and 47 U.S.C. §§ 206-207 (the Communications Act of 1934).

Plaintiffs further pled that the Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(d) because this is a class action in which a member of the class of plaintiffs is a citizen of a state different than a defendant, there is more than $5 million in controversy, and the number of proposed class members exceeds 100.

Plaintiffs further pled that the Court has supplemental jurisdiction over the state law claims because they form part of the same case or controversy. 28 U.S.C. § 1367.

> **1. If diversity jurisdiction is the asserted basis for federal jurisdiction, any nongovernmental party, other than an individual or sole proprietorship, shall include the following information as required by Northern District of Illinois Local Rule 3.2:**

2

> **a. In the case of a corporation, the citizenship of any entity owning more than 5% of the corporation.**

There is no entity owning more than 5% of Craigville Telephone Co. d/b/a AdamsWells or Consolidated Telephone Company d/b/a CTC.

**C. Describe the nature of the claims asserted in the complaint and any counterclaims.**

**The Parties**. Plaintiffs are local telephone companies known as "local exchange carriers" or "LECs". LECs help long-distance carriers and mobile carriers like T-Mobile deliver calls to residences and businesses by providing the "last mile" connection to the LECs' customers. Intermediate providers, like Defendant Inteliquent, provide transport services that help mobile carriers, like T-Mobile, deliver traffic to the terminating LECs, such as Plaintiffs. In exchange for the use of its network to terminate these calls, LECs have been historically entitled to charge and collect a payment known as an access charge.

**The Claims.** This case alleges that T-Mobile and Inteliquent conspired to avoid payment of high cost access charges by unlawfully providing degraded call service and quality when T-Mobile's customers called rural areas. This degraded service helped to inflate T-Mobile's profits and/or decrease Inteliquent's negative margins. This is because access charges for rural areas are generally more expensive than those in urban areas. Because T-Mobile's customers generally rely on unlimited long-distance plans, reducing traffic volumes to rural areas yields better profit margins. But, because T-Mobile did not want its customers to know that T-Mobile and its intermediate carriers like Inteliquent were the reason why their calls were not being completed, fake ring tones were inserted into hundreds of millions of calls annually to mask their intentional call disruptions and failures. The failure to complete calls to rural areas, and the use of fake ring tones, were both practices that the FCC has declared to be illegal.

**T-Mobile's Admissions.** In April 2018, the FCC announced that it had entered into a Consent Decree with T-Mobile and that T-Mobile would pay a $40 million penalty for engaging in these unlawful practices. T-Mobile's protracted illegal scheme deceived its customers and cheated carriers like Plaintiffs, who seek to represent a nationwide class of LECs. T-Mobile has admitted that its illegal fake ring tones impacted hundreds of millions of calls annually. T-Mobile admitted it also failed to oversee intermediate carriers – chiefly, Inteliquent – who provided degraded call services to rural parts of the country. It is this degraded service that was masked by the illegal ringtones.

**The Conspiracy.** Defendants Inteliquent and T-Mobile have a history of regularly discussing a desire to reduce the amount of calls T-Mobile's customers make to "high cost" areas and how T-Mobile implemented methods to decrease traffic volumes and the associated access charges paid to certain carriers. The FAC describes evidence that was made public in other litigation demonstrating that Inteliquent's CEO at the time, Matthew Carter, was concerned about its 2015 Master Services Agreement ("MSA") with T-Mobile, in which Inteliquent agreed to become the nearly-exclusive provider of long-distance services for T-Mobile, was impacting Inteliquent's bottom line; he encouraged his team to come up with "crazy hair ball ideas" to curb costs and boost margins. The disclosure also includes an email from Inteliquent's Senior Vice President, who

3

wrote about efforts underway in March 2016 for Inteliquent to "develop[ ] a series of strategies/initiatives to more aggressively work with [T-Mobile] to contain the volume of traffic to high costs codes" with the explicit goal of "yield[ing] a reduction in volume to these codes. . . ."

