**THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

|  |  |  |
|---|---|---|
| CRAIGVILLE TELEPHONE CO. d/b/a ADAMSWELLS; and CONSOLIDATED TELEPHONE COMPANY d/b/a CTC | ) ) ) ) | |
| Plaintiff, | ) ) | No. 1:19-cv-07190 |
| vs. | ) ) | Judge John Z. Lee |
| T-MOBILE USA, INC.; and INTELIQUENT, INC. | ) ) ) ) | |
| Defendants. | ) | |

**PLAINTIFFS' OPPOSITION TO T-MOBILE USA, INC.'S
MOTION TO DISMISS PLAINTIFFS' FIRST AMENDED COMPLAINT**

David T.B. Audley (Bar No. 6190602)
Mia D. D'Andrea (Bar No. 6307966)
**CHAPMAN AND CUTLER LLP**
111 West Monroe Street
Chicago, IL 60603-4080
Tel. 312-845-2971
Email: audley@chapman.com
Email: dandrea@chapman.com

Cathy A. Hinger (*pro hac vice*)
G. David Carter (*pro hac vice*)
**WOMBLE BOND DICKINSON (US) LLP**
1200 19th Street, NW, Suite 500
Washington, DC 20036
Tel.: 202-857-4489
Email: cathy.hinger@wbd-us.com
Email: david.carter@wbd-us.com

Kurt D. Weaver (*pro hac vice*)
**WOMBLE BOND DICKINSON (US) LLP**
555 Fayetteville Street, Suite 1100
Raleigh, NC 27601
Telephone: 919-755-8163
Email: kurt.weaver@wbd-us.com

*Counsel for Plaintiffs*

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ............................................................................................................... 1

STATEMENT OF FACTS ................................................................................................. 2

LEGAL STANDARD ........................................................................................................ 4

   I.   Standard for a Rule 12(B)(1) Motion to Dismiss. ............................................. 4

   II.   Standard for a Rule 12(B)(6) Motion to Dismiss. ............................................. 4

   III.  Standard for Pleading Fraud Allegations. ........................................................ 5

DISCUSSION .................................................................................................................... 6

   I.   THE FAC PLAUSIBLY ALLEGES INJURY RESULTING FROM DEFENDANTS'
   CONDUCT. ....................................................................................................... 6

   II.   PLAINTIFFS ADEQUATELY ALLEGE VIOLATIONS OF THE COMMUNICATIONS
   ACT (COUNTS II AND III)................................................................................. 8

      A.   The 2012 Order Opened The Door To The Courthouse. ........................... 8

      B.   The *Consent Decree's* Supposed Limitation To "Certain Rural OCN's" Presents No
      Basis For Dismissal. ................................................................................ 9

      C.   The Allegations In The FAC State A *Prima Facie* Case For Violations Of Sections
      201(b) And 202(a) Of The Act. .............................................................. 11

   III.  THE RICO CLAIMS ARE WELL PLEAD (COUNTS IV-V). ........................................ 14

      A.   Count IV Adequately Alleges Causation. ............................................... 14

      B.   Plaintiffs Amply Allege Predicate Acts Of Mail And Wire Fraud. ......................... 16

      C.   Interstate Wires Need Not Defraud Recipient Or Contain Misrepresentations. ....... 19

      D.   The FAC Alleges Sufficient Facts To State A Plausible § 1962(d) Conspiracy
      Claim. ................................................................................................... 20

      E.   Plaintiffs May Seek Punitive Damages Because RICO's Treble Damages Provision
      Is Remedial, Not Punitive. ...................................................................... 22

   IV.  THE FAC ALLEGES THAT T-MOBILE INTERFERED WITH KNOWN TARIFFS
   AND BUSINESS RELATIONSHIPS (COUNT VI). ............................................... 24

   V.   PLAINTIFFS HAVE STANDING TO PURSUE THEIR ICFA CLAIM (COUNT VII). 26

   VI.  THE CIVIL CONSPIRACY CLAIM IS ADEQUATELY PLED (COUNT VIII). .......... 30

## <u>TABLE OF AUTHORITIES</u>

Cases

*Al-Kazemi v. General Acceptance & Inv. Corp.*,
  633 F. Supp. 540 (D.C. Cir. 1986)........................................................................... 23
*Anza v. Ideal Steel Supply Corp.*,
  547 U.S. 451 (2006)..................................................................................... 14, 15
*Apex Digital, Inc. v. Sears, Roebuck & Co.*,
  572 F.3d 440 (7th Cir. 2009) ...................................................................................... 4
*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009)..................................................................................... 4, 5
*AT&T Co. v. Central Office Telephone, Inc.*,
  524 U.S. 214 (1998)........................................................................................... 26
*Avery v. State Farm Mut. Auto. Ins.*,
  835 N.E.2d 801 (Ill. 2005)................................................................... 26, 28, 29
*Bastien v. AT&T Wireless Servs., Inc.*,
  205 F.3d 983 (7th Cir. 2000)................................................................................... 26
*BCS Servs., Inc. v. BG Invs., Inc.*,
  728 F.3d 633 (7th Cir. 2013) ................................................................................. 23
*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007)........................................................................................... 5
*Beller v. Health & Hosp. Corp. of Marion Cty., Ind.*,
  703 F.3d 388 (7th Cir. 2012) .................................................................................... 8
*Bible v. United Student Aid Funds, Inc.*,
  799 F.3d 633 (7th Cir. 2015) ................................................................................. 20
*Brody v. Finch Univ. of Health Sciences/The Chi. Med. Sch.*,
  698 N.E.2d 257 (Ill. 1998)................................................................................... 26
*Brouwer v. Raffensberger, Hughes & Co.*,
  199 F.3d 961 (7th Cir. 2000) ................................................................................. 20
*Brown v. Budz*,
  398 F.3d 904 (7th Cir. 2005) .................................................................................... 5
*Byczek v. Boelter Cos., Inc.*,
  264 F. Supp. 2d 720 (N.D. Ill. 2003) ..................................................................... 17
*Campbell v. City of Chi.*,
  No. 17-cv-4467, 2018 WL 4352614 (N.D. Ill. Sept. 12, 2018)............................... 30
*Carl v. Galuska*,
  785 F. Supp. 2d 1283 (N.D. Ill. 1992) ................................................................... 18
*Carter v. Berger*,
  777 F.2d 1173 (7th Cir. 1985) ............................................................................... 23
*Chatman v. City of Chi.*,
  No. 14-cv-2945, 2015 WL 1090965 (N.D. Ill. Mar. 10, 2015) ............................... 30
*City of Evanston v. N. Ill. Gas Co.*,
  229 F. Supp. 3d 714 (N.D. Ill. 2017)..................................................................... 30
*City of Rock Falls v. Chi. Title & Tr. Co.*,
  300 N.E.2d 331 (Ill. App. 1973)........................................................................... 25

*Clay v. Johnson,*
  264 F.3d 744 (7th Cir. 2001) ............................................................................ 8
*Cole v. Milwaukee Area Tech. Coll. Dist.,*
  634 F.3d 901 (7th Cir. 2011) ....................................................................... 4, 21
*Com-Tech Assocs. v. Computer Assocs. Int'l., Inc.,*
  753 F. Supp. 1078 (E.D.N.Y. 1990) ............................................................... 23
*Conn. Gen. Life Ins. Co. v. Sw. Surgery Ctr., LLC,*
  349 F. Supp. 3d 718 (N.D. Ill. 2018) ............................................................. 27
*Conboy v. AT&T,*
  241 F.3d 242 (2d. Cir. 2001) ........................................................................... 6
*Cooperative Communications, Inc. v. AT&T Corp.,*
  867 F. Supp. 1511 (D. Utah 1994) ................................................................. 26
*Cosmetique, Inc. v. ValueClick, Inc.,*
  753 F. Supp. 2d 716 (N.D. Ill. 2010) ....................................................... 27, 29
*Crichton v. Golden Rule Ins. Co.,*
  576 F.3d 392 (7th Cir. 2009) ......................................................................... 29
*CustomGuide v. CareerBuilder, LLC,*
  813 F. Supp. 2d 990 (N.D. Ill. 2011) ............................................................. 27
*DeGuelle v. Camilli,*
  664 F.3d 192 (7th Cir. 2011) ..................................................................... 20, 21
*Domanus v. Locke Lord LLP,*
  847 F.3d 469 (7th Cir. 2017) ..................................................................... 20, 21
*Elda Arnhold & Byzantio, LLC. v. Ocean Atl. Woodland Corp.,*
  284 F.3d 693 (7th Cir. 2002) ......................................................................... 11
*Elward v. Electrolux Home Products, Inc.,*
  264 F. Supp. 3d 877 (N.D. Ill. 2017) .............................................................. 5
*Emery v. Am. Gen. Fin., Inc.,*
  134 F.3d 1321 (7th Cir. 1998) ....................................................................... 18
*Empress Casino Joliet Corp. v. Blagojevich,*
  No. 09-cv-3585, 2013 WL 4478741 (N.D. Ill. Aug. 19, 2013) ...................... 15
*Empress Casino Joliet Corp. v. Johnston,*
  763 F.3d 723 (7th Cir. 2014) ......................................................... 14, 15, 16, 20
*Exp., Inc. v. McMahon,*
  482 U.S. 220 (1987) ....................................................................................... 23
*Fax Telecommunicaciones Inc. v. AT&T,*
  138 F.3d 479 (2d Cir. 1998) ........................................................................... 24
*Fid. Nat'l Title Ins. Co. of N.Y. v. Intercounty Nat'l Title Ins. Co.,*
  412 F.3d 745 (7th Cir. 2005) ......................................................................... 16
*Freedom Mortg. Corp. v. Burnham Mortg., Inc.,*
  720 F. Supp. 2d 978 (N.D. Ill. 2010) ............................................................. 26
*Gibson v. City of Chi.,*
  910 F.2d 1510 (7th Cir. 1990) ......................................................................... 4
*Glob. Crossing Telecomms., Inc. v. Metrophones Telecomms., Inc.,*
  550 U.S. 45 (2007) ........................................................................................... 9
*Glob. Total Office Ltd. P'ship v. Glob. Allies, LLC,*
  No. 10-cv-1896, 2011 WL 3205487 (N.D. Ill. July 28, 2011) ....................... 27

