## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| CRAIGVILLE TELEPHONE CO., d/b/a ADAMS WELLS INTERNET TELECOM TV, and CONSOLIDATED TELEPHONE CO., d/b/a CTC, | ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | No. 19 C 7190 |
| | ) ) | Judge John Z. Lee |
| T-MOBILE USA INC., and INTELIQUENT, INC., | ) ) | |
| Defendants. | ) ) | |

### MEMORANDUM OPINION AND ORDER

In this putative class action, local phone companies claim that T-Mobile USA Inc. ("T-Mobile") and Inteliquent, Inc. ("Inteliquent") (collectively "Defendants") intentionally refrained from fixing connection issues that interfered with calls placed by cellular phones to landline telephones located in rural areas. Instead, Plaintiffs contend, T-Mobile and Inteliquent utilized fake ring tones that led consumers to mistakenly blame local phone companies for those problems. Based on that conduct, Craigville Telephone Co. ("Craigville") and Consolidated Telephone Co. ("Consolidated") (collectively "Plaintiffs") bring claims under the Communications Act, 47 U.S.C. § 201 *et seq.*, (Counts I to III); and the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 *et seq.* (Counts IV and V); as well as several state-law tort claims (Counts VI to VIII).

Defendants have moved to dismiss. Alternatively, Inteliquent has moved to stay the case and refer certain questions to the Federal Communications Commission ("the Commission"). And a group of local phone companies has sought to intervene. For the reasons below, the motions to dismiss are granted in part and denied in part, the motion to refer is denied, and the motion to intervene is denied as moot.

## I.     Background[1]

### A.     The Telecommunications Landscape

Most of the time, when a consumer initiates a call, multiple telecommunication carriers work together to route that call to the intended recipient. Am. Compl. ¶ 34, ECF No. 19. As relevant here, these carriers fall into three broad categories:

- **Mobile Carriers:** As the name suggests, mobile carriers transmit calls between the cell phones of mobile subscribers to and from nearby wireless towers. *Id.* ¶ 49. From there, mobile carriers turn the calls over to intermediate providers, who handle the long-distance portion of each connection. *Id.* T-Mobile is a mobile carrier. *Id.* ¶ 48.

- **Intermediate Providers:** Usually, mobile carriers "do not build and operate wireline networks." *Id.* ¶ 50. Instead, they "rely on . . . networks of unaffiliated intermediate providers . . . to provide the transport services required." *Id.* Starting from the wireless towers closest to the originating cellular phones, intermediate providers route calls to the local exchange carriers ("LECs")

---

[1]     In analyzing a motion to dismiss, the court "accept[s] as true all well-pleaded factual allegations and draw all reasonable inferences in favor of the plaintiff." *Heredia v. Capital Mgmt. Servs., L.P.*, 942 F.3d 811, 814 (7th Cir. 2019).

responsible for delivering them to the final destination (otherwise known as "terminating" them). *Id.* Inteliquent is an intermediate provider. *Id.* ¶ 53.

- **Local Exchange Carriers:** Called "LECs" for short, these carries "typically own or lease the [landlines] that connect directly to homes and businesses." *Id.* ¶ 34. For that reason, they "provid[e] the portion of the route closest to the calling and called parties" for calls "terminating to a traditional landline telephone." *Id.* Craigville and Consolidated are LECs. *Id.* ¶ 36.

Compared with other carriers, LECs typically incur higher costs to build and maintain their networks. *Id.* ¶ 31. To help LECs recover those expenses, the Commission has introduced a system of intercarrier compensation. *Id.* Under that regime, mobile carriers and intermediate providers pay "access charges" for each call LECs complete.[2] *Id.* ¶ 58.

Those fees are especially steep for calls that terminate with rural LECs. *Id.* ¶ 31. Because access charges account for a substantial portion of mobile carriers' and intermediate providers' expenses, they have an incentive to reduce the volume of calls they route to rural LECs. *Id.* ¶¶ 63–70.

**B.    The Consent Decree**

Calls meant for recipients in rural areas often suffer from delayed or degraded connections. *Id.* ¶ 97. "[T]o mask the silence the caller would otherwise hear during

---

[2]    The Commission is in the process of revising the rules that require carriers to pay access charges. *See* Am. Compl. ¶ 61; Eliminating Ex Ante Pricing Regulation and Tariffing of Telephone Access Charges, 85 Fed. Reg. 30,899 (proposed May 21, 2020) (to be codified at 47 C.F.R. pts. 51, 54, 61, 69).

excessive call setup time," some carriers play a ring tone that makes it appear to the caller that the recipient's phone is ringing, even when it is not. *In re T-Mobile USA, Inc.* ("*Consent Decree*"), 33 FCC Rcd. 3737, 3742 (2018). According to the Commission, such "false audible ringing" occurs "when an originating or intermediate provider prematurely triggers audible ring tones to the caller before the call setup request has actually reached the terminating rural provider." *Id*.

The Commission has highlighted two harms associated with false ringing. First, "the caller may often hang up, thinking nobody is available to receive the call." *Id*. Second, false ringing makes it "appear to the caller that the terminating rural provider is responsible for the call failure, instead of the originating or intermediate provider." *Id*. To avoid these problems, the Commission has adopted a rule forbidding "long-distance voice service providers" from deploying fake ring tones in this manner. *See* 47 C.F .R. § 64.2201(a).

In 2016, rural LECs submitted several complaints about T-Mobile to the Commission. *Consent Decree*, 33 FCC Rcd. at 3742. When the Commission's enforcement arm opened an investigation, T-Mobile acknowledged that it had inserted false ringtones into some of its subscribers' calls. *Id*. Based on that admission, the Commission estimated that T-Mobile "likely injected" ring tones "into hundreds of millions of calls each year." *Id*.

Not long after the investigation began, T-Mobile signed a consent decree conceding that it had violated the rule prohibiting the "insertion of false ring tones." *Id*. at 3744. T-Mobile also admitted that it "did not correct problems with its

Intermediate Providers' delivery of calls to consumers in certain rural [LECs]."[3]  *Id.* T-Mobile agreed to alter its operating procedures, create a compliance plan, and pay a $40 million civil penalty.  *Id.* at 3744–47.

## C.    The Alleged Scheme

T-Mobile serves more than eighty million subscribers.  Am. Compl. ¶ 18.  It engages Inteliquent to handle the long-distance portion of most of those subscribers' calls.  *Id.* ¶ 196.  Working together, T-Mobile and Inteliquent have implemented what industry insiders call "least-cost routing."  *Id.* ¶¶ 74, 127–29.  That strategy seeks to minimize expenses by dispatching calls to the cheapest "carrier options for a given route."  *Id.*  Sometimes, however, lower costs come at the price of degraded service. *Id.* ¶ 76.  The crux of Plaintiffs' complaint is that T-Mobile and Inteliquent adopted least-cost routing, recognized that it resulted in poor connection rates for calls to rural areas, and yet refrained from taking corrective action.  *Id.* ¶¶ 76, 77.

Instead, Plaintiffs say, T-Mobile sought to conceal those problems by inserting fake ring tones into certain calls.  *Id.* ¶¶ 183, 289.  Although Plaintiffs are uncertain of Inteliquent's precise role in that aspect of the scheme, they allege that Inteliquent routed many of the T-Mobile's calls at issue, reaped economic rewards from the insertion of fake ringtones, and knew or should have known about that practice.  *Id.* ¶¶ 172, 176–77.

Both Plaintiffs perceived "problems with calls originating on T-Mobile's network."  *Id.* ¶ 273.  Craigville, for instance, an Indiana LEC with about 2,800

---

[3]     T-Mobile made these admissions "for the purpose of th[e] Consent Decree and for civil enforcement purposes in connection" therewith.  *See Consent Decree*, 33 FCC Rcd. at 3744.

subscribers, recounts an incident that started in 2015. *Id*. ¶ 270. At the time, a T-Mobile subscriber living in Minnesota reported that she struggled to reach her parents' Craigville landline telephone. *Id*. Out of 109 calls the Minnesota subscriber placed to her parents, just 53 connected. *Id*. During failed call attempts, she "hear[d] one or two rings and dead air, ring[ing but] no rings on my Parent's end, sometimes a single ring on their end and then . . . a dial tone, music, messages such as 'you are unable to make long distance calls,' [or] faint dial tones." *Id*. ¶ 274.

When the Minnesota subscriber complained to T-Mobile and Craigville about those issues, both companies searched for a solution. *Id*. ¶¶ 280–88. In time, Craigville determined that its systems were not responsible for the failed calls. *Id*. ¶¶ 281, 287. A few months later, T-Mobile implemented a fix, but the Minnesota subscriber's connection issues eventually returned. *Id*. ¶¶ 286–87.

Consolidated, which serves about 15,000 consumers in central Minnesota, encountered a similar problem in 2013. *Id*. ¶ 292. That year, Consolidated received a complaint from Louie's Bucket of Bones, a barbecue restaurant that subscribed to its landline service. *Id*. ¶ 295. According to Louie's owner, a T-Mobile customer had been unable to reach the restaurant to place her order. *Id*. ¶¶ 296–97. When her calls failed, the T-Mobile customer said she heard a message claiming that Louie's number "was out of reach." *Id*. ¶ 299. Due to similar incidents involving multiple mobile carriers, Consolidated assigned the equivalent of one and a half full-time employees to field similar complaints. *Id*. ¶ 300. Believing that T-Mobile and

Inteliquent's routing practices depleted their resources, damaged their reputations, and depressed their access charge revenues, Plaintiffs filed this lawsuit.

## II.  Legal Standard

To survive a motion to dismiss pursuant to Rule 12(b)(6), a complaint must "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

When considering motions to dismiss, the Court accepts "all well-pleaded factual allegations as true and view[s] them in the light most favorable to the plaintiff." *Lavalais v. Vill. of Melrose Park*, 734 F.3d 629, 632 (7th Cir. 2013) (citing *Luevano v. Wal–Mart Stores, Inc.*, 722 F.3d 1014, 1027 (7th Cir. 2013)). At the same time, "allegations in the form of legal conclusions are insufficient to survive a Rule 12(b)(6) motion." *McReynolds v. Merrill Lynch & Co., Inc.*, 694 F.3d 873, 885 (7th Cir. 2012) (citing *Iqbal*, 556 U.S. at 678). For that reason, "[t]hreadbare recitals of the elements of the cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678.

## III.  T-Mobile's Motion to Dismiss

The Court first reviews T-Mobile's motion to dismiss count-by-count.

### A.  Count I: Communications Act—False Ringing

The Communications Act prohibits carriers from engaging in any "practice, classification, or regulation that is unjust or unreasonable." 47 U.S.C. § 201(b). Still,

7

"[a private] plaintiff is not entitled to a cause of action under [the Act] simply on the basis of its own determination that conduct was unjust or unreasonable." *Havens v. Mobex Network Servs., LLC*, 820 F.3d 80, 89 (3d Cir. 2016) (citing *Global Crossing Telecomms., Inc. v. Metrophones Telecomms., Inc.*, 550 U.S. 45, 52–53 (2007)). Instead, a plaintiff may only bring suit if the Commission first "determin[es] [that] a particular practice constitutes a violation." *N. Cnty. Commc'ns Corp. v. Ca. Catalog & Tech.*, 594 F.3d 1149, 1158 (9th Cir. 2010). As relevant here, the Commission has promulgated a rule preventing "long-distance voice service provider[s]" from inserting false ringing into calls. 47 C.F.R. § 64.2201(a) (the "False Ringing Rule"). In Count I, Plaintiffs fault T-Mobile and Inteliquent for flouting that rule.

The core issue here is whether the complaint plausibly alleges that Defendants' false ringing injured Plaintiffs.[4] *See* 47 U.S.C. § 206 (a carrier that violates the Act "shall be liable . . . for the full amount of damages sustained in consequence"); *Conboy v. AT&T Corp.*, 241 F.3d 242, 250 (2d Cir. 2001) ("[A] private party seeking relief under Section[] 206 . . . must allege and prove specific damages flowing from violations of the Act . . . ." (cleaned up)). In analyzing this requirement, both parties make the mistake of lumping together false ringing and bad connections. The question here is not whether Defendants' routing practices, taken as a whole, injured Plaintiffs. Rather, the question is whether Plaintiffs suffered damages attributable to the alleged practice of false ringing.

---

[4]      Because injury goes to Article III standing, which is jurisdictional, the Court evaluates this issue under Rule 12(b)(1) rather than Rule 12(b)(6), although the relevant pleading standard remains the same. *See Silha v. ACT, Inc.*, 807 F.3d 169, 173–74 (7th Cir. 2015).

Plaintiffs suggest two theories about how false ringing harmed them. *See* Pls.' Resp. Opp'n T-Mobile's Mot. Dismiss ("Resp.") at 6, ECF No. 66. First and foremost, they insist that fake ring tones caused consumers to end calls prematurely, diminishing the access charges Plaintiffs might have earned. Second, they maintain that Defendants' false ringing practice misled subscribers into blaming rural LECs for connection issues, prompting an influx of customer service requests. Although the complaint contains little support for the first theory, it marshals sufficient factual allegations to support the second, at least at the pleading stage.

As to the first theory, Plaintiffs posit that fake ring tones "influence [callers] to hang up," limiting the access charges rural LECs collect. Am. Compl. ¶ 365 (citing *Consent Decree*, 33 FCC Rcd. at 3742). What this theory ignores is that T-Mobile allegedly inserted false ringing to mask delays associated with connection issues. Am. Compl. ¶¶ 14, 82, 155. Without false ringing, callers would have heard dead air or other "symptoms" of those issues. *Id*. ¶ 142. If anything, common sense dictates that a caller who encountered ringing would have stay on the line longer than one who met with dead air. *See Iqbal*, 556 U.S. at 679 (directing courts to draw on their "judicial experience and common sense" when "[d]etermining whether a complaint state a plausible claim"). As a result, fake ring tones *improve*, not worsen, the odds that calls connect, increasing rather than reducing Plaintiffs' opportunity to earn access charges. Indeed, consistent with that logic, the complaint is bereft of any "factual content" showing that Plaintiffs have lost accesses charges as a result of the alleged false ringing. *See id*. at 678.

Plaintiffs' second theory rests on firmer ground. As the Commission has concluded, "[f]alse audible ringing can [] make it appear to the caller that the terminating rural provider is responsible for the call failure." Am. Compl. ¶ 107 (quoting *Consent Decree*, 33 FCC Rcd. at 3742). Given that T-Mobile allegedly inserted false ring tones "into hundreds of millions of calls," *id.* ¶ 132, it is plausible that T-Mobile customers—and the intended recipients of their calls—were confused into thinking that Plaintiffs were responsible for their call completion problems. This conclusion is backed up by the complaint's telling of the Minnesota caller who submitted service requests to Craigville after T-Mobile failed to solve her problems, *see id.* ¶¶ 274–77, 281, 287, and of the Minnesota restaurant owner who called Consolidated "extremely upset" after a patron complained about unconnected calls, *see id.* ¶ 297. Taking such allegations to be true, a reasonable inference can be drawn that Defendants' false ringing misled customers into directing their ire to Plaintiffs, thereby depleting Plaintiffs' customer service resources. *See id.* ¶¶ 288, 300, 386.

Thus, because the complaint introduces sufficient factual allegations to "nudge" Plaintiffs' second theory of injury "across the line from conceivable to plausible," Count I withstands dismissal.[5] *See Twombly*, 550 U.S. at 570.

---

[5]     Though Plaintiffs' briefing neglects to address them, the complaint also articulates other theories of injury. In particular, the complaint asserts that Plaintiffs have suffered "reputational harm," "loss of good will with customers," "loss of revenue due to discounts and monetary concessions . . . made to appease and retain . . . disgruntled customers," and loss of "business opportunities." Am. Compl. ¶ 3; *see id.* ¶¶ 383–85, 387–89. In these respects, the Court agrees with T-Mobile that the complaint is again devoid of facts showing that Plaintiffs have suffered any such injuries as a result of the alleged false ringing. The upshot is that a depletion of customer service resources is the sole injury Plaintiffs have successfully pled.

**B.     Counts II and III: Communications Act—Failure to Correct Call Completion Problems**

In the remaining Communications Acts counts, Plaintiffs contend that T-Mobile and Inteliquent knew that connection issues plagued calls to rural LECs, yet neglected to take corrective action.  Count II casts that failure as an unreasonable practice in violation of 47 U.S.C. § 201(b), whereas Count III characterizes it as a form of unjust discrimination in violation of 47 U.S.C. § 202(a).

At the outset, the parties dispute which of the Commission's regulations governs T-Mobile's conduct.  *See N. Cnty. Commc'ns*, 594 F.3d at 1160.  In Plaintiffs' view, the relevant guidelines derive from a 2012 declaratory ruling holding that:

> [I]t is an unjust and unreasonable practice in violation of section 201 of the Act for a carrier that knows or should know that it is providing degraded service to certain areas to fail to correct the problem or to fail to ensure that intermediate providers, least-cost routers, or other entities acting for or employed by the carrier are performing adequately.

*In re Unified Intercarrier Comp. Regime* ("*2012 Ruling*"), 27 FCC Rcd. 1351, 1355–56 (2012).

As T-Mobile sees it, a 2018 Commission order outlines the relevant requirements:

> When . . . evidence of persistent poor performance exists with respect to a rural area, the provider should know that there may be a problem with calls being completed to that area and it has a duty to investigate.  We further clarify that a covered provider or carrier may only deem the duty set forth in the *2012 Declaratory Ruling* satisfied if it: (a) promptly resolves any anomalies or problems and takes action to ensure they do not recur; or (b) determines that responsibility lies with a party other than the provider itself.

*In re Rural Call Completion* ("*2018 Order*"), 33 FCC Rcd. 4199, 4211 (2018).

11

T-Mobile has the better of this argument. As the Seventh Circuit has emphasized, "[s]ome [agency] rules simply clarify unsettled or confusing areas of law." *Beller v. Health & Hosp. Corp. of Marion Cnty., Ind.*, 703 F.3d 388, 391 (7th Cir. 2012). "[R]ather than changing the law," such rules "merely restate what the law has always been." *Id.* In deciding whether a rule clarifies existing law, courts typically "defer to an agency's expressed intent." *Id.* at 391–92. And here, the Commission made clear that it meant for the 2018 Order to clarify the 2012 Ruling. *See 2018 Order*, 33 FCC Rcd. at 4242 n.85 ("The duties in the [*2012 Ruling*] (and clarified here) apply to covered providers."). It follows that the 2018 Order sets the standards against which T-Mobile's conduct must be measured.

With those guidelines in mind, the Court turns to T-Mobile's three arguments in favor of dismissal. First, T-Mobile questions whether the alleged connection issues harmed Plaintiffs. In support, it points out that the Consent Decree only describes a failure "to correct problems with . . . Intermediate Providers' delivery of calls to consumers in *certain* rural [locations]." *Consent Decree*, 33 FCC Rcd. at 3744 (emphasis added). And T-Mobile argues that Plaintiffs have provided no factual allegations to support the notion that the issues impacted *their* coverage areas.

This is incorrect. While the Consent Decree alone may not establish that T-Mobile's practices harmed Plaintiffs, the complaint articulates other allegations justifying that inference. For example, a Minnesota subscriber reported that 56 out of 109 calls she placed to Craigville customers dropped, creating a reasonable inference that such a high failure rate was a sign of systemic connection issues. *See*

12

Am. Compl. ¶ 273. Moreover, in investigating that subscriber's concerns, Craigville expended substantial resources that it could have dedicated to other purposes. *Id*. ¶¶ 287–88. Of course, discovery may show that T-Mobile lacked sufficient notice about the Minnesota subscriber's issues or bore no responsibility for rectifying them. For now, however, Plaintiffs have done enough to withstand this argument.

Second, T-Mobile contends that it complied with the 2018 Order by "promptly resolv[ing the] anomalies" detailed in the complaint. *See* 33 FCC Rcd. at 4211. But that argument is difficult to square with the Minnesota subscriber's experience. She waited for months while T-Mobile failed to implement a solution. Am. Compl. ¶¶ 280, 286. And even when T-Mobile came up with a fix, her connection problems returned. *Id*. ¶ 287. Considering those apparent shortcomings, the Court cannot say that T-Mobile's troubleshooting complied with the 2018 Order as a matter of law.

Lastly, T-Mobile insists that the Communication Act's two-year limitations period bars Counts II and III. *See* 47 U.S.C. § 415(a). A claim under the Act accrues "when the plaintiff discovers, or with due diligence should have discovered, the injury that is the basis for the action." *Sprint Commc'ns Co., L.P. v. FCC*, 76 F.3d 1221, 1226 (D.C. Cir. 1996). That is, the limitations clock starts "when the plaintiff has inquiry notice" about the claim. *Id*. at 1229–30. Furthermore, it bears emphasizing that "[w]hether a plaintiff had sufficient facts to place him on inquiry notice . . . is often inappropriate for resolution on a motion to dismiss." *Maimonides Med. Ctr. v. Verizon N.Y. Inc.*, No. 09-CV-54, 2010 WL 11627493, at *14 (E.D.N.Y. May 13, 2010) (citing *Marks v. CDW Computer Ctrs., Inc.*, 122 F.3d 363, 367 (7th Cir. 1997)).

Before applying these principles, it is first necessary to "define . . . the injury that serves as the basis of the claim." *Loughlin v. United States*, 230 F. Supp. 2d 26, 40 (D.D.C. 2002). Under the 2018 Order, a single dropped call does not give rise to a cause of action under the Communications Act. Rather, that Order only authorizes a private plaintiff to sue if a covered provider detects "persistent poor performance," yet declines to "take action." *2018 Order*, 33 FCC Rcd. at 4211.

To be sure, Plaintiffs admit that they suspected T-Mobile's practices were persistently poor as early as 2013. Am. Compl. ¶ 307. But nothing in the complaint indicates that Plaintiffs knew that T-Mobile had persistent poor performance *and* intentionally declined to take remedial action prior to the two-year limitations period. To the contrary, the complaint alleges that Consolidated struggled to discern which carriers were responsible for the issues it encountered, *id.* ¶¶ 301, 302, and states that rural LECs have no "means of knowing how many calls made by other T-Mobile subscribers . . . were never delivered," *id.* ¶ 290; *see id.* ¶ 301. That leaves open the possibility that Plaintiffs lacked inquiry notice about their Communications Act claims until 2018, when the Consent Decree made T-Mobile's practices public. Under Seventh Circuit law, that is enough. *See Clark v. City of Braidwood*, 318 F.3d 764, 768 (7th Cir. 2003) (instructing courts not to dismiss a claim as long as "there is *any* set of facts that if proven would establish a defense to the statute of limitations").

Having decided that none of T-Mobile's arguments ring true, the Court declines to dismiss Counts II and III at this stage based upon the statute of limitations.

14

## C.     Counts IV and V: RICO Violations

Plaintiffs' next claims characterize T-Mobile and Inteliquent's call-routing practices as racketeering acts that violate RICO.  As relevant here, that statute makes it unlawful both to conduct an enterprise "through a pattern of racketeering activity," 18 U.S.C. § 1962(c), and "to conspire" to do so, *id.* § 1962(d).  And it provides a private cause of action for "[a]ny person injured in his business or property by reason of a violation of section 1962."  *Id.* § 1964(c).

T-Mobile raises several arguments against Plaintiffs' claims under §§ 1962(c) and 1962(d).  The Court takes them in turn.

### 1.     Proximate Cause

T-Mobile first argues that Plaintiffs cannot satisfy RICO's proximate-cause requirement.[6]  Interpreting § 1964(c)'s "by reason of" language, the Supreme Court has held that "to state a claim under civil RICO, the plaintiff is required to show that a RICO predicate offense 'not only was a 'but for' cause of his injury, but was the proximate cause as well.'"  *Hemi Grp., LLC v. City of New York*, 559 U.S. 1, 9 (2010) (plurality opinion) (quoting *Holmes v. Sec. Investor Prot. Corp.*, 503 U.S. 258, 268 (1992)); *accord Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 457 (2006).  The Court has explained that RICO "incorporate[s] common-law principles of proximate causation."  *Holmes*, 503 U.S. at 267–68; *accord Hemi Grp.*, 559 U.S. at 9 (plurality

---

[6]     The Seventh Circuit has clarified that proximate causation under RICO is necessary to establish Article III standing.  *See RWB Servs., LLC v. Hartford Computer Grp., Inc.*, 539 F.3d 681, 686 (7th Cir. 2008).  The Court thus analyzes T-Mobile's proximate cause argument under Rule 12(b)(1) rather than Rule 12(b)(6) as well.  *See Silha*, 807 F.3d 174.

opinion) ("Proximate cause for RICO purposes should be evaluated in light of [RICO's] common-law foundations."). Proximate cause under RICO thus demands "some direct relation between the injury asserted and the injurious conduct alleged." *Holmes*, 503 U.S. at 268. "A link that is too remote, purely contingent, or indirect is insufficient." *Hemi Grp.*, 559 U.S. at 9 (plurality opinion) (cleaned up).

In T-Mobile's view, Plaintiffs fail to meet this demand because the intervening cause—or "first step," *id.* at 10—of confused or disgruntled T-Mobile subscribers, who in turn submit customer service to Plaintiffs after hearing fake ring tones, breaks the chain of causation under RICO. Such a view admittedly draws support from *Hemi Group*, in which a plurality of the Supreme Court found that the plaintiff City of New York's loss of sales tax dollars was not proximately caused by the defendant's fraudulent scheme of selling cigarettes to city residents without charging sales tax. *Id.* at 9–11. In so finding, the plurality reasoned that "the City's harm was directly caused by the customers" who did not pay sales tax, "not Hemi." *Id.* at 11. The plurality also rejected the dissent's view that proximate cause under RICO "turn[s] on foreseeability," *id.* at 12, such that a foreseeable intervening act "does not break the causal chain," *id.* at 25 (Breyer, J., dissenting).

But T-Mobile fails to recognize that just four Justices assented to *Hemi Group*'s proximate cause analysis. It is well established that where, as there, "a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds." *Marks*

16

*v. United States*, 430 U.S. 188, 193 (1977) (cleaned up). And in *Hemi Group*, the narrowest grounds were those provided by Justice Ginsburg's concurrence, which expressly declined to join the plurality's "proximate cause analysis." 559 U.S. at 19 (Ginsburg, J., concurring in part and concurring in the judgment); *see City & Cnty. of S.F. v. Purdue Pharma L.P.*, No. 3:18-CV-07591, 2020 WL 5816488, at *22 (N.D. Cal. Sept. 30, 2020); *Andrews v. Dairy Farmers of Am., Inc.*, No. 2:11-CV-97, 2011 WL 5444245, at *3 n.5 (S.D. Miss. Nov. 9, 2011); *Garrett v. Cassity*, No. 4:09-CV-01252, 2010 WL 5392767, at *11 (E.D. Mo. Dec. 21, 2010). Instead, Justice Ginsburg reasoned only that the City could not use civil RICO to assert claims based on violations of the Jenkins Act, which provides "quite limited remedies." 559 U.S. at 19 (Ginsburg, J., concurring in part and concurring in the judgment) (cleaned up).

*Hemi Group* thus does not "d[o] away with a foreseeability analysis for RICO causation," *Garrett*, 2010 WL 5392767, at *11, or otherwise displace the "traditional understanding" of proximate cause established by the Court's prior RICO decisions, *Hemi Grp.*, 55 U.S. at 26 (Breyer, J., dissenting). And "under the 'directness' theory of proximate causation" articulated in those decisions, "there is liability for both 'all 'direct' (or 'directly traceable') consequences *and those indirect consequences that are foreseeable.*'" *Id.* at 25–26 (quoting W. Keeton et al., Prosser and Keeton on the Law of Torts § 42, at 273 (5th ed. 1984)); *see Bridge v. Phx. Bond & Indem. Co.*, 553 U.S. 639, 657–58 (2008) (holding that "the proximate-cause principles articulated in *Holmes* and *Anza*" were satisfied where the plaintiff's asserted injury "was a foreseeable and natural consequence of [the defendant's] scheme").

A closer look at *Holmes* and *Anza* confirms that they do not support the "first-step" theory of proximate causation advanced by T-Mobile. *See* T-Mobile's Mem. at 20. In *Holmes*, the Securities Investor Protection Corporation sued to recover funds it paid to creditors of two broker-dealers who went bankrupt after investing in the defendant's stock-manipulation scheme. 503 U.S. at 261–62. In finding that causal link "too remote," the Court emphasized that the plaintiff's injury was incidental to the broker-dealers' insolvency—which might have been attributable to any number of causes—making the plaintiff at best a "secondary victim[]" of the defendant's scheme. *See id.* at 271–74. Similarly, in *Anza*, the Court found that proximate cause was not satisfied where the plaintiff's asserted competitive injury was caused by "a set of actions (offering lower prices) entirely distinct from the alleged RICO violation (defrauding the State)". 547 U.S. at 457–58. "Thus, in both *Holmes* and *Anza*," the problem was that the plaintiffs "alleged special harm, neither squarely within the class of harms at which [RICO was] directed, nor of a kind that typical violators would intend or even foresee." *Hemi Grp.*, 559 U.S. at 28 (Breyer, J., dissenting).

Here, by contrast, Plaintiffs' injury of depleted customer service resources was surely "a foreseeable and natural consequence" of Defendants' alleged fake ring tone scheme. *See Bridge*, 553 U.S. at 657–58. In surreptitiously causing subscribers to believe their calls were connecting when in fact they were not, that scheme teed up rural LECs like Plaintiffs to bear the brunt of the confusion and spend their resources attempting to resolve it. And while subscriber confusion was an intervening step in the causal chain, it did not necessarily create a "more directly injury party" who may

be counted on to challenge the scheme, *Empress Casino Joliet Corp. v. Johnston*, 763 F.3d 723, 734 (7th Cir. 2014), since mere confusion does not seem to be the sort of "concrete" injury that Article III demands, *see Spokeo, Inc. v. Robins*, 136 S. Ct. at 1548. Rather, Plaintiffs themselves seem to have "suffered the only injury resulting from" the challenged scheme. *See Empress Casino*, 763 F.3d at 734. Accordingly, their injury satisfies RICO's proximate-cause requirement.

## 2. Predicate Acts

T-Mobile next argues that Plaintiffs' RICO claims must be dismissed because the complaint fails to adequately allege a "pattern" of two or more predicate acts of "racketeering activity." 18 U.S.C. § 1962(c); *see Jennings v. Auto Meter Prod., Inc.*, 495 F.3d 466, 472 (7th Cir. 2007). 'Racketeering activity' includes "any act indictable" under the federal wire fraud statute, 18 U.S.C. § 1343. *Ashland Oil, Inc. v. Arnett*, 875 F.2d 1271, 1278 & n.8 (7th Cir. 1989); *see* 18 U.S.C. § 1961(1). Plaintiffs contend that they have pled numerous instances "of wire fraud by fake ring tone." Resp. at 16; *see* Am. Compl. ¶¶ 357–78.

The federal wire fraud statute provides that

Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be fined under this title or imprisoned not more than 20 years, or both.

18 U.S.C. § 1343. Without disputing that its alleged insertion of fake ring tones into telephone calls constitutes a scheme to transmit by means of wire, T-Mobile argues

that the complaint fails to plausibly show that the scheme was devised *for the purpose* of defrauding anyone of money or property. *See United States v. Bloom*, 846 F.3d 243, 250 (7th Cir. 2017) (noting that "intent to defraud" is an essential element of wire fraud under 18 U.S.C. § 1343). Plaintiffs counter that they have "amply alleged" that the intent of the fake ring tone scheme was to defraud rural LECs "of access charges." Resp. at 19; *see* Am. Compl. ¶¶ 365–67, 371–75.

T-Mobile has the better argument here. While the complaint certainly asserts that T-Mobile's fake ring tone scheme "had the illegitimate purpose of fraudulently reducing" the access charges that Plaintiffs and other rural LECs "would otherwise have been entitled to charge," Am. Compl. ¶¶ 365–66, it fails to make this conclusion plausible for the same reasons that doom Plaintiffs' first theory of injury. As noted above, Plaintiffs' loss-of-access-charges theory overlooks that T-Mobile allegedly inserted false ring tones only to mask delays associated with connection issues. *See id.* ¶¶ 14, 82, 155; *see also Consent Decree*, 33 FCC Rcd. at 3742. As a result, it is reasonable to infer that T-Mobile conducted its alleged scheme either to "influence" callers to stay on the line, *not* "to hang up" prematurely, *see* Am. Compl. ¶ 365; or else simply to improve their subscribers' user experience while their calls sought connection, as T-Mobile contends, *see* T-Mobile's Mem. at 22. Either way, since the alleged scheme in no way tended to deprive Plaintiffs of access charges, it would be unreasonable, without more, to infer that T-Mobile conducted it for that purpose.[7]

---

[7]    The other predicate acts of wire fraud alleged in the complaint—such as T-Mobile's sending of dishonest emails about call connection problems to its subscribers, *see* Am. Compl. ¶ 372(c)—fail for the same reason. As for the complaint's vague references to "call blocking practices" *other* than the insertion of fake rings tones, *see, e.g., id.* ¶ 365, the complaint does

Thus, because Plaintiffs fail to plausibly allege that T-Mobile carried out its fake ring tone scheme for the purpose of defrauding them, Count IV is dismissed without prejudice. And because Plaintiffs fail to plead a violation of § 1962(c), they likewise fail to plead a violation of § 1962(d) "based on the same facts." *Stachon v. United Consumers Club, Inc.*, 229 F.3d 673, 677 (7th Cir. 2000); *see* Am. Compl. ¶¶ 391–98. So Count V is dismissed without prejudice as well.[8]

## D.    Count VI: Tortious Interference

Plaintiffs' tortious interference claim fares no better. By permitting connection problems to persist, Plaintiffs say, T-Mobile prevented rural LECs from collecting access charges from intermediate providers. The problem is that "a claim for tortious interference with contract" is premised on "the existence of a valid and enforceable contract" and "a subsequent breach . . . caused by the defendant's wrongful conduct." *Cromeens, Holloman, Sibert, Inc. v. AB Volvo*, 349 F.3d 376, 398 (7th Cir. 2003). Given that Plaintiffs make no mention of any contractual breach by any intermediate provider, their tortious interference with contract claim cannot proceed.

Without saying so explicitly, Plaintiffs' response brief recasts the complaint as raising a claim based upon tortious interference with business expectancy. For such a claim to succeed, "the evidence must establish that the [defendant] acted with a desire to harm which was unrelated to the interest he was presumably seeking to

---

not disclose enough factual details for the Court to assess whether those practices count as predicate acts under RICO, let alone to make a plausible showing that they occurred.

[8]    Because the Court dismisses Counts IV and V on this basis, it need not address T-Mobile's remaining arguments against them or their request for punitive damages.

protect." *Slep-Tone Entm't Corp. v. Coyne*, 141 F. Supp. 3d 813, 834 (N.D. Ill. 2015) (citing *Capital Options Invs., Inc. v. Golderg Bros. Commodities, Inc.*, 958 F.2d 186, 189 (7th Cir. 1992)). But the complaint concedes that the problems were attributable to T-Mobile's desire to minimize its costs rather than any "desire to harm" Plaintiffs. *Id.*; *see* Am. Compl. ¶¶ 127–31. As such, Count VI is dismissed without prejudice.

### E.     Count VII: Illinois Consumer Fraud and Deceptive Business Practices

Plaintiffs' claim under the Illinois Consumer Fraud and Deceptive Business Practices Act ("IFCA"), *see* 815 Ill. Comp. Stat. 505/1 *et seq.*, is more complicated. As a general rule, the ICFA "does not apply to fraudulent transactions which take place outside Illinois." *Tarzian v. Kraft Heinz Foods Co.*, No. 18-CV-7148, 2019 WL 5064732, at *3 (N.D. Ill. Oct. 9, 2010) (citing *Avery v. State Farm Mut. Auto. Ins. Co.*, 835 N.E.2d 801, 853 (Ill. 2005)). That is why a non-resident plaintiff may only invoke the ICFA if "the circumstances that relate to the disputed transaction . . . occurr[ed] primarily and substantially in Illinois." *Crichton v. Golden Rule Ins. Co.*, 576 F.3d 392, 396 (7th Cir. 2009) (quoting *Avery*, 835 N.E.2d at 853–54)).

As relevant here, alleging only that "a scheme to defraud was disseminated from [the defendant's Illinois] headquarters is insufficient to establish the necessary connection." *Van Tassell v. United Mktg. Grp., LLC*, 795 F. Supp. 2d 770, 782 (N.D. Ill. 2011). In *Haught v. Motorola Mobility, Inc.*, for example, a court in this district dismissed an ICFA claim even though "the alleged misrepresentations were designed in Illinois" and "emanated from servers located in Illinois." No. 12-CV-2515, 2012 WL 3643831, at *4 (N.D. Ill. Aug. 23, 2012); *see Phillips v. Bally Total Fitness Holding*

*Corp.*, 865 N.E.2d 310, 316 (Ill. App. Ct. 2007); *Sheeley v. Wilson Sporting Goods Co.*, No. 17-CV-3076, 2017 WL 5517352, at *2 (N.D. Ill. Nov. 17, 2017).

Similarly, here, Plaintiffs emphasize that Inteliquent has its headquarters in Illinois and may have inserted fake ring tones from a Chicago-area data center. Am. Compl. ¶¶ 19, 163, 181, 190. Aside from those allegations, however, Plaintiffs provide no other links to Illinois.[9] Instead, they concede that neither they nor the customers who heard false ringing reside in that state. Am. Compl. ¶¶ 16–17, 273, 295. As a result, "the disputed transaction[s]" lack a sufficiently "substantial[]" connection with Illinois to permit Plaintiffs' ICFA claim to proceed, *see Crichton*, 576 F.3d at 396, and it is dismissed without prejudice.

## F. Count VIII: Civil Conspiracy

This brings us to Plaintiffs' final claim: civil conspiracy. "In Illinois, a civil conspiracy is defined as a combination of two or more persons for the purpose of accomplishing by concerted action either an unlawful purpose or a lawful purpose by unlawful means." *Indep. Trust Corp. v. Stewart Info. Servs. Corp.*, 665 F.3d 930, 938–39 (7th Cir. 2012). In practice, "[t]he civil conspiracy theory has the effect of extending liability for a tortious act beyond the active tortfeasor to individuals who have not acted but have only planned, assisted, or encouraged the act." *McClure v.*

---

[9]     *Morrison v. YTB Int'l, Inc.*, a case Plaintiffs cite, underscores how few factual allegations link their IFCA claims with Illinois. 649 F.3d 533 (7th Cir. 2011). Apart from alleging that the defendant made its headquarters in Illinois, the *Morrison* complaint also pleaded that: (1) the underlying deals were executed in Illinois, (2) a choice-of-law clause in the governing contract required that the parties litigate in Illinois courts, (3) the plaintiffs sent payments to Illinois, and (4) the defendants resolved complaints in Illinois. *Id.* at 537. None of those considerations is present here.

*Owens Corning Fiberglass Corp.*, 720 N.E.2d 242, 258 (Ill. 1999). To sustain that theory, Plaintiffs must allege facts establishing both "an agreement" and "a tortious act committed in furtherance of that agreement." *See id.* Defendants focus on the first element.[10]

At its core, the agreement requirement hinges on whether the complaint spotlights "acts sufficient to raise the inference of mutual understanding." *Linkepic Inc. v. Vyasil, LLC*, 370 F. Supp. 3d 906, 926–27 (N.D. Ill. 2019) (citing *Amundsen v. Chi. Park Dist.*, 218 F.3d 712, 718 (7th Cir. 2000)). Although "a bare allegation of conspiracy [is] not enough," *Cooney v. Rossiter*, 583 F.3d 967, 970 (7th Cir. 2009), "[i]t is enough . . . to indicate the parties, general purpose, and approximate date, so that the defendant has notice of what he is charged with," *Campbell v. City of Chi.*, No. 17-CV-4467, 2018 WL 4352614, at *4 (N.D. Ill. Sept. 12, 2018) (citing *Walker v. Thompson*, 288 F.3d 1005, 1007 (7th Cir. 2002)).

Measured against that standard, the complaint adequately pleads that T-Mobile and Inteliquent entered an agreement to bring about "an unlawful purpose or a lawful purpose by unlawful means." *See Indep. Trust Corp.*, 665 F.3d at 938–39. According to Plaintiffs, Inteliquent assumed responsibility for terminating calls placed by T-Mobile subscribers, reviewed information about completion rates, and

---

[10] At times, T-Mobile seems to suggest that a violation of the Communications Act does not qualify as "a tortious act committed in furtherance of [an] agreement." *McClure*, 720 N.E.2d at 258. But courts embrace a broad understanding of what counts as a "tortious" act. *See, e.g.*, *Freedom Mortg. Corp. v. Burnham Mortg., Inc.*, 720 F. Supp. 2d 978, 1000 (N.D. Ill. 2010) ("[A]n alleged overt or unlawful act need not be tortious or otherwise actionable in tort to support a cause of action for conspiracy." (quoting *Vance v. Chandler*, 597 N.E.2d 233, 236 (Ill. App. Ct. 1992))).

realized economic rewards from T-Mobile's apparent refusal to fix connection issues. Am. Compl. ¶¶ 196–99. One plausible inference, advanced by Defendants, is that Inteliquent tolerated T-Mobile's practices without endorsing them. *See Adcock v. Brakegate, Ltd.*, 645 N.E.2d 888, 894 (Ill. 1994). But another plausible inference, promoted by Plaintiffs, is that Inteliquent's extensive involvement in routing T-Mobile's calls is evidence that Defendants agreed not to remedy call failures. At this early stage, the Court cannot say which of those positions prevails.

Defendants' reliance on *Stewart* is unavailing. In upholding the dismissal of a civil conspiracy claim, the *Stewart* court stressed that "the complaint d[id] not plausibly suggest that [defendant] . . . knew of . . . the underlying fraud." 665 F.3d at 941. "Without knowledge of the scheme," the Seventh Circuit added, the defendant "could not have agreed to it." *Id.* Unlike in *Stewart*, Inteliquent allegedly routed many of T-Mobile's calls, making it plausible that Inteliquent knew about the plan to refrain from fixing connection issues. That is sufficient to save Count VIII for now.[11]

## IV. **Inteliquent's Motion to Dismiss**

Turning to Inteliquent's motion to dismiss, for the most part it raises issues substantively identical to those raised in T-Mobile's motion. So, the same infirmities

---

[11]    In a footnote, T-Mobile also posits that the civil conspiracy claim is untimely under Illinois's five-year limitations period, *see* 735 Ill. Stat. Ann. 5/13-205, and preempted by the Communications Act. *See* T-Mobile's Mem. at 28 n.28. Those "perfunctory and undeveloped argument[s]" are waived. *See M.G. Skinner & Assocs. Ins. Agency, Inc. v. Norman–Spencer Agency, Inc.*, 845 F.3d 313, 321 (7th Cir. 2017). In any event, the case on which T-Mobile relies provides no basis for finding preemption here. *See Bastien v. AT&T Wireless Servs., Inc.*, 205 F.3d 983, 988–90 (7th Cir. 2000) (viewing the Communication Act's preemption clause as a bar to state-law claims challenging "the rates and level of service offered by" mobile carriers). And Illinois's five-year limitations period poses no bar for the same reasons discussed above with respect to the Communication Act's two-year limitations period.

that afflict Counts IV to VII as pleaded against T-Mobile also foreclose those claims as to Inteliquent. And likewise, because Inteliquent challenges Count VIII on the same grounds as T-Mobile, that claim may proceed as to Inteliquent.[12]

When it comes to Counts II and III, however, Inteliquent advances an argument unavailable to T-Mobile. In those counts, Plaintiffs charge Inteliquent with defying the Communications Act by failing to fix call completion problems, and, as discussed, a private plaintiff may only raise a Communications Act claim if the Commission first "determine[s that] a particular practice constitutes a violation of the Act." *N. Cnty. Commc'ns*, 594 F.3d at 1158. The Commission has mandated that T-Mobile correct connection problems in question, but none of its rules extend those duties to intermediate providers, such as Inteliquent.

In response, Plaintiffs point to the 2012 Ruling and its applicability to "carriers," a category that might be construed as covering Inteliquent. *See* 27 FCC Rcd. at 1355–56. But the 2018 Order clarifies that the 2012 Ruling only "appl[ies] to covered providers." 33 FCC Rcd. at 4211; *see Beller*, 703 F.3d at 391. And a "covered provider" is "a provider of long-distance voice service that makes the initial long-distance path choice for more than 100,000 domestic retail subscriber lines." 47 C.F.R. § 64.2101. Inteliquent, however, is an "intermediate provider" when it comes to T-Mobile's calls, Am. Compl. ¶¶ 10, 51, 62, 17, and the Commission has stated that

---

[12] Inteliquent briefly contends that the civil conspiracy claim is time-barred. In Illinois, a civil conspiracy claim "is governed by the statute of limitations for the underlying tort[s]." *Jovic v. L-3 Servs. Inc.*, 69 F. Supp. 3d 750, 764 (N.D. Ill. 2014). Here, the underlying illegal acts are the alleged violations of the Communications Act. As explained above, the statute of limitations does not foreclose Plaintiffs' Communications Act claims, and the Court cannot conclude that Count VIII is untimely as a matter of law.

an intermediate provider "[d]oes not . . . serve as a covered provider in the context of originating or terminating a given call," 47 C.F.R. § 64.2101. Accordingly, Inteliquent does not fall within the scope of the requirements set out in the 2012 Ruling. Nor have Plaintiffs identified any other rule or regulation that requires intermediate providers to correct connection problems of the type at issue here. Thus, Counts II and III are dismissed without prejudice as to Inteliquent, leaving Count I as the sole remaining claim against Inteliquent.

### V.    Inteliquent's Motion for Primary Jurisdiction Referral

Along with its motion to dismiss, Inteliquent also submitted a motion inviting the Court to refer several questions to the Commission and to stay this case in the meantime.[13] In particular, Inteliquent proposes three main questions for the agency:

(1)    Whether a letter of inquiry that the Commission prepared during its investigation establishes that Inteliquent knew about the insertion of fake ring tones,

(2)    What call-completion standard, if any, governs intermediate providers, and,

(3)    Whether Inteliquent deviated from that standard.

The second and third questions assume that Counts II and III—the Communications Act claims based on a failure to fix connection issues—will go forward as to Inteliquent. Given that the Court has dismissed those claims, the

---

[13]    "The doctrine of primary jurisdiction allows a federal court to refer a matter extending beyond the conventional experience of judges or falling within the realm of administrative discretion to an administrative agency." *In re StarNet, Inc.*, 355 F.3d 634, 639 (7th Cir. 2004) (cleaned up).

Commission's answers to these questions would do little to facilitate the resolution of this dispute.

That leaves the first question, which centers on the Commission's interpretation of a letter of inquiry it dispatched during its investigation of T-Mobile. Having reviewed that letter, the Court is not persuaded that referral is needed to discern its meaning. *See* Pls.' Ex. 1, 12/17/2016 Letter of Inquiry at 3, ECF No. 64-1. So Inteliquent's motion to refer primary jurisdiction to the Commission is denied.

## VI. <u>Motion to Intervene</u>

With Plaintiffs' support, a group of rural phone companies ("Plaintiffs-Intervenors") has moved for leave to intervene under Rule 24. As Plaintiffs-Intervenors acknowledge, their motion "is a direct response to Defendants' pending motions to dismiss on statute of limitations grounds, and is brought out of an abundance of caution to ensure adequate preservation of the statute of limitations for the putative class members." Mot. Intervene at 2, ECF No. 72. Yet the Court has not dismissed any of Plaintiffs' claims under a statute of limitations. For that reason, the motion to intervene is denied without prejudice as moot.[14] If Plaintiffs-Intervenors still wish to intervene after reviewing this order, they may submit a revised motion.

---

[14] Plaintiffs-Intervenors make a cursory argument that they are entitled to intervention as of right. *See* Fed. R. Civ. P. 24(a)(2). To support that theory, they must show that "disposition of the action threatens to impair [their] interest" and that "the [parties] fail to represent adequately their interest." *Ligas ex rel. Foster v. Maram*, 478 F.3d 771, 773 (7th Cir. 2007). Given that the Court declined to dismiss any claim on statute of limitations grounds, Plaintiffs-Intervenors satisfy neither requirement.

### **Conclusion**

For the reasons stated above, T-Mobile's motion to dismiss is denied as to Counts I, II, III, and VIII, but granted in all other respects. Inteliquent's motion to dismiss is granted as to all claims, except Count VIII. Plaintiffs are granted leave to file a second amended complaint by December 3, 2020 if they so choose and can address the deficiencies identified in this order. Finally, the motion for primary jurisdiction referral is denied, and the motion to intervene is denied as moot.

**IT IS SO ORDERED.**                **ENTERED** **11/16/20**

_____

**John Z. Lee**
**United States District Judge**