# EXHIBIT 18

<u>**CONFIDENTIAL – NOT FOR PUBLIC INSPECTION**</u>

**Supplemental Response of T-Mobile USA, Inc.**
**File No. EB-IHD-16-00023247**
**September 8, 2017**

T-Mobile USA, Inc. ("T-Mobile" or the "Company") hereby submits this Supplemental Response in the above-referenced proceeding concerning T-Mobile's compliance with the Commission's rural call completion rules and decisions (the "*2013 RCC Order*").[1] Information that is the subject of the accompanying Request for Confidential Treatment is denoted in this response with the symbols **[[ ]]**. As the Commission recognizes, "both EB and the parties under investigation have legitimate interests in keeping the investigative phase of a proceeding non-public."[2]

T-Mobile understands that the Enforcement Bureau (the "Bureau") is contemplating a substantial enforcement action—potentially approaching (b) (7)(E) ▓▓▓▓▓ dollars—concerning T-Mobile's use of a Local Ring Back Tone ("LRBT") parameter in contravention of Section 64.2201(a) of the Commission's Rules—*i.e.*, the Commission's "ringing indications requirements" rule (the "early ringtone rule").[3] T-Mobile fully acknowledges that it is and was required to comply with the early ringtone rule and that its continued use of the LRBT parameter for certain calls after the early ringtone rule went into effect violated the rule.

While T-Mobile appreciates that non-compliance with the early ringtone rule is appropriately a matter of concern for the Bureau, it respectfully submits that an enforcement action of the magnitude contemplated by the Bureau is unwarranted for the following reasons, each of which will be discussed in turn.

- ***T-Mobile's rural call completion performance is significantly better than average.***
  The purpose of the early ringtone rule is—per the Commission—to promote rural call completion performance. Based on information the Commission has made public, T-Mobile's performance is well above average. T-Mobile does not contend that there should be no penalty for violating Commission rules and understands the Bureau's desire to deter future violations by T-Mobile or other carriers. There is no basis, however, for taking the extreme action considered in response to violation of a rule whose underlying objective T-Mobile is meeting notwithstanding the violation.

---

[1] *See* Letter from Jeffrey J. Gee, Chief, Investigations and Hearings Division, Enforcement Bureau, Federal Communications Commission, to David H. Solomon and Russell P. Hanser, Counsel for T-Mobile USA, Inc., File No. EB-IHD-16-00023247 (Apr. 3, 2017); *Rural Call Completion*, Report and Order and Further Notice of Proposed Rulemaking, 28 FCC Rcd 16154 (2013) ("*2013 RCC Order*").

[2] *Amendment of Certain of the Commission's Part 1 Rules of Practice and Procedure and Part 0 Rules of Commission Organization*, Report and Order, 26 FCC Rcd 1594, 1596 ¶ 7 (2011).

[3] 47 C.F.R. § 64.2201(a) ("A long-distance voice provider shall not convey ringing information until the terminating provider has signaled that the called party is being alerted to an incoming call, such as by ringing.").

**CONFIDENTIAL – NOT FOR PUBLIC INSPECTION**

- ***The violation at issue stemmed from errors and oversights by T-Mobile personnel, not from any intentional decision to deceive or defraud customers.*** T-Mobile's violation was not a deliberate or intentional scheme to violate the law. Rather, the violation was the product of good-faith mistakes stemming from T-Mobile employees' heavy focus on the reporting and recordkeeping requirements, and with the sole objective of providing optimal service for customers.

- ***T-Mobile's use of the LRBT parameter did not give rise the harm the early ringtone rule was designed to prevent, nor did T-Mobile benefit financially from using the early ringtone.*** When the Commission adopted the early ringtone rule, it stated that the rule's purpose was "to address the problem of calls failing to complete to the rural PSTN." [4] Data published by the Wireline Competition Bureau ("WCB") demonstrate that T-Mobile consistently completes rural calls at a rate well above the average. [5] Moreover, complaint data in the record suggests that T-Mobile's use of the LRBT parameter did not suppress complaints regarding rural call completion problems. Thus, while T-Mobile understands that it violated the rule, it does not appear that the violation led to the type of harm the rule was designed to prevent. Likewise, T-Mobile did not, by virtue of the LRBT parameter, collect any customer or government funds (collection of which is one hallmark of the type of serious rule violation that could warrant a penalty in the range contemplated here) at all—let alone through fraud. The magnitude of any enforcement action must account for these facts.

- ***The magnitude of the proposed forfeiture cannot be reconciled with prior enforcement actions.*** Given the above, a fine of even close to the magnitude the Bureau has suggested is simply not fair or appropriate under the circumstances and would be wildly disproportionate to existing precedent. The facts in this matter bear no resemblance to the kind of intentionally fraudulent conduct at issue in decisions involving penalties comparable to what the Bureau is considering here.

- ***A fine of the magnitude the Bureau is contemplating would violate the statutory maximum.*** The Communications Act permits a maximum penalty of $192,459 per day for a continuing violation, up to a maximum of $1,929,459 for a continuing violation involving a single act. [6] This limitation applies here, because T-Mobile's use of the LRBT parameter was a continuing violation involving a single act—in Congress's words, "a 'one-time' offense that continues over the duration of the violation," as opposed to "action[s] repeated on successive days." [7] Any contrary interpretation would allow for virtually unlimited liability—a strange reading of a

---

[4] *2013 RCC Order*, 28 FCC Rcd at 16203 ¶ 117.

[5] See *Rural Call Completion*, Report, 32 FCC Rcd 4980 (WCB 2017) ("*June 22 Report*").

[6] See *Amendment of Section 1.80(b) of the Commission's Rules; Adjustment of Civil Monetary Penalties to Reflect Inflation*, Order, 31 FCC Rcd 13485 (EB 2016) ("*Civil Monetary Penalties Order*").

[7] H.R. Rep. No. 101-386, at 3038 (1989) (Conf. Rep.).

2

FOIA_000160

CONFIDENTIAL – NOT FOR PUBLIC INSPECTION

provision expressly designed to cabin agency discretion. As then-Commissioner Pai said in 2014, "[i]t strains credulity to think that Congress intended" this result.[8]

Consistent with the facts and circumstances present here, this submission addresses what is fair, just, and proportional with regard to the violation at issue. Although T-Mobile accepts full responsibility for its unintentional failure to ensure compliance with the early ringtone rule, the magnitude of the penalty contemplated by the Bureau is entirely unwarranted by the facts or the governing law. It also far eclipses what is necessary or sufficient to deter future violations.

## I. T-MOBILE HAS CONSISTENTLY SATISFIED THE EARLY RINGTONE RULE'S PURPOSE, WHICH WAS TO PROMOTE STRONG RURAL CALL COMPLETION PERFORMANCE

In adopting the early ringtone rule, the Commission was clear that the rule was intended to promote the completion of calls to rural areas—*i.e.*, to further the same objectives as other aspects of the *2013 RCC Order*. "The purpose of the [early ringtone] rule is to address the problem of calls failing to complete to the rural PSTN."[9] That is, of course, the same purpose as the Commission's rules and policies regarding rural call completion more generally—"to address significant concerns about completion of long-distance calls to rural areas."[10] T-Mobile has consistently outperformed other covered providers in completing such calls. The magnitude of any enforcement action for violation of the early ringtone rule should take into account the animating purpose of the rule and, therefore, T-Mobile's strong performance in completing rural calls.

In its *June 22 Report,* WCB observed that, for "the eight sets of quarterly Form 480 reports filed from August 2015 through March 2017, which contain data covering the period from April 1, 2015 through March 31, 2017,"[11] "the aggregate call answer rate for all covered providers' call attempts to rural OCNs during the reporting period was 64.3 percent," whereas "the aggregate call answer rate for all covered providers' call attempts to nonrural OCNs for the same period was 68.8 percent."[12] T-Mobile's performance is substantially better, particularly with respect to rural call completion. In the 24 months covered by the eight quarterly reports filed to date, T-Mobile's monthly call answer rate for calls placed to rural OCNs ranged from a low of (b) (4) to a high of (b) (4) (all well above the aggregate average of 64.3%).[13] For

---

[8] *TerraCom, Inc. and YourTel America, Inc.*, Notice of Apparent Liability for Forfeiture, 29 FCC Rcd 13325, 13350 (2014) ("*TerraCom NAL*") (dissenting statement of Commissioner Ajit Pai).

[9] *2013 RCC Order*, 28 FCC Rcd at 16203 ¶ 117.

[10] *Id.* at 16155 ¶ 1.

[11] *June 22 Report*, 32 FCC Rcd at 4984 ¶ 13.

[12] *Id.* at 4985 ¶ 14.

[13] *See* Form 480 Rural Call Completion Report ("Form 480 RCC Report") Q2 2015; Form 480 RCC Report Q3 2015; Form 480 RCC Report Q4 2015; Form 480 RCC Report Q1 2016; Form 480 RCC Report Q2 2016; Form 480 RCC Report Q3 2016; Form 480 RCC Report Q4 2016; Form 480 RCC Report Q1 2017.

3

CONFIDENTIAL – NOT FOR PUBLIC INSPECTION

calls to non-rural OCNs, T-Mobile's monthly call answer rates ranged from ▉(b)(4)▉ to ▉(b)(4)▉ (again, all well above the aggregate average of 68.8%).[14]

Going forward, T-Mobile expects to expand its own footprint in rural areas, using 600 MHz spectrum won in the recent incentive auction.[15]  The result will be to increase the number of rural customers relying on T-Mobile for the termination of calls, to reduce the number of calls relying on third-party long-distance providers, and so to improve still further T-Mobile's performance in terminating calls to rural areas.

Thus, the Bureau appears to be contemplating one of the highest proposed forfeitures in the agency's history even though there is no evidence that the stated violation caused harm of the type the rule at issue was designed to prevent.  To the contrary, there is concrete evidence that T-Mobile's efforts to meet the rule's goals were substantially more successful than those of the average carrier.  Under these circumstances, penalties of the magnitude under consideration serve no valid policy or law enforcement objective.

## II. T-MOBILE'S VIOLATION OF THE EARLY RINGTONE RULE WAS NEITHER PREMEDITATED NOR DELIBERATE

As noted, there was no knowing violation of the law or intentional flouting of the Commission's rules.  Rather, as discussed directly below, the violation was the product of good-faith mistakes stemming from T-Mobile employees heavy focus on the reporting and recordkeeping requirements and related regrettable and avoidable miscommunication, but not part of any unlawful scheme.

During the period in which T-Mobile began to swap its Alcatel-Lucent ("ALU") servers for those provided by Ericsson, an inter-networking problem arose such that, for certain calls originating on Ericsson servers but connecting using ALU servers, no ringtone was transmitted back to the calling party even after a call was delivered to the terminating carrier and the called party's phone began ringing.  Specifically, for some calls the calling party did not hear a ringtone even when the call had been delivered to the terminating carrier and the called party's phone was ringing.  Rather, the calling party heard dead air until the called party answered the call or the call went to the called party's voice mail.[16]

---

[14] *Id.*  Although T-Mobile previously identified and corrected a problem with how some of its prior Form 480 figures were computed, it appears that the error had no significant effect on the results.  *See* Response of T-Mobile USA, Inc. to December 27, 2016 Letter of Inquiry, File No. EB-IHD-16-00023247, at 12 (Feb. 9, 2017) ("*Feb. 9 Response*") (responding to Request No. 8).

[15] *See, e.g.*, Press Release, T-Mobile, *T-Mobile Lights Up World's First 600 MHz LTE Network at Breakneck Pace* (Aug. 16, 2017), https://newsroom.t-mobile.com/news-and-blogs/cheyenne-600-mhz.htm ("T-Mobile's first 600 MHz LTE network sites—the very first in the world—were just switched on in Cheyenne, Wyoming using Nokia equipment. Starting in rural America and other markets where the spectrum is clear of broadcasting today, T-Mobile plans to deploy the new super-spectrum at record-shattering pace—compressing what would normally be a two-year process from auction to consumer availability into a short six months.").

[16] *See* Declaration of Kathleen Foster at ¶ 6, attached hereto as Ex. 1 ("Foster Decl.").

4

CONFIDENTIAL – NOT FOR PUBLIC INSPECTION

To address this problem, prior to the adoption of the *2013 RCC Order*, T-Mobile made a request to Ericsson that the early ringtone be implemented in the Ericsson servers. The LRBT parameter was expanded after the completion of the ALU-Ericsson migration, consistent with the Company's practice of having various features and parameters uniformly applied.[17]

T-Mobile network engineers responsible for the implementation of the LRBT parameter on Ericsson servers received notice in early 2014 of the *2013 RCC Order*. However, at the time, T-Mobile was keenly focused on the new substantial recordkeeping and reporting obligations imposed by the *2013 RCC Order* on wireless carriers like T-Mobile, and on developing procedures and systems to comply with those obligations.[18] As was the case with other wireless carriers, at the time the *2013 RCC Order* was adopted, T-Mobile did not have mechanisms in place to report certain data required to be reported under the *2013 RCC Order*. Over the course of the next two years, T-Mobile personnel expended considerable time and resources to develop the systems necessary to comply with those recordkeeping and reporting obligations.[19] Because they were so focused on the intense and complex work necessary to build the recordkeeping and reporting compliance systems, the network engineers did not recognize that the *2013 RCC Order* included a prohibition on early ringtones. Thus, the engineers who knew about the LRBT parameter were not conscious of the fact that its continued use was prohibited.[20]

For the avoidance of any doubt, T-Mobile acknowledges that it should have discovered sooner that it was using an LRBT parameter that was prohibited by the *2013 RCC Order*. But T-Mobile's failure to do so was not the result of any malice or ill-intent, much less any conscious scheme (at the senior management level or otherwise). There was no intent to circumvent the early ringtone rule and there was no intent to harm consumers.[21] T-Mobile prides itself in its exceptional customer service and in its ongoing efforts to make positive, competitive change in the wireless industry for the benefit of consumers. It deeply regrets what occurred here. But it is also the case that the T-Mobile personnel involved acted in good faith and with the sole objective of providing optimal service for customers.

## III. THE CONDUCT AT ISSUE IMPOSED NO DIRECT FINANCIAL HARM ON CONSUMERS, AND DID NOT INVOLVE RECEIPT OF CUSTOMER OR GOVERNMENTAL FUNDS

T-Mobile acknowledges that it violated the early ringtone rule, but emphasizes that its behavior did not cause consumer harm of the type the rule at issue was designed to prevent. Nor did T-Mobile benefit financially from these activities—something that is a hallmark of the kinds

---

[17] *Id.* at ¶ 7.

[18] *Id.* at ¶ 8.

[19] *Id.* In this regard, T-Mobile notes that the Commission is now considering eliminating the reporting requirements and shifting instead to a framework built on ensuring that intermediate providers perform within acceptable parameters. *See generally Rural Call Completion*, Second Further Notice of Proposed Rulemaking, 32 FCC Rcd 6047 (2017).

[20] *See* Foster Decl. at ¶¶ 8-10.

[21] *See id.* at ¶ 10.

FOIA_000163

CONFIDENTIAL – NOT FOR PUBLIC INSPECTION

of malfeasance that typically lead to penalties in the range being considered here. These facts render the forfeiture being considered here highly excessive, and call for reassessment of the Bureau's proposal.

First, data analyzed by T-Mobile strongly suggests that the use of the LRBT parameter did not suppress customer complaints about rural call completion failures. During the period the LRBT parameter was in place, local exchange carriers and customers *did* complain about ringtones when calls were not being completed.[22] Indeed, when T-Mobile disabled the LRBT parameter, the magnitude of complaints regarding calls completing to rural locations did not materially increase, as one would expect if the LRBT parameter were in fact suppressing complaints. To the contrary, it declined. Specifically, based on information previously submitted, T-Mobile has evaluated all instances between January 1, 2016 and May 31, 2017 in which complaints received from its customers or other carriers were resolved by making a routing change—in other words, complaints that appeared to reflect genuine rural call completion concerns, rather than issues that happened to arise on calls placed to rural recipients but were attributable to other causes (*e.g.*, defective equipment, or the absence of up-to-date software on the customer's device).[23] T-Mobile then calculated the rate of such true rural call completion complaints both before and after January 25, 2017—the date by which the LRBT parameter was fully disabled. Between January 1, 2016 and January 25, 2017, T-Mobile received ▇▇ complaints that were resolved through a routing change, or an average of ▇▇ complaints per day.[24] Between January 26, 2017 and May 31, 2017, T-Mobile received ▇▇ complaints that were resolved through a routing change, or an average of ▇▇ complaints per day.[25] The fact that the daily percentage of true rural call completion complaints did not increase is evidence that the use of the LRBT parameter did not suppress or artificially reduce complaints about actual rural call completion failures.[26]

---

[22] *See, e.g.*, *2013 RCC Order*, 28 FCC Rcd at 16203 ¶ 117 (noting that if callers "receive misleading ring sounds, leading them to mistakenly believe that the called party is not answering when in fact the called party has not been alerted, the terminating carrier may be erroneously subject to complaints regarding its perceived failure to terminate calls to its customers").

[23] A change in call path indicates that a T-Mobile networking issue prevented the call from completing and, for that reason, complaints that were resolved by a call path change can be considered "true" rural call completion complaints. The analysis described herein relied on the complaint data that T-Mobile has submitted in response to the Bureau's Letter of Inquiry and Supplemental Letter of Inquiry. *See* Response of T-Mobile USA, Inc. to April 3, 2017 Supplemental Letter of Inquiry, File No. EB-IHD-16-00023247, at Exs. 1-3 (Aug. 2, 2017) ("*Aug. 2 Response*") (responding to Request Nos. 14.a, 15, and 16.a) (highlighted entries); Response of T-Mobile USA, Inc. to Requests 14(b) and 26 of April 3, 2017 Supplemental Letter of Inquiry, File No. EB-IHD-16-00023247, at Ex. 1 (July 13, 2017) ("*July 13 Response*") (responding to Request No. 14.b) (highlighted entries); *Feb. 9 Response* at Ex. 2 (responding to Request No. 4) (highlighted entries).

[24] Details regarding these complaints are set forth in Ex. 2 and are highlighted in yellow. The total ▇▇ also includes two complaints identified in T-Mobile's *Aug. 2 Response* as raising issues regarding problems with routing. *See Aug. 2 Response* at 6-7 (responding to Request No. 19.g).

[25] Details regarding these complaints are also set forth in Ex. 2 and are highlighted in blue.

[26] T-Mobile also identified an additional ▇▇ complaints from January 1, 2016 through January 25, 2017 and ▇▇ complaints from January 26, 2017 and May 31, 2017 where the written description does

FOIA_000164

CONFIDENTIAL – NOT FOR PUBLIC INSPECTION

Second, the use of the LRBT parameter did not involve the collection of any funds either from consumers or the government (*e.g.*, Lifeline or other Universal Service Fund monies). Receipt of such monies is a common thread connecting many legal actions and settlements in the range being considered here by the Bureau. Here, T-Mobile simply did not receive any direct pecuniary benefit, from either customers or the government, via its use of the LRBT parameter.

To be sure, T-Mobile does not mean to suggest that parties are free to violate Commission rules when the harms arising from such violations do not involve direct economic loss by consumers or the government. But when considering the magnitude of the appropriate penalty here, the Bureau must consider and give weight to the fact that the behavior at issue caused neither the type of harm the rule was expressly adopted to prevent or the other types of harm that traditionally give rise to penalties on the order being considered here.

## IV.   THE PROPOSED FORFEITURE IS INCOMMENSURATE WITH OTHER ENFORCEMENT ACTIONS

Given the above, a forfeiture in the range of [(b)] million would be grossly disproportionate in comparison to relevant precedent, both at the Commission and elsewhere.

### A.   *COMMISSION PRECEDENT*

Enforcement action of the magnitude contemplated by the Bureau here is entirely inconsistent with Commission precedent. Prior Commission rural call completion enforcement actions ranged from $100,000 to $5 million.[27] All of these actions appear to have involved (1) low call completion rates to rural consumers, (2) inadequate monitoring by the carrier of its own performance or that of its agents, or (3) both.[28] In other words, prior rural call completion

---

not explicitly say that a routing change was made to resolve the complaint, but it is possible that under the circumstances described, a routing change would have been required. These complaints are highlighted in blue in Ex. 2. For example, certain trouble tickets were closed because T-Mobile did not receive any follow-up response from the rural carrier. In other cases, the engineer's notes simply state that the issue was resolved without describing the steps taken to fix the problem. Assuming each of these complaints were or would have been resolved by a change in call path, the number of complaints from January 1, 2016 through January 25, 2017 would increase from [[(b)]] to [[(b)]], or an average of [(b)] complaints per day. Applying the same assumption to complaints after the LRBT parameter was fully disabled, the number of complaints from January 26, 2017 through May 31, 2017 would increase from [[(b)]] to [[(b)]], or an average of [(b)] complaints per day. In other words, including such complaints in the analysis would not have a material impact on the results.

[27] *See inContact, Inc.*, Order and Consent Decree, 31 FCC Rcd 4329 (EB 2016) ("*inContact Consent Decree*"); *Verizon*, Adopting Order and Consent Decree, 30 FCC Rcd 245 (EB 2015) ("*Verizon Consent Decree*"); *Matrix Telecom, Inc.*, Order and Consent Decree, 29 FCC Rcd 5709 (EB 2014) ("*Matrix Consent Decree*"); *Windstream Corp.*, Order and Consent Decree, 29 FCC Rcd 1646 (EB 2014) ("*Windstream Consent Decree*"); *Level 3 Commc'ns., LLC*, Order and Consent Decree, 28 FCC Rcd 2272 (EB 2013) ("*Level 3 Consent Decree*").

[28] *See inContact Consent Decree*, 31 FCC Rcd at 4329 ¶ 1 (settling investigation "into whether inContact violated Sections 201(b) and 202(a) of the Communications Act of 1934, as amended , in connection with substandard delivery of long distance calls to a consumer in a certain rural area"); *Level 3 Consent*

FOIA_000165

**CONFIDENTIAL – NOT FOR PUBLIC INSPECTION**

actions topped out at $5 million, even though each of the actions involved threatened or actual sub-par rural call completion performance.[29] A forfeiture ▮(b) (7)▮ times higher than the maximum rural call completion penalty imposed under Chairmen Genachowski and Wheeler has no basis here, particularly given T-Mobile's strong rural call completion record.

Nor are the facts of the current matter comparable to others in which the Commission has contemplated imposing ▮(b) (7)(E)▮. The recent $120 million Notice of Apparent Liability ("NAL") against Adrian Abramovich in June 2017, allegedly involving "one of the largest spoofed robocall campaigns that the Commission has ever investigated" with "the intent to cause consumers harm," receiving payment that "depended on false[] represent[ations]," all of which was perpetrated as "an integral part" of a "scheme to mislead consumers."[30]

Under Abramovich's scheme, spoofed robocalls appeared to come from local numbers and prompted individuals who answered to "Press 1" to learn more about an exclusive vacation deal offered by one of several well-known travel and hospitality companies, including TripAdvisor.[31] Those consumers were then connected to unaffiliated call centers where live operators attempted to sell the consumers vacation packages.[32] As a representative of TripAdvisor explained: "[t]he calls ultimately connected Americans to call centers in Mexico that usually attempted to fleece innocent customers out of their hard-earned money by promising too-good-to-be-true vacation deals."[33]

---

*Decree*, 28 FCC Rcd at 2272 ¶ 1 (terminating investigation into "possible violations of Sections 201(b) and 202(a) of the Communications Act of 1934, as amended, with respect to Level 3's call completion practices to rural areas, including its use and monitoring of intermediate providers"); *Windstream Consent Decree*, 29 FCC Rcd at 1648 ¶ 1 (terminating investigation into "possible violations of Sections 201(b) and 202(a) of the Communications Act of 1934, as amended ..., which ultimately focused on Windstream's call completion practices to rural areas via its Legacy PAETEC Network, including the use and monitoring of Intermediate Providers"); *Verizon Consent Decree*, 30 FCC Rcd at 245 ¶ 1 (terminating investigation "into whether Verizon violated Sections 201(b) and 202(a) of the Communications Act of 1934, as amended ..., in connection with evidence collected over an eight-month period that reflected potentially substandard delivery of long distance calls to certain rural areas"); *Matrix Consent Decree*, 29 FCC Rcd at 5709 ¶ 1 (setting "allegations that Matrix Telecom, Inc. ... violated federal laws by failing to complete long-distance calls to rural areas on a just, reasonable, and non-discriminatory basis").

[29] Moreover, only $2 million of the $5 million amount in the *Verizon Consent Decree* was in the form of payment to the Treasury. The other $3 million related to the implementation of a compliance plan. The highest payment to the Treasury regarding rural call completion enforcement actions was $2.5 million in the *Windstream Consent Decree*, which is ▮(b) (7)(E)▮ of the amount the Bureau is apparently contemplating here.

[30] *Adrian Abramovich, Marketing Strategy Leaders, Inc., and Marketing Leaders, Inc.*, Notice of Apparent Liability for Forfeiture, 32 FCC Rcd 5418, 5418-19 ¶¶ 1-2 (2017) ("*Abramovich NAL*").

[31] *Id.* at 5420 ¶ 5.

[32] *Id.*

[33] *See* Todd Shields & Gerri De Vynck, *Miami Man Faces $120 Million Fine for 96-Million Robocall Spree*, Bloomberg (June 22, 2017), https://www.bloomberg.com/news/articles/2017-06-22/miami-man-faces-120-million-fine-for-96-million-robocall-spree.

8

## CONFIDENTIAL – NOT FOR PUBLIC INSPECTION

The Commission also emphasized the particular harm to which consumers are exposed from large-scale spoofing operations like Mr. Abramovich's:

> Both Congress and the Commission have long recognized the unique threats posed by illegal robocalls, including that such calls are a nuisance and invasion of privacy. Similarly, courts have routinely recognized that robocalls are an invasion of privacy, an injury in fact sufficient for Article III jurisdiction. Spoofing deceptively enhances the efficacy of illegal robocalling campaigns by attempting to trick consumers into answering the call and trusting the caller. In addition to the harms caused by illegal robocalls generally, Abramovich's spoofing campaign poses additional harms. In this case, Abramovich apparently intended to spoof millions of calls in order to perpetuate an illegal robocalling campaign, which is an inherently harmful practice.[34]

The $120 million proposed forfeiture was designed "to account for the egregiousness of the harm caused by this massive spoofing activity and to serve as both a punishment and a deterrent to future wrongdoing."[35] The Commission issued the NAL to further its "aim to put unlawful robocallers out of business and to deter anyone else from hatching a business plan that plunders American consumers' pocketbooks."[36]

Likewise, the instant matter differs in significant, crucial ways from last month's NAL for $82.1 million against Best Insurance Contracts, Inc. and Philip Roesel[37] who allegedly

---

[34] *Abramovich NAL*, 32 FCC Rcd at 5423 ¶ 16. *See also Dialing Services, LLC*, Forfeiture Order, 32 FCC Rcd 6192, 6192 ¶ 1, 6205 ¶ 36 (2017) ("our decision advances Congress' goal of protecting consumers from the nuisance, invasion of privacy, cost and inconvenience that autodialed and prerecorded calls generate"; "Congress has deemed robocalls a particularly pernicious threat to the privacy of wireless telephone consumers"); *Advanced Methods to Target and Eliminate Unlawful Robocalls*, Notice of Proposed Rulemaking and Notice of Inquiry, 32 FCC Rcd 2306, 2306 ¶ 1, 2306-07 ¶ 2 (2017) (referring to "illegal robocalls that can bombard their phones at all hours of the day, in some cases luring consumers into scams (*e.g.*, when a caller claims to be collecting money owed to the Internal Revenue Service (IRS)) or leading to identity theft"; "One example of how illegal robocalls can hurt consumers is the 'IRS scam.' The IRS reports that there have been over 10,000 victims of a scam in which callers pretend to be representing the IRS and claim the called party owes back taxes. These calls often threaten the victim with arrest or deportation. Victims have collectively paid over $54 million as a result of these scams, despite concerted efforts by the IRS to educate consumers."); *Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, Declaratory Ruling and Order, 30 FCC Rcd 7961, 7969 ¶ 5 (2015) ("TCPA complaints as a whole are the largest category of informal complaints we receive," giving rise to "roughly 5,000 or 6,000 such complaints per month in 2013 and 2014, with the Federal Trade Commission receiving 200,000 robocall complaints a month during the fourth quarter of 2014").

[35] *Abramovich NAL*, 32 FCC Rcd at 5426 ¶ 25.

[36] *Id.* at 5431 (statement of Chairman Ajit Pai).

[37] *Best Insurance Contracts, Inc. and Philip Roesel, dba Wilmington Insurance Quotes*, Notice of Apparent Liability for Forfeiture, 32 FCC Rcd 6403 (2017).

9

**CONFIDENTIAL – NOT FOR PUBLIC INSPECTION**

perpetrated a widespread robocalling campaign. The Commission's investigation there revealed the following:

- Roesel "knowingly spoofed caller ID information with the apparent intent to perpetuate an illegal robocalling campaign that was harmful to both consumers and businesses."[38]

- Roesel "intended to exploit some of the most vulnerable members of society through his health insurance robocalling campaign...."[39]

- Roesel told an employee that "the goal was to market to economically disadvantaged and unsophisticated consumers, stating that 'the dumber and more broke, the better.'"[40]

- Roesel's "entire marketing approach targeted the elderly, the infirm, and low-income families."[41]

- An employee reported that Roesel "was involved in a large robocalling enterprise and that he was well aware that his robocall activities were illegal."[42]

- Roesel and his staff "repeatedly 'joked' and 'laughed' about their robocalls being 'illegal.'"[43]

- Roesel's marketing campaign "generated significant consumer outrage" and "significant consumer anger."[44]

- Roesel "spoofed the caller ID to avoid detection" depriving consumers of the ability to point any enforcement agency "to the culprit because they could not identify the person or originating phone number responsible for the harms they suffered."[45]

- Roesel "intended to profit from his apparent illegal activity...."[46]

---

[38] *Id.* at 6408 ¶ 15.

[39] *Id.* at 6408 ¶ 17.

[40] *Id.*

[41] *Id.* at 6409 ¶ 18.

[42] *Id.* at 6409 ¶ 17

[43] *Id.*

[44] *Id.* at 6410 ¶ 19.

[45] *Id.* at 6410 ¶ 20.

[46] *Id.* at 6412 ¶ 26. The only other proposed forfeiture approaching the range being contemplated by the Bureau, the 2015 $100 million NAL against AT&T for alleged violations of the open Internet

FOIA_000168

## CONFIDENTIAL – NOT FOR PUBLIC INSPECTION

Indeed, T-Mobile's actions here are not even remotely comparable to those leading to the recent NALs in the $30 million to $50 million range. In December 2016, the Commission issued an NAL for approximately $50 million—(b) (7)(E) being contemplated here—against Sandwich Isles Communications, Inc. ("SIC"), related companies, and the individual controlling them.[47] There, the Commission found, SIC had "purposely"[48] misallocated costs for a decade in order to collect "improper payments of more than $27 million from the [Universal Service] Fund's high-cost program"[49]—all as part of a scheme to enrich the owner of SIC's parent company, who had himself been convicted of related tax fraud.[50] The Commission found that SIC had engaged in "widespread conduct" exhibiting "a systemic disregard for the high-cost program Rules"[51]—"egregious misconduct" that resulted in "demonstrated harm to the Fund."[52]

Similarly, the behavior at issue in a 2016 NAL for approximately $30 million also involved behavior far worse than here. Specifically, the co-managed OneLink companies in that case "apparently perpetrated an array of fraudulent, deceptive and manipulative practices that targeted consumers with Hispanic surnames," the practices reflected "an ongoing, expansive, calculated, and multi-pronged campaign to allegedly 'win' customers through deceit and fraud, which included "misrepresenting themselves to consumers including by 'spoofing' the Companies' telephone number, tricking consumers into making statements or disclosing information that the Companies recorded and then used to 'verify' that the consumer had authorized a change in telephone service provider, charging for services that the consumer had not ordered...."[53]

T-Mobile's violation of the early ringtone rule bears no resemblance to the deliberate and calculated actions Abramovich, Roesel, SIC and its owner, and OneLink undertook to line their

---

transparency rule, is of no import to the determination of an appropriate amount here. As then-Commissioner Pai described it, that NAL was "Kafkaesque," with "[a] penalty conjured from the executioner's imagination." *AT&T Mobility, Inc.*, Notice of Apparent Liability for Forfeiture and Order, 30 FCC Rcd 6613, 6629 (2015) ("*AT&T Forfeiture Order*") (dissenting statement of Commissioner Ajit Pai); *see also AT&T Forfeiture Order*, 30 FCC Rcd at 6642 (dissenting statement of Commissioner Michael O'Rielly) ("[T]he Commission threw a dart and came up with a $100 million forfeiture"). Given the dissents by then-Commissioner Pai and Commissioner O'Rielly, that NAL is almost certain to be reversed, and it is fair to say that it does not provide any meaningful guidance for this case. If the Commission issues a Forfeiture Order notwithstanding the above, the weighty legal arguments asserted by AT&T in response to the NAL are likely to lead to its vacatur in court, likewise eliminating any precedential or persuasive authority it might otherwise exert.

[47] *Sandwich Isles Communications, Inc., Waimana Enterprises, Inc., Albert S.N. Hee*, Notice of Apparent Liability for Forfeiture and Order, 31 FCC Rcd 12947 (2016).

[48] *Id.* at 12965 ¶ 53.

[49] *Id.* at 12948 ¶ 3.

[50] *See id.* at 12952-55 ¶¶ 10-18, 12967 ¶ 65.

[51] *Id.* at 12973 ¶¶ 81-82.

[52] *Id.* at 12974 ¶ 84.

[53] *One Link Communications, Inc.*, Notice of Apparent Liability for Forfeiture, 31 FCC Rcd 1403, 1403 ¶ 1 (2016).

11

CONFIDENTIAL – NOT FOR PUBLIC INSPECTION

pockets at the expense and to the detriment of consumers or the government. All of these matters involve calculated, intentionally fraudulent misconduct giving rise to tangible and sizable harm to consumers—including significant, direct financial benefit to the targeted companies. They are a far cry from the facts underlying the violation here, and demonstrate that a penalty approaching the range of ██ million as apparently contemplated here—or even a penalty in the $30 million to $50 million range—is simply incommensurate with the facts presented. T-Mobile's use of the LRBT parameter was not part of any intentional scheme to trick consumers into spending money on goods or services through illicit means, and was not designed to bilk the government itself of public funds. Quite the contrary, there is no evidence that consumers sustained any tangible injury at all or that T-Mobile profited in any measurable way from its use of the LRBT parameter.[54] Moreover, as detailed above, T-Mobile's violation of the early ringtone rule through not disabling the LRBT parameter after the effective date of the rule was not the product of bad faith or a premediated scheme to violate the law.

## B. *BROADER ENFORCEMENT PRECEDENT*

Enforcement action ██████████ also is inconsistent with enforcement cases more broadly in the American legal system. For example, two recent examples of Federal Trade Commission ("FTC") cases in the ██████ range involved intentional deception and/or extensive harm that is not present here:

- In 2016, DeVry University and its parent company "agreed to a $100 million settlement of a Federal Trade Commission lawsuit alleging that they misled prospective students with ads that touted high employment success rates and income levels upon graduation."[55] DeVry had allegedly induced students to enroll by claiming falsely "90 percent of graduates actively seeking employment landed jobs in their field within six months of graduation" and that "graduates with bachelor's degrees, on average, had 15 percent higher incomes one year after graduation than the graduates with bachelor's degrees from all other colleges or universities."[56]

- In January 2017, pharmaceutical company Mallinckrodt agreed to a $100 million settlement with the FTC to settle claims that it had used its monopoly power over a particular drug to raise prices 85,000% between 2001 and 2017 and to stifle competition by acquiring the rights to its greatest competitive threat in violation of antitrust laws.[57]

---

[54] T-Mobile does not mean to diminish the Commission's finding in the *2013 RCC Order* that early audible ringing is by its nature deceptive. The point is that unlike other cases involving penalties of the magnitude the Bureau appears to be considering here, there is no evidence in this case of any financial loss to consumers or gain by T-Mobile.

[55] Fed. Trade Comm'n, *DeVry University Agrees to $100 Million Settlement with FTC* (Dec. 15, 2016), https://www.ftc.gov/news-events/press-releases/2016/12/devry-university-agrees-100-million-settlement-ftc.

[56] *Id.*

[57] *See* Fed. Trade Comm'n, *Mallinckrodt Will Pay $100 Million to Settle FTC, State Charges It Illegally*

FOIA_000170

CONFIDENTIAL – NOT FOR PUBLIC INSPECTION

### V.     THE CONTEMPLATED FINE IS INCONSISTENT WITH MAXIMUM FORFEITURES PERMITTED BY THE COMMUNICATIONS ACT

Enforcement action in the range contemplated here also would be inconsistent with the maximum forfeitures permitted by the Communications Act, as adjusted for inflation in the Commission's rules—$192,459 per violation, or $192,459 per day for a continuing violation up to a maximum of $1,929,459 for a continuing violation involving a single act.[58]  T-Mobile's use of the LRBT parameter was a continuing violation involving a single act.  T-Mobile did not take specific actions with respect to specific customers on specific days.  Rather, it had a continuing overall practice derived from the single act in 2013 of deciding to include in Ericsson servers the LRBT parameter for traffic routed on Session Initiation Protocol ("SIP") trunks.  As Congress explained, continuing violations are "violations the actions of which constitute a 'one-time' offense that continues over the duration of the violation," as opposed to "action[s] repeated on successive days."[59]  T-Mobile's "'one-time' act"[60] of implementing the LRBT parameter on SIP traffic stands in contrast to Congress's one example of a series of separate repeated violations— for example, broadcasting on an unauthorized frequency and causing interference for one hour a day for each of 15 days.[61]  Unlike Congress's hypothetical unauthorized broadcaster, T-Mobile did not take specific actions on each of the specific days during which the LRBT parameter was in place; rather, it was a continuing, single mistake in that T-Mobile established a process that, on an ongoing basis, continually violated the rule.  This contrasts with the robocall cases cited above, in which the companies were actively making decisions about individual calls, *e.g.*, what consumers to target, what "spoofed" caller ID would be most appropriate for the customer's location.  Thus, the situation here places T-Mobile's actions firmly within the class Congress deemed to constitute one-time, ongoing violations.  Accordingly, the maximum permissible forfeiture here with respect to Section 64.2201(a) is $1,929,459.[62]

---

*Maintained its Monopoly of Specialty Drug Used to Treat Infants* (Jan. 18, 2017), https://www.ftc.gov/news-events/press-releases/2017/01/mallinckrodt-will-pay-100-million-settle-ftc-state-charges-it.

[58] 47 U.S.C. § 503(b)(2)(B); 47 C.F.R. § 1.80(i); *See Civil Monetary Penalties Order*, 31 FCC Rcd at 13491 (Section 1.80 Maximum Forfeiture Penalties).

[59] H.R. Rep. No. 101-386 at 3038 (1989) (Conf. Rep.).

[60] *Id.*

[61] *Id.*

[62] In response to Request No. 26(b)(ii) of the April 3, 2017 Supplemental Letter of Inquiry, T-Mobile provided an estimate that, in 2016, the LRBT parameter was applied to ▮(b) (4)▮ out-of-network SIP calls where call setup exceeded four seconds, noting that it did not have actual data from 2016.  This estimate was calculated by analyzing a small sample set of 2017 domestic out-of-network SIP traffic—*i.e.*, traffic that post-dated the elimination of the LRBT.  T-Mobile has since identified additional types of calls that could have involved the LRBT parameter and were not included in T-Mobile's prior estimate.  Including these call types and using an estimation approach based on samples of 2017 data that was used before would likely increase the number of affected calls to approximately ▮(b)▮.  That said, T-Mobile cautions that any estimate based on 2017 data is subject to inherent limitations and an unknowable degree of imprecision.

13

CONFIDENTIAL – NOT FOR PUBLIC INSPECTION

This is the only sensible construction of the statute—and the only construction consistent with bounded agency discretion. In circumstances where carriers employ a single unlawful practice that affects many consumers, counting every consumer who is affected by an unlawful practice as a separate violation would eviscerate any statutory forfeiture limits. Such an approach would result in a maximum forfeiture amount of infinity. As then-Commissioner Pai observed in dissenting to an NAL in which the Commission set a base forfeiture amount of $9 billion for a practice affecting nearly 300,000 customers: "It strains credulity to think that Congress intended such massive potential liability...."[63] Then-Commissioner Pai was right: It would be absurd to read a statutory provision that expressly limits liability as affording the agency unlimited discretion in setting liability. The result of such an approach would be improperly to permit the Bureau to set a penalty amount that "appear[s] to be plucked from thin air,"[64] in an apparent effort to "issue[] headline-grabbing fines...."[65]

The Commission should reaffirm its fidelity to Congress's mandates by acknowledging that each call subjected to a uniform practice is not a discrete violation, but rather part of an ongoing unlawful practice—and setting its maximum penalty accordingly.

---

[63] *TerraCom NAL*, 29 FCC Rcd at 13350 (dissenting statement of Commissioner Ajit Pai).

[64] *Oversight of the Federal Communications Commission, Hearing Before the H. Subcomm. on Commc'ns and Tech.*, 114th Cong. 4 (2015) (written testimony of Commissioner Ajit Pai), https://apps.fcc.gov/edocs_public/attachmatch/DOC-336418A1.pdf.

[65] Ajit Pai, Commissioner, Federal Communications Commission, Remarks at the PLI/FCBA 33rd Annual Institute on Telecommunications Policy & Regulation, at 1 (Dec. 3, 2015), https://apps.fcc.gov/edocs_public/attachmatch/DOC-336693A1.pdf. *See also* Michael O'Rielly, Commissioner, Federal Communications Commission, *Improved Staff Openness and New Priorities*, FCC Blog (Mar. 22, 2017, 12:05 pm), https://www.fcc.gov/news-events/blog/2017/03/22/improved-staff-openness-new-priorities ("[O]ur enforcement staff should move away from headline grabbing and eye popping penalties.").

FOIA_000172

CONFIDENTIAL – NOT FOR PUBLIC INSPECTION

## VI.    CONCLUSION

T-Mobile recognizes the importance of the Commission's rural call completion rules, and it sincerely regrets its violation of the early ringtone rule. It understands that its error will result in an enforcement penalty, and is *not* arguing that it should endure no consequences. However, there was no intention to cause monetary injury to consumers in implementing the LRBT parameter or in continuing to use it after the *2013 RCC Order* went into effect. Nor is there any evidence that any customers suffered any tangible injury as a result of the violation. Importantly, where a central purpose of the Commission's rural call completion rules is to ensure that calls are delivered to rural customers, T-Mobile's rural call completion record is strong. There is no rationale for the Commission to seek or impose penalties here that are vastly disproportionate to those it has imposed in the past for rural call completion-related violations, nor do the facts in this case bear even a remote resemblance to those in which the Commission has assessed a penalty amount comparable to the one the Bureau is reportedly considering here. T-Mobile is hopeful that an appropriate resolution of this situation can be reached and looks forward to continuing to provide excellent service to its customers, including with regard to rural call completion.

T-Mobile takes great pride in its record as a pro-consumer company that has brought significant benefits to consumers in a robustly competitive wireless industry. T-Mobile strives to do good things each day for consumers as it competes against much larger companies with deeper pockets. It asks the Commission to step back and consider the objectives it hopes to further in taking enforcement action here, and to reconsider imposing what would be one of the largest fines in the agency's history. Neither the specific underlying conduct nor T-Mobile's actions more broadly warrant the enormous penalty contemplated here.

FOIA_000173