## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

CRAIGVILLE TELEPHONE CO. d/b/a
ADAMSWELLS; and CONSOLIDATED
TELEPHONE COMPANY d/b/a CTC.,

                Plaintiffs,

                v.

T-MOBILE USA, INC.; and
INTELIQUENT, INC.,

                Defendants.

Hon. John Z. Lee

Case No. 1:19-cv-07190

## DEFENDANT INTELIQUENT'S ANSWER AND AFFIRMATIVE DEFENSES TO SECOND AMENDED CLASS ACTION COMPLAINT AND JURY DEMAND

Defendant Inteliquent, Inc. ("Inteliquent") answers the Second Amended Class Action Complaint and Jury Demand as follows:

## I.    NATURE OF THE CASE

1.    *T-Mobile tells the world that it is the "Un-carrier" and brags that it has "disrupted the wireless communication services industry by listening to our customers and providing them with added value and an exceptional experience, including implementing signature initiatives that changed the wireless industry forever." T-Mobile certainly is a disruptive force; one of its signature initiatives has been to illegally disrupt billions of calls as part of a nationwide fraud perpetuated against its own customers in order to deter them from making phone calls to rural America.*

**Answer:** Inteliquent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 1 and on that basis denies them.

2.    *In April 2018, T-Mobile admitted that it engaged in a protracted and illegal scheme which cheated its customers, and carriers like Plaintiffs comprising a nationwide class, impacting hundreds of millions of calls annually. T-Mobile has also admitted that this protracted scheme included a cover up - the insertion of fake ring tones into calls before the calls were connected to the intended recipient of the calls. The Federal Communications commission ("FCC" and "Commission") has found that the use of fake ring tones causes calls not to be completed because it confuses callers into premature hanging up, wrongfully believing their call has been successfully*

*connected but that the recipient of the call is simply not answering. The FCC has also found that insertion of fake ring tones prevents calls that are not completing from being handed back to the preceding intermediate carrier to try another route. Every time a call is not completed because of these direct consequences of fake ring tones, the termination LEC is directly harmed by not receiving access charges for the termination of that call. T-Mobile consciously used this illegal practice to mask its intermediate carriers' routine failure to deliver high cost calls routed to rural areas of the United States that created a negative margin for T-Mobile. In addition, the use of the fake ring tones deceived customers into believing the calls were reaching their intended destination and thereby shifted blame for those call failures onto local phone companies, particularly rural carriers, even though the calls never even made it to these rural carriers' networks.*

**Answer:** To the extent paragraph 2 alleges anything against Inteliquent, including, but not limited to, that it "routinely fail[ed] to deliver high cost calls routed to rural areas of the United States that created a negative margin for T-Mobile," Inteliquent denies those allegations. With regards to the remaining allegations in paragraph 2, Inteliquent lacks knowledge or information sufficient to form a belief as to the truth of those allegations and on that basis denies them.

3.      *T-Mobile's fake ring tone scheme injured the class members' businesses by depriving them of opportunities to seek intercarrier compensation for calls the scheme blocked from connecting to the Plaintiffs' switches, and causing them lost profits and revenue, and lost time value of labor hours associated with investigating and responding to customer complaints.*

**Answer:** Inteliquent denies the allegations in paragraph 3.

4.      *T-Mobile has admitted that its conduct violated rules expressly adopted by the Commission that prohibit these practices, an admission that it also violated the Communications Act of 1934.*

**Answer:** Inteliquent states that the allegations in paragraph 4 state legal conclusions, that legal conclusions are for the Court to make, and therefore denies those allegations. Inteliquent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 4 and on that basis denies them.

5.      *T-Mobile conceded its misconduct in an April 2018 consent decree with the FCC, which included payment of a $40 million penalty to the U.S. Treasury. See In the Matter of T-Mobile USA, Inc., Order and Consent Decree, DA 18-373, 33 F.C.C. Rcd. 3737 (2018) ("Consent Decree") (attached hereto as Exhibit 1). T-Mobile's conduct represents one of the largest telecommunications frauds ever perpetrated against the American people. In comparison to T-*

*Mobile's 2018 net profits of $2.88 billion and $43.3 billion in total revenue, however, a $40 million penalty represents but a slap on the wrist.*

**Answer:** Inteliquent states that the allegations in paragraph 5 state legal conclusions, that legal conclusions are for the Court to make, and therefore denies those allegations. Further answering, Inteliquent states that the allegations in paragraph 5 seek to characterize the April 2018 consent decree (which Inteliquent had no involvement and was not a party). Inteliquent denies that the allegation places that consent decree in proper context or otherwise accurately describes it. Inteliquent respectfully refers the Court to the consent decree for its content, and it denies all inconsistent allegations. Inteliquent lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 5 and on that basis denies them.

6. *The FCC's Consent Decree did nothing to compensate any of the consumers who were victims of T-Mobile's fake ring tone scheme and deceptive trade practices. T-Mobile made no public statements apologizing for its conduct and did nothing to atone to its consumers or the local and predominantly rural carriers it harmed by failing to deliver calls. (T-Mobile's customers have little avenue for redress in light of binding arbitration and class action waiver provisions in T-Mobile's consumer terms and conditions.)*

**Answer:** Inteliquent states that the allegations in paragraph 6 seek to characterize the April 2018 consent decree (with which Inteliquent had no involvement and was not a party). Inteliquent denies that the allegation places that consent decree in proper context or otherwise accurately describes it. Inteliquent respectfully refers the Court to the consent decree for its content, and it denies all inconsistent allegations. Inteliquent lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 6 and on that basis denies them.

7. *In fact, when questioned by Congress about the Consent Decree, T-Mobile's then CEO John Legere went so far as to deny that the company had admitted to wrongdoing.*

**Answer:** Inteliquent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 7 and on that basis denies them.

8. *The FCC's Consent Decree also did not compensate the carriers that were harmed by T-Mobile's conduct. Here, however, the FCC acted to ensure that impacted carriers could*

3

*obtain appropriate compensation by picking up where the Commission left off to ensure that T-Mobile does not profit from its illegal conduct. Specifically, by declaring the use of false ring tones and the failure to oversee intermediate providers to both qualify as "unjust and unreasonable practices" that violate Section 201(b) of the Communications Act of 1934, and by extracting admissions from T-Mobile that it engaged in these illegal practices, the Commission ensured that carrier-victims would have a clear and efficient path to the courthouse to obtain recovery for T-Mobile's illegal conduct. See, e.g., 47 U.S.C. § 201(b); 47 U.S.C. §§ 206-207.*

**Answer:** Inteliquent states that the allegations in paragraph 8 state legal conclusions, that legal conclusions are for the Court to make, and therefore denies those allegations. Further answering, Inteliquent states that the allegations in paragraph 8 seek to characterize the April 2018 consent decree (with which Inteliquent had no involvement and was not a party). Inteliquent denies that the allegations places that consent decree in proper context or otherwise accurately describe it. Inteliquent respectfully refers the Court to the consent decree for its content, and it denies all inconsistent allegations. Inteliquent lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 8 and on that basis denies them.

9. *Also not adequately addressed by the Consent Decree is the role of T-Mobile's coconspirators in the massive fraud. On information and belief, after T-Mobile and Defendant Inteliquent entered into a Master Services Agreement in 2015 in which Inteliquent was to become the exclusive carrier to transit and terminate traffic for T-Mobile, the evidence will reveal that Inteliquent was losing money on the contract and became desperate to reduce one of its primary costs, known as access charges, which Inteliquent was required to pay on T-Mobile's behalf to local phone companies for the privilege of using their networks to terminate calls made by T-Mobile's subscribers. As a result, T-Mobile and Inteliquent began to actively conspire to develop strategies to deter or prevent customers from making phone calls for which there are high per-minute costs to complete.*

**Answer:** Inteliquent denies the allegations in paragraph 9.

10. *One of the ways in which T-Mobile's intermediate providers who failed to deliver calls (whether Inteliquent or other Doe Defendants) created savings was to route calls to other parties that were not equipped to deliver the traffic to its intended destination in a reliable manner, to the point of creating significant volumes of call failures. Inteliquent and Doe Defendants may have also intentionally dropped or failed to deliver calls. Moreover, Plaintiffs believe that discovery will reveal that the fake ring tone scheme was hatched jointly by T-Mobile and Inteliquent.*

**Answer:** Inteliquent denies the allegations in paragraph 10.

11.     *The Consent Decree describes how T-Mobile expanded the use of fake ring tones on a nationwide basis, after the FCC expressly declared the practice unlawful in January 2014. This admission of such egregious conduct is astounding, even for an "Un-carrier" like T-Mobile, which prides itself on breaking the rules in the name of competition. What is particularly noteworthy about T-Mobile's astonishing admission, however, is that the expanded use of the fake ring tones coincides with T-Mobile's expanded reliance on Inteliquent to deliver almost all domestic calls that leave the T-Mobile network destined to other carriers. Plaintiffs assert that this is not mere coincidence, but rather a direct result of Inteliquent's need to cut costs so that it could avoid the financial ramifications of a poorly-negotiated contract that made T-Mobile not only its largest, but also its riskiest, customer.*

**Answer:** Inteliquent states that the allegations in paragraph 11 seek to characterize the April 2018 consent decree (with which Inteliquent had no involvement and was not a party). Inteliquent denies that the allegations places that consent decree in proper context or otherwise accurately describe it.  Inteliquent respectfully refers the Court to the consent decree for its content, and it denies all inconsistent allegations. Inteliquent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 11 relating to T-Mobile and on that basis denies them.  Inteliquent denies all remaining allegations in paragraph 11.

12.     *Indeed, in February 2016, Inteliquent's CEO at the time, Matthew Carter, made clear that the company would consider even "crazy hair ball ideas" to counteract the financial impact of its contract with T-Mobile. Just a few months later, in the early summer, the FCC began receiving a flood of complaints about T-Mobile calls not completing to rural areas and the potential use of fake ring tones, which prompted its investigation and the Consent Decree.*

**Answer:**  The allegations in paragraph 12 seek to quote and characterize an email. Inteliquent admits that the quoted language in paragraph 12 appears in a February 2016 email, but denies that the allegations place that email in proper context or otherwise accurately describe it, and therefore denies all inconsistent allegations.  Inteliquent lacks knowledge or information sufficient to form a belief as to the truth of the allegations and on that basis denies them.

13.     *In furtherance of their illegal scheme, Defendants and their fake ring tone enterprise have committed multiple acts of wire fraud and engaged in a pattern of racketeering activity in violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"). Defendants perpetrated their scheme in furtherance of an association-in-fact enterprise consisting of (1) defendant T-Mobile; (2) Defendant Inteliquent; (3) any other intermediate provider whose delivery of calls to consumers in certain rural operating company numbers ("OCNs") T-Mobile*

admitted in the Consent Decree it failed to correct; (4) one or more key individuals working specifically with these other co-conspirators to achieve these ends; and (5) on information and belief, several currently unidentified Doe Defendant co-conspirators that will be added to this lawsuit as facts are developed and their identities become known.

**Answer:** Inteliquent states that the allegations in paragraph 13 state legal conclusions, that legal conclusions are for the Court to make, and therefore denies those allegations. To the extent a further answer is deemed required, Inteliquent denies the allegations in paragraph 13.

14.     *In addition to violating the Communications Act and RICO, Defendants have also violated Illinois law. Specifically, T-Mobile has tortiously interfered with Plaintiffs' business expectancy, and both T-Mobile and Inteliquent, as well as the Doe Defendants, have violated the Illinois Consumer Fraud And Deceptive Business Practices Act, 815 ILCS 505/1 et seq., by deceiving consumers and Plaintiffs with the use of fake ring tones in order to mask their shoddy service and unscrupulous practices aimed at avoiding completion of high cost calls. Plaintiffs have been damaged through the loss of access charge revenues, significant time and resources expended in trying to investigate and resolve these issues. All along, T-Mobile, Inteliquent, and T-Mobile's other intermediaries participating in the scheme either remained silent, repeatedly failing to inform T-Mobile's customers that their secretly employed illegal practices were the cause of countless call completion inquiries they received from consumers and rural carriers who could never diagnose the root cause because it was covertly buried within the fake ring tone enterprise's networks and confidential business practices; or, they expressly placed blame on rural carriers, reflecting their knowing intent to victimize LECs by their illegal scheme.*

**Answer:** Inteliquent states that the allegations in paragraph 14 state legal conclusions, that legal conclusions are for the Court to make, and therefore denies those allegations. To the extent a further answer is deemed required, Inteliquent denies the allegations in paragraph 14.

15.     *Through this action, Plaintiffs seek damages, including the disgorgement of the illegal savings generated by Defendants, triple damages, punitive damages, and attorneys' fees. Companies like T-Mobile, Inteliquent, and Doe Defendant co-conspirators can no longer be allowed to believe that they can break the law and get away with it by entering into a Consent Decree and paying a tiny fine. Justice demands more. The American people and businesses serving rural American communities deserve better.*

**Answer:** Inteliquent states that the allegations in paragraph 15 state legal conclusions, that legal conclusions are for the Court to make, and therefore denies those allegations. To the extent a further answer is deemed required, Inteliquent denies the allegations in paragraph 15.

II.      *THE PARTIES*

    A.      *Plaintiffs*

    16.      *Craigville Telephone Company, Inc. d/b/a AdamsWells Internet Telecom TV ("AdamsWells") is an Indiana corporation with its principal place of business in Craigville, Indiana.*

    **Answer:**  On information and belief, Inteliquent admits the allegations in paragraph 16.

    17.      *Consolidated Telephone Company d/b/a CTC ("CTC") is a Minnesota corporation with its principal place of business in Brainerd, Minnesota.*

    **Answer:**  On information and belief, Inteliquent admits the allegations in paragraph 17.

    B.      *Defendants*

    18.      *Defendant T-Mobile USA, Inc. is a Delaware corporation, with its principal place of business in Bellevue, Washington. T-Mobile USA, Inc., is a member of the T-Mobile International group, one of the world's largest mobile communications companies, and is the United States mobile telecommunications subsidiary of Deutsche Telekom AG. As of the first quarter of 2019, T-Mobile had a total of about 81.3 million subscribers, making it the third largest wireless carrier in the United States with approximately 18% market share.*

    **Answer:**  On information and belief, Inteliquent admits that Defendant T-Mobile USA, Inc. is a Delaware corporation, with its principal place of business in Bellevue, Washington. With regard to the remaining allegations in paragraph 18, Inteliquent lacks knowledge or information sufficient to form a belief as to the truth of those allegations.

    19.      *Defendant Inteliquent, Inc. is a Delaware corporation with its principal place of business in Chicago, Illinois.*

    **Answer:**  Inteliquent admits the allegations in paragraph 19.

    20.      *Doe Defendants 1-10 are unnamed co-conspirators of Defendants, who may include intermediate providers and least-cost routers whose delivery of calls to consumers in certain rural OCNs T-Mobile admitted in the Consent Decree it failed to correct, or other technology support providers. The Doe Defendants' involvement and culpability in the fake ring tone enterprise will be determined through discovery.*

    **Answer:**  Inteliquent denies the existence of any conspiracy or any fake ring tone enterprise. Inteliquent states that the allegations in paragraph 20 state legal conclusions, that legal conclusions are for the Court to make, and therefore denies those allegations. To the extent a

further answer is deemed required and the allegations are against Inteliquent, Inteliquent denies those allegations. With regard to the remaining allegations in paragraph 20, Inteliquent lacks knowledge or information sufficient to form a belief as to the truth of those allegations and on that basis denies them.

### III.   *JURISDICTION AND VENUE*

21.   *The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1332(d) and 47 U.S.C. §§ 206-207.*

**Answer:** Inteliquent states that the allegations in paragraph 21 state legal conclusions, that legal conclusions are for the Court to make, and on that basis denies those allegations. Inteliquent denies the allegations in paragraph 21.

22.   *The Court also has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(d) because this is a class action in which a member of the class of plaintiffs is a citizen of a state different than a defendant, there is more than $5 million in controversy, and the number of proposed class members exceeds 100.*

**Answer:** Inteliquent states that the allegations in paragraph 22 state legal conclusions, that legal conclusions are for the Court to make, and on that basis denies those allegations. Further answering, Inteliquent denies that any certifiable class exists. With regard to the remaining allegations in paragraph 22, Inteliquent denies those allegations.

23.   *The Court has supplemental jurisdiction over the state law claims because they form part of the same case or controversy. 28 U.S.C. § 1367.*

**Answer:** Inteliquent states that the allegations in paragraph 23 state legal conclusions, that legal conclusions are for the Court to make, and on that basis denies those allegations and denies that the plaintiffs have any viable claims against Inteliquent. To the extent a further response is deemed required, Inteliquent admits that the Court has supplemental jurisdiction over any state law claims that the Court does not dismiss, but otherwise denies the allegations in paragraph 23.

24.   *The Court has personal jurisdiction over all Defendants pursuant to Fed. R. Civ. P. 4(k)(1)(A), 735 ILCS 5/2-209, and 18 U.S.C. § 1965(b).*

**Answer:** Inteliquent states that the allegations in paragraph 24 state legal conclusions, that legal conclusions are for the Court to make, and on that basis denies those allegations. To the extent a further answer is required, Inteliquent admits that this Court has personal jurisdiction over it for purposes of this action.

25. *Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b)(1), 28 U.S.C. § 1391(b)(2), and 28 U.S.C. § 1391 because all Defendants are corporations that reside in this district pursuant to 28 U.S.C. § 1391(c)(2), and because a substantial part of the events or omissions giving rise to the claim occurred in or near Chicago, Illinois.*

**Answer:** Inteliquent denies that the plaintiffs have any viable claims, and denies that a substantial part of the events or omissions alleged supposedly giving rise to claims occurred in or near Chicago, Illinois. Inteliquent states that the allegations in paragraph 25 state legal conclusions, that legal conclusions are for the Court to make, and on that basis denies those allegations.

## IV. *FACTUAL ALLEGATIONS*

### A. *Universal Service Is The Paramount Objective For Regulation Of The Telecommunications Industry.*

26. *While most Americans take it for granted, the notion of universal access to residential telephone services was not a foregone conclusion in this country; nor was it a foregone conclusion that the American people would enjoy the benefits of competition in the telecommunications marketplace, while simultaneously being able to reach friends, families, and businesses that subscribed to the services of another telecommunications provider. Today, however, a ubiquitous, interconnected telecommunications system is core to the economic prosperity and security of our nation.*

**Answer:** The allegations in paragraph 26 try to state a general description of the history and present aspects of the telecommunications industry. While there may be aspects of the description that are accurate at a general level and for general purposes, there are too many variations among telecommunications services and calls to provide a specific admission in the paragraph as phrased or in context of this complaint. Inteliquent therefore lacks knowledge or

information sufficient to form a belief as to the truth of the allegations in paragraph 26 as they are stated and in the context of this complaint and on that basis denied them.

27.     *Early in the twentieth century, after the expiration of the Bell telephone patents in 1894, new carriers began to enter the market. Initially these independent phone companies were not interconnected with, and could not exchange calls with, the Bell telephone networks. This required many businesses to maintain subscriptions with more than one phone company in order to receive calls from customers who subscribed to a different service provider.*

**Answer:** The allegations in paragraph 27 try to state a general description of the history and present aspects of the telecommunications industry. While there may be aspects of the description that are accurate at a general level and for general purposes, there are too many variations among telecommunications services and calls to provide a specific admission in the paragraph as phrased or in context of this complaint. Inteliquent therefore lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 27 as they are stated and in the context of this complaint and on that basis denied them.

28.     *Universal service in telecommunications was established as U.S. national policy by the Communications Act of 1934 (the "Act") in which Congress declared its intention "to make available, so far as possible, to all the people of the United States, a rapid, efficient, Nationwide, and world-wide wire and radio communication service with adequate facilities at reasonable charges." 47 U.S.C. § 151. The law combined the Federal Radio Commission with the Interstate Commerce Commission's wire communications powers to create the FCC which has greater powers over both radio and wire communications than these predecessor commissions.*

**Answer:** The allegations in paragraph 28 seek to quote and characterize the provisions of statutes. Inteliquent admits that the quoted language in paragraph 28 appears in those statutes, but it denies that the allegations place those statutes in proper context or otherwise accurately describe them. Inteliquent respectfully refers the Court to the statutes for their provisions and content, and it denies all inconsistent allegations. Inteliquent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 28 and on that basis denies them.

29.     *As the Commission and its Wireline Competition Bureau ("WCB") have long recognized, "the ubiquity and reliability of the nation's telecommunications network is of paramount importance to the explicit goals of the Communications Act of 1934, as amended . . .*

*." See, e.g., In the Matter of Establishing Just & Reasonable Rates for Local Exch. Carriers, Declaratory Ruling and Order, 22 F.C.C. Rcd. 11629, ¶ 1 (WCB 2007) ("2007 Call Blocking Declaratory Ruling") (attached hereto as Exhibit 2).*

**Answer:** The allegations in paragraph 29 seek to quote and characterize an FCC ruling and order. Inteliquent admits that the quoted language in paragraph 29 appears in that ruling, but it denies that the allegations place that ruling in proper context or otherwise accurately describe it. Inteliquent respectfully refers the Court to the ruling for its content, and it denies all inconsistent allegations. Inteliquent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 29 and on that basis denies them.

30.     *The goal of universal and reliable telecommunications service has underscored much of the nation's telecommunications policies in the intervening decades. Central to those policies has been an unbending conviction that the nation must eliminate the inherent inequities in rural America that would inevitably arise if the free market was left unrestrained. For example, Congress prohibited telecommunications carriers from engaging in "unjust or unreasonable discrimination in charges, practices, classifications, regulations, facilities, or services for or in connection with like communication service" and "undue or reasonable preference or advantage" among "localit[ies]." 47 U.S.C. § 202(a). Congress also required providers of interstate long-distance services to ensure that "subscribers in rural and high areas" are charged "no higher than the rates charged by each such provider to its subscribers in urban areas." 47 U.S.C. § 254(g).*

**Answer:** The allegations in paragraph 30 try to state a general description of the history and present aspects of the telecommunications industry. While there may be aspects of the description that are accurate at a general level and for general purposes, there are too many variations among telecommunications services and calls that may be at issue in this complaint to provide a specific admission in the paragraph as phrased or in context of this complaint. Further answering, the allegations in paragraph 30 seek to quote and characterize the provisions of statutes. Inteliquent admits that the quoted language in paragraph 30 appears in those statutes, but it denies that the allegations place those statutes in proper context or otherwise accurately describes them. Inteliquent respectfully refers the Court to the statutes for their provisions and content, and it denies

all inconsistent allegations. Inteliquent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 30 and on that basis denies them.

31. *The Commission took steps to further the Congressional mandate and ensure reliable service in rural America by, inter alia, creating a "universal service fund." Under the universal service regime, the Commission collects fees from all telecommunications carriers, which are generally passed on to consumers, in order to make funds available to deploy infrastructure in unserved and underserved areas. The Commission also created and maintains a system of intercarrier compensation payments known as "access charges" by which companies providing interexchange or long-distance services pay local telephone companies for the network facilities they maintain, and the switching and transport services they provide, which are necessary to transit and terminate calls to the customers of the local telephone companies. While multiple factors impact the access charges a local carrier may collect, and while terminating charges have been decreased in recent years, the Commission's policies have historically been designed to allow rural carriers to collect a much higher level of access rates than their urban counterparts in order to recover the proportionately higher costs attributable to providing service in very low density markets.*

**Answer:** The allegations in paragraph 31 try to state a general description of the telecommunications regulatory framework. While there may be aspects of the description that are accurate at a general level and for general purposes, there are too many variations among telecommunications services and calls to provide a specific admission in the paragraph as phrased or in context of this complaint. Further answering, Inteliquent states that the allegations in paragraph 31 state legal conclusions on statutory regulations, that legal conclusions are for the Court to make, and on that basis denies those allegations. Inteliquent denies all remaining allegations in paragraph 31.

### B. The Intercarrier Compensation System

32. *T-Mobile's illegal fake ring tone scheme demonstrates its greed and willingness to "break the rules" to increase profits in any way possible, even if that means harming its own customers.*

**Answer:** To the extent paragraph 32 alleges anything against Inteliquent, it denies those allegations. Inteliquent lacks sufficient knowledge or information to form a belief as to the truth of the remaining allegations and on that basis denies them.

33. *In order to understand the financial incentives that led to T-Mobile's fake ring tone scheme and the rural call completion failures central to this case, it is necessary to understand how telephone calls are delivered to and among different telecommunications carriers and the intercarrier compensation system. The following paragraphs explain the various carriers that may be involved in the delivery of telephone calls to rural America.*

**Answer:** To the extent paragraph 33 alleges anything against Inteliquent, it denies those allegations. Inteliquent lacks sufficient knowledge or information to form a belief as to the truth of the remaining allegations and on that basis denies them.

### i. *Local Exchange Carriers (LECs)*

34. *The delivery of telephone calls in the United States often requires the involvement of numerous carriers, each of which carries the calls for a portion of the route. With regard to calls originating on or terminating to a traditional landline telephone, the company providing the portion of the route closest to the calling and called parties is referred to as the local exchange carrier or "LEC." LECs typically own or lease the phone lines that connect directly to homes and businesses within their defined service territories.*

**Answer:** The allegations in paragraph 34 try to state a general description of telecommunications architectures or pathways. While there may be aspects of the description that are accurate at a general level and for general purposes, there are too many variations among telecommunications services and calls to provide a specific admission in the paragraph as phrased or in context of this complaint. Inteliquent therefore lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 34 as they are stated and in the context of this complaint and on that basis denies them.

35. *Pursuant to the Communications Act, "[t]he term `local exchange carrier' means any person that is engaged in the provision of telephone exchange service or exchange access." 47 U.S.C. § 153(32). As described further below, LECs come in various types and their regulatory classification may vary depending on the area in which they provide service.*

**Answer:** The allegations in paragraph 35 seek to quote and characterize the provisions of statutes. Inteliquent admits that the quoted language in paragraph 35 appears in those statutes, but it denies that the allegations place those statutes in proper context or otherwise accurately describes them. Inteliquent respectfully refers the Court to the statutes for their provisions and content, and

it denies all inconsistent allegations. Inteliquent lacks knowledge or information sufficient to form

a belief as to the truth of the allegations in paragraph 35 and on that basis denies them.

36.     *All Plaintiffs are LECs.*

**Answer:** Inteliquent states that the allegations in paragraph 36 state legal conclusions, that

legal conclusions are for the Court to make, and therefore denies those allegations. Further

answering, Inteliquent lacks knowledge or information sufficient to form a belief as to the truth of

the allegations in paragraph 36 as they are stated and in the context of this complaint and on that

basis denies them.

37.     *Incumbent Local Exchange Carriers or "ILECs" are those local exchange carriers
that existed before 1996 (when Congress adopted the Telecommunications Act of 1996, which
opened local telephone markets to competition), insofar as they are providing service in their
original territories. Specifically, the FCC has defined an ILEC as:*

> *Incumbent Local Exchange Carrier (Incumbent LEC). With respect to an
> area, the local exchange carrier that:*
> *(1) On February 8, 1996, provided telephone exchange service in such
> area; and*
> *(2)(i) On February 8, 1996, was deemed to be a member of the exchange
> carrier association pursuant to § 69.601(b) of this chapter; or*
> *(ii) Is a person or entity that, on or after February 8, 1996, became a
> successor or assign of a member described in paragraph (2)(i) of this
> section.*

*47 C.F.R. § 51.5.*

**Answer:** The allegations in paragraph 37 seek to quote and characterize the provisions of

regulations. Inteliquent admits that the quoted language in paragraph 37 appears in those

regulations, but it denies that the allegations place those regulations in proper context or otherwise

accurately describe them. Inteliquent respectfully refers the Court to the regulations for their

provisions and content, and it denies all inconsistent allegations. Inteliquent lacks knowledge or

information sufficient to form a belief as to the truth of the allegations in paragraph 37 and on that

basis denies them.

38. *Competitive Local Exchange Carriers or "CLECs" are generally competitive market entrants, or more specifically, those local exchange carriers that were not providing telephone exchange service in a particular geographic area as of February 8, 1996.*

**Answer:** The allegations in paragraph 38 try to state a general description of certain aspects of the telecommunications industry. While there may be aspects of the description that are accurate at a general level and for general purposes, there are too many variations among telecommunications services and calls to provide a specific admission in the paragraph as phrased or in context of this complaint. Inteliquent therefore lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 38 as they are stated and in the context of this complaint. Inteliquent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 38 and on that basis denies them.

39. *Notably, a carrier that meets the definition of ILEC, but which expanded its services into other geographic areas, would not be considered an ILEC with regard to those expanded service territories. Rather, in that expanded service territory, it would be a CLEC.*

**Answer:** The allegations in paragraph 39 try to state a general description of certain aspects of the telecommunications industry. While there may be aspects of the description that are accurate at a general level and for general purposes, there are too many variations among telecommunications services and calls to provide a specific admission in the paragraph as phrased or in context of this complaint. Inteliquent therefore lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 39 as they are stated and in the context of this complaint. Inteliquent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 39 and on that basis denies them.

40. *In a traditional legacy ILEC network, an ILEC would deploy a series of interconnected switches throughout its service territory to enable the exchange of traffic within the markets it serves. Networks maintained by ILECs may include a variety of switching equipment. Simplistically speaking, switches provide features, such as the dial tone and/or the network intelligence, needed to route a call between one customer's premises to another. Historically, telecommunications networks have been organized in a hierarchical fashion defined by differing switch types. For example, the lines from many customers of local service are*

*aggregated to a local or end office switch. In turn, end-office switches would be aggregated into a tandem switch. End office switches are those switches that directly connect or "switch" calls to individual homes and businesses and provide local dial tone and associated services, while tandem switches are switches that do not provide discrete services to customers. Because it is often not practical or economical for long-distance carriers to interconnect at each end office, such carriers generally interconnect at the tandem switch, which serves a concentration and distribution function between those long-distance carriers and the end office switches.*

**Answer:** The allegations in paragraph 40 try to state a general description of telecommunications architectures or pathways. While there may be aspects of the description that are accurate at a general level and for general purposes, there are too many variations among telecommunications services and calls to provide a specific admission in the paragraph as phrased or in context of this complaint. Inteliquent therefore lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 40 as they are stated and in the context of this complaint. To the extent a further response is deemed required, Inteliquent lacks sufficient knowledge or information to form a belief as to the truth of the allegations and on that basis denies them.

41. *After the introduction of competition in the long-distance marketplace, some carriers chose to focus primarily on providing tandem switching services, without focusing on the provision of end office services directly to consumers. These carriers may serve a variety of ILECs and CLECs that provide services directly to consumers, making it easier for rural areas to enjoy the benefits of competition in the long-distance marketplace. ILECs, CLECs, and tandem providers may collaborate to provide originating and terminating exchange access.*

**Answer:** The allegations in paragraph 41 try to state a general description of the history and current aspects of the telecommunications industry. While there may be aspects of the description that are accurate at a general level and for general purposes, there are too many variations among telecommunications services and calls to provide a specific admission in the paragraph as phrased or in context of this complaint. Inteliquent therefore lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 41 as they are

stated and in the context of this complaint. Inteliquent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 41 and on that basis denies them.

42. *One specific type of tandem provider is a centralized equal access provider or "CEA provider." CEA providers are "a specialized type of intermediate carrier authorized by the Commission in the late 1980s to implement long distance equal access obligations (permitting end users to use 1+ dialing to reach the interexchange carrier (IXC) of their choice) and to aggregate traffic for connection between rural incumbent LECs and other networks, particularly those of IXCs." In the Matter of Iowa Network Access Div. Tariff F.C.C. No. 1, 33 F.C.C. Rcd. 3825, 3827, ¶ 7 (2018). CEA Providers fit within the definition of CLEC. AT&T Corp. v. Iowa Network Services, Inc. d/b/a Aureon Network Services, 32 F.C.C. Rcd. 9677, ¶ 25 (2017).*

**Answer:** The allegations in paragraph 42 seek to quote and characterize FCC materials. Inteliquent admits that the quoted language in paragraph 42 appears in those materials, but it denies that the allegations place them in proper context or otherwise accurately describe them. Inteliquent respectfully refers the Court to the materials for their content, and it denies all inconsistent allegations. Inteliquent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 42 and on that basis denies them.

43. *The Communications Act also includes a separate definition for a subclass of ILECs or CLECs known as "rural telephone company," that provide service in particularly rural areas, and that are also referred to as a Rural LECs or RLECs:*

> *The term "rural telephone company" means a local exchange carrier operating entity to the extent that such entity--*
>
> *(A) provides common carrier service to any local exchange carrier study area that does not include either--*
>
> *(i) any incorporated place of 10,000 inhabitants or more, or any part thereof, based on the most recently available population statistics of the Bureau of the Census; or*
>
> *(ii) any territory, incorporated or unincorporated, included in an urbanized area, as defined by the Bureau of the Census as of August 10, 1993;*
>
> *(B) provides telephone exchange service, including exchange access, to fewer than 50,000 access lines;*
>
> *(C) provides telephone exchange service to any local exchange carrier study area with fewer than 100,000 access lines; or*

17

*(D) has less than 15 percent of its access lines in communities of more than 50,000 on February 8, 1996.*

*47 U. S.C.A. § 153(44).*

**Answer:** The allegations in paragraph 43 seek to quote and characterize the provisions of statutes. Inteliquent admits that the quoted language in paragraph 43 appears in those statutes, but it denies that the allegations place those statutes in proper context or otherwise accurately describes them. Inteliquent respectfully refers the Court to the statutes for their provisions and content, and it denies all inconsistent allegations. Inteliquent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 43 and on that basis denies them.

44. *Thus, a LEC may qualify as a rural telephone company or RLEC in situations in which it provides service in certain low-density geographic areas, while not qualifying as an RLEC when providing service in more urban areas.*

**Answer:** The allegations in paragraph 44 try to state a general description of certain aspects of the telecommunications industry. While there may be aspects of the description that are accurate at a general level and for general purposes, there are too many variations among telecommunications services and calls that to provide a specific admission in the paragraph as phrased or in context of this complaint. Inteliquent therefore lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 44 as they are stated and in the context of this complaint. Inteliquent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 44 and on that basis denies them.

### ii. *Interexchange Carriers (IXCs)*

45. *With regard to what is generally referred to as long-distance telephone calls, once a call is originated on a LEC's network, the LEC (often in connection with a tandem provider) delivers that traffic to the long-distance carrier of the customer's choosing at a point of interconnection known as a meet point. See 47 C.F.R. § 51.5 ("A meet point is a point of interconnection between two networks, designated by two telecommunications carriers, at which one carrier's responsibility for service begins and the other carrier's responsibility ends.").*

**Answer:** The allegations in paragraph 45 try to state a general description of telecommunications architectures or pathways. While there may be aspects of the description that are accurate at a general level and for general purposes, there are too many variations among telecommunications services and calls to provide a specific admission in the paragraph as phrased or in context of this complaint. Inteliquent therefore lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 45 as they are stated and in the context of this complaint. Further answering, the allegations in paragraph 45 seek to quote and characterize the provisions of regulations. Inteliquent admits that the quoted language in paragraph 45 appears in those regulations, but it denies that the allegations place those regulations in proper context or otherwise accurately describe them. Inteliquent respectfully refers the Court to the regulations for their provisions and content, and it denies all inconsistent allegations. Inteliquent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 45 and on that basis denies them.

46. *Long-distance carriers are known in the telecommunications industry as interexchange carriers or "IXCs." The FCC has defined interexchange carrier as "a telephone company that provides telephone toll service. An interexchange carrier does not include commercial mobile radio service providers as defined by federal law." 47 C.F.R. § 64.4001(d).*

**Answer:** The allegations in paragraph 46 try to state a general description of certain aspects of the telecommunications industry. While there may be aspects of the description that are accurate at a general level and for general purposes, there are too many variations among telecommunications services and calls to provide a specific admission in the paragraph as phrased or in context of this complaint. Inteliquent therefore lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 46 as they are stated and in the context of this complaint. Further answering, the allegations in paragraph 46 seek to quote and characterize the provisions of regulations. Inteliquent admits that the quoted language in

19

paragraph 46 appears in those regulations, but it denies that the allegations place those regulations in proper context or otherwise accurately describes them. Inteliquent respectfully refers the Court to the regulations for their provisions and content, and it denies all inconsistent allegations. Inteliquent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 46 and on that basis denies them.

47.     *Intelliquent is, inter alia, an IXC.*

**Answer:** Inteliquent states that the allegations in paragraph 47 state legal conclusions, that legal conclusions are for the Court to make, and denies that the plaintiffs have any viable claims against Inteliquent. Further answering, Inteliquent admits that it is an IXC, among other things, but denies that the plaintiffs have properly set forth the legal standards and significance of the functions and roles that Inteliquent plays (as set forth in the pending motion to dismiss that Inteliquent filed).

### iii.     *Mobile Carriers (CMRS)*

48.     *Mobile phone service providers are a distinct class of telecommunications provider known formally as a "commercial mobile radio service" provider or "CMRS provider." See 47 U.S.C. § 332(d)(1).*

**Answer:** The allegations in paragraph 48 seek to quote and characterize the provisions of a statute. Inteliquent admits that the quoted language in paragraph 48 appears in that statute, but it denies that the allegations place that statute in proper context or otherwise accurately describe it. Inteliquent respectfully refers the Court to the statute for its provisions and content, and it denies all inconsistent allegations. Inteliquent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 48 and on that basis denies them.

49.     *Defendant T-Mobile is a CMRS provider.*

**Answer:** On information and belief, Inteliquent admits the allegations in paragraph 49.

50. *For purposes of a call originating on a mobile phone, the call originates on a user's handset and is transmitted over a radio signal to the nearby wireless tower. From there, the call is generally routed on wireline facilities to a corresponding mobile telephone switching office ("MTSO") that directs the call towards its intended destination on the public switched telephone network ("PSTN").*

**Answer:** The allegations in paragraph 50 try to state a general description of telecommunications architectures or pathways. While there may be aspects of the description that are accurate at a general level and for general purposes, there are too many variations among telecommunications services and calls to provide a specific admission in the paragraph as phrased or in context of this complaint. Inteliquent therefore lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 50 as they are stated and in the context of this complaint. Inteliquent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 50 and on that basis denies them.

### iv. Intermediate Providers and Covered Providers

51. *Because CMRS providers generally do not build and operate wireline networks throughout the country, they rely either on an affiliated wireline provider (e.g., AT&T wireless would rely on AT&T's long-distance network) or on the networks of unaffiliated intermediate third parties to provide the transport services required to transport their traffic and ultimately deliver their subscriber's call to the terminating LEC, Voice-over-IP provider, or CMRS provider to which the called party has directed their call. These third parties that provide transport services may be IXCs, such as Inteliquent.*

**Answer:** The allegations in paragraph 51 try to state a general description of telecommunications architectures or pathways. While there may be aspects of the description that are accurate at a general level and for general purposes, there are too many variations among telecommunications services and calls to provide a specific admission in the paragraph as phrased or in context of this complaint. Inteliquent therefore lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 51 as they are stated and in the context of this complaint. Inteliquent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 51 and on that basis denies them.

52.    *The FCC's rural call completion rules, discussed more fully infra. ¶¶ 102-124, have defined two terms that may apply to these third-party providers, depending on the nature of the services and the specific routing arrangements that they have in place with the originating carriers: "Intermediate Providers" and "Covered Providers."  The term Covered Provider may also apply to CMRS carriers, again depending on the nature of the services and the specific routing arrangements that they have in place with the third-party transport providers they rely upon.*

**Answer:**  The allegations in paragraph 52 seek to characterize FCC rules, and there are too many variations among telecommunications services and calls that may be at issue in this complaint to provide a specific admission in the paragraph as phrased or in the context of this complaint.  Inteliquent further states that this allegation attempts to state legal conclusions and that legal conclusions are for the Court to make.  Inteliquent therefore lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 52 as they are stated and in the context of this complaint.  Further answering, Inteliquent respectfully refers the Court to the FCC rules for their content, and it denies all inconsistent allegations.  Inteliquent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 52 and on that basis denies them.

53.    *The term "Intermediate Provider" has been defined by the FCC in multiple ways over time.*

**Answer:**  The allegation in paragraph 53 seeks to characterize FCC definitions.  Inteliquent further states that this allegation attempts to state a legal conclusion and that legal conclusions are for the Court to make.  Inteliquent respectfully refers the Court to the regulations for their provisions and content and denies all inconsistent allegations.  Inteliquent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 53 and on that basis denies them.

54.    *As relevant here, Intermediate Providers was defined in the FCC's rural call completion rules, 47 C.F.R. § 64.2101, from January 16, 2014 to June 10, 2018, by reference to 47 C.F.R. §64.17600(f).  See 47 C.F.R. § 64.2101 (effective Jan. 16, 2014 – June 10, 2018) ("The term 'intermediate provider' has the same meaning as in § 64.1600(f).").  During this time period,*

*Intermediate Provider was, therefore, defined as "any entity that carries or processes traffic that traverses or will travers the PSTN at any point insofar as that entity neither originates nor terminates that traffic." 47 C.F.R § 64.1600(f) (effective Dec. 29, 2011 to current). Thus, from January 16, 2014 to June 10, 2018, the operative definition of Intermediate Provider did not exclude all Covered Providers, rather it only excluded the originating or terminating entities.*

**Answer**: The allegations in paragraph 54 seek to quote and characterize the provisions of regulations. Inteliquent admits that the quoted language in paragraph 54 appears in those regulations, but it denies that the allegations place those regulations in proper context or otherwise accurately describe them. Inteliquent respectfully refers the Court to the regulations for their provisions and content, and it denies all inconsistent allegations. Inteliquent further states that this allegation attempts to state legal conclusions and legal conclusions are for the Court to make, and on that basis denies them.

55.    *Beginning on June 11, 2018, the definition of Intermediate Provider was changed to mean:*

*any entity that—*

*(1) Enters into a business arrangement with a covered provider or other intermediate provider for the specific purpose of carrying, routing, or transmitting voice traffic that is generated from the placement of a call placed—*

*(i) From an end user connection using a North American Numbering Plan resource; or*

*(ii) To an end user connection using such a numbering resource; and*

*(2) Does not itself, either directly or in conjunction with an affiliate, serve as a covered provider in the context of originating or terminating a given call.*

*47 C.F.R. § 64.2101. Thus, only on or after June 11, 2018 could the Covered Provider for a given call not also be the Intermediate Provider for the call. Since the calls at issue in this lawsuit all occurred before this definition went into effect, it is not applicable here.*

**Answer:** The allegations in paragraph 55 seek to quote and characterize the provisions of regulations. Inteliquent admits that the quoted language in paragraph 55 appears in those

regulations, but it denies that the allegations place those regulations in proper context or otherwise accurately describe them.  Inteliquent respectfully refers the Court to the regulations for their provisions and content, and it denies all inconsistent allegations.  Inteliquent further states that this allegation attempts to state legal conclusions and legal conclusions are for the Court to make, and on that basis denies them.

56.     *Beginning on January 16, 2014, the term "Covered Provider" has been defined as:*

> *The term "covered provider" means a provider of long-distance voice service that makes the initial long-distance call path choice for more than 100,000 domestic retail subscriber lines, counting the total of all business and residential fixed subscriber lines and mobile phones and aggregated over all of the providers' affiliates.* ***A covered provider may be*** *a local exchange carrier as defined in § 64.4001(e),* ***an interexchange carrier*** *as defined in § 64.4001(d), a* ***provider of commercial mobile radio service*** *as defined in § 20.3 of this chapter, a provider of interconnected voice over Internet Protocol (VoIP) service as defined in 47 U.S.C. 153(25), or a provider of non-interconnected VoIP service as defined in 47 U.S.C 153(36) to the extent such a provider offers the capability to place calls to the public switched telephone network.*

*47 C.F.R. § 64.2101 (emphasis added).*

**Answer:**  The allegations in paragraph 56 seek to quote and characterize the provisions of regulations.  Inteliquent admits that the quoted language in paragraph 56 appears in those regulations, but it denies that the allegations place those regulations in proper context or otherwise accurately describes them.  Inteliquent respectfully refers the Court to the regulations for their provisions and content, and it denies all inconsistent allegations.  Inteliquent further states that this allegation attempts to state legal conclusions and legal conclusions are for the Court to make, and on that basis denies them.

57.     *As discussed more fully below, Defendants Inteliquent and T-Mobile are, inter alia, Intermediate Providers.  See infra ¶¶ 149, 157.*

**Answer**:  Inteliquent admits that it is an intermediate provider in certain circumstances, including for some long-distance T-Mobile calls.  Inteliquent denies the allegations in paragraph

57 to the extent they imply actionable conduct by Inteliquent. Inteliquent further states that this allegation attempts to state legal conclusions and legal conclusions are for the Court to make, and on that basis denies them. Inteliquent lacks sufficient knowledge or information to form a belief as to the remaining allegations in paragraph 57 in the context of this complaint and on that basis denies them.

58. *As discussed more fully below, upon information and belief, both Defendants T-Mobile and Inteliquent were also Covered Providers. See infra ¶¶ 150-51, 155-56.*

**Answer**: Inteliquent further states that this allegation attempts to state legal conclusions and legal conclusions are for the Court to make, and on that basis denies them. To the extent a further answer is deemed required, Inteliquent lacks sufficient knowledge or information to form a belief as to the remaining allegations in paragraph 58 in the context of this complaint and on that basis denies them. Inteliquent denies that it was a Covered Provider in relation to any calls alleged or related to this complaint.

## C. *How Calls Are Routed*

59. *To illustrate the interconnected nature of the PSTN, a call originated by a T-Mobile subscriber in Chicago and intended for a rural subscriber in Indiana may be routed as follows: (1) from the subscriber's handset to T-Mobile's nearest tower in Chicago; (2) from T-Mobile's tower to a meet point with Inteliquent; (3) from the T-Mobile-Inteliquent meet point to Inteliquent's meet point with another Intermediate Provider that is connected to the terminating LEC's tandem provider; (4) from the LEC's tandem provider to the LEC's end office; and (5) from the terminating LEC's end office to the called party's home or business in Indiana.*

**Answer:** The allegations of paragraph 59 try to state a general description of telecommunications architectures or pathways. While there may be aspects of the description that are accurate at a general level and for general purposes, there are too many variations among telecommunications services and calls to provide a specific admission in the paragraph as phrased or in context of this complaint. Inteliquent therefore lacks knowledge or information sufficient to

form a belief as to the truth of the allegations in paragraph 59 as they are stated and in the context of this complaint, and on that basis denies them.

60.     *Below is a diagram of this simplified call flow for illustrative purposes:*



**Answer:**  This picture tries to depict a general image of telecommunications architectures or pathways.  While there may be aspects of the picture that are accurate at a general level and for general purposes, there are too many variations among telecommunications services and calls that may be at issue in this complaint to provide a specific admission in the paragraph as phrased or in context of this complaint.  Inteliquent therefore lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 60 as they are stated and in the context of this complaint, and on that basis denies them.

61.     *Thus, a call originated by a T-Mobile subscriber and terminating to a rural LEC will travel through the networks of three or four carriers at a minimum. It is often the case, however, that a call will pass through multiple Intermediate Providers before reaching its intended destination, using a process known as "least-cost routing" in an effort to deliver the call in the cheapest possible way.*

**Answer:**  Inteliquent denies the allegations in paragraph 61.

26

### D. Intercarrier Compensation

62. *As discussed above, LECs, as the local phone companies, own or lease the phone lines that connect directly to residences and businesses within their service territories. IXCs and Intermediate Providers, on the other hand, do not own these lines and, therefore, must access them in order to receive or deliver interexchange (long-distance) calls. In order to compensate the LECs for the use of the local lines for the origination and termination of interexchange calls, the IXCs have traditionally paid the LECs a fee known as "access charges." The FCC established such charges in order to allow LECs to recover a share of the costs associated with deploying and maintaining local communications infrastructure. (End user customers are also assessed local connection charges which are also designed to recover a portion of the costs necessary to maintain their connection to the local exchange network.) Access charges are made up of a variety of rate elements that reflect the services performed. Those rate elements can be a combination of a fixed flat-monthly fee, per-minute charges, and mileage-sensitive charges for transport services. For example, end office switching would typically be charged per-minute of traffic originated or terminated by the LEC on the IXC's behalf. Transport between the tandem switch and the end office switch, however, would be a fee that is multiplied by the total miles that the traffic is carried and multiplied again by the minutes of traffic originated or terminated (rate x miles x minutes).*

**Answer:** The allegations in paragraph 62 try to state a general description of certain aspects of the telecommunications industry. While there may be aspects of the description that are accurate at a general level and for general purposes, there are too many variations among telecommunications services and calls that may be at issue in this complaint to provide a specific admission in the paragraph as phrased or in context of this complaint. Inteliquent therefore lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 62 as they are stated and in the context of this complaint. Further answering, the allegations in paragraph 62 seek to characterize the provisions of regulations. Inteliquent denies that the allegations place those regulations in proper context or otherwise accurately describes them. Inteliquent respectfully refers the Court to the regulations for their provisions and content, and it denies all inconsistent allegations. Inteliquent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 62 and on that basis denies them.

63. *The specific rate that a carrier would charge for access services depends on a variety of factors. For example, while the FCC generally has oversight over the fees assessed on interstate and international long-distance calls, state utility commissions were historically responsible for setting the rates for intrastate access charges applicable to interstate long-distance*

*calling. (As discussed more fully below, this stopped being completely true in 2011.) But, even within the FCC's domain over interstate long-distance, different rules apply to different types of carriers. For example, some carriers are rate-of-return carriers that set their access charges based on their historic and projected costs with the intent of earning a designated rate-of-return for their investment. Some of those rate-of-return carriers participate in the National Exchange Carrier Association ("NECA") pool in which the members pool their revenues, or settlements, for interstate telecommunications services based on a series of statistical formulas and forecasts based on historical call data, approved by the FCC, that approximate the amounts received by a similar cost company. Others are average schedule companies, whose rates and revenues are determined using a set of formulas of costs incurred by similar cost companies.*

**Answer:** The allegations in paragraph 63 try to state a general description of certain aspects of the telecommunications industry. While there may be aspects of the description that are accurate at a general level and for general purposes, there are too many variations among telecommunications services and calls that may be at issue in this complaint to provide a specific admission in the paragraph as phrased or in context of this complaint. Inteliquent therefore lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 63 as they are stated and in the context of this complaint. Further answering, the allegations in paragraph 63 seek to characterize the provisions of regulations. Inteliquent denies that the allegations place those regulations in proper context or otherwise accurately describe them. Inteliquent respectfully refers the Court to the regulations for their provisions and content, and it denies all inconsistent allegations. Inteliquent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 63 and on that basis denies them.

64. *CLECs have typically set their rates by benchmarking their access charges to the ILEC with which they compete. In 2001, the Commission determined that CLECs could provide an IXC with, and charge for, interstate switched access services in one of two ways. First, a CLEC may tariff interstate access charges if its rates are no higher than the rates charged for such services by the competing ILEC (the benchmark rule). Second, as an alternative to tariffing interstate access services, CLECs may enter into contracts, governed by state law, with an IXC to charge rates higher than those permitted under the benchmark rule. See, e.g., In the Matter of AT&T Corp. v. Iowa Network Services, 32 F.C.C. Rcd. 9677 (2017).*

**Answer:** The allegations in paragraph 64 try to state a general description of certain aspects of the telecommunications regulatory framework. While there may be aspects of the

description that are accurate at a general level and for general purposes, there are too many variations among telecommunications services and calls that may be at issue in this complaint to provide a specific admission in the paragraph as phrased or in context of this complaint. Inteliquent therefore lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 64 as they are stated and in the context of this complaint. Further answering, the allegations in paragraph 64 seek to characterize FCC rulings. Inteliquent denies that the allegations place those rulings in proper context or otherwise accurately describes them. Inteliquent respectfully refers the Court to the rulings for their content, and it denies all inconsistent allegations. Inteliquent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 64 and on that basis denies them.

65.     *In November 2011, the FCC began a comprehensive reform of the intercarrier compensation regime, establishing as the ultimate end goal the complete phase out of access charges through the adoption of a bill-and-keep regime in which carriers do not exchange payments for access charges. See In re: Connect America Fund, et al., Report and Order and Further Notice of Proposed Rulemaking, 26 F.C.C. Rcd. 17663, FCC 11-161 (Nov. 18, 2011), aff'd In re: FCC 11-161, 753 F.3d 1015 (10th Cir. 2014) ("Connect America Fund Order"). As part of the Connect America Fund Order, the Commission acted to ensure that intrastate terminating access charges would be on par with interstate terminating access charges, eliminating the historical role of state utility commissions to set intrastate terminating access rates. Further, the Commission resolved a long-standing controversy about whether Voice-over-IP ("VoIP") traffic was subject to access charge regimes, concluding that this traffic should be treated equally with traditional telecommunications traffic originating and terminating in time-division multiplexing ("TDM") protocol. The Commission also began a multi-year phased reduction of all interstate and intrastate terminating end office access charges. Despite the reduction of certain access charges, other rate elements, including terminating tandem switching and transport charges, may still be assessed by LECs in certain circumstances. Thus, calls terminating to rural America continue to generally cost more than calls terminating in more urban areas.*

**Answer:** The allegations in paragraph 65 try to state a general description of certain aspects of the telecommunications regulatory framework. While there may be aspects of the description that are accurate at a general level and for general purposes, there are too many variations among telecommunications services and calls that may be at issue in this complaint to

provide a specific admission in the paragraph as phrased or in context of this complaint. Inteliquent therefore lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 65 as they are stated and in the context of this complaint. Further answering, the allegations in paragraph 65 seek to characterize FCC rulings. Inteliquent denies that the allegations place those rulings in proper context or otherwise accurately describes them. Inteliquent respectfully refers the Court to the rulings for their content, and it denies all inconsistent allegations. Inteliquent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 65 and on that basis denies them.

66.     *Long-distance traffic originating on a CMRS provider's network and terminating to a LEC is subject to the intercarrier compensation system. See, e.g., Connect America Fund Order, 26 F.C.C. Rcd. 17663, ¶¶ 769, 779, 806. Unless alternative arrangements are made by contract, those access charges would be paid by the last Intermediate Provider to hand the traffic off to the terminating LEC based on the rates in the terminating LEC's federally-filed tariff. Id. ¶ 812. Thus, an Intermediate Provider like Inteliquent would tender the payment for terminating access charges to the LEC, it would recoup that payment from T-Mobile, which would pay the charges from the monthly fees paid by subscribers.*

**Answer:** The allegations in paragraph 66 try to state a general description of certain aspects of the telecommunications regulatory framework. While there may be aspects of the description that are accurate at a general level and for general purposes, there are too many variations among telecommunications services and calls that may be at issue in this complaint to provide a specific admission in the paragraph as phrased or in context of this complaint. Inteliquent therefore lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 66 as they are stated and in the context of this complaint. Further answering, the allegations in paragraph 66 seek to characterize FCC rulings. Inteliquent denies that the allegations place those rulings in proper context or otherwise accurately describes them. Inteliquent respectfully refers the Court to the rulings for their content, and it

denies all inconsistent allegations. Inteliquent lacks knowledge or information sufficient to form

a belief as to the truth of the allegations in paragraph 66 and on that basis denies them.

> **E.** ***A Confluence Of Rate Structures, The Evolving Nature Of The Long Distance Market And Corrupt Adaptations By Market Players Presented Incentives For Carriers To Degrade Or Limit Rural Call Completion.***

67. *In 1996, Congress adopted the Telecommunications Act of 1996 with the goal of promoting competition in the delivery of telecommunications services. Over time, this has meant a gradual relaxation of the heavy regulations that typically governed telecommunications services. At times, as discussed more fully below, the deregulated nature of certain services, like long-distance service, has clashed with the continued regulation of other parts of the telecommunications market, such as access charges. These disparate regulatory regimes create perverse incentives for carriers to curtail the delivery of traffic to more expensive rural areas of the country in order to maximize the profitability of long-distance services.*

**Answer:** Inteliquent admits that Congress adopted the Telecommunications Act of 1996

in 1996. Further answering, the allegations in paragraph 67 seek to characterize the goal of the

Telecommunications Act of 1996. Inteliquent denies that the allegations place that Act in proper

context or otherwise accurately describes it. Inteliquent respectfully refers the Court to the Act for

its content, and it denies all inconsistent allegations. Inteliquent denies the remaining allegations

in paragraph 67.

> **i.** ***Access Rates in Rural Areas***

68. *As discussed above, access rates are not one-size-fits-all. Rather, they vary based on the type of carrier and often depend on the geographic location of the carrier, as well as the density of the market(s) it serves. Urban areas, with high density and small distances between homes and businesses, are, generally speaking, the most economical markets to serve.*

**Answer:** The allegations in paragraph 68 try to state a general description of certain

aspects of the telecommunications industry. While there may be aspects of the description that are

accurate at a general level and for general purposes, there are too many variations among

telecommunications services and calls that may be at issue in this complaint to provide a specific

admission in the paragraph as phrased or in context of this complaint. Inteliquent therefore lacks

knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph

68 as they are stated and in the context of this complaint. Inteliquent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 68 and on that basis denies them.

69. *Access rates charged in rural areas, on the other hand, have traditionally been significantly higher than those rates charged by their more urban counterparts. These higher rates in rural areas reflect a variety of factors, including:*

    a. *Longer distances to deliver traffic in rural areas increase the costs for infrastructure deployment compared to more urban areas;*
    b. *Smaller entities operating in rural areas may incur higher costs due to fewer opportunities to generate cost savings through competition among suppliers;*
    c. *Difficult terrain such as mountains, valleys, forests, tundra, swamps and deserts as well as harsh weather conditions and long winters involving snow and ice also increase costs;*
    d. *Lower population density means that those costs are spread over fewer subscribers;*
    e. *Lower population also means lower call density over which to spread out the costs;*
    f. *Governmental policies designed to help ensure that RLECs are able to remain in business and serve these remote areas as part of the effort to maintain universal service, by requiring fair treatment from purely profit-motivated companies which may otherwise find it more economical to not provide service in these remote areas.*

**Answer:** The allegations in paragraph 69 try to state a general description of the history and certain current aspects of the telecommunications industry and its regulatory framework. While there may be aspects of the description that are accurate at a general level and for general purposes, there are too many variations among telecommunications services and calls that may be at issue in this complaint to provide a specific admission in the paragraph as phrased or in context of this complaint. Inteliquent therefore lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 69 as they are stated and in the context of this complaint. Inteliquent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 69 and on that basis denies them.

70.     *Thus, IXCs and CMRS providers delivering a call to a rural carrier will generally experience higher costs than if it delivered a call of equal duration to a major urban area.*

**Answer:**  The allegations in paragraph 70 try to state a general description of the telecommunications industry.  While there may be aspects of the description that are accurate at a general level and for general purposes, there are too many variations among telecommunications services and calls that may be at issue in this complaint to provide a specific admission in the paragraph as phrased or in context of this complaint.  Inteliquent therefore lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 70 as they are stated and in the context of this complaint.  Inteliquent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 70 and on that basis denies them.

## ii.     *Evolving Nature Of The Interexchange And Wireless Marketplace*

71.     *Historically, long-distance charges were a separate set of charges from those associated with local service. Charges were assessed on a per-minute basis with calls to certain long-distance areas costing more as a reflection of the increased cost of delivering the call to that destination.*

**Answer:**  The allegations in paragraph 71 try to state a general description of the history and certain current aspects of the telecommunications industry.  While there may be aspects of the description that are accurate at a general level and for general purposes, there are too many variations among telecommunications services and calls that may be at issue in this complaint to provide a specific admission in the paragraph as phrased or in context of this complaint.  Inteliquent therefore lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 71 as they are stated and in the context of this complaint.  Inteliquent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 71 and on that basis denies them.

72.     *For many years, long-distance service was a highly profitable segment of the telecommunications market with a virtual guarantee of profit for each minute called. Thus, while*

33

*cost was certainly a competitive factor, long-distance companies also had incentive to provide the best quality service in order to keep their customers on the phone talking for as long as possible.*

**Answer:** The allegations in paragraph 72 try to state a general description of the history and certain current aspects of the telecommunications industry. While there may be aspects of the description that are accurate at a general level and for general purposes, there are too many variations among telecommunications services and calls that may be at issue in this complaint to provide a specific admission in the paragraph as phrased or in context of this complaint. Inteliquent therefore lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 72 as they are stated and in the context of this complaint. Inteliquent further denies the allegations in the paragraph to the extent they seek to imply that Inteliquent does not provide quality service to its customers. Inteliquent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 72 and on that basis denies them.

73. *Over time, however, policy changes and a competitive market began to change this market dynamic, producing an environment in which IXCs and CMRS providers faced a powerful financial incentive to reduce or eliminate calls to higher costs areas of the country. Three evolutions in the long-distance telecommunications marketplace are chiefly to blame:*

a. ***Rate Averaging Policy*** *— The Telecommunications Act of 1996 added 47 U.S.C. § 254(g), which required the FCC to "adopt rules to require that the rates charged by providers of interexchange telecommunications services to subscribers in rural and high cost areas shall be no higher than the rates charged by each such provider to its subscribers in urban areas." Thus, following the adoption of these rules, an IXC was restricted from charging more to deliver calls to rural Nebraska than it did to Los Angeles, even though the incremental costs continued to differ.*

b. ***Increasing Competition from Other Services*** *— AT&T, the traditional IXC, began to experience increasing competition on a variety of fronts. First, other landline IXCs began to compete, particularly in more urban areas, often picking off the most lucrative accounts. Then CMRS providers began to bundle their local and long-distance services, drawing additional accounts away from AT&T. Eventually, the popularity of cellular service led many consumers to "cut the cord," resulting in declining subscribership for residential telephone service. Finally, with the advent of VoIP services, people began replacing*

> traditional landline phones with alternative services that rely on this more modern technology.
>
> **c. Bundled Rate Designs —** As competition increased, IXCs and CMRS providers competed head-to-head for consumers by beginning to provide new product offerings. These product innovations included "bucket" plans, where a consumer could make a certain volume of calls to any part of the country for a flat fee, and, eventually, unlimited long distance plans, in which a subscriber could make unlimited long distance calls to anywhere in the nation for one flat fee. As a result of these evolutions, many carriers now have a fixed revenue stream for a service that still includes the payment of incremental costs in the form of access charges. With tightening margins and competitive pressures to avoid raising rates to consumers, IXCs and CMRS providers became increasingly focused on the incremental costs associated with terminating access charges.

**Answer:** The allegations in paragraph 73 try to state a general description of the history and certain current aspects of the telecommunications industry. While there may be aspects of the description that are accurate at a general level and for general purposes, there are too many variations among telecommunications services and calls that may be at issue in this complaint to provide a specific admission in the paragraph as phrased or in context of this complaint. Inteliquent therefore lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 73 as they are stated and in the context of this complaint. Moreover, to the extent the allegations in paragraph 73 state a legal conclusion, Inteliquent states that legal conclusions are for the Court to make, and therefore denies those allegations. To the extent that any allegations in paragraph 73 are alleged as to Inteliquent—including, but not limited to, any allegation that Inteliquent has reduced or eliminated calls to certain areas of the country— Inteliquent denies those allegations. Inteliquent denies the allegations in paragraph 73.

74.     *As a matter of pure economics, when confronted with this situation, one of the only ways for IXCs and CMRS providers to increase profit margins is to reduce the volume of traffic that their subscribers make to higher cost areas.*

**Answer:** The allegations in paragraph 74 try to state a general description of the history and certain current aspects of the telecommunications industry. There are too many variations

among telecommunications services and calls that may be at issue in this complaint to provide a specific admission in the paragraph as phrased or in context of this complaint. Inteliquent therefore lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 74 as they are stated and in the context of this complaint, and on that basis denies them.

### iii. *Corrupted Adaptation By Market Players*

75.    *As competition increased, so did the complexity of call routing. Historically, call routing was a relatively straightforward affair and was limited to routing a call based on the most direct path between Point A and Point B.*

**Answer:**  The allegations in paragraph 75 try to state a general description of the history of telecommunications architecture or pathways. While there may be aspects of the description that are accurate at a general level and for general purposes, there are too many variations among telecommunications services and calls that may be at issue in this complaint to provide a specific admission in the paragraph as phrased or in context of this complaint. Inteliquent therefore lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 75 as they are stated and in the context of this complaint, and on that basis denies them.

76.    *With a ballooning number of IXCs and Intermediate Providers, as well as the deployment of IP networks in which carriers can route traffic through alternative paths, the options for delivering a call to a particular destination also increased.*

**Answer:**  The allegations in paragraph 76 try to state a general description of the history of telecommunications architecture or pathways. While there may be aspects of the description that are accurate at a general level and for general purposes, there are too many variations among telecommunications services and calls that may be at issue in this complaint to provide a specific admission in the paragraph as phrased or in context of this complaint. Inteliquent therefore lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 76 as they are stated and in the context of this complaint, and on that basis denies them.

77.     *Over time, routing algorithms became more sophisticated, and began to include decision points such as the cost of termination. Increased computing power also meant that sophisticated computers could be applied to consider a variety of different routing scenarios. And, as long-distance became ever more commoditized, carriers increasingly sought to improve margins through route optimization, which included employing routing algorithms to avoid paying tariffed access charges to rural termination locations.*

**Answer:**  The allegations in paragraph 77 try to state a general description of the history of telecommunications architecture or pathways.  While there may be aspects of the description that are accurate at a general level and for general purposes, there are too many variations among telecommunications services and calls that may be at issue in this complaint to provide a specific admission in the paragraph as phrased or in context of this complaint.  Inteliquent therefore lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 77 as they are stated and in the context of this complaint, and on that basis denies them.

### a.     *Ascension Of Least Cost Routing (LCR)*

78.     *Once carriers realized that the cost of rural terminations was a drain on profits, "Least Cost Routing" ("LCR") was used to aggressively minimize the cost associated with terminating traffic to rural destinations. LCR is the process of selecting the path of outbound communications traffic based on cost. LCR systems can select a route from dozens of potential carrier options for a given route.*

**Answer:**  Inteliquent denies that there is anything improper in routing calls in a cost-efficient manner, and denies the allegations in paragraph 78 to the extent they are directed at Inteliquent.  The allegations in paragraph 78 try to state a general description of the history of telecommunications architecture or pathways.  While there may be aspects of the description that are accurate at a general level and for general purposes, there are too many variations among telecommunications services and calls that may be at issue in this complaint to provide a specific admission in the paragraph as phrased or in context of this complaint.  Inteliquent therefore lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 78 as they are stated and in the context of this complaint, and on that basis denies them.

79.    *LCR software relates a destination to a series of available rates from a diverse set of carriers and allows calls to be routed in real time based on a defined set of parameters. An LCR table can be populated with a series of high quality carriers — carriers which complete virtually every call in a high quality way (which historically resulted in relatively higher costs) or low quality carriers that will complete a minority of the calls handed to it with resulting quality being inconsistent at best (but the calls that do go through are significantly cheaper).*

**Answer:**    The allegations in paragraph 79 try to state a general description of

telecommunications architecture or pathways.  While there may be aspects of the description that

are accurate at a general level and for general purposes, there are too many variations among

telecommunications services and calls that may be at issue in this complaint to provide a specific

admission in the paragraph as phrased or in context of this complaint.  Inteliquent therefore lacks

knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph

79 as they are stated and in the context of this complaint, and on that basis denies them.

80.    *It is not uncommon for carriers and Covered Providers like T-Mobile and Inteliquent to look for the cheapest route for their traffic. However, if an Intermediate Provider or Least-Cost Router is offering a rate that is materially below prevailing rates for a particular destination, it should raise concerns that the Intermediate Provider or Least-Cost Router is engaged in potential fraud, will have degraded service due to insufficient capacity to handle the calls, or that the call will be "looped," rather than completing. Nevertheless, companies like Defendants continue to route traffic without ensuring adequate call quality in order to save money. They engage in these practices with full awareness of the harmful effects it will have on their consumers and rural carriers.*

**Answer:**  Inteliquent denies that there is anything improper in routing calls in a cost-

efficient manner, and denies the allegations in paragraph 80 to the extent they are directed at

Inteliquent.  The allegations in paragraph 80 try to state a general description of the history of

telecommunications architecture or pathways.  While there may be aspects of the description that

are accurate at a general level and for general purposes, there are too many variations among

telecommunications services and calls that may be at issue in this complaint to provide a specific

admission in the paragraph as phrased or in context of this complaint.  Inteliquent therefore lacks

knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 80 as they are stated and in the context of this complaint, and on that basis denies them.

81. *Carriers like T-Mobile and Inteliquent could virtually eliminate rural call completion issues by relying on routes with carriers that are proven effective and by proactively monitoring for call completion problems. Instead, T-Mobile chooses to act as the "Un-carrier," allowing these problems to persist because it is more profitable for them to do so. T-Mobile's thirst for profit and willingness to operate beyond the boundaries is brazen, including when it publicly exclaims that "We won't stop breaking the rules of wireless."*

**Answer:** Inteliquent denies the allegations in paragraph 81.

### b. Evolution Of The Use Of Fake Ring Tones To Mask Excessive LCR Or Deter Call Completion

82. *At the same time that the number of options and use of LCR was on the rise, so too was the increased use of IP technology, with TDM technology gradually beginning to be phased out. While the use of IP technology presents tremendous opportunities for increased efficiency and flexibility in network architecture, it also presented new challenges.*

**Answer:** The allegations in paragraph 82 try to state a general description of the history of telecommunications architecture or pathways. While there may be aspects of the description that are accurate at a general level and for general purposes, there are too many variations among telecommunications services and calls that may be at issue in this complaint to provide a specific admission in the paragraph as phrased or in context of this complaint. Inteliquent therefore lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 82 as they are stated and in the context of this complaint, and on that basis denies them.

83. *In its earliest days, at least, there were not a set of rigorous, definitive standards that were uniformly adopted across the industry for how IP technology would be routed or how to interpret the call signaling information that accompanies the calls. The result was that some carriers interpreted signaling information on IP traffic differently than other carriers did, causing confusion and the potential for call failures to occur.*

**Answer:** The allegations in paragraph 83 try to state a general description of the history of telecommunications architecture or pathways and related regulations. While there may be aspects of the description that are accurate at a general level and for general purposes, there are too many

39

variations among telecommunications services and calls that may be at issue in this complaint to provide a specific admission in the paragraph as phrased or in context of this complaint. Inteliquent therefore lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 83 as they are stated and in the context of this complaint, and on that basis denies them.

84.    *Call failures can also occur because of errors in the routing tables; insufficient capacity between carriers to handle large, unplanned surges in traffic; or improper IP addresses. For example, a phenomena known as "looping" occurs when a call becomes trapped in an infinite routing loop caused by a regenerating call path between carriers. Simplistically, a carrier in an LCR routing table (Carrier X), redirects the call to a previous carrier (Carrier Y), which in turn routes the call, either directly or indirectly, back to (Carrier X) trapping the call in an infinite loop.*

**Answer:**    The allegations in paragraph 84 try to state a general description of telecommunications architecture or pathways and the supposed resulting call failures due to unnamed "carrier[s]." There are too many variations among telecommunications services and calls that may be at issue in this complaint to provide a specific admission in the paragraph as phrased or in context of this complaint. Inteliquent therefore lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 84 as they are stated and in the context of this complaint, and on that basis denies them.

85.    *Call failures can also occur, however, when a carrier willfully or intentionally blocks a call, rather than completing it to its intended destination, or drops the call after it has been connected for a short period of time. In short, one bad carrier in the call path can intentionally or unintentionally lead to a call not being completed to its intended destination or result in poor call quality.*

**Answer:** To the extent any of the allegations in paragraph 85 are directed at Inteliquent, it denies those allegations. Inteliquent otherwise lacks sufficient information or knowledge to form a belief as to the truth of the allegations in paragraph 85 and on that basis denies them.

86.    *While ring tones should only be heard by the calling party when the call has reached the network of its intended destination, fake ring tones are heard by the calling party before the called party's phone rings. Fake ring tones obscure the delay in finding a route to the*

40

*called party, or prevents the calling party from learning that the call failed. In other words, fake ring tones mask post dial delay (PDD).*

**Answer:** Inteliquent lacks knowledge and information sufficient to form a believe as to the truth of the allegations in paragraph 86 and on that basis denies them. Further answering, to the extent the allegations in paragraph 86 are intended to imply actionable wrongdoing by Inteliquent, it denies them.

87. *The use of fake ring tones can also prevent calls from reaching their intended destination. As discussed more fully below, see infra ¶¶ 104, 113-115, the FCC has concluded that the use of fake ring tones causes calls not to be completed because the caller hangs up, believing that no one is home, when the recipient's phone has not even rung. Moreover, the use of fake ring tones interferes with the proper routing of calls by preventing a call from being handed back to the prior provider when a route is not functioning properly. Thus, fake ring tones can cause call failures, which are then masked by the fake ringing.*

**Answer:** The allegations in paragraph 87 seek to characterize FCC materials. Inteliquent denies that paragraph 87 puts those materials in the proper context or otherwise accurately describes them. Inteliquent respectfully refers the Court to the FCC materials for their content, and denies the remaining allegations in paragraph 87.

### F. *The FCC Requires Carriers To Complete Calls Placed To Customers Of LECs And Prohibits Practices That Restrict Traffic, Including Fake Ring Tone Schemes*

88. *Despite efforts to ensure universal service, the Commission has, for many years, had to combat the practices of unscrupulous carriers who were intent on reducing the intercarrier compensations charges they paid to rural carriers. While the FCC has made repeated efforts to prevent rural call completion problems and punish those responsible, its efforts have not been forceful enough to deters carriers like T-Mobile from continuing to cheat the system.*

**Answer:** Inteliquent lacks sufficient information or knowledge to form a belief as to the truth of the allegations in paragraph 88 and on that basis denies them.

#### i. *2001 — The FCC Addresses Carriers' Threats Or Refusals To Deliver Traffic To CLECs*

89. *In 2001, the Commission acted to address situations in which IXCs were threatening or refusing to deliver traffic to CLECs:*

> *IXCs have threatened to stop delivering traffic to, or accepting it from, certain CLECs that they view as over-priced. Thus, AT&T has notified a number of CLECs that it refused to exchange originating or terminating traffic. In some instances, AT&T has terminated its relationship with CLECs and is blocking traffic, thus raising various consumer and service quality issues. These practices threaten to compromise the ubiquity and seamlessness of the nation's telecommunications network and could result in consumer confusion. Once one or more IXCs refuse to do business with a CLEC, it will become impossible for that CLEC's end users to reach, or receive calls from, some parties outside of the local calling area. If such refusals to exchange traffic were to become a routine bargaining tool, callers might never be assured that their calls would go through. We are particularly concerned with preventing such a degradation of the country's telecommunications network. It is not difficult to foresee instances in which the failure of a call to go through would represent a serious problem, and, in certain circumstances, it could be life-threatening.*

*In Re Access Charge Reform, Seventh Report and Order and Further Notice of Proposed Rulemaking, 16 F.C.C. Rcd. 9923, 9932-33, ¶ 24 (2001) ("Seventh Report and Order").*

**Answer:** The allegations in paragraph 89 seek to quote and characterize FCC materials. Inteliquent admits that the quoted language in paragraph 89 appears in those materials, but it denies that the allegations place those materials in proper context or otherwise accurately describe them. Inteliquent respectfully refers the Court to those materials for their content, and it denies all inconsistent allegations. Inteliquent denies the remaining allegations in paragraph 89.

### ii. 2007 — The WCB Issues Its Call Blocking Declaratory Ruling

90. *Acting on its own volition, the Commission's WCB issued the 2007 Call Blocking Declaratory Ruling to "remove any uncertainty about the scope of the Commission's general prohibition on call blocking and to clarify the obligation of interexchange carriers (IXCs) and commercial mobile radio service (CMRS) providers (collectively carriers) to complete their customers' interexchange calls." Ex. 2, 2007 Call Blocking Declaratory Ruling, ¶ 1. In that order, the Bureau concluded that carriers "may not engage in self-help actions such as call blocking." Id. It reiterated Commission policy that "the practice of call blocking, coupled with a failure to provide adequate consumer information, is unjust and unreasonable in violation of Section 201(b) of the Act." Id. ¶ 6 (quoting In the Matter of Telecommunications Research and Action Center and Consumer Action v. Central Corporation et al., File Nos. E-88-104-108, Memorandum Opinion and Order, 4 F.C.C. Rcd. 2157 (1989)).*

**Answer:** The allegations in paragraph 90 seek to quote and characterize FCC materials. Inteliquent admits that the quoted language in paragraph 90 appears in those materials, but it denies

that the allegations place those materials in proper context or otherwise accurately describe them. Inteliquent respectfully refers the Court to those materials for their content, and it denies all inconsistent allegations. Inteliquent denies the remaining allegations in paragraph 90.

### iii.       2011 — The FCC Hosts A Rural Call Completion Workshop

91.       *In 2011, the Commission became alarmed about a rise in complaints from consumers and rural carriers about poor call quality and repeated challenges to receiving long-distance phone calls. On September 26, 2011, the Commission announced the creation of a Rural Call Completion Task Force to investigate and address the growing problem of calls to rural customers being delayed or failing to connect.[1] The Commission also held a workshop on October 18, 2011 to identify causes and discuss potential solutions with key stakeholders.[2]*

**Answer:** The allegations in paragraph 91 seek to characterize FCC motivations, materials, and events. Inteliquent denies that the allegations place those motivations, materials, and events in proper context or otherwise accurately describe them. Inteliquent respectfully refers the Court to the relevant FCC materials for their content, and it denies all inconsistent allegations. Inteliquent denies the remaining allegations in paragraph 91.

### iv.       November 2011 — FCC Issues The Connect America Fund Order

92.       *In November of that year, the Commission released an order of great significance to the telecommunication industry, in which it began a process of revising and modernizing the intercarrier compensation regime. See Connect America Fund Order) (attached hereto as Exhibit 3). Among other things, the Commission adopted rules that began to transition access rates to a "bill-and-keep" model, essentially with the aim of eliminating them. Specifically, the order commenced a phased-in reduction of terminating end office access charges over time, but does not eliminate all costs for terminating traffic in rural America.*

**Answer:** The allegations in paragraph 92 seek to quote and characterize FCC materials. Inteliquent admits that the quoted language in paragraph 92 appears in those materials, but it denies

---

[1] *See, e.g., FCC Documents, FCC Launches Rural Call Completion Task Force, Sets Oct. 18 Workshop (Sept. 26, 2011), https://www.fcc.gov/document/fcc-launches-rural-call-completion-task-force-sets-oct-18-workshop (last visited Dec. 9, 2020).*

[2] *See FCC Events, Rural Call Completion Workshop (Oct. 18, 2011), https://www.fcc.gov/news-events/events/2011/10/rural-call-completion-workshop (last visited Dec. 9, 2020).*

that the allegations place those materials in proper context or otherwise accurately describe them. Inteliquent respectfully refers the Court to those materials for their content, and it denies all inconsistent allegations. Inteliquent denies the remaining allegations in paragraph 92.

93.     *In the Connect America Fund Order, the Commission reiterated its "longstanding prohibition on call blocking"" while rejecting a proposal to "allow selective call blocking." Id. ¶ 734. The Commission also extended the prohibition to traffic exchanged as VoIP traffic. See id., ¶ 972.*

**Answer:** The allegations in paragraph 93 seek to quote and characterize FCC materials. Inteliquent admits that the quoted language in paragraph 93 appears in those materials, but it denies that the allegations place those materials in proper context or otherwise accurately describe them. Inteliquent respectfully refers the Court to those materials for their content, and it denies all inconsistent allegations. Inteliquent denies the remaining allegations in paragraph 93.

94.     *The Commission again recognized that "blocking or the refusal to deliver voice telephone traffic, whether as a means of 'self help' to address perceived unreasonable intercarrier compensation charges or otherwise, risks `degradation of the country's telecommunications network' and reiterated that "call blocking is an unjust and unreasonable practice under section 201(b) of the Act." Id.*

**Answer:** The allegations in paragraph 94 seek to quote and characterize FCC materials. Inteliquent admits that the quoted language in paragraph 94 appears in those materials, but it denies that the allegations place those materials in proper context or otherwise accurately describe them. Inteliquent respectfully refers the Court to those materials for their content, and it denies all inconsistent allegations. Inteliquent denies the remaining allegations in paragraph 94.

> **v.**     ***2012 — The WCB Issues Its Rural Call Completion Declaratory Ruling***

95.     *A few months later, on February 12, 2012, the WCB, acting on "evidence that there is a pattern of call completion and service quality problems on long distance calls to certain rural areas, and in response to numerous requests," issued a declaratory ruling "to clarify the scope of the Commission's prohibition on blocking, choking, reducing, or restricting telephone traffic" in response to complaints about rural call completion issues from rural associations, state utility commissions, and consumers. In the Matter of Developing an Unified Intercarrier Comp. Regime Establishing Just & Reasonable Rates for Local Exch. Carriers, Declaratory Ruling, 27 F.C.C. Rcd. 1351, ¶ 1 (2012) ("2012 Declaratory Ruling") (attached hereto as Exhibit 4). The WCB*

*observed that there were reports of a "sharp increase in complaints that long distance calls and faxes are not reaching" rural locations and that consumers were complaining of "poor call quality, as well as of calls that ring for a prolonged period for the caller but that do not ring, or ring on an extremely delayed basis, on the receiving end." Id. ¶ 2.*

**Answer:** The allegations in paragraph 95 seek to quote and characterize FCC materials. Inteliquent admits that the quoted language in paragraph 95 appears in those materials, but it denies that the allegations place those materials in proper context or otherwise accurately describe them. Inteliquent respectfully refers the Court to those materials for their content, and it denies all inconsistent allegations. Inteliquent denies the remaining allegations in paragraph 95.

96. *The 2012 Declaratory Ruling documented significant detrimental effects associated with rural call completion problems:*

> *Small businesses can lose customers who get frustrated when their calls don't go through. Urgent long distance calls from friends or family can be missed. Schools may be unable to reach parents with critical alerts, including school closings due to extreme weather. And those in need of help may be unable to reach public safety officials.*

*Id.*

**Answer:** The allegations in paragraph 96 seek to quote and characterize FCC materials. Inteliquent admits that the quoted language in paragraph 96 appears in those materials, but it denies that the allegations place those materials in proper context or otherwise accurately describe them. Inteliquent respectfully refers the Court to those materials for their content, and it denies all inconsistent allegations. Inteliquent denies the remaining allegations in paragraph 96.

97. *The 2012 Declaratory Ruling took several actions to put an end to the unlawful practices of carriers who were interfering with the delivery of calls to rural America, which "adversely affect the ubiquity and reliability of the nation's communications network and threaten commerce, public safety, and the ability of consumers, businesses, and public health and safety officials in rural America to access and use a reliable network." Id. ¶ 11.*

**Answer:** The allegations in paragraph 97 seek to quote and characterize FCC materials. Inteliquent admits that the quoted language in paragraph 97 appears in those materials, but it denies that the allegations place those materials in proper context or otherwise accurately describe them.

Inteliquent respectfully refers the Court to those materials for their content, and it denies all inconsistent allegations. Inteliquent denies the remaining allegations in paragraph 97.

98. *First, the order made clear that it is "an unjust and unreasonable practice in violation of section 201 of the Act for a carrier that knows or should know that it is providing degraded service to certain areas to fail to correct the problem or to fail to ensure that Intermediate Providers, least-cost routers, or other entities acting for or employed by the carrier are performing adequately." Id. ¶ 12. This clarification is important because it requires carriers to ensure the delivery of their calls even when they use third parties, such as IXCs, Intermediate Providers, or Least-Cost Routers, to deliver the traffic for some of the route, rather than handing off the call directly to the local phone company that will terminate the call. In connection with this declaration, the WCB also provided examples of the types of "degraded service" that constitute an unjust and unreasonable practice in violation of the Act, 47 U.S.C. § 201(b):*

> *This could include, inter alia, unreasonable delay to connect a call, as manifested by prolonged silence ("dead air") and/or prolonged **ringing in advance of the called phone being alerted.** Prolonged ringing occurs when callers are provided with prolonged audible ringing well before the called party's phone has even been alerted. This causes a caller to hang up because they believe the called entity's phone rang and no one is available to answer. See, e.g., Fritz Hendricks, Onvoy Voice Service, "When a person calls a customer in a rural market the [caller's] phone will ring 8 to 10 times before the end office of the ILEC is ever signaled - if it is signaled at all." and "[The caller] will hear ring but the far end will never ring; that is the trouble in approximately 60 to 65 per cent of the time." Rural Call Termination Workshop Video at 13:40, 41:20, viewable at http://www.fcc.gov/events/rural-call-completion-workshop. See also Washington Call Termination Issues, Washington Independent Telecommunications Association, presented to WUTC Workshop on Call Termination Issues held August 8, 2011, WUTC docket UT-110866, ("Customer call completion issues: [1] Ring tone with no answer - rings 1020 times - caller hangs up.") available at http://www.wutc.wa.gov/rms2.nsf/177d98baa5918c7388256a550064a61e/93037 ed14bbOcb6f882578e7007442ae ! OpenDocument*

*Id. ¶ 12, n.35 (emphasis added). Thus, carriers were on notice by at least 2012 that the use of prolonged fake ring tones was prohibited.*

**Answer:** The allegations in paragraph 98 seek to quote and characterize FCC materials. Inteliquent admits that the quoted language in paragraph 98 appears in those materials, but it denies that the allegations place those materials in proper context or otherwise accurately describe them.

Inteliquent respectfully refers the Court to those materials for their content, and it denies all inconsistent allegations. Inteliquent denies the remaining allegations in paragraph 98.

99.    *Next, the 2012 Declaratory Ruling clarified that it is an unjust and unreasonable practice in violation of Section 201(b) of the Act for a carrier to "inform a caller that a number is not reachable or is out of service when the number is, in fact, reachable and in service." Id. ¶ 13.*

**Answer:**  The allegations in paragraph 99 seek to quote and characterize FCC materials. Inteliquent admits that the quoted language in paragraph 99 appears in those materials, but it denies that the allegations place those materials in proper context or otherwise accurately describe them. Inteliquent respectfully refers the Court to those materials for their content, and it denies all inconsistent allegations. Inteliquent denies the remaining allegations in paragraph 99.

100.    *Third, citing the Communication Act's prohibition against unjust or unreasonable discrimination, the 2012 Declaratory Ruling concluded that "adopting or perpetuating routing practices that result in lower quality service to rural or high-cost localities than like service to urban or lower cost localities (including other lower cost rural areas) may, in the absence of a persuasive explanation, constitute unjust or unreasonable discrimination in practices, facilities, or services and violate section 202 of the Act." Id. ¶ 14 (citing 47 U.S.C. § 202).*

**Answer:**  The allegations in paragraph 100 seek to quote and characterize FCC materials. Inteliquent admits that the quoted language in paragraph 100 appears in those materials, but it denies that the allegations place those materials in proper context or otherwise accurately describe them.  Inteliquent respectfully refers the Court to those materials for their content, and it denies all inconsistent allegations.  Inteliquent denies the remaining allegations in paragraph 100.

101.    *Fourth, and finally, the 2012 Declaratory Ruling made it inescapably clear that carriers could no longer turn a blind eye to the call completion problems plaguing rural America by passing off their call traffic to an unregulated Intermediate Provider. Specifically, the Commission declared:*

> *Section 217 of the Act states that a carrier is liable for the acts, omissions, or failures of its agent or other person acting for or employed by the carrier. [ ] Therefore, if an underlying provider is blocking, choking, or otherwise restricting traffic, employing other unjust or unreasonable practices in violation of section 201, engaging in unjust or unreasonable discrimination in violation of section 202, or otherwise not complying with the Act or Commission rules, the carrier using that underlying provider to deliver*

> *traffic is liable for those actions if the underlying provider is an agent or other person acting for or employed by the carrier.*

*Id. ¶ 15 (citing 47 U.S.C. § 217).*

**Answer:** The allegations in paragraph 101 seek to quote and characterize FCC materials. Inteliquent admits that the quoted language in paragraph 101 appears in those materials, but it denies that the allegations place those materials in proper context or otherwise accurately describe them. Inteliquent respectfully refers the Court to those materials for their content, and it denies all inconsistent allegations. Inteliquent denies the remaining allegations in paragraph 101.

### vi. *2013 — The FCC Issues A Rule Prohibiting Fake Ring Tones And A Rural Call Completion Enforcement Advisory*

102. *A year later, on February 7, 2013, with rural completion problems still rampant, the Commission issued a Notice of Proposed Rulemaking, observing that Intermediate Providers "may be failing to deliver a significant number of calls to rural telephone company customers" and that evidence suggested that "retail long-distance providers may not be adequately examining the resultant rural call completion performance." In the Matter of Rural Call Completion, Notice of Proposed Rulemaking, 28 F.C.C. Rcd. 1569, ¶ 1 (2013) (attached hereto as Exhibit 5). The Commission reiterated that these rural call competition issues "manifest themselves in lengthy periods of dead air on the calling party's end after dialing a number, audible ringing tones on the calling party's end when the called party's telephone never rings at all, false busy signals, inaccurate intercept messages, and the inability of one or both parties to hear the other when the call does go through." Id. ¶ 2. The Commission proposed reporting and data retention requirements that would "aid enforcement action" and permit "review [of] a long distance provider's call performance to specific areas." Id. ¶ 3.*

**Answer:** The allegations in paragraph 102 seek to quote and characterize FCC materials. Inteliquent admits that the quoted language in paragraph 102 appears in those materials, but it denies that the allegations place those materials in proper context or otherwise accurately describe them. Inteliquent respectfully refers the Court to those materials for their content, and it denies all inconsistent allegations. Inteliquent denies the remaining allegations in paragraph 102.

103. *Citing its authority to prohibit unjust and unreasonable practices, 47 U.S.C.§ 201(b), the Commission also proposed rules to eliminate entirely the use of "false audible ringing," (i.e., fake ring tones) in which "the originating provider or an intermediate provider prematurely triggers the audible ring tone to the caller before the call setup request has actually reached the terminating rural provide." Id. ¶ 39.*

**Answer:** The allegations in paragraph 103 seek to quote and characterize FCC materials. Inteliquent admits that the quoted language in paragraph 103 appears in those materials, but it denies that the allegations place those materials in proper context or otherwise accurately describe them. Inteliquent respectfully refers the Court to those materials for their content, and it denies all inconsistent allegations. Inteliquent denies the remaining allegations in paragraph 103.

104.   *According to the FCC, "false audible ringing" causes a caller to "hear[ ] prolonged ringing" and "finally hang [ ] up—before the rural phone he called has rung at all." Id. The FCC further indicated that "once an intermediate provider provides a ringing indication to an originating provider while still processing the call, the call cannot be handed back to the preceding provider for an alternate route." Id. In other words, the FCC asserted that the insertion of fake ring tones makes it **less** likely that a call ultimately reached its intended destination for at least two reasons: (1) it causes the caller to "hang up" before the called party's phone begins to ring; and (2) it prevents the call from being returned to the preceding carrier so that alternative routes may be attempted and thus serves to block the call form being completed.*

**Answer:** The allegations in paragraph 104 seek to quote and characterize FCC materials. Inteliquent admits that the quoted language in paragraph 104 appears in those materials, but it denies that the allegations place those materials in proper context or otherwise accurately describe them. Inteliquent respectfully refers the Court to those materials for their content, and it denies all inconsistent allegations. Inteliquent denies the remaining allegations in paragraph 104.

105.   *While the Commission gathered and evaluated public comments, it also continued to put carriers on notice of its intention to enforce the rules already in place. On July 19, 2013, the Enforcement Bureau ("EB") issued an FCC Enforcement Advisory in which it called out carriers who were not adequately investigating and responding to consumer complaints about rural call completion problems. See FCC Enforcement Advisory, Public Notice, 28 F.C.C. Rcd. 10347 (2013) (attached hereto as Exhibit 8).*

**Answer:** The allegations in paragraph 105 seek to characterize FCC materials. Inteliquent denies that the allegations place those materials in proper context or otherwise accurately describe them. Inteliquent respectfully refers the Court to those materials for their content, and it denies all inconsistent allegations. Inteliquent denies the remaining allegations in paragraph 105.

106.   *Particularly problematic, according to the Commission, were carriers that would "assert, without any explanation, that the called party's rural telephone company is the source of*

49

*any problems." Id. The Commission put carriers on notice that inadequate or insufficient responses to consumer complaints would "provide the basis for further Commission investigation and enforcement action, which may include monetary fines." Id. at 10349. The Commission also reiterated that, "a provider's failure to investigate and satisfy such complaints may trigger separate liability under section 201(b) and constitute the basis for additional penalties." Id.*

**Answer:** The allegations in paragraph 106 seek to quote and characterize FCC materials. Inteliquent admits that the quoted language in paragraph 106 appears in those materials, but it denies that the allegations place those materials in proper context or otherwise accurately describe them. Inteliquent respectfully refers the Court to those materials for their content, and it denies all inconsistent allegations. Inteliquent denies the remaining allegations in paragraph 106.

107.     *Notably, Inteliquent was one of the only parties to argue against the Commission's proposal to prohibit fake ring tones. For example, on both September 26, 2013 and September 30, 2013, Inteliquent met with Commission staff addressing rural call completion issues and made the following assertions:*

> *With respect to rules addressing "false ringing," we noted that, when the call party is a wireless customer roaming on another provider's network, completing the call may take longer than calls terminating to wireline customers. While the wireless carrier is processing the call and locating the called party, presenting the caller with ringing provides comfort that the call has been dialed correctly and is being processed.*

*Letter from John Harrington, Inteliquent, to Marlene H. Dortch, Secretary, Federal Communications Commission, WC Docket No. 13-39 (Oct. 1, 2013) (attached hereto as Exhibit 6); Letter from John Harrington, Inteliquent, to Marlene H. Dortch, Secretary, Federal Communications Commission, WC Docket No. 13-39 (Oct. 18, 2013) (attached hereto as Exhibit 7). The FCC later expressly rejected this argument. See infra. ¶¶ 117-18.*

**Answer:**   The allegations in paragraph 107 seek to quote and characterize letters Inteliquent submitted to the FCC.  Inteliquent admits that the quoted language in paragraph 107 appears in those letters, but it denies that the allegations place those letters in proper context or otherwise accurately describe them.  Inteliquent respectfully refers the Court to the letters for their contents and context, and denies any inconsistent allegations.  Inteliquent admits that it exercised its First Amendment right to petition the FCC.  To the extent paragraph 107 alleges anything about

Inteliquent and the "fake ring tones" alleged in the complaint, Inteliquent denies those allegations.

Inteliquent denies any remaining allegations in paragraph 107.

108.    *On September 30, 2013, the same day that Inteliquent was lobbying for the use of fake ringtones, the Commission announced that its Tentative Agenda for its October 2013 Open Meeting included adoption of a Report and Order and Further Notice of Proposed Rulemaking "to address problems associated with completion of long distance calls to rural areas." See FCC News Release, FCC Announces Tentative Agenda for October Open Meeting (Sept. 30, 2013), available at: https://docs.fcc.gov/public/attachments/DOC-323564Al.pdf (last viewed Dec. 10, 2020).*

**Answer:** The allegations in paragraph 108 seek to quote and characterize FCC materials. Inteliquent admits that the quoted language in paragraph 108 appears in those materials, but it denies that the allegations place those materials in proper context or otherwise accurately describe them. Inteliquent admits that it exercised its First Amendment right to petition the FCC. Inteliquent denies any remaining allegations in paragraph 108.

109.    *On October 17, 2013, the Commission published its final agenda for the October 28, 2013 Open Meeting. See Commission Meeting Agenda, FCC to Hold Open Commission Meeting Monday, October 28, 2013 (Oct. 17, 2013), available at: https ://docs fcc. gov/public/attachments/DOC -323581A 1 .pdf (last viewed Dec. 10, 2020).*

**Answer:** The allegations in paragraph 109 characterize FCC materials. Inteliquent denies that the allegations place those materials in proper context or otherwise accurately describe them. Inteliquent admits any remaining allegations in paragraph 109.

110.    *Upon information and belief, Inteliquent's lobbying in favor of fake ringtones in late September 2013 was in response to being informed that the Commission intended to move forward with adopting the proposed rules to prohibit the practice.*

**Answer:** Inteliquent denies the allegations in paragraph 110.

111.    *Upon information and belief, between September 30, 2013 and the adoption of the order on October 28, 2013, T-Mobile's lobbyist and/or FCC lawyers would also have learned that the FCC's order would include a prohibition against the use of fake ring tones and conveyed this information to T-Mobile.*

**Answer:** Inteliquent lacks sufficient knowledge or information to form a belief as to the truth of paragraph 111's allegations and on that basis denies them.

112.    *The Commission adopted the Report and Order and Further Notice of Proposed Rulemaking on October 28, 2013. See In the Matter of Rural Call Completion, Report and Order and Further Notice of Proposed Rulemaking, 28 F.C.C. Rcd. 16154 (2013) ("2013 Rural Call Completion Order") (attached hereto as Exhibit 9). The Commission concluded that poor call quality in rural parts of the country was directly attributable to carriers seeking to end run the Commission's policies on payment of access charges:*

> *One key reason for the increased problems in rural areas is that a call to a rural area is often handled by numerous different providers in the call's path. Given the particularly high rates long-distance providers incur to terminate long-distance calls to rural rate-of-return carriers, long-distance providers have additional incentives to reduce the per-minute cost of calls. For example, the disparity between interstate rates can be 5-6 cents per minute for rate-of-return areas and just over half a cent per minute for price cap areas. As a result, there is greater incentive for the long-distance provider to hand off the call to an intermediate provider that is offering to deliver it cheaply—and potentially less incentive to ensure that calls to rural areas are actually completed properly. The prevalence of these problems accords with providers' incentives to engage in blocking or degrading traffic, or similar behavior, in an effort to minimize their intercarrier compensation payments, which has been long recognized by the Commission. While the Commission's comprehensive reform of intercarrier compensation will alleviate some of these price differences in the long-term, it likely will continue to be more costly to complete calls to rate-of-return carriers while the transition to bill-and-keep is implemented over the next several years.*

*Id. 1117.*

**Answer:**  The allegations in paragraph 112 seek to quote and characterize FCC materials. Inteliquent admits that the quoted language in paragraph 112 appears in those materials, but it denies that the allegations place those materials in proper context or otherwise accurately describe them.  Inteliquent respectfully refers the Court to those materials for their content, and it denies all inconsistent allegations.  Inteliquent denies the remaining allegations in paragraph 112.

113.    *In the 2013 Rural Call Completion Order, the Commission adopted its proposed rule to prohibit the use of fake ring tones.  The Commission described the use of fake ring tones as deceptive, explaining that "[f]alse audible ringing can [ ] make it appear to the caller that the terminating rural provider is responsible for the call failure, instead of the originating or intermediate provider," id. ¶ 111, and that codifying the rule was intended to address the harm that "consumers mistakenly believe that the terminating rural provider is responsible for the call failure," id. ¶ 114.*

**Answer:** The allegations in paragraph 113 seek to quote and characterize FCC materials. Inteliquent admits that the quoted language in paragraph 113 appears in those materials, but it denies that the allegations place those materials in proper context or otherwise accurately describe them. Inteliquent respectfully refers the Court to those materials for their content, and it denies all inconsistent allegations. Inteliquent denies the remaining allegations in paragraph 113.

114. *The Commission reiterated that the use of fake ring tones causes the caller to hang up prematurely, "thinking nobody is available to receive the call," and that the use of a fake ring tone prevents the call from being handed "back to the preceding provider for an alternative route" when the call is not able to reach its intended destination. Id. ¶ 111. The FCC elaborated on this point:*

*As discussed, once an intermediate provider sends a ringing indication to the originating provider while still processing a call, that call cannot be handed back to the preceding provider for an alternate route. We believe prohibiting false audible ringing affects an intermediate provider's incentive to continue processing calls struggling with excessive setup times, allowing them to hand back such calls to the preceding provider.*

*Id., ¶ 114 n.294.*

**Answer:** The allegations in paragraph 114 seek to quote and characterize FCC materials. Inteliquent admits that the quoted language in paragraph 114 appears in those materials, but it denies that the allegations place those materials in proper context or otherwise accurately describe them. Inteliquent respectfully refers the Court to those materials for their content, and it denies all inconsistent allegations. Inteliquent denies the remaining allegations in paragraph 114.

115. *Thus, in the 2013 Rural Call Completion Order the FCC expressly concluded that the use of fake ring tones causes calls not to be completed.*

**Answer:** The allegations in paragraph 115 seek to characterize FCC materials. Inteliquent denies that the allegations place those materials in proper context or otherwise accurately describe them. Inteliquent respectfully refers the Court to those materials for their content, and it denies all inconsistent allegations. Inteliquent denies the remaining allegations in paragraph 115.

116. *When calls are not completed because of the use of fake ring tones, the terminating LEC is harmed by not receiving access charges for the termination of that call.*

**Answer:** Inteliquent denies the allegations in paragraph 116.

117.  *In the 2013 Rural Call Completion Order, the Commission rejected arguments, like those that Inteliquent had made, that fake ring tones should not be prohibited because they are meant to "ensure that the calling party does not hang up before the call is answered because the calling party hears a relatively prolonged silence." Id. ¶ 113 (citations omitted).*

**Answer:** The allegations in paragraph 117 seek to quote and characterize FCC materials. Inteliquent admits that the quoted language in paragraph 117 appears in those materials, but it denies that the allegations place those materials in proper context or otherwise accurately describe them. Inteliquent respectfully refers the Court to those materials for their content, and it denies all inconsistent allegations. Inteliquent denies the remaining allegations in paragraph 117.

118.  *Instead, the Commission concluded that its new rule prohibiting fake ring tones was essential to ensuring that calls actually reached rural areas:*

*As a result of this rule, consumers will no longer prematurely hang up when the call has not even rung on the caller's side, nor will consumers mistakenly believe that the terminating rural provider is responsible for the call failure. Industry will benefit from this rule because intermediate providers will now hand back calls that have excessive set-up time to the preceding provider to find an alternate route, so that the call can ultimately be completed.*

*Id. P 114.*

**Answer:** The allegations in paragraph 118 seek to quote and characterize FCC materials. Inteliquent admits that the quoted language in paragraph 118 appears in those materials, but it denies that the allegations place those materials in proper context or otherwise accurately describe them. Inteliquent respectfully refers the Court to those materials for their content, and it denies all inconsistent allegations. Inteliquent denies the remaining allegations in paragraph 118.

119.  *The Commission codified the new rule as follows:*

*(a) A long-distance voice service provider shall not convey a ringing indication to the calling party until the terminating provider has signaled that the called party is being alerted to an incoming call, such as by ringing.*

*(1) If the terminating provider signals that the called party is being alerted and provides an audio tone or announcement, originating providers must cease any locally generated audible tone or announcement and convey the terminating provider's tone or announcement to the calling party.*

*(2) The requirements in this paragraph apply to all voice call signaling and transmission technologies and to all long-distance voice service providers, including local exchange carriers as defined in § 64.4001(e), interexchange carriers as defined in § 64.4001(d), providers of commercial mobile radio service as defined in § 20.3 of this chapter, providers of interconnected voice over Internet Protocol (VoIP) service as defined in 47 U.S.C. 153(25), and providers of non-interconnected VoIP service as defined in 47 U.S.C. 153(36) to the extent such providers offer the capability to place calls to or receive calls from the public switched telephone network.*

*47 C.F.R. § 64.2201.*

**Answer:** The allegations in paragraph 119 seek to quote and characterize FCC materials. Inteliquent admits that the quoted language in paragraph 119 appears in those materials, but it denies that the allegations place those materials in proper context or otherwise accurately describe them. Inteliquent respectfully refers the Court to those materials for their content, and it denies all inconsistent allegations. Inteliquent denies the remaining allegations in paragraph 119.

120.     *No party successfully challenged the Commission's new fake ring tone rule or its finding in the 2013 Rural Call Completion Order that the use of fake ring tones causes calls not to be completed. The Commission's conclusion that use of fake ring tones causes calls not to be completed is, therefore, entitled to Chevron deference and, pursuant to the Hobbs Act, 28 U.S.C. § 2342(1), may not now be challenged by either Defendant here. See, e.g., PDR Network, LLC v. Carlton & Harris Chiropractic, Inc., 139 S. Ct. 2051, 2055 (2019) (under the Hobbs Act, a legislative rule adopted by the FCC may not be challenged in subsequent litigation by a party that had a prior adequate opportunity to seek judicial review).*

**Answer:** Inteliquent states that the allegations in paragraph 120 state legal conclusions, that legal conclusions are for the Court to make, and therefore denies those allegations. The allegations in paragraph 120 also seek to characterize FCC materials. Inteliquent denies that the allegations place those materials in proper context or otherwise accurately describe them. Inteliquent respectfully refers the Court to those materials for their content, and it denies all inconsistent allegations. Inteliquent lacks sufficient information or knowledge as to form a belief

as to the truth of these allegations and on that basis denies the remaining allegations in paragraph 120.

121.    *The 2013 Rural Call Completion Order also imposed rural call reporting obligations on "Covered Providers." The Commission concluded that the reporting obligations would "apply to providers of long-distance voice service that make the initial long-distance call path choice for more than 100,000 domestic retail subscriber lines, regardless of whether those providers are facilities-based." Id. ¶ 20. "By 'initial long-distance call path choice,' [the Commission] refer[s] to the static or dynamic selection of the path for a long-distance call based on the called number of the individual call." Id.*

**Answer:** The allegations in paragraph 121 seek to quote and characterize FCC materials. Inteliquent admits that the quoted language in paragraph 121 appears in those materials, but it denies that the allegations place those materials in proper context or otherwise accurately describe them. Inteliquent respectfully refers the Court to those materials for their content, and it denies all inconsistent allegations. Inteliquent denies the remaining allegations in paragraph 121.

122.    *The Commission described several different scenarios in which the "originating provider" may or may not be the "Covered Provider[]" for its traffic. See id. For example, if the originating provider hands all of its traffic off to an IXC, that IXC qualifies as the Covered Provider. Id. (first example). If the originating carrier selects an IXC based only on the call**ing** party's telephone number, rather than the "call**ed** number," the originating carrier would also not be the Covered Provider. Id. (emphasis added).*

**Answer:** The allegations in paragraph 122 seek to quote and characterize FCC materials. Inteliquent admits that the quoted language in paragraph 122 appears in those materials, but it denies that the allegations place those materials in proper context or otherwise accurately describe them. Inteliquent respectfully refers the Court to those materials for their content, and it denies all inconsistent allegations. Inteliquent denies the remaining allegations in paragraph 122.

123.    *A carrier that meets the definition of Covered Provider may also be an Intermediate Provider. Thus, the Commission provided that "a covered provider that also serves as an intermediate provider for other providers may—but need not—segregate its originated traffic from its intermediary traffic in its recording and reporting." Id., n.64.*

**Answer:** The allegations in paragraph 123 seek to quote and characterize FCC materials. Inteliquent admits that the quoted language in paragraph 123 appears in those materials, but it

denies that the allegations place those materials in proper context or otherwise accurately describe them. Inteliquent respectfully refers the Court to those materials for their content, and it denies all inconsistent allegations. Inteliquent denies the remaining allegations in paragraph 123.

124. *In addressing how call attempts should be reported, the Commission concluded that "call attempts that are handed back to the upstream provider" could be excluded "in order to avoid double-counting of the same phone call," Id. ¶¶ 57-58. However, the Commission also accepted arguments by Inteliquent that many "CMRS providers" are "'unable to take back a call that an intermediate provider is unable to complete.'" Id. ¶ 58. As a result, when a call is attempted but cannot be handed back to the originating CMRS carrier, it should not be excluded from the Covered Provider's report. See id.*

**Answer:** The allegations in paragraph 124 seek to quote and characterize FCC materials. Inteliquent admits that the quoted language in paragraph 124 appears in those materials, but it denies that the allegations place those materials in proper context or otherwise accurately describe them. Inteliquent respectfully refers the Court to those materials for their content, and it denies all inconsistent allegations. Inteliquent denies the remaining allegations in paragraph 124.

### vii. From 2013 Through 2016, FCC Takes Limited Enforcement Actions Related To Call Quality And Failure To Oversee Intermediaries

125. *Following adoption of the 2012 Declaratory Ruling and 2013 Rural Call Completion Order, the FCC took limited enforcement actions against carriers for failing to comply with the rural call completion obligations.*

**Answer:** The allegations in paragraph 125 seek to generally characterize FCC actions. Inteliquent denies that the allegations place those actions in proper context or otherwise accurately describe them. Inteliquent lacks sufficient information or knowledge as to form a belief about these allegations and on that basis denies them.

126. *In total, five carriers entered into Consent Decrees with the FCC between 2013 and 2016, agreeing to fines between $100,000 and $5 million. T-Mobile and Inteliquent were undoubtedly aware of their illegal conduct but the FCC's limited enforcement efforts and modest penalties in the Consent Decrees emboldened them to conclude that their fake ring tone scheme would nevertheless pay off.*

**Answer:** The allegations in paragraph 126 seek to characterize FCC consent decrees. Inteliquent denies that the allegations place those consent decrees in proper context or otherwise accurately describe them, or that they have any relevance to this complaint. Inteliquent denies it participated in any so-called "fake ring tone scheme," committed any other illegal conduct alleged in the complaint, or was "emboldened" by the FCC's consent decrees. Inteliquent denies the allegations in paragraph 126.

127.    *Indeed, during negotiations with the FCC regarding the amount of penalty that the FCC was considering imposing on T-Mobile, T-Mobile expressly relied on its expectation that its exposure, if caught violating the fake ring tone prohibition, would be limited to a few million dollars, arguing:*

> *Enforcement action of the magnitude contemplated by the Bureau here is entirely inconsistent with Commission precedent. Prior Commission rural call completion enforcement actions ranged from $100,000 to $5 million. . . . In other words, rural call completion actions topped out at $5 million, even though each of the actions involved threatened or actual sub-par rural call completion performance. A forfeiture [redacted by T-Mobile] times higher than the maximum rural call completion penalty imposed by Chairmen Genachowski and Wheeler has no basis here, particularly given T-Mobile's strong rural call completion record.*

*Supplemental Response of T-Mobile USA, Inc., File No. EB-IHD-16-00023247, at 7 (Sept. 8, 2017), attached hereto as Exhibit 18. Its reprehensible conduct having been discovered, T-Mobile sought to protect the only thing it truly cares about: T-Mobile's money and profits.*

**Answer:** The allegations in paragraph 127 seek to quote and characterize a supplemental response by T-Mobile submitted to the FCC. Inteliquent admits that the quoted language in paragraph 127 appears in those materials, but it denies that the allegations place those materials in proper context or otherwise accurately describe them. Inteliquent lacks sufficient knowledge or information to form a belief as to the truth of the allegations and on that basis denies them.

### G.    *Congress Acts To Address The Rural Call Completion Problems Plaguing Rural America*

128.    *The FCC, acting alone, has not been successful in eradicating rural call completion problems, in part because it lacks the tools and resources necessary to police the conduct of*

*Intermediate Providers like Inteliquent. Therefore, rural carriers and constituents alike turned to their elected representatives.*

**Answer:** Inteliquent denies the allegations in paragraph 128.

129.    *In February 2018, Congress adopted, and President Trump signed into law, the Improving Rural Call Quality and Reliability Act of 2017, Pub. L. No. 115-129, 132 Stat 329 (2018) ("RCC Act"). The bill was proposed by a bi-partisan group of representatives from rural states, including Rep. David Young (R-IA), Rep. Peter Welch (D-VT), Rep. David Loesback (D-IA), Rep. Sean Duffy (R-WI), Rep. Mark Pocan (D-WI), Rep. Robert Latta (R-OH), Rep. Ron Kind (D-WI), Rep. Richard Nolan (D-MN), Rep. Kristi Noem (R-SD), Rep. Kevin Cramer (R-ND), and Rep. Blaine Luetkemer (R-MO) in the House of Representatives. In the Senate, the RCC Act was sponsored by Sen. Amy Klobuchar (D-MN), Sen. John Thune (R-SD), Sen. Jon Tester (D-MT), Sen. Angus King (I-ME), Sen. Chuck Grassley (R-IA), Sen Joni Ernst (R-IA), Sen. Al Franken (D-MN), Sen. Mike Round (R-SD), and Sen. Claire McCaskill (D-MO). Marking its overwhelming bi-partisan support, the bill passed the Senate on unanimous consent and in the House by a unanimous voice vote.*

**Answer:** Inteliquent admits the allegations in paragraph 129.

130.    *Among other things, the RCC Act directed the FCC to adopt rules requiring Intermediate Providers to register with the Commission and abide by certain service quality standards, while also prohibiting Covered Providers from using Intermediate Providers that were not registered.*

**Answer:** The allegations in paragraph 130 seek to characterize FCC actions. Inteliquent admits the FCC adopted rules pursuant to the RCC Act, but it denies that the allegations place those materials in proper context or otherwise accurately describe them. Inteliquent respectfully refers the Court to those materials for their content, and it denies all inconsistent allegations. Inteliquent denies the remaining allegations in paragraph 130.

131.    *As demonstrated by the Congressional records, the insertion of fake ring tones and the unscrupulous practices of Intermediate Providers was a clear impetus for the adoption of the RCC Act. For example, the Committee Report on the bill authored by the Senate Committee on Commerce, Science, and Transportation states:*

> *The FCC has found that there is a frequent and pervasive inability to properly complete long-distance calls to rural areas. The problem, known as "rural call completion," results in lengthy periods of dead air on the calling party's end after dialing a number,* **audible ringing tones on the calling party's end when the called party's telephone never rings at all,** *false busy signals, inaccurate intercept messages, and the inability of one or both parties to hear the other when the call does go through. The*

> Commission has received examples of life-threatening call failures, including a situation where an on-call surgeon was unable to receive a call from a hospital for emergency surgery and a 9-1-1 call center was unable to complete emergency call backs. In rural and small-town America, call completion failures have created 'dire consequences' to consumers, economic development, and public safety across the Nation."
>
> *The FCC has determined that one of the main causes of the rural call completion problem is that intermediate providers, companies often hired by long distance providers to route and deliver calls to local telephone providers serving rural areas, are not completing the calls. Higher-than-average rates charged to transport and terminate long-distance calls to rural areas create an incentive for long-distance providers to hand off these calls to intermediate providers that offer to deliver them cheaply.* **Those high rates, though, also create an incentive for those intermediate providers not to complete the calls properly, to avoid paying those higher-than-average transport and termination charges when it is not profitable to do so.**
>
> *Practices used for routing calls to rural areas that lead to call termination and quality problems may violate the Communications Act of 1934. The Commission has clarified the applicability of its rules and imposed additional reporting and data retention requirements for local telephone exchange carriers, interexchange carriers (i.e., long distance providers), commercial mobile radio service providers (i.e., cellular providers), and voice over Internet protocol providers, but call completion problems remain.*

*Report of the Committee on Commerce, Science and Transportation on the Improving Rural Call Quality and Reliability Act of 2017 (S.96) (Mar. 21, 2017) (emphasis added).*

**Answer:** The allegations in paragraph 131 seek to quote and characterize congressional records. Inteliquent admits that the quoted language in paragraph 131 appears in those materials, but it denies that the allegations place those materials in proper context or otherwise accurately describe them. Inteliquent respectfully refers this Court to the materials for their content and denies all inconsistent allegations. Inteliquent denies the remaining allegations in paragraph 131.

132. *The issues were addressed repeatedly during floor debate as well. For example, Representative Young of Iowa, a co-drafter of the bill, stated:*

> *Mr. Speaker, I rise in support of H.R. 460, the bipartisan Improving Rural Call Quality and Reliability Act, legislation I introduced with my colleague from Vermont, Congressman Welch.*

60

*This bill helps fix the significant problems rural Iowans and other rural Americans face from dropped and poor quality calls. Reliable communication is critical for our constituents to live their lives, for our businesses to succeed, and for our communities to thrive. Yet, in rural States and areas across America, phone calls are not getting through or the connection and quality are poor.*

*Telephone companies often rely on intermediate providers, who are paid to route calls from larger networks to local service providers. Much of the time, this is to mixed results.*

*There simply is no excuse for these intermediate providers to not fulfill their contracts and leave our rural constituents with unreliable communication service. Dropped, looped, or poor quality calls hurt rural America's quality of life, impacting our small businesses, farmers, consumers, and our families who are in need of emergency assistance and public services. It also gives unfair blame to our essential local service providers when they are not the problem, they are the solution.*

*A family in rural America should not be disadvantaged because of where they live. Iowa businesses should have the same communication access to conduct daily businesses as those in urban areas.*

*Improving rural call completion rates and quality are important to ensuring the survival of small towns and granting Americans the choice to live and thrive in whatever community is best for them and their family, rural, urban, or anywhere in between.*

*Our bill will help address this problem by requiring providers to register with the FCC in order to meet quality standards and ensure reliable phone service in rural areas. It also prohibits providers from using intermediary routing services not registered with the FCC.*

*Congressional Record Vol. 163, No. 12 (Jan. 23, 2017).*

**Answer:** The allegations in paragraph 132 seek to quote and characterize congressional records. Inteliquent admits that the quoted language in paragraph 132 appears in those materials, but it denies that the allegations place those materials in proper context or otherwise accurately describe them. Inteliquent respectfully refers this Court to the materials for their content and denies all inconsistent allegations. Inteliquent denies the remaining allegations in paragraph 132.

133.    *Representative Welch of Vermont, the second co-drafter, stated:*

61

> *We often focus on rural broadband accessibility and affordability so that the next generation of technological innovation does not skip rural America and leave it behind. The promise of innovation, like the Internet of things, should not be earmarked just for urban and suburban America, which is why it is backwards and unfortunate that we are still talking about finding ways to ensure that traditional landline telephone calls can be completed without interruption on a consistent basis, but that is exactly what this bill that I worked on with Representative Young is getting at.*
>
> *Our bill would require the FCC, the Federal Communications Commission, to establish rules that require third-party providers--or least cost routers, as they are called, which is the problem in the call chain--to register their companies, for the first time, with the FCC and, therefore, have to comply with FCC service quality regulations, just like other companies.*
>
> *This legislation would make it easier for the FCC to hold accountable third-party providers. The FCC will finally know who they are and make them comply with those quality standards.*
>
> *This is really important in rural areas because we have got companies that do business with urban America. In Vermont, Dakin Farm had rural call completion problems during their busiest times in 2012. That was the Thanksgiving to Christmas holiday period.*
>
> *It really hurt their bottom line. It put them at a competitive disadvantage. When people call in and the call is dropped, they think it is bad service from Dakin Farm or the company that they are calling, when it is not. Those folks have to then deal with the reputational harm that is caused.*
>
> *It is important in rural school districts like Camels Hump in Vermont that rely on these calls when there is a snowstorm or ice storm--and there is one coming tonight--to check whether, in fact, they have got to get their kids to school or not. So it is a big deal when they need it.*

*Id.*

      **Answer:** The allegations in paragraph 133 seek to quote and characterize congressional records. Inteliquent admits that the quoted language in paragraph 133 appears in those materials, but it denies that the allegations place those materials in proper context or otherwise accurately describe them. Inteliquent respectfully refers this Court to the materials for their content and denies all inconsistent allegations. Inteliquent denies the remaining allegations in paragraph 133.

134.     *Representative Lance of New Jersey also explained the harm caused by unscrupulous Intermediate Providers and the need to hold them accountable:*

> *Consumers expect to be able to pick up the telephone and be connected with businesses, friends, and loved ones across the country. In today's connected world, that should not be a tall request. Unfortunately, for many constituents across the country, particularly in rural areas, call quality and reliability are just not up to par compared to their urban counterparts.*
>
> *This is due, partly, because of the call routing process where long distance and wireless providers use so-called least cost routers. These inexpensive third-party intermediate providers try to complete calls for the lowest possible price, without taking measures to ensure the call actually goes through.*
>
> *I am sure that most of us have experienced the annoyance of at least one failed or dropped call. You make a call to someone and it rings over and over again but no one, not even the voicemail, picks up. Or, maybe you place a call, only to hear a prerecorded message telling you that the number you dialed is not in service, even though you know you have the right number. Even in cases where you are able to connect, the sound might be distorted or delayed.*
>
> *For many constituents, this is more than just an annoyance. These missed connections have significant consequences.*
>
> *Folks rely on the networks for more than just staying in touch with loved ones. Our constituents count on reliable networks to run their businesses and receive messages from our community institutions. A failed call can mean a lost sale for a small rural business. Another failed call might mean that a message from your child's school or your medical provider goes undelivered. These are real and harmful impacts. This bill will address this situation through commonsense improvements.*
>
> *For the most part, consumers are unaware of these intermediate providers, which has allowed them to be held unaccountable. H.R. 460 takes measured steps to bring these intermediate providers out from the shadows and into the light so that we can hold them accountable to the consuming public.*

*Id*.

**Answer:**  The allegations in paragraph 134 seek to quote and characterize congressional records.  Inteliquent admits that the quoted language in paragraph 134 appears in those materials, but it denies that the allegations place those materials in proper context or otherwise accurately

describe them. Inteliquent respectfully refers this Court to the materials for their content, and denies all inconsistent allegations. Inteliquent denies the remaining allegations in paragraph 134.

135. *Representative Michael Doyle of Pennsylvania stated:*

> *We know that problems with call completion are often related to intermediate providers--the middlemen hired to route calls. This bill requires intermediate providers to register with the FCC and comply with service quality standards. These commonsense steps should make it easier to figure out when providers are cutting corners or not doing their jobs.*

*Congressional Record Vol. 164, No. 25 (Feb. 8, 2018).*

**Answer:** The allegations in paragraph 135 seek to quote and characterize congressional records. Inteliquent admits that the quoted language in paragraph 135 appears in those materials, but it denies that the allegations place those materials in proper context or otherwise accurately describe them. Inteliquent respectfully refers this Court to the materials for their content and denies all inconsistent allegations. Inteliquent denies the remaining allegations in paragraph 135.

136. *Representative Kristi Noem of South Dakota articulated well how Intermediate Providers interrupt calls specifically for the purpose of saving money and the frustration of people living in rural parts of our country:*

> *Mr. Speaker, I rise today to support the Improving Rural Call Quality and Reliability Act.*
>
> *Most Americans can rely on their phone service to keep in touch with loved ones. They can respond to urgent work when away from their place of business and respond to emergencies. But many of my constituents in South Dakota continue to have these critical calls dropped with absolutely no warning.*
>
> *More specifically, companies in the business of routing voice calls sometimes purposely drop long-distance calls headed for remote areas as a way to save money.*
>
> *While this is inexcusable just for the sheer inconvenience, some of these calls involve emergencies, leaving families in unnecessarily dangerous situations.*
>
> *The provisions within this bill are simple. We simply direct the FCC to establish basic quality standards for providers that transmit voice calls.*

> *This will help ensure businesses, families, and emergency responders can count on phone calls being completed.*
>
> *Mr. Speaker, I love living in a small town in America. It is where I grew up, and it is where I have chosen to raise my family.*
>
> *Dependable phone service shouldn't be a question for those who make the choice to live in wide-open spaces, especially when we are making new, amazing technological advances on a daily basis.*
>
> *Mr. Speaker, I urge my colleagues to pass this legislation and ensure that those in South Dakota and rural areas across the country can rely on their phone calls going through.*

*Id*.

**Answer:** The allegations in paragraph 136 seek to quote and characterize congressional records. Inteliquent admits that the quoted language in paragraph 136 appears in those materials, but it denies that the allegations place those materials in proper context or otherwise accurately describe them. Inteliquent respectfully refers this Court to the materials for their content and denies all inconsistent allegations. Inteliquent denies the remaining allegations in paragraph 136.

### H.     *In 2018, The FCC Adopted New Rules and Reoriented Prior Practices*

137.     *Since adoption of the RCC Act, the FCC has adopted new rules to further address rural call completion concerns. See In the Matter of Rural Call Completion, Second Report and Order and Third Further Notice of Proposed Rulemaking, 33 F.C.C. Red. 4199 (Apr. 17, 2018) ("2018 Second Report and Order"); In the Matter of Rural Call Completion, Third Report and Order, 33 F.C.C. Red. 8400 (Aug. 13, 2018) ("2018 Third Report and Order").*

**Answer:** The allegations in paragraph 137 seek to characterize FCC actions. Inteliquent admits the FCC adopted rules pursuant to the RCC Act, but it denies that the allegations place those materials in proper context or otherwise accurately describe them. Inteliquent respectfully refers the Court to those materials for their content, and it denies all inconsistent allegations. Inteliquent denies the remaining allegations in paragraph 137.

138.     *In the 2018 Second Report and Order, the Commission stated: "Based on the record before us and our experience over the last five years, we adopt new measures, and seek comment on others, to better tackle the problem of call completion and ensure that calls are indeed*

*completed to all Americans—including those in rural America." Id. ¶ 2. The Commission also indicated that it would "reorient" its "existing rural call completion rules to better reflect strategies that have worked to reduce rural call completion problems while at the same time reducing the overall burden of our rules on providers." Id. ¶ 11. Such statements reflect an intention by the Commission to implement new measures with prospective application, rather than merely explain prior rulings. Thus, close examination is required to ascertain the Commission's intention.*

**Answer:** Inteliquent states that the allegations in paragraph 138 state legal conclusions, that legal conclusions are for the Court to make, and therefore denies those allegations. The allegations in paragraph 138 seek to quote and characterize FCC materials. Inteliquent admits that the quoted language in paragraph 138 appears in those materials, but it denies that the allegations place those materials in proper context or otherwise accurately describe them. Inteliquent respectfully refers the Court to those materials for their content, and it denies all inconsistent allegations. Inteliquent denies the remaining allegations in paragraph 138.

139.    *In the 2018 Second Report and Order, the Commission also expressly affirmed the WCB's conclusions in the 2012 Declaratory Ruling, thus giving the WCB's findings the imprimatur of the full Commission. Specifically, the Commission observed and agreed that the Bureau had "clarif[ied] the statutory provisions discussed by the WCB," namely, the duties that carriers owe under sections 201, 202, and 217 of the Act. Id. ¶ 24. The Commission expressly affirmed the WCB's conclusion that "'it is an unjust and unreasonable practice in violation of section 201 of the Act for **a carrier** that knows or should know that it is providing degraded service to certain areas to fail to correct the problem or to fail to ensure that intermediate providers, least-cost routers, or other entities acting for or employed by the carrier are performing adequately,'" id. (quoting 2012 Declaratory Ruling, ¶ 12) (emphasis added), and that "'adopting or perpetuating routing practices that result in lower quality service to rural or high-cost localities than like service to urban or lower cost localities (including other lower cost rural areas) may, in the absence of a persuasive explanation, constitute unjust or unreasonable discrimination in practices, facilities, or services and violate section 202 of the Act,'" id. (quoting 2012 Declaratory Ruling, ¶ 14).*

**Answer:** Inteliquent states that the allegations in paragraph 139 state legal conclusions, that legal conclusions are for the Court to make, and therefore denies those allegations. The allegations in paragraph 139 also seek to quote and characterize FCC materials. Inteliquent admits that the quoted language in paragraph 139 appears in those materials, but it denies that the allegations place those materials in proper context or otherwise accurately describe them.

Inteliquent respectfully refers the Court to those materials for their content, and it denies all inconsistent allegations. Inteliquent denies the remaining allegations in paragraph 139.

140.     *In the 2018 Second Report and Order, the Commission also "specifically highlight[ed] that under the 2012 Declaratory Ruling, 'a carrier that knows or should know that calls are not being completed to certain areas, and that engages in acts (or omissions) that allow or effectively allow these conditions to persist' may be liable for a violation of section 201 of the Act." Id. ¶ 25 (emphasis added). The Commission also made clear that "willful ignorance will not excuse a failure by a covered provider or carrier to investigate evidence of poor performance to a rural area, such as repeated complaints, persistent low answer rates, or other indicia identified above." Id. (emphasis added). Thus, the Commission affirmed the WCB's 2012 conclusions about what activities would constitute a violation of Sections 201(b) and 202(a) if performed by any "carrier."*

**Answer:**  Inteliquent states that the allegations in paragraph 140 state legal conclusions, that legal conclusions are for the Court to make, and therefore denies those allegations.  The allegations in paragraph 140 also seek to quote and characterize FCC materials.  Inteliquent admits that the quoted language in paragraph 140 appears in those materials, but it denies that the allegations place those materials in proper context or otherwise accurately describe them. Inteliquent respectfully refers the Court to those materials for their content, and it denies all inconsistent allegations.  Inteliquent denies the remaining allegations in paragraph 140.

141.     *The Commission's decision to affirm the WCB's findings from the 2012 Declaratory Ruling as part of a decision adopted pursuant to notice-and-comment rulemaking, had the effect of making those findings a legislative rule, rather than an interpretive rule. As such, the Commission's conclusion that "carriers" violate 201(b) and 202(a) when they engage in the conduct described in the 2012 Declaratory Ruling is subject to the Hobbs Act and may not be challenged by either Defendant in this proceeding. See, e.g., PDR Network, LLC, 139 S. Ct. at 2055 (under the Hobbs Act, a legislative rule adopted by the FCC may not be challenged in subsequent litigation by a party that had a prior adequate opportunity to seek judicial review).*

**Answer:**  Inteliquent states that the allegations in paragraph 141 state legal conclusions, that legal conclusions are for the Court to make, and therefore denies those allegations.  The allegations in paragraph 141 also seek to quote and characterize FCC materials.  Inteliquent admits that the quoted language in paragraph 141 appears in those materials, but it denies that the allegations place those materials in proper context or otherwise accurately describe them.

Inteliquent respectfully refers the Court to those materials for their content, and it denies all inconsistent allegations. Inteliquent denies the remaining allegations in paragraph 141.

142. *The fact that the Commission's 2012 Declaratory Ruling applied to all carriers is also evidenced by the Consent Decree. The Consent Decree quotes with approval the WCB's conclusion on the 2012 Declaratory Ruling that:*

> *"a carrier that knows or should know that calls are not being completed to certain areas, and that engages in acts (or omissions) that allow or effectively allow these conditions to persist, may be liable for a violation of section 201 of the Act." Moreover, "it is an unjust and unreasonable practice in violation of section 201 of the Act for a carrier that knows or should know that it is providing degraded service to certain areas to fail to correct the problem or to fail to ensure that intermediate providers, least cost routers, or other entities acting for or employed by the carrier are performing adequately. This is particularly the case when the problems are brought to the carrier's attention by customers, rate-of-return carriers serving rural areas, or others, and the carrier nevertheless fails to take corrective action that is within its power.""*

*Consent Decree, ¶ 3 (citations omitted).*

**Answer:** Inteliquent states that the allegations in paragraph 142 state legal conclusions, that legal conclusions are for the Court to make, and therefore denies those allegations. The allegations in paragraph 142 also seek to quote and characterize FCC materials. Inteliquent admits that the quoted language in paragraph 142 appears in those materials, but it denies that the allegations place those materials in proper context or otherwise accurately describe them. Inteliquent respectfully refers the Court to those materials for their content, and it denies all inconsistent allegations. Inteliquent denies the remaining allegations in paragraph 142.

143. *The 2018 Second Report and Order also adopted new rules that required Covered Providers to undertake both prospective and retrospective monitoring. See, e.g., id. ¶¶ 12, 17-30. These new rules apply only to "Covered Providers." In explaining its new rules, the Commission indicated that, on a going forward basis, the requirements included in the 2012 Declaratory Ruling would constitute "the minimum retrospective monitoring duty of covered providers." Id. ¶ 24. The Commission also made clear that the duty imposed by its new rules on Covered Providers included "active monitoring," by either themselves or a contracted third party. Id. ¶ 34, n.112.*

**Answer:** Inteliquent states that the allegations in paragraph 143 state legal conclusions, that legal conclusions are for the Court to make, and therefore denies those allegations. The

allegations in paragraph 143 also seek to quote and characterize FCC materials. Inteliquent admits that the quoted language in paragraph 143 appears in those materials, but it denies that the allegations place those materials in proper context or otherwise accurately describe them. Inteliquent respectfully refers the Court to those materials for their content, and it denies all inconsistent allegations. Inteliquent denies the remaining allegations in paragraph 143.

144. *Thus, while the Commission's newly-adopted **rules** established the minimum standards for a "Covered Provider" (which may or may not be a "carrier") to fulfill its "retrospective monitoring requirement," the Commission did not abandon or supersede the WCB's 2012 **statutory interpretation** that it is a violation of Section 201(b) of the Act for any "carrier" "that knows or should know that calls are not being completed to certain areas," to "engage[ ] in acts (or omissions) that allow or effectively allow these conditions to persist." Id., ¶¶ 24 - 25. Rather, the WCB's 2012 conclusions about the duties of "carriers" constitutes a definitive Commission statement on the duties that all carriers owe under Sections 201(b) and 202(a) without regard to whether they are also a Covered Provider.*

**Answer:** Inteliquent states that the allegations in paragraph 144 state legal conclusions, that legal conclusions are for the Court to make, and therefore denies those allegations. The allegations in paragraph 144 also seek to quote and characterize FCC materials. Inteliquent admits that the quoted language in paragraph 144 appears in those materials, but it denies that the allegations place those materials in proper context or otherwise accurately describe them. Inteliquent respectfully refers the Court to those materials for their content, and it denies all inconsistent allegations. Inteliquent denies the remaining allegations in paragraph 144.

145. *In the 2018 Third Report and Order, the Commission took additional steps to ensure that Covered Providers routed their traffic in a manner that facilitated accountability. The Commission established an intermediate provider registry, that designated the information that must be supplied to the registry, and prohibited Covered Providers from using any unregistered intermediate provider anywhere in the call path. 2018 Third Report and Order, 33 FCC Rcd. 8400, ¶¶ 6-8, 25-41.*

**Answer:** Inteliquent states that the allegations in paragraph 145 state legal conclusions, that legal conclusions are for the Court to make, and therefore denies those allegations. The allegations in paragraph 145 also seek to characterize FCC materials and actions. Inteliquent

denies that the allegations place those materials and actions in proper context or otherwise accurately describe them. Inteliquent respectfully refers the Court to those materials for their content, and it denies all inconsistent allegations. Inteliquent denies the remaining allegations in paragraph 145.

I.      **The Available Facts Reveal That T-Mobile and Inteliquent Are Each Carriers, Intermediate Providers and Likely Covered Providers**

146.    *Inteliquent is a carrier, an Intermediate Provider, and, depending on whether it "makes the initial long-distance call path choice" (i.e., the "static or dynamic selection of the path for a long-distance call based on the called number of the individual call"), is also a Covered Provider.*

**Answer:** Inteliquent admits that it is an intermediate provider in certain circumstances, including for some long-distance T-Mobile calls. Inteliquent denies that it was a Covered Provider for any T-Mobile long-distance call or any alleged call relevant to this Complaint. Further answering, Inteliquent admits that it is an IXC, among other things, but denies that the plaintiffs have properly set forth the legal standards and significance of the functions and roles that Inteliquent plays (as set forth in the pending motion to dismiss that Inteliquent filed). Further answering, Inteliquent states that the allegations in paragraph 146 state legal conclusions, that legal conclusions are for the Court to make, and on that basis denies the allegations. Inteliquent denies the remaining allegations in paragraph 146.

147.    *Inteliquent is a carrier. Inteliquent has repeatedly represented itself as a carrier. See, e.g., Inteliquent, Inc. v. Free Conferencing Corp., et al., 1:16-cv-06976 (N.D. Ill.), Complaint, ¶ 3 (ECF No. 1) ("Inteliquent is a telecommunications carrier based in Chicago with facilities in Chicago. . ."). Specifically with regard to its relationship with T-Mobile, Inteliquent has described its role as that of an IXC. Inteliquent, Inc. v. Free Conferencing Corp., et al., 1:16-cv-06976, Inteliquent, Inc.'s Fed. R. Civ. P. 56.1 Statement of Undisputed Material Facts, ¶ 1 (ECF No. 585) ("For pertinent purposes of this case, Inteliquent is a long-distance carrier, also known as an interexchange carrier or 'IXC' under telecommunications terminology.").*

**Answer:** Inteliquent states that the allegations in paragraph 147 state legal conclusions, that legal conclusions are for the Court to make, and therefore denies those allegations. The

70

allegations in paragraph 147 seek to quote and characterize materials in another litigation. Inteliquent admits that the quoted language in paragraph 147 appears in those materials, but it denies that the allegations place those materials in proper context or otherwise accurately describe them. Inteliquent respectfully refers the Court to those materials for their content, and it denies all inconsistent allegations. Further answering, Inteliquent admits that it is an IXC, among other things, but denies that the plaintiffs have properly set forth the legal standards and significance of the functions and roles that Inteliquent plays (as set forth in the pending motion to dismiss that Inteliquent filed). Inteliquent denies the remaining allegations in paragraph 147.

148.    *As a carrier, Inteliquent is, and all times since 2012 has been, prohibited from engaging in acts or omissions that allow or effectively allow calls not to be completed to certain areas, and from providing degraded service to certain areas, failing to correct problems, or failing to ensure that intermediate providers, least cost routers, or other entities acting for or employed by the carrier are performing adequately, pursuant to the WCB's findings that Sections 201(b) and Sections 202(a) of the Act prohibit such conduct.*

**Answer:**  Inteliquent states that the allegations in paragraph 148 state legal conclusions, that legal conclusions are for the Court to make, and therefore denies those allegations. The allegations in paragraph 148 also seek to characterize FCC materials and actions. Inteliquent denies that the allegations place those materials and actions in proper context or otherwise accurately describes them. Inteliquent respectfully refers the Court to those materials for their content, and it denies all inconsistent allegations. Inteliquent denies the remaining allegations in paragraph 148.

149.    *Inteliquent and its subsidiaries Onvoy and Neutral Tandem are listed on the Intermediate Provider Registry, which is available for download from the FCC's website at: https://fccprod.servicenowservices.com/ipr_ext.    Each entity identifies Richard Monto, Inteliquent's General Counsel, and Randy Frederick as their points of contact. Both individuals have work addresses in Chicago, Illinois. Moreover, it is evident from the 2015 MSA that Inteliquent met the operative definition of Intermediate Provider in effect at that time: "any entity that carries or processes traffic that traverses or will traverse the PSTN at any point insofar as that entity neither originates nor terminates that traffic." 47 C.F.R. § 64.1600(f) (effective Dec. 29, 2011 to January 1, 2018).*

**Answer:** Inteliquent states that the allegations in paragraph 149 state legal conclusions, that legal conclusions are for the Court to make, and therefore denies those allegations. The allegations in paragraph 149 also seek to quote and characterize regulations and an Intermediate Provider Registry. Inteliquent denies that the allegations place those materials in proper context or otherwise accurately describe them. Inteliquent respectfully refers the Court to those materials for their content, and it denies all inconsistent allegations. Inteliquent admits that certain employees have work addresses in Chicago, Illinois, and beginning in 2018 was identified on the registry when that registry was created. Inteliquent denies the remaining allegations in paragraph 149.

150. *Just because Inteliquent was an Intermediate Provider does not preclude it from also being a Covered Provider with regard to some or all of T-Mobile's traffic. Upon information and belief, Inteliquent was a Covered Provider with regard to some or all of T-Mobile's traffic based on the FCC's guidance in paragraph 20 of the 2013 Rural Call Completion Order. See supra ¶ 122. This assertion is based on the following facts:*

   a. *The FCC's rules provide that a "covered provider may be," inter alia, "an interexchange carrier." 47 C.F.R. § 64.2101.*
   b. *Inteliquent lists on its website a rural call completion point of contact as FCC rules require for Covered Providers.See 47 C.F.R. § 64.2113; see also https://www.inteliquent.com/getmedia/9de720c1-e755-4d17-8c7b-6d0f3ae6eef5/Rural-Call-Completion-Point-of-Contact.pdf.aspx (last viewed : Dec. 9, 2020). The rural call completion contact is Randy Frederick. Mr. Frederick's LinkedIn profile indicates that he is Senior Director of Network Services located in the Greater Chicago Area. See hhttps://www.linkedin.com/in/randy-frederick-08164b85/ (last viewed Dec. 9. 2020).*
   c. *In 2016, Inteliquent's 10-K reported that it utilized a "patented proprietary software tool . . . to manage the complicated routing scenarios required to terminate traffic to hundreds of millions of telephone numbers." Given that Inteliquent has "patented proprietary software" to manage routing scenarios, this statement strongly suggests that Inteliquent was the party responsible for selecting routes for the delivery of some or all of T-Mobile's calls. Id. p. 5*
   d. *The 2015 MSA indicates that T-Mobile will deliver all traffic to Inteliquent, with the exception of certain "Excluded PSTN Traffic." 2015 MSA, p. 3.*
   e. *The 2015 MSA imposes obligations on Inteliquent with regard to the routing of calls, except when expressly instructed otherwise by a written communication from T-Mobile. See id., pp. 8-9.*
   f. *The 2015 MSA requires Inteliquent to share with T-Mobile "a copy of any report or form filed, or prepared for filing, with the Federal Communications Commission*

("FCC") to comply with the FCC's rural call completion rules, including, but not limited to, the requirements set forth In the Matter of Rural Call Completion, Report and Order and Further Notice of Proposed Rulemaking, WC Docket No. 13-39 (rel. Nov. 8, 2013)" and thus contemplates that Inteliquent will prepare and file the reports the FCC required Covered Providers to file. Id., pp. 11-12. Thus, the 2015 MSA indicates that Inteliquent would file Rural Call Completion reports for traffic it routed for T-Mobile. Such reports are to be filed by "Covered Providers."

g. The MSA also requires that, if there is any instance in which Inteliquent is not required to file the rural call completion reports with the FCC, Inteliquent has an obligation to "concurrently provide T-Mobile with verification regarding Provider's collection and retention for a period of at least six (6) months of required information (as well as the information itself if T-Mobile so requests). . . ." Id. Six months is the period that the FCC required Covered Providers to retain call detail records. See 2013 Declaratory Ruling, ¶¶ 61-64.

h. As part of the FCC's investigation of call routing and failure problems that led to the Consent Decree and the exposure of the fake ring tone scheme, see infra. ¶¶ 102-124, T-Mobile repeatedly made the following representation or a substantially similar representation to the FCC: "T-Mobile opened a trouble ticket with Inteliquent, which Inteliquent resolved by changing the route used to terminate the call to the rural carrier." This statement shows that in those instances, Inteliquent was the first party to make a "static or dynamic selection of the path for a long-distance call based on the called number of the individual call." 2013 Rural Call Completion Order, ¶ 20.

**Answer:** Inteliquent states that the allegations in paragraph 150 state legal conclusions, that legal conclusions are for the Court to make, and therefore denies those allegations. The allegations in paragraph 150 also seek to quote and characterize numerous materials. Inteliquent admits that the quoted language in paragraph 150 appears in those materials, but it denies that the allegations place those materials in proper context or otherwise accurately describe them. Inteliquent respectfully refers the Court to those materials for their content, and it denies all inconsistent allegations. Inteliquent denies that it was a Covered Provider for any T-Mobile long-distance call or any alleged call relevant to this Complaint. Inteliquent denies the remaining allegations in paragraph 150.

151.    Thus, Inteliquent was a Covered Provider for the T-Mobile traffic for which it made the initial long-distance call path choice (i.e., the "static or dynamic selection of the path for a long-distance call based on the called number of the individual call"). Discovery will be required to ascertain the scope and breadth of those calls. Moreover, if T-Mobile is one of the CMRS providers that Inteliquent referred to when it informed that FCC that many "CMRS providers"

*are "'unable to take back a call that an intermediate provider is unable to complete,'" 2013 Rural Call Completion Order, ¶ 58, it follows that such call attempts would have to be reported in Inteliquent's rural call completion reports. See id.*

**Answer:** Inteliquent states that the allegations in paragraph 151 state legal conclusions, that legal conclusions are for the Court to make, and therefore denies those allegations. The allegations in paragraph 151 also seek to quote and characterize FCC materials. Inteliquent admits that the quoted language in paragraph 151 appears in those materials, but it denies that the allegations place those materials in proper context or otherwise accurately describe them. Inteliquent respectfully refers the Court to those materials for their content, and it denies all inconsistent allegations. Inteliquent denies the remaining allegations in paragraph 151.

152.    *T-Mobile is also a carrier, a Covered Provider, and an Intermediate Provider.*

**Answer:** Inteliquent states that the allegations in paragraph 152 state legal conclusions, that legal conclusions are for the Court to make, and therefore denies those allegations. Inteliquent lacks sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 152 and on that basis denies them.

153.    *In the Consent Decree, the Commission indicated that "T-Mobile is a wireless telecommunications carrier and a 'covered provider' under the Commission's rural call completion rules." Consent Decree, ¶ 6.*

**Answer:** The allegations in paragraph 153 seek to quote a consent decree. Inteliquent admits that the quoted language in paragraph 153 appears in that consent decree, but it denies that the allegations place those materials in proper context or otherwise accurately describe them. Inteliquent respectfully refers the Court to its that consent decree, and it denies all inconsistent allegations. Inteliquent lacks sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 153 and on that basis denies them.

154.    *As a carrier, T-Mobile has at all times since 2012 been bound by the WCB's conclusion that Sections 201(b) and Sections 202(a) of the Act prohibit carriers from engaging in acts or omissions that allow or effectively allow calls not to be completed to certain areas, and*

*prohibits providing degraded service to certain areas, failing to correct problems, or failing to ensure that intermediate providers, least cost routers, or other entities acting for or employed by the carrier are performing adequately.*

**Answer:** Inteliquent states that the allegations in paragraph 154 state legal conclusions, that legal conclusions are for the Court to make, and therefore denies those allegations. The allegations in paragraph 154 also seek to characterize certain statutes. Inteliquent denies that the allegations place those statutes in proper context or otherwise accurately describe them. Inteliquent respectfully refers the Court to those statutes for their content, and it denies all inconsistent allegations. Inteliquent lacks sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 154 and on that basis denies them.

155. *In addition, T-Mobile is a Covered Provider. As noted, the Consent Decree specifically describes T-Mobile as a "covered provider." Moreover, as discussed more fully below, T-Mobile submitted Form 480 reports, which are the rural call completion reports required of Covered Providers. See infra ¶ 297 (discussing the FCC's investigation of T-Mobile's submitting false information on several Form 480s and T-Mobile's subsequent admission that all of its Form 480s had contained inaccurate information). Thus, following the June 11, 2018 effective date of the 2018 Second Report and Order, T-Mobile has been obligated by Commission rules as a Covered Provider to engage in both prospective and retrospective monitoring. See 47 C.F.R. § 64.2111.*

**Answer:** Inteliquent states that the allegations in paragraph 155 state legal conclusions, that legal conclusions are for the Court to make, and therefore denies those allegations. The allegations in paragraph 155 also seek to characterize and quote a consent decree and regulations. Inteliquent denies that the allegations place those regulations and consent decree in proper context or otherwise accurately describe them. Inteliquent respectfully refers the Court to those materials for their content, and it denies all inconsistent allegations. Inteliquent lacks sufficient knowledge or information to form a belief as to the truth of the allegations about T-Mobile's Form 480 reports and on that basis denies them. Inteliquent lacks sufficient information or knowledge to form a belief as to the truth of the remaining allegations in paragraph 155 and on that basis denies them.

156.   *Discovery will be required to ascertain whether T-Mobile's Form 480s, as subsequently revised, included all of the traffic originated by T-Mobile and its subsidiaries (i.e., MetroPCS) or whether it incorporated only a portion of T-Mobile's originated traffic. Because the FCC has indicated that "a covered provider that also serves as an intermediate provider for other providers may—but need not—segregate its originated traffic from its intermediary traffic in its recording and reporting," it is not possible without discovery to determine whether traffic originated on T-Mobile's network (and that of its subsidiaries) are reported exclusively in T-Mobile's Form 480s, any Form 480s prepared by Inteliquent, or both.*

**Answer**:   Inteliquent denies that it prepared any Form 480s for any T-Mobile traffic. Further answering, paragraph 156 seeks to characterize FCC materials. Inteliquent denies that the allegations place those materials in the proper context or accurately describes them.  Inteliquent respectfully refers to the court to the materials for their content and denies all inconsistent allegations.  Inteliquent lacks sufficient information or knowledge as to form a belief as to the truth of the remaining allegations and on that basis denies them.

157.   *T-Mobile is also listed on the Intermediate Provider Registry, which is available for download from the FCC's website at: https://fccprod.servicenowservices.com/ipr_ext. While T-Mobile could not have acted in the capacity as an Intermediate Provider for traffic it originated directly, see 47 C.F.R. § 64.1600(f) (effective Dec. 29, 2011 to Jan. 1, 2018), discovery will be required to ascertain to what extent T-Mobile's role as an Intermediate Provider is relevant to any traffic at issue in this case. That discovery will include examination of whether T-Mobile operated in the capacity as an Intermediate Provider during the time period relevant to this dispute, and, if so, for which entities. For example, based on the applicable definitions, it is possible that T-Mobile determined that it was classified as an Intermediate Provider for traffic originating on the network of its subsidiaries.*

**Answer:**   These allegations seek to characterize FCC regulations.  Inteliquent denies that the allegations place those regulations in the proper context or accurately describes them.  Inteliquent respectfully refers to the court to the regulations for their content and denies all inconsistent allegations.  Inteliquent lacks sufficient information or knowledge as to the remaining allegations in paragraph 157 and on that basis denies them.

### *J*     *T-Mobile Was Incentivized To Reduce Intercarrier Compensation Payments At The Expense Of Rural Carriers And Consumers Nationwide*

158.   *The conclusion reached by the FCC in the 2013 Rural Call Completion Order that some carriers are willing to engage in "blocking or degrading traffic" to rural America "in an*

*effort to minimize their intercarrier compensation payments" comes as little surprise. Ex. 9, 2013 Rural Call Completion Order at 16163, ¶ 17.*

**Answer:** The allegations in paragraph 158 seek to quote and characterize FCC materials. Inteliquent admits that the quoted language in paragraph 158 appears in those materials, but it denies that the allegations place those materials in proper context or otherwise accurately describe them. Inteliquent respectfully refers the Court to those materials for their content, and it denies all inconsistent allegations. Inteliquent denies the remaining allegations in paragraph 158.

159. *Defendant T-Mobile, like many of its competitors, adopted an "unlimited" long-distance plan model. See, e.g., T-Mobile Cell Phone Plans, https://www.t-mobile.com/cell-phone-plans (last visited Dec. 9 2020). It advertises those plans as "A whole lot more than just talk-at no extra cost." See, e.g., T-Mobile Home Page, https://www.t-mobile.com/ (last visited Dec. 9, 2020).*

**Answer:** Inteliquent lacks sufficient knowledge or information to form a belief as to the truth of these allegations in paragraph 159 and on that basis denies them.

160. *While T-Mobile's service is widely available, T-Mobile has focused significant attention on marketing its services to lower-income and elderly people. See, e.g., Chairman Frank Pallone, Jr., Memorandum to Committee on Energy & Commerce, to Subcommittee on Communications and Technology Members and Staff (Feb. 8, 2019) at 3, https ://energycommerce. house. gov/sites/democrats.energycommerce.house.gov/files/documents/ CAT%20Briefing%20Memo%20for%20Hearing%20on%20Merger%20or/020T-Mobile%20and%20Sprint_2019.02.13_UPDATE_O.pdf (last visited Dec. 9, 2020); T-Mobile Senior Discount Unlimited Plans, https://www.t-mobile.com/cell-phone-plans/unlimited-55-senior- discount-plans (last visited Dec. 9, 2020) ("T-Mobile and Sprint are competitors in the prepaid market, mostly populated by low-income consumers and those with poor credit, and each company has a significant share of the market."); Douglas A. McIntrye, T-Mobile Offers Plan for Old People, YAHOO! FINANCE (Aug. 8, 2017), https://finance.yahoo.com/news/t-mobile-offers-plan-old-102048853.html (last visited Dec. 9, 2020).*

**Answer:** Inteliquent lacks sufficient knowledge or information to form a belief as to the truth of these allegations in paragraph 160 and on that basis denies them.

161. *For example, T-Mobile purchased MetroPCS, a brand that focuses heavily on the prepaid market segment in 2013. See, e.g., City of New York, City Sues T-Mobile for Violating Consumer Protection Law (Sept. 5, 2019), https ://www1.nyc.gov/office-of-the-mayor/news/415-19/city-sues-t-mobile-violating-consumer-protection-law (last visited Dec. 9, 2020). T-Mobile also receives federal funds under the Lifeline program to subsidize service to low income individuals. See, e.g., Joan Engebretson, T-Mobile, Cleartalk Get Go-Ahead on Low-Income*

*Services, TELECOMPETITOR (Aug. 20, 2012), https://www.telecompetitor.com/t-mobile-cleartalk-get-go-ahead-on-low-income-services/ (last visited Dec. 9, 2020).*

**Answer:** Inteliquent lacks sufficient knowledge or information to form a belief as to the truth of these allegations in paragraph 161 and on that basis denies them.

162.    *Unlimited calling plans are clearly attractive to consumers, but these fixed cost plans fail to reflect the realities of T-Mobile's cost structure. That is, while T-Mobile receives a fixed fee from its consumers, access charges reflect a variable cost that is paid to terminate the calls.*

**Answer:** Inteliquent lacks sufficient knowledge or information to form a belief as to the truth of these allegations in paragraph 162 and on that basis denies them.

163.    *As a result, one of the most effective means for T-Mobile to increase profit margins is to decrease the variable costs it pays by blocking or degrading its customers' high cost calls.*

**Answer:** Inteliquent lacks sufficient knowledge or information to form a belief as to the truth of these allegations in paragraph 163 and on that basis denies them.

164.    *This strategy is particularly effective for calls to rural areas where consumers are likely to assume that any problems with call quality or call completion are the fault of the much smaller and generally locally owned rural telephone company, rather than a corporate behemoth like T-Mobile.*

**Answer:** Inteliquent lacks sufficient knowledge or information to form a belief as to the truth of these allegations in paragraph 164 and on that basis denies them.

165.    *The practice of blocking and degrading calls to rural areas is particularly pernicious because of the ripple effects that are experienced by others in the industry. First, when a consumer regularly experiences difficulty in reaching family, friends, or businesses in rural areas, over time they become trained to not make those calls using that service. So, for example, when a T-Mobile consumer cannot reach their elderly parents in rural Indiana on her T-Mobile phone, she may be conditioned to start making those calls using a landline or other alternative service provider. This saves T-Mobile the expense of the access charges associated with the calls, even though T-Mobile continues to collect its full monthly subscription fee from its customers.*

**Answer:** Inteliquent lacks sufficient knowledge or information to form a belief as to the truth of these allegations in paragraph 165 and on that basis denies them.

166.    *Second, it often causes consumers to place blame for the failure on the rural telephone company, rather than the carrier that originated the call. Here again, when T-Mobile*

*does not deliver its calls to rural areas, most consumers assume that the problem lies with the rural carrier, not with the nationally-known and well-funded carrier.*

**Answer:** Inteliquent lacks sufficient knowledge or information to form a belief as to the truth of these allegations in paragraph 166 and on that basis denies them.

167.     *Third, and finally, by failing to abide by the same rules that other mobile carriers are required to follow, T-Mobile is able to unfairly compete by offering lower fees for its monthly subscriptions. Thus, by illegally reducing its costs, T-Mobile covertly manipulated a unique competitive advantage, allowing itself to compete unfairly in the marketplace. And, while T-Mobile has repeatedly touted its "unlimited" long distance plan and assured consumers that it has a comparable, if not superior, product offering to its competitors, the reality is that T-Mobile has offered consumers an inferior product and acted unlawfully to cheat its way to a competitive advantage.*

**Answer:** Inteliquent lacks sufficient knowledge or information to form a belief as to the truth of these allegations in paragraph 167 and on that basis denies them.

### K.     *T-Mobile Admits To Engaging In An Illegal Fake Ring Tone Scheme That Impacted Hundreds Of Millions Of Calls Annually And Pays A $40,000,000 Fine To The U.S. Treasury*

168.     *On April 16, 2018, the FCC's EB announced that it had entered into the Consent Decree with T-Mobile in which T-Mobile admitted to violating the Commission's rural call completion rules by insert [sic] false ring tones into hundreds of millions of calls annually and for failing to supervise its Intermediate Providers delivering calls to rural areas. See Ex. 1, Consent Decree.*

**Answer:** The allegations in paragraph 168 seek to characterize the April 2018 consent decree (with which Inteliquent had no involvement and was not a party). Inteliquent denies that the allegation places the consent decree in proper context or accurately describes it. Inteliquent respectfully refers this Court to the consent decree for its terms and content, and denies all inconsistent allegations. Inteliquent denies any remaining allegations in paragraph 168.

169.     *T-Mobile voluntarily agreed to pay a $40 million civil penalty to the United States Treasury. See id. ¶ 24.*

**Answer:** The allegations in paragraph 169 seek to characterize the April 2018 consent decree (with which Inteliquent had no involvement and was not a party). Inteliquent denies that

79

the allegation places the consent decree in proper context or accurately describes it. Inteliquent respectfully refers this Court to the consent decree for its terms and content, and denies all inconsistent allegations. Inteliquent lacks sufficient knowledge or information to form a belief as to the allegations and on that basis denies them.

170.    *Beginning in June and continuing through the summer of 2016, the FCC received complaints from three rural incumbent LECs in Wisconsin. Id. ¶ 7. These complaints, which were filed in the Commission's rural call completion e-mail box, alleged over 40 incidents in which T-Mobile customers were unable to complete calls to consumers served by these three rural providers. Id. Many of the complaints reported that the calling party heard ring tones on call attempts that failed to reach the rural customers. Id.*

**Answer:**  The allegations in paragraph 170 seek to characterize the April 2018 consent decree (with which Inteliquent had no involvement and was not a party) and complaints filed with the FCC. Inteliquent denies that the allegation places the consent decree or complaints in proper context or accurately describes them. Inteliquent respectfully refers this Court to the consent decree and complaints for their content, and denies all inconsistent allegations. As for any facts described in the consent decree or complaints, Inteliquent lacks sufficient information or knowledge to form a belief as to the truth of those facts and on that basis denies them. Inteliquent lacks sufficient information or knowledge to form a belief as to the truth of any remaining allegations in paragraph 170 and on that basis denies them.

171.    *"The [EB] served these complaints on T-Mobile and requested that [T-Mobile] contact the complainants, investigate and resolve the problems, and submit reports of its investigations to the [EB]." Id.*

**Answer:**  The allegations in paragraph 171 seek to quote the April 2018 consent decree (with which Inteliquent had no involvement and was not a party). Inteliquent admits that the quoted language in paragraph 171 appears in the consent decree, but it denies that the allegations place the consent decree in proper context or otherwise accurately describe it. Inteliquent respectfully refers this Court to the consent decree for its content, and denies all inconsistent

allegations. Inteliquent lacks sufficient information or knowledge to form a belief as to the truth of any remaining allegations and on that basis denies them.

172. *"In two instances, the [EB] pointed out to T-Mobile that the Commission's rules prohibit sending ring tones to the calling party before the called party is alerted to an incoming call." Id.*

**Answer:** The allegations in paragraph 172 seek to quote the April 2018 consent decree (with which Inteliquent had no involvement and was not a party). Inteliquent admits that the quoted language in paragraph 172 appears in the consent decree, but it denies that the allegations place the consent decree in proper context or otherwise accurately describe it. Inteliquent respectfully refers this Court to the consent decree for its content, and denies all inconsistent allegations. Inteliquent lacks sufficient information or knowledge to form a belief as to the truth of any remaining allegations and on that basis denies them.

173. *"T-Mobile subsequently filed with the Bureau reports of its investigations of the complaints. In each instance, T-Mobile reported that it had handed the call off to an Intermediate Provider for delivery, and that any reported problems had been `resolved.' T-Mobile stated that it believed that the actions taken by Intermediate Providers in response to each complaint had remedied all problems." Id. ¶ 8.*

**Answer:** The allegations in paragraph 173 seek to quote the April 2018 consent decree (with which Inteliquent had no involvement and was not a party). Inteliquent admits that the quoted language in paragraph 173 appears in the consent decree, but it denies that the allegations place the consent decree in proper context or otherwise accurately describe it. Inteliquent respectfully refers this Court to the consent decree for its content, and denies all inconsistent allegations. Inteliquent lacks sufficient information or knowledge to form a belief as to the truth of any remaining allegations.

174. *In its original responses to the EB, T-Mobile did not specifically address the ring tone issue raised in some of the complaints. See id.*

**Answer:** Inteliquent lacks sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 174 and on that basis denies them.

175. *In addition to the rural carrier complaints filed in the Commission's rural call completion e-mail box, in August 2016, three T-Mobile customers filed informal complaints against [T-Mobile] with the Commission's Consumer and Governmental Affairs Bureau ("CGB"). Id. ¶ 9. CGB served these informal complaints on T-Mobile pursuant to Section 208 of the Act and Section 1.717 of the Commission's Rules. See id. All three complaints described ongoing problems reaching landline phones in a particular exchange. See id. Records subsequently obtained by the EB from T-Mobile show that these consumers called T-Mobile at least 13 times between June 5 and August 18. See id.*

**Answer:** The allegations in paragraph 175 seek to characterize the April 2018 consent decree (with which Inteliquent had no involvement and was not a party) and complaints filed with the FCC. Inteliquent denies that the allegation places the consent decree or complaints in proper context or accurately describes them. Inteliquent respectfully refers this Court to the consent decree and complaints for their content, and denies all inconsistent allegations. Inteliquent lacks sufficient information or knowledge to form a belief as to the truth of any remaining allegations and on that basis denies them.

176. *On December 27, 2016, the Bureau issued a Letter of Inquiry ("LOI") to T-Mobile. Id. ¶ 10. The purpose of the LOI was to investigate whether T-Mobile violated the Commission's Rules governing rural call completion, including whether [T-Mobile] may have provided degraded telephone service on calls placed to rural areas and conveyed false ring tones to its customers. See id.*

**Answer:** The allegations in paragraph 176 seek to characterize the April 2018 consent decree (with which Inteliquent had no involvement and was not a party) and a letter of inquiry. Inteliquent denies that the allegation places the consent decree or letter of inquiry in proper context or accurately describes them. Inteliquent respectfully refers this Court to the consent decree and letter of inquiry for their content, and denies all inconsistent allegations. Inteliquent lacks sufficient information or knowledge to form a belief as to the truth of any remaining allegations in paragraph 176 and on that basis denies them.

177. *"The Bureau issued a Supplemental LOI on April 3, 2017, to clarify responses provided by [T-Mobile]." Id.*

**Answer:** The allegations in paragraph 177 seek to quote the April 2018 consent decree (with which Inteliquent had no involvement and was not a party). Inteliquent admits that the quoted language in paragraph 177 appears in the consent decree, but it denies that the allegations place the consent decree in proper context or otherwise accurately describes it. Inteliquent respectfully refers this Court to the consent decree for its content, and denies all inconsistent allegations. Inteliquent lacks sufficient information or knowledge to form a belief as to the truth of any remaining allegations and on that basis denies them.

178. *"With respect to the fake ring tones, T-Mobile reported that in 2007 it began using servers that included a `Local Ring Back Tone' ("LRBT") for calls from certain customers that took more than a certain amount of time to complete." Id. ¶ 11.*

**Answer:** The allegations in paragraph 178 seek to quote the April 2018 consent decree (with which Inteliquent had no involvement and was not a party). Inteliquent admits that the quoted language in paragraph 178 appears in the consent decree, but it denies that the allegations place the consent decree in proper context or otherwise accurately describes it. Inteliquent respectfully refers this Court to the consent decree for its content, and denies all inconsistent allegations. Inteliquent lacks sufficient information or knowledge to form a belief as to the truth of any remaining allegations and on that basis denies them.

179. *"[T-Mobile] further reported that in 2013, as it migrated to different servers, it began using the LRBT only for out-of-network calls from its customers that were routed via Session Initiation Protocol ("SIP") trunks and that took more than a certain amount of time to complete." Id. The use of SIP trunks is synonymous with traffic being routed using IP protocol.*

**Answer:** The allegations in paragraph 179 seek to quote the April 2018 consent decree (with which Inteliquent had no involvement and was not a party). Inteliquent admits that the quoted language in paragraph 179 appears in the consent decree, but it denies that the allegations place the consent decree in proper context or otherwise accurately describes it. Inteliquent

respectfully refers this Court to the consent decree for its content, and denies all inconsistent allegations. Inteliquent lacks sufficient information or knowledge to form a belief as to the truth of any remaining allegations and on that basis denies them.

180.   *T-Mobile admitted that it continued its practice of using fake ring tones on such calls after the FCC's rules expressly prohibiting the practice went into effect in January 2014. See id.*

**Answer:**  The allegations in paragraph 180 seek to characterize the April 2018 consent decree (with which Inteliquent had no involvement and was not a party). Inteliquent denies that the allegations place the consent decree in proper context or otherwise accurately describe it. Inteliquent respectfully refers this Court to the consent decree for its content, and denies all inconsistent allegations. Inteliquent lacks sufficient information or knowledge to form a belief as to the truth of any remaining allegations and on that basis denies them.

181.   *T-Mobile admitted that it expanded the use of fake ring tones to calls on additional SIP routes sometime after the practice became unequivocally illegal in January 2014. See id.*

**Answer:**  The allegations in paragraph 181 seek to characterize the April 2018 consent decree (with which Inteliquent had no involvement and was not a party). Inteliquent denies that the allegations place the consent decree in proper context or otherwise accurately describe it. Inteliquent respectfully refers this Court to the consent decree for its content, and denies all inconsistent allegations. Inteliquent lacks sufficient information or knowledge to form a belief as to the truth of any remaining allegations and on that basis denies them.

182.   *T-Mobile admitted that it used fake ring tones on a nationwide basis. Id.*

**Answer:**  The allegations in paragraph 182 seek to characterize the April 2018 consent decree (with which Inteliquent had no involvement and was not a party). Inteliquent denies that the allegations place the consent decree in proper context or otherwise accurately describe it. Inteliquent respectfully refers this Court to the consent decree for its content, and denies all

inconsistent allegations. Inteliquent lacks sufficient information or knowledge to form a belief as to the truth of any remaining allegations and on that basis denies them.

183. *"Because T-Mobile applied this practice to out-of-network calls from its customers on SIP routes that took more than a certain amount of time on a nationwide basis and without regard to time of day, T-Mobile admitted that the LRBT was likely injected into hundreds of millions of calls each year." Id.*

**Answer:** The allegations in paragraph 183 seek to quote the April 2018 consent decree (with which Inteliquent had no involvement and was not a party). Inteliquent admits that the quoted language in paragraph 183 appears in the consent decree, but it denies that the allegations place the consent decree in proper context or otherwise accurately describes it. Inteliquent respectfully refers this Court to the consent decree for its content, and denies all inconsistent allegations. Inteliquent lacks sufficient information or knowledge to form a belief as to the truth of any remaining allegations and on that basis denies them.

184. *It was not until the release of the FCC's Consent Decree that any of the Plaintiffs learned that T-Mobile was responsible (directly or indirectly) for inserting fake ring tones on calls originated by T-Mobile subscribers.*

**Answer:** Inteliquent denies the allegations in paragraph 184.

185. *In response to an LOI inquiry requesting details of any complaints received in 2016 regarding problems with T-Mobile customer calls completing to rural areas that the Company had received from sources independent of the Commission, T-Mobile submitted a list of complaints that had been made directly to it by its customers and rural carriers related to problems with calls placed on behalf of its customers completing to rural areas, some which involved concerns addressed by the Rural Call Completion Rules. Id. ¶ 12. T-Mobile later supplemented this list. Id.*

**Answer:** The allegations in paragraph 185 seek to characterize the April 2018 consent decree (with which Inteliquent had no involvement and was not a party). Inteliquent denies that the allegations place the consent decree in proper context or otherwise accurately describe it. Inteliquent respectfully refers this Court to the consent decree for its content, and denies all inconsistent allegations. Inteliquent lacks sufficient information or knowledge to form a belief as to the truth of any remaining allegations and on that basis denies them.

186.     *The list of complaints T-Mobile provided to the EB revealed, among other things, that during the time period from June 9 to October 5, 2016, T-Mobile had received 71 complaints about problems with calls completing to just one of the three Wisconsin LECs that had filed complaints with the Commission. See id. at n. 27.*

**Answer:**  The allegations in paragraph 186 seek to characterize the April 2018 consent decree (with which Inteliquent had no involvement and was not a party).  Inteliquent denies that the allegations place the consent decree in proper context or otherwise accurately describe it. Inteliquent respectfully refers this Court to the consent decree for its content, and denies all inconsistent allegations.  Inteliquent lacks sufficient information or knowledge to form a belief as to the truth of any remaining allegations and on that basis denies them.

187.     *The EB sorted these complaints by the individual rural ILEC's OCNs that are published in the annual NECA list. In evaluating the complaint data, the EB found patterns of complaints alleging the failure of T-Mobile to complete calls to numbers within at least seven rural OCNs, in addition to the three Wisconsin OCNs that had been the subject of the complaints filed with the Commission by rural carriers and consumers during the summer of 2016. Id.*

**Answer:**  The allegations in paragraph 187 seek to characterize the April 2018 consent decree (with which Inteliquent had no involvement and was not a party).  Inteliquent denies that the allegations place the consent decree in proper context or otherwise accurately describe it. Inteliquent respectfully refers this Court to the consent decree for its content, and denies all inconsistent allegations.  Inteliquent lacks sufficient information or knowledge to form a belief as to the truth of any remaining allegations and on that basis denies them.

188.     *The seven rural OCNs identified by the EB have not been identified publicly.*

**Answer:**  Inteliquent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 188.

189.     *T-Mobile admitted that it violated the prohibition against the insertion of fake ring tones codified at 47 C.F.R. § 64.2201. Id. ¶ 17.*

**Answer:**  The allegations in paragraph 189 seek to characterize the April 2018 consent decree (with which Inteliquent had no involvement and was not a party).  Inteliquent denies that

the allegations place the consent decree in proper context or otherwise accurately describe it. Inteliquent respectfully refers this Court to the consent decree for its content, and denies all inconsistent allegations. Inteliquent lacks sufficient information or knowledge to form a belief as to the truth of any remaining allegations and on that basis denies them.

190. *T-Mobile also admitted that it "did not correct problems with its Intermediate Providers' delivery of calls to consumers in certain rural OCNs," which the 2012 Declaratory Ruling declared an unjust and unreasonable practice. Id.*

**Answer:** The allegations in paragraph 190 seek to quote and characterize the April 2018 consent decree (with which Inteliquent had no involvement and was not a party). Inteliquent admits that the quoted language in paragraph 190 appears in the consent decree, but it denies that the allegations place the consent decree in proper context or otherwise accurately describe it. Inteliquent respectfully refers this Court to the consent decree for its content, and denies all inconsistent allegations. Inteliquent lacks sufficient information or knowledge to form a belief as to the truth of any remaining allegations and on that basis denies them.

### L. *Inserting Fake Ring Tones On Hundreds Of Millions Of T-Mobile's Customers' Calls Per Year Required Sophisticated Technological Support And A Centralized Policy Server*

191. *Upon information and belief, and as described in more detail below, the failure to deliver calls to rural areas and the effort to mask these failures by the expanded use of fake ring tones was a scheme developed and implemented with knowledge and participation of Defendants T-Mobile, Inteliquent and other Doe Defendants in order to mask the excessive use of LCR and for the intent and purpose of reducing liability for access charges for terminating calls to high cost codes and improving profit margins.*

**Answer:** Inteliquent denies the allegations in paragraph 191.

192. *The facts set forth in the Consent Decree regarding the insertion of fake ring tones can be correlated to publicly available information regarding T-Mobile's relationship with Inteliquent.*

**Answer:** Inteliquent denies the allegations in paragraph 192.

193. *First, according to the Consent Decree, T-Mobile reported that it began inserting ring tones "for calls from certain customers that took more than a certain amount of time to*

*complete" in 2007. Id. ¶ 11. According to a revised Form S-1 filed by Inteliquent's predecessor Neutral Tandem, Inc. ("Neutral Tandem") with the Securities and Exchange Commission on March 27, 2008, in preparation for becoming a publicly-traded company, T-Mobile was one of 78 major competitive carriers and non-carriers connected to Neutral Tandem's network as of December 31, 2007. T-Mobile represented 14% of Neutral Tandem's total revenue for 2007. Neutral Tandem's Amendment No. 2 to Form S-1 at 50 (Mar. 27, 2008) (attached hereto as Exhibit 10).*

**Answer:** The first sentence in paragraph 193 seeks to characterize the April 2018 consent decree (with which Inteliquent had no involvement and was not a party). Inteliquent denies that the allegations place the consent decree in proper context or otherwise accurately describe it. Inteliquent respectfully refers this Court to the consent decree for its content, and denies all inconsistent allegations. The remainder of the paragraph seeks to characterize a SEC filing. Inteliquent respectfully refers this Court to the SEC filing for its content, and denies all inconsistent allegations. Inteliquent admits that the SEC filing states that T-Mobile was one of 78 carriers and non-carriers connected to Neutral Tandem's network as of December 31, 2007. Inteliquent denies any remaining allegations.

194.    *Based on total reported traffic volumes, Plaintiffs estimate that Neutral Tandem carried approximately 6.88 billion minutes of traffic for T-Mobile in 2007.*

**Answer:** Inteliquent admits that Neutral Tandem carried approximately 6.88 billion minutes of traffic for T-Mobile in 2007, but denies that this traffic has any relevance to this complaint.

195.    *According to the Master Services Agreement between T-Mobile and Neutral Tandem ("NT MSA"), which was also filed with the SEC by Neutral Tandem, Neutral Tandem agreed to "provide transit and access services to [T-Mobile] under this Agreement." NT MSA, "Services" (attached hereto as Exhibit 11.)*

**Answer:** The allegations in paragraph 195 seek to quote and characterize the terms of a contract. While Inteliquent admits that the quoted language appears in the contract, it denies that the allegation places the contract in proper context or accurately describes it. Inteliquent

respectfully refers this Court to the contract for its terms and content, and denies all inconsistent

allegations.  Inteliquent denies any remaining allegations in paragraph 195.

196.    *Transit Service is defined, in pertinent part, as "a local or intraLATA call." NT MSA, Service Order Exhibit 1 — Chicago Market. LATA is an acronym for Local access and transport area, a term used in U.S. telecommunications regulation that previously reflected an area in which a divested Regional Bell Operating Company offered local phone service. Typically, calls that originate and terminate in the same LATA (intraLATA) are included in a customer's local calling area. Thus, Transit Service relates to the delivery of what is commonly understood as a "local" call.*

**Answer:**  The allegations in paragraph 196 seek to characterize the terms of a contract and

the terms under which a divested Regional Bell Operating Company offers services in a local

calling area.  Inteliquent denies that the allegations place the contract in proper context or

accurately describes it.  Inteliquent respectfully refers this Court to the contract for its terms and

content, and denies all inconsistent allegations.  Further answering, Inteliquent admits that "intra

LATA" calls can mean calls that originate and terminating within the same LATAcan sometimes

refer to long-distance calls.  Inteliquent also admits that LATA is an acronym for local access and

transport area.  Inteliquent denies any remaining allegations in 196 paragraph.

197.    *Access Service is defined in pertinent part as "any interLATA call." NT MSA, Service Order Exhibit 1 — Chicago Market. Calls that originate and terminate in different LATAs (interLATA) have historically been treated as long-distance calls for which consumers paid separate long-distance fees. Thus, Access Service relates to the delivery of what is commonly understood as "long-distance traffic."*

**Answer:**  The allegations in paragraph 197 seek to characterize the terms of a contract.

Inteliquent denies that the allegation places the contract in proper context or accurately describes

it.  Inteliquent respectfully refers this Court to the contract for its terms and content, and denies all

inconsistent allegations.  Inteliquent denies any remaining allegations in paragraph 197.

198.    *The NT MSA states that "[T-Mobile] agrees that it will. . . (f) accept terminating traffic properly bound for [T-Mobile] (e.g. LNP dip accomplished) from [Neutral Tandem] within 30 days of notice from [Neutral Tandem] that the connection with [Neutral Tandem] is operational; . . . [and] (h) send to [Neutral Tandem] only Authorized Transit and Access Services ("Services"), as defined in [Neutral Tandem Tariffs] and shall not terminate non-Authorized traffic*

*to [Neutral Tandem], including but not limited to: 911, 411, 976, 311, 611, 500, 950, 700, Directory Assistance, 0+ local. . . ." NT MSA, Customer Obligations. Thus, the NT MSA contemplates that: (1) Neutral Tandem will deliver calls to T-Mobile that were originated by other carriers and intended for T-Mobile's customers; and (2) that Neutral Tandem will pick up calls from T-Mobile that are originated by T-Mobile's subscribers and intended for another carrier. Pursuant to clause (h) of this paragraph, the calls that Neutral Tandem would pick up from T-Mobile were either "Transit" or "Access Services" traffic. Thus, Neutral Tandem contracted to pick up from T-Mobile both local and long-distance calls for delivery to other carriers.*

**Answer:** The allegations in paragraph 198 seek to characterize the terms of a contract. Inteliquent denies that the allegation places the contract in proper context or accurately describes it. Inteliquent respectfully refers this Court to the contract for its terms and content, and denies all inconsistent allegations. Inteliquent denies any remaining allegations in paragraph 198.

199. *The Service Order Exhibits to the NT MSA, which are arranged based on various geographic markets, reveal that the only geographic market in which "Access Service" (i.e., long-distance traffic) would be picked up by Neutral Tandem under the NT MSA was the Chicago, Illinois market. In other geographic markets, only "transit services" (i.e., local calls) were to be exchanged. Thus, the NT MSA established Chicago, Illinois as the sole place in which Neutral Tandem could pick up long-distance traffic originated by T-Mobile subscribers for delivery to carriers nationwide.*

**Answer:** The allegations in paragraph 199 seek to characterize the terms of a contract. Inteliquent denies that the allegation places the contract in proper context or accurately describes it. Inteliquent respectfully refers this Court to the contract for its terms and content, and denies all inconsistent allegations. Inteliquent denies any remaining allegations in paragraph 199.

200. *Second, according to the Consent Decree, T-Mobile reported that, "in 2013, as it migrated to different servers, it began using the LRBT only for out-of-network calls from its customers that were routed via SIP trunks and that took more than a certain amount of time to complete." Ex. 1, Consent Decree, ¶ 11.*

**Answer:** Inteliquent states that the allegations in paragraph 200 seek to characterize and quote the April 2018 consent decree (with which Inteliquent had no involvement and was not a party). Inteliquent denies that the allegation places that consent decree in proper context or otherwise accurately describes it. Inteliquent respectfully refers this Court to the consent decree

for its content, and denies all inconsistent allegations. Inteliquent lacks knowledge or information sufficient to form a belief as to the truth of the allegations and on that basis denies them.

201.    *By this point in time, Inteliquent's annual 10-K reported that it "provide [d] voice telecommunications services primarily on a wholesale basis . . . using an all-IP network." Inteliquent, Inc.'s Form 10-K ("2013 Form 10-K") at 3 (Dec. 31, 2013), https://www. sec . gov/Archives/edgar/data/1292653/0001193 12514093913/d667806d10k.htm (last visited Dec. 19 2020) (attached hereto as Exhibit 12). Inteliquent described how its "managed service offering includes technologically advanced IP switching platforms manufactured by Sonus Networks, Inc. linked together by an IP backbone." Id. at 5. Inteliquent also stated that it utilized "a patented proprietary software tool. . . to manage the complicated routing scenarios required to terminate traffic to hundreds of millions of telephone numbers and support our network. The software allows us to quickly identify new routing opportunities between carriers and to help optimize our customers' interconnection costs . . . ." Id. at 6.*

**Answer:** The allegations in paragraph 201 seek to quote and characterize an Inteliquent 10-K. Inteliquent admits that the quoted language in paragraph 201 appears in that 10-K, but it denies that the allegations place the 10-K in proper context or otherwise accurately describe it. Inteliquent respectfully refers this Court to the 10-K for its content, and denies all inconsistent allegations. Inteliquent denies any remaining allegations in paragraph 201.

202.    *During this same time period, Inteliquent publicly advocated for use of fake ring tones as part of the FCC's RCC rulemaking process. Specifically, in a filing made by Inteliquent with the FCC on October 18, 2013, summarizing ex parte conversations Inteliquent had with FCC staff in September 2013, Inteliquent stated in relevant part as follows:*

> *With respect to rules addressing "false ringing," we noted that, when the called party is a wireless customer roaming on another provider's network, completing the call may take longer than calls terminating to wireline customers. While the wireless carrier is processing the call and locating the called party, presenting the caller with ringing provides comfort that the call has been dialed correctly and is being processed.*

*Ex. 7, Letter from Inteliquent to Marlene H. Dortch at 2.  As noted previously, the FCC later rejected Inteliquent's argument.  See supra ¶¶ 117-18.*

**Answer:** The allegations in paragraph 202 seek to quote and characterize a letter Inteliquent submitted to the FCC. Inteliquent admits that the quoted language in 202 paragraph appears in those letters, but it denies that the allegations place that letter in proper context or

otherwise accurately describe them. Inteliquent respectfully refers the Court to the letter for its content and context, and denies any inconsistent allegations. Inteliquent admits that it exercised its First Amendment right to petition the FCC. To the extent paragraph 202 alleges anything about Inteliquent and the "fake ring tones" alleged in the complaint, Inteliquent denies those allegations. Inteliquent denies any remaining allegations in paragraph 202.

203. *Upon information and belief, Inteliquent's FCC advocacy reflected both its technical ability to insert fake ring tones and its desire to use fake ring tones.*

**Answer:** Inteliquent denies the allegations in paragraph 203.

204. *Third, according to the Consent Decree, T-Mobile reported that at some unspecified time after the FCC's rules expressly prohibiting fake ring tones became effective in January 2014, it expanded the use of fake ring tones on more routes. Consent Decree, ¶ 11.*

**Answer:** The allegations in paragraph 204 seek to characterize the April 2018 consent decree (with which Inteliquent had no involvement and was not a party). Inteliquent denies that the allegations place the consent decree in proper context or otherwise accurately describe it. Inteliquent respectfully refers this Court to the consent decree for its content, and denies all inconsistent allegations. Inteliquent lacks sufficient information or knowledge to form a belief as to the truth of any remaining allegations and on that basis denies them.

205. *The FCC's November 6, 2019 FOIA production confirms that the expanded use of fake ring tones occurred in September 2015. However, these materials fail to provide any additional details regarding the expanded use of fake ringtones on "all remaining SIP routes." The only substantive declaration from any T-Mobile employee included in the FOIA production, that of Kathleen Foster, T-Mobile's Director of Network Technology, omits entirely any discussion of the expanded use of fake ringtones in September 2015.*

**Answer:** The allegations in paragraph 205 seek to quote and characterize the April 2018 consent decree (with which Inteliquent had no involvement and was not a party) and related materials. Inteliquent admits that the quoted language in paragraph appears in those materials, but it denies that the allegations place the consent decree and those materials in proper context or otherwise accurately describe them. Inteliquent respectfully refers this Court to the consent decree

and the related materials for their content, and denies all inconsistent allegations. Inteliquent lacks sufficient information or knowledge to form a belief as to the truth of any remaining allegations and on that basis denies them.

206.    *In the second half of 2015, T-Mobile was engaged in a major network transition in which its out-of-network traffic would be routed through Inteliquent, whose network relies almost exclusively on SIP trunking. On June 23, 2015, Defendants T-Mobile and Inteliquent entered into a new contract whereby Inteliquent would become the nearly-exclusive router of T-Mobile's out-of-network traffic. On August 17, 2015, lnteliquent publicly announced the new three-year Telecom Master Services Agreement and a related services agreement ("PSTN Agreement," or, collectively with the Master Services Agreement, the "2015 MSA") with T-Mobile, under which Inteliquent would provide a range of services to carry local, long distance and toll-free voice traffic between T-Mobile's network and the PSTN (attached hereto as Exhibit 13).*

**Answer:**  Inteliquent admits that it entered into a contract with T-Mobile in 2015. The allegations in paragraph 206 seek to characterize the terms of a contract. Inteliquent denies that the allegation places the contract in proper context or accurately describes it. Inteliquent respectfully refers this Court to the contract for its terms and content, and denies all inconsistent allegations. Inteliquent denies any remaining allegations in paragraph 206.

207.    *The 2015 MSA provided that T-Mobile would generally use Inteliquent as its sole provider of voice interconnection services for all calls exchanged between T-Mobile and nearly all other voice providers in the United States, with limited exception. Accordingly, Inteliquent expected the 2015 MSA to result in a significant increase in the volume of traffic that it carried on its network for T-Mobile.*

**Answer:**  The allegations in paragraph 207 seek to characterize the terms of a contract. Inteliquent denies that the allegation places the contract in proper context or accurately describes it. Inteliquent respectfully refers this Court to the contract for its terms and content, and denies all inconsistent allegations. Further answering, Inteliquent admits that it expected the 2015 MSA to increase traffic that it carried on its network for T-Mobile. Inteliquent denies any remaining allegations in paragraph 207.

208.    *The 2015 MSA was signed by David Lopez, SVP of Global Sales at Inteliquent. Mr. Lopez's LinkedIn profile indicates that he is a Telecom Executive Leader in the Greater Chicago, Illinois area. Id., p. 25.*

**Answer:** Inteliquent admits that the 2015 MSA was signed by Mr. Lopez and that a LinkedIn profile identified as Dave Lopez provides his professional description as Telecom Executive Leader in the Greater Chicago Area.

209. *The 2015 MSA requires T-Mobile to submit trouble reports to the Inteliquent NOC, which is located in Chicago, Illinois. Id., Schedule 2, pp. 28-29.*

**Answer:** The allegations in paragraph 209 seek to characterize the terms of a contract. Inteliquent denies that the allegation places the contract in proper context or accurately describes it. Inteliquent respectfully refers this Court to the contract for its terms and content, and denies all inconsistent allegations. Further answering, Inteliquent admits that the NOC as described in the 2015 MSA is located in Chicago, Illinois. Inteliquent denies any remaining allegations in paragraph 209.

210. *The 2015 MSA requires Inteliquent to provide reports to T-Mobile within ten business days of issuing each monthly invoice. Id., pp. 10-11. Those reports include information regarding, inter alia, trouble tickets and service disruptions, as well as information specifically related to the delivery of calls to Rural OCNs. See id. Upon information and belief, those reports would have been prepared by Inteliquent using data maintained primarily in Chicago, Illinois and by personnel working primarily in Inteliquent's headquarters located in Chicago, Illinois.*

**Answer:** The allegations in paragraph 210 seek to characterize the terms of a contract. Inteliquent denies that the allegation places the contract in proper context or accurately describes it. Inteliquent respectfully refers this Court to the contract for its terms and content, and denies all inconsistent allegations. Inteliquent denies any remaining allegations in paragraph 210.

211. *The 2015 MSA also requires Inteliquent to provide T-Mobile with copies of any reports that Inteliquent will file with the FCC to comply with the 2013 Declaratory Ruling relating to calls made to rural and non-rural OCNs. Id., p. 11. Included in those reports "[f]or each Rural OCN" was "the total number of attempted [interstate] calls, the number of attempted calls that were answered, the number of attempted calls that were not answered . . ." Id. Upon information and belief, such reports would have been prepared by Inteliquent using data maintained primarily in Chicago, Illinois and by personnel working primarily in Inteliquent's headquarters located in Chicago, Illinois.*

**Answer:** The allegations in paragraph 211 seek to characterize and quote the terms of a contract. Inteliquent admits that those quotes are included in the identified contract, but Inteliquent denies that the allegation places the contract in proper context or accurately describes it. Inteliquent respectfully refers this Court to the contract for its terms and content, and denies all inconsistent allegations. Inteliquent denies any remaining allegations of paragraph 211.

212. *In the event that Inteliquent does not have to submit to the FCC certain data as part of its rural call completion reports, the 2015 MSA nevertheless required Inteliquent to maintain such data for a period of at least six months and to verify to T-Mobile its collection and retention of such data. Upon information and belief, such data would have been maintained primarily in Chicago, Illinois. Id., pp. 11-12.*

**Answer:** The allegations in paragraph 212 seek to characterize the terms of a contract. Inteliquent denies that the allegation places the contract in proper context or accurately describes it. Inteliquent respectfully refers this Court to the contract for its terms and content, and denies all inconsistent allegations. Inteliquent admits that such data is maintained, including in Chicago, Illinois. Inteliquent denies any remaining allegations in paragraph 212.

213. *The 2015 MSA sets forth the rates that Inteliquent will bill to T-Mobile for the services provided pursuant to the MSA. See id., p. 9 & Schedule 4. Upon information and belief, Inteliquent sends invoices to T-Mobile from its headquarters in Chicago, Illinois.*

**Answer:** The allegations in paragraph 213 seek to characterize the terms of a contract. Inteliquent denies that the allegation places the contract in proper context or accurately describes it. Inteliquent respectfully refers this Court to the contract for its terms and content, and denies all inconsistent allegations. Inteliquent admits that the MSA sets forth certain rates and that it has sent invoices to T-Mobile. Inteliquent denies any remaining allegations in paragraph 213.

214. *Upon information and belief, T-Mobile delivered payment for services billed pursuant to the 2015 MSA to Inteliquent's bank accounts controlled by Inteliquent in Chicago, Illinois.*

**Answer:** Inteliquent admits that it received payments from T-Mobile pursuant to the 2015 MSA. Inteliquent denies any remaining allegations in paragraph 214.

215.     *According to a sworn declaration provided by T-Mobile's Senior Manager for Revenue Assurance, Adrian Lazar Adler, "[s]tarting in 2015 and through present . . . [a]lmost all domestic calls that leave the T-Mobile network destined to other carriers are routed through Inteliquent. Inteliquent is responsible for completing the calls, and Inteliquent bills T-Mobile for the services it provides under a contract between the two companies." Inteliquent, Inc. v. Free Conferencing Corporation, et al., Declaration of Adrian Lazar Adler, No. 1:16-cv-06976, ¶ 10 (Feb. 18, 2019 N.D. Ill.) (ECF. No. 503-2) ("Adler Declaration") (attached hereto as Exhibit 14).*

**Answer:**  The allegations in paragraph 215 seek to quote and characterize materials in another litigation.  Inteliquent admits that the quoted language in paragraph 215 appears in those materials, but it denies that the allegations place those materials in proper context or otherwise accurately describe them.  Inteliquent respectfully refers the Court to those materials for their content, and it denies all inconsistent allegations.  Inteliquent denies the remaining allegations in paragraph 215.

216.     *Fourth, according to the Consent Decree, the fake ring tones were still in effect on a nationwide basis in June and continuing through the summer of 2016 when the FCC received numerous complaints and began its investigation of T-Mobile's practices. Consent Decree ¶¶ 79.*

**Answer:**  Inteliquent states that the allegations in paragraph 216 seek to characterize the April 2018 consent decree (with which Inteliquent had no involvement and was not a party).  Inteliquent denies that the allegation places that consent decree in proper context or otherwise accurately describes it.  Inteliquent respectfully refers the Court to the Consent Decree for its content, and it denies all inconsistent allegations.  Inteliquent lacks knowledge or information sufficient to form a belief as to the truth of the allegations and on that basis denies them.

217.     *Therefore, fake ring tones were in effect on SIP routes on a nationwide basis after Inteliquent told the SEC that "T-Mobile will generally use Inteliquent as its sole provider of voice interconnection services for all calls exchanged between T-Mobile and nearly all other voice providers in the United States (excluding certain traffic, including among other things, that is exchanged with other providers over peering arrangements, etc.)." Inteliquent, Inc.'s Form 8-K at Item 1.01 (Aug. 13, 2015), https://www.sec.gov/Archives/edgar/data/1292653/000119312515293613/d54428d8k.htm (last visited Oct. 10, 2019) (attached hereto as Exhibit 15).*

**Answer:**  To the extent this allegation alleges anything about Inteliquent and "fake ring tones" alleged in this complaint, it denies those allegations.  Further answering, Inteliquent states

that the allegations in paragraph 217 seek to characterize and quote a Form 8-K. Inteliquent admits that Form 8-K includes that quote, but denies that the allegation places that quotation in its proper context or otherwise accurately describes it. Inteliquent respectfully refers the Court to the Form 8-K for its content, and it denies all inconsistent allegations. Inteliquent lacks knowledge or information sufficient to form a belief as to the truth of the allegations and on that basis denies them.

218. *In 2015, T-Mobile accounted for 14% of Inteliquent's revenues. However, the total traffic volumes that Inteliquent carried in 2015 far exceeded the volumes that Neutral Tandem had carried in 2007. Plaintiffs estimate that Inteliquent may have carried as much as 21.8 billion minutes of traffic for T-Mobile in 2015.*

**Answer:** Inteliquent admits that T-Mobile accounted for approximately 14% of Inteliquent's revenues in 2015. Inteliquent cannot adequately parse the vague allegation of total "minutes," and so lacks knowledge or information sufficient to form a belief as to the truth of the allegation and so denies the allegation.

219. *Thus, the expanded use of the fake ring tones on T-Mobile traffic coincided with T-Mobile's decision to use Inteliquent to deliver "[a]lmost all domestic calls that leave the T-Mobile network destined to other carriers. . . ." Ex. 14, Adler Declaration, ¶ 10.*

**Answer:** The allegations in paragraph 219 seek to quote and characterize materials in another litigation (*Inteliquent, Inc. v. Free Conferencing Corporation, et al.*, No. 1:16-cv-06976, (N.D. Ill.)). Inteliquent admits that the quoted language in paragraph 219 appears in those materials, but it denies that the allegations place those materials in proper context or otherwise accurately describe them. Inteliquent respectfully refers the Court to those materials for their content, and it denies all inconsistent allegations. Inteliquent denies the remaining allegations in paragraph 219.

220. *Also potentially relevant is the statement in Inteliquent's 10-K that it had deployed "advanced IP switching platforms manufactured by Sonus Networks, Inc." 2013 Form 10-K at 5 (Ex. 12). Sonus Networks, Inc. ("Sonus"), now known as Ribbon Communications ("Ribbon"), has developed perhaps the world's most sophisticated IP switching equipment. The equipment*

*developed by Sonus/Ribbon is capable of inserting "Local Ring Back Tones" or LRBTs on calls that have not reached their intended destination. Indeed, Sonus/Ribbon uses the exact same terminology T-Mobile used when describing its illegal fake ring tone scheme, as reflected in the FCC's Consent Decree.*

**Answer:** The allegations in paragraph 220 seek to quote and characterize an Inteliquent 10-K. Inteliquent admits that the quoted language in paragraph 220 appears in that 10-K, but it denies that the allegations place the 10-K in proper context or otherwise accurately describe it. Inteliquent respectfully refers this Court to the 10-K for its content, and denies all inconsistent allegations. Inteliquent admits that LRBT can theoretically be inserted by Sonus equipment on certain calls. Inteliquent denies, however, that such equipment is capable of inserting LRBT into the T-Mobile calls at issue in this case. Inteliquent also denies the existence of a supposed "fake ring tone scheme." Inteliquent lacks sufficient information or knowledge as to form a belief as to the truth of the remaining allegations and on that basis denies them.

221. *One of the products Ribbon offers is a "PSX Policy Server." According to a news release available on Ribbon Communication's website, Neutral Tandem (now Inteliquent) installed a "full suite of Sonus' IMS (IP Multimedia Subsystem)-ready solutions, including the GSX9000TM, the PSXTM Policy Server, and the Sonus InsightTM Management System.[3]*

**Answer:** Inteliquent states that the allegation in paragraph 221 seeks to characterize and quote a news release on a website. Inteliquent admits that the quoted language appears on that website, but denies that the allegation places it in the proper context or otherwise accurately describes it. Inteliquent admits that it did install certain Sonus equipment. Inteliquent denies any remaining allegations in paragraph 221.

222. *A PSX Policy Server "provides a single, central point of provisioning for all routing and policy in either a service provider or enterprise network, greatly simplifying network management while offering unmatched scalability," according to Ribbon Communications*

---

[3] *Ribbon Press Releases, Neutral Tandem to Complete IP Voice Network Transformation with Sonus Networks Next Generation IP Voice Network Now Serves 100 Markets in the United States (Feb. 24, 2009),* https://ribboncommunications.com/company/media-center/press-releases/neutral-tandem-complete-ip-voice-network-transformation-sonus-networks

*materials. The Ribbon Communications Centralized Policy Server (2017), https ://www.videnda. ie/download/Ribbon-P SXDL1 .pdf (last visited Dec. 9, 2020).*

**Answer:** Inteliquent states that this allegation seeks to characterize and quote a news release on a website. Inteliquent admits that the quoted language appears on that website, but denies that the allegation places it in the proper context or otherwise accurately describes it. The remainder of the allegations are vague, and therefore, Inteliquent lacks sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 222 and on that basis denies them.

223.    *A PSX Policy Server could be utilized to direct the injection of fake ring tones on hundreds of millions of calls annually on a nationwide basis from a single, centralized location. The insertion of fake ring tones would be activated merely by toggling a switch on the Tone and Announcement Profile section of the Ribbon user interface:*



**Answer:** Inteliquent denies the allegations in paragraph 223.

99

224.    *Upon information and belief, insertion of fake ring tones into this volume of calls on a nationwide basis could be performed by Inteliquent from its primary data center near Chicago, Illinois. First, a centralized or "master" PSX Policy Server would be programmed by a human to effectuate the fake ring tone scheme. The master PSX Policy Server, in turn, would push those instructions out to "slave" policy servers, which would be located at geographic points throughout the network. The slave policy servers would then operate in connection with Session Border Controllers ("SBCs"), which are roughly equivalent to the IP version of TDM switches, to insert the fake ring tones when call setup is being delayed or the call has failed.*

**Answer:** Inteliquent denies the allegations in paragraph 224.

225.    *Upon information and belief, Inteliquent operates a network capable of inserting fake ring tones on hundreds of millions of calls annually.*

**Answer:** Inteliquent admits that it could theoretically insert LRBT on certain calls. Inteliquent denies, however, that it is capable of inserting LRBT into the T-Mobile calls at issue in this case. Inteliquent lacks sufficient information or knowledge as to form a belief as to the truth of the remaining allegations in paragraph 225 and on that basis denies them.

226.    *Upon information and belief, whether or not Inteliquent directly inserted the fake ring tones or not, it was Inteliquent's routing practices that T-Mobile sought to mask through its use of illegal fake ring tones. T-Mobile's admission that it "did not correct problems with its Intermediate Providers' delivery of calls to consumers in certain rural OCNs" is an admission that Inteliquent engaged in, or participated in, routing practices that impeded the delivery of calls to rural America.*

**Answer:** Inteliquent denies the allegations in paragraph 226.

227.    *Even if additional Doe Defendant intermediate providers to which Inteliquent handed off T-Mobile calls engaged in tactics that caused T-Mobile to also insert fake ring tones and/or not complete, as the primary Intermediate Provider carrying "almost all" of T-Mobile's long distance traffic, Inteliquent knew or should have known that grossly disproportional numbers of calls placed by T-Mobile customers to high cost rural areas were not being completed, as compared to lower cost traffic in urban or more heavily populated areas, to the economic benefit of both T-Mobile and Inteliquent.*

**Answer:** Inteliquent denies the allegations in paragraph 227.

### M.    T-Mobile Used Its Association With Inteliquent For Legitimate Business Purposes And For The Illicit Purpose Of Carrying Out The Fake Ring Tone Scheme

228.    *As described in the section below, T-Mobile's association with Inteliquent has been used for both legitimate and illegitimate purposes, namely, to carry out the fake ring tone scheme.*

**Answer:** Inteliquent denies the allegations in paragraph 228.

### i. *Inteliquent Provides Legitimate Intermediary Carrier Services To T-Mobile*

229.    *Inteliquent provides reporting and measurement services to T-Mobile, in addition to its Intermediate Provider carrier services. According to the Adler Declaration:*

> *Starting in 2015 and through the present, Inteliquent has served as an independent vendor to T-Mobile. Almost all domestic calls that leave the T-Mobile network destined to other carriers are routed through Inteliquent. Inteliquent is responsible for completing the calls, and Inteliquent bills T-Mobile for the services it provides under a contract between the two companies. In addition, calls routed through the public switched network towards T-Mobile numbers are routed through the Inteliquent network and then delivered to T-Mobile.*

*Ex. 14, Adler Decl. ¶ 10.*

**Answer:** The allegations in paragraph 229 seek to quote and characterize materials in another litigation (*Inteliquent, Inc. v. Free Conferencing Corporation, et al.*, No. 1:16-cv-06976, (N.D. Ill.)). Inteliquent admits that the quoted language in paragraph 229 appears in those materials, but it denies that the allegations place those materials in proper context or otherwise accurately describe them. Inteliquent respectfully refers the Court to those materials for their content, and it denies all inconsistent allegations. Inteliquent denies the remaining allegations in paragraph 229.

230.    *"Inteliquent is T-Mobile's key network vendor for domestic voice traffic." Id. ¶ 11.*

**Answer:** The allegations in paragraph 230 seek to quote and characterize materials in another litigation (*Inteliquent, Inc. v. Free Conferencing Corporation, et al.*, No. 1:16-cv-06976, (N.D. Ill.)). Inteliquent admits that the quoted language in paragraph 230 appears in those materials, but it denies that the allegations place those materials in proper context or otherwise accurately describe them. Inteliquent respectfully refers the Court to those materials for their

content, and it denies all inconsistent allegations. Inteliquent denies the remaining allegations in paragraph 230.

231. *On the face of this relationship, the association is for the legitimate purpose of facilitating T-Mobile's completion of long-distance traffic and Inteliquent acting as an ordinary Intermediate Provider.*

**Answer:** Inteliquent admits that it does act as an intermediate provider for some T-Mobile traffic. Inteliquent states that the allegations in paragraph 231 state legal conclusions, that legal conclusions are for the Court to make, and therefore denies those allegations. Inteliquent denies any remaining allegations in paragraph 231.

232. *As part of this relationship, Inteliquent provides T-Mobile with call detail records ("CDR"). "There is a T-Mobile database that receives a download of Inteliquent CDRs for all domestic long distance calls." Id. ¶ 14. Upon information and belief, Inteliquent transmits these CDRs to T-Mobile electronically via a wire.*

**Answer:** The allegations in paragraph 232 seek to quote and characterize materials in another litigation (*Inteliquent, Inc. v. Free Conferencing Corporation, et al.*, No. 1:16-cv-06976, (N.D. Ill.)). Inteliquent admits that the quoted language in paragraph 232 appears in those materials, but it denies that the allegations place those materials in proper context or otherwise accurately describe them. Inteliquent respectfully refers the Court to those materials for their content, and it denies all inconsistent allegations. Inteliquent states that the allegations in paragraph 232 state legal conclusions, that legal conclusions are for the Court to make, and therefore denies those allegations. Inteliquent denies the allegations in paragraph 232.

233. *Upon information and belief, Inteliquent's copies of the T-Mobile CDRs is maintained in its primary data center located in or near Elgin, Illinois.*

**Answer:** Inteliquent denies the allegations in paragraph 233.

234. *The senior manager on T-Mobile's revenue assurance group interacts regularly with counterparts at Inteliquent and often relies on information and analyses that Inteliquent provides. See id. ¶ 16.*

**Answer:** The allegations in paragraph 234 seek to characterize materials in another litigation (*Inteliquent, Inc. v. Free Conferencing Corporation, et al.*, No. 1:16-cv-06976, (N.D. Ill.)). Inteliquent denies that the allegations place those materials in proper context or otherwise accurately describe them. Inteliquent respectfully refers the Court to those materials for their content, and it denies all inconsistent allegations. Inteliquent denies the remaining allegations in paragraph 234.

235.     *T-Mobile has asserted that its costs for calls are "dependent on the rates billed by Inteliquent." Id. "High cost traffic has a negative margin" for T-Mobile. Id. ¶ 18. "One of the costs is the rate that T-Mobile paid to Inteliquent to deliver outbound domestic long-distance calls." Id. T-Mobile has also asserted that "[u]nder [T-Mobile's] agreement with Inteliquent, the rates [T-Mobile] paid differed depending on the percentage of calls" T-Mobile subscribers placed to certain high cost rural OCNs. Id.*

**Answer:** The allegations in paragraph 235 seek to quote and characterize materials in another litigation (*Inteliquent, Inc. v. Free Conferencing Corporation, et al.*, No. 1:16-cv-06976, (N.D. Ill.)). Inteliquent admits that the quoted language in paragraph 235 appears in those materials, but it denies that the allegations place those materials in proper context or otherwise accurately describe them. Inteliquent respectfully refers the Court to those materials for their content, and it denies all inconsistent allegations. Inteliquent denies the remaining allegations in paragraph 235.

236.     *Upon information and belief, however, T-Mobile's 2015 MSA with Inteliquent has not always allowed Inteliquent to recoup its costs for termination of calls to certain high cost rural OCNs. As a result, Inteliquent lost money, or stood to lose money, on its contract with T-Mobile when too much traffic terminated to high cost areas.*

**Answer:** The allegations in paragraph 236 seek to characterize the terms of a contract. Inteliquent denies that this allegation places the contract in proper context or accurately describes it. Inteliquent respectfully refers this Court to the contract for its terms and content, and denies all inconsistent allegations. Inteliquent denies any remaining allegations in paragraph 236.

ii.   *Inteliquent Provides Illegitimate Intermediary Carrier Services To T-Mobile*

237.   *T-Mobile has a "Revenue Assurance Team [that] analyzes T-Mobile's revenues and margins, with the goal of helping the Company be more profitable." Id. ¶ 2. Areas of focus for this team include "negative margin" and "high-cost, domestic calls." Id. Negative margin calls can be any of the following: (1) "calls for which there are high per-minute costs to complete" the call; (2) calls that generate high volumes of minutes; or (3) a combination of both high per-minute costs and high volumes. Id.*

**Answer:**  The allegations in paragraph 237 seek to quote and characterize materials in another litigation (*Inteliquent, Inc. v. Free Conferencing Corporation, et al.*, No. 1:16-cv-06976, (N.D. Ill.)).  Inteliquent admits that the quoted language in paragraph 237 appears in those materials, but it denies that the allegations place those materials in proper context or otherwise accurately describe them.  Inteliquent respectfully refers the Court to those materials for their content, and it denies all inconsistent allegations.  Inteliquent lacks sufficient knowledge or information to form a belief as to the truth of these allegations and on that basis denies them.

238.   *Because "high-cost calls have historically not produced incremental revenue and created a negative margin," T-Mobile has "focused on identifying ways to reduce [its] costs or increase [its] revenues with respect to this traffic." Id.*

**Answer:**  The allegations in paragraph 238 seek to quote and characterize materials in another litigation (*Inteliquent, Inc. v. Free Conferencing Corporation, et al.*, No. 1:16-cv-06976, (N.D. Ill.)).  Inteliquent admits that the quoted language in paragraph 238 appears in those materials, but it denies that the allegations place those materials in proper context or otherwise accurately describe them.  Inteliquent respectfully refers the Court to those materials for their content, and it denies all inconsistent allegations.  Inteliquent lacks sufficient knowledge or information to form a belief as to the truth of these allegations and on that basis denies them.

239.   *After Inteliquent became "responsible for completing" "[a]lmost all domestic calls that leave the T-Mobile network" in 2015, id. ¶ 10, T-Mobile and Inteliquent began to have "weekly calls," id. ¶ 22. Those calls focused on at least four distinct issues: (1) fraud; (2) a practice known as "traffic pumping"; (3) prevention of inbound scam and robocalls; and (4)"high-cost traffic in various forms." Id. (emphasis added).*

**Answer:** The allegations in paragraph 239 seek to quote and characterize materials in another litigation (*Inteliquent, Inc. v. Free Conferencing Corporation, et al.*, No. 1:16-cv-06976, (N.D. Ill.)). Inteliquent admits that the quoted language in paragraph 239 appears in those materials, but it denies that the allegations place those materials in proper context or otherwise accurately describe them. Inteliquent respectfully refers the Court to those materials for their content, and it denies all inconsistent allegations. Inteliquent denies the remaining allegations in paragraph 239.

240. *The senior manager on T-Mobile's revenue assurance group "regularly communicated with [her] counterparts at Inteliquent about things that would impact the volumes of calls that T-Mobile routed to Inteliquent." Id. ¶ 19. "Inteliquent was focused on the quantity of calls because it impacted its costs relating to network planning and management." Id. ¶ 18.*

**Answer:** The allegations in paragraph 240 seek to quote and characterize materials in another litigation (*Inteliquent, Inc. v. Free Conferencing Corporation, et al.*, No. 1:16-cv-06976, (N.D. Ill.)). Inteliquent admits that the quoted language in paragraph 240 appears in those materials, but it denies that the allegations place those materials in proper context or otherwise accurately describe them. Inteliquent respectfully refers the Court to those materials for their content, and it denies all inconsistent allegations. Inteliquent denies the remaining allegations in paragraph 240.

241. *Upon information and belief, among the topics that T-Mobile employees discussed with Inteliquent was measures that either or both parties could take to reduce the volume of T-Mobile traffic terminating to areas with higher terminating access rates.*

**Answer:** Inteliquent denies the allegations in paragraph 241.

242. *Upon information and belief, these measures included the use of fake ring tones to reduce the volume of calls routed to areas with higher terminating access rates and/or mask call completion failures.*

**Answer:** Inteliquent denies the allegations in paragraph 242.

### iii. T-Mobile And Inteliquent Knew Fake Ring Tones Were Unlawful And That They Had The Duty To Deliver Calls To All LECs, Including Those In Rural Areas

243.    *Upon information and belief, T-Mobile and Inteliquent employees discussed the use of fake ring tones despite knowing that any form of the practice had been expressly declared unlawful by the FCC in January 2014.*

**Answer:** Inteliquent denies the allegations in paragraph 243.

244.    *Both T-Mobile and Inteliquent were active participants in matters before the FCC and regularly utilize outside counsel and lobbyists to advocate for policy changes at the FCC. Thus, both were well aware that fake ring tone schemes were unlawful and of the FCC's efforts to address rural call completion problems.*

**Answer:**  Inteliquent states that the allegations in 244 paragraph state legal conclusions, that legal conclusions are for the Court to make, and therefore denies those allegations.  Further answering, Inteliquent admits that it has appeared before the FCC, but denies any implication of actionable conduct on its part.  Inteliquent lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 244 and on that basis denies them.

245.    *As discussed above, Inteliquent directly argued in the FCC's RCC Rulemaking docket in favor of permitting the use of fake ring tones but those arguments were rejected by the FCC.*

**Answer:**  Inteliquent states that the allegations in paragraph 245 state legal conclusions, that legal conclusions are for the Court to make, and therefore denies those allegations.  Further answering, Inteliquent admits that it has appeared before the FCC, but denies any implication of actionable conduct on its part.  To the extent a further answer is deemed required, Inteliquent states that this allegation purports to characterize proceedings before the FCC.  Inteliquent denies that these allegations place those proceedings in the proper context or accurately describe them. Inteliquent respectfully refers this Court to the record of those proceedings and denies all inconsistent allegations.

246.    *Moreover, the 2015 MSA specifically referenced the FCC's order which made it unlawful to use fake ring tones, imposing reporting and compliance obligations on Inteliquent:*

*In addition to, and without limiting, any other obligation of [Inteliquent] under the GTCs or SA, Provider shall, as soon as reasonably possible, provide T-Mobile with a copy of any report or form filed, or prepared for filing, with the Federal Communications Commission ("FCC") to comply with the FCC's rural call completion rules, including, but not limited to, the requirements set forth In the Matter of Rural Call Completion, Report and Order and Further Notice of Proposed Rulemaking, WC Docket No. 13-30 (rel. Nov. 8, 2013), including, but not limited to, filing the mandated quarterly reports with the FCC that contain, at a minimum, the following information:*

*i.      For each Rural OCN:*

*(1) The OCN and the state, and*

*(2) For attempted interstate calls: the total number of attempted calls, the number of attempted calls that were answered, the number of attempted calls that were not answered (reported separately for call attempts signed as busy, ring no answer, or unassigned number).*

*(3) For attempted intrastate calls: the total number of attempted calls, the number of attempted calls that were answered, the number of attempted calls that were not answered (reported separately for call attempts signed as busy, ring no answer, or unassigned number).*

*ii.     For each non-Rural OCN, the aggregate information for attempted intrastate calls: the total number of attempted calls, the number of attempted calls that were answered, the number of attempted calls that were not answered (reported separately for call attempts signed as busy, ring no answer, or unassigned number).*

*For purposes of this SA, the term "Rural OCN" means the Operating Carrier Number ("OCN") associated with an end office switch of a rural local exchange carrier ("RLEC") that is identified on the list published by the National Exchange Carrier Association ("NECA"), as updated from time to time, excluding any OCNs mutually agreed to by the Parties.*

*              *        *

*[Inteliquent] shall provide T-Mobile with a draft of any report or form that [Inteliquent] intends to file with the FCC or any other governmental authority as soon as possible but no later than five (5) business days before the intended filing date (unless the deadline is shorter than five (5) business days) if the filing of such draft report might reasonably be interpreted as evidence that T-Mobile may not be in full compliance with applicable Law;*

> *provided, however, that [Inteliquent] shall provide T-Mobile with written notice of intent to file a report pursuant to this Section if [Inteliquent] will not, for any reason, be able to provide T-Mobile with the draft of such report five (5) business days before the filing deadline.*

*Ex. 13, PSTN at 11-12.*

**Answer:** The allegations in paragraph 246 seek to characterize the terms of a contract. Inteliquent denies that the allegation places the contract in proper context or accurately describes it. Inteliquent respectfully refers this Court to the contract for its terms and content, and denies all inconsistent allegations. Inteliquent denies any remaining allegations in paragraph 246.

247. *Accordingly, T-Mobile and Inteliquent were both aware of and shared joint responsibility for complying with the FCC's rural call completion orders.*

**Answer:** Inteliquent states that the allegations in paragraph 247 state legal conclusions, that legal conclusions are for the Court to make, and therefore denies those allegations. The allegations in paragraph 247 also seek to characterize the terms of a contract. Inteliquent denies that the allegations places the contract in proper context or accurately describes it. Inteliquent respectfully refers this Court to the contract for its terms and content, and denies all inconsistent allegations. Inteliquent lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 247 and on that basis denies them.

### iv. *Inteliquent Has Collaborated With T-Mobile On A Different Scheme To Deter Completion Of Certain Calls Placed By T-Mobile Customers*

248. *The fake ring tone scheme is not the only way Inteliquent has worked with T-Mobile on a strategy to reduce the volume of high cost calls placed by T-Mobile subscribers to avoid liability for high cost access charges.*

**Answer:** Inteliquent denies the allegations in paragraph 248.

249. *Inteliquent is currently a party to litigation pending in this Court that involved claims that Inteliquent and T-Mobile jointly developed and instituted a scheme to deter T-Mobile subscribers from completing calls to certain high volume, and/or high cost, phone numbers tied to rural OCNs. See Inteliquent, Inc. v. Free Conferencing Corp. et al., Case No. 1:16-CV-06976 ("Inteliquent Litigation").*

**Answer:** Inteliquent denies the allegations in paragraph 249. Further answering, the Court recently issued a Memorandum Opinion and Order granting summary judgment in Inteliquent's favor with respect to the claims against Inteliquent. *Inteliquent, Inc. v. Free Conferencing Corporation et al*, No. 1:2016cv06976 (ECF No. 722) (Nov. 30, 2020 N.D. Ill).

250.    *The scheme alleged in the Inteliquent Litigation was called the "One-Cent Policy," which involved T-Mobile and Inteliquent interrupting calls placed by T-Mobile subscribers to intentionally selected telephone numbers and inserting a message advising the caller that they would be charged a penny a minute if they completed the call.*

**Answer:** Inteliquent denies the allegations in paragraph 250. Further answering, the Court recently issued a Memorandum Opinion and Order granting summary judgment in Inteliquent's favor with respect to the claims against Inteliquent. *Inteliquent, Inc. v. Free Conferencing Corporation et al*, No. 1:16-cv-06976 (ECF No. 722) (Nov. 30, 2020 N.D. Ill).

251.    *The alleged purpose of this message was to confuse the caller and coerce T-Mobile's subscribers to hang up high cost calls before they were connected.*

**Answer:** Inteliquent denies the allegations in paragraph 251.

252.    *According to court documents, the parties in the Inteliquent Litigation estimate that tens of thousands of telephone numbers were subject to the One-Cent Policy. See id., Dkt. No. 491, at 11n.10.*

**Answer:**   The allegations in paragraph in seek to characterize materials in another litigation. Inteliquent objects to the use, reference, or incorporation of information that is subject to a protective order. Further answering, the Court recently issued a Memorandum Opinion and Order granting summary judgment in Inteliquent's favor with respect to the claims against Inteliquent. *Inteliquent, Inc. v. Free Conferencing Corporation et al*, No. 1:16-cv-06976 (ECF No. 722) (Nov. 30, 2020 N.D. Ill). Inteliquent denies the remaining allegations in paragraph 252.

253.    *The defendants in the Inteliquent Litigation served third-party subpoenas on T-Mobile seeking, among other things, documents that would reflect Inteliquent's involvement and participation in the execution of the One-Cent Policy.*

**Answer:** The allegations in paragraph 253 seek to characterize materials in another litigation. Inteliquent admits that the defendants in that litigation served third party subpoenas on T-Mobile, but it denies that the allegations place those materials in proper context or otherwise accurately describe them. Inteliquent respectfully refers the Court to those materials for their content, and it denies all inconsistent allegations. The Court recently issued a Memorandum Opinion and Order granting summary judgment in Inteliquent's favor with respect to the claims against Inteliquent. *Inteliquent, Inc. v. Free Conferencing Corporation et al*, No. 1:16-cv-06976 (ECF No. 722) (Nov. 30, 2020 N.D. Ill). Inteliquent denies the remaining allegations in paragraph 253.

254. *The subpoenas to T-Mobile included requests for information T-Mobile submitted to the FCC in the Consent Decree investigation. The parties issuing the subpoenas contend the call blocking to high cost rural OCNs at issue in the Inteliquent Litigation overlaps with the Consent Decree's finding that T-Mobile failed to oversee its Intermediate Providers (i.e. Inteliquent). Those parties contend the Consent Decree investigation documents are relevant to the One-Cent Policy because both practices have the same purpose: to confuse callers and coerce them to hang up.*

**Answer:** The allegations in 254 paragraph seek to characterize materials in another litigation. Inteliquent admits that the defendants in that litigation served third party subpoenas on T-Mobile, but it denies that the allegations place those materials in proper context or otherwise accurately describe them. Inteliquent respectfully refers the Court to those materials for their content, and it denies all inconsistent allegations. The Court recently issued a Memorandum Opinion and Order granting summary judgment in Inteliquent's favor with respect to the claims against Inteliquent. *Inteliquent, Inc. v. Free Conferencing Corporation et al*, No. 1:16-cv-06976 (ECF No. 722) (Nov. 30, 2020 N.D. Ill). Inteliquent denies the remaining allegations in paragraph 254.

255. *T-Mobile filed a Motion to Quash in the Inteliquent Litigation and has vigorously contested production of any of the materials it submitted to the FCC in the Consent Decree investigation.*

**Answer:** The allegations in paragraph 255 seek to characterize materials in another litigation. Inteliquent admits that T-Mobile filed a motion to quash in that litigation, but it denies that the allegations place those materials in proper context or otherwise accurately describe them. Inteliquent respectfully refers the Court to those materials for their content, and it denies all inconsistent allegations. The Court recently issued a Memorandum Opinion and Order granting summary judgment in Inteliquent's favor with respect to the claims against Inteliquent. *Inteliquent, Inc. v. Free Conferencing Corporation et al*, No. 1:16-cv-06976 (ECF No. 722) (Nov. 30, 2020 N.D. Ill) Inteliquent lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 255 and on that basis denies them.

256. *T-Mobile also moved for relief from producing any documents that might reveal its collaboration with Inteliquent on either the One-Cent Policy or fake ring tone scheme, claiming Inteliquent was not involved in the development and implementation of the One-Cent Policy and that all information submitted to the Commission is confidential.*

**Answer:** The allegations in paragraph 256 seek to characterize materials in another litigation. Inteliquent admits that T-Mobile filed a motion to quash in that litigation, but it denies that the allegations place those materials in proper context or otherwise accurately describe them. Inteliquent respectfully refers the Court to those materials for their content, and it denies all inconsistent allegations. The Court recently issued a Memorandum Opinion and Order granting summary judgment in Inteliquent's favor with respect to the claims against Inteliquent. *Inteliquent, Inc. v. Free Conferencing Corporation et al*, No. 1:16-cv-06976 (ECF No. 722) (Nov. 30, 2020 N.D. Ill). Inteliquent denies the allegations in paragraph 256 to the extent they are intended to imply any actionable conduct by Inteliquent and denies any existence of any supposed "fake ring tone scheme." Inteliquent lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 256 and on that basis denies them.

257. *T-Mobile's Motion to Quash was supported by an affidavit of Mike Taylor, a T-Mobile upper management employee, who attested, in at least ten different ways, that Inteliquent*

*had nothing to do with the One-Cent Policy, and he appears to have testified to the same at his deposition. See id., Dkt. No. 491 at 4 (summarizing statements); see also id., Dkt. No. 491 at 6 (discussing a second Taylor affidavit contending T-Mobile acted independently from Inteliquent in the One-Cent Policy).*

**Answer:** The allegations in paragraph 257 seek to characterize materials in another litigation. Inteliquent objects to the use, reference, or incorporation of information that is subject to a protective order. Further answering, the Court recently issued a Memorandum Opinion and Order granting summary judgment in Inteliquent's favor with respect to the claims against Inteliquent. *Inteliquent, Inc. v. Free Conferencing Corporation et al*, No. 1:16-cv-06976 (ECF No. 722) (Nov. 30, 2020 N.D. Ill). Inteliquent denies the remaining allegations in paragraph 257.

258. *T-Mobile's lawyers also argued to this Court that Inteliquent had nothing to do with the One-Cent Policy. See id., Dkt. No. 491 at 5.*

**Answer:** The allegations in paragraph 258 seek to characterize materials in another litigation. Inteliquent respectfully refers the Court to those materials for their content, and it denies all inconsistent allegations. The Court recently issued a Memorandum Opinion and Order granting summary judgment in Inteliquent's favor with respect to the claims against Inteliquent. *Inteliquent, Inc. v. Free Conferencing Corporation et al*, No. 1:16-cv-06976 (ECF No. 722) (Nov. 30, 2020 N.D. Ill). Inteliquent denies the remaining allegations in paragraph 258.

259. *Just sixteen days before the close of discovery in the Inteliquent Litigation, an Inteliquent employee revealed the truth in her deposition — Inteliquent and T-Mobile witnesses who testified before her that there was no collaboration between Inteliquent and T-Mobile on the One-Cent Policy were lying. See generally id., Dkt. No. 485. This witness exposed that Inteliquent and T-Mobile had over one hundred meetings discussing the One-Cent Policy and that there were meeting notes concerning this collaboration that had not been produced previously by Inteliquent or T-Mobile in discovery.*

**Answer:** The allegations in paragraph 259 seek to characterize materials in another litigation. Inteliquent objects to the use, reference, or incorporation of information that is subject to a protective order. Further answering, the Court recently issued a Memorandum Opinion and Order granting summary judgment in Inteliquent's favor with respect to the claims against

Inteliquent. *Inteliquent, Inc. v. Free Conferencing Corporation et al*, No. 1:16-cv-06976 (ECF No. 722) (Nov. 30, 2020 N.D. Ill). Inteliquent denies the remaining allegations in paragraph 259.

260. *This led to discovery of additional documents about these meetings and collaboration on the One-Cent Policy that T-Mobile and Inteliquent had been concealing.*

**Answer:** Inteliquent denies the allegations in paragraph 260.

261. *Inteliquent also attempted, unsuccessfully, to move for a protective order preventing discovery of its communications with Mobileum, a third-party software vendor T-Mobile hired in connection with the One-Cent Policy. Discovery from Mobileum further confirmed that T-Mobile and Inteliquent set up an FTP site or other file transfer mechanism for T-Mobile to access call data directly from Inteliquent to facilitate the One-Cent Policy.*

**Answer:** The allegations in paragraph 261 seek to characterize materials in another litigation. Inteliquent objects to the use, reference, or incorporation of information that is subject to a protective order. Further answering, the Court recently issued a Memorandum Opinion and Order granting summary judgment in Inteliquent's favor with respect to the claims against Inteliquent. *Inteliquent, Inc. v. Free Conferencing Corporation et al*, No. 1:16-cv-06976 (ECF No. 722) (Nov. 30, 2020 N.D. Ill). Inteliquent denies the remaining allegations in paragraph 261.

262. *Though much of the information in the Inteliquent Litigation has been filed under seal or appears to be subject to protective orders or confidentiality agreements, publicly available evidence reflects that shortly after Inteliquent entered into the 2015 MSA with T-Mobile, it became apparent to Inteliquent that the MSA was not going to generate the financial performance Inteliquent expected and would quickly become unprofitable. As a result, Inteliquent, at the behest of its Board, embarked on business strategies aggressively aimed at preventing completion of high cost traffic.*

**Answer:** Inteliquent denies the allegations in paragraph 262.

263. *Some information from the case has become public, including portions of an email from the CEO of Inteliquent in February 2016, Matthew Carter, which states:*

> *As it relates to peering, I understand we have no direct control over this outcome. If TMO is going to potentially cost us $6-9MM in EBITDA, what are the alternative solutions we are looking at to make up for this lost (sic)? I think we should at least identify, from the mundane to crazy hair ball ideas, how to chip away at this variance. This does not mean we will sign up as a commitment for low probability initiatives but I don't think we should accept as a given this outcome either.*

113

*Stephen Wald, Letter to FCC Secretary Marlene Dortch, NATIONAL EXCHANGE CARRIER ASSOCIATION (Aug. 7, 2018),* https://prodnet.www.neca.org/publicationsdocs/ *wwpdf/8718carrier.pdf (last visited Oct 10, 2019) (attached hereto as Exhibit 16).*

**Answer:** The allegations in paragraph 263 seek to quote and characterize materials in another litigation (*Inteliquent, Inc. v. Free Conferencing Corporation, et al.*, No. 1:16-cv-06976, (N.D. Ill.)). Inteliquent admits that the quoted language in paragraph 263 appears in those materials, but it denies that the allegations place those materials in proper context or otherwise accurately describe them. Inteliquent respectfully refers the Court to those materials for their content, and it denies all inconsistent allegations. Inteliquent denies the remaining allegations in paragraph 263.

264. *On March 23, 2016, CEO Carter wrote:*

*[T]his is a quick update on our ongoing negotiations with TMO and other related EBITDA impacting activities.*

*Last week the team met with TMO to discuss options to improve the current high costs destination codes and understanding their timeline on peering. The options that are under consideration are:*

- *Implement a cost+ model whereas we charge above the costs to protect ourselves from unprofitable traffic.*

- *Limit the number of high destination codes by 50% by TMO cutting off the first minute of this traffic. The goal would be to eventually eliminate as much as 80% by forcing those calls to listen to a recording asking for a credit card to continue the call.*

*Id.*

**Answer:** The allegations in paragraph 264 seek to quote and characterize materials in another litigation (*Inteliquent, Inc. v. Free Conferencing Corporation, et al.*, No. 1:16-cv-06976, (N.D. Ill.)). Inteliquent admits that the quoted language in paragraph 264 appears in those materials, but it denies that the allegations place those materials in proper context or otherwise accurately describe them. Inteliquent respectfully refers the Court to those materials for their

content, and it denies all inconsistent allegations. Inteliquent denies the remaining allegations in paragraph 264.

265.   *On March 29, 2016, Ian Neale, a Senior Vice President at Inteliquent, wrote:*

*[A]s I discussed with [Mike Taylor of T-Mobile] on Friday, we are currently developing a series of strategies/initiatives to more aggressively work with you all to contain the volume of traffic to high costs codes, we plan to have a document finalized that we can share with you both early next week. I am confident that we will bring much more focus to this issue going forward and I am sure that our collaborative efforts will yield a reduction in volume to these codes . . . .*

*Id*.

**Answer:**  The allegations in paragraph 265 seek to quote and characterize materials in another litigation (*Inteliquent, Inc. v. Free Conferencing Corporation, et al*., No. 1:16-cv-06976, (N.D. Ill.)).  Inteliquent admits that the quoted language in paragraph 265 appears in those materials, but it denies that the allegations place those materials in proper context or otherwise accurately describe them.  Inteliquent respectfully refers the Court to those materials for their content, and it denies all inconsistent allegations.  Inteliquent denies the remaining allegations in paragraph 265.

266.   *Inteliquent's participation in failing to deliver calls to their intended destination, and masking this failure through the use of fake ring tones is consistent with its Board's directive to reduce the volume of high cost traffic it completes for T-Mobile.*

**Answer:**  Inteliquent denies the allegations in paragraph 266.

267.   *On November 30, 2020 the Court issued a Memorandum Opinion and Order in the Inteliquent Litigation finding no triable issues against Inteliquent; however, T-Mobile was not a party in that case and this Court did find that T-Mobile and Inteliquent, "work[ed] together to reduce traffic . . .to high cost locations." See Inteliquent Litigation, ECF No. 722, p. 8. The opinion also found, as alleged here, that in October 2015, "Inteliquent's T-Mobile contract became less profitable." Id.*

**Answer:**  The allegations in paragraph 267 seek to quote and characterize a Memorandum Opinion and Order in another litigation (*Inteliquent, Inc. v. Free Conferencing Corporation, et al*.,

115

No. 1:16-cv-06976, (N.D. Ill.)). Inteliquent admits that the Court granted summary judgment in Inteliquent's favor with respect to the claims against Inteliquent. *Inteliquent, Inc. v. Free Conferencing Corporation et al*, No. 1:16-cv-06976 (ECF No. 722) (Nov. 30, 2020 N.D. Ill). Inteliquent respectfully refers the Court to that Opinion for its content, and it denies all inconsistent allegations. Inteliquent denies the remaining allegations in paragraph 267.

268. *T-Mobile's efforts to hide the evidence of its collaboration with Inteliquent in the One-Cent Policy, and further efforts in this Court to block discovery of evidence of the Consent Decree investigation, is yet another indicator of Defendants' high degree of moral culpability, deliberate oppression and wonton disregard of the rights of others with respect to implementing strategies intended to reduce traffic to high cost codes in violation of the Commission's express prohibitions on doing so.*

**Answer:** Inteliquent denies the allegations in paragraph 268.

### N.     T-Mobile Blocked Plaintiffs' Access To Evidence Of Its Illegal Conduct In FOIA Litigation

269. *On February 25, 2019, Plaintiffs' counsel, as Requestor, acting on behalf of Plaintiffs and over seventy-five rural carriers, submitted a FOIA Request to the Commission requesting that the Commission disclose three categories of documents related to the Consent Decree: (1) all documents in the Commission's Consent Decree file; (2) all compliance reports submitted by T-Mobile to the Commission pursuant to the Consent Decree; and (3) all Form 480 Reports (Rural Call Completion Data Filing) and supporting information submitted by T-Mobile to the Commission.*

**Answer:** Inteliquent lacks sufficient knowledge or information to form a belief as to the truth of these allegations in paragraph 269 and on that basis denies them.

270. *On March 22, 2019, the Commission notified T-Mobile of the FOIA Request because it previously requested confidential treatment of the Consent Decree investigation files pursuant to various FOIA exemptions.*

**Answer:** Inteliquent lacks sufficient knowledge or information to form a belief as to the truth of these allegations in paragraph 270 and on that basis denies them.

271. *On April 1, 2019, T-Mobile filed its response to the FOIA Request with the Commission, asserting its grounds for requesting confidential treatment of all documents in the Commission's file. T-Mobile initially only agreed that one post-Consent Decree compliance report was not exempt.*

**Answer:** Inteliquent lacks sufficient knowledge or information to form a belief as to the truth of these allegations in paragraph 271 and on that basis denies them.

272. *T-Mobile's April 1 letter to the Commission reflects that, among the documents and information it submitted to the Commission, there was evidence concerning the amount of T-Mobile calls answered or completed from April 2016 through December 2016, names of T-Mobile's Intermediate Providers, the specific percentages of T-Mobile out-of-network traffic sent via trunks using SIP technology for periods between 2013 and 2016, and other data concerning calls attempted by T-Mobile customers sent via trunks using SIP technology taking more than four seconds for call setup. T-Mobile's descriptions of the documents it submitted to the Commission reflect that evidence of T-Mobile's and Inteliquent's participation in the fake ring tone scheme should be found within the FCC's Consent Decree file.*

**Answer:** Inteliquent states that the allegations in paragraph 272 seek to characterize a T-Mobile letter. Inteliquent denies that the allegation place that letter in its proper context or otherwise accurately describes it. Inteliquent denies that the FCC Consent Decree file, or anything else, contains evidence of Inteliquent's participation in a supposed "fake ring tone scheme" because no such evidence exists as Inteliquent did not participate in any such thing. Inteliquent lacks knowledge or information sufficient to form a belief as to the truth of the allegations and on that basis denies them.

273. *T-Mobile's April 1 letter to the Commission also asserted that documents that disclosed the identities of T-Mobile's Intermediate Providers warrant confidential treatment because T-Mobile supposedly treats the identity of its intermediaries as confidential.*

**Answer:** Inteliquent states that the allegations in paragraph 273 seek to characterize a T-Mobile letter. Inteliquent denies that the allegations place that letter in its proper context or otherwise accurately describe it. Inteliquent lacks knowledge or information sufficient to form a belief as to the truth of the allegations and on that basis denies them.

274. *On April 11, 2019, Requestor served a response to T-Mobile's response to the FOIA Request, rebutting each of T-Mobile's purported justifications for its requests for confidential treatment. Among its rebuttal points, Requestor pointed out to the Commission that the identity of T-Mobile's primary intermediary, Inteliquent, is not at all confidential but is publicly available information that was disclosed by Inteliquent via press releases as well as in an SEC filing.*

**Answer:** Inteliquent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 274 and on that basis denies them.

275.     *The Commission took no further action on the FOIA Request, so on June 10, 2019, Plaintiffs' counsel filed a Complaint for Declaratory Relief Pursuant to FOIA Compelling the Production Of Documents Related To T-Mobile USA Inc.'s Unjust And Unreasonable Rural Call Completion Practices in the United States District Court for the District of Columbia. See Womble Bond Dickinson (US) LLP v. FCC, No. 1:19-cv-01690-RDM (D.D.C.) ("FOIA Litigation").*

**Answer:** Inteliquent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 275 and on that basis denies them.

276.     *T-Mobile did not concede that the identity of its primary Intermediate Provider is not confidential information until months later, in a July 9, 2019 submission to the Commission. Nevertheless, T-Mobile continued to claim confidentiality over substantial portions of the evidence it submitted to the Commission related to the fake ring tone scheme.*

**Answer:** Inteliquent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 276 and on that basis denies them.

277.     *By doing so, T-Mobile suppressed Plaintiffs' access to information about the precise OCNs affected by its illegal practices, the identities and roles of each participant in this scheme, how many calls were impacted, precisely how the fake ring tones were inserted, and the magnitude of terminating access charges it deprived LECs of the opportunity to charge for and collect as a result of its illegal practice.*

**Answer:** Inteliquent denies the allegations in paragraph 277.

278.     *On October 8, 2019, the Commission produced the following two categories of documents pursuant to an agreement between the Commission and Plaintiffs' counsel concerning resolution of the FOIA disputes: (1) T-Mobile's post-Consent Decree compliance reports; and (2) documents sufficient to identify T-Mobile's intermediate carriers. The latter category was produced in the form of a chart that T-Mobile produced to the Commission during the investigation, which lists a series of 2017 customer complaints T-Mobile received reporting failures of calls placed to rural call recipients.*

**Answer:** Inteliquent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 278 and on that basis denies them.

279.     *The only Intermediate Providers identified by T-Mobile's customer complaint chart during the time period relevant to the Commission's investigation were Inteliquent and Level 3 Communications LLC ("Level 3"), which was acquired in or about November 2017 by CenturyLink, Inc. ("CenturyLink"), which, upon information and belief is now Level 3's parent*

*company. Inteliquent is mentioned in the majority of the customer complaint log entries as T-Mobile's "long-distance carrier partner" while Level 3 is only referenced in two of the call complaint log entries produced. In one instance, Level 3 was identified as "the LEC that was immediately before Loretto in the call chain" and in the other, T-Mobile refers to Level 3 as its "long-distance carrier partner." The complaint logs reflect a pattern of customer complaints being resolved by Inteliquent, and in only one case Level 3, "changing the route used to terminate the call to the rural carrier." These descriptions of Inteliquent's role in resolving rural call completion complaints show that Inteliquent had the capacity to change the routes used to terminate calls to rural carriers and was routinely the resource T-Mobile relied upon to resolve rural call completion failures that its customers were able to identify.*

**Answer:** Inteliquent admits that it was not T-Mobile's sole intermediate provider during the relevant time. Inteliquent admits that it resolved customer complaints. Further answering, paragraph 279 seeks to characterize and quote a T-Mobile customer complaint chart. Inteliquent admits that the quotations are included in that chart, but denies that the allegations place those quotations in the proper context or otherwise accurately describe it. Inteliquent respectfully refers the Court to the document for its content, and denies all inconsistent allegations. Inteliquent denies any remaining allegations in paragraph 279.

280. *The role of Level 3 in the fake ring tone scheme, and whether it is one of the Intermediate Providers whose problems with delivery of calls to consumers in certain rural OCN's T-Mobile admitted it failed to correct, remains to be seen, but it appears that Level 3 may also be a co-conspirator, or one of the Doe Defendants, which Plaintiffs will investigate further in discovery and reserve the right to accordingly amend their pleadings.*

**Answer:** To the extent that paragraph 280 alleges anything against Inteliquent, Inteliquent denies those allegations. Inteliquent lacks sufficient knowledge or information to form a belief as to the truth of any other allegations in paragraph 280 and on that basis denies them.

281. *The November 6, 2019 FOIA production reveals that on August 2, 2017, in response to a Supplemental Letter of Inquiry which, inter alia, asked about specific instances of call completion problems, T-Mobile informed the FCC that calls were routed through "Inteliquent and West." Upon information and belief, the reference by T-Mobile to West refers to West Corporation, a telecommunications service provider based in Omaha, Nebraska. The specific role of West in the fake ring tone scheme, and whether it was responsible for rural call completion failures that T-Mobile failed to correct, is not explained in the FOIA production, but West may also be a co-conspirator, or one of the Doe Defendants, which Plaintiffs will investigate further in discovery and reserve the right to accordingly amend their pleadings.*

**Answer:** Inteliquent lacks sufficient knowledge or information to form a belief as to the truth of any other allegations in paragraph 281 and on that basis denies them.

282.   *The November 6, 2019 FOIA Production also reveals that T-Mobile informed the Commission that fake ring tones were implemented by Ericsson on Ericsson Mobile Switching Centers at T-Mobile's direction. See Declaration of Kathleen Foster (Exhibit 19), ¶ 7. The Foster Declaration does not explain: (1) why Ericsson would agree to implement fake ringtones in October 2013, the same time that the FCC announced it was prepared to adopt an order, which would ultimately codify the prohibition of using fake ringtones; (2) whether Ericsson was aware of T-Mobile's continued use of the fake ring tones after the FCC's 2013 Rural Call Completion Order became effective; and (3) whether Ericsson had any role in the expanded use of fake ringtones in September 2015. Ericsson may also be a co-conspirator, or one of the Doe Defendants, which Plaintiffs will investigate further in discovery and reserve the right to accordingly amend their pleadings.*

**Answer:** Inteliquent lacks sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 282 and on that basis denies them.

### O.   *T-Mobile's Actions Show No Remorse*

283.   *T-Mobile's CEO at the time of the Consent Decree, John Legere often referred to T-Mobile's competitors, AT&T and Verizon, as dumb and dumber. He said that they are not "interested in their customers." T-Mobile's Legere on Customer Growth, Strategy and Competition, YouTuBE (Feb. 8, 2018), https://www.youtube.com/watch?v=NSEph9pCX5Y (last visited Dec. 9, 2020). Legere made these types of statements while simultaneously downplaying or refusing to discuss T-Mobile's fraudulent conduct that harms its own customers.*

**Answer:** The allegations in paragraph 283 seek to quote and characterize a video. Inteliquent admits that the quoted language in paragraph 283 appears in that video, but it denies that the allegations place the video in proper context or otherwise accurately describe it. Inteliquent respectfully refers the Court to the video for its content, and it denies all inconsistent allegations. Inteliquent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 283 and on that basis denies them.

284.   *For example, during testimony before the House Energy and Commerce Committee, the following exchange between Legere and Congressman Peter Welch of Vermont took place:*

> *REP. WELCH:        Last February Congress passed and the president signed some bi-partisan legislation that I worked on with David Young —*

*improving rural call quality. And it turned out that shortly after that bill became law T-Mobile and Sprint — the FCC announced that T-Mobile agreed to pay forty million dollars. Forty million dollars in a fine for violating FCC rules with a practice of faking ring tones. I mean, this is a big deal for us in Vermont. Dacon farms and the Christmas season depends on those calls. Camel's Hump School gets the word out that it's been cancelled because weather. And in the settlement T-Mobile acknowledged that it had injected false ring tones into hundreds of millions of calls. I mean that's really upsetting to us and I'm struggling to see how this past gives me confidence about the future so Mr. Legere can you explain how T-Mobile did fail to abide by the basic call quality standards and not connecting hundreds of millions of calls in rural America but very briefly because we don't have much time.*

*LEGERE:          Yeah, so you know the details associated with the settlement associated with that action are far more complex and I'm not sure we could go into the process here.*

*REP. WELCH:          Maybe offline we could do that.*

*LEGERE:          I'd be glad to.*

*REP. WELCH:          Because that's incredible. What is — your admitting to, T-Mobile admitted to is that actually had the system of false ring tones.*

*LEGERE:          **There was no admission to a willingness participation of any kind.***

*REP. WELCH:          Well that's, you and I both know that's sort of the deal but it happened.*

*House Committee on Energy & Commerce, Subcommittee on Communications and Technology, Hearing on "Protecting Consumers and Competition: An Examination of the T-Mobile and Sprint Merger" (Feb. 13, 2019), https ://energycommerce.house. gov/committee-activity/hearings/hearing-on-protecting-consumers -and-competition-an-examination-of-the -t (last visited Oct. 10, 2019) (emphasis added).*

**Answer:** Paragraph 284 seeks to quote and characterize congressional testimony. Inteliquent admits that the quotations were included in that congressional testimony, but denies that the allegations place them in the proper context or otherwise describes them accurately. Inteliquent respectfully refers the Court to the testimony and denies all inconsistent allegations. Inteliquent lacks knowledge or information sufficient to form a belief as to the truth of the allegations and on that basis denies them.

285.    *T-Mobile refers to itself as the "Un-carrier" to suggest that it is different and better than its competitors. It pledges to operate as a "maverick." Memorandum from Chairman Frank Pallone, Jr., Committee on Energy & Commerce, to Subcommittee on Communications and Technology Members and Staff at 3 (Feb. 8, 2019).*

**Answer:** The allegations in paragraph 285 seek to quote and characterize congressional records.  Inteliquent admits that the quoted language in paragraph 285 appears in those records, but it denies that the allegations place those records in proper context or otherwise accurately describe them.  Inteliquent respectfully refers the Court to the records for their content, and it denies all inconsistent allegations.  Inteliquent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in  paragraph 285 and on that basis denies them.

286.    *In reality, however, T-Mobile has repeatedly engaged in unfair and deceptive practices. For example, in addition to its fake ring tone scheme and rural call completion failures, T-Mobile previously agreed to pay a $90 million fine and restitutions to settle an investigation by the FCC into its wireless cramming practices, in which T-Mobile charged consumers for third-party services that the customers had not authorized. See FCC Documents, T-Mobile to Pay $90M to Settle Wireless Cramming Investigation (Dec. 19, 2014), https://www.fcc.gov/document/t-mobile-pay-90m-settle-wireless-cramming-investigation (last visited Dec. 9, 2020) the City of New York announced that it had sued T-Mobile and its MetroPCS brand in New York for engaging in "multiple deceptive practices, including selling used phones as new, enrolling customers in expensive financing plans without their consent, deceiving consumers about its refund policy, overcharging customers and failing to provide customers with legal receipts.  City of New York, City Sues T-Mobile for Violating Consumer Protection Law (Sept. 5, 2019), https ://wwwl . nyc.gov/office-of-the-mayor/news/415-19/city- sue s-t-mobile-violating-consumer-protection-law (last visited Dec. 9, 2020); City of New York et al v T-Mobile USA et al, Case No. 451540/2019 (NY Cty. Sup. Ct.).  Motions to Dismiss filed by T-Mobile and MetroPCS were denied in March 2020.*

**Answer:** The allegations in paragraph 286 seek to quote and characterize FCC materials and news articles.  Inteliquent admits that the quoted language in paragraph 286 appears in those materials, but it denies that the allegations place those materials in proper context or otherwise accurately describe them.  Inteliquent respectfully refers the Court to the materials for their content, and it denies all inconsistent allegations.  Inteliquent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 286 and on that basis denies them.

287.    *T-Mobile is "intent on kicking the asses of [its] competitors." John Legere, CEO of T-Mobile, The Brave Ones at 14:50-57, You TUBE (Oct. 28, 2017),*

*https://www.youtube.com/watch?v=Unb5JJeIgJI (last visited Dec. 9, 2020). T-Mobile's CEO, John Legere, has accused other wireless carriers of "raping" their customers "for every penny" and "hat[ing]" people. Id. at 14:17-26. According to Legere, other "Carriers just want to screw [people]," while T-Mobile "just want[s] to take you to dinner and a movie." E.g., id. at 20:48-54. Far from taking its customers to dinner and a movie, however, T-Mobile has taken its customers for a ride, taking their hard earned money while intentionally failing to deliver their calls to their intended destination and intentionally and fraudulently deceiving them through the use of fake ring tones.*

**Answer:** The allegations in paragraph 287 seek to quote and characterize a video. Inteliquent admits that the quoted language in paragraph 287 appears in that video, but it denies that the allegations place the video in proper context or otherwise accurately describe it. Inteliquent respectfully refers the Court to the video for its content, and it denies all inconsistent allegations. Inteliquent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 287 and on that basis denies them.

288. *T-Mobile cultivated an image of itself as a rule-breaker. See, e.g., Lucy Handley, The Brave Ones, John Leger: T-Mobile's rule breaker, CNBC (Nov. 27, 2017), https://www.cnbc.com/2017/11/24/t-mobile-ceo-john-legere-on-twitter-his-rivals-and-being-an-uncarrier.html (last visited Dec. 9, 2020). This mentality that it is ok to break the rules, even the law, permeates T-Mobile's culture. And, the company has utilized aggressive class action waivers and arbitration provisions in its service agreements to avoid being held responsible by its customers for this fraudulent conduct. See, e.g., T-Mobile Terms and Conditions ("By accepting these T&Cs, you are agreeing to resolve any dispute with us through binding arbitration or small claims dispute procedures (unless you opt out), and to waive your rights to a jury trial and to participate in any class action suit"), https://www.t-mobile.com/responsibility/legal/terms-and-conditions (last visited Dec. 9, 2020).*

**Answer:** The allegations in paragraph 288 seek to quote and characterize online articles and legal documents. Inteliquent admits that the quoted language in paragraph 288 appears in those materials, but it denies that the allegations place them in proper context or otherwise accurately describe it. Inteliquent respectfully refers the Court to the materials for their content, and it denies all inconsistent allegations. Inteliquent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 288 and on that basis denies them.

289. *Thus, despite the $40 million forfeiture paid to the U.S. Treasury as a result of the Consent Decree, and its admission of wrongdoing, T-Mobile has undertaken no effort to*

*compensate affected customers. See, e.g., Jon Brodkin, T-Mobile deceived customers with `false ring tones" on failed phone calls, ARS TECHNICA (Apr. 16, 2018, 6:30 PM), https://arstechnica.com/information-technology/2018/04/t-mobile-deceived-customers-with-false-ring-tones-on-failed-phone-calls/ (last visited Dec. 9, 2020). It did not even issue a press release to apologize to its customers for its unlawful conduct.*

**Answer:** The allegations in paragraph 289 seek to characterize a news article. Inteliquent denies that the allegations place that article in proper context or otherwise accurately describe it. Inteliquent respectfully refers the Court to the article for its content, and it denies all inconsistent allegations. Inteliquent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 289 and on that basis denies them.

290.    *Indeed, Commissioner Mignon Clyburn took issue with the Consent Decree for this very reason, stating, in relevant part:*

> *I wish that I could celebrate today's settlement as a victory for consumers and a moment in which the Commission championed consumer protection. Unfortunately, I cannot. With today's item, the Chairman has missed an opportunity to protect consumers and betrayed his own self-professed values when it comes to process.*
>
> *Today's Consent Decree attempts to address massively deceptive and harmful violations of the Commission's rules likely impacting billions—yes, billions—of telephone calls to rural areas over the past several years. According to the Consent Decree, T-Mobile admits to inserting false ringtones into calls that failed to connect. This may have affected `hundreds of millions of calls each year' after the practice was expressly prohibited by the Commission in January 2014.[4]This meant that consumers making calls to certain rural areas would hear ringing on their end even if the call was not actually connecting and the phone was not actually ringing at the called party's premises. The deception made it difficult to pinpoint the problem and resolve it—consumers would think that their service was working and that the person at the other end just did not pick up.*
>
> *How many times was a loved one calling to check on the wellbeing of an elderly relative, only to have the phone ring and ring with no answer? How many times did a consumer try calling his or her doctor for an urgent refill of an important prescription, only to think that nobody was picking up on the other end of the call? Childcare providers, employers, local businesses, old friends—what critical information was missed?*

---

[4] *T-Mobile USA, Inc., Order and Consent Decree, DA 18-373 (Apr. 2018).*

> *How did the Commission address this situation? With a severely mismatched Consent Decree, negotiated by the Chairman's office. The $40 million civil penalty, which will be paid to the U.S. Treasury, is dwarfed by larger, unpaid fines recently proposed against individual robocallers—and the volume of potential violations here outpaces any robocalling action the Commission has taken. And the compliance plan does not contain any concessions that would explain such a massive discount.*
>
> *Perhaps most importantly, there is absolutely nothing in this Consent Decree to compensate consumers. Prior Consent Decrees have included direct-to-consumer benefits, such as refunds or discounts, or notifications to customers who have been impacted.[5]Despite demonstrating a clear and tangible consumer harm, in this Consent Decree, consumers are treated as a mere afterthought.*

*(Attached hereto as Exhibit 17, Commissioner Clyburn Statement of False Ringtones Consent Decree (Apr. 16, 2018).)*

**Answer:** The allegations in paragraph 290 seek to quote and characterize FCC materials. Inteliquent admits that the quoted language in paragraph 290 appears in those materials, but it denies that the allegations place them in proper context or otherwise accurately describe them. Inteliquent respectfully refers the Court to the materials for their content, and it denies all inconsistent allegations. Inteliquent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in 290 paragraph and on that basis denies them.

291. *On November 6, 2019, following T-Mobile's objections to the FCC's production of almost every document in the Commission's investigatory file, the Commission produced 501 additional pages of documents in response to the FOIA request. Several of the documents include redactions. According to the Commission, prior to disclosing the documents to requestors, T-Mobile was given an opportunity to request modifications to those redactions and the Commission acquiesced to T-Mobile's changes. The Commission has also withheld 376 pages of relevant materials in full due to T-Mobile's objections.*

---

[5] *See, e.g., T-Mobile USA, Inc., Order and Consent Decree, 31 F.C.C .Rcd.11410 (EB 2016); Birch Communications, Inc., Order and Consent Decree, 31 F.C.C. Rcd. 13510 (EB 2016); AT&T Services, Inc., Order and Consent Decree, 31 F.C.C. Rcd. 8540 (EB 2016); AT&T Mobility LLC, Order and Consent Decree, 29 F.C.C. Rcd. 11803 (EB 2014).*

**Answer:** Inteliquent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 291 and on that basis denies them.

292. *The November 6, 2019 FOIA Production also reveals that T-Mobile repeatedly provided false, incomplete, or misleading information to the Commission during the course of its investigation. For example, two key documents produced by the FCC illustrate that T-Mobile tried to hide key information from the FCC and proffered implausible excuses for its egregious violation of the FCC's ban on the use of fake ring tones. The first document is T-Mobile's July 12, 2017 response to the Enforcement Bureau's April 3, 2017 Supplemental Letter of Inquiry ("LOI"), attached hereto as Exhibit 20 ("July LOI Response"). In the July LOI Response, T-Mobile revised the response it previously provided to the Commission about its use of fake ring tones.*

**Answer:** Inteliquent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 292 and on that basis denies them.

293. *T-Mobile's July LOI Response explained T-Mobile's intentional activation and use of the fake ring tones as follows:*

> *In 2007, T-Mobile began using Alcatel Lucent call servers that included as a default a five-second Local Ring Back Tone ("LRBT"). That LRBT covered* ***all*** *traffic originating on T-Mobile networks. In late 2008, T-Mobile began using Ericsson call servers in Puerto Rico and North and South Carolina, and in early 2009 it began using Ericsson call servers in New York and California. In July 2013, T-Mobile began migrating its remaining markets to Ericsson call servers, a migration that T-Mobile completed in July 2014. The Ericsson call servers did not initially include LBRT (sic). However,* ***at T-Mobile's request, Ericsson modified the call servers by adding a four-second LRBT feature. The rollout of the four-second LRBT on Ericsson equipment began in October 2013 and was likely completed by the end of 2013.*** *The four-second LRBT on Ericsson equipment* ***applied to all*** *out-of-network traffic originating on T-Mobile networks (i.e., calls from T-Mobile customers to non-T-Mobile customers) that was routed via Session Initiation Protocol (SIP) trunks. By the end of July 2015, MetroPCS traffic had fully migrated to the T-Mobile networks and was thus subject to the four-second LRBT on out-of-network traffic routed via SIP trunks.* ***In September 2015,*** *after T-Mobile determined that the four-second LRBT was not in service on all SIP routes, T-Mobile* ***implemented it on all remaining SIP routes.***

*Id. (emphasis added).*

**Answer:** Inteliquent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 293 and on that basis denies them.

294.     *The second is a declaration from Kathleen Foster dated September 8, 2017 and attached hereto as Exhibit 19. Ms. Foster was a Senior Manager of Core Network Engineering until she became Director of Network Technology in May 2015. Id.*

**Answer:**  Inteliquent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 294 and on that basis denies them.

295.     *Ms. Foster's declaration states in relevant part as follows:*

*5.     In my current role, I oversee the engineers who design and manage the operation of the voice core of T-Mobile's Network, including the Mobile Switching Centers (MSCs). In that role, I was responsible for the integration of Ericsson MSCs (servers) into T-Mobile's Network, including the addition to those servers, and continued use on those servers, of the "early ringing tone" (also referred to as "Local Ring Back Tone," or LRBT) parameter during the 2013-January 2017 period.*

*6.     During the period in which T-Mobile began to swap its Alcatel Lucent (ALU) MSCs for those provided by Ericsson, an inter-networking problem arose such that, for certain calls originating on Ericsson servers but connecting using ALU servers, no ring tone was transmitted back to the calling party even after a call was delivered to the terminating carrier and the called party received a ring tone. Specifically, for certain calls, the calling party did not hear a ring tone even when the call had been delivered to the terminating carrier and the called party's phone was ringing. Rather, the calling party heard dead air until the called party answered the call or the call went to the called party's voice mail.*

*7.     To address this problem, **on or about October 14, 2013, we made a request to Ericsson that the early ringing tone be implemented in the Ericsson MSCs. The LRBT parameter was expanded** after the completion of the ALU-Ericsson migration, consistent with the company's practice of having various features and parameters uniformly applied throughout its network to the extent possible.*

*8.     **I now realize that I and others on my team had received notifications beginning in early 2014 about the FCC's 2013 Rural Call Completion Order (RCC Order) and its contents, including the ban on early ringtone use for voice calls.** At that time, my team and I were very focused on the reporting and recordkeeping aspects of the RCC Order because the company itself was focused on ensuring that it would be ready to collect and report the required data when the record- keeping, reporting, and retention requirements became effective. T-Mobile did not have mechanisms in place to report this data when the RCC Order was released in 2013. **Over the course of the next two years, I and other T-Mobile personnel expended considerable time and resources to develop the systems necessary to collect and report such data.***

*9.     When I was contacted internally about the FCC's Letter of Inquiry in early January 2017, I focused for the first time on the RCC Order's early ringing tone ban. We immediately began to disable the LRBT parameter.*

10. *That **neither I nor anyone on my team became consciously aware of the RCC Order's early ringtone ban** after it went into effect in 2014 was the result of a good-faith mistake. T-Mobile's use of the LRBT parameter was not the result of any malice, ill-intent or conscious scheme to harm consumers. I had no intent to ignore or circumvent the early ringtone rule, nor was I ever asked or directed to do so by anyone at T-Mobile.*

*Id. (emphasis added).*

**Answer:** Inteliquent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 295 and on that basis denies them.

296. *When reviewed together, the July LOI Response and Foster Declaration show the following:*

- *T-Mobile's engineering team affirmatively asked Ericsson to implement the fake ring tones on its Ericsson servers in October 2013, and Ericsson complied with this request, despite publication about the Commission's proposal to ban fake ring tones and its announcement that the issue was on the October 2013 agenda. Upon information and belief, T-Mobile's, as well as Ericsson's, legal and regulatory compliance professionals must have been aware of the impending fake ring tone ban. It made no sense to implement fake ring tones on all out-of-network T-Mobile traffic during the last three months of 2013 when the practice was being banned. The timing of T-Mobile's implementation of the fake ring tones, with the assistance of Ericsson, reflects willful intent by T-Mobile to violate the ban.*

- *T-Mobile omitted material information from its LOI responses concerning how it expanded the use of the fake ring tones in September 2015, and who else was involved. T-Mobile told the FCC it implemented the fake ring tones on "all" out-of-network traffic originating on T-Mobile networks in 2014, but separately and inconsistently reported that "[i]n September 2015, after T-Mobile determined that the four-second LRBT was **not** in service on **all** SIP routes, T-Mobile implemented it on all remaining SIP routes." (Emphasis added). Yet T-Mobile's LOI Response does not indicate whether this "implementation" of the fake ring tones was done over more Ericsson servers or through some other servers, perhaps Inteliquent's servers. It also fails to speak to whether the September 2015 "implementation" of the fake ring tones on more SIP routes coincides with Inteliquent becoming T-Mobile's exclusive nationwide intermediate provider on SIP routes under the PSTN Agreement at the same time. T-Mobile's failure to provide any details to the FCC about who, where, and why fake ring tones were expanded in September 2015 obfuscated the identity of a co-conspirator.*

- *Ms. Foster's testimony to the FCC proffers an implausible excuse for T-Mobile's violation of the fake ring tone ban — her entire team was too focused on developing systems to comply with the Commission's rural call completion reporting requirements for anyone to notice that they had to stop using fake ring tones, despite multiple "notifications" regarding the ban. In addition to it being unfathomable that*

> *T-Mobile overlooked the fake ring tone ban, given its presumptive keen awareness of the ban through its highly competent inside and outside legal, regulatory and compliance staff, Ms. Foster's excuse is incompatible with the PSTN Agreement's delegation to Inteliquent of the responsibility to collect the data required to comply with the rural call completion reporting requirements.*

**Answer:** To the extent paragraph 296 alleges anything against Inteliquent, it denies those allegations. Inteliquent lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 296 and on that basis denies them.

297. *The FOIA production also revealed for the first time that in addition to the call routing and fake ringtone issues, the FCC's investigation into T-Mobile also included investigation of T-Mobile providing false information on the Form 480 rural call completion reports that T-Mobile submitted to the FCC. Specifically, T-Mobile's Form 480 reports represented that there were zero call attempts made to some of the rural LECs in Wisconsin who were experiencing significant call completion issues, which had prompted the FCC's investigation. T-Mobile admitted that "algorithms used to compute call attempts by T-Mobile customers for purposes of generating its quarterly Form 480 reports contained errors that results in the reports for the second and third quarters of 2016 reporting zero call attempts to certain rural OCNs." According to subsequent responses from T-Mobile, T-Mobile eventually admitted that all of its Form 480 reports prior to the FCC's investigation included inaccurate information.*

**Answer:** Inteliquent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 297 and on that basis denies them.

298. *In another instance, it became clear that T-Mobile's original response to the FCC's Letter of Inquiry omitted complaints from MetroPCS subscribers. By this time, however, MetroPCS had been acquired by T-Mobile, its traffic had migrated to T-Mobile's network, and the issues experienced by T-Mobile subscribers impacted MetroPCS subscribers as well. The failure to include complaint information related to MetroPCS subscribers concealed the impact on those consumers.*

**Answer:** Inteliquent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 298 and on that basis denies them.

299. *The FCC proposed slapping "one of the highest proposed forfeitures in the agency's history" on T-Mobile in response to its flagrant violation of FCC's rules. In order to avoid such a significant forfeiture penalty, T-Mobile's lawyers argued that T-Mobile's "behavior did not cause consumer harm of the type the [fake ringtone rule] was designed to prevent." See Supplemental Response of T-Mobile USA, Inc. (Sept. 8, 2017), Exhibit 18, at 4-5. This argument is specious. As the Commission concluded in the 2013 Rural Call Completion Order, a consumer is harmed any time he or she is deceived into believing that his or her call has reached the intended destination when, in fact, it has not, or when a consumer wrongly concludes that the rural carrier*

*is responsible for the call failure. And, as T-Mobile admitted, "early audible ringing is by its nature deceptive." Id. at 12, n.54. The ban against the use of fake ring tones was specifically intended to stop CMRS carriers, like T-Mobile, from deceiving consumers into believing that "the terminating rural provider is responsible for the call failure." 2013 Rural Call Completion Order, ¶ 114.*

**Answer:** The allegations in paragraph 299 seek to quote and characterize FCC materials. Inteliquent admits that the quoted language in paragraph 299 appears in those materials, but it denies that the allegations place those materials in proper context or otherwise accurately describe them. Inteliquent respectfully refers the Court to those materials for their content, and it denies all inconsistent allegations. Inteliquent lacks information or knowledge sufficient to form a belief as to the truth of the remaining allegations and on that basis denies them.

300. *The evidence demonstrates that even after the FCC's fake ringtone ban was implemented, T-Mobile not only violated the FCC's rules but also continued to falsely represent to its customers that rural carriers like Plaintiffs were to blame for call failures. Thus, T-Mobile appears to have engaged in deception during the course of the Commission's investigation in an effort order to avoid "the highest proposed forfeitures in the agency's history."*

**Answer:** Inteliquent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 300 and on that basis denies them.

301. *T-Mobile has undertaken no effort to compensate the carriers that it harmed by its violation of the Commission's rules.*

**Answer:** Inteliquent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 301 and on that basis denies them.

302. *In contrast to its potential exposure of violations of the FCC's rules, the $40 million T-Mobile paid to the U.S Treasury is a paltry sum. Congress has invested the Commission with substantial power to impose steep forfeiture penalties. See 47 U.S.C. § 503.*

**Answer:** Inteliquent states that paragraph 302 attempts to state a legal conclusion, that legal conclusions are for the Court to make, and therefore denies them. Inteliquent also states that paragraph 302 seeks to characterize a statute. Inteliquent denies that it puts that statute in proper context or otherwise accurately describes it. Inteliquent respectfully refers the Court to the statute for its provisions and content, and it denies all inconsistent allegations. Inteliquent lacks

knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 302 and on that basis denies them.

303.     *In 2018, a common carrier could be assessed a forfeiture of $196,387 per violation. See 47 C.F.R. § 1.80(b)(9)(i)-(ii); In the Matter of Amendment of Section 1.80(B) of the Commission's Rules, 33 FCC Rcd. 46 (Jan. 5 2018) (Attachment A; 2018 Maximum Forfeiture Penalty for 47 U.S.C. § 503(b)(2)(B)).*

**Answer:**  Inteliquent states that paragraph 303 attempts to state a legal conclusion, that legal conclusions are for the Court to make, and therefore denies them.  Inteliquent also states that paragraph 303 seeks to characterize regulations and statutes.  Inteliquent denies that it puts those regulations and statutes in proper context or otherwise accurately describes them.  Inteliquent respectfully refers the Court to the statutes and regulations for their content, and it denies all inconsistent allegations.  Inteliquent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 303 and on that basis denies them.

304.     *CMRS providers, like T-Mobile, "will be treated as common carriers for purposes of Section 503 of the Act and [the Commission's] forfeiture guidelines." In the Matter of the Commission's Forfeiture Policy Statement and Amendment of Section 1.89 of the Rules to Incorporate the Forfeiture Guidelines, Report and Order, 12 F.C.C. Rcd. 17087, 17096, ¶ 16 (July 28, 1997).*

**Answer:** Inteliquent states that the allegations in paragraph 304 state legal conclusions, that legal conclusions are for the Court to make, and therefore denies those allegations. Further answering, the allegations in paragraph 304 seek to quote and characterize FCC materials. Inteliquent admits that the quoted language in paragraph 304 appears in those materials, but it denies that the allegations place those materials in proper context or otherwise accurately describe them. Inteliquent respectfully refers the Court to those materials for their content, and it denies all inconsistent allegations.  Inteliquent lacks knowledge or information sufficient to form a belief as to the truth of the allegations and on that basis denies them.

305.     *The Commission has adopted a series of "base forfeiture amounts," for specific violations while recognizing that the list is not exhaustive and that for "large or highly profitable*

*communications entities, the base forfeiture amounts . . . are generally low." Id. at 17099, ¶¶ 2224. The Commission has recognized, therefore, the forfeitures generally should be higher for larger entities in order to ensure that "forfeitures issued against large or highly profitable entities are not considered merely an affordable cost of doing business." Id. at 17099, ¶ 24. The Commission will "take into account the subject violator's ability to pay in determining the amount of a forfeiture" and forfeitures against them will "in many cases be above, or even well above, the relevant base amount." Id. at 17099-17100, ¶ 24.*

**Answer:** Inteliquent states that the allegations in paragraph 305 state legal conclusions, that legal conclusions are for the Court to make, and therefore denies those allegations. Further answering, the allegations in paragraph 305 seek to quote and characterize FCC materials. Inteliquent admits that the quoted language in paragraph 305 appears in those materials, but it denies that the allegations place those materials in proper context or otherwise accurately describe them. Inteliquent respectfully refers the Court to those materials for their content, and it denies all inconsistent allegations. Inteliquent lacks knowledge or information sufficient to form a belief as to the truth of the allegations and on that basis denies them.

306. *In establishing a forfeiture, the Commission will also "consider factors such as `the degree of culpability, any history of prior offenses, ability to pay, and such other factors as justice may require." Id. at 17100, ¶ 27 (quoting 47 U.S.C. § 503(b)(2)(E)).*

**Answer:** Inteliquent states that the allegations in paragraph 306 state legal conclusions, that legal conclusions are for the Court to make, and therefore denies those allegations. Further answering, the allegations in paragraph 306 seek to quote and characterize FCC materials. Inteliquent admits that the quoted language in paragraph 306 appears in those materials, but it denies that the allegations place those materials in proper context or otherwise accurately describe them. Inteliquent respectfully refers the Court to those materials for their content, and it denies all inconsistent allegations. Inteliquent lacks knowledge or information sufficient to form a belief as to the truth of the allegations and on that basis denies them.

307. *Based on Commission precedent, each insertion of a fake ringtone by T-Mobile would constitute a separate violation of the Commission's rule and the Communication Act that could result in a separate forfeiture penalty.*

**Answer:** Inteliquent states that the allegations in paragraph 307 state legal conclusions, that legal conclusions are for the Court to make, and therefore denies those allegations. Inteliquent lacks knowledge or information sufficient to form a belief as to the truth of the allegations and on that basis denies them

308. *The Communications Act also provides that "any carrier who knowingly violates" 47 U.S.C. § 202(a)'s prohibition against unjust or unreasonable discrimination shall "forfeit to the United States the sum of $[12,081] for each such offense." 47 U.S.C. § 202(c); 47 C.F.R. § 1.80(b)(9)(ii) (adjusted for inflation).*

**Answer:** Inteliquent states that the allegations in paragraph 308 state legal conclusions, that legal conclusions are for the Court to make, and therefore denies those allegations. Further answering, the allegations in paragraph 308 seek to quote and characterize a statute. Inteliquent admits that the quoted language in paragraph 308 appears in that statute, but it denies that the allegations place that statute in proper context or otherwise accurately describe it. Inteliquent respectfully refers the Court to that statute for its content, and it denies all inconsistent allegations.

309. *In comparison to the meager $40 million T-Mobile voluntarily paid, the Commission recently imposed a fine of $120 million against a company and its founder after concluding that that company had made more than 96 million spoofed robocalls during a three-month period in violation of the Truth in Caller ID Act of 2009. See In the Matter of Adrian Abramovich, et al., Notice of Apparent Liability for Forfeiture, 32 F.C.C. Rcd. 5418 (June 22, 2017) ("NAL"); In the Matter of Adrian Abrmovich, et al., Forfeiture Order, 33 F.C.C. Rcd. 4663 (May 10, 2018) ("Forfeiture Order"). In calculating this amount, the Commission considered that it had specifically examined 80,000 calls that involved unlawful caller ID spoofing and applied a base forfeiture amount of $1,000 per spoofed call, totaling $80 million, "well below the maximum" that it could have imposed. NAL, 32 F.C.C. Rcd. at 5426, ¶ 25. Then, the Commission determined that the "circumstances in this case merit a significant upward adjustment," and concluded that an additional $40 million forfeiture should be added. Id. at 5427, ¶ 26. The Commission rejected arguments from Abramovich that the forfeiture violated his due process rights or was excessive in light of his inability to pay. See Forfeiture Order, ¶¶ 23 — 30.*

**Answer:** Inteliquent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 309 and on that basis denies them.

310. *T-Mobile argued to the FCC that it should not have a similar penalty imposed on it. See Supplemental Response of T-Mobile USA, Inc. (Sept. 8, 2017), Exhibit 18, at 7-10. According to T-Mobile, Abramovich's conduct was more egregious because it included false*

*representations and misled consumers. Id. As T-Mobile has admitted, however, "early audible ringing is by its nature deceptive." Id. at 12, n.54. T-Mobile deceived consumers, tricked them into blaming rural carriers, and did so all in order to reduce its liability for access charges for high cost codes. This selfish, self-serving, and deceptive conduct is all the more despicable for a company that utilizes the public airwaves to provide its services and is already making billions of dollars annually. It is pure greed.*

**Answer:** Inteliquent states that the allegations in paragraph 310 state legal conclusions, that legal conclusions are for the Court to make, and therefore denies those allegations. Further answering, the allegations in paragraph 310 seek to quote and characterize FCC materials. Inteliquent admits that the quoted language in paragraph 310 appears in those materials, but it denies that the allegations place those materials in proper context or otherwise accurately describe them. Inteliquent respectfully refers the Court to those materials for their content, and it denies all inconsistent allegations. Inteliquent lacks Inteliquent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 310 and on that basis denies them.

311. *Indeed, according to recent news reports, T-Mobile's former CEO John Legere, despite overseeing illegal conduct and what appears to have been the largest fraud ever perpetuated against telecommunications subscribers, left his post with the company shortly after this case was filed. But, rather than publicly condemning his failures, T-Mobile's board rewarded him with a $96 million exit package according to news reports.*

**Answer:** Inteliquent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 311 and on that basis denies them.

312. *Given the magnitude and longevity of T-Mobile's illegal conduct, its high degree of moral culpability, its substantially greater ability to pay, and the fact that it violated both 47 U.S.C. § 201 and 47 U.S.C. § 202, T-Mobile could have easily faced penalties totaling hundreds of billions of dollars.*

**Answer:** Inteliquent states that the allegations in paragraph 312 state legal conclusions, that legal conclusions are for the Court to make, and therefore denies those allegations. Inteliquent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 312 and on that basis denies them.

313.    *While T-Mobile did not incur proportionate penalties at the FCC, the FCC extracted something far more valuable from T-Mobile, its admission of violation of the Commission's rules, which opens the door to the courthouse for the Plaintiffs so they may recover for the harm that T-Mobile and Inteliquent have caused them.*

**Answer:**  Inteliquent states that the allegations in paragraph 313 state legal conclusions, that legal conclusions are for the Court to make, and therefore denies those allegations.  Inteliquent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 313 and on that basis denies them.

### P.    *Factual Allegations Relating To Named Plaintiffs*

### i.    *Plaintiff Craigville Telephone Co. Experienced T-Mobile Call Completion Problems Consistent With The Fake Ring Tone Scheme*

314.    *Plaintiff Craigville Telephone Company operates both an ILEC and a CLEC in northeastern Indiana. Craigville does business as AdamsWells Internet Telecom TV in and around Craigville, Indiana. The ILEC serves about 50 square miles with approximately 800 customers. Its CLEC servers an adjoining area to the north with about 2,000 customers.*

**Answer:**  Inteliquent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 314 and on that basis denies them.

315.    *AdamsWells has worked to combat systemic RCC problems for many years. As AdamsWells's General Manager wrote in a letter to the FCC's Commissioners in 2013:*

> *My wife's father, grandfather, and great-grandfather (and their wives) all worked extremely hard to keep this small rural company alive. Now, will this FCC promote or kill rural communications? In your hands is great responsibility.*
>
> *Literally, our survival depends on whether our business customers can receive calls from their customers. By your lack of enforcement of **"rural call termination"** you may single-handedly destroy the viability of our company and others like us. If business customers pull their service from our network, the end will come for us and there is not one thing I can do to stop it.*
>
> *I have spent much of this week in meetings, or on the phone, with business owners trying to explain our dilemma — I can't make a carrier (least cost router) deliver a call to you. They almost don't believe me!*

\* \* \*

> *One of our largest business customers (300+ employees) informed me this week that they can no longer accept not receiving calls from their customers. They plan to move their telecom services back to a large national carrier. If this continues rural communications (and life in general) for our company and employees will never be the same.*

**Answer:** Inteliquent states that the allegations in 315 paragraph seek to quote and characterize FCC materials. Inteliquent admits that the quoted language in paragraph 315 appears in those materials, but it denies that the allegations place those materials in proper context or otherwise accurately describe them. Inteliquent respectfully refers the Court to those materials for their content, and it denies all inconsistent allegations. Inteliquent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 315 and on that basis denies them.

316. *As relayed by Larry Landis, a Commissioner on the Indiana Utility Regulatory Commission, in a letter to the FCC Commissioners dated October 24, 2013:*

> *Increasingly, rural providers are having to resort to extraordinary `workarounds' in order to assure that the calls directed to them are ultimately delivered to their customers. In a last ditch effort for business customers bedeviled by call termination problems, Craigville Telephone has ported about 30 of its customer numbers to Indigital Telecom (Craigville is a minor shareholder) in Fort Wayne, Indiana. (Indigital Telecom has a Certificate of Territorial Authority from the IURC to operate as a CLEC, toll reseller, and wireless provider in Indiana.) The General Manger explains that Indigital call forwards a newly assigned (temporary) number back to the Craigville Telephone switching network and Craigville delivers the call to the customer. While this is a painful and time consuming process, they have no other alternative which will assure call delivery for these customers.*

> *There is no other way to describe the actions of the manipulative least cost routers than to characterize them for what they are: a perversion to the marketplace, illegal activity motivated by greed and reckless disregard for those attempting to play by the rules. Such activity must be crushed.*

**Answer:** Inteliquent states that the allegations in paragraph 316 seek to quote and characterize FCC materials. Inteliquent admits that the quoted language in paragraph 316 appears

in those materials, but it denies that the allegations place those materials in proper context or otherwise accurately describe them. Inteliquent respectfully refers the Court to those materials for their content, and it denies all inconsistent allegations. Inteliquent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 316 and on that basis denies them.

317. *AdamsWells had significant and prolonged problems with calls originating on T-Mobile's network. During the period of February 2015 to April 2016, a T-Mobile subscriber located in Minneapolis, Minnesota experienced significant problems reaching her elderly parents who resided in Bluffton, Indiana and were subscribers to AdamsWells's telephone service. The T-Mobile subscriber maintained detailed records of her call completion problems, logging a total of 109 call attempts during this time period. Of those 109 call attempts, 56 of the calls were not completed. Several of the calls that were completed were dropped in less than a minute, according to the call logs maintained by the T-Mobile subscriber.*

**Answer:** Inteliquent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 317 and on that basis denies them.

318. *The T-Mobile subscriber reported several events that were consistent with the fake ring tone scheme. For example, the caller informed T-Mobile and AdamsWells that:*

> *I have to make repeated attempts to connect hearing one or two rings and dead air, ring no answer with no rings on my Parent's end, sometimes a single ring on their end and then no one or a dial tone, music, messages such as "you are unable to make long distance calls", and faint dial tones. Often when I do connect, the calls drop after a very short time and there are long delays such that we are speaking over one another.*

**Answer:** Inteliquent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 318 and on that basis denies them.

319. *On March 14, 2015, the T-Mobile subscriber reported that she had "not received a call back from T-Mobile after contacting them regarding this issue for the 4th time."*

**Answer:** Inteliquent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 319 and on that basis denies them.

320. *On March 16, 2015, the T-Mobile subscriber again reported her problems to T-Mobile. According to an email sent by the T-Mobile subscriber to AdamsWells, T-Mobile suggested "one of the carriers between T-Mobile and Adamswells" may be responsible:*

> *I contacted T-Mobile again and my ticket was escalated to the Solutions Center and I spoke with Daniel. He spoke with the engineers and returned my call. They are contacting one of the carriers between T-Mobile and Adamswells where the calls are being routed to see if they can resolve this issue.*

**Answer:** Inteliquent did not provide long-distance services to T-Mobile on March 16, 2015. Inteliquent otherwise lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 320 and on that basis denies them.

321. *When the T-Mobile subscriber did not receive an adequate response from T-Mobile, AdamsWells submitted a rural call completion ticket on her behalf to the FCC on March 17, 2015.*

**Answer:** Inteliquent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 321 and on that basis denies them.

322. *On March 24, 2015, Leah Tokar, part of the Executive Response team in the Office of T-Mobile's President/CEO, John Legere, wrote to Kurt Oliver at AdamsWells in response to the complaint submitted by AdamsWells on behalf of the T-Mobile subscriber, summarizing a conversation that occurred that same day. According to the letter, "T-Mobile engineering is working with a third party, Incomm in resolving" the concerns.*

**Answer:** Inteliquent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 322 and on that basis denies them.

323. *On April 6, 2015, the T-Mobile subscriber spoke with Jordan at T-Mobile. According to notes provided by the T-Mobile subscriber:*

> *[Jordan] explained how calls are passed to intermediary parties to make the connection. He worked with a company called InComm. We did a test call where it rang 9 times and then failed. My parent's said their phone rang twice and when they picked it up no one was there.*

**Answer:** Inteliquent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 323 and on that basis denies them.

324. *Routing changes made by Jordan seemed to resolve the issue for a period of time. However, a few days later, on April 18, 2015, the T-Mobile subscriber reported that the problems had returned. She reported several call attempts with "rings and dead air." The T-Mobile subscriber also reported escalating her concerns to "Leah at the executive office of T-Mobile."*

**Answer:** Inteliquent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 324 and on that basis denies them.

325. *On June 1, 2015, the T-Mobile subscriber reported additional problems and a new trouble ticket was opened by T-Mobile. When AdamsWells staff contacted T-Mobile to try to trouble shoot these issues, Jesse, a T-Mobile technician, was unable to assist, could not provide contact information for an escalation department, and suggested AdamsWells proceed with filing another complaint with the FCC. As a result, AdamsWells filed another complaint with the FCC on behalf of the T-Mobile subscriber.*

**Answer:** Inteliquent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 325 and on that basis denies them.

326. *One June 12, 2015, the T-Mobile subscriber called T-Mobile and spoke with an individual named Brian. According to notes maintained by the T-Mobile subscriber,*

> *[Brian] stated that Engineering had a successful test and closed the ticket and directed me to a retail store to check the sim card on my phone but it was most likely a network routing issue and re-opened a ticket. He said he would return my call the next day at 9AM which did not happen. Up until this point, T-Mobile seemed genuinely interested to attempting to resolve this issue even given how frustrating it had been. I have remained professional with T-Mobile throughout this process.*

**Answer:** Inteliquent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 326 and on that basis denies them.

327. *On June 22, 2015, the T-Mobile subscriber again spoke with a T-Mobile representative. This representative provided false and misleading information about the ring tones, failed to acknowledge T-Mobile's fake ring tone scheme that inserts ring tones before the call reaches the terminating carrier's network, and also placed blame on AdamsWells:*

> *I received a call from Stephanie at T-Mobile as a result of them sending a Customer Satisfaction Survey and being concerned with the results.*
>
> *She made a test call from her business cell phone to my parents number and after a few attempts was able to connect.* **She said once the phone starts ringing, the call is within [Adams Well's] network.** *Just because I hear a phone ringing, does not mean my parent's phone is ringing. She researched my issue and indicated that their engineering team have done numerous tests and troubleshooting and have found no issues with the T-Mobile Network.* **They are pointing the issue towards Adamswells stating that I am not the only one in my family with this issue, and this is a known issue with other members of the Adamswells network according to some web research.** *I am*

*the only one in my family that uses T-Mobile. Others include AT&T, Sprint, and Cellular One. **T-Mobile have closed my issue and are not going to provide me with further support on this matter.** I expressed my frustration with the ongoing problems since February and their failure to reply back from 3 members of their team since June 1st. I requested a letter in writing, which I will forward if you would like to have a copy for your records.*

*Stephanie made 3 attempts to contact my parent's number at approximately 5:30 CST. She did not provide me with the number she called from. On one of the attempts, she heard one ring and then a recorded message to leave a voicemail message. The other attempt was ring no answer. I informed her that my parent's do not have an electronic prompt greeting, but my father's voice.*

*I called my parents at 5:42 CST and the call dropped after 34 seconds. again at 5:43 that dropped after 32 seconds, again at 5:45 that dropped after 7 seconds, and again at 6:09 with ring no answer. These are some examples you should be able to research on your end.*

**Answer:** To the extent paragraph 327 alleges Inteliquent's involvement in a "fake ring tone scheme," Inteliquent denies that allegation. Inteliquent lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 327 and on that basis denies them.

328. *In other notes regarding this call, the T-Mobile subscriber wrote:*

*6/22 - Stephanie from T-Mobile 651-674-3238 called me in response to the customer satisfaction survey. I was on the phone with her for approximately 1 hour. She had 3 failed attempts in reaching my parents with rings and dead air as well as recorded messages and succeeded on the 4 try. She also had me on hold while speaking with other contacts at T-Mobile. **Her response to me was this was this was a known issue with Adamswells and there is not a problem with the T-Mobile Network. She said once the phone starts ringing, it is out of T-Mobile's network and is not their problem. She said this issue was closed with T-Mobile and I was to make no further problem requests regarding this issue.** I requested a letter in writing explaining what T-Mobile had done to resolve this issue so I had something to work with as I was not provided with any contact information with the intermediary parties. She placed me on hold while speaking with her manager and replied stating that I should receive a letter within 7 business days. She offered me 1 month of service at no charge which was done.*

140

**Answer:** Inteliquent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 328 and on that basis denies them.

329. *In a series of email exchanges in August 2015, T-Mobile personnel reported to the T-Mobile subscriber, among other things, that they were:*

- *"open[ing] a ticket with our long distance carrier";*

- *"mak[ing] sure the problematic carriers are identified and then circumvented to alleviate these issues";*

- *having "[its] carrier investigate" and that the carrier "made changes"; and*

- *"continu[ing] to drive this matter with [T-Mobile's] carrier until this issue is permanently resolved."*

**Answer:** Inteliquent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 329 and on that basis denies them.

330. *On September 4, 2015, T-Mobile reported to its subscriber that "[a]s of now, we have all of this traffic routing over a different carrier." Later that day, T-Mobile wrote that "the routing over this new carrier is now in place permanently. The only time that it may default back to the other carrier is in the event of congestion or other network outage affect the new carrier, but that would be very rare."*

**Answer:** Inteliquent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 330 and on that basis denies them.

331. *In early 2016, the T-Mobile subscriber's problems resurfaced again. On April 1, 2016, the T-Mobile subscriber informed T-Mobile and AdamsWells of several call issues in reaching her parents in February and March 2016. William Rowe at T-Mobile pulled call records for five calls attempted on April 1, 2016. AdamsWells reviewed its call records as well. AdamsWells's records revealed that only one of the five calls actually reached its switch, meaning the other four call attempts were never delivered to AdamsWells.*

**Answer:** Inteliquent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 331 and on that basis denies them.

332. *Staff at AdamsWells spent considerable time and resources attempting to trouble shoot the problems identified by the T-Mobile subscriber, responding to emails and calls from the subscribers as well as T-Mobile, and reporting issues to the FCC.*

**Answer:** Inteliquent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 332 and on that basis denies them.

333. *A review of call detail records reveals that some of the T-Mobile subscriber's calls that did reach AdamsWells and were delivered to the caller's parents were carried by Inteliquent as T-Mobile's IXC. Accordingly, upon information and belief, many of the calls that did not reach their intended destination, but which were subjected to fake ring tones, were also carried by Defendant Inteliquent. Discovery will be required to ascertain whether Inteliquent or T-Mobile made "the initial long-distance call path choice" (i.e., the "static or dynamic selection of the path for a long-distance call based on the called number of the individual call") with regard to these calls (and others to AdamsWells' network into which fake ring tones were inserted) and is, therefore, the Covered Provider.*

**Answer:** Inteliquent denies that it was a Covered Provider for any T-Mobile long-distance call. Inteliquent lacks sufficient information or knowledge as to form a belief as to the truth of the remaining allegations in paragraph 333 and on that basis denies them.

334. *AdamsWells does not have any means of knowing how many calls made by other T-Mobile subscribers to an AdamsWells subscriber were never delivered to its network.*

**Answer:** Inteliquent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 334 and on that basis denies them.

335. *AdamsWells did not know until the Consent Decree was released by the FCC that T-Mobile was responsible for the insertion of fake ring tones on calls destined for AdamsWells's subscribers and that T-Mobile had failed to correct known problems with its Intermediate Providers' delivery and completion of calls.*

**Answer:** Inteliquent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 335 and on that basis denies them.

### ii. *Plaintiff Consolidated Telephone Company Experienced T-Mobile Call Completion Problems Consistent With The Fake Ring Tone Scheme*

336. *CTC is located in Brainerd, Minnesota and operates in both CLEC and ILEC areas. It serves over 7,000 business phone lines, and almost 1,700 residential phone lines, in its CLEC area. It serves approximately 650 business phone lines, and approximately 5,600 residential phone lines, in its ILEC area. As a whole, CTC has approximately 15,000 access lines, of which approximately half are business customers.*

**Answer:** Inteliquent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 336 and on that basis denies them.

337. *CTC's CLEC area includes Brainerd, Baxter and communities with a larger business presence than the ILEC area, so its business strategies always focus on growing the number of subscribers, and in particular businesses customers, in the CLEC area where there is opportunity to compete for new business.*

**Answer:** Inteliquent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 337 and on that basis denies them.

338. *CTC struggled for years with poor call completion of inbound calls to its subscribers in both the CLEC and ILEC areas. However, complaints from business customers, particularly in the CLEC area, regarding call completion problems were the most prevalent.*

**Answer:** Inteliquent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 338 and on that basis denies them.

339. *For example, on November 22, 2013, CTC received a customer complaint from the owner of a barbeque take out restaurant called Louie's Bucket of Bones located in Ironton, Minnesota. Louie's Bucket of Bones was a small business serving a rural community and was a CTC subscriber in its CLEC area.*

**Answer:** Inteliquent did not provide long-distance services to T-Mobile on November 22, 2013, and therefore Inteliquent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 339 and on that basis denies them.

340. *The owner of Louie's Bucket of Bones reported to CTC that a patron came into her restaurant and said that she had been trying to call all day regarding an order she wanted to place, but her calls were not connecting. The patron was a T-Mobile customer and had been using her T-Mobile wireless service to place calls to Louie's Bucket of Bones.*

**Answer:** Inteliquent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 340 and on that basis denies them.

341. *The owner of Louie's Bucket of Bones called CTC about this problem and was extremely upset with CTC over this interference with her business which depended upon receiving calls for carryout, catering and delivery orders. The owner reported that some calls from her customers connected to her business, but others did not.*

**Answer:** Inteliquent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 341 and on that basis denies them.

342. *CTC obtained the phone number of the patron whose calls to Louie's Bucket of Bones did not connect, and CTC determined that no calls from her phone number hit CTC's switch, indicating these calls were being halted upstream from CTC.*

**Answer:** Inteliquent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 342 and on that basis denies them.

343. *CTC advised the owner of Louie's Bucket of Bones and its patron to call T-Mobile about the call failure. They reported back to CTC that T-Mobile claimed it made multiple test calls and they all went through to Louie's Bucket of Bones. Nevertheless, the patron reported that when she had called Louie's Bucket of Bones, she heard a message indicating the number was out of reach. T-Mobile resolved the issue for Louie's Bucket of Bones without sharing why the T-Mobile customer's call failed to complete or how the issue was resolved.*

**Answer:** Inteliquent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 343 and on that basis denies them.

344. *The Louie's Bucket of Bones incident was but one of many such instances. Prior to and throughout 2013, CTC observed that apparent call blocking to rural OCNs had become a prevalent practice, not only by T-Mobile, but by other carriers as well. This imposed tremendous economic and reputational burden on CTC, which had to dedicate the full time of 1.5 employees to respond to customer complaints dominated by rural call completion failures.*

**Answer:** Inteliquent denies the allegations in paragraph 344 to the extent they are made against Inteliquent. Inteliquent lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 344 and on that basis denies them.

345. *CTC, like all other impacted carriers, had no way of determining how many times a T-Mobile customer may have attempted to place a call to one of its customers that was not completed, nor was there any way for CTC to know whether T-Mobile was using fake messages, or other call blocking tactics, to deter completion of certain calls. Such information has been kept confidential by T-Mobile.*

**Answer:** Inteliquent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 345 and on that basis denies them.

346. *Kevin Beyer, General Manager of Minnesota's Federated Telephone Cooperative, once described the industry's inability to determine why rural calls are dropped in a 2015 article,*

*stating, "you know where the call originated, but you can't tell where it went to [in] Never Neverland." Jim Spencer, Rural phone woes persist in Minnesota, across the country, STAR TRIBUNE (Apr. 18, 2015, 12:35 PM) ("Star Tribune Article"), http://www.startribune.com/rural-phone-woes-persist-in-mirmesota-across-the-country/300369541/ (last visited Dec. 9, 2020).*

**Answer:** Inteliquent states that the allegations in paragraph 346 seek to quote and characterize a news article. Inteliquent admits that the quoted language in paragraph 346 appears in that news article, but it denies that the allegations place that article in proper context or otherwise accurately describe it. Inteliquent respectfully refers the Court to the article for its content, and it denies all inconsistent allegations. Inteliquent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 346 and on that basis denies them.

347. *CTC submitted complaints to the FCC pursuant to its rural call completion complaint portal.*

**Answer:** Inteliquent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 347 and on that basis denies them.

348. *CTC felt discriminated against due to the imbalance of power and leverage the large carriers like T-Mobile appeared to be exerting over rural carriers like CTC.*

**Answer:** Inteliquent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 348 and on that basis denies them.

349. *Months before the Louie's Bucket of Bones incident, in or about April 2013, CTC had begun working on troubleshooting its call completion problems with Onvoy, Inc. ("Onvoy"), which at the time was a wholesale provider of telecommunications services to other carriers, resellers and service providers. Onvoy's then President, Fritz Hendricks, worked directly with CTC on this project. Mr. Hendricks developed, participated in, and oversaw a call testing process that included testing calls placed to CTC phone lines from T-Mobile test lines, as well as test calls from other carriers' test lines.*

**Answer:** Inteliquent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 349 and on that basis denies them.

350. *For some test calls Onvoy and CTC placed to CTC's customers, they heard no ring back tone and the call did not complete. For others, calls would initially have no sound for up to ten seconds, then they would hear a ring tone without the calls hitting CTC's switch. Sometimes the test calls resulted in the caller hearing a message in Spanish with the call not completing.*

145

**Answer:** Inteliquent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 350 and on that basis denies them.

351.     *CTC believes T-Mobile and other carriers engaging in these types of call blocking strategies did not want to complete calls to its OCNs to avoid high cost intercarrier compensation payments. Mr. Hendricks told CTC he shared in this belief.*

**Answer:** To the extent paragraph 351 contains any allegations against Inteliquent, Inteliquent denies those allegations. Further answering, Inteliquent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 351 and on that basis denies them.

352.     *Unable to solve the call completion problems themselves, Mr. Hendricks and CTC developed a work-around solution. Since they perceived that calls placed to CTC's OCNs were being intentionally blocked or deterred from completion by upstream carriers, CTC ported hundreds of its business customers' phone numbers to Onvoy to make it look to the large carriers like these business customer phone numbers were owned by Onvoy, which had lower intercarrier compensation rates. Doing so dramatically reduced CTC's call completion complaints and the man-hours CTC was devoting to customer call completion complaints.*

**Answer:** Inteliquent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 352 and on that basis denies them.

353.     *CTC had to pay Onvoy for this work-around service and it reduced the volume of calls for which CTC could otherwise seek intercarrier compensation revenue. CTC felt it had no better alternative due to the significant man-hours it was devoting to call completion complaints that it could not resolve, the harm being imposed on its business reputation and the loss of customer goodwill resulting from the prevalent call completion failures.*

**Answer:** Inteliquent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 353 and on that basis denies them.

354.     *CTC believes many other LECs in Minnesota adopted the same practice of porting their customer's numbers to Onvoy for a fee and surrendering the opportunity to collect inter-carrier compensation revenue to Onvoy. CTC presently continues this practice.*

**Answer:** Inteliquent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 354 and on that basis denies them.

146

355.     *Two years prior to this trouble-shooting project, Mr. Hendricks spoke at the 2011 Rural Call Completion workshop and was critical of carriers engaged in rural call blocking or fake ring tone practices. As he explained at the workshop:*

> *When a person calls a customer in a rural market the [caller's] phone will ring 8 to 10 times before the end office of the ILEC is ever signaled — if it is signaled at all. . . [The caller] will hear [] ring but the far end will never ring; that is the trouble in approximately 60 to 65 per cent of the time.*

*And:*

> *The originating carrier is not owning the service responsibility to deliver to the consumer that purchased it from them. Rather, the worse yet, we've found that the originating carrier is deflecting the responsibility for the service quality to a rural carrier that has not even been called in the troubleshooting process to help identify what went wrong on a particular call the customer called them about —* ***and it vilifies the LEC.***

*See 2012 Rural Call Completion Declaratory Ruling at nn. 35, 40 (emphasis added).*

**Answer:**  The allegations in paragraph 355 seek to quote and characterize FCC materials. Inteliquent admits that the quoted language in paragraph 355 appears in those materials, but it denies that the allegations place those materials in proper context or otherwise accurately describe them. Inteliquent respectfully refers the Court to those materials for their content, and it denies all inconsistent allegations.  Inteliquent denies the remaining allegations in paragraph 355.

356.     *Mr. Hendricks's quotes were so influential, they were included in the footnotes of the 2012 Rural Call Completion Declaratory Ruling.*

**Answer:**     Inteliquent admits that the footnotes of the 2012 Rural Call Completion Declaratory Ruling included quotes from Mr. Hendrick's.  Inteliquent respectfully refers the Court to those materials for their content, and it denies all inconsistent allegations.  Inteliquent denies any remaining allegations in paragraph 356.

357.     *In 2015, Mr. Hendricks, still President of what by then had become Onvoy, LLC, was quoted in an article discussing the lack of oversight and regulation of intermediaries that may drop calls, as saying, "you can go buy a computer any place and publish a long-distance rate deck, and it will be used[.]" See Star Tribune Article. He also confirmed that among the ways companies try to avoid connecting rural calls is by what Mr. Hendricks called "false ring-backs," explaining further, "Carriers provide ringing before you are connected on the far end . . . . It's actually not*

*ringing where you're trying to call, but you've heard it ring nine or ten times. So you think the person is not in." Id.*

**Answer:** The allegations in paragraph 357 seek to quote and characterize a newspaper article. Inteliquent admits that the quoted language in paragraph 357 appears in that article, but it denies that the allegations places that article in proper context or otherwise accurately describe it. Inteliquent respectfully refers the Court to that article for its content, and it denies all inconsistent allegations. Further answering, to the extent paragraph 357 alleges anything against Inteliquent, Inteliquent denies those allegations. Inteliquent lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations and on that basis denies them.

358. *On February 10, 2017, GTCR, a private equity firm that owns Onvoy, LLC, created a wholly owned single purpose entity that merged with Inteliquent. The surviving company maintained the Inteliquent name. Inteliquent became wholly owned by Onvoy, LLC.*

**Answer:** Inteliquent admits that on February 10, 2017, Onvoy, LLC, created a wholly owned single purpose entity that merged with Inteliquent. The surviving company maintained the Inteliquent name. Inteliquent became wholly owned by Onvoy, LLC. GTCR, a private equity firm, indirectly wholly owns Onvoy, LLC. Inteliquent denies any inconsistent allegations in paragraph 358.

359. *In connection with the Inteliquent/Onvoy merger, Fritz Hendricks became the President of Inteliquent and remained its President until February 7, 2020, when he was succeeded by Ed O'Hara who had been the company's Chief Financial Officer. Therefore, Inteliquent's immediate-past President is a fact witness in this case because, inter alia, he: (1) investigated suspected call blocking strategies used by T-Mobile during the same time period in which T-Mobile used fake ring tones to mask Inteliquent's rural call completion failures; and (2) has provided regulatory testimony regarding the tremendous harm experienced by rural carriers caused by rural call blocking strategies, including the use of fake ring tones.*

**Answer:** Inteliquent admits that Mr. Hendricks became the CEO of Inteliquent and was succeeded by Mr. O'Hara as the CEO around February 7, 2020, and that Mr. O'Hara previously served as the Chief Financial Officer. Inteliquent denies that it caused any actionable rural call

completion failures. Inteliquent lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 359 and on that basis denies them.

360. *CTC continues to have hundreds of business phone numbers ported to Inteliquent, which took over the ported numbers following the merger. To this day, CTC and likely many other rural LECs who ported their numbers to Onvoy pay Inteliquent to receive its business customers' calls to avoid inbound long distance call completion problems. Thus, Inteliquent and T-Mobile continue to benefit from the fruits of their fake ring tone and call blocking scheme at the expense of small rural carriers.*

**Answer:** Inteliquent denies that it has been involved in any "fake ring tone and call blocking scheme at the expense of small rural carriers" or otherwise. Inteliquent lacks information or knowledge sufficient to form a belief as to the truth about any allegations concerning numbers ported to Onvoy before its 2017 merger. Inteliquent denies the remaining allegations in paragraph 360.

361. *Inteliquent's retention of the phone numbers ported to its OCN and continued collection of revenue from CTC and other similarly situated LECs who implemented the same work-around reflects Defendants' high degree of moral culpability, deliberate oppression and wonton disregard of the rights of others.*

**Answer:** Inteliquent denies the allegations in paragraph 361.

## V. CLASS ALLEGATIONS

362. *Plaintiffs bring this action on behalf of themselves and as a class action, pursuant to the provisions of Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure, on behalf of the following class (collectively, the "Class"):*

> *All local exchange carriers that had calls placed to their customers from a T-Mobile customer which had fake ring tones inserted into the call that masked the blocked or delayed delivery of the call to the local exchange carrier's network.*

**Answer:** Inteliquent states that the allegations in paragraph 362 state legal conclusions, that legal conclusions are for the Court to make, and therefore denies those allegations. To the extent a further answer is deemed required, Inteliquent admits that the plaintiffs purport to bring this action under Federal Rule of Civil Procedure 23 on behalf of themselves and others.

149

Inteliquent denies that there exists a certifiable class under Federal Rule of Civil Procedure 23, that the plaintiffs' class definition is proper, or that the plaintiffs are adequate class representatives.

363.    *Plaintiffs reserve the right to propose subclasses or modify the above class definition based on the evidence adduced in discovery, or as necessary and appropriate.*

**Answer:**  Inteliquent states that the allegations in paragraph 363 state legal conclusions, that legal conclusions are for the Court to make, and therefore denies those allegations.  To the extent a further answer is deemed required, denies that there exists a certifiable subclass or subclasses under Federal Rule of Civil Procedure 23.

364.    *Excluded from the Class are T-Mobile and Inteliquent and any of their subsidiaries and affiliates, and all entities who make a timely election to be excluded from the Class. Plaintiffs reserve the right to revise the Class definition based upon information learned through discovery.*

**Answer:**  Inteliquent admits that it would not be part of any purported class.  Inteliquent denies any remaining allegations in paragraph 364.

365.    *Certification of Plaintiffs' claims for class-wide treatment is appropriate because Plaintiffs can prove the elements of their claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claim.*

**Answer:**  Inteliquent denies the allegations in paragraph 365.

366.    *This action has been brought and may be properly maintained on behalf of the Class proposed herein under Federal Rule of Civil Procedure 23.*

**Answer:**  Inteliquent denies the allegations in paragraph 366.

367.    ***Numerosity****. Federal Rule of Civil Procedure 23(a)(1): The members of the Class are so numerous and geographically dispersed that individual joinder of all Class members is impracticable. For purposes of this complaint, Plaintiffs allege that there are estimated to be over 2,000 local exchange carriers operating within the United States. The precise number of Class members is unknown to Plaintiffs but may be ascertained from records possessed by the Commission and/or Defendants. Class members may be notified of the pendency of this action by recognized, Court-approved notice dissemination methods, which may include U.S. Mail, electronic mail, Internet postings, and/or published notice.*

**Answer:**  Inteliquent states that the allegations in paragraph 367 state legal conclusions, that legal conclusions are for the Court to make, and therefore denies those allegations.  To the

extent a further answer is deemed required, Inteliquent admits that the plaintiffs purport to bring this action under Federal Rule of Civil Procedure 23 on behalf of themselves and others. Inteliquent denies that there exists a certifiable class under Federal Rule of Civil Procedure 23.

368. ***Commonality and Predominance****: Federal Rule of Civil Procedure 23(a)(2) and 23(b)(3): This action involves common questions of law and fact, which predominate over any questions affecting individual Class members, including, without limitation:*

 a. *Whether T-Mobile and Inteliquent jointly violated the Commission's rule prohibiting the insertion of false or fake ring tones, 47 C.F.R. § 64.2201;*

 b. *Whether T-Mobile failed to correct problems or delays associated with its Intermediate Providers' delivery of calls in violation of the Commission's 2012 Declaratory Ruling;*

 c. *Whether T-Mobile, Inteliquent and/or Doe Defendants inserted fake ring tones in calls placed to subscribers of Plaintiffs and which fake ring tones masked calls either being delayed or not completed;*

 d. *Whether T-Mobile, Inteliquent and/or Doe Defendants are liable to Plaintiffs for violations of the Communications Act of 1934, as amended, including but not limited to 47 U.S.C. § 201(b) and 47 U.S.C. § 202(a);*

 e. *Whether T-Mobile's, Inteliquent's or Doe Defendants' conduct violates the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962(c);*

 f. *Whether T-Mobile's, Inteliquent's and/or Doe Defendants' conduct violates the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962(d);*

 g. *Whether T-Mobile, Inteliquent and/or Doe Defendants unlawfully conspired to reduce costs associated with the delivery of high cost calls and relied on the use of fake ring tones to mask those efforts;*

 h. *Whether T-Mobile is liable and responsible for the acts of Inteliquent and/or Doe Defendants as authorized agents and/or pursuant to 47 U.S.C. § 217;*

 i. *Whether T-Mobile's, Inteliquent's and/or Doe Defendants' conduct constitutes tortious interference with prospective economic advantage under Illinois law;*

 j. *Whether T-Mobile's, Inteliquent's and/or Doe Defendants' conduct violated the Illinois Consumer Fraud And Deceptive Business Practices Act, 815 Ill. Comp. Stat. 505/1, et seq. (2007).*

 k. *Whether Plaintiffs and the Class are entitled to compensatory and treble and/or punitive damages, attorneys' fees, and other monetary relief and, if so, in what amount.*

**Answer:** Inteliquent states that the allegations in paragraph 368 state legal conclusions, that legal conclusions are for the Court to make, and therefore denies those allegations. To the extent a further answer is deemed required, Inteliquent denies that common questions of law or fact predominate. Inteliquent denies any remaining allegations in paragraph 368.

369. ***Typicality****: Federal Rule of Civil Procedure 23(a)(3): Plaintiffs' claims are typical of the other Class members' claims because, among other things, all Class members were comparably injured through T-Mobile's, Inteliquent's, and/or Doe Defendants' wrongful conduct as described herein.*

**Answer:** Inteliquent states that the allegations in paragraph 369 state legal conclusions, that legal conclusions are for the Court to make, and therefore denies those allegations. To the extent a further answer is deemed required, Inteliquent denies there is a certifiable class and that the plaintiffs' claims are typical of other supposed class members' claims. Inteliquent further denies that the plaintiffs were injured. Inteliquent denies any remaining allegations in paragraph 369.

370. *No individual inquiry is necessary since the focus is only on T-Mobile, Inteliquent and/or Doe Defendants' wrongful conduct.*

**Answer:** Inteliquent states that the allegations in paragraph 370 state legal conclusions, that legal conclusions are for the Court to make, and therefore denies those allegations. To the extent a further answer is deemed required, Inteliquent denies that no individual inquiry is necessary. Inteliquent denies any remaining allegations in paragraph 370.

371. ***Adequacy****: Federal Rule of Civil Procedure 23(a)(4): Plaintiffs are adequate Class representatives because their interests do not conflict with the interests of the other members of the Class they seek to represent; Plaintiffs have retained counsel competent and experienced in telecommunications law, complex litigation and class action litigation; and Plaintiffs intend to prosecute this action vigorously. The Class's interests will be fairly and adequately protected by Plaintiffs and their counsel.*

**Answer:** Inteliquent states that the allegations in paragraph 371 state legal conclusions, that legal conclusions are for the Court to make, and therefore denies those allegations. Inteliquent denies the allegations in paragraph 371.

372. ***Superiority: Federal Rule of Civil Procedure 23(b)(3): A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The damages or other financial detriment suffered by Plaintiffs and the other Class members are relatively small compared to the burden and expense that would be required to individually litigate their claims against T-Mobile and Inteliquent, so it would be impracticable for the members of the Class to individually seek redress for their wrongful conduct. Even if Class members could afford individual litigation, the court system could not. Individualized litigation creates a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.***

**Answer:** Inteliquent states that the allegations in paragraph 372 state legal conclusions, that legal conclusions are for the Court to make, and therefore denies those allegations. Inteliquent denies all allegations, including that a class action is superior to any other means of adjudicating this case fairly and efficiently.

## VI.   CLAIMS

**Answer to Counts I and VI:** Counts II and VI are not brought against Inteliquent, so no response is required. To the extent a response is deemed required, Inteliquent incorporates its answers to the preceding paragraphs by reference as if fully set forth in response to these claims.

**Answer to Counts II – V and VII:** Inteliquent was dismissed from Counts II – V and VII, and has again moved to dismiss these claims against it in their entirety. Inteliquent therefore reserves answering the allegations in the paragraphs for Counts II – V (paragraphs 383 – 447) and VII (paragraphs 463 – 472) unless and until the Court rules on the pending motion to dismiss, and then only if the Court permits the plaintiffs to proceed on those claims. Inteliquent expressly reserves each and every defense that Inteliquent could assert against these claims as pleaded

against Inteliquent. To the extent a response is deemed required, Inteliquent incorporates its answers to the preceding paragraphs by reference as if fully set forth in response to these claims and denies that the complaint states a viable claim against Inteliquent as to these claims.

## COUNT VIII
## Civil Conspiracy
## (Against All Defendants)

473. *The allegations of paragraphs 1 - 472 are incorporated by reference as though fully set forth herein.*

**Answer:** The answers of all the foregoing paragraphs are incorporated by reference as if fully set forth in this answer to paragraph 473. Inteliquent denies any remaining allegations in paragraph 473.

474. *Defendants agreed to perpetrate the scheme against Plaintiffs and those similarly situated.*

**Answer:** Inteliquent denies the allegations in paragraph 474.

475. *Defendants agreed on the objective and method to perpetrate their scheme.*

**Answer:** Inteliquent denies the allegations in paragraph 475.

476. *The scheme was unlawful.*

**Answer:** Inteliquent denies the allegations in paragraph 476.

477. *Each Defendant committed an overt act in furtherance of the scheme.*

**Answer:** Inteliquent denies the allegations in paragraph 477.

478. *Plaintiffs have been injured by the conspiracy.*

**Answer:** Inteliquent denies the allegations in paragraph 478.

479. *Punitive damages should be awarded because Defendants' conduct evinces a high degree of moral culpability, their conduct was committed with fraud, actual malice, deliberate oppression, and they acted willfully and with wanton disregard of the rights of others.*

**Answer:** Inteliquent denies the allegations paragraph 479.

*WHEREFORE, Plaintiffs request that the Court enter judgment against Defendants and award Plaintiffs damages and all available relief as a result of the conspiracy, as well as any other relief that may be available to remedy Defendants' actions.*

### Prayer for Relief

*WHEREFORE, Plaintiffs and the Class request the following relief:*

1. *That the Court enter an order certifying the Class and appointing either or both Plaintiffs as the representative(s) of the Class, and appointing counsel for Plaintiffs as lead counsel for the respective class;*

2. *That the Court enter judgment against all Defendants jointly and severally, in an amount no less than $750,000,000, premised on the requests for relief set forth herein;*

3. *That the Court enter judgment against all Defendants and in favor of Plaintiffs and the Class, for all economic, monetary, actual, consequential and compensatory damages caused by their wrongful conduct;*

4. *That the Court enter judgment against all Defendants and in favor of Plaintiffs and the Class in an amount sufficient to disgorge Defendants of the significant costs and expenses they avoided by their wrongful conduct;*

5. *That the Court award Plaintiffs and the Class treble damages;*

6. *That the Court award Plaintiffs and the Class punitive damages;*

7. *That the Court award Plaintiffs and the Class the costs and expenses, as well as reasonable attorneys' fees, they incurred in prosecuting this action;*

8. *That the Court award Plaintiffs and the Class pre- and post judgment interest;*

9. *That the Court award such other and further relief as may be necessary or appropriate.*

**Answer to Prayer for Relief:** Inteliquent denies that the plaintiffs are entitled to the relief requested in this "Prayer for Relief" or any other relief whatsoever. Inteliquent thus requests that the Court enter judgment in favor of Inteliquent and against the plaintiffs, and grant any such other relief as the Court shall deem just and equitable.

### Trial By Jury

*Plaintiffs demand trial by jury on all Counts where trial by jury is available.*

## GENERAL DENIAL

Except to the extent than an allegation is specifically and expressly admitted, Inteliquent's answers to the headings, allegations, claims, prayers for relief, and all other statements in the Second Amended Complaint shall be construed as denials. For ease of reference, the headings match the headings used in the Second Amended Class Action Complaint. Inteliquent denies all allegations, if any, contained in the headings.

## AFFIRMATIVE DEFENSES

Without assuming any burden that they would not otherwise bear, Inteliquent asserts the separate and additional defenses set forth below. In addition to the separate and additional defenses set forth below, Inteliquent states that it has insufficient knowledge or information on which to form a belief as to whether it might have additional, as yet unstated, separate defenses available. Inteliquent has not knowingly or intentionally waived any applicable defenses and it reserves the right to amend, add, delete, modify, or rely on any affirmative or other defenses based on legal theories that may be or will be divulged through clarification of the complaint, through discovery, or through further legal analysis of the plaintiffs' position(s) in this litigation. Nothing stated herein is intended or shall be construed as an admission that any particular issue or subject matter is relevant to the complaint's allegations. All allegations in the complaint, including headings and footnotes, not heretofore admitted or denied are here and now denied as though specifically denied herein.

As separate and distinct affirmative defenses, the defendants allege as follows:

## FIRST AFFIRMATIVE DEFENSE

The claims of the members of the putative class are barred, in whole or in part, by the applicable statute of limitations. Every claim should be dismissed as untimely because "it is plain

from the complaint that the defense is indeed a bar to the suit [and] dismissal is proper without further pleading." *Jay E. Hayden Found. v. First Neighbor Bank, N.A.*, 610 F.3d 382, 383 (7th Cir. 2010). The statute of limitations for the Communications Act claims is two years. 47 U.S.C. § 415. For the RICO claims, four years. *See Jones v. Burge*, 2012 WL 2192272, at *3 (N.D. Ill. June 13, 2012). For the ICFA claim, three years. *See Tartan Constr., LLC v. New Equip. Servs. Corp.*, 2018 WL 4563079, at *2 (N.D. Ill. Sept. 24, 2018). And for the civil conspiracy claim, five years. *See Lakin v. Skaletsky*, 2008 WL 4662846, at *4 (N.D. Ill. Oct. 15, 2008), *aff'd*, 327 F. App'x 636 (7th Cir. 2009). The plaintiffs initiated this suit on November 1, 2019, meaning the statutory periods began on: (i) November 1, 2017, for the Communications Act claims; (ii) November 1, 2015, for the RICO claims; (iii) November 1, 2016, for the ICFA claim; and (iv) November 1, 2014 for the civil conspiracy claim. The complaint also alleges that the plaintiffs had knowledge of the facts that form the initial basis for their complaint by 2013. Therefore, all the claims are time-barred.

## SECOND AFFIRMATIVE DEFENSE

The claims of the plaintiffs and the members of the putative classes are barred, in whole or in part, by the doctrines of laches, waiver, and/or estoppel. Such putative class members knew or should have known of the alleged facts that form the initial basis for their complaint by 2013. Yet, no member of the putative class filed suit until well after this time period. This delay prejudiced the defendants.

## THIRD AFFIRMATIVE DEFENSE

The claims of the plaintiffs and the members of the putative classes are barred, in whole or in part, because recovery on such claims would result in unjust enrichment to the plaintiffs and the putative classes. The plaintiffs pray for relief that is duplicative and exceeds the injuries alleged

in the complaint. Therefore, awarding the plaintiffs the relief requested would unjustly enrich the plaintiffs and the putative classes.

## FOURTH AFFIRMATIVE DEFENSE

The relief sought by the plaintiffs and the putative classes—including compensatory damages, treble damages, attorneys' fees and expenses, and punitive damages—is grossly excessive, inequitable, punitive, duplicative and arbitrary so as to violate the Due Process Clauses of the Fifth Amendment and the Eighth Amendment of the United States Constitution.

## FIFTH AFFIRMATIVE DEFENSE

The defendants assert, consistent with their prior motion to dismiss the Complaint, that the claims of the plaintiffs and the members of the putative classes are barred, in whole or in part, because the plaintiffs and the members of the putative classes have not suffered any injury.

## SIXTH AFFIRMATIVE DEFENSE

The defendants assert, consistent with their prior motion to dismiss the Complaint, that any claims of fraud are barred, in whole or in part, because the complaint fails to plead allegations of fraud with the particularity required under Federal Rule of Civil Procedure 9(b).

## SEVENTH AFFIRMATIVE DEFENSE

The claims of the plaintiffs and members of the putative classes are barred, in whole or in part, because the alleged damages suffered by the plaintiffs and the members of the putative class are speculative, and because of the impossibility of ascertaining and/or allocating these alleged damages.

## EIGHTH AFFIRMATIVE DEFENSE

The claims of the plaintiffs and the members of the putative classes are barred, in whole or in part, because the plaintiffs and the putative classes failed to mitigate their alleged damages at or

158

within a reasonable time after the occurrence of the violations alleged in the Complaint. Under the plaintiffs' theory of injury, the plaintiffs were injured once they supposedly lost access charges. It may be determined through discovery that had plaintiffs or their agents timely and diligently taken reasonable steps to mitigate their alleged injuries, they would have been reduced or eliminated altogether.

## NINTH AFFIRMATIVE DEFENSE

The claims of the plaintiffs and the members of the putative classes are barred, in whole or in part, because all conduct of Inteliquent alleged in the Complaint was conducted in good faith and conformed to all laws, government regulations, and industry standards at all relevant times and was therefore not unlawful.

## TENTH AFFIRMATIVE DEFENSE

The plaintiffs' state law claims are preempted by the Federal Communication Act. *See Bastien v. AT&T Wireless Servs., Inc.*, 205 F.3d 983, 987 (7th Cir. 2000) (state law claims based on "poor" "service quality" are preempted by 47 U.S.C. 332(c)(3)(A)).

**WHEREFORE**, Inteliquent respectfully request the following relief:

a. That the plaintiffs and members of the putative classes take nothing by the complaint;

b. That the complaint and each and every allegation and subpart contained therein be dismissed with prejudice;

c. That the Court enter judgment in favor of the Inteliquent;

d. That Inteliquent recover their costs of suit, including reasonable attorneys' fees; and For such other and further relief that the Court may deem just and proper.

Dated: January 12, 2021

Respectfully submitted,

By: _/s/ John J. Hamill_

John J. Hamill
john.hamill@dlapiper.com
Michael S. Pullos
michael.pullos@us.dlapiper.com
Devin J. Carpenter
devin.carpenter@us.dlapiper.com
DLA PIPER LLP (US)
444 West Lake Street, Suite 900
Chicago, Illinois 60606
Tel: 312.368.7036/2176
Fax: 312.251.5809/312.630.6350

*Attorneys for Inteliquent, Inc.*

## <u>CERTIFICATE OF SERVICE</u>

The undersigned attorney, on oath, certifies that on January 12, 2021, he served the foregoing **Answer and Affirmative Defenses to the Second Amended Class Action Complaint** via the ECF system to all parties that have consented to same in accordance with applicable Federal Rules of Civil Procedure and Local Rules of the U.S. District Court for the Northern District of Illinois.

By:  */s/ John J. Hamill*

John J. Hamill