**IN THE UNITED STATES DISTRICT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**


CRAIGVILLE TELEPHONE CO. d/b/a   )
ADAMSWELLS; and CONSOLIDATED   )
TELEPHONE COMPANY d/b/a CTC,   )
   )
        Plaintiffs,   )     No. 1:19-cv-07190
   )
        vs.   )     Judge John Z. Lee
   )
T-MOBILE USA, INC.; and   )
INTELIQUENT, INC.,   )
   )
        Defendants.   )


**MEMORANDUM OF LAW IN SUPPORT OF T-MOBILE USA, INC.'S**
**<u>PARTIAL MOTION TO DISMISS PLAINTIFFS' SECOND AMENDED COMPLAINT</u>**

## <u>TABLE OF CONTENTS</u>

PRELIMINARY STATEMENT ................................................................................. 1

BACKGROUND ................................................................................................. 3

    A.    Plaintiffs' Prior Complaints and the Court's Decision ........................................... 4

    B.    The SAC ........................................................................................... 5

        i.    The SAC Realleges Plaintiffs' "Lost Access Charges" Theory that the Court Found Implausible ....................................................... 5

        ii.    The SAC Repeats Dismissed Counts IV-VII ............................................. 6

LEGAL STANDARD ............................................................................................ 7

ARGUMENT ..................................................................................................... 8

I.    PLAINTIFFS' PREVIOUSLY DISMISSED THEORY OF LOST ACCESS CHARGES REMAINS IMPLAUSIBLE AND SHOULD BE DISMISSED AGAIN. ........................................................................................................ 8

    A.    Plaintiffs' First Theory For Lost Access Charges Is Unsupported and Contrary to Common Sense ...................................................................... 9

    B.    Plaintiffs' Second Theory For Lost Access Charges Is Also Implausible and Unsupported. .............................................................................. 11

II.    COUNTS IV-V ALLEGING RICO VIOLATIONS SHOULD BE DISMISSED. .......... 14

III.    COUNT VI ALLEGING TORTIOUS INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE SHOULD BE DISMISSED. ............................................. 17

IV.    COUNT VII ALLEGING VIOLATIONS OF THE ICFA SHOULD BE DISMISSED UNDER RULES 12(B)(6) AND/OR 12(B)(1) BECAUSE PLAINTIFFS LACK STANDING. ................................................................... 19

CONCLUSION .................................................................................................. 22

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

CASES

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009)..................................................................................................7, 16

*ATC Healthcare Servs. v. RCM Techs., Inc.*,
    282 F. Supp. 3d 1043 (N.D. Ill.2017) ........................................................................21

*Bingham v. Zolt*,
    823 F. Supp. 1126 (S.D.N.Y. 1993), *aff'd*, 66 F.3d 553 (2d Cir. 1995) ...................17

*Borsellino v. Goldman Sachs Grp., Inc.*,
    477 F.3d 502 (7th Cir. 2007) ....................................................................................17

*Castro v. Chicago Hous. Auth.*,
    360 F.3d 721 (7th Cir. 2004) ....................................................................................11

*Conrad v. Nutramax Labs., Inc.*,
    No. 13-3780, 2013 WL 5288152 (N.D. Ill. Sept. 18, 2013)......................................21

*Crichton v. Golden Rule Ins. Co.*,
    576 F.3d 392 (7th Cir. 2009) ....................................................................................19

*Cromeens, Holloman, Sibert, Inc. v. AB Volvo*,
    349 F.3d 376 (7th Cir. 2003) ....................................................................................18

*Dobrowolski v. Intelius, Inc.*,
    No. 17 CV 1406, 2018 WL 11185289 (N.D. Ill. May 21, 2018)................................8

*Freedom Mortg. Corp. v. Burnham Mortg., Inc.*,
    720 F. Supp. 2d 978 (N.D. Ill. 2010) ........................................................................21

*Gelco Corp. v. Major Chevrolet, Inc.*,
    No. 01-cv-9719, 2002 WL 31427027 (N.D. Ill. Oct. 30, 2002) ...............................21

*Gen. Motors Corp. v. State Motor Vehicle Review Bd.*,
    224 Ill.2d 1, 862 N.E.2d 209 (2007) ........................................................................18

*Goren v. New Vision Int'l, Inc.*,
    156 F.3d 721 (7th Cir. 1998) ....................................................................................16

*Got Gold LLC v. Temple*,
    No. 12-2278, 2013 WL 1682862 (C.D. Ill. Mar. 12, 2013).....................................18

*Health King Enter., Inc. v. Dalian Health King Prods. Co.*,
No. 19 C 1878, 2020 WL 1124760 (N.D. Ill. Mar. 6, 2020) (Lee, J.) ....................................18

*In re Sears, Roebuck & Co.*,
No. 05 C 2623, 2006 WL 1443737 (N.D. Ill. May 17, 2006) ................................................20

*In re VMS Sec. Litig.*,
752 F. Supp. 1373 (N.D. Ill. 1990) ....................................................................................16

*Iron Workers Loc. Union No. 17 Ins. Fund v. Philip Morris Inc.*,
29 F. Supp. 2d 801 (N.D. Ohio 1998) ................................................................................17

*Patel v. Zillow, Inc.*,
No. 17-cv-4008, 2018 WL 2096453 (N.D. Ill. May 7, 2018), *aff'd*, 915 F.3d
446 (7th Cir. 2019) ..............................................................................................................21

*Peters v. N. Tr. Co.*,
No. 92 C 1647, 1999 WL 515481 (N.D. Ill. July 15, 1999) ................................................20

*Resol. Tr. Corp v. S & K Chevrolet*,
868 F. Supp. 1047 (C.D. Ill. 1994), *vacated in part on other grounds*, 923 F.
Supp. 135 (C.D. Ill. 1996) ..................................................................................................17

*Rohlfing v. Manor Care, Inc.*,
172 F.R.D. 330 (N.D. Ill. 1997) ..........................................................................................20

*Scanlan v. Eisenberg*,
669 F.3d 838 (7th Cir. 2012) ................................................................................................7

*Selyutin v. Bd. of Dirs. of the Skokie Gardens Condo. Ass'n*,
818 F. App'x 535 (7th Cir. 2020) ..........................................................................................8

*Sequoia Fin. Sols., Inc. v. City of Chicago*,
No. 14 C 3065, 2014 WL 6910494 (N.D. Ill. Dec. 9, 2014) ................................................8

*Soderlund Bros., Inc. v. Carrier Corp.*,
278 Ill. App. 3d 606 (1995) ................................................................................................18

*Standard Chlorine v. Sinibaldi*,
821 F. Supp. 232 (D. Del. 1992).........................................................................................17

*Sunny Handicraft Ltd. v. Envision This!, LLC*,
No. 14-cv-1512, 2015 WL 231108 (N.D. Ill. Jan. 16, 2015) (Lee, J.) ................................18

*Tarzian v. Kraft Heinz Foods Co.*,
No. 18-CV-7148, 2019 WL 5064732 (N.D. Ill. Oct. 9, 2010) ........................................19, 20

*U.S. ex rel. Fowler v. Caremark RX, Inc.*,
  No. CIV.A. 03C8714, 2006 WL 2425331 (N.D. Ill. Aug. 21, 2006) ......................................8

*United States v. Bloom*,
  846 F.3d 243 (7th Cir. 2017) ...................................................................................................15

*Van Tassell v. United Mktg. Grp., LLC*,
  795 F. Supp. 2d 770 (N.D. Ill. 2011) .......................................................................................20

*Vicom, Inc. v. Harbridge Merch. Servs., Inc.*,
  No. 92 C 2808, 1993 WL 8340 (N.D. Ill. Jan. 8, 1993) ..........................................................15

*Williams v. Prizker*,
  No. 18 C 5085, 2018 WL 10638705 (N.D. Ill. Oct. 25, 2018) ..................................................8

STATUTES

18 U.S.C. § 1343 ............................................................................................................................15

18 U.S.C. § 1962(c) .......................................................................................................................15

28 U.S.C. § 2342 ............................................................................................................................11

47 U.S.C. § 262(c)(1)(B) ...............................................................................................................14

OTHER AUTHORITIES

Fed. R. Civ. P. 9(b) ...................................................................................................................1, 16

Fed. R. Civ. P. 12(b) ...................................................................................................................7, 19

Improving Rural Call Quality and Reliability Act of Cong. (2018) ..............................................14

*In the Matter on Rural Call Completion, Fourth Report & Order*, FCC 19-23, WC
  Docket No. 13-39, 2019 WL 1253785 (rel. Mar. 15, 2019) .....................................................14

Defendant T-Mobile USA, Inc. ("TMUS") respectfully submits this memorandum of law in support of its partial motion to dismiss Plaintiffs' Second Amended Complaint (ECF No. 94 ("SAC")), pursuant to Fed. R. Civ. P. 12(b)(1) and 12(b)(6). Specifically, in keeping with the Court's November 16, 2020 decision (Dkt. 91 ("Decision")), TMUS seeks the dismissal, with prejudice, of Plaintiffs' "lost access charges" theory of injury, as well as Counts IV (RICO), V (RICO Conspiracy), VI (Tortious Interference with Prospective Economic Advantage), and VII (Illinois Consumer Fraud Act or "ICFA").

## PRELIMINARY STATEMENT

The SAC is, in reality, a meritless motion for reconsideration. It ignores the Court's rationale for dismissing Plaintiffs' "lost access charges" theory of injury and Counts IV-VII on the prior motions to dismiss, and constitutes an ill-conceived effort to get the Court to reverse itself.

The SAC – the third complaint filed in this action – repeats Plaintiffs' claim of "lost access charges" due to TMUS's use of local ring back tones (or "LRBT"), but does not add anything new. In so doing, Plaintiffs refuse to credit, or even address, the Court's Decision rejecting that theory of injury as contrary to common sense:

> [C]ommon sense dictates that a caller who encountered ringing would have stay[ed] on the line longer than one who met with dead air. As a result, fake ring tones *improve*, not worsen, the odds that calls connect, increasing rather than reducing Plaintiffs' opportunity to earn access charges. Indeed, consistent with that logic, the complaint is bereft of any "factual content" showing that Plaintiffs have lost access[] charges as a result of the alleged false ringing.

Decision at 9 (emphasis in original) (internal citations omitted).

Plaintiffs do not (and cannot) plead facts to the contrary in the SAC. Indeed, as before, the SAC does not identify a single instance when Plaintiffs lost an access charge as a result of LRBT. Instead, Plaintiffs rely solely on mischaracterizations of FCC documents previously raised by them in opposition to Defendants' prior motions to dismiss. Plaintiffs use those documents to argue the

FCC found that LRBT makes callers hang up more quickly than they would have without LRBT (thereby depriving Plaintiffs of access charges). *But the FCC made no such finding*: it never purported to compare the length of time callers would remain on the line with versus without LRBT. The SAC's renewed claim for access charges is therefore no more plausible than it was in Plaintiffs' prior complaint. The Court should again dismiss that claim.

Plaintiffs' attempt to re-plead their RICO claims fails for the same reasons identified in the Decision. The Court dismissed Plaintiffs' RICO claims because, although Plaintiffs made the conclusory allegation that TMUS inserted LRBT into calls for the purpose of defrauding them out of access charges, that conclusion was implausible. Specifically, the Court correctly found, based on Plaintiffs' pleading, that TMUS inserted LRBT "either to 'influence' callers to stay on the line, *not* 'to hang up' prematurely . . . or else simply to improve their subscribers' user experience while their calls sought connection." Decision at 20 (emphasis in original). Although Plaintiffs repeat in the SAC their conclusory contention about TMUS's supposed intent to deprive them of access charges, they have not alleged any new facts to support that conclusion. Indeed, the SAC repeats those allegations that support the Court's decision about why TMUS used LRBT (*i.e.*, to influence callers to stay on the line and improve user experience; not to defraud Plaintiffs of access charges). Therefore, as before, the RICO claims in the SAC fail to allege that TMUS acted with the intent to defraud anyone of money or property. For that reason, Plaintiffs' RICO claims (Counts IV and V) should again be dismissed.

The same is true with respect to Plaintiffs' tortious interference claim (Count VI). The Decision correctly notes that, in their opposition to the prior motions to dismiss, Plaintiffs attempted to re-cast their original claim for tortious interference with *contract* as one for tortious interference with *business expectancy*. And the Court went on to rule that Plaintiffs failed to state

a claim for tortious interference with business expectancy, which requires an allegation that the defendant acted with the intent to injure the plaintiff. Specifically, the Court found, based on Plaintiffs' own allegations, that TMUS did not "desire to harm" Plaintiffs, but rather acted with a "desire to minimize its costs." Decision at 21-22. Plaintiffs' tortious interference claim in the SAC fails for the same reason, as it fails to add any new allegations providing a plausible basis to conclude TMUS inserted LRBT for the purpose of injuring Plaintiffs.

Finally, Plaintiffs' attempt to replead their ICFA claim (Count VII) also fails. The Court dismissed this claim because Plaintiffs did not allege any connection between the purported conduct at issue and the state of Illinois, other than that Defendant Inteliquent, Inc. ("Inteliquent") "has its headquarters in Illinois and may have inserted [LRBT] from a Chicago-area data center." Decision at 23. As the Court correctly found, Plaintiffs "concede that neither they nor the customers who heard [LRBT] reside in" Illinois; thus, "the disputed transactions lack a sufficiently substantial connection with Illinois to permit Plaintiffs' ICFA claim to proceed." *Id.* (quotation and citation omitted). In the SAC, Plaintiffs add allegations that Defendant Inteliquent may have taken actions "in, or at the direction of employees located in, its Chicago, Illinois headquarters," SAC ¶ 471, apparently believing the Court did not appreciate that a company "headquarter[ed]" in Illinois could have employees in Illinois who might take actions in Illinois. But none of the added allegations about Inteliquent's Chicago presence changes the central reason why the ICFA claim fails: neither Plaintiffs nor the customers who allegedly heard LRBT reside in Illinois.

In short, Plaintiffs' attempt to quarrel with the correctness of the Court's Decision through the vehicle of a further amended pleading is meritless. This motion should be granted.

## **BACKGROUND**

Plaintiffs and Defendants are telecommunication companies that connect phone calls. Plaintiffs allege that long-distance calls made between customers of the parties are routed through

each of the parties. SAC ¶¶ 59-60. According to the SAC, a call from a subscriber of TMUS (a wireless carrier (SAC ¶ 18)) to one of Plaintiffs' subscribers located in the geographic regions Plaintiffs service (Minnesota or Indiana (SAC ¶¶ 314, 336)) is routed through "intermediate" providers like Defendant Inteliquent (SAC ¶ 146) before reaching local telephone companies like Plaintiffs (Local Exchange Companies or "LECs"). Plaintiffs then connect the last leg of the long-distance call to their customers. SAC ¶ 66.

Plaintiffs allege that TMUS inserted into calls LRBT – audible ringtones heard on the caller's end of a call before the call has reached the intended call recipient – in order to "mask" delays in calls connecting to Plaintiffs, and that Defendants failed to take adequate corrective action when calls were reported not to complete. SAC ¶¶ 80-81, 226, 333. (Plaintiffs refer to LRBT as "fake" ring tones. *See id.*) Plaintiffs allege that TMUS inserted LRBT into calls that took more than a certain amount of time to complete (*e.g., id.* ¶¶ 178-79) and acknowledge that an alternative to hearing LRBT would have been "dead air." *E.g.*, *id.* ¶ 102.

### A.     Plaintiffs' Prior Complaints and the Court's Decision

Plaintiffs filed this lawsuit on November 1, 2019 (Dkt. 1), and amended their complaint for the first time on November 25, 2019 (Dkt. 19 ("FAC")). They sought recovery of "access charges" they claim they lost because calls to their customers were not connected, as well as other damages.

On November 16, 2020, this Court decided TMUS's and Inteliquent's motions to dismiss the FAC, dismissing five of Plaintiffs' eight causes of action as against TMUS for failure to state a claim. The Court first dismissed Plaintiffs' "access charges" theory of injury, finding implausible Plaintiffs' contention that LRBT caused calls not to connect. Decision at 9. The Court also dismissed Plaintiffs' RICO claims (Counts IV and V of the FAC), because the FAC failed to allege plausibly that Plaintiffs acted with an intent to defraud anyone of money or property in light

of the fact that use of LRBT "in no way tended to deprive Plaintiffs of access charges." *Id.* at 20. The Court dismissed the tortious interference claim (Count VI of the FAC) because Plaintiffs failed to allege plausibly a required element, that TMUS acted with a "desire to harm Plaintiffs" by using LRBT. *Id*. at 22. The Court also dismissed Plaintiffs' claim under the Illinois Consumer Fraud Act (Count VII of the FAC) because Plaintiffs did not plead that any Plaintiff or their customers who heard LRBT were residents of Illinois. *Id*. at 23. The Court allowed Plaintiffs' Communications Act (Counts I-III) and Civil Conspiracy (Count VIII) claims to proceed based on the "sole injury Plaintiffs [] successfully pled": namely, that addressing alleged LRBT-related issues led to a "depletion of [Plaintiffs'] customer service resources." *Id*. at 10 & n.5.

### B.      The SAC

Plaintiffs filed their SAC on December 10, 2020. Plaintiffs do not allege any new material facts relating to their own customers (*compare* FAC ¶¶ 270-317 *with* SAC ¶¶ 314-361) or TMUS's conduct (*compare* FAC ¶¶ 155-204 *with* SAC ¶¶ 191-247). The bulk of Plaintiffs' "new" allegations consist of quoting directly or more extensively from the same documents cited in their FAC. *Compare* FAC ¶¶ 93, 97-99, 107-08, 121 *with* SAC ¶¶ 98, 102-105, 117-124, 137-45. As in the FAC, Plaintiffs purport to represent a putative class of "local exchange carriers that had calls placed to their customers from a T-Mobile customer which had [LRBT] inserted into the call that masked the blocked or delayed delivery of the call to the local exchange carrier's network." SAC ¶ 362; FAC ¶ 318.

### i.      The SAC Realleges Plaintiffs' "Lost Access Charges" Theory that the Court Found Implausible

As in the FAC, the SAC's central grievance is the claim that LRBT "causes calls not to be completed," thereby purportedly depriving Plaintiffs of access fees that they would otherwise receive for connecting calls. SAC ¶¶ 115-16. In the SAC, Plaintiffs merely expand their

quotations from and characterizations of two FCC documents Plaintiffs also relied upon in the FAC in connection with this "access charges" theory of injury: a 2013 Notice of Proposed Rulemaking (the "2013 NPRM"), and the background section of a 2013 Report and Order and Further Notice of Proposed Rulemaking (the "Background of the 2013 Order"). *Compare, e.g.,* FAC ¶¶ 97-98 with SAC ¶¶ 102-104; *compare, e.g.,* FAC ¶¶ 106-108 *with, e.g.*, SAC ¶¶ 112-124. Plaintiffs also relied on characterizations of the Background of the 2013 Order in their opposition to TMUS's motion to dismiss the FAC. *See* Plaintiffs' Opposition to TMUS's MTD the FAC (Dkt. 66, "Opp. to TMUS First MTD") at 7 (citing ¶ 114 from the Background of the 2013 Order).

Plaintiffs further again rely heavily on the Consent Decree that TMUS entered into with the FCC in April 2018, but that document does not mention Plaintiffs or access fees, and does not state that LRBT could cause calls not to connect. *Compare, e.g.*, FAC ¶¶ 360, 365 *and* SAC ¶¶ 411, 416 *with* the Consent Decree, annexed as Exhibit 1 to the SAC (Dkt. 94-1, ("CD")).

### ii.     The SAC Repeats Dismissed Counts IV-VII

Plaintiffs' RICO claims in the SAC (Counts IV and V) are nearly identical to those claims in the FAC. One difference is the addition of an allegation that LRBT inserted by intermediaries prevents calls from being "handed back." SAC ¶ 416. Otherwise, Plaintiffs restate the conclusory allegation about TMUS's alleged intent to deprive them of access charges, which the Decision found to be insufficient, but do not otherwise revise their pleading. The allegations upon which the Court concluded that TMUS's intent in inserting LRBT was "either to 'influence callers to stay on the line, *not* 'to hang up' prematurely . . . or else simply to improve their subscribers' user experience while their calls sought connection" still remain in the SAC. *See* Decision at 20 (citing, *e.g.*, FAC ¶¶ 14, 82, 155); *compare* SAC ¶¶ 14, 86, 191; *see also* SAC ¶¶ 142 (LRBT was only inserted on calls that took a certain amount of time to complete (quoting CD at 3742)), 193 (same), 200 (same), 295 (same).

6

Plaintiffs' claim for tortious interference with business expectancy merely formalizes their prior attempt (in opposition to TMUS's First MTD) to recast the claim in the FAC for tortious interference with contract. SAC ¶ 448-462. However, the SAC does not include any new plausible allegations to support a conclusion that TMUS acted with a desire to harm Plaintiffs by interfering with any business expectancy.

With respect to ICFA claim (Count VII), Plaintiffs' allegations are unchanged, except for an attempt to expand upon the allegation in the FAC that Defendant Inteliquent's headquarters are in Illinois. *Compare* FAC ¶ 415 with SAC ¶ 471. What is still missing are allegations of any other connection to the State, including allegations that any caller heard LRBT in Illinois.

## LEGAL STANDARD

A complaint cannot survive a motion to dismiss under Fed. R. Civ. P. 12(b)(6) for "failure to state a claim upon which relief can be granted" unless it "contain[s] sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Fed. R. Civ. P. 12(b)(6); *Ashcroft v. Iqbal*, 556 U.S. 662, 667 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). The Court is not required to accept as true allegations that amount to legal conclusions, "conclusory statements," or "'naked assertion[s]' devoid of 'further factual enhancement.'" *Id.* at 678 (quoting *Twombly*, 550 U.S. at 557). "Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." *Id.* (internal quotation marks omitted).

A Rule 12(b)(1) motion challenges federal subject-matter jurisdiction, and the plaintiff bears the burden of establishing that the elements necessary for jurisdiction, including standing, have been met. *Scanlan v. Eisenberg*, 669 F.3d 838, 841-42 (7th Cir. 2012).

Critically for purposes of this motion, where an amended complaint does not cure the defects of a previously dismissed complaint, it should be dismissed for the same reasons that the

prior complaint was dismissed. *See*, *e.g.*, *Williams v. Prizker*, No. 18 C 5085, 2018 WL 10638705, at *2 (N.D. Ill. Oct. 25, 2018) (Lee, J.) (dismissing second amended complaint that "suffer[ed] from many of the same defects as" previously-dismissed complaints); *Dobrowolski v. Intelius, Inc.*, No. 17 CV 1406, 2018 WL 11185289, at *3 (N.D. Ill. May 21, 2018) (dismissing amended complaints with prejudice, because "Plaintiffs' amended complaints do not fix the defects that warranted dismissal of their original complaints for failure to state a . . . claim."); *Sequoia Fin. Sols., Inc. v. City of Chicago*, No. 14 C 3065, 2014 WL 6910494, at *3 (N.D. Ill. Dec. 9, 2014) ("[Plaintiff's] failure to cure these pleading deficiencies in its amended complaint implicitly but clearly concedes that the deficiencies cannot be cured."); *U.S. ex rel. Fowler v. Caremark RX, Inc.*, No. CIV.A. 03C8714, 2006 WL 2425331, at *7 (N.D. Ill. Aug. 21, 2006) (collecting authority denying leave to replead due to "repeated failure" to cure pleading defects because granting plaintiffs "a blank check to amend the complaint again would serve [no] purpose other than drawing another motion to dismiss on the same grounds"); *see also Selyutin v. Bd. of Dirs. of the Skokie Gardens Condo. Ass'n*, 818 F. App'x 535, 538 (7th Cir. 2020) (further amendment of complaint may be found futile where defendants flag the same deficiencies in multiple motions to dismiss and the plaintiff fails to remedy those deficiencies.)

## ARGUMENT

### I. PLAINTIFFS' PREVIOUSLY DISMISSED THEORY OF LOST ACCESS CHARGES REMAINS IMPLAUSIBLE AND SHOULD BE DISMISSED AGAIN.

Contrary to the Decision, Plaintiffs continue to allege that LRBT causes calls not to complete and deprives Plaintiffs of access charges they would otherwise receive had the calls connected. SAC ¶¶ 2, 3, 116, 381. In reasserting their "lost access charges" theory of injury, Plaintiffs mischaracterize statements in the 2013 NPRM and the Background of the 2013 Order, but add no new factual content that supports their arguments. *E.g.*, *id.* ¶¶ 87, 104, 114, 380; *see*

*also id.* ¶ 416. At bottom, Plaintiffs do no more than reargue their contention that LRBT causes calls not to complete because LRBT (1) "causes the caller to hang up prematurely, 'thinking nobody is available to receive the call'" and (2) "prevents the call from being handed 'back to the preceding provider for an alternative route." *Id.* ¶ 114. The Court should again dismiss Plaintiffs' purported "access charges" injury, as the SAC merely rehashes illogical arguments previously raised in opposition to Defendants' motions to dismiss the FAC.

### A. Plaintiffs' First Theory For Lost Access Charges Is Unsupported and Contrary to Common Sense.

Plaintiffs' first theory for why they purportedly lost "access charges" is that LRBT "causes" a caller to hang up too early. *See, e.g.*, SAC ¶¶ 104, 114-116. This is exactly what the Court found in the Decision to be contrary to "common sense." Decision at 9. Plaintiffs have simply inserted into the SAC arguments made in their brief in opposition to TMUS's First MTD, without adding anything additional. *Compare* Plaintiffs' Opp. to TMUS First MTD (Dkt. 66) at 7 (citing ¶ 114 from the Background of the 2013 Order) *with* SAC ¶¶ 113-16, 118 (quoting ¶ 114 from the Background of the 2013 Order).

Plaintiffs' argument is no more persuasive in its current form than it was when Plaintiffs were opposing TMUS's motion to dismiss the FAC. As the Court previously noted, the alternative to a TMUS subscriber hearing LRBT – which was applied only if a call took more than a certain amount of time to connect – would be dead air or other symptoms of call connection issues. Decision at 9; *see, e.g.*, SAC ¶ 178 (FAC ¶ 142) (alleging that LRBT was applied for calls that "took more than a certain amount of time to complete"); SAC ¶ 295 (FAC ¶ 251) (alleging that LRBT was implemented to avoid callers hearing extended dead air). In the scenario in which LRBT was applied, therefore, the Court found that it was "[c]ommon sense" that hearing the ringing sound that constituted LRBT would keep a caller on the line longer than if the caller simply

heard dead air or other symptoms of call completion issues that would have been the alternative to LRBT. Decision at 9; *see also* FAC ¶ 142, SAC ¶ 295. Accordingly, the Court concluded, LRBT improved, rather than worsened, the chances of the call connecting and increased, rather than decreased, Plaintiffs' chances of receiving an access charge. Decision at 9.

Plaintiffs repeatedly allege the FCC found that LRBT "causes calls not to be completed," thereby depriving Plaintiffs of access charges (*e.g.*, SAC ¶¶ 115-16), but the FCC made no such finding. *See also* TMUS' Reply Memorandum of Law in Further Support of Motion to Dismiss (Dkt. 69) at 2 (Plaintiffs "fail to cite any FCC order that actually" supports their "theories of harm."). The FCC did not purport to compare how long callers would stay on the phone with LRBT versus with dead air or other symptoms of call connection issues, which is the comparison Plaintiffs assert here for the lost access charges theory. Neither did the FCC "reject" the logical conclusion that LRBT should keep callers on the line longer than would be the case without it. *Compare* SAC ¶¶ 117-118 (citing ¶ 113 of the Background of the 2013 Order) *with* the Background of the 2013 Order (SAC Ex. 9) ¶ 113 (the actual provision, which summarizes third-party – not FCC – comments made in opposition to and in support of the proposed LRBT rule). Plaintiffs' (mis)characterizations of FCC documents do nothing to counter the "[c]ommon sense" principle that LRBT would keep callers on the line longer than would occur without LRBT, improving rather than worsening Plaintiffs' chances of receiving an access charge. *See* Decision at 9.

Plaintiffs also contend that, as a matter of "*Chevron* deference" and under the "Hobbs Act," this Court must accept without question statements in the FCC documents they cite in the SAC. But, as a threshold matter, the Court does not need to reach that issue because, as explained above, the statements actually made in those documents do not support Plaintiffs' lost access charge

theory. Even if they did, this Court would not be bound by them. First, *Chevron* deference refers to the principle in statutory interpretation that a court, upon determining a statute is silent or ambiguous as to the precise interpretive question at issue, may defer to certain reasonable agency interpretations. *See, e.g.*, *Castro v. Chicago Hous. Auth.*, 360 F.3d 721, 727 (7th Cir. 2004) (citing *Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837 (1984)). But whether Plaintiffs have plausibly alleged a theory for "lost access charges" does not involve a question of statutory (or even regulatory) interpretation. Second, the Hobbs Act provides that the Courts of Appeal have "exclusive jurisdiction to enjoin, set aside, suspend (in whole or in part), or to determine the validity of [] all final orders of the Federal Communications Commission made reviewable by section 402(a) of title 47." 28 U.S.C. § 2342. Here again, whether Plaintiffs have plausibly alleged a theory for "lost access charges" has nothing to do with the validity of any FCC order (including the validity of the FCC's prohibition of LRBT, which TMUS does not challenge).

Rather, the implausibility of Plaintiffs' "lost access charges" theory of injury is, as this Court has already found, a matter of common sense. Notably, in addition to the reasoning of the Court's Decision on the point, Plaintiffs' entire theory rests on the (implausible) assumption that a caller who heard LRBT and hung up before the call connected would *never try again*. Even if a call in which LRBT was applied failed to reach a Plaintiff's network, that Plaintiff would still collect an access charge if the caller attempted to call again and successfully connected. *See* TMUS's First MTD (Dkt. 55) at 11-12. Regardless, as with the FAC, the SAC fails to identify even a single access charge Plaintiffs lost, or a single call that did not connect, as a result of the insertion of LRBT.

**B.** **Plaintiffs' Second Theory For Lost Access Charges Is Also Implausible and Unsupported.**

Plaintiffs' second "lost access charges" theory is that LRBT "prevents" calls from being

handed back to a preceding provider for rerouting, thereby "causing" calls to fail (and Plaintiffs to be deprived of an access charge). *E.g.*, SAC ¶¶ 104, 114-116. This argument, which Plaintiffs made without success in opposition to Defendants' prior motions to dismiss the FAC, should also be rejected.[1]

Plaintiffs' attempt to apply the conclusory label of "intermediate provider" to TMUS runs contrary to the factual allegations in the SAC and the Consent Decree upon which Plaintiffs contend their claims rely. Other than the SAC's conclusory labels, Plaintiffs' allegations uniformly refer to TMUS as the *originating* provider for relevant calls. *See, e.g.*, SAC ¶¶ 49-50, 59-60, 317, 340 (describing calls or possible call paths *originating* on TMUS's network), *id.* ¶¶ 168-190 (describing Consent Decree concerning TMUS's use of LRBT), *id.* ¶¶ 226-27 (referring to TMUS's "use of" LRBT and "insert[ion]" of LRBT); *see also id.* ¶¶ 293, 295, 296, 317 (referring to calls or traffic "originating" on TMUS's network). Although Plaintiffs note that TMUS appears on an "Intermediate Provider Registry" (*id.* ¶ 157), Plaintiffs fail to indicate what significance that has to this case. Given Plaintiffs' failure to allege that TMUS inserted LRBT in a single call while acting as an intermediate provider, there is none.

Indeed, the Consent Decree, which Plaintiffs contend "open[ed] the door" for them to file their lawsuit in the first place (*id.* ¶ 313), also concerns only TMUS's conduct as an originating provider. CD at 3741-42 ¶ 5 ("*Originating* providers like T-Mobile, are prohibited from 'convey[ing] a ringing indication to the calling party until the terminating provider has signaled

---

[1] *See* Plaintiffs' Opposition to Inteliquent's First MTD (Dkt. 65) at 8-9 & n.5 (referring to a supposed FCC conclusion that "when an intermediate provider conveys fake ring tones, the intermediate provider is no longer able to hand back the call to the originating carrier for re-routing") (citing the 2013 NPRM); *see also* Opp. to TMUS First MTD (Dkt. 66) at 7 ("Fake ring tones are used to mask routing problems caused by Intermediate Providers, like Inteliquent") (citing, *inter alia*, paragraph 111 of the Background of the 2013 Order).

that the called party is being alerted to an incoming call, such as by ringing.'" (emphasis added));
SAC ¶ 293 ("The four-second LRBT on Ericsson equipment applied to all out-of-network traffic
*originating* on [TMUS] networks (i.e., calls from [TMUS] customers to non-[TMUS] customers)
that was routed via Session Initiation Protocol (SIP) trunks.") (emphasis added).

Plaintiffs' reliance on other statements in FCC documents – cited previously in opposition
to Defendants' motions to dismiss the FAC (*see* Dkt. 65 at 8-9 & n.5, Dkt. 66 at 7) – clearly do
not apply here. *See* SAC ¶¶ 104, 114 (citing ¶¶ 111 and 114 n.294 of the Background of the 2013
Order). The cited FCC documents provide, "Once an intermediate provider provides a ringing
indication to an originating provider while still processing the call, the call cannot be handed back
to the preceding provider for an alternate route." SAC Ex. 9 ¶ 111. On its face, this language
applies only when an intermediate provider is providing a ringing indication while processing a
call. *But, as noted, the SAC fails to allege a single instance of TMUS (or Inteliquent) inserting*
*LRBT as an intermediate provider.* The FCC documents (which the Court already considered on
the prior motions to dismiss) therefore are inapposite.

Like the FAC, the SAC does not contain a single factual averment that explains how or
why LRBT prevents calls from being "handed back" to the originating provider for "rerouting" or
why the intermediate provider could not itself reroute calls if necessary. Nor does the SAC explain
who would be "hand[ing] back" calls, or to whom calls could even theoretically be handed back.
*See also* Inteliquent's Reply on its First MTD (Dkt. 67) at 9-10 (explaining, *inter alia*, that the
FAC contained no factual allegations concerning any of Inteliquent's customers being unable to
take back calls that Inteliquent was unable to complete).

In any event, Plaintiffs cannot simultaneously contend that TMUS could have acted as an
intermediate provider as to any relevant calls *and* assert that TMUS could be liable to Plaintiffs

for violation of the Communications Act (Counts I-III) where it was acting as an intermediate provider, for the same reasons that the Court dismissed Plaintiffs' Communications Act claims in the FAC against Inteliquent. Decision at 26-27. As the Court noted, the requirements set forth in the Communications Act, and the associated FCC rulings upon which Plaintiffs' claims are based, *do not apply to intermediate providers*. *Id.* (quoting 47 C.F.R. § 64.2101 (an intermediate provider "[d]oes not . . . serve as a covered provider in the context of originating or terminating a given call")).) Intermediate providers did not have any specific duties to complete calls under the Communications Act until the FCC created rules in March 2019 pursuant to the Improving Rural Call Quality and Reliability Act of 2017, S. 96, 105th Cong. (2018). *See also* 47 U.S.C. § 262(c)(1)(B) (directing the FCC to "promulgate rules to establish service quality standards" applicable to "intermediate providers"); *In the Matter on Rural Call Completion, Fourth Report & Order*, FCC 19-23, WC Docket No. 13-39, 2019 WL 1253785 (rel. Mar. 15, 2019). Plaintiffs do not even try to reconcile this hopeless inconsistency and fatal flaw in their theory that TMUS acted as an intermediate provider.

## II. COUNTS IV-V ALLEGING RICO VIOLATIONS SHOULD BE DISMISSED.

Plaintiffs' RICO claim and conspiracy to commit RICO claim fail because Plaintiffs do not plead any new facts that cure the fatal defect identified by this Court in the Decision. Plaintiffs' RICO claims are still predicated on the entirely conclusory allegation that LRBT deprived them of access charges, a theory that, as noted *supra*, this Court has found implausible. Thus, Plaintiffs continue to fail to plead an essential requirement for their RICO claim: that TMUS acted with intent to defraud anyone of money or property. Decision at 9, 20-21.

A RICO claim requires Plaintiff to allege a "pattern" of two or more predicate acts of "racketeering activity" (18 U.S.C. § 1962(c)) committed for the purpose of defrauding another of money or property. *See Vicom, Inc. v. Harbridge Merch. Servs., Inc.*, No. 92 C 2808, 1993 WL

8340, at *4 (N.D. Ill. Jan. 8, 1993) (holding that predicate acts must be "intended to deprive an

owner of his property or money"); *see United States v. Bloom*, 846 F.3d 243, 250 (7th Cir. 2017)

(noting that "intent to defraud" is an essential element of wire fraud under 18 U.S.C. § 1343).

In dismissing the FAC's RICO claims, this Court held:

> While the complaint certainly asserts that T-Mobile's fake ring tone scheme "had the illegitimate purpose of fraudulently reducing" the access charges that Plaintiffs and other rural LECs "would otherwise have been entitled to charge," [FAC] ¶¶ 365-66, it fails to make this conclusion plausible for the same reasons that doom Plaintiffs' first theory of injury. As noted above, Plaintiffs' loss-of-access-charges theory overlooks that T-Mobile allegedly inserted false ring tones only to mask delays associated with connection issues. *See id.* ¶¶ 14, 82, 155; *see also Consent Decree*, 33 FCC Rcd. at 3742. As a result, it is reasonable to infer that T-Mobile conducted its alleged scheme either to "influence" callers to stay on the line, *not* "to hang up" prematurely, *see* Am. Compl. ¶ 365; or else simply to improve their subscribers' user experience while their calls sought connection, as T-Mobile contends, *see* T-Mobile's Mem. at 22. Either way, since the alleged scheme in no way tended to deprive Plaintiffs of access charges, it would be unreasonable, without more, to infer that T-Mobile conducted it for that purpose.

Decision at 20 (emphasis in original). The Court also held that all of the other purported "predicate

acts of wire fraud – such as [TMUS's] sending of dishonest emails about call connection problems

to its subscribers – fail for the same reason." *Id*. at n.7 (quoting FAC ¶ 372(c)) (internal citations

omitted). The Court additionally held that the "complaint's vague references to 'call blocking

practices' *other* than insertion of fake ring tones" failed, because there were not enough "factual

details" to even make a "plausible showing that they occurred." *Id*. (emphasis in original).

The SAC does not supply the missing element of an intent to defraud anyone of money or

property. Plaintiffs' theory that LRBT deprives them of access charges is not plausible for the

reasons discussed *supra*. Moreover, the paragraphs of Plaintiffs' pleading that the Court relied on

in concluding that LRBT was allegedly used by TMUS "only to mask delays associated with

connection issues" (in other words, not to defraud anyone of money or property) are fundamentally

unchanged. *See* Decision at 20 (citing, *e.g.*, FAC ¶¶ 14, 82); *compare* SAC ¶¶ 14, 86; *see also*

SAC ¶ 295. Furthermore, as this Court held regarding the FAC (Decision at 20 (quoting CD at

15

3742)), the SAC recognizes that LRBT was only inserted on calls that took a certain amount of time to complete. SAC ¶¶ 142 (quoting CD at 3742), 193 (same), 200 (same), 295 (same). Thus, it continues to be, as the Court previously held, "reasonable to infer" that TMUS's use of LRBT was to ensure callers stayed on the line so the call would connect, not to deprive Plaintiffs of access charges. Decision at 20. And given that Plaintiffs make no amendments at all with respect to other alleged predicate acts (*compare* FAC ¶¶ 365, 372(c) *with* SAC ¶¶ 423(c)), Plaintiffs fail to state any RICO claim, because they do not allege predicate acts of wire fraud with sufficient specificity. *See Goren v. New Vision Int'l, Inc.*, 156 F.3d 721, 726 (7th Cir. 1998) (heightened specificity requirements under Fed. R. Civ. P. 9(b) govern RICO allegations).

Plaintiffs' conclusory addition that TMUS acted with the "purpose of reducing liability for access charges" (SAC ¶ 191) is contradicted by the allegations that TMUS added LRBT "only to mask delays associated with connection issues" in order to "'influence' callers to stay on the line, *not* 'to hang up' prematurely'" "or else simply to improve their subscribers' user experience while their calls sought connection," as this Court held. Decision at 20 (citing FAC ¶¶ 365-66); *see also* (SAC ¶¶ 416-17 (materially similar allegations)). Consequently, Plaintiffs' conclusory amendment, devoid of any factual enhancement, is not entitled to any weight. *See Iqbal*, 556 U.S. at 678. And Plaintiffs' other conclusory (and internally inconsistent, *see supra*) revision – the allegation that LRBT inserted by an intermediate caller prevents calls from being handed back – is not probative of an intent to defraud anyone of money or property. In short, this Court's rationale for dismissing Plaintiffs' RICO counts in the FAC applies equally to the SAC's RICO counts.

Additionally, although the Court did not need to reach the issue in its prior opinion, Plaintiffs' claim for punitive damages under their RICO claims should be dismissed for the further reason that punitive damages are not available under RICO. *See In re VMS Sec. Litig.*, 752 F.

Supp. 1373, 1404 (N.D. Ill. 1990) ("As to the RICO claims, the treble damages provisions define the extent of possible recovery."); *see also Resol. Tr. Corp v. S & K Chevrolet*, 868 F. Supp. 1047, 1062 (C.D. Ill. 1994), *vacated in part on other grounds*, 923 F. Supp. 135, 137 (C.D. Ill. 1996); *Iron Workers Loc. Union No. 17 Ins. Fund v. Philip Morris Inc.*, 29 F. Supp. 2d 801, 819 (N.D. Ohio 1998); *Bingham v. Zolt*, 823 F. Supp. 1126, 1135 (S.D.N.Y. 1993), *aff'd*, 66 F.3d 553, (2d Cir. 1995); *Standard Chlorine v. Sinibaldi*, 821 F. Supp. 232, 252-53 (D. Del. 1992).

## III. COUNT VI ALLEGING TORTIOUS INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE SHOULD BE DISMISSED.

A claim for tortious interference with prospective economic advantage requires pleading: "(1) a reasonable expectancy of entering into a valid business relationship, (2) the defendant's knowledge of the expectancy, (3) an intentional and unjustified interference by the defendant that induced or caused a breach or termination of the expectancy, and (4) damage to the plaintiff resulting from the defendant's interference." *Borsellino v. Goldman Sachs Grp., Inc.*, 477 F.3d 502, 508 (7th Cir. 2007). Plaintiffs' tortious interference claim should be dismissed because Plaintiffs do not (and cannot) satisfy the third element – that TMUS intended to interfere with Plaintiffs' business expectancy.

In opposing TMUS's motion to dismiss Plaintiffs' tortious interference with contract claim in the FAC, Plaintiffs tried to recast it as one for tortious interference with business expectancy. The Court recognized this (*see* Decision at 21 ("Without saying so explicitly, Plaintiffs' response brief recasts the complaint as raising a claim based upon tortious interference with business expectancy.")), considered the recast claim on its merits, and held that Plaintiffs failed to state a claim because they did not adequately plead TMUS "acted with a desire to harm [Plaintiffs] which was unrelated to the interest [it] was presumably seeking to protect." *Id.* at 22 (quoting *Slep-Tone Entm't Corp. v. Coyne*, 141 F. Supp. 3d 813, 834 (N.D. Ill. 2015) (citing *Cap. Options Invs., Inc.*

17

*v. Golderg Bros. Commodities, Inc.*, 958 F.2d 186, 189 (7th Cir. 1992)); *see also Sunny Handicraft Ltd. v. Envision This!, LLC*, No. 14-cv-1512, 2015 WL 231108, at *9-10 (N.D. Ill. Jan. 16, 2015) (Lee, J.) ("[T]he party must allege facts which demonstrate that the defendant's acted with the purpose of injuring the party's expectancies" (citations omitted)). Specifically, this Court held that Plaintiffs "concede[] that the problems were attributable to [TMUS's] desire to minimize its costs rather than any 'desire to harm' Plaintiffs" (Decision at 21-22 (citing FAC ¶¶ 127-31)) – a concession that Plaintiffs also make in the SAC (SAC ¶¶ 163-67).

None of the amendments in the SAC plausibly allege that TMUS acted with a "desire to harm" Plaintiffs. Rather, Plaintiffs continue to allege that TMUS had a desire to minimize its costs, mask call connection issues, and improve the customer experience. SAC ¶¶ 14, 86, 127-31, 295. Instead, for reasons Plaintiffs do not explain, they assert that TMUS cannot meet requirements of the Competitor's Privilege – an affirmative defense. *See Gen. Motors Corp. v. State Motor Vehicle Review Bd.*, 224 Ill.2d 1, 15, 862 N.E.2d 209, 220 (2007) (holding that the Competitor's Privilege is an "affirmative defense to the tort of intentional interference with prospective business advantage").[2] But, as is obvious, this Court need not evaluate an affirmative defense to a claim that Plaintiffs have not properly pled to begin with. Irrespective of whether the Competitor's Privilege applies, Plaintiffs still bear the burden to allege plausibly the elements of tortious interference with business expectancy. *See, e.g.*, *Health King Enter., Inc. v. Dalian Health King Prods. Co.*, No. 19 C 1878, 2020 WL 1124760, at *3 (N.D. Ill. Mar. 6, 2020) (Lee, J.) (distinguishing between elements of the tort and Competitor's Privilege affirmative defense); *Got Gold LLC v. Temple*, No. 12-2278, 2013 WL 1682862, at *4 (C.D. Ill. Mar. 12, 2013), *report and*

---

[2] Even the cases Plaintiffs cite in the SAC acknowledge that the Competitor's Privilege is an affirmative defense. *Cromeens, Hollman, Sibert, Inc. v. AB Volvo*, 349 F.3d 376, 398-99 (7th Cir. 2003); *Soderlund Bros., Inc. v. Carrier Corp.*, 278 Ill. App. 3d 606, 615 (1995).

18

*recommendation adopted*, No. 12-CV-2278, 2013 WL 1667816 (C.D. Ill. Apr. 17, 2013) (distinguishing between elements of the tort and Competitor's Privilege affirmative defense).

In sum, because Plaintiffs do not plausibly allege that TMUS acted with a desire to harm them, the tortious interference with prospective business advantage claim should be dismissed.

## IV. COUNT VII ALLEGING VIOLATIONS OF THE ICFA SHOULD BE DISMISSED UNDER RULES 12(B)(6) AND/OR 12(B)(1) BECAUSE PLAINTIFFS LACK STANDING.

As the Court previously held in dismissing Plaintiffs' prior ICFA claim in the FAC (Decision at 22-23), the ICFA "does not 'apply to fraudulent transactions which take place outside Illinois.'" *Tarzian v. Kraft Heinz Foods Co.*, No. 18-CV-7148, 2019 WL 5064732, at *3 (N.D. Ill. Oct. 9, 2010) (citing *Avery v. State Farm Mut. Auto. Ins. Co.*, 216 Ill.2d 100, 185, 835 N.E.2d 801, 853 (2005)). That is why a non-resident plaintiff may only invoke the ICFA if "the circumstances that relate to the disputed transaction . . . occurr[ed] primarily and substantially in Illinois." *Crichton v. Golden Rule Ins. Co.*, 576 F.3d 392, 396 (7th Cir. 2009) (quoting *Avery*, 216 Ill.2d at 187, 835 N.E.2d at 853-54)). Applying this rule, the Court held Plaintiffs' allegation in the FAC that "Inteliquent has its headquarters in Illinois and may have inserted its fake ring tones from a Chicago-area data center" was insufficient as a matter of law to plead a violation of the ICFA. Decision at 22-23 (citing *Haught v. Motorola Mobility, Inc.*, No. 12-CV-2515, 2012 WL 3643831, at *4 (N.D. Ill. Aug. 23, 2012); *Phillips v. Bally Total Fitness Holding Corp.*, 372 Ill.App.3d 53, 59, 865 N.E.2d 310, 316 (App. Ct. 2007); *Sheeley v. Wilson Sporting Goods Co.*, No. 17-CV-3076, 2017 WL 5517352, at *2 (N.D. Ill. Nov. 17, 2017)). In particular, the Court emphasized that that dismissal was warranted because Plaintiffs "concede that neither they nor the customers who heard [LRBT] reside in" Illinois. Decision at 23.

The SAC ignores the Court's ruling. Plaintiffs resubmit the same claim by simply rewording the prior allegations already considered and rejected by the Court, including that certain

Inteliquent "employees" are "located in" Illinois, and "numerous reporting obligations" took place in Illinois.  SAC ¶ 471.  These are, of course, things associated with have a headquarters in Illinois, a fact the Court already found to be insufficient.  Decision at 22-23.  The same is true for the allegations in the SAC that Inteliquent may have received payments (*id.* ¶ 471), maintained data (*id.* ¶ 213-14), or created reports in connection with the 2015 MSA (*id.* ¶ 212) in Illinois.  Those are precisely the sort of things that happen at a company's headquarters.

Plaintiffs also neglect to address another reason why the Court previously dismissed Plaintiffs' ICFA claim: Plaintiffs' failure to plead that any Illinois consumer or customer was deceived, that any injury occurred in Illinois, or that any misrepresentation was uttered in Illinois. Decision at 23 ("[Plaintiffs] concede that neither they nor their customers who heard [LRBT] reside in [Illinois].").  Far from pleading that Plaintiffs suffered an injury in Illinois, the SAC alleges that all of Plaintiffs' customers and callers allegedly affected by the LRBT reside in Minnesota and Indiana.  SAC ¶¶ 16-17, 25, 273, 294-95, 415.  As a result, Plaintiffs cannot state a claim under the *Illinois* Consumer Fraud and Deceptive Practice Act Claim.  *See, e.g.*, *Kraft Heinz*, 2019 WL 5064732, *3 (the "situs of the transactions at issue" did not occur "primarily and substantially" in Illinois); *In re Sears, Roebuck & Co.*, No. 05 C 2623, 2006 WL 1443737, at *2 (N.D. Ill. May 17, 2006) (dismissing ICFA claim raised by non-resident plaintiffs, but sustaining it for single resident plaintiff); *see also Peters v. N. Tr. Co.*, No. 92 C 1647, 1999 WL 515481, at *14 (N.D. Ill. July 15, 1999) (no ICFA claim because "none of these events [alleged to take place in Illinois] include the deceptive acts that form the basis of the ICFA claim").[3]

---

[3] Independently, because Plaintiffs "new" allegations only relate to Inteliquent, none of them provide a nexus between *TMUS* and Illinois.  *See, e.g.*, *Rohlfing v. Manor Care, Inc.*, 172 F.R.D. 330, 340 (N.D. Ill. 1997) ("where the only connection with Illinois is the headquarters of one defendant, we conclude that the ICFA does not apply to the claims of the non-Illinois plaintiffs"); *Van Tassell v. United Mktg. Grp., LLC*, 795 F. Supp. 2d 770, 782 (N.D. Ill. 2011) (same).

Additionally, Plaintiffs' ICFA claim also fails for reasons this Court did not reach in its Decision. Plaintiffs fail to allege a nexus between themselves and Illinois consumers, which requires Plaintiffs to plead "(1) that its actions were akin to a consumer's actions to establish a link between it and consumers; (2) how defendant's representations . . . concerned consumers other than plaintiff; (3) how defendant's particular breach . . . involved consumer protection concerns; and (4) how the requested relief would serve the interests of consumers." *Freedom Mortg. Corp. v. Burnham Mortg., Inc.*, 720 F. Supp. 2d 978, 1004 (N.D. Ill. 2010) (citations omitted); *see also Patel v. Zillow, Inc.*, No. 17-cv-4008, 2018 WL 2096453, at *1 (N.D. Ill. May 7, 2018) (Rule 12(b)(6) dismissal), *aff'd*, 915 F.3d 446 (7th Cir. 2019); *Conrad v. Nutramax Labs., Inc.*, No. 13-3780, 2013 WL 5288152, at *2 (N.D. Ill. Sept. 18, 2013) (Rule 12(b)(1) dismissal).

Because these elements are absent from the SAC, dismissal is warranted. Here, Plaintiffs, call-routing intermediaries who did not hear LRBT, do not plausibly plead that their actions are akin to an Illinois consumer's actions. *See, e.g.*, *ATC Healthcare Servs. v. RCM Techs., Inc.*, 282 F. Supp. 3d 1043, 1051-52 (N.D. Ill. 2017); *see also Zillow, Inc.*, 2018 WL 2096453, at *9 (where plaintiffs were real estate sellers and the consumers at issue were real estate buyers, plaintiffs "failed to plausibly allege that their actions were akin to consumers' actions"), *aff'd*, 915 F.3d at 449 ("[P]laintiffs are not buyers of real estate. The subject does not require additional discussion."). Furthermore, Plaintiffs' ICFA claim does not implicate – and the relief it seeks would not serve – *Illinois* consumers. *See Gelco Corp. v. Major Chevrolet, Inc.*, No. 01-cv-9719, 2002 WL 31427027, at *11 n.7 (N.D. Ill. Oct. 30, 2002). Ultimately, awarding Plaintiffs – non-Illinois businesses – damages (costs for alleged depletion of resources addressing non-Illinois customers' complaints) does not serve the interests of any Illinois consumer who would have been harmed by the allegedly deceptive conduct. *Zillow*, 2018 WL 2096453, at *9.

## <u>CONCLUSION</u>

For the foregoing reasons, the SAC should be dismissed to the same extent that the FAC was dismissed, as set forth in this Court's November 16, 2020 Order (Decision). The dismissal should be with prejudice.

Dated: January 12, 2021

Respectfully submitted,

<u>/s/ Nigel F. Telman</u>
Nigel F. Telman
PROSKAUER ROSE LLP
Three First National Plaza
70 West Madison, Suite 3800
Chicago, IL 60602
(312) 962-3550
(312) 962-3551 (fax)
ntelman@proskauer.com

Bradley I. Ruskin (admitted *pro hac vice*)
Michael T. Mervis (admitted *pro hac vice*)
Baldassare Vinti (admitted *pro hac vice*)
PROSKAUER ROSE LLP
11 Times Square
New York, New York 10036
(212) 969-3249
(212) 969-2900
bruskin@proskauer.com
mmervis@proskauer.com
bvinti@proskauer.com

## CERTIFICATE OF SERVICE

I, Nigel F. Telman, one of the attorneys for Defendant T-Mobile USA, Inc., certify that I caused a copy of the attached MEMORANDUM OF LAW IN SUPPORT OF T-MOBILE USA, INC.'S PARTIAL MOTION TO DISMISS to be served by email via the Court's ECF System, upon counsel for Plaintiffs:

David T.B. Audley
Mia D. D'Andrea
Chapman and Cutler LLP
111 West Monroe Street
Chicago, IL 60603-4080
Email: audley@chapman.com
Email: dandrea@chapman.com

Cathy A. Hinger
G. David Carter
Womble Bond Dickinson (US) LLP
1200 19th Street, NW, Suite 500
Washington, DC 20036
Email: cathy.hinger@wbd.us.com
Email: david.carter@wbd.us.com

Kurt Weaver
Womble Bond Dickinson (US) LLP
555 Fayetteville Street, Suite 1100
Raleigh, NC 27061
Email: kurt.weaver@wbd-us.com

this 12th day of January, 2021.

*/s/ Nigel F. Telman*