Documents recently provided to Plaintiffs by the FCC expose that T-Mobile admitted, during the course of the FCC's investigation, that it expanded the use of fake ring tones in September 2015, long after the FCC codified its prohibition on the use of fake ringtones. September 2015 is precisely the time period in which the new T-Mobile-Inteliquent MSA was being implemented, which dramatically increased T-Mobile's reliance on Inteliquent's IP-based network for the delivery of long-distance traffic. There is evidence within the FCC's FOIA production that Inteliquent was the intermediary for numerous calls to rural phone numbers that did not complete. Indeed, the FCC's very first letter of inquiry to T-Mobile reported that Inteliquent was already aware that fake ring tones were being played on T-Mobile calls even when the call did not reach the rural LEC's switching equipment. Thus, Plaintiffs allege that this expanded use of fake ring tones in September 2015, occurring at precisely the same time that T-Mobile was shifting more traffic to Inteliquent's IP network, is not a mere coincidence. Rather, it was part of a conspiracy between the two companies to reduce costs and increase profitability, and that they have been attempting to hide or prevent discovery regarding the full nature and extent of their collaboration.

The FCC's November 6, 2019 FOIA production includes documents clearly establishing that Inteliquent was responsible for several call failure and rural call completion problems and that T-Mobile's admission that it failed to adequately oversee its Intermediate Provider directly related to Inteliquent's failures.

The nature of Plaintiffs' class action are summarized as follows:

- Count I asserts federal statutory claims against T-Mobile for violating Section 201(b) of the Communications Act of 1934 ("Act"), 47 U.S.C. § 201(b), by violating the Commission's prohibition against the insertion of fake ring tones, 47 C.F.R. § 64.2201.

- Count II asserts federal statutory claims against T-Mobile, Inteliquent and Doe Defendants for violating Section 201(b) of the Act by failing to deliver calls to rural phone numbers, providing degraded delivery of calls to rural phone numbers, and failing to correct problems with intermediate providers providing degraded call completion service to rural phone numbers.

- Count III asserts federal statutory claims against T-Mobile, Inteliquent and Doe Defendants for violating Section 202(a) of the Act, 47 U.S.C. § 202(a), by engaging in the discriminatory practices described in Counts I and II, resulting in degraded call delivery for calls placed to certain rural areas.

- Count IV asserts federal statutory claims against all Defendants for violating 18 U.S.C. § 1962(c) ("RICO") by participating in an association in fact enterprise that existed for both the legitimate business purpose of delivering long distance calls but also the illegitimate purpose of fraudulently avoiding payment of access charges by inserting illegal fake ring

4

    tones into calls bound for high cost rural areas and engaging in other prohibited call blocking practices. The RICO claims are premised on a pattern of racketeering activity supported by T-Mobile's admission that this Fake Ring Tone Scheme impacted hundreds of millions of long-distance calls annually, impacting interstate commerce, and the fact that it inserted false messages directly into telephonic wire transfers in violation of 18 U.S.C. § 1343.

- Count V asserts federal statutory claims against all Defendants for violating 18 U.S.C. § 1962(d) by conspiring to violate RICO.

- Count VI asserts a state law claim against T-Mobile for tortious interference with contract, pursuant to which Plaintiffs allege T-Mobile caused the loss of access charge revenues by interfering with contracts and tariffs that obligated carriers to pay terminating access charges when transmitting T-Mobile's calls to the Plaintiffs.

- Count VII asserts state law statutory claims against all Defendants for violating the Illinois Consumer Fraud and Deceptive Business Practice Act, 815 ILCS 505/1 *et seq*. by participating in the scheme to avoid high cost terminating access fees through use of illegal and fraudulent fake ring tones to mask excessive least cost routing practices that were designed to prevent calls placed to rural areas from ever completing.

- Count VIII asserts state law claims for civil conspiracy against all defendants for engaging in the Fake Ring Tone scheme that is the subject of the RICO and ILCS claims.

No counterclaims have been filed to date.

**D. A statement of the major legal and factual issues in the case to be submitted by each side in 200 words or less per side. A party need not agree to the opposing party's statement.**

T-Mobile made two admissions of unlawful conduct in the FCC's *Consent Decree*: (1) violating the FCC's prohibition on the use of fake ring tones; and (2) violating FCC rules by failing to correct problems with its intermediary providers' delivery of calls to rural areas. The FCC's FOIA production and other public Inteliquent documents directly link T-Mobile's second admission to Inteliquent being the primary provider of degraded service to certain rural areas. Plaintiffs anticipate that the major factual and legal issues will relate to Plaintiffs' fraud-based claims. A key focus of fact discovery will be the who, what, when, where and how of T-Mobile's expanded use of fake ring tones in September 2015, including the precise nature of Inteliquent's knowledge and participation in the fake ring tone scheme to mask its degraded service. The number of calls impacted by the scheme, the costs avoided by the Defendants as a result of the scheme, and the access charges the class of Plaintiffs were denied will also be key subjects of fact discovery. Key legal issues will also include class certification and the calculation of damages on behalf of the class.

**E. Describe the relief sought by the Plaintiff(s).**

Plaintiffs seek damages including, treble damages, punitive damages, and attorneys' fees on behalf of themselves and similarly-situated local exchange carriers. Exploration of damages will require, among other things, discovery from T-Mobile and Inteliquent concerning their call completion rates, call detail records and financial records related to terminating access charges and other costs each Defendant avoided paying by failing to complete calls.

**III. PENDING MOTIONS AND CASE PLAN**

**A. Day/date of the Initial Status Hearing:** Thursday, January 16, 2020

**B. Pending motions and the dates Answers were filed:**

**Pending Motions:**

Plaintiffs have filed a Motion to Establish Date for Initial Disclosures and to Commence Discovery.

Defendants are expected to file Motions to Dismiss on January 15, 2020. Therefore, no Answers have been filed by either Defendant.

**C. Description of the parties' discussions of the mandatory initial discovery responses required by the Mandatory Initial Discovery Pilot Project.**

The Defendants have declined to engage in discussion regarding the mandatory initial discovery responses required by the Mandatory Initial Discovery Pilot Project.

**D. Proposed discovery plan, including the following information:**

The parties were unable to reach agreement on a discovery plan due to a disagreement about whether discovery should commence before resolution of Defendants' Motions to Dismiss. Therefore, the parties' respective positions are set forth separately below.

**1. The general type of discovery needed;**

The specific needs of discovery will depend, in part, on the material provided by the Defendants in response to the MIDP Amended Standing Order. However, anticipated areas of discovery for Plaintiffs include, but are not limited to at least the following:

    1. Unredacted copies of all materials exchanged between the FCC and T-Mobile in response to the FCC's investigation of T-Mobile's rural call completion and fake ring tones.

    2. The underlying materials relied upon by T-Mobile in crafting its responses to the FCC's Letters of Inquiry ("LOI") and any other requests for information.

3. All drafts and versions of T-Mobile's Form 480 reports and internal communications and communications with Inteliquent or any other intermediate provider related thereto, including the forms as originally filed and as amended.

4. All documents related to T-Mobile's negotiation of the terms and conditions of the Consent Decree with the FCC, including, but not limited to: (1) disclosure of the full amount the Commission threatened to seek in its Notice of Apparent Liability against T-Mobile; (2) the amount of penalty the Commission initially proposed T-Mobile pay to settle its threatened enforcement action; (3) communications related to the Commission's justifications for its proposed forfeiture and settlement amounts; (4) communications from T-Mobile arguing for a reduction in the proposed forfeiture or settlement amounts, including any factual representations made during the course of those discussions.

5. Specifics regarding the use of fake ring tones on T-Mobile's traffic, including, but not limited to: (1) the expanded use of fake ring tones in September 2015; (2) why the use of fake ring tones was expanded at that time; (3) the identity of all persons and businesses involved in T-Mobile's expanded use of fake ring tones in September 2015; and (4) the location of all equipment used to insert and convey the fake ring tones.

6. All communications by and between Kathleen Foster, members of the Network Technology team, and legal or regulatory compliance personnel regarding: (1) the FCC's 2013 Rural Call Completion Order; (2) the ban on fake ringtones; (3) their awareness of the ban on fake ringtones; (4) efforts made to comply with any aspect of the 2013 Rural Call Completion Order; and (5) the preparation of Ms. Foster's September 8, 2017 Declaration.

7. All statements, writings, materials or information related to Fritz Hendrick's involvement in rural call completion issues, including efforts to migrate numbers to Inteliquent or its predecessor's switches and charges related thereto.

8. All call reporting and measurement services that Inteliquent provided to T-Mobile pursuant to any contract.

9. All statements, writings, materials or information T-Mobile or Inteliquent disclosed to any third parties concerning the Consent Decree, the actions set forth therein, or its exposure to liability therefore in the context of any merger, acquisition, audit, insurance claims, or other business transactions that have called for disclosure of information about any matters related to the Consent Decree.

10. All communications between T-Mobile and Inteliquent concerning the issues in the litigation.

11. Internal communications at T-Mobile and Inteliquent regarding efforts to reduce costs associated with the T-Mobile MSA or to reduce traffic to high cost codes.

12. Financial records related to the services Inteliquent provided to T-Mobile pursuant to their MSA.

13. All documents related to T-Mobile's and Inteliquent's amendment of their MSA.

14. Records related to the services Inteliquent or its predecessor companies provided to T-Mobile prior to September 2015.

15. Unredacted copies of all materials exchanged between Inteliquent and the parties involved in the Free Conferencing litigation, or filed or maintained under seal in that action, related to the T-Mobile/Inteliquent working group that was tasked with devising ways to reduce traffic to high cost codes.

16. Depositions of relevant party fact witnesses.

17. Third party discovery from other companies potentially involved in the fake ring tone scheme, including Ericsson, West, Level 3, Ribbon Communications or other intermediate providers or technology equipment providers.

18. Expert testimony and analysis concerning relevant technical issues and damages.

**2. A date to issue written discovery;**

On or after March 11, 2020

**3. A date for the deadline for the amendment of pleadings (90 days after Rule 26(a) disclosures are exchanged).**

June 15, 2020

**4. A fact discovery completion date;**

September 25, 2020

**5. An expert discovery completion date, including dates for the delivery of expert reports; and**

Affirmative Expert Reports: October 30, 2020
Rebuttal Expert Reports: December 4, 2020
Close of Expert Discovery: January 15, 2021

**6. A date for the filing of dispositive motions.**

February 26, 2021

**E. With respect to trial, indicate the following:**

**1. Whether a jury trial is requested and by whom; and**

A jury has been requested by the Plaintiffs.

8

**2. The probable length of trial**

Two to three weeks

IV. **CONSENT TO PROCEED BEFORE A MAGISTRATE JUDGE**

The parties have not unanimously agreed to proceed before a Magistrate Judge.

V. **STATUS OF SETTLEMENT DISCUSSIONS**

No active settlement discussions are underway at this time.

Submitted on this 8th day of January 2020.

  /s/DavidT.B.Audley\_\_\_\_
David T.B. Audley (Bar No. 6190602)
Mia D. D'Andrea (Bar No. 6307966)
Chapman and Cutler LLP
111 West Monroe Street
Chicago, IL 60603-4080
Tel. 312-845-2971
Fax: 312-516-3971
Email: audley@chapman.com
Email: dandrea@chapman.com

Cathy A. Hinger (*pro hac vice*)
G. David Carter (pro hac vice)
Womble Bond Dickinson (US) LLP
1200 19th Street, NW, Suite 500
Washington, DC 20036
Tel.: 202-857-4489
Fax: 202-261-0029
Email: cathy.hinger@wbd-us.com
Email: david.carter@wbd-us.com

Kurt D. Weaver (*pro hac vice*)
Womble Bond Dickinson (US) LLP
555 Fayetteville Street, Suite 1100
Raleigh, NC 27601
Telephone: 919-755-8163
Facsimile: 919-755-6770
Email: kurt.weaver@wbd-us.com

*Counsel for Plaintiffs*

<u>**CERTIFICATE OF SERVICE**</u>

The undersigned hereby certifies that on January 8, 2020, I electronically filed the foregoing **Plaintiffs' Initial Status Report**, with the Clerk of Court using the Court's CM/ECF electronic filing system, which will automatically send e-mail notification of such filing to the following attorneys of record:

**Nigel F. Telman**
Proskauer Rose LLP
Three First National Plaza
70 W. Madison
Suite 3800
Chicago, IL 60602
Email: ntelman@proskauer.com

**John J. Hamill , Jr.**
**Devin James Carpenter**
**Michael S. Pullos**
DLA Piper LLP (US)
444 West Lake Street
Suite 900
Chicago, IL 60606
Email: john.hamill@dlapiper.com
Email: devin.carpenter@dlapiper.com
Email: michael.pullos@dlapiper.com

   /s/DavidT.B.Audley_____
       David T.B. Audley