*Goren v. New Vision Int'l., Inc.*,
  156 F.3d 721 (7th Cir. 1998) .................................................................. 20, 25
*Heiman v. Bimbo Foods Bakeries Distrib. Co.*,
  902 F.3d 715 (7th Cir. 2018) ........................................................................ 24
*Hobbs v. Gerber Prods. Co.*, No. 17-cv-3534,
  2018 WL 3861571 (N.D. Ill. Aug. 14, 2018) .................................................. 6
*Hoffman v. Rashid*,
  388 F. App'x 121 (3d Cir. 2010) .................................................................... 9
*Holmes v. City of Racine*,
  No. 14-CV-208, 2014 WL 5514181 (E.D. Wis. Oct. 31, 2014) ..................... 16
*Huon v. Denton*,
  841 F.3d 733 (7th Cir. 2016) ........................................................................ 21
*ICOM Holding, Inc. v. MCI Worldcom*,
  238 F.3d 219 (2d Cir. 2001) .......................................................................... 24
*In re ClassicStar Mare Lease Litig.*,
  727 F.3d 473 (6th Cir. 2013) ........................................................................ 23
*In re Developing an Unified Intercarrier Comp. Regime*, Declaratory Ruling,
  27 FCC Rcd. 1351 (2012) ............................................................. 8, 9, 10, 13
*In re Rural Call Completion*, Rep. & Order & Further Notice of Proposed Rulemaking,
  28 FCC Rcd. 16154 (2013) ............................................. 7, 10, 12, 13, 27
*In re Rural Call Completion*, Second Rep. & Order and Third Further Notice of Proposed
  Rulemaking
  33 FCC Rcd. 4199 (2018) ................................................................................ 8
*In re T-Mobile USA, Inc.*, Order & Consent Decree,
  33 FCC Rcd. 3737 (2018) ........................................... 9, 10, 11, 13, 18, 27
*In re VMS Sec. Litig.*,
  752 F. Supp. 1373 (N.D. Ill. 1990) ............................................................... 22
*Inteliquent v. Free Conferencing Corp.*,
  No. 16-cv-06976, 2017 WL 1196957 (N.D. Ill. Mar. 30, 2017) ............... 17, 19
*Jamison v. Summer Infant (USA), Inc.*,
  778 F. Supp. 2d 900 (N.D. Ill. 2011) .............................................................. 5
*Kaye v. D'Amato*,
  357 F. App'x 706 (7th Cir. 2009) .................................................................. 19
*Kemp v. AT&T*,
  393 F.3d 1354 (11th Cir. 2004) .................................................................... 23
*Liquid Air Corp. v. Rogers*,
  834 F.2d 1297 (7th Cir. 1987) ...................................................................... 23
*Loubser v. Thacker*,
  440 F.3d 439 (7th Cir. 2006) ........................................................................ 20
*Malvino v. Delluniversita*,
  840 F.3d 223 (5th Cir. 2016) ........................................................................ 23
*Menzies v. Seyfarth Shaw LLP*,
  943 F.3d 328 (7th Cir. 2019) ........................................................................ 18
*Morrison v. YTB Intern., Inc.*,
  649 F.3d 533 (7th Cir. 2011) .................................................................. 28, 29

*N. Cty. Commc'ns Corp. v. Cal. Catalog & Tech.*,
  594 F.3d 1149 (9th Cir. 2010) ........................................................................... 9

*Naqvi v. Ill. Health & Science*,
  No. 17-cv-3145, 2018 WL 2745897 (C.D. Ill. June 7, 2018) .............................. 25

*O'Brien v. State St. Bank & Tr. Co.*,
  401 N.E. 2d 1356 (Ill. App. 1980) .............................................................. 24, 25

*Oshana v. Coca-Cola Co.*,
  No. 04-cv-3596, 2005 WL 1661999 (N.D. Ill. July 13, 2005) .............................. 7

*O'Shea v. Harding*,
  No. 4:16-cv-15, 2017 WL 1347044 (N.D. Ind. Feb. 10, 2017) ........................... 21

*P&P Mktg., Inc. v. Ditton*,
  746 F. Supp. 1354 (N.D. Ill. 1990) ................................................................... 19

*PacifiCare Health Sys., Inc. v. Book*,
  538 U.S. 401 (2003) ................................................................................... 22, 23

*PharMerica Corp. v. Advanced Healthcare Sols., LLC*,
  No. 10-cv-0349, 2010 WL 1417460 (N.D. Ill. Apr. 5, 2010) ............................... 7

*Pirelli Armstrong Tire Corp. Retiree Med. Benefits Tr. v. Walgreen Co.*,
  631 F.3d 436 (7th Cir. 2011) ............................................................................. 5

*Prince-Servance v. BankUnited, FSB*,
  No. 07-cv-1259, 2007 WL 3254432 (N.D. Ill. Nov. 1, 2007) ............................ 18

*Reshal Assocs., Inc. v. Long Grove Trading Co.*,
  754 F. Supp. 1226 (N.D. Ill. 1990) .............................................................. 5, 17

*Reynolds v. Roberts*,
  202 F.3d 1303 (11th Cir. 2000) ....................................................................... 11

*Rocha v. Rudd*,
  826 F.3d 905 (7th Cir. 2016) ........................................................................... 17

*Rose v. Nat'l Collegiate Athletic Ass'n*,
  346 F. Supp. 3d 1212 (N.D. Ill. 2018) ......................................................... 5, 18

*S. New Eng. Tel. Co. v. Glob. Naps, Inc.*,
  482 F. Supp. 2d 216 (D. Conn. 2007) .............................................................. 24

*Schmuck v. United States*,
  489 U.S. 705 (1989) ......................................................................................... 19

*Shearson/Am. Exp., Inc. v. McMahon*,
  482 U.S. 220 (1987) ......................................................................................... 23

*Smith v. Short Term Loans*,
  No. 99-cv-1288, 2001 WL 127303 (N.D. Ill. Feb. 14, 2001) .............................. 7

*St. John's United Church of Christ v. City of Chi.*,
  502 F.3d 616 (7th Cir. 2007) ............................................................................. 4

*Tankersley v. Albright*,
  514 F.2d 956 (7th Cir. 1975) ............................................................................. 5

*Thompson v. Ill. Dep't. of Prof'l Regulation*,
  300 F.3d 750 (7th Cir. 2002) ............................................................................. 4

*Triad Assocs., Inc. v. Chi. Hous. Auth.*,
  892 F.2d 583 (7th Cir. 1989) ............................................................................. 4

*United States ex rel. Presser v. Acacia Mental Health Clinic, LLC*,
  836 F.3d 770 (7th Cir. 2016) ..................................................................... 16, 18

*United States v. Boone*,
   628 F.3d 927 (7th Cir. 2010) ................................................................. 19
*United States v. White*,
   879 F.2d 1509 (7th Cir. 1989) ............................................................... 25
*V&V Supremo Foods, Inc. v. Sloan Acquisition Corp.*,
   No. 01-cv-9913, 2002 WL 1759787 (N.D. Ill. July 29, 2002) ................. 25
*Vicom, Inc. v. Harbridge Merch. Servs.*,
   20 F.3d 771 (7th Cir. 1994) ................................................................... 17
*Walsh Chiropractic, Ltd. v. StrataCare, Inc.*,
   752 F. Supp. 2d 896 (S.D. Ill. 2010) ...................................................... 27
*Wells Fargo Bank v. Leafs Hockey Club, Inc.*,
   No. 13-cv-2247, 2014 WL 1017211 (N.D. Ill. Mar. 14, 2014) ................. 30

Statutes

18 USC §§ 1341 ....................................................................................... 19
18 USC §§ 1343 ....................................................................................... 19
47 U.S.C. § 201(b) ............................................................................. 8, 9, 13
47 U.S.C. § 414 ....................................................................................... 26
47 U.S.C. §§ 206-07 .................................................................................. 9
815 ILCS 505/2 ........................................................................................ 26

Rules

Fed. R. Civ. P. 9(b) ............................................................................. 5, 20
Fed. R. Civ. P. 10(c) .................................................................................. 5

Craigville Telephone Co. d/b/a AdamsWells and Consolidated Telephone Company d/b/a CTC, on behalf of themselves and a class of similarly-situated companies, respectfully submit this Opposition to T-Mobile USA, Inc.'s Motion to Dismiss Plaintiff's First Amended Class Action Complaint ("FAC"). (ECF No. 19.)

## INTRODUCTION

T-Mobile's Motion asserts that this litigation is an "opportunistic attempt" by Plaintiffs to gain an "unwarranted windfall"; nothing could be further from reality. The named Plaintiffs in this litigation are small, locally owned and operated telecommunications companies that struggle each day to provide advanced telecommunications services to their rural communities. Taking lead in a class action against carriers like T-Mobile and Inteliquent, both of which wield significant influence throughout the industry, in order to fight for the interests of rural telecom carriers and their communities, is anything but an act of greed.

Plaintiffs seek, on behalf of themselves and the class, to recover lost revenue and other economic harm resulting from Defendants' scheme to unlawfully and surreptitiously suppress traffic volumes to rural areas in order to avoid payment of high-cost access charges and to mask that degraded service with the use of fake ring tones. Plaintiffs have adequately and timely pled each of their claims against the Defendants based on the information that is publicly available. They have explained in considerable detail how they have been damaged by the fake ring tone scheme, resulting in both added costs and lost revenues. Plaintiffs' theories of harm are directly supported by orders of the Federal Communications Commission ("FCC"), which have consistently and repeatedly found that poor rural call completion and fake ring tones, working in combination, unequivocally impose the types of costs and economic burdens on rural carriers describe by the FAC. As explained more fully below, and in Plaintiffs' Opposition to Inteliquent's

Motion to Dismiss, none of Plaintiffs' claims should be dismissed and discovery should promptly commence.

## STATEMENT OF FACTS

As a competitive wireless carrier, T-Mobile USA, Inc. ("T-Mobile") does not build an extensive network of lines to carry its customers' calls across the country to their intended destination. (FAC ¶¶ 50 - 57.) Instead, it relies on third parties, like Defendant Inteliquent, Inc., ("Inteliquent"), who deliver their calls to the terminating local exchange carriers ("LECs"), like Plaintiffs, who provide the "last-mile" connectivity to their rural consumers. (*Id.*)

Call completion and call quality problems have plagued rural communities, like those Plaintiffs serve, for more than a decade. (*Id.* ¶¶ 83-121.) As Inteliquent and similar companies were formed to compete with established long-distance companies to deliver traffic, they became focused on delivering calls as cheaply as possible (hence the name "least-cost router"). (*Id.* ¶¶ 67 – 77.) This focus on cost reduction predictably led to some carriers cutting corners, sacrificing quality or intentionally engaging in practices that fail to deliver traffic to higher-cost areas. (*Id.*)

The FAC alleges that T-Mobile and Inteliquent jointly perpetrated the largest fraud in telecommunications history, impacting more than a billion calls, by injecting fake ring tones to mask call failures and degraded call quality to these high-cost areas. (*Id.* ¶¶ 1-15; 132 – 224.) The fake ring tone scheme was partly revealed when T-Mobile and the FCC entered into a $40 million Consent Decree in April 2018 wherein T-Mobile admitted to its illegal use of fake ring tones and that it had failed to correct problems with its Intermediate Providers' delivery of calls – the precise combination of practices the FCC for years identified as imposing severe harm on rural LECs and consumers. (*Id.* ¶¶ 132-154; FAC Ex. 1.) However, the nature and purpose of the scheme was not fully revealed until months later, in August 2018, when a company known as Free Conferencing

received leave of Court to unseal and publicly disclose internal Inteliquent emails reflecting a conspiracy between T-Mobile and Inteliquent to intentionally suppress traffic to "high cost codes." (FAC ¶¶ 196-204; 220-223; FAC Ex. 16.)[1]

As the FAC details, in September 2015, Inteliquent had become the nearly-exclusive Intermediate Provider for the delivery of T-Mobile's traffic. (FAC ¶ 170.) At precisely the same time Inteliquent took on these duties in September 2015, T-Mobile has admitted to the expanded use of fake ring tones on traffic routed on SIP-trunks. (*Id.* ¶¶ 168-176.) Plaintiffs do not know the details of this September 2015 expansion, because the who, what, where, when and how of the expansion was not included in the materials the FCC released in response to Plaintiffs' Freedom of Information Act ("FOIA") request. (*Id.* ¶¶ 238, 249-252.) They do know, however, that Inteliquent operates a sophisticated SIP-based least-cost routing network capable of inserting fake ring tones on a nationwide basis. (*Id.* ¶¶ 177-184.)

Almost immediately after Inteliquent's new contract with T-Mobile took effect, Inteliquent became alarmed that the contract was producing negative financial results. (FAC ¶¶ 196-204; 220-223; FAC Ex. 16.) In very early 2016, then-CEO Matthew Carter was sounding the alarm bells, frantically calling for "crazy hair ball ideas" to address the financial impact of the contract and Inteliquent was vowing to "aggressively" "contain the volume of traffic to high cost codes." (*Id.*)

Beginning in June 2016, the FCC began to receive an alarming increase in complaints about T-Mobile's customers' calls failing, which prompted an investigation. (*Id.* ¶ 134.) Even with the investigatory tools available to it, it took the FCC until April 2018 to resolve that those call failures were the result of T-Mobile and its Intermediate Provider, Inteliquent's, call routing practices and

_____

[1]    While Defendants suggest these partially-redacted emails only relate to the "One-Cent Policy", the evidence suggest that the collaboration between the carriers extended more broadly.

that billions of similar routing problems had been masked by the use of fake ring tones. (*Id.* ¶¶ 133 - 154.) What the FCC did not apparently learn at the time, however, is that this was a purposeful strategy concocted jointly by the Defendants in order to avoid payment of Plaintiffs' and the class' access charges. (FAC ¶¶ 196-204; 220-223; FAC Ex. 16.)

## LEGAL STANDARD

### I. STANDARD FOR A RULE 12(B)(1) MOTION TO DISMISS.

Under Rule 12(b)(1), the Court will dismiss claims over which it lacks subject-matter jurisdiction, including claims for which the parties lack standing. *See Apex Digital, Inc. v. Sears, Roebuck & Co.*, 572 F.3d 440, 443 (7th Cir. 2009). In ruling on a Rule 12(b)(1) motion, the Court must accept as true all well-pleaded facts and may look beyond the jurisdictional allegations to evidence submitted on the subject-matter jurisdiction issue. *St. John's United Church of Christ v. City of Chi.*, 502 F.3d 616, 625 (7th Cir. 2007).

### II. STANDARD FOR A RULE 12(B)(6) MOTION TO DISMISS.

A motion to dismiss under Rule 12(b)(6) is meant to "test the sufficiency of the complaint, not to decide the merits" of the case. *Gibson v. City of Chi.*, 910 F.2d 1510, 1520 (7th Cir. 1990) (quoting *Triad Assocs., Inc. v. Chi. Hous. Auth.*, 892 F.2d 583, 586 (7th Cir. 1989)). In evaluating a Rule 12(b)(6) motion, the Court must accept all well-pleaded allegations as true and draw all reasonable inferences in Plaintiffs' favor. *Cole v. Milwaukee Area Tech. Coll. Dist.*, 634 F.3d 901, 903 (7th Cir. 2011); *Thompson v. Ill. Dep't. of Prof'l Regulation*, 300 F.3d 750, 753 (7th Cir. 2002). The Court may grant a motion to dismiss only if a complaint lacks "enough facts to state a claim [for] relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 697 (2009) (quoting

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).[2]  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 556).  It is the Seventh Circuit's long-standing policy that, "[w]here pleadings concern matters peculiarly within the knowledge of the defendants, conclusory pleading on 'information and belief' should be liberally viewed." *Brown v. Budz*, 398 F.3d 904, 914 (7th Cir. 2005) (quoting *Tankersley v. Albright*, 514 F.2d 956, 964 n.16 (7th Cir. 1975).

## III.    STANDARD FOR PLEADING FRAUD ALLEGATIONS.

Under Rule 9(b), in "averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity."  Fed. R. Civ. P. 9(b).  This requirement ensures defendants have fair notice of plaintiffs' claims, providing defendants an opportunity to frame their answers and defenses.  *Reshal Assocs., Inc. v. Long Grove Trading Co.*, 754 F. Supp. 1226, 1230 (N.D. Ill. 1990).  Allegations of fraud may be pled on "information and belief" where "(1) the facts constituting the fraud are not accessible to the plaintiff and (2) the plaintiff provides the grounds for his suspicions."  *Rose v. Nat'l Collegiate Athletic Ass'n*, 346 F. Supp. 3d 1212, 1220 (N.D. Ill. 2018) (Lee, J.) (quoting *Pirelli Armstrong Tire Corp. Retiree Med. Benefits Tr. v. Walgreen Co.*, 631 F.3d 436, 442 (7th Cir. 2011)).

---

[2] Under Rule 10(c), "[a] copy of a written instrument that is an exhibit to a pleading is a part of the pleading for all purposes," and therefore may be considered in deciding a Rule 12(b)(6) motion.  Fed. R. Civ. P. 10(c); *Elward v. Electrolux Home Products, Inc.*, 264 F. Supp. 3d 877, 886 (N.D. Ill. 2017) (Lee, J.).  The Court may also take judicial notice of decisions and matters of public record of a regulatory agency, such as the FCC.  *See, e.g.*, *Jamison v. Summer Infant (USA), Inc.*, 778 F. Supp. 2d 900, 908 n.4 (N.D. Ill. 2011).

## DISCUSSION

### I. THE FAC PLAUSIBLY ALLEGES INJURY RESULTING FROM DEFENDANTS' CONDUCT.

While T-Mobile asserts that Plaintiffs do not plead plausible damages (T-Mobile's Mem. in Supp. of Mot. to Dismiss ("Mem.") 10-13, ECF No. 55), it acknowledges that Plaintiffs' allege being "depriv[ed] of revenue in the form of 'access charges.'" (Mem. at 11 (citing FAC ¶¶ 58, 60, 62).) The FAC also describes other economic harms, including "considerable time and resources attempting to trouble shoot the problem identified by the T-Mobile subscriber." (FAC ¶ 288; *see also id.* ¶ 8.) It alleges CTC's belief that T-Mobile engaged in its strategies to avoid high cost intercarrier compensation, a belief that was shared by Inteliquent's CEO, Fritz Hendricks, before he took over Inteliquent.[3] (*See id.* ¶ 307.)

T-Mobile asks the Court to prejudge Plaintiffs' claims by concluding none of the damages pled are plausible. T-Mobile's arguments suffer from the dual flaws of: (1) ignoring the obligation to accept Plaintiffs' allegations as true; and (2) resting on the wrong pleading standard. (*See, e.g.*, Mem. at 11 (demanding pleading of injury with specificity); *id.* at 13 (demanding pleading of amounts of time and labor cost damages).) Nor are Plaintiffs' damages the "presumed damages" for mental and emotional distress alleged in *Conboy v. AT&T*, 241 F.3d 242, 249-51 & n.6 (2d. Cir. 2001), a case T-Mobile relies on to claim that Plaintiffs' alleged damages are speculative. To the contrary, the FAC alleges concrete economic damages in the form of lost access charges that fully satisfies the notice pleading standard. *See, e.g.*, *Hobbs v. Gerber Prods. Co.*, No. 17-cv-3534, 2018 WL 3861571, at * 10 (N.D. Ill. Aug. 14, 2018) (denying motion to dismiss ICFA claim finding plaintiff adequately pled damages by merely stating she paid more for the defendant's

---

[3] According to a recent press release, Mr. Hendricks resigned from Inteliquent as of January 30, 2020.

production than she would have because of the fraud); *PharMerica Corp. v. Advanced Healthcare Sols., LLC*, No. 10-cv-0349, 2010 WL 1417460, at *4 (N.D. Ill. Apr. 5, 2010) (holding "loss of payments on services provided … state[s] a plausible claim of tortious interference with contractual relationships" under Illinois law); *Oshana v. Coca-Cola Co.*, No. 04-cv-3596, 2005 WL 1661999, at *13 (N.D. Ill. July 13, 2005) (ICFA "provides for the recovery of 'actual economic damages or any other relief which the court deems proper' [which] may include disgorgement of profits.") (citations omitted); *Smith v. Short Term Loans,* No. 99-cv-1288, 2001 WL 127303, at **6-7 (N.D. Ill. Feb. 14, 2001) (allegation that "Plaintiff and the class members were damaged by defendants' unfair and deceptive acts and practices" was sufficient) (citation omitted).

The FCC's repeated conclusions that rural call completion, defective least cost-routing, and fake ring tones harm rural carriers confirms that Plaintiffs' alleged damages are plausible. *See In re Rural Call Completion*, Rep. & Order & Further Notice of Proposed Rulemaking, 28 FCC Rcd. 16154 (2013) ("2013 Order"). Fake ring tones are used to mask routing problems caused by Intermediate Providers, like Inteliquent, including calls that fail to reach their intended destination. (*Id.* ¶¶ 16, 111.) The reason for using least-cost routing providers is to avoid access charges that would otherwise be paid to rural carriers. (*Id.* ¶ 17.) Using fake ring-tones causes consumers to prematurely hang up before a call is completed and to erroneously place blame on the rural terminating carriers. (*See* 2013 Order ¶¶ 114, 117.) In short, the allegations in the FAC and the FCC orders, which detail the interrelated nature of fake ring tones, least-cost routing, and lost access charge revenues, establishes that Plaintiffs have plausibly alleged injury.

## II.   PLAINTIFFS ADEQUATELY ALLEGE VIOLATIONS OF THE COMMUNICATIONS ACT (COUNTS II AND III).

T-Mobile's arguments to dismiss Counts II and III rests on the flawed premise that a 2018 FCC order "clarified" carriers' call completion duties.  (Mem. at 14 (citing *In re Rural Call Completion*, Second Rep. & Order and Third Further Notice of Proposed Rulemaking, 33 FCC Rcd. 4199 (2018) ("2018 Order")).  The 2018 Order is irrelevant.  It was adopted after the conduct alleged in the FAC.  (*See* Mem. at 14, n.13.)  It imposed "new measures" based on the FCC's "experience over the last five years," (2018 Order ¶ 2) and "reduc[ed] the overall burden of [its] rules," (*id.* ¶ 11.)  It did not clarify the FCC's *existing* standards, it created new ones.  Absent a statement by the regulator that a new order is meant to clarify pre-existing law, the agency's action has no retroactive effect.  *See Beller v. Health & Hosp. Corp. of Marion Cty., Ind.*, 703 F.3d 388, 391-92 (7th Cir. 2012) (citing *Clay v. Johnson*, 264 F.3d 744, 749 (7th Cir. 2001)).[4]

### A.  The 2012 Order Opened The Door To The Courthouse.

Count II alleges that Defendants engaged in an unjust and unreasonable practice in violation of Section 201(b) of the Communications Act ("Act"), 47 U.S.C. § 201(b).  The claim is premised on the FCC's declaration that it is an unjust and unreasonable practice when a "carrier [ ] knows or should know" that: (1) "calls are not being completed to certain areas" or (2) it "is providing degraded service to certain areas" and allows those conditions to persist.  (FAC ¶ 338 (quoting *In re Developing an Unified Intercarrier Comp. Regime*, Declaratory Ruling, 27 FCC Rcd. 1351, 1355-56 ¶¶ 11-12 (2012) (hereafter "2012 Order") (FAC Ex. 4).)  Count III alleges that Defendants engaged in unjust and unreasonable discrimination based on the FCC's declaration

---

[4] Even if the 2018 Order applied to Plaintiffs' claims, which it does not, T-Mobile ignores that the FCC expressly rejected "arguments that [it] should establish a 'good faith' threshold for compliance whereby [the FCC] would not impose liability on covered providers making 'a good faith effort to comply with the rules.'"  (2018 Order ¶ 42.)

that "adopting or perpetuating routing practices that result in lower quality service to rural or high-cost localities than like service to urban or lower cost facilities (including other lower cost rural areas)" violates Section 202(a) of the Act. (2012 Order ¶ 14.)

By making these declarations, the FCC unequivocally empowered Plaintiffs to pursue their claims for damages in federal court. *See* 47 U.S.C. §§ 201(b), 202(a); *see also* 47 U.S.C. §§ 206-07; *Glob. Crossing Telecomms., Inc. v. Metrophones Telecomms., Inc*., 550 U.S. 45, 52 (2007) (holding that Section 201 authorized suit in federal district court where FCC had already announced that prohibited practice would be a section 201(b) violation); *N. Cty. Commc'ns Corp. v. Cal. Catalog & Tech.*, 594 F.3d 1149, 1160, 1162 (9th Cir. 2010) (affirming district court's dismissal of suit in the absence of an FCC determination that the challenged practice constituted an unreasonable practice in violation of section 201(b)); *Hoffman v. Rashid*, 388 F. App'x 121, 123 (3d Cir. 2010) (affirming dismissal of suit brought under section 201(b) where FCC had not determined the challenged practice was unjust or unreasonable).

**B. The *Consent Decree's* Supposed Limitation To "Certain Rural OCN's" Presents No Basis For Dismissal.**

T-Mobile attacks these claims by asserting that its admission that it failed to correct problems with its Intermediate Providers' delivery of calls to consumers is limited to "certain" rural areas. The *Consent Decree* provides that:

> **Admission.** T-Mobile admits for purpose of this Consent Decree and for civil enforcement purposes in connection with this Consent Decree, and in express reliance on the provisions of paragraph 16 herein, that it: (a) violated Section 64.2201's prohibition against the insertion of fake ring tones; and (b) did not correct problems with its Intermediate Providers' delivery of calls to consumers in ***certain*** rural OCNs.

(FAC, Ex. 1, *In re T-Mobile USA, Inc.*, Order & Consent Decree, 33 FCC Rcd. 3737 ¶ 17 (2018) ("*Consent Decree*") (emphasis added).)   According to T-Mobile, Plaintiffs are not part of the "certain rural OCNs" to which its admission applied.  (Mem. at 15.)

The clear implication of this paragraph and the Consent Decree as a whole is that T-Mobile's admitted violation of failing to correct routing and call delivery problems is conterminous with its admission regarding the insertion of fake ring tones; the "certain OCNs" to which this admission extends are *all* rural carriers who had fake ring tones inserted on calls made to their customers.   The FCC has firmly associated these two practices, expressly holding that an "unreasonable delay to connect a call, as manifested by . . .  prolonged ringing in advance of the called phone being alerted" is a routing practice that must be avoided (2012 Order n.35); that originating and/or intermediate providers use fake ring tones to "mask" "excessive call setup time" (2013 Order, ¶ 111); and that false ring tones are a "symptom of the problems of impaired quality and completion of calls to rural areas" (*Consent Decree* ¶ 2).   Because T-Mobile admitted to using fake ring tones hundreds of millions of times, it also admitted that it allowed degraded service to persist and did not adequately oversee its Intermediate Providers' delivery of calls.   Plaintiffs' were victims of this unlawful practice and thus are part of the "certain OCNs" to which T-Mobile's admission applies. (FAC ¶¶ 273-74, 283-83, 287-89, 296-302.)

In any event, because there is no list of rural OCNs harmed by the Defendants' illegal practices in the *Consent Decree*, the Court cannot credit T-Mobile's representation that Plaintiffs are not among them.   The ambiguity in T-Mobile's admission that the fake ring tones impacted "certain" rural carriers underscores Plaintiffs' request to immediately commence discovery; it provides no grounds for dismissal.   In evaluating an ambiguous consent decree, "[f]irst and foremost, the court should look to what the parties or their lawyers said to one another in fashioning

10

the decree." *Reynolds v. Roberts*, 202 F.3d 1303, 1316 (11th Cir. 2000); *see also Elda Arnhold & Byzantio, LLC. v. Ocean Atl. Woodland Corp.*, 284 F.3d 693, 701 (7th Cir. 2002) (the court should "focus, in descending order of importance, on: (1) the parties' negotiations over the contract at issue") (citing *Reynolds*). In response to Plaintiffs' FOIA request, T-Mobile objected to disclosure of this information by the FCC. As such, the intent of the Consent Decree is uniquely available to T-Mobile and must be obtained through discovery here.

### C. The Allegations In The FAC State A *Prima Facie* Case For Violations Of Sections 201(b) And 202(a) Of The Act.

T-Mobile also attempts to twist isolated statements regarding the pattern of call failures and issues experienced by T-Mobile subscribers into evidence of its compliance with an FCC Order released in 2018. As discussed above, however, that is not the correct legal inquiry for Counts II and III.

Because neither the *Consent Decree* nor the materials contained in the FOIA documents identify the rural carriers victimized by Defendants' practices, the FAC provides examples of call routing problems experienced by Plaintiffs AdamsWells and Craigville that show why it is plausible that both are likely victims of Defendants' illegal fake ring tone scheme. (*See* FAC ¶¶ 273-289, 294-301.)[5] These allegations are not the sum and substance of Counts II and III, however. Rather, these specific examples are needles in the proverbial haystack. The beauty of

---

[5] T-Mobile's argument that it does not have liability as a matter of law because it *eventually* corrected the problems raised by its customers is meritless on several levels. First, whether Defendants have a persuasive explanation for the call routing problems is a defense that Plaintiffs had no obligation to anticipate or refute in their pleadings. Second, T-Mobile's defense is inherently factual in nature. Third, T-Mobile's argument is flawed because it proves too much. T-Mobile's defense theory would allow its call failures and degraded service to persist for months, as long as a T-Mobile customer had the time, patience and persistence to document and complain about the problem, *and* T-Mobile corrected the problems. There is no reason to conclude that a carrier's liability for providing degraded service is erased merely because it *eventually* takes corrective measures in response to customer complaints.

Defendants' scheme is how difficult it is for carriers to identify and investigate when calls never reach their networks, much less pinpoint the parties responsible.  Consider the following:

- When calls get trapped in a least-cost routing loop or experience excessive post-dial delay, the caller hangs up before the call reaches the terminating carrier's switch.  (*See, e.g.*, 2013 Order, ¶ 111.)

- Carriers like Plaintiffs have no way of knowing the magnitude of calls that never reached their switches.  There are no reports they can pull or investigations they can undertake – other than discovery under the Federal Rules of Civil Procedure.  (FAC ¶¶ 14, 290, 301-302.)

- Because fake ring tones are used to mask call routing problems, the callers hang up without knowing that a problem actually exists.  If T-Mobile's subscribers did not know they were being deceived, they had no reason to complain to anyone, let alone to Plaintiffs.  (*Id*.; *see also* 2013 Order ¶¶ 16, 111, 114, 117.)

- Even if a T-Mobile subscriber thought her calls were not being completed, they were unlikely to ever report their suspicions to the called-party's carrier (*i.e.*, Plaintiffs).  Indeed, it would take a very industrious consumer (like the one described in the FAC) to investigate and track down who the called-party used as its carrier and then take it upon herself to communicate with that carrier to triangulate the problem.  (*See generally* FAC ¶¶ 273-289.)

- Because call paths often involve multiple carriers, understanding the problem's magnitude, where the problem is occurring, or where the fake ring tones are being inserted is virtually impossible (unless you possess the FCC's or courts' investigative powers to compel responses).

These barriers are precisely why the FCC's investigation and T-Mobile's admission of inserting fake ring tones into hundreds of millions of calls were critical to the Plaintiffs' ability to pursue this action.  Without T-Mobile's admissions and the discovery made public through Inteliquent's other litigation in this District, Plaintiffs would have never discovered that T-Mobile and Inteliquent were actively suppressing call volumes to high costs areas and that fake ring tones were being used to mask call completion and quality problems.

T-Mobile's Motion ignores entirely the inescapable conclusion that the very fact that hundreds of millions of calls were subjected to fake ring tones is, by itself, indicia that Defendants

violated Sections 201(b) and 202(a) by "providing degraded service to certain areas" and "adopting or perpetuating routing practices that result in lower quality service." (2012 Order, ¶¶ 11-12, 14.) The 2012 Order held that "unreasonable delay to connect a call, as manifested by prolonged silence ("dead air") and/or prolonged ringing in advance of the called phone being alerted," exemplifies the type of "degraded service" that would be unjust and unreasonable. (*Id.* ¶ 12 & n.35 (citing testimony of Inteliquent CEO Fritz Hendricks); *see also* 2013 Order ¶ 114 (fake ring tones hide "***excessive*** set-up time." (emphasis added).) T-Mobile has already admitted that fake ring tones were inserted only when its calls "took more than a certain amount of time to complete." (*Consent Decree* ¶ 11.)

It is also undisputed that the use of fake ring tones was "expanded" in September 2015 to include all calls with extended set-up time that were "out-of-network calls from its customers that were routed via Session Initiation Protocol (SIP) trunks." (*Id.*; *see also* FAC ¶ 169.) September 2015 is precisely the same period in which Inteliquent began the nearly-exclusive routing of T-Mobile's out-of-network traffic on its all-SIP network. (FAC ¶¶ 165-170, 252.) Thus, the very fact that traffic being routed through Inteliquent required the expanded use of fake ring tones to mask excessive set-up time is *prima facie* evidence that T-Mobile and Inteliquent "provid[ed] degraded service to certain areas" and "adopt[ed] or perpetuat[ed] routing practices that result in lower quality service." (2012 Order ¶¶ 11-12, 14.) But for Inteliquent's routing practices, there would not have been hundreds of millions of problems to hide. (FAC ¶¶ 367, 370.) Counts II and III should move forward against both Defendants.[6]

---

[6] T-Mobile also asserts Plaintiffs' Communications Act claims are "time barred." (Mem. at 18.) Plaintiffs address this argument in their Opposition to Inteliquent, Inc.'s Motion to Dismiss First Amended Class Action Complaint, which makes the same argument. (*See* Pl.' Opp'n to Inteliquent Mot. to Dismiss at Section I.A.) Those arguments are incorporated as though fully set forth herein.

## III. THE RICO CLAIMS ARE WELL PLEAD (COUNTS IV-V).

### A. Count IV Adequately Alleges Causation.

Plaintiffs allege racketeering acts caused them harm: Defendants used fake ring tones "to avoid payment of high cost inter-carrier compensation charges LECs would otherwise have been entitled to charge, and T-Mobile and its Intermediate Providers would otherwise be required to fund." (FAC ¶ 366.)[7] The FAC's opening paragraphs allege the primary acts of racketeering by wire fraud – insertion of hundreds of millions of fake ring tones into telephone wires – directly injured Plaintiffs and their businesses, including lost terminating access charges. (*Id.* ¶¶ 2-3, 372.) T-Mobile's use of fake ring tones to squelch rural LECs' collection of terminating access fees was not the scheme's byproduct; it was the primary purpose. Plaintiffs' allegations thus place them "in the center of the target of the conspiracy," so causation has been adequately pled. *Empress Casino Joliet Corp. v. Johnston*, 763 F.3d 723, 733 (7th Cir. 2014).

Citing *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451 (2006), T-Mobile contends Plaintiffs' injuries are too indirect to be caused by the fake ring tone scheme. (Mem. at 20.) But the facts in *Anza* are completely different from this case. In *Anza*, the plaintiff alleged the defendant, its business competitor, defrauded New York State by failing to charge certain sales taxes. *Anza*, 547 U.S. at 454-55. As a result, the plaintiff claimed, the defendant was able to offer lower prices and attract the plaintiff's customers. *Id.* at 457. The Court held the plaintiff's harm was too remote

---

[7] *See also*, *e.g.*, *id.* ¶ 62 ("[A]n Intermediate Provider like Inteliquent would tender the payment for terminating access charges to the LEC, it would recoup that payment from T-Mobile, which would pay the charges from the monthly fees paid by subscribers"); ¶ 115 (Defendants sought "to avoid paying those higher-than-average transport and termination charges" to Plaintiffs and other rural LECs) (quoting S. Rep. No. 115-6, at 2 (2017)); ¶ 365 ("The association also had the illegitimate purpose of fraudulently reducing T-Mobile's liability for call termination fees to high cost OCNs by either (i) inserting fake ring tones into calls that were not connected to the recipient to confuse the caller and influence them to hang up; (ii) by engaging in other call blocking practices …; or (iii) by using a combination of both illegal practices to thwart completion of high cost calls").

because the cause of the plaintiff's harms was "a set of actions (offering lower prices) ***entirely distinct*** from the alleged RICO violation (defrauding the State)." *Id.* at 458 (emphasis added).

*Anza* may be germane to a claim brought by one of T-Mobile's competitor CMRS (*i.e.*, mobile) providers alleging T-Mobile's fraudulent avoidance of high-cost LEC fees gave it an unfair competitive advantage over other CMRS providers. (*Cf.* FAC ¶¶ 127, 131 (describing how T-Mobile gains a competitive advantage by blocking and degrading high cost calls to rural LECs).) But Plaintiffs are not market competitors caught in the fading wake of T-Mobile's fraudulent scheme. To the contrary, Plaintiffs have alleged the scheme was devised for the primary purpose of fraudulently avoiding Plaintiffs' high-cost terminating access fees. (*See* FAC ¶¶ 62, 115, 365-66.)

However, *Empress*, *supra*, shows Plaintiffs have adequately alleged an injury caused by racketeering acts. 763 F.3d at 725-28, 33. In *Empress*, several casinos sued under RICO, alleging they were harmed because the Illinois Governor conspired with horseracing industry members, and took a bribe (racketeering), to pass a bill creating a trust for the horse racing industry's benefit, which was funded by taxing certain in-state casinos. *See id.* at 725. After discovery, the district court granted summary judgment for the defendants, reasoning that, "although plaintiffs have offered evidence that [Governor] Blagojevich traded his signature on the legislation for Johnston's $100,000 contribution," this would not "permit a reasonable jury to find that this was a proximate cause of the 2008 Act's adoption" because other actions also contributed to the adoption of the 2008 Act. *Empress Casino Joliet Corp. v. Blagojevich*, No. 09-cv-3585, 2013 WL 4478741, at *8 (N.D. Ill. Aug. 19, 2013), *rev'd in part and remanded*, 763 F.3d 723 (7th Cir. 2014).

The Seventh Circuit reversed:

> The case before us, by contrast [with *Anza*], exemplifies direct effect. The object of the conspiracy was to bring the '08 Act into effect in exchange for a cash bribe;

the Act harmed the Casinos to the tune of 3% of their revenue. The Casinos thus
sat in the center of the target of the conspiracy.

*Empress*, 763 F.3d at 733; *see also Holmes v. City of Racine*, 14-CV-208, 2014 WL 5514181, *10
- *12 (E.D. Wis. Oct. 31, 2014) (denying motion to dismiss based on the *Empress* standard that
"there is a direct relation between the activity and the injury and the injury is the one resulting
from the alleged RICO activity").  The case at bar is no different.  The injury to Plaintiffs and the
putative class were the direct effect of T-Mobile's racketeering acts – wire fraud by fake ring tones
– which T-Mobile committed "to avoid payment of high cost inter-carrier compensation charges
LECs would otherwise have been entitled to charge."  (FAC ¶ 366.)  Plaintiffs and the putative
class thus "sat in the center of the target of the conspiracy," just as in *Empress*.

### B.  Plaintiffs Amply Allege Predicate Acts Of Mail And Wire Fraud.

Plaintiffs allege predicate acts of racketeering with sufficient specificity "to enable the
defendant to riposte swiftly and effectively if the claim is groundless," as required by Rule 9(b).
*United States ex rel. Presser v. Acacia Mental Health Clinic, LLC*, 836 F.3d 770, 776 (7th Cir.
2016) (quoting *Fid. Nat'l Title Ins. Co. of N.Y. v. Intercounty Nat'l Title Ins. Co.*, 412 F.3d 745,
749 (7th Cir. 2005)).  For example, Plaintiffs allege that, in June through the summer of 2016, the
FCC received complaints from three rural LECs regarding over 40 instances in which T-Mobile
subscribers were unable to complete calls to rural LEC customers and reported hearing ring tones
even though the calls did not connect.  (FAC ¶ 134 and Ex. 1 ¶¶ 7, 12.)  The FAC also alleges the
FCC served these complaints on T-Mobile and required it to investigate them and submit reports
of its investigation, which it did.  (FAC ¶¶ 135-37.)  These allegations show T-Mobile certainly
knows far more than Plaintiffs about these particular incidences of wire fraud by fake ring tone.

Moreover, the FAC pleads T-Mobile inserted fake ring tones into hundreds of millions of calls per year, and used wires and the mail in other ways in furtherance of the scheme. (*Id*. at ¶ 372.).[8]

T-Mobile's argument that Plaintiffs have not adequately satisfied Rule 9(b)'s requirement to plead the "date, time, place, and content" of each predicated act of mail or wire fraud is also inaccurate. (Mem. at 21.) Plaintiffs have done so to the extent the information is available by pleading that T-Mobile's insertion of fake ring tones into wires occurred from 2007 to 2017, initially by inserting them using an Ericcson server (though no facts are known about how fake ring tones were inserted after Inteliquent became primarily responsible for delivery of T-Mobile's traffic in September 2015), and that the content of the fraudulent messages were ring tones conveyed to callers prior to their calls being connected to the called party. (FAC ¶¶ 142-47, 173, 249-52.) Under the circumstances, given that T-Mobile knows precisely when, where, and how the fake ring tones were inserted, Plaintiffs have pled racketeering acts with sufficient specificity.

"[F]air notice is the 'most basic consideration underlying Rule 9(b).'" *Rocha v. Rudd*, 826 F.3d 905, 911 (7th Cir. 2016) (quoting *Vicom, Inc. v. Harbridge Merch. Servs.*, 20 F.3d 771, 777-78 (7th Cir. 1994)). "The heightened pleading standard does not require adherence to blind formalism." *Byczek v. Boelter Cos., Inc.*, 264 F. Supp. 2d 720, 722 (N.D. Ill. 2003); *see also Reshal Assocs.*, 754 F. Supp. at 1230 ("Rule 9(b) must not be applied blindly."). Rather, "Rule 9(b) should be applied with a view to its purposes which are (1) to inform the defendants of the claimed wrong and enable them to formulate an effective response; and (2) to protect defendants

---

[8] The predicate acts of racketeering need not involve Plaintiffs or be directed at Plaintiffs. It is only necessary that the scheme be coupled with a mailing or use of interstate wires in furtherance of the scheme. *Inteliquent v. Free Conferencing Corp.*, No. 16-cv-06976, 2017 WL 1196957, at *11 (N.D. Ill. Mar. 30, 2017). Therefore, T-Mobile's suggestion that Plaintiffs must identify their own customers' calls that were blocked by the scheme to satisfy RICO's racketeering element is flat out wrong. (Mem. at 21.)

from unfounded, conclusory charges of fraud." *Carl v. Galuska*, 785 F. Supp. 2d 1283, 1287 (N.D. Ill. 1992).

There are at least two circumstances – both of which are present here – where Rule 9(b)'s ordinary call for "the 'who, what, when, where, and how' of the alleged fraud" is relaxed. *Menzies v. Seyfarth Shaw LLP*, 943 F.3d 328, 338 (7th Cir. 2019). The first is where some of the allegations (like the "what" and "how") are so specific that the court is assured Rule 9(b)'s dual goals[9] are met, even though other allegations (like the "when" or "where") are less than exact. *See e.g. Prince-Servance v. BankUnited, FSB*, No. 07-cv-1259, 2007 WL 3254432, at *6 (N.D. Ill. Nov. 1, 2007).

The second reason courts relax Rule 9(b) is to avoid "creat[ing] a Catch-22 situation in which a complaint is dismissed because of the plaintiff's inability to obtain essential information without pretrial discovery." *Emery v. Am. Gen. Fin., Inc.*, 134 F.3d 1321, 1323 (7th Cir. 1998). "[A]n imbalance of information serves to relax Rule 9(b)'s particularity requirement, especially given Plaintiffs' allegations that the [Defendants] not only had this information, but kept it from them." *Rose v. NCAA*, 346 F. Supp. 3d at 1226. (Lee, J.) (collecting cases).

Both circumstances are present here because the predicate acts:

> . . . are far too numerous to identify the date, time and place of each such instance, and, since T-Mobile is obstructing Plaintiffs' FOIA requests seeking such data from the Commission, to which T-Mobile provided such information, and T-Mobile and Inteliquent are also engaged in myriad sealing motions in the Inteliquent Litigation, obscuring information about the Consent Decree investigation from public view in that proceeding as well. . . .

(FAC ¶ 373.) For these reasons, Plaintiffs need not plead the who, what, where, when and how of each act of mail or wire fraud, especially since Plaintiffs have pled with great specificity the

---

[9] Rule 9(b) operates to (1) "enable the defendant to riposte swiftly and effectively if the claim is groundless," and (2) "screen against spurious fraud claims." *Presser*, 836 F.3d at 776.

publicly available details of the fake ring tone scheme and Defendants are the holders of the remaining details.[10]

### C. Interstate Wires Need Not Defraud Recipient Or Contain Misrepresentations.

T-Mobile's lack of intent argument should be rejected. T-Mobile claims the FAC "does not allege use of the wires intended to deprive anyone of property or money." (Mem. at 22.) It also argues that "Plaintiffs allegations … [of] wire fraud … [are] devoid of any facts to support a conclusion that [the use of wires] were driven by an intent to deprive anyone of property or money." (*Id.* at 23 n.19.) These assertions are inaccurate and legally irrelevant. Plaintiffs amply alleged that the intention of the fake ring tone scheme was to deprive rural LECs of access charges. (FAC ¶¶ 366-67, 106, 372, 375; *see also* FAC Ex. 9 ¶¶ 16-17 (reflecting FCC's recognition that fake ring tones are motivated by avoidance of access charges.)

The legal premise of T-Mobile's argument is also flawed because, "a wire communication need not itself contain a misrepresentation" giving rise to an intent requirement. *Kaye v. D'Amato*, 357 F. App'x 706, 714 (7th Cir. 2009). "It is sufficient for the mailing to be incident to an essential part of the scheme, or a step in the plot." *Schmuck v. United States*, 489 U.S. 705, 710-11 (1989) (quotation marks and internal citation omitted). "The mailing … merely provides the prerequisite to federal jurisdiction over the scheme to defraud." *United States v. Boone*, 628 F.3d 927, 934 (7th Cir. 2010).[11]

---

[10] *See* FAC ¶¶ 55-57 (explaining how calls are routed); ¶¶ 58-70 (explaining how rural LECs generate revenue); ¶¶ 71-111 (explaining how T-Mobile wrongfully used fake ring tones to avoid paying LECs); ¶¶ 122-31 (alleging T-Mobile tried to decrease its variable costs by fraudulently blocking calls to rural areas); ¶¶ 132-54 (describing T-Mobile's admission that it illegally used fake ring tones); ¶¶ 155-224 (describing and alleging in detail evidence of Defendants' motive, ability to scheme, and execution of scheme); ¶¶ 270-317 (describing Plaintiffs' injuries).

[11] *See also* Inteliquent's Brief in Opp'n to Mot. to Dismiss at 9-10, *Inteliquent v. Free Conf.*, No. 1:16-cv-6976, ECF No. 72 (quoting *P&P Mktg., Inc. v. Ditton*, 746 F. Supp. 1354, 1362 (N.D. Ill. 1990)) ("For purposes of the predicate acts of mail and wire fraud, 18 USC §§ 1341 and 1343, it is not required that the

Even if pleading an element of intent were necessary to allege predicate acts, Rule 9(b) allows states of mind, such as fraudulent intent, to be pleaded generally. *See* Fed. R. Civ. P. 9(b); *Bible v. United Student Aid Funds, Inc.*, 799 F.3d 633, 658 (7th Cir. 2015).

### D. The FAC Alleges Sufficient Facts To State A Plausible § 1962(d) Conspiracy Claim.

In order to state a viable claim under § 1962(d), a plaintiff must allege:

> (1) that each defendant agreed to maintain an interest in or control of an enterprise or to participate in the affairs of an enterprise through a pattern of racketeering activity and (2) that each defendant further agreed that someone would commit at least two predicate acts to accomplish those goals.

*Goren v. New Vision Int'l., Inc.*, 156 F.3d 721, 732 (7th Cir. 1998); *see also Domanus v. Locke Lord LLP*, 847 F.3d 469, 479 (7th Cir. 2017). Rule 9(b) does not apply to pleading conspiracy allegations. *Loubser v. Thacker*, 440 F.3d 439, 442-43 (7th Cir. 2006).

The FAC satisfies this two-prong notice pleading requirement. It alleges that Defendants agreed to participate in the fake ring tone enterprise through a pattern of racketeering activity. (FAC ¶¶ 393-97.) It also alleges Defendants agreed to commit two or more predicate acts in furtherance of the enterprise's common purpose. (FAC ¶ 396.) T-Mobile cites no authority to support its conclusory argument that the allegations do not satisfy § 1962(d)'s minimum pleading requirements.[12] *See DeGuelle v. Camilli,* 664 F.3d 192, 206 (7th Cir. 2011) (finding adequately-

---

false representations be sent through the U.S. mails or made through the use of interstate wires. It is only necessary to have a scheme to defraud coupled with a mailing or use of interstate wires in furtherance of the scheme and the use of the mails or interstate wires need not be an essential part of the scheme, but it is sufficient if such use is incident to an essential component of the scheme. The defendant need not have personally used the mails or interstate wires, it is sufficient that their use by others was reasonably foreseeable.").

[12] T-Mobile's exclusive reliance on *Empress*, 763 F.3d at 734-35, and *Brouwer v. Raffensberger, Hughes & Co.*, 199 F.3d 961, 967 (7th Cir. 2000), is misplaced. Both cases involve appeals from grants of motions for summary judgment and do not discuss, or provide any guidance on, the Rule 12(b)(6) pleading standards for a § 1962(d) claim. (*See* Mem. at 23.)

plead RICO conspiracy despite allegations of the agreement being "sparse"); *see also, e.g.*, *O'Shea v. Harding*, No. 4:16-cv-15, 2017 WL 1347044, at *9 (N.D. Ind. Feb. 10, 2017) (finding § 1962(d) claim satisfied Rule 8(a) pleading standards despite conspiracy allegations being "tersely stated").

T-Mobile's criticism of the FAC alleging upon information and belief that Inteliquent was losing money on the MSA and financially desperate to reduce its liability for high-cost access charges has no merit. (*See* Mem. at 23.) It is permissible to plead such facts on information and belief because Defendants' motives are matters peculiarly within their own knowledge.[13] *See Huon v. Denton*, 841 F.3d 733, 743 (7th Cir. 2016). Moreover, the allegations about Inteliquent becoming financially desperate to reduce high-cost access charges and conspiring with T-Mobile to develop deterrence strategies are not, as T-Mobile claims (Mem. 23), speculation – they come directly out of public documents cited by the FAC.[14] (FAC ¶¶ 9, 219-22.)

T-Mobile's contention that the FAC fails to allege a specific agreement to commit predicate acts is of no moment either because a formal agreement is not necessary – the agreement can be inferred. *See DeGuelle,* 664 F.3d at 205-06. T-Mobile ignores myriad allegations that support the inference of the agreement alleged, including, for example:

- Inteliquent knew, due to its contractual obligation to create, collect and transmit T-Mobile's call detail records ("CDR"), that a grossly disproportional number of calls placed by T-Mobile subscribers to high cost rural areas were not being completed to the economic benefit of both T-Mobile and Inteliquent.[15] (FAC ¶¶ 184, 189, 203.)

- Inteliquent publicly opposed the FCC's ban on fake ring tones and advocated in favor of them, reflecting its desire to use them. (*Id*. ¶¶ 101-02, 166-67, 202.)

---

[13] Motive is not a necessary element of this claim and was merely pled to provide context for the plausibility of the conspiracy alleged, so the manner in which the FAC pleads facts showing motive is inconsequential.

[14] Moreover, claiming allegations are speculative is invalid given the Court must take all facts alleged by the plaintiff as true and draw all reasonable inferences from those facts in the plaintiffs' favor. *Cole*, 634 F.3d at 903.

[15] A defendants' knowledge of a conspiracy can be established by actual or circumstantial evidence or willful blindness. *Domanus*, 847 F.3d at 479-82.

- T-Mobile expanded its use of fake ring tones after the MSA with Inteliquent went into effect, and T-Mobile had weekly calls with Inteliquent to address, among other things, the quantity of "high cost calls." (*Id*. ¶¶ 176, 194-99.)

- Inteliquent's CEO demanded that Inteliquent employees find ways to squelch high cost traffic, including "crazy hair ball ideas." (*Id*. ¶¶ 220-21.)

- T-Mobile and Inteliquent jointly developed and instituted a scheme to deter TMUS subscribers from completing calls to certain high volume, and/or high cost, phone numbers tied to rural OCNs, and T-Mobile and Inteliquent witnesses lied in depositions about their agreement to block certain high cost traffic. (*Id*. ¶¶ 205-24.)

These circumstances, along with T-Mobile's admission that it engaged in two prohibited practices – use of fake ring tones and failure to oversee known problems with Inteliquent's delivery of calls – amply support a plausible agreement between T-Mobile and Inteliquent to violate § 1962(c).

### E. Plaintiffs May Seek Punitive Damages Because RICO's Treble Damages Provision Is Remedial, Not Punitive.

T-Mobile has presented no authority to support its claim that Plaintiffs are prohibited from pleading punitive damages under its RICO claims. T-Mobile's entire argument is based on a single case – *In re VMS Sec. Litig*., 752 F. Supp. 1373, 1404 (N.D. Ill. 1990) – which struck a RICO punitive damages demand in response to an unopposed motion and relied on a 1989 California District Court decision, and thus concluded RICO's treble damages provision is already punitive and therefore precluded recovery of any additional punitive damages. *In re VMS* is neither good law nor dispositive of this issue, as the Supreme Court has repeatedly held that RICO's treble damages provision is remedial, not punitive. The Seventh Circuit follows this important Supreme Court precedent and other courts have permitted plaintiffs to pursue punitive damages as a RICO remedy.

The Supreme Court has "repeatedly acknowledged that the treble-damages provision contained in RICO itself [and the parallel treble damages provision in the Clayton Act, upon which RICO's damage provision is based] is ***remedial in nature***." *PacifiCare Health Sys., Inc. v. Book*,

538 U.S. 401, 405-06 (2003) (emphasis added); *see also Shearson/Am. Exp., Inc. v. McMahon,* 482 U.S. 220, 240-41 (1987).

Several circuit courts have also interpreted RICO's treble-damages remedy as being primarily remedial. *See, e.g.*, *Malvino v. Delluniversita*, 840 F.3d 223, 230 (5th Cir. 2016) ("[T]he availability of treble damages under RICO does not prevent it from being classified as a remedial statute."); *BCS Servs., Inc. v. BG Invs., Inc.*, 728 F.3d 633, 641 (7th Cir. 2013) ("[O]f course we're bound by the Supreme Court's interpretation of RICO's treble-damages remedy as being compensatory rather than punitive."); *In re ClassicStar Mare Lease Litig.*, 727 F.3d 473, 495 (6th Cir. 2013) ("RICO is essentially compensatory."); *Liquid Air Corp. v. Rogers*, 834 F.2d 1297, 1310, n.8 (7th Cir. 1987) ("Although there is some sense in which RICO treble damages are punitive, they are largely compensatory . . . .") (citing *Carter v. Berger,* 777 F.2d 1173, 1176 (7th Cir. 1985)).

Other courts observing that RICO's treble damages provision is remedial have allowed plaintiffs to pursue punitive damages for RICO claims. *See, e.g. Kemp v. AT&T*, 393 F.3d 1354 (11th Cir. 2004) (affirming availability of punitive damages award in RICO case against telecommunications carrier engaged in fraudulent billing practices); *Al-Kazemi v. General Acceptance & Inv. Corp.*, 633 F. Supp. 540, 543-44 (D.C. Cir. 1986) (finding federal court may allow recovery of punitive damages for RICO violation so long as there was a compensatory award); *Com-Tech Assocs. v. Computer Assocs. Int'l., Inc*., 753 F. Supp. 1078, 1093 (E.D.N.Y. 1990), *aff'd*, 938 F.2d 1574 (2d Cir. 1991) (stating, "a claim for punitive damages should be permitted to stand, especially since the Supreme Court has held that civil RICO is primarily remedial in nature and only secondarily punitive").   Thus, there are no grounds upon which the Court may strike Plaintiffs' punitive damages demand at the pleading stage.

## IV.    THE FAC ALLEGES THAT T-MOBILE INTERFERED WITH KNOWN TARIFFS AND BUSINESS RELATIONSHIPS (COUNT VI).

Count VI alleges T-Mobile interfered with Plaintiffs' business expectancies under tariffs or agreements with other carriers by reducing the volume of calls terminated by Plaintiffs.  (FAC ¶¶ 402-04.)  T-Mobile first contends the FAC does not allege the relevant tariffs and contracts with the requisite specificity.   This contention lacks merit.   Plaintiffs (and all putative LEC class members) have terminating access charge tariffs on file with the FCC.  As a carrier, T-Mobile is charged with knowledge of these tariffs, as they "bind both carriers and [customers] with the force of law."  *ICOM Holding, Inc. v. MCI Worldcom*, 238 F.3d 219, 221 (2d Cir. 2001).   Knowledge of tariffs should be "conclusively presumed," regardless of how the parties managed their interconnection agreements and service orders.  *S. New Eng. Tel. Co. v. Glob. Naps, Inc.*, 482 F. Supp. 2d 216, 222 n.3 (D. Conn. 2007) (citing *Fax Telecommunicaciones Inc. v. AT&T,* 138 F.3d 479, 490 (2d Cir. 1998)), *aff'd*, 624 F.3d 123 (2d Cir. 2010).   Moreover, because discovery is needed to ascertain the class members, it is impossible at this time for Plaintiffs to list all tariffs with which T-Mobile interfered.[16]   But this is not sufficient reason to conclude the FAC fails to give T-Mobile adequate notice of the basis of the claims against it.

T-Mobile's argument that Count VI fails to plead a breach of contract by a third party or sufficient persuasion by T-Mobile to cause the breach ignores that one can state a tortious interference claim without identifying any specific contract when, as here, the plaintiff pleads an existing business relationship and "interference with an identifiable class of third parties."  *See*

---

[16] The claim does not allege interference with *T-Mobile's contracts*.  T-Mobile does not deliver its own traffic; it relies on intermediate providers, like Inteliquent.  Thus, to the extent Count VI addresses contracts, those contracts would be between rural LECs and T-Mobile's intermediate providers, like Inteliquent.  (*See* FAC ¶¶ 402-04.)  Thus, *Heiman v. Bimbo Foods Bakeries Distrib. Co.*, 902 F.3d 715, 720 (7th Cir. 2018) is inapposite.

*O'Brien v. State St. Bank & Tr. Co.*, 401 N.E. 2d 1356, 1357-58 (Ill. App. 1980) (reversing dismissal of tortious interference with business relations claim); *see also Naqvi v. Ill. Health & Science*, No. 17-cv-3145, 2018 WL 2745897, at *7 (C.D. Ill. June 7, 2018) ("[E]ven if the Court later finds there is no written employment agreement … it would not necessarily be fatal to a tortious interference with a current business relationship claim."); *V&V Supremo Foods, Inc. v. Sloan Acquisition Corp.*, No. 01-cv-9913, 2002 WL 1759787, at *4 (N.D. Ill. July 29, 2002); *City of Rock Falls v. Chi. Title & Tr. Co.*, 300 N.E. 2d 331, 363 (Ill. App. 1973). The FAC alleges the relationship interfered with Plaintiffs' relationship with any Intermediate Providers who delivered (or should have delivered) T-Mobile's calls to Plaintiffs. (FAC ¶ 404.) Inteliquent, Level 3, and West are identified as some of those providers. (*Id.* ¶¶ 235-37.) The "how" of T-Mobile's tortious interference is alleged: "by directing or causing the insertion of fake ring tones and failing to adequately supervise its Intermediate Providers." (*Id.* ¶ 404.) The FAC explains T-Mobile's actions were with the intent to reduce the amounts paid in terminating access charges. (*Id.* ¶¶ 122-31; *see also id.* ¶¶ 221-22 (emails showing T-Mobile was focused on reducing high-cost traffic volumes due to their impact on EBITDA).)[17]

Plaintiffs have adequately pled their tortious interference claim based on the information available. If the Court determines further specificity is required, Plaintiffs should be afforded the opportunity to replead the claim after obtaining reasonable discovery, because Defendants are the only parties that possess the information necessary to identify all impacted LECs.[18]

---

[17] T-Mobile's contention that paragraph 251 of the FAC provides "evidence" that fake ring tones were intended to address "customer complaints about dead air," ignores the fact that their use was illegal. It also ignores the allegations in paragraph 252 of the FAC that Ms. Foster's declaration "proffers an implausible excuse."

[18] T-Mobile asserts in a footnote that this claim is preempted by federal law, but does not explain the basis for this assertion. Undeveloped arguments and arguments raised in footnotes are waived. *Goren*, 156 F.3d at 726 n.2; *United States v. White*, 879 F.2d 1509, 1513 (7th Cir. 1989). In any event, it is apparent that T-

## V.  PLAINTIFFS HAVE STANDING TO PURSUE THEIR ICFA CLAIM (COUNT VII).

The ICFA prohibits the use of deceptive acts or unfair business practices in the conduct of trade or commerce. *See* 815 ILCS 505/2. To state an ICFA claim, Plaintiffs must allege: (1) a deceptive act or unfair practice by the defendant; (2) defendant's intent that plaintiff rely on the deception; (3) the occurrence of the deception in the course of conduct involving trade or commerce; and (4) actual damage to plaintiff; (5) proximately caused by the deception. *Freedom Mortg. Corp. v. Burnham Mortg., Inc.*, 720 F. Supp. 2d 978, 1003 (N.D. Ill. 2010) (citing *Avery v. State Farm Mut. Auto. Ins.*, 835 N.E.2d 801, 850 (Ill. 2005)).

A business can bring an ICFA claim where it meets the "consumer nexus" standard, which requires Plaintiffs to allege facts showing the conduct involves trade practices directed to the market generally or otherwise relates to consumer protection issues. To sufficiently establish an implication of consumer protection concerns, Plaintiffs must "plead and otherwise prove (1) that [their] actions were akin to a consumer's actions to establish a link between [them] and consumers; (2) how defendant's representations … concerned consumers other than [Plaintiffs]; (3) how defendant's particular [action] involved consumer protection concerns; and (4) how the requested relief would serve the interests of consumers." *Brody v. Finch Univ. of Health Sciences/The Chi. Med. Sch.*, 698 N.E.2d 257, 269 (Ill. 1998).

---

Mobile did not develop this argument because it is meritless. This is not a claim based on "poor" "service quality" brought by a carrier's customer and would not invalidate any filed tariff. *See Bastien v. AT&T Wireless Servs., Inc.*, 205 F.3d 983, 988 (7th Cir. 2000) (citing *AT&T Co. v. Central Office Telephone, Inc.*, 524 U.S. 214, 223 (1998)). Rather, this is a claim of intentional interference with Plaintiffs' business relationships and does not seek to deviate from a filed tariff, but rather to recover business expectancies lost as a result of T-Mobile's fraudulent conduct, and is not preempted. *See* 47 U.S.C. § 414; *Cooperative Communications, Inc. v. AT&T Corp.*, 867 F. Supp. 1511 (D. Utah 1994).

Courts have repeatedly permitted an ICFA claim to proceed so long as the plaintiff alleges misrepresentations or unfair practices engaged in by the defendant and provides a sufficient basis to explain how those practices negatively affected consumers generally or the plaintiff's customers in particular. *See, e.g.*, *Conn. Gen. Life Ins. Co. v. Sw. Surgery Ctr., LLC*, 349 F. Supp. 3d 718, 725 (N.D. Ill. 2018) ("Passing on costs to customers is a recognized consumer protection concern."); *Glob. Total Office Ltd. P'ship v. Glob. Allies, LLC*, No. 10-cv-1896, 2011 WL 3205487 (N.D. Ill. July 28, 2011) (false and misleading statements to consumers about defendant's quality control and engineering procedures, the size and experience of the company negatively affected plaintiff's brand); *CustomGuide v. CareerBuilder, LLC*, 813 F. Supp. 2d 990, 1001 (N.D. Ill. 2011) (complaint "adequately pleaded a consumer nexus by alleging that CareerBuilder 'intended that general consumers and the general public rely on its unfair, unlawful and deceptive business practices'"); *Cosmetique, Inc. v. ValueClick, Inc.*, 753 F. Supp. 2d 716, 719-20 (N.D. Ill. 2010) (plaintiff sufficiently plead defendant's attempted to "deceive the public generally" by relying on a recent FTC investigation and settlement involving defendant); *Walsh Chiropractic, Ltd. v. StrataCare, Inc.*, 752 F. Supp. 2d 896, 913 (S.D. Ill. 2010) (plaintiffs alleged facts from which court could infer patients of medical providers may be subject to fee increases).

The FAC provides ample allegations meeting the consumer-nexus requirements for standing. T-Mobile admitted the use of fake ring tones is "by its nature deceptive." (FAC Ex. 18 at 12 n.54.) It has admitted to inserting fake ring tones into "hundreds of millions of calls each year." (*Consent Decree*, ¶ 12.) The FCC has made clear that fake ring tones mislead consumers and cause them to hang up before calls reach their intended destination. (2013 Order, ¶¶ 111-16.) Critically, the FCC has found that the use of fake ring tones deceives callers about the nature and quality of Plaintiffs' services. (*See, e.g.*, *id.* ¶ 111 ("False audible ringing can also make it appear

27

to the caller that the terminating rural provider is responsible for the call failure, instead of the originating or intermediate provider.").) Thus, Plaintiffs' actions are "akin" to a consumer action because there is a direct nexus between the deceptive practice and Plaintiffs' harm.

Moreover, permitting Plaintiffs to proceed would benefit consumers. The FAC alleges T-Mobile has taken no action to compensate the consumers harmed by its deceptive practices. (FAC ¶¶ 6, 245.) Allowing the plaintiff class, many of which are rural cooperatives owned by impacted consumers, to recover against T-Mobile can help compensate consumers that have been harmed by the fake ring tone scheme. This would serve the interests of those consumers.

T-Mobile also asserts "the lack of any conceivable connection between the non-resident Plaintiffs' allegations and Illinois independently warrant dismissal." (*See* Mem. at 28, n.27.) But the Seventh Circuit has held a plaintiff class's residence has nothing to do with standing. *See Morrison v. YTB Intern., Inc.*, 649 F.3d 533, 535-36 (7th Cir. 2011) ("The class that plaintiffs propose is nationwide; that's why they filed suit in federal court…. There's no problem with standing. Plaintiffs have standing if they have been injured, the defendants caused the injury, and the injury can be redressed by a judicial decision.").

As *Morrison* explains, when properly framed, the issue is whether plaintiffs may rely on Illinois law for their consumer fraud claim, or must rely on some other state's law. *Id.* at 536. *Morrison* explains that "[c]omplaints need not do more than narrate a plausible claim for relief" to survive dismissal, and nonresidents may rely on Illinois law where "'the circumstances that relate to the disputed transaction occur primarily and substantially in Illinois.'" *Id.* (quoting *Avery*, 835 N.E.2d at 854. As the Seventh Circuit continued:

> *Avery*'s standard is not exactly self-defining, and the Supreme Court of Illinois said that "each case must be decided on its own facts", a formula that gives the trier of fact substantial latitude and implies deferential appellate review. But if we can't say that the complaint and answer contain enough to point unerringly to Illinois

28

law, we can say that the complaint does not *defeat* application of Illinois law.
Recall that the district court dismissed the out-of-Illinois plaintiffs' claim under
Rule 12(b)(6). It did not take evidence, make findings of fact, or weigh the
incommensurable factors in *Avery*'s formula; it was not entitled to do any of these
things on a motion to dismiss the complaint.

*Id.* at 537-38 (alteration in original) (citation omitted); *see also Crichton v. Golden Rule Ins. Co.*,
576 F.3d 392, 396 (7th Cir. 2009) (citing *Avery*, 835 N.E.2d at 854) (courts conduct "highly fact-
bound inquir[ies] in which no single factor is dispositive"); *Cosmetique, Inc.*, 753 F. Supp. 2d at
723 ("[I]t is premature to engage in [] a factual analysis at the pleadings stage.").

The FAC alleges a substantial nexus to Illinois that may entitle a nationwide class to rely
on the ICFA. (*See, e.g.*, FAC ¶¶ 19, 163, 181, 190, 415.) The FAC explains that T-Mobile
admitted to the expanded use of illegal ring tones in September 2015, which coincides precisely
with Inteliquent becoming T-Mobile's nearly-exclusive intermediate provider. (*See id.* ¶¶ 166-
84.) Inteliquent is headquartered in Illinois, Illinois is the sole location in which Inteliquent's
predecessor, Neutral Tandem, and T-Mobile agreed to exchange long-distance traffic, and Illinois
is where Inteliquent maintained T-Mobile's CDR's reflecting their illegal practices. (*Id.* ¶¶ 162-
63, 190, 253.) The FAC explains that Plaintiffs cannot adduce the "where" and "how" of the fake
ring tone scheme's 2015 expansion because T-Mobile's FCC submissions entirely omit all details
regarding this critical time period. (*See id.* ¶ 249, 252.) Nevertheless, the FAC explains that
Inteliquent has the capacity to insert fake ring tones on SIP routes on a nationwide basis from
Illinois. (*See id.* ¶¶ 165-84.) Thus, the FAC "does not *defeat* application of Illinois law."
*Morrison*, 649 F.3d at 538 (alteration in original). Discovery is essential to understanding the facts
and events regarding the expanded use of fake ring tones in September 2015. Plaintiffs deserve
the opportunity to amass the evidence necessary to establish that Illinois law should apply to a
nationwide class of affected carriers. The Motion should be denied.

29

## VI.    THE CIVIL CONSPIRACY CLAIM IS ADEQUATELY PLED (COUNT VIII).

Finally, T-Mobile moves to dismiss Plaintiffs' conspiracy claim based on two flawed assertions: that pleading on "information and belief" is "legally insufficient," and that the claim must be dismissed for failure to plead an agreement.  (Mem. at 28-30.)

T-Mobile's assertion regarding "information and belief pleading" ignores that it is a practical necessity when the information is uniquely in Defendants' possession.  *See, e.g.*, *City of Evanston v. N. Ill. Gas Co.*, 229 F. Supp. 3d 714, 721 (N.D. Ill. 2017).  It also misconstrues the holding of *Leafs Hockey Club*, which declined to rely on information and belief pleading for a conspiracy to defraud claim where, unlike here, plaintiffs "fail[ed] to provide grounds for its suspicions."  *Wells Fargo Bank v. Leafs Hockey Club, Inc.*, No. 13-cv-2247, 2014 WL 1017211, *7 (N.D. Ill. Mar. 14, 2014).

T-Mobile also errs by asserting the FAC must allege facts showing a specific agreement to the conspiracy.  As this Court has held:

> [T]here is no requirement, at the motion-to-dismiss stage, that a plaintiff alleging conspiracy plead any facts directly relating to an agreement.  Indeed, the Seventh Circuit has explained that plaintiffs alleging conspiracy need not "plead a meeting of the minds in detail," as conspiratorial agreements "may need to be inferred even after an opportunity for discovery, for conspirators rarely sign contracts."

*Campbell v. City of Chi.*, No. 17-cv-4467, 2018 WL 4352614, *4 (N.D. Ill. Sept. 12, 2018).

To plead a conspiracy, Plaintiffs need only "plead the parties involved, the general purpose, and the approximate date."  *Id.*; *see also Chatman v. City of Chi.*, No. 14-cv-2945, 2015 WL 1090965, *7-8 (N.D. Ill. Mar. 10, 2015).  As the Motion acknowledges, Plaintiffs have set forth the basis for their suspicions that Defendants were part of a conspiracy to use fake ring tones to mask Inteliquent's rural call quality and completion failures, including a shared motive to cut costs and avoid access charges.  (Mem. at 30.)  This is sufficient and the Motion should be denied.

30

Submitted on this 10th day of February 2020.

/s/   David T.B. Audley
David T.B. Audley (Bar No. 6190602)
Mia D. D'Andrea (Bar No. 6307966)
Chapman and Cutler LLP
111 West Monroe Street
Chicago, IL 60603-4080
Tel. 312-845-2971
Fax: 312-516-3971
Email: audley@chapman.com
Email: dandrea@chapman.com

Cathy A. Hinger (*pro hac vice*)
G. David Carter (*pro hac vice*)
Womble Bond Dickinson (US) LLP
1200 19th Street, NW, Suite 500
Washington, DC 20036
Tel.: 202-857-4489
Fax: 202-261-0029
Email: cathy.hinger@wbd-us.com
Email: david.carter@wbd-us.com

Kurt D. Weaver (*pro hac vice*)
Womble Bond Dickinson (US) LLP
555 Fayetteville Street, Suite 1100
Raleigh, NC 27601
Telephone: 919-755-8163
Facsimile: 919-755-6770
Email: kurt.weaver@wbd-us.com

*Counsel for Plaintiffs*

31

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this the 10th day of February, 2020, I served the foregoing **Plaintiffs' Opposition to T-Mobile USA, Inc.'s Motion to Dismiss Plaintiffs' First Amended Class Action Complaint** via the ECF system on parties that have consented to the same in accordance with applicable Federal Rules of Civil Procedure and the Local Rules of the U.S. District Court for the Northern District of Illinois.

By:     */s/   David T.B. Audley*