**IN THE UNITED STATES DISTRICT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| CRAIGVILLE TELEPHONE CO. d/b/a | ) | |
| ADAMSWELLS; and CONSOLIDATED | ) | |
| TELEPHONE COMPANY d/b/a CTC | ) | |
| | ) | |
| Plaintiff, | ) | No. 1:19-cv-07190 |
| | ) | |
| vs. | ) | Judge John Z. Lee |
| | ) | |
| T-MOBILE USA, INC.; and | ) | |
| INTELIQUENT, INC. | ) | |
| | ) | |
| Defendants. | ) | |

**T-MOBILE USA, INC.'S ANSWER AND AFFIRMATIVE DEFENSES TO
PLAINTIFFS' SECOND AMENDED COMPLAINT**

Defendant T-Mobile USA, Inc. ("T-Mobile" or "TMUS") hereby responds to Plaintiffs'

Second Amended Complaint (ECF No. 94) ("SAC") as follows:

## I.     NATURE OF THE CASE

**Paragraph 1:**  T-Mobile tells the world that it is the "Un-carrier" and brags that it has "disrupted the wireless communication services industry by listening to our customers and providing them with added value and an exceptional experience, including implementing signature initiatives that changed the wireless industry forever."  T-Mobile certainly is a disruptive force; one of its signature initiatives has been to illegally disrupt billions of calls as part of a nationwide fraud perpetuated against its own customers in order to deter them from making phone calls to rural America.

**Answer to Paragraph 1:**  Defendant TMUS states that it advertises its services to the public and

that the allegations of this paragraph purport to characterize those advertisements.  Defendant

TMUS denies that the allegations of this paragraph accurately and/or completely describe its

advertisements, respectfully refers the Court to those advertisements for their contents and context,

and denies all inconsistent allegations.  Further answering, Defendant TMUS states that this

paragraph states legal conclusions and that legal conclusions are for the Court to make, but denies

that Plaintiffs have any viable claim against TMUS.  Defendant TMUS otherwise denies the

remaining allegations in this paragraph.

**Paragraph 2:**  In April 2018, T-Mobile admitted that it engaged in a protracted and illegal scheme which cheated its customers, and carriers like Plaintiffs comprising a nationwide class, impacting hundreds of millions of calls annually.  T-Mobile has also admitted that this protracted scheme included a cover up - the insertion of fake ring tones into calls before the calls were connected to the intended recipient of the calls. The Federal Communications ("FCC" and "Commission") has found that the use of fake ring tones causes calls not to be completed because it confuses callers into prematurely hanging up, wrongfully believing their call has been successfully connected but that the recipient of the call is simply not answering.  The FCC has also found that insertion of fake ring tones prevents calls that are not completing from being handed back to the preceding intermediate carrier to try another route.  Every time a call is not completed because of these direct consequences of fake ring tones, the terminating LEC is directly harmed by not receiving access charges for the termination of that call. T-Mobile consciously used this illegal practice to mask its intermediate carriers' routine failure to deliver high cost calls it routed to rural areas of the United States that created a negative margin for T-Mobile.  In addition, the use of the fake ring tones deceived customers into believing the calls were reaching their intended destination and thereby shifted blame for those call failures onto local phone companies, particularly rural carriers, even though the calls never even made it to these rural carriers' networks.

**Answer to Paragraph 2:** No response is required because the allegations in this paragraph relate to Defendant TMUS's pending motion to dismiss, to which the Court is respectfully referred. Further answering, Defendant TMUS otherwise denies the allegations in this paragraph, including that there was any "fake ringtone scheme."

**Paragraph 3:** T-Mobile's fake ring tone scheme injured the class members' businesses by depriving them of opportunities to seek intercarrier compensation for calls the scheme blocked from connecting to the Plaintiffs' switches, and causing them lost profits and revenue, and lost time value of labor hours associated with investigating and responding to customer complaints.

**Answer to Paragraph 3:** No response is required because the allegations in this paragraph relate to Defendant TMUS's pending motion to dismiss, to which the Court is respectfully referred. Further answering, Defendant TMUS otherwise denies the allegations in this paragraph, including that there was any "fake ringtone scheme."

**Paragraph 4:** T-Mobile has admitted that its conduct violated rules expressly adopted by the Commission that prohibit these practices, an admission that it also violated the Communications Act of 1934.

**Answer to Paragraph 4:** Defendant TMUS states that it entered into a Consent Decree with the FCC in April 2018 and that the allegations of this paragraph purport to characterize that Consent Decree. Defendant TMUS denies that the allegations of this paragraph accurately and/or completely describe the Consent Decree, respectfully refers the Court to the Consent Decree (Exhibit 1 to the SAC) for its contents and context, and denies all inconsistent allegations. Further answering, Defendant TMUS states that this paragraph states legal conclusions and that legal conclusions are for the Court to make, but denies that Plaintiffs have any viable claim against TMUS. Defendant TMUS otherwise denies the allegations in this paragraph.

**Paragraph 5:** T-Mobile conceded its misconduct in an April 2018 consent decree with the FCC, which included payment of a $40 million penalty to the U.S. Treasury. *See In the Matter of T-Mobile USA, Inc.*, Order and *Consent Decree*, DA 18-373, 33 F.C.C. Rcd. 3737 (2018) ("*Consent Decree*") (attached hereto as Exhibit 1). T-Mobile's conduct represents one of the largest telecommunications frauds ever perpetrated against the American people. In comparison

to T-Mobile's 2018 net profits of $2.88 billion and $43.3 billion in total revenue, however, a $40 million penalty represents but a slap on the wrist.

**Answer to Paragraph 5:**  Defendant TMUS states that the allegations of this paragraph purport to characterize Exhibit 1 to the SAC (the Consent Decree), denies that the allegations of this paragraph accurately and/or completely describe Exhibit 1 to the SAC, respectfully refers the Court to Exhibit 1 to the SAC for its contents and context, and denies all inconsistent allegations. Defendant TMUS otherwise denies the remaining allegations in this paragraph.

**Paragraph 6:**  The FCC's *Consent Decree* did nothing to compensate any of the consumers who were victims of T-Mobile's fake ring tone scheme and deceptive trade practices.  T-Mobile made no public statements apologizing for its conduct and did nothing to atone to its consumers or the local and predominantly rural carriers it harmed by failing to deliver calls.  (T-Mobile's customers have little avenue for redress in light of binding arbitration and class action waiver provisions in T-Mobile's consumer terms and conditions.)

**Answer to Paragraph 6:**  Defendant TMUS states that the allegations of this paragraph purport to characterize Exhibit 1 to the SAC (the Consent Decree), denies that the allegations of this paragraph accurately and/or completely describe Exhibit 1 to the SAC, respectfully refers the Court to Exhibit 1 to the SAC for its contents and context, and denies all inconsistent allegations. Further answering, Defendant TMUS otherwise denies the allegations in this paragraph, including that there was any "fake ringtone scheme."

**Paragraph 7:**  In fact, when questioned by Congress about the *Consent Decree*, T-Mobile's then CEO John Legere went so far as to deny that the company had admitted to wrongdoing.

**Answer to Paragraph 7:**  Defendant TMUS states that the allegations of this paragraph purport to characterize Mr. Legere's Congressional testimony, denies that the allegations of this paragraph accurately and/or completely describe Mr. Legere's Congressional testimony, respectfully refers the Court to Mr. Legere's Congressional testimony for its contents and context, and denies all inconsistent allegations.  Defendant TMUS otherwise denies the remaining allegations in this paragraph.

**Paragraph 8:** The FCC's *Consent Decree* also did not compensate the carriers that were harmed by T-Mobile's conduct. Here, however, the FCC acted to ensure that impacted carriers could obtain appropriate compensation by picking up where the Commission left off to ensure that T-Mobile does not profit from its illegal conduct. Specifically, by declaring the use of false ring tones and the failure to oversee intermediate providers to both qualify as "unjust and unreasonable practices" that violate Section 201(b) of the Communications Act of 1934, and by extracting admissions from T-Mobile that it engaged in these illegal practices, the Commission ensured that carrier-victims would have a clear and efficient path to the courthouse to obtain recovery for T-Mobile's illegal conduct. *See, e.g.*, 47 U.S.C. § 201(b); 47 U.S.C. §§ 206-207.

**Answer to Paragraph 8:** Defendant TMUS states that the allegations of this paragraph purport to characterize Exhibit 1 to the SAC (the Consent Decree), denies that the allegations of this paragraph accurately and/or completely describe Exhibit 1 to the SAC, respectfully refers the Court to Exhibit 1 to the SAC for its contents and context, and denies all inconsistent allegations. Further answering, Defendant TMUS states that this paragraph states legal conclusions and that legal conclusions are for the Court to make, but denies that Plaintiffs have any viable claim against TMUS. Defendant TMUS otherwise denies the remaining allegations in this paragraph.

**Paragraph 9:** Also not adequately addressed by the *Consent Decree* is the role of T-Mobile's co-conspirators in the massive fraud. On information and belief, after T-Mobile and Defendant Inteliquent entered into a Master Services Agreement in 2015 in which Inteliquent was to become the exclusive carrier to transit and terminate traffic for T-Mobile, the evidence will reveal that Inteliquent was losing money on the contract and became desperate to reduce one of its primary costs, known as access charges, which Inteliquent was required to pay on T-Mobile's behalf to local phone companies for the privilege of using their networks to terminate calls made by T-Mobile's subscribers. As a result, T-Mobile and Inteliquent began to actively conspire to develop strategies to deter or prevent customers from making phone calls for which there are high per-minute costs to complete.

**Answer to Paragraph 9:** No response is required because the allegations in this paragraph relate to Defendant TMUS's pending motion to dismiss, to which the Court is respectfully referred. To the extent a response is required, Defendant TMUS denies the allegations in this paragraph.

**Paragraph 10:** One of the ways in which T-Mobile's intermediate providers who failed to deliver calls (whether Inteliquent or other Doe Defendants) created savings was to route calls to other parties that were not equipped to deliver the traffic to its intended destination in a reliable manner, to the point of creating significant volumes of call failures. Inteliquent and Doe Defendants may have also intentionally dropped or failed to deliver calls. Moreover, Plaintiffs believe that

discovery will reveal that the fake ring tone scheme was hatched jointly by T-Mobile and Inteliquent.

**Answer to Paragraph 10:** Defendant TMUS has insufficient information upon which to form a belief as to the truth of the allegations in this paragraph concerning Inteliquent and/or the Doe Defendants' unilateral conduct and therefore denies those allegations. Further answering, Defendant TMUS otherwise denies the allegations in this paragraph, including that there was any "fake ringtone scheme."

**Paragraph 11:** The *Consent Decree* describes how T-Mobile expanded the use of fake ring tones on a nationwide basis, *after* the FCC expressly declared the practice unlawful in January 2014. This admission of such egregious conduct is astounding, even for an "Un-carrier" like T-Mobile, which prides itself on breaking the rules in the name of competition. What is particularly noteworthy about T-Mobile's astonishing admission, however, is that the expanded use of the fake ring tones coincides with T-Mobile's expanded reliance on Inteliquent to deliver almost all domestic calls that leave the T-Mobile network destined to other carriers. Plaintiffs assert that this is not mere coincidence, but rather a direct result of Inteliquent's need to cut costs so that it could avoid the financial ramifications of a poorly-negotiated contract that made T-Mobile not only its largest, but also its riskiest, customer.

**Answer to Paragraph 11:** Defendant TMUS states that the allegations of this paragraph purport to characterize Exhibit 1 to the SAC (the Consent Decree), denies that the allegations of this paragraph accurately and/or completely describe Exhibit 1 to the SAC, respectfully refers the Court to Exhibit 1 to the SAC for its contents and context, and denies all inconsistent allegations. Further answering, Defendant TMUS states it has insufficient information upon which to form a belief as to the truth of the allegations in this paragraph concerning Inteliquent's unilateral conduct and therefore denies those allegations. Defendant TMUS denies the remaining allegations in this paragraph.

**Paragraph 12:** Indeed, in February 2016, Inteliquent's CEO at the time, Matthew Carter, made clear that the company would consider even "crazy hair ball ideas" to counteract the financial impact of its contract with T-Mobile. Just a few months later, in the early summer, the FCC began receiving a flood of complaints about T-Mobile calls not completing to rural areas and the potential use of fake ring tones, which prompted its investigation and the *Consent Decree*.

**Answer to Paragraph 12:** Defendant TMUS has insufficient information upon which to form a belief as to the truth of the allegations in this paragraph and therefore denies those allegations.

**Paragraph 13:** In furtherance of their illegal scheme, Defendants and their fake ring tone enterprise have committed multiple acts of wire fraud and engaged in a pattern of racketeering activity in violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"). Defendants perpetrated their scheme in furtherance of an association-in-fact enterprise consisting of (1) defendant T-Mobile; (2) Defendant Inteliquent; (3) any other intermediate provider whose delivery of calls to consumers in certain rural operating company numbers ("OCNs") T-Mobile admitted in the *Consent Decree* it failed to correct; (4) one or more key individuals working specifically with these other co-conspirators to achieve these ends; and (5) on information and belief, several currently unidentified Doe Defendant co-conspirators that will be added to this lawsuit as facts are developed and their identities become known.

**Answer to Paragraph 13:** No response is required because the allegations in this paragraph relate to Defendant TMUS's pending motion to dismiss, to which the Court is respectfully referred.

Further answering, Defendant TMUS otherwise denies the allegations in this paragraph, including that there was any "fake ringtone scheme."

**Paragraph 14:** In addition to violating the Communications Act and RICO, Defendants have also violated Illinois law. Specifically, T-Mobile has tortiously interfered with Plaintiffs' business expectancy, and both T-Mobile and Inteliquent, as well as the Doe Defendants, have violated the Illinois Consumer Fraud And Deceptive Business Practices Act, 815 ILCS 505/1, *et seq.*, by deceiving consumers and Plaintiffs with the use of fake ring tones in order to mask their shoddy service and unscrupulous practices aimed at avoiding completion of high cost calls. Plaintiffs have been damaged through the loss of access charge revenues and significant time and resources expended in trying to investigate and resolve these issues. All along, T-Mobile, Inteliquent, and T-Mobile's other intermediaries participating in the scheme either remained silent, repeatedly failing to inform T-Mobile's customers that their secretly employed illegal practices were the cause of countless call completion inquiries they received from consumers and rural carriers who could never diagnose the root cause because it was covertly buried within the fake ring tone enterprise's networks and confidential business practices; or, they expressly placed blame on rural carriers, reflecting their knowing intent to victimize LECs by the illegal scheme.

**Answer to Paragraph 14:** No response is required because the allegations in this paragraph relate to Defendant TMUS's pending motion to dismiss, to which the Court is respectfully referred.

Further answering, Defendant TMUS otherwise denies the allegations in this paragraph, including that there was any "fake ringtone scheme."

**Paragraph 15:** Through this action, Plaintiffs seek damages, including the disgorgement of the illegal savings generated by Defendants, triple damages, punitive damages, and attorneys' fees. Companies like T-Mobile, Inteliquent, and Doe Defendant co-conspirators can no longer be allowed to believe that they can break the law and get away with it by entering into a *Consent Decree* and paying a tiny fine. Justice demands more. The American people and businesses serving rural American communities deserve better.

**Answer to Paragraph 15:** No response is required because the allegations in this paragraph relate to Defendant TMUS's pending motion to dismiss, to which the Court is respectfully referred. To the extent a response is required, Defendant TMUS denies the allegations in this paragraph.

## II.   THE PARTIES

### A.   Plaintiffs

**Paragraph 16:** Craigville Telephone Company, Inc. d/b/a AdamsWells Internet Telecom TV ("AdamsWells") is an Indiana corporation with its principal place of business in Craigville, Indiana.

**Answer to Paragraph 16:** Defendant TMUS has insufficient information upon which to form a belief as to the truth of the allegations in this paragraph.

**Paragraph 17:** Consolidated Telephone Company d/b/a CTC ("CTC") is a Minnesota corporation with its principal place of business in Brainerd, Minnesota.

**Answer to Paragraph 17:** Defendant TMUS has insufficient information upon which to form a belief as to the truth of the allegations in this paragraph.

### B.   Defendants

**Paragraph 18:** Defendant T-Mobile USA, Inc. is a Delaware corporation, with its principal place of business in Bellevue, Washington. T-Mobile USA, Inc., is a member of the T-Mobile International group, one of the world's largest mobile communications companies, and is the United States mobile telecommunications subsidiary of Deutsche Telekom AG. As of the first quarter of 2019, T-Mobile had a total of about 81.3 million subscribers, making it the third largest wireless carrier in the United States with approximately 18% market share.

**Answer to Paragraph 18:** Defendant TMUS states that it is a Delaware corporation with its principal place of business in Bellevue, Washington and that, as of the first quarter of 2019, it had

a total of about 81.3 million subscribers and was the among the leading wireless carriers in the United States. Defendant TMUS otherwise denies the remaining allegations in this paragraph.

**Paragraph 19:** Defendant Inteliquent, Inc. is a Delaware corporation with its principal place of business in Chicago, Illinois.

**Answer to Paragraph 19:** Upon information and belief, Defendant TMUS admits the allegations in this paragraph.

**Paragraph 20:** Doe Defendants 1-10 are unnamed co-conspirators of Defendants, who may include intermediate providers and least-cost routers whose delivery of calls to consumers in certain rural OCNs T-Mobile admitted in the *Consent Decree* it failed to correct, or other technology support providers. The Doe Defendants' involvement and culpability in the fake ring tone enterprise will be determined through discovery.

**Answer to Paragraph 20:** Defendant T-Mobile denies the existence of any conspiracy or "fake ring tone enterprise." Defendant TMUS has insufficient information concerning unnamed Doe Defendants 1-10 upon which to form a belief about the truth of the allegations in this paragraph and therefore denies those allegations. Further answering, Defendant TMUS states that this paragraph states legal conclusions and that legal conclusions are for the Court to make, but denies that Plaintiffs have any viable claim against TMUS.

## III. JURISDICTION AND VENUE

**Paragraph 21:** The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1332(d) and 47 U.S.C. §§ 206-207.

**Answer to Paragraph 21:** Defendant TMUS states that this paragraph states legal conclusions and that legal conclusions are for the Court to make, but denies that Plaintiffs have any viable claim against TMUS. To the extent a further response is required, Defendant TMUS admits that the Court has subject matter jurisdiction over this action, but has insufficient information upon which to form a belief about the truth of the allegation as to 28 U.S.C. § 1332(d), and denies that this lawsuit is suitable to proceed as a class action.

**Paragraph 22:** The Court also has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(d) because this is a class action in which a member of the class of plaintiffs is a citizen of a state different than a defendant, there is more than $5 million in controversy, and the number of proposed class members exceeds 100.

**Answer to Paragraph 22:** Defendant TMUS states that this paragraph states legal conclusions and that legal conclusions are for the Court to make, but denies that Plaintiffs have any viable claim against TMUS. To the extent a further response is required, Defendant TMUS has insufficient information upon which to form a belief about the truth of the allegations in this paragraph, and denies that this lawsuit is suitable to proceed as a class action.

**Paragraph 23:** The Court has supplemental jurisdiction over the state law claims because they form part of the same case or controversy. 28 U.S.C. § 1367.

**Answer to Paragraph 23:** Defendant TMUS states that this paragraph states legal conclusions and that legal conclusions are for the Court to make, but denies that Plaintiffs have any viable claim against TMUS. To the extent a further response is required, Defendant TMUS admits that the Court has supplemental jurisdiction over any state law claims that the Court does not dismiss, but otherwise denies the allegations in this paragraph.

**Paragraph 24:** The Court has personal jurisdiction over all Defendants pursuant to Fed. R. Civ. P. 4(k)(1)(A), 735 ILCS 5/2-209, and 18 U.S.C. § 1965(b).

**Answer to Paragraph 24:** Defendant TMUS states that this paragraph states legal conclusions and that legal conclusions are for the Court to make, but denies that Plaintiffs have any viable claim against TMUS. To the extent a further response is required, Defendant TMUS admits that the Court has personal jurisdiction over TMUS for purposes of this action but has insufficient information upon which to form a belief about the truth of the allegations in this paragraph as to any Defendant other than TMUS and therefore denies those allegations.

**Paragraph 25:** Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b)(1), 28 U.S.C. § 1391(b)(2), and 28 U.S.C. § 1391 because all Defendants are corporations that reside in this district pursuant to 28 U.S.C. § 1391(c)(2), and because a substantial part of the events or omissions giving rise to the claim occurred in or near Chicago, Illinois.

**Answer to Paragraph 25:** Defendant TMUS denies that a substantial part of the events or omissions giving rise to the claim occurred in or near Chicago, Illinois. Further answering, Defendant TMUS states that this paragraph states legal conclusions and that legal conclusions are for the Court to make, but denies that Plaintiffs have any viable claim against TMUS. To the extent a further response is required, Defendant TMUS admits that venue is proper.

## IV.   FACTUAL ALLEGATIONS

### A.   Universal Service Is The Paramount Objective For Regulation Of The Telecommunications Industry.

**Paragraph 26:** While most Americans take it for granted, the notion of universal access to residential telephone services was not a foregone conclusion in this country; nor was it a foregone conclusion that the American people would enjoy the benefits of competition in the telecommunications marketplace, while simultaneously being able to reach friends, families, and businesses that subscribed to the services of another telecommunications provider. Today, however, a ubiquitous, interconnected telecommunications system is core to the economic prosperity and security of our nation.

**Answer to Paragraph 26:** Defendant TMUS has insufficient information upon which to form a belief as to the truth of the allegations in this paragraph and therefore denies them.

**Paragraph 27:** Early in the twentieth century, after the expiration of the Bell telephone patents in 1894, new carriers began to enter the market. Initially these independent phone companies were not interconnected with, and could not exchange calls with, the Bell telephone networks. This required many businesses to maintain subscriptions with more than one phone company in order to receive calls from customers who subscribed to a different service provider.

**Answer to Paragraph 27:** Defendant TMUS has insufficient information upon which to form a belief as to the truth of the allegations in this paragraph and therefore denies them.

**Paragraph 28:** Universal service in telecommunications was established as U.S. national policy by the Communications Act of 1934 (the "Act") in which Congress declared its intention "to make available, so far as possible, to all the people of the United States, a rapid, efficient, Nationwide, and world-wide wire and radio communication service with adequate facilities at reasonable charges." 47 U.S.C. § 151. The law combined the Federal Radio Commission with the Interstate Commerce Commission's wire communications powers to create the FCC which has greater powers over both radio and wire communications than these predecessor commissions.

**Answer to Paragraph 28:** Defendant TMUS states that the allegations of this paragraph purport to characterize 47 U.S.C. § 151, denies that the allegations of this paragraph accurately and/or completely describe 47 U.S.C. § 151, respectfully refers the Court to 47 U.S.C. § 151 for its contents and context, and denies all inconsistent allegations. Defendant TMUS denies that the quoted language appears exactly as stated in this paragraph in 47 U.S.C. § 151. Further answering, Defendant TMUS states that this paragraph states legal conclusions and that legal conclusions are for the Court to make, but denies that Plaintiffs have any viable claim against TMUS. Defendant TMUS otherwise has insufficient information upon which to form a belief about the truth of the remaining allegations in this paragraph and therefore denies those allegations.

**Paragraph 29:** As the Commission and its Wireline Competition Bureau ("WCB") have long recognized, "the ubiquity and reliability of the nation's telecommunications network is of paramount importance to the explicit goals of the Communications Act of 1934, as amended . . . *See, e.g., In the Matter of Establishing Just & Reasonable Rates for Local Exch. Carriers*, Declaratory Ruling and Order, 22 F.C.C. Rcd. 11629, ¶ 1 (WCB 2007) ("*2007 Call Blocking Declaratory Ruling*") (attached hereto as Exhibit 2).

**Answer to Paragraph 29:** Defendant TMUS states that the allegations of this paragraph purport to characterize Exhibit 2 to the SAC, denies that the allegations of this paragraph accurately and/or completely describe Exhibit 2 to the SAC, respectfully refers the Court to Exhibit 2 to the SAC for its contents and context, and denies all inconsistent allegations. Further answering, Defendant TMUS states that this paragraph states legal conclusions and that legal conclusions are for the Court to make, but denies that Plaintiffs have any viable claim against TMUS. Defendant TMUS otherwise has insufficient information upon which to form a belief about the truth of the remaining allegations in this paragraph and therefore denies those allegations.

**Paragraph 30:** The goal of universal and reliable telecommunications service has underscored much of the nation's telecommunications policies in the intervening decades. Central to those policies has been an unbending conviction that the nation must eliminate the inherent inequities in rural America that would inevitably arise if the free market was left unrestrained. For example, Congress prohibited telecommunications carriers from engaging in "unjust or unreasonable discrimination in charges, practices, classifications, regulations, facilities, or services for or in

connection with like communication service" and "undue or reasonable preference or advantage" among "localities]." 47 U.S.C. § 202(a). Congress also required providers of interstate long-distance services to ensure that "subscribers in rural and high areas" are charged "no higher than the rates charged by each such provider to its subscribers in urban areas." 47 U.S.C. § 254(g).

**Answer to Paragraph 30:** Defendant TMUS states that the allegations of this paragraph purport to characterize 47 U.S.C. §§ 202 and 253, denies that the allegations of this paragraph accurately and/or completely describe 47 U.S.C. §§ 202 and 253, respectfully refers the Court to 47 U.S.C. §§ 202 and 253 for their contents and context, and denies all inconsistent allegations. Further answering, Defendant TMUS states that this paragraph states legal conclusions and that legal conclusions are for the Court to make, but denies that Plaintiffs have any viable claim against TMUS. Defendant TMUS otherwise has insufficient information upon which to form a belief about the truth of the remaining allegations in this paragraph and therefore denies those allegations.

**Paragraph 31:** The Commission took steps to further the Congressional mandate and ensure reliable service in rural America by, *inter alia*, creating a "universal service fund." Under the universal service regime, the Commission collects fees from all telecommunications carriers, which are generally passed on to consumers, in order to make funds available to deploy infrastructure in unserved and underserved areas. The Commission also created and maintains a system of intercarrier compensation payments known as "access charges" by which companies providing interexchange or long-distance services pay local telephone companies for the network facilities they maintain, and the switching and transport services they provide, which are necessary to transit and terminate calls to the customers of the local telephone companies. While multiple factors impact the access charges a local carrier may collect, and while terminating charges have been decreased in recent years, the Commission's policies have historically been designed to allow rural carriers to collect a much higher level of access rates than their urban counterparts in order to recover the proportionately higher costs attributable to providing service in very low density markets.

**Answer to Paragraph 31:** Defendant TMUS states that the allegations of this paragraph purport to characterize the statutes and regulations that govern the programs and policies referenced in this paragraph (*e.g.*, the universal service fund and intercarrier compensation), denies that the allegations of this paragraph accurately and/or completely describe those statutes and regulations, respectfully refers the Court to those statutes and regulations for their contents and context, and denies all inconsistent allegations. Further answering, Defendant TMUS states that this paragraph

states legal conclusions and that legal conclusions are for the Court to make, but denies that Plaintiffs have any viable claim against TMUS. Defendant TMUS otherwise has insufficient information upon which to form a belief about the truth of the remaining allegations in this paragraph and therefore denies those allegations.

### B. The Intercarrier Compensation System

**Paragraph 32:** T-Mobile's illegal fake ring tone scheme demonstrates its greed and willingness to "break the rules" to increase profits in any way possible, even if that means harming its own customers.

**Answer to Paragraph 32:** Defendant TMUS denies the allegations in this paragraph, including that there was any "fake ringtone scheme."

**Paragraph 33:** In order to understand the financial incentives that led to T-Mobile's fake ring tone scheme and the rural call completion failures central to this case, it is necessary to understand how telephone calls are delivered to and among different telecommunications carriers and the intercarrier compensation system. The following paragraphs explain the various carriers that may be involved in the delivery of telephone calls to rural America.

**Answer to Paragraph 33:** Defendant TMUS denies the allegations in this paragraph, including that there was any "fake ringtone scheme."

### i. *Local Exchange Carriers (LECs)*

**Paragraph 34:** The delivery of telephone calls in the United States often requires the involvement of numerous carriers, each of which carries the calls for a portion of the route. With regard to calls originating on or terminating to a traditional landline telephone, the company providing the portion of the route closest to the calling and called parties is referred to as the local exchange carrier or "LEC." LECs typically own or lease the phone lines that connect directly to homes and businesses within their defined service territories.

**Answer to Paragraph 34:** Defendant TMUS states that "local exchange carrier" or "LEC" are terms used in the industry that generally refer to an operator of traditional landline service, that multiple carriers can be involved in delivering telephone calls in the United States, and that a LEC can own or lease the phone lines it uses. Defendant TMUS otherwise has insufficient information

upon which to form a belief as to the truth of the remaining allegations in this paragraph and therefore denies those allegations.

**Paragraph 35:**  Pursuant to the Communications Act, "[t]he term 'local exchange carrier' means any person that is engaged in the provision of telephone exchange service or exchange access." 47 U.S.C. § 153(32).  As described further below, LECs come in various types and their regulatory classification may vary depending on the area in which they provide service.

**Answer to Paragraph 35:**  Defendant TMUS states that the allegations of this paragraph purport to characterize 47 U.S.C. § 153(32), respectfully refers the Court to 47 U.S.C. § 153(32) for its contents and context, and denies all inconsistent allegations.  Further answering, Defendant TMUS states that this paragraph states legal conclusions and that legal conclusions are for the Court to make, but denies that Plaintiffs have any viable claim against TMUS.  Defendant TMUS otherwise has insufficient information upon which to form a belief about the truth of the remaining allegations in this paragraph and therefore denies those allegations.

**Paragraph 36:**  All Plaintiffs are LECs.

**Answer to Paragraph 36:**  Defendant TMUS has insufficient information upon which to form a belief about the truth of the allegations in this paragraph.  Further answering, Defendant TMUS states that this paragraph states legal conclusions and that legal conclusions are for the Court to make, but denies that Plaintiffs have any viable claim against TMUS.

**Paragraph 37:**  Incumbent Local Exchange Carriers or "ILECs" are those local exchange carriers that existed before 1996 (when Congress adopted the Telecommunications Act of 1996, which opened local telephone markets to competition), insofar as they are providing service in their original territories.  Specifically, the FCC has defined an ILEC as:

> Incumbent Local Exchange Carrier (Incumbent LEC).  With respect to an area, the local exchange carrier that:
>
> (1)    On February 8, 1996, provided telephone exchange service in such area; and
>
> (2)    (i) On February 8, 1996, was deemed to be a member of the exchange carrier association pursuant to § 69.601(b) of this chapter; or (ii) Is a person or

entity that, on or after February 8, 1996, became a successor or assign of a member described in paragraph (2)(i) of this section.

47 C.F.R. § 51.5.

**Answer to Paragraph 37:**  Defendant TMUS states that the allegations of this paragraph purport to characterize 47 C.F.R. § 51.5, respectfully refers the Court to 47 C.F.R. § 51.5 for its contents and context, and denies all inconsistent allegations.  Further answering, Defendant TMUS states that this paragraph states legal conclusions and that legal conclusions are for the Court to make but denies that Plaintiffs have any viable claim against TMUS.  Defendant TMUS otherwise has insufficient information upon which to form a belief about the truth of the remaining allegations in this paragraph and therefore denies those allegations.

**Paragraph 38:**  Competitive Local Exchange Carriers or "CLECs" are generally competitive market entrants, or more specifically, those local exchange carriers that were not providing telephone exchange service in a particular geographic area as of February 8, 1996.

**Answer to Paragraph 38:**  Defendant TMUS states that the allegations of this paragraph purport to define the term "Competitive Local Exchange Carriers" or "CLECs," respectfully refers the Court to any applicable regulations for their contents and context, and denies all inconsistent allegations.  Further answering, Defendant TMUS states that this paragraph states legal conclusions and that legal conclusions are for the Court to make, but denies that Plaintiffs have any viable claim against TMUS.  Defendant TMUS otherwise has insufficient information upon which to form a belief about the truth of the remaining allegations in this paragraph and therefore denies those allegations.

**Paragraph 39:**  Notably, a carrier that meets the definition of ILEC, but which expanded its services into other geographic areas, would not be considered an ILEC with regard to those expanded service territories.  Rather, in that expanded service territory, it would be a CLEC.

**Answer to Paragraph 39:**  Defendant TMUS states that the allegations of this paragraph purport to characterize applicable regulations, respectfully refers the Court to any applicable regulations

15

for their contents and context, and denies all inconsistent allegations. Further answering, Defendant TMUS states that this paragraph states legal conclusions and that legal conclusions are for the Court to make, but denies that Plaintiffs have any viable claim against TMUS. Defendant TMUS otherwise has insufficient information upon which to form a belief about the truth of the remaining allegations in this paragraph and therefore denies those allegations.

**Paragraph 40:** In a traditional legacy ILEC network, an ILEC would deploy a series of interconnected switches throughout its service territory to enable the exchange of traffic within the markets it serves. Networks maintained by ILECs may include a variety of switching equipment. Simplistically speaking, switches provide features, such as the dial tone and/or the network intelligence, needed to route a call between one customer's premises to another. Historically, telecommunications networks have been organized in a hierarchical fashion defined by differing switch types. For example, the lines from many customers of local service are aggregated to a local or end office switch. In turn, end-office switches would be aggregated into a tandem switch. End office switches are those switches that directly connect or "switch" calls to individual homes and businesses and provide local dial tone and associated services, while tandem switches are switches that do not provide discrete services to customers. Because it is often not practical or economical for long-distance carriers to interconnect at each end office, such carriers generally interconnect at the tandem switch, which serves a concentration and distribution function between those long-distance carriers and the end office switches.

**Answer to Paragraph 40:** Defendant TMUS has insufficient information upon which to form a belief about the truth of the allegations in this paragraph and therefore denies those allegations.

**Paragraph 41:** After the introduction of competition in the long-distance marketplace, some carriers chose to focus primarily on providing tandem switching services, without focusing on the provision of end office services directly to consumers. These carriers may serve a variety of ILECs and CLECs that provide services directly to consumers, making it easier for rural areas to enjoy the benefits of competition in the long-distance marketplace. ILECs, CLECs, and tandem providers may collaborate to provide originating and terminating exchange access.

**Answer to Paragraph 41:** Defendant TMUS has insufficient information upon which to form a belief as to the truth of the allegations in this paragraph and therefore denies those allegations.

**Paragraph 42:** One specific type of tandem provider is a centralized equal access provider or "CEA provider." CEA providers are "a specialized type of intermediate carrier authorized by the Commission in the late 1980s to implement long distance equal access obligations (permitting end users to use 1+ dialing to reach the interexchange carrier (IXC) of their choice) and to aggregate traffic for connection between rural incumbent LECs and other networks, particularly those of IXCs." *In the Matter of Iowa Network Access Div. Tariff F.C.C. No. 1*, 33 F.C.C. Rcd. 3825, 3827,

¶ 7 (2018). CEA Providers fit within the definition of CLEC. *AT&T Corp. v. Iowa Network Services, Inc. d/b/a Aureon Network Services*, 32 F.C.C. Rcd. 9677, ¶ 25 (2017).

**Answer to Paragraph 42:** Defendant TMUS states that the allegations of this paragraph purport to characterize the cited decisions in this paragraph, respectfully refers the Court to those cited decisions and any applicable regulations for their contents and context, and denies all inconsistent allegations. Further answering, Defendant TMUS states that this paragraph states legal conclusions and that legal conclusions are for the Court to make, but denies that Plaintiffs have any viable claim against TMUS. Defendant TMUS otherwise has insufficient information upon which to form a belief about the truth of the remaining allegations in this paragraph and therefore denies those allegations.

**Paragraph 43:** The Communications Act also includes a separate definition for a subclass of ILECs or CLECs known as "rural telephone company," that provide service in particularly rural areas, and that are also referred to as a Rural LECs or RLECs:

The term "rural telephone company" means a local exchange carrier operating entity to the extent that such entity--

(A)     provides common carrier service to any local exchange carrier study area that does not include either--

(i)     any incorporated place of 10,000 inhabitants or more, or any part thereof, based on the most recently available population statistics of the Bureau of the Census; or

(ii)     any territory, incorporated or unincorporated, included in an urbanized area, as defined by the Bureau of the Census as of August 10, 1993;

(B)     provides telephone exchange service, including exchange access, to fewer than 50,000 access lines;

(C)     provides telephone exchange service to any local exchange carrier study area with fewer than 100,000 access lines; or

(D)     has less than 15 percent of its access lines in communities of more than 50,000 on February 8, 1996.

47 U.S.C.A. § 153(44).

**Answer to Paragraph 43:**  Defendant TMUS states that the allegations of this paragraph purport to characterize 47 U.S.C.A. § 153(44), respectfully refers the Court to 47 U.S.C.A. § 153(44) for its contents and context, and denies all inconsistent allegations.  Further answering, Defendant TMUS states that this paragraph states legal conclusions and that legal conclusions are for the Court to make, but denies that Plaintiffs have any viable claim against TMUS.  Defendant TMUS otherwise has insufficient information upon which to form a belief about the truth of the remaining allegations in this paragraph and therefore denies those allegations.

**Paragraph 44:**  Thus, a LEC may qualify as a rural telephone company or RLEC in situations in which it provides service in certain low-density geographic areas, while not qualifying as an RLEC when providing service in more urban areas.

**Answer to Paragraph 44:**  Defendant TMUS states that the allegations of this paragraph purport to characterize applicable regulations, respectfully refers the Court to any applicable regulations for their contents and context, and denies all inconsistent allegations.  Further answering, Defendant TMUS states that this paragraph states legal conclusions and that legal conclusions are for the Court to make, but denies that Plaintiffs have any viable claim against TMUS.  Defendant TMUS otherwise has insufficient information upon which to form a belief about the truth of the remaining allegations in this paragraph and therefore denies those allegations.

### ii.    *Interexchange Carriers (IXCs)*

**Paragraph 45:**  With regard to what is generally referred to as long-distance telephone calls, once a call is originated on a LEC's network, the LEC (often in connection with a tandem provider) delivers that traffic to the long-distance carrier of the customer's choosing at a point of interconnection known as a meet point.  *See* 47 C.F.R. § 51.5 ("A meet point is a point of interconnection between two networks, designated by two telecommunications carriers, at which one carrier's responsibility for service begins and the other carrier's responsibility ends.").

**Answer to Paragraph 45:**  Defendant TMUS states that the allegations of this paragraph purport to characterize 47 C.F.R. § 51.5, respectfully refers the Court to 47 C.F.R. § 51.5 for its contents and context, and denies all inconsistent allegations.  Further answering, Defendant TMUS states

that this paragraph states legal conclusions and that legal conclusions are for the Court to make, but denies that Plaintiffs have any viable claim against TMUS. Defendant TMUS otherwise has insufficient information upon which to form a belief about the truth of the remaining allegations in this paragraph and therefore denies those allegations.

**Paragraph 46:** Long-distance carriers are known in the telecommunications industry as interexchange carriers or "IXCs". The FCC has defined interexchange carrier as "a telephone company that provides telephone toll service. An interexchange carrier does not include commercial mobile radio service providers as defined by federal law." 47 C.F.R. § 64.4001(d).

**Answer to Paragraph 46:** Defendant TMUS states that the allegations of this paragraph purport to characterize 47 C.F.R. § 64.4001(d), respectfully refers the Court to 47 C.F.R. § 64.4001(d) for its contents and context, and denies all inconsistent allegations. Further answering, Defendant TMUS states that this paragraph states legal conclusions and that legal conclusions are for the Court to make, but denies that Plaintiffs have any viable claim against TMUS. Defendant TMUS otherwise has insufficient information upon which to form a belief about the truth of the remaining allegations in this paragraph and therefore denies those allegations.

**Paragraph 47:** Inteliquent is, *inter alia*, an IXC.

**Answer to Paragraph 47:** Defendant TMUS states that this paragraph states legal conclusions and that legal conclusions are for the Court to make, but denies that Plaintiffs have any viable claim against TMUS. Defendant TMUS otherwise has insufficient information upon which to form a belief about the truth of the remaining allegations in this paragraph and therefore denies those allegations.

### iii. *Mobile Carriers (CMRS)*

**Paragraph 48:** Mobile phone service providers are a distinct class of telecommunications provider known formally as a "commercial mobile radio service" provider or "CMRS provider." *See* 47 U.S.C. § 332(d)(1).

**Answer to Paragraph 48:** Defendant TMUS states that the allegations of this paragraph purport to characterize 47 U.S.C. § 332(d)(1), respectfully refers the Court to 47 U.S.C. § 332(d)(1) for its contents and context, and denies all inconsistent allegations. Further answering, Defendant TMUS states that this paragraph states legal conclusions and that legal conclusions are for the Court to make, but denies that Plaintiffs have any viable claim against TMUS. To the extent a further response is required, Defendant TMUS admits the allegations in this paragraph.

**Paragraph 49:** Defendant T-Mobile is a CMRS provider.

**Answer to Paragraph 49:** Defendant TMUS admits that it acts as a provider of CMRS in those instances when it provides telephone service. Defendant TMUS otherwise denies the remaining allegations in this paragraph.

**Paragraph 50:** For purposes of a call originating on a mobile phone, the call originates on a user's handset and is transmitted over a radio signal to the nearby wireless tower. From there, the call is generally routed on wireline facilities to a corresponding mobile telephone switching office ("MTSO") that directs the call towards its intended destination on the public switched telephone network ("PSTN").

**Answer to Paragraph 50:** Defendant TMUS states that the allegations in this paragraph purport to describe what can generally occur when a call is initiated from a mobile phone. Defendant TMUS otherwise has insufficient information upon which to form a belief about the truth of the remaining allegations in this paragraph and therefore denies those allegations.

### iv. *Intermediate Providers and Covered Providers*

**Paragraph 51:** Because CMRS providers generally do not build and operate wireline networks throughout the country, they rely either on an affiliated wireline provider (*e.g.*, AT&T wireless would rely on AT&T's long-distance network) or on the networks of unaffiliated intermediate third parties to provide the transport services required to transport their traffic and ultimately deliver their subscriber's call to the terminating LEC, Voice-over-IP provider, or CMRS provider to which the called party has directed their call. These third parties that provide transport services may be IXCs, such as Inteliquent.

**Answer to Paragraph 51:** Defendant TMUS states that the allegations in this paragraph purport to describe potential means for the transmission of calls initiated from a mobile phone. Defendant

TMUS otherwise has insufficient information upon which to form a belief as to the truth of the allegations in this paragraph and therefore denies those allegations.

**Paragraph 52:** The FCC's rural call completion rules, discussed more fully *infra*. ¶¶ 102-124, have defined two terms that may apply to these third-party providers, depending on the nature of the services and the specific routing arrangements that they have in place with the originating carriers: "Intermediate Providers" and "Covered Providers." The term Covered Provider may also apply to CMRS carriers, again depending on the nature of the services and the specific routing arrangements that they have in place with the third-party transport providers they rely upon.

**Answer to Paragraph 52:** Defendant TMUS states that the allegations of this paragraph purport to characterize the cited FCC rules, denies that the allegations of this paragraph accurately and/or completely describe the cited FCC rules, respectfully refers the Court to the cited FCC rules for their contents and context, and denies all inconsistent allegations. Further answering, Defendant TMUS states that this paragraph states legal conclusions and that legal conclusions are for the Court to make, but denies that Plaintiffs have any viable claim against TMUS.

**Paragraph 53:** The term "Intermediate Providers" has been defined by the FCC in multiple ways over time.

**Answer to Paragraph 53:** Defendant TMUS states that the allegations of this paragraph purport to characterize FCC definition(s), denies that the allegations of this paragraph accurately and/or completely describe those FCC definition(s), respectfully refers the Court to the FCC definition(s) for their contents and context, and denies all inconsistent allegations. Further answering, Defendant TMUS states that this paragraph states legal conclusions and that legal conclusions are for the Court to make, but denies that Plaintiffs have any viable claim against TMUS.

**Paragraph 54:** As relevant here, Intermediate Providers was defined in the FCC's rural call completion rules, 47 C.F.R. § 64.2101, from January 16, 2014 to June 10, 2018, by reference to 47 C.F.R. § 64.1600(f). *See* 47 C.F.R. § 64.2101 (effective Jan. 16, 2014 – June 10, 2018) ("The term 'intermediate provider' has the same meaning as in § 64.1600(f)."). During this time period, Intermediate Provider was, therefore, defined as "any entity that carries or processes traffic that traverses or will traverse the PSTN at any point insofar as that entity neither originates nor terminates that traffic." 47 C.F.R. § 64.1600(f) (effective Dec. 29, 2011 to current). Thus, from January 16, 2014 to June 10, 2018, the operative definition of Intermediate Provider did not exclude all Covered Providers, rather it only excluded the originating or terminating entities.

**Answer to Paragraph 54:** Defendant TMUS states that the allegations of this paragraph purport to characterize the cited regulations, denies that the allegations of this paragraph accurately and/or completely describe the cited regulations, respectfully refers the Court to the cited regulations for their contents and context, and denies all inconsistent allegations. Further answering, Defendant TMUS states that this paragraph states legal conclusions and that legal conclusions are for the Court to make, but denies that Plaintiffs have any viable claim against TMUS.

**Paragraph 55:** Beginning on June 11, 2018, the definition of Intermediate Provider was changed to mean:

> any entity that—
>
> > (1)    Enters into a business arrangement with a covered provider or other intermediate provider for the specific purpose of carrying, routing, or transmitting voice traffic that is generated from the placement of a call placed—
> >
> > > (i)    From an end user connection using a North American Numbering Plan resource; or
> > >
> > > (ii)    To an end user connection using such a numbering resource; and
> >
> > (2)    Does not itself, either directly or in conjunction with an affiliate, serve as a covered provider in the context of originating or terminating a given call.

47 C.F.R. § 64.2101. Thus, only on or after June 11, 2018, could the Covered Provider for a given call not also be the Intermediate Provider for the call. Since the calls at issue in this lawsuit all occurred before this definition went into effect, it is not applicable here.

**Answer to Paragraph 55:** Defendant TMUS states that the allegations of this paragraph purport to characterize 47 C.F.R. § 64.2101, denies that the allegations of this paragraph accurately and/or completely describe 47 C.F.R. § 64.2101, respectfully refers the Court to 47 C.F.R. § 64.2101 for its contents and context, and denies all inconsistent allegations. Further answering, Defendant TMUS states that this paragraph states legal conclusions and that legal conclusions are for the Court to make. To the extent a further response is required, Defendant TMUS denies the allegations in this paragraph.

**Paragraph 56:** Beginning on January 16, 2014, the term "Covered Provider" has been defined as:

> The term "covered provider" means a provider of long-distance voice service that makes the initial long-distance call path choice for more than 100,000 domestic retail subscriber lines, counting the total of all business and residential fixed subscriber lines and mobile phones and aggregated over all of the providers' affiliates. ***A covered provider may be*** a local exchange carrier as defined in § 64.4001(e), ***an interexchange carrier*** as defined in § 64.4001(d), ***a provider of commercial mobile radio service*** as defined in § 20.3 of this chapter, a provider of interconnected voice over Internet Protocol (VoIP) service as defined in 47 U.S.C. 153(25), or a provider of non-interconnected VoIP service as defined in 47 U.S.C. 153(36) to the extent such a provider offers the capability to place calls to the public switched telephone network.

47 C.F.R. § 64.2101 (emphasis added).

**Answer to Paragraph 56:** Defendant TMUS states that the allegations of this paragraph purport to characterize 47 C.F.R. § 64.2101, denies that the allegations of this paragraph accurately and/or completely describe 47 C.F.R. § 64.2101, respectfully refers the Court to 47 C.F.R. § 64.2101 for its contents and context, and denies all inconsistent allegations. Further answering, Defendant TMUS states that this paragraph states legal conclusions and that legal conclusions are for the Court to make. To the extent a further response is required, Defendant TMUS admits that the quoted language appears in 47 C.F.R. § 64.2101 but denies the allegations in this paragraph insofar as the quoted language is taken out of context and denies that Plaintiffs have any viable claim against TMUS.

**Paragraph 57:** As discussed more fully below, Defendants Inteliquent and T-Mobile are, *inter alia*, Intermediate Providers. *See infra* ¶¶ 149, 157.

**Answer to Paragraph 57:** No response is required because the allegations in this paragraph relate to Defendant TMUS's pending motion to dismiss, to which the Court is respectfully referred. To the extent a response is required, Defendant TMUS denies the allegations in this paragraph to the extent they are intended to imply actionable wrongdoing by Defendant TMUS and, upon information and belief, admits the allegations as to Defendant Inteliquent. Further answering,

Defendant TMUS states that this paragraph states legal conclusions and that legal conclusions are for the Court to make, but denies that Plaintiffs have any viable claim against TMUS.

**Paragraph 58:** As discussed more fully below, upon information and belief, both Defendants T-Mobile and Inteliquent were also Covered Providers. *See infra* ¶¶ 150-51, 155-56.

**Answer to Paragraph 58:** Defendant TMUS respectfully refers the Court to its responses below to ¶¶ 150-51, 155-56 of the SAC. Further answering, Defendant TMUS states that this paragraph states legal conclusions and that legal conclusions are for the Court to make, but denies that Plaintiffs have any viable claim against TMUS.

### C. How Calls Are Routed

**Paragraph 59:** To illustrate the interconnected nature of the PSTN, a call originated by a T-Mobile subscriber in Chicago and intended for a rural subscriber in Indiana may be routed as follows: (1) from the subscriber's handset to T-Mobile's nearest tower in Chicago; (2) from T-Mobile's tower to a meet point with Inteliquent; (3) from the T-Mobile-Inteliquent meet point to Inteliquent's meet point with another Intermediate Provider that is connected to the terminating LEC's tandem provider; (4) from the LEC's tandem provider to the LEC's end office; and (5) from the terminating LEC's end office to the called party's home or business in Indiana.

**Answer to Paragraph 59:** Defendant TMUS states that the allegations in this paragraph purport to describe a possible routing of a hypothetical call initiated by a T-Mobile customer. Defendant TMUS otherwise has insufficient information upon which to form a belief about the truth of the remaining allegations in this paragraph and therefore denies those allegations.

**Paragraph 60:** Below is a diagram of this simplified call flow for illustrative purposes:



**Answer to Paragraph 60:** Defendant TMUS states that the allegations in this paragraph purport to describe, in diagram form, a possible routing of a hypothetical call initiated by a T-Mobile customer. Defendant TMUS otherwise has insufficient information upon which to form a belief as to the truth of the remaining allegations in this paragraph and therefore denies those allegations.

**Paragraph 61:** Thus, a call originated by a T-Mobile subscriber and terminating to a rural LEC will travel through the networks of three or four carriers at a minimum. It is often the case, however, that a call will pass through multiple Intermediate Providers before reaching its intended destination, using a process known as "least-cost routing" in an effort to deliver the call in the cheapest possible way.

**Answer to Paragraph 61:** Defendant TMUS states that the allegations in this paragraph purport to describe a possible routing of a hypothetical call initiated by a T-Mobile customer and denies that there is anything improper in routing calls in a cost-efficient manner. Defendant TMUS otherwise has insufficient information upon which to form a belief as to the truth of the remaining allegations in this paragraph and therefore denies those allegations.

D.      **Intercarrier Compensation**

**Paragraph 62:** As discussed above, LECs, as the local phone companies, own or lease the phone lines that connect directly to residences and businesses within their service territories. IXCs and Intermediate Providers, on the other hand, do not own these lines and, therefore, must access them in order to receive or deliver interexchange (long-distance) calls. In order to compensate the LECs for the use of the local lines for the origination and termination of interexchange calls, the IXCs have traditionally paid the LECs a fee known as "access charges." The FCC established such charges in order to allow LECs to recover a share of the costs associated with deploying and maintaining local communications infrastructure. (End user customers are also assessed local connection charges which are designed to recover a portion of the costs necessary to maintain their connection to the local exchange network.) Access charges are made up of a variety of rate elements that reflect the services performed. Those rate elements can be a combination of a fixed flat-monthly fee, per-minute charges, and mileage-sensitive charges for transport services. For example, end office switching would typically be charged per-minute of traffic originated or terminated by the LEC on the IXC's behalf. Transport between the tandem switch and the end office switch, however, would be a fee that is multiplied by the total miles that the traffic is carried and multiplied again by the minutes of traffic originated or terminated (rate x miles x minutes).

**Answer to Paragraph 62:** Defendant TMUS states that the allegations in this paragraph purport to describe ways in which calls can be transmitted and charges can be assessed by and to parties involved in such transmission. Defendant TMUS otherwise has insufficient information upon which to form a belief as to the truth of the remaining allegations in this paragraph and therefore denies those allegations.

**Paragraph 63:** The specific rate that a carrier would charge for access services depends on a variety of factors. For example, while the FCC generally has oversight over the fees assessed on *interstate* and international long-distance calls, state utility commissions were historically responsible for setting the rates for *intrastate* access charges applicable to interstate long-distance calling. (As discussed more fully below, this stopped being completely true in 2011.) But, even within the FCC's domain over interstate long-distance, different rules apply to different types of carriers. For example, some carriers are rate-of-return carriers that set their access charges based on their historic and projected costs with the intent of earning a designated rate-of-return for their investment. Some of those rate-of-return carriers participate in the National Exchange Carrier Association ("NECA") pool in which the members pool their revenues, or settlements, for interstate telecommunications services based on a series of statistical formulas and forecasts based on historical call data, approved by the FCC, that approximate the amounts received by a similar cost company. Others are average schedule companies, whose rates and revenues are determined using a set of formulas of costs incurred by similar cost companies.

**Answer to Paragraph 63:** Defendant TMUS states that the allegations in this paragraph purport to describe ways in which charges can be assessed by and to parties involved in the transmission

of calls. Defendant TMUS otherwise has insufficient information upon which to form a belief as to the truth of the remaining allegations in this paragraph and therefore denies those allegations.

**Paragraph 64:** CLECs have typically set their rates by benchmarking their access charges to the ILEC with which they compete. In 2001, the Commission determined that CLECs could provide an IXC with, and charge for, interstate switched access services in one of two ways. First, a CLEC may tariff interstate access charges if its rates are no higher than the rates charged for such services by the competing ILEC (the benchmark rule). Second, as an alternative to tariffing interstate access services, CLECs may enter into contracts, governed by state law, with an IXC to charge rates higher than those permitted under the benchmark rule. *See, e.g., In the Matter of AT&T Corp. v. Iowa Network Services*, 32 F.C.C. Rcd. 9677 (2017).

**Answer to Paragraph 64:** Defendant TMUS states that the allegations in this paragraph purport to describe the ways in which charges can be assessed by CLECs. Defendant TMUS also states that the allegations in this paragraph purport to characterize the cited decision, respectfully refers the Court to the cited decision for its contents and context, and denies all inconsistent allegations.. Defendant TMUS otherwise has insufficient information upon which to form a belief as to the truth of the remaining allegations in this paragraph and therefore denies those allegations.

**Paragraph 65:** In November 2011, the FCC began a comprehensive reform of the intercarrier compensation regime, establishing as the ultimate end goal the complete phase out of access charges through the adoption of a bill-and-keep regime in which carriers do not exchange payments for access charges. *See In re: Connect America Fund, et al.*, Report and Order and Further Notice of Proposed Rulemaking, 26 F.C.C. Rcd. 17663, FCC 11-161 (Nov. 18, 2011), *aff'd In re: FCC 11-161*, 753 F.3d 1015 (10th Cir. 2014) ("*Connect America Fund Order*")*.* As part of the *Connect America Fund Order*, the Commission acted to ensure that intrastate terminating access charges would be on par with interstate terminating access charges, eliminating the historical role of state utility commissions to set intrastate terminating access rates. Further, the Commission resolved a long-standing controversy about whether Voice-over-IP ("VoIP") traffic was subject to access charge regimes, concluding that this traffic should be treated equally with traditional telecommunications traffic originating and terminating in time-division multiplexing ("TDM") protocol. The Commission also began a multi-year phased reduction of all interstate and intrastate *terminating end office* access charges. Despite the reduction of certain access charges, other rate elements, including terminating tandem switching and transport charges, may still be assessed by LECs in certain circumstances. Thus, calls terminating to rural America continue to generally cost more than calls terminating in more urban areas.

**Answer to Paragraph 65:** Defendant TMUS states that the allegations in this paragraph purport to characterize the cited decision, denies that the allegations of this paragraph accurately and/or

completely describe the cited decision, respectfully refers the Court to the cited decision for its contents and context, and denies all inconsistent allegations. Defendant TMUS otherwise has insufficient information upon which to form a belief as to the truth of the remaining allegations in this paragraph and therefore denies those allegations.

**Paragraph 66:** Long-distance traffic originating on a CMRS provider's network and terminating to a LEC is subject to the intercarrier compensation system. *See, e.g., Connect America Fund Order*, 26 F.C.C. Rcd. 17663, ¶¶ 769, 779, 806. Unless alternative arrangements are made by contract, those access charges would be paid by the last Intermediate Provider to hand the traffic off to the terminating LEC based on the rates in the terminating LEC's federally-filed tariff. *Id.* ¶ 812. Thus, an Intermediate Provider like Inteliquent would tender the payment for terminating access charges to the LEC, it would recoup that payment from T-Mobile, which would pay the charges from the monthly fees paid by subscribers.

**Answer to Paragraph 66:** Defendant TMUS states that the allegations in this paragraph purport to describe the manner in which charges can be assessed by and to parties involved in the transmission of calls. Defendant TMUS also states that the allegations in this paragraph purport to characterize the cited FCC decision, denies that the allegations of this paragraph accurately and/or completely describe the cited FCC decision, respectfully refers the Court to the cited FCC decision for its contents and context, and denies all inconsistent allegations. Defendant TMUS otherwise has insufficient information upon which to form a belief as to the truth of the remaining allegations in this paragraph and therefore denies those allegations.

> ### E.    A Confluence Of Rate Structures, The Evolving Nature Of The Long Distance Market And Corrupt Adaptations By Market Players Presented Incentives For Carriers To Degrade Or Limit Rural Call Completion.

**Paragraph 67:** In 1996, Congress adopted the Telecommunications Act of 1996 with the goal of promoting competition in the delivery of telecommunications services. Over time, this has meant a gradual relaxation of the heavy regulations that typically governed telecommunications services. At times, as discussed more fully below, the deregulated nature of certain services, like long-distance service, has clashed with the continued regulation of other parts of the telecommunications market, such as access charges. These disparate regulatory regimes create perverse incentives for carriers to curtail the delivery of traffic to more expensive rural areas of the country in order to maximize the profitability of long-distance services.

**Answer to Paragraph 67:**  Defendant TMUS states that the allegations in this paragraph purport to characterize the Telecommunications Act of 1996, denies that the allegations of this paragraph accurately and/or completely describe the Telecommunications Act of 1996, respectfully refers the Court to the Telecommunications Act of 1996 for its contents and context, and denies all inconsistent allegations.  Defendant TMUS otherwise has insufficient information upon which to form a belief as to the truth of the remaining allegations in this paragraph and therefore denies those allegations.

### i.    *Access Rates in Rural Areas*

**Paragraph 68:**  As discussed above, access rates are not one-size-fits-all.  Rather, they vary based on the type of carrier and often depend on the geographic location of the carrier, as well as the density of the market(s) it serves.  Urban areas, with high density and small distances between homes and businesses, are, generally speaking, the most economical markets to serve.

**Answer to Paragraph 68:**    Defendant TMUS states that access rates can vary for different reasons.  Defendant TMUS otherwise has insufficient information upon which to form a belief as to the truth of the remaining allegations in this paragraph and therefore denies those allegations.

**Paragraph 69:**  Access rates charged in rural areas, on the other hand, have traditionally been significantly higher than those rates charged by their more urban counterparts.  These higher rates in rural areas reflect a variety of factors, including:

    a.    Longer distances to deliver traffic in rural areas increase the costs for infrastructure deployment compared to more urban areas;

    b.    Smaller entities operating in rural areas may incur higher costs due to fewer opportunities to generate cost savings through competition among suppliers;

    c.    Difficult terrain such as mountains, valleys, forests, tundra, swamps and deserts as well as harsh weather conditions and long winters involving snow and ice also increase costs;

    d.    Lower population density means that those costs are spread over fewer subscribers;

    e.    Lower population also means lower call density over which to spread out the costs;

f.   Governmental policies designed to help ensure that RLECs are able to remain in business and serve these remote areas as part of the effort to maintain universal service, by requiring fair treatment from purely profit-motivated companies which may otherwise find it more economical to not provide service in these remote areas.

**Answer to Paragraph 69:**  Defendant TMUS states that, for one or more reasons, access rates charged in rural areas can, in certain instances, be higher than access rates charged in urban areas. Defendant TMUS otherwise has insufficient information upon which to form a belief as to the truth of the remaining allegations in this paragraph and therefore denies those allegations.

**Paragraph 70:**  Thus, IXCs and CMRS providers delivering a call to a rural carrier will generally experience higher costs than if it delivered a call of equal duration to a major urban area.

**Answer to Paragraph 70:**  Defendant TMUS has insufficient information upon which to form a belief as to the truth of the allegations in this paragraph and therefore denies those allegations.

ii.   ***Evolving Nature Of The Interexchange And Wireless Marketplace***

**Paragraph 71:**  Historically, long-distance charges were a separate set of charges from those associated with local service.  Charges were assessed on a per-minute basis with calls to certain long-distance areas costing more as a reflection of the increased cost of delivering the call to that destination.

**Answer to Paragraph 71:**  Defendant TMUS has insufficient information upon which to form a belief as to the truth of the allegations in this paragraph and therefore denies those allegations.

**Paragraph 72:**  For many years, long-distance service was a highly profitable segment of the telecommunications market with a virtual guarantee of profit for each minute called.  Thus, while cost was certainly a competitive factor, long-distance companies also had incentive to provide the best quality service in order to keep their customers on the phone talking for as long as possible.

**Answer to Paragraph 72:**  Defendant TMUS has insufficient information upon which to form a belief as to the truth of the allegations in this paragraph and therefore denies those allegations.

**Paragraph 73:**  Over time, however, policy changes and a competitive market began to change this market dynamic, producing an environment in which IXCs and CMRS providers faced a powerful financial incentive to reduce or eliminate calls to higher costs areas of the country.  Three evolutions in the long-distance telecommunications marketplace are chiefly to blame:

a. **Rate Averaging Policy** – The Telecommunications Act of 1996 added 47 U.S.C. § 254(g), which required the FCC to "adopt rules to require that the rates charged by providers of interexchange telecommunications services to subscribers in rural and high cost areas shall be no higher than the rates charged by each such provider to its subscribers in urban areas." Thus, following the adoption of these rules, an IXC was restricted from charging more to deliver calls to rural Nebraska than it did to Los Angeles, even though the incremental costs continued to differ.

b. **Increasing Competition from Other Services** – AT&T, the traditional IXC, began to experience increasing competition on a variety of fronts. First, other landline IXCs began to compete, particularly in more urban areas, often picking off the most lucrative accounts. Then CMRS providers began to bundle their local and long-distance services, drawing additional accounts away from AT&T. Eventually, the popularity of cellular service led many consumers to "cut the cord," resulting in declining subscribership for residential telephone service. Finally, with the advent of VoIP services, people began replacing traditional landline phones with alternative services that rely on this more modern technology.

c. **Bundled Rate Designs** – As competition increased, IXCs and CMRS providers competed head-to-head for consumers by beginning to provide new product offerings. These product innovations included "bucket" plans, where a consumer could make a certain volume of calls to any part of the country for a flat fee, and, eventually, unlimited long distance plans, in which a subscriber could make unlimited long distance calls to anywhere in the nation for one flat fee. As a result of these evolutions, many carriers now have a fixed revenue stream for a service that still includes the payment of incremental costs in the form of access charges. With tightening margins and competitive pressures to avoid raising rates to consumers, IXCs and CMRS providers became increasingly focused on the incremental costs associated with terminating access charges.

**Answer to Paragraph 73:** Defendant TMUS states that the allegations in this paragraph purport to characterize 47 U.S.C. § 254(g), denies that the allegations of this paragraph accurately and/or completely describe 47 U.S.C. § 254(g), respectfully refers the Court to 47 U.S.C. § 254(g) for its contents and context, and denies all inconsistent allegations. Defendant TMUS otherwise has insufficient information upon which to form a belief as to the truth of the remaining allegations in this paragraph and therefore denies those allegations.

**Paragraph 74:** As a matter of pure economics, when confronted with this situation, one of the only ways for IXCs and CMRS providers to increase profit margins is to reduce the volume of traffic that their subscribers make to higher cost areas.

**Answer to Paragraph 74:** Defendant TMUS has insufficient information upon which to form a

belief as to the truth of the allegations in this paragraph and therefore denies those allegations.

### iii. *Corrupted Adaptation By Market Players*

**Paragraph 75:** As competition increased, so did the complexity of call routing. Historically, call routing was a relatively straightforward affair and was limited to routing a call based on the most direct path between Point A and Point B.

**Answer to Paragraph 75:** Defendant TMUS has insufficient information upon which to form a

belief as to the truth of the allegations in this paragraph and therefore denies those allegations.

**Paragraph 76:** With a ballooning number of IXCs and Intermediate Providers, as well as the deployment of IP networks in which carriers can route traffic through alternative paths, the options for delivering a call to a particular destination also increased.

**Answer to Paragraph 76:** Defendant TMUS has insufficient information upon which to form a

belief as to the truth of the allegations in this paragraph and therefore denies those allegations.

**Paragraph 77:** Over time, routing algorithms became more sophisticated, and began to include decision points such as the cost of termination. Increased computing power also meant that sophisticated computers could be applied to consider a variety of different routing scenarios. And, as long-distance became ever more commoditized, carriers increasingly sought to improve margins through route optimization, which included employing routing algorithms to avoid paying tariffed access charges to rural termination locations.

**Answer to Paragraph 77:** Defendant TMUS has insufficient information upon which to form a

belief as to the truth of the allegations in this paragraph and therefore denies those allegations.

### a. **Ascension Of Least Cost Routing (LCR)**

**Paragraph 78:** Once carriers realized that the cost of rural terminations was a drain on profits, "Least Cost Routing" ("LCR") was used to aggressively minimize the cost associated with terminating traffic to rural destinations. LCR is the process of selecting the path of outbound communications traffic based on cost. LCR systems can select a route from dozens of potential carrier options for a given route.

**Answer to Paragraph 78:**  Defendant TMUS denies that there is anything improper in routing calls in a cost-efficient manner, denies the allegations in this paragraph to the extent they are directed at Defendant TMUS, and otherwise has insufficient information upon which to form a belief as to the truth of the remaining allegations in this paragraph and therefore denies those allegations.

**Paragraph 79:**  LCR software relates a destination to a series of available rates from a diverse set of carriers and allows calls to be routed in real time based on a defined set of parameters.  An LCR table can be populated with a series of high quality carriers – carriers which complete virtually every call in a high quality way (which historically resulted in relatively higher costs) or low quality carriers that will complete a minority of the calls handed to it with resulting quality being inconsistent at best (but the calls that do go through are significantly cheaper).

**Answer to Paragraph 79:**  Defendant TMUS has insufficient information upon which to form a belief as to the truth of the allegations in this paragraph and therefore denies those allegations.

**Paragraph 80:**  It is not uncommon for carriers and Covered Providers like T-Mobile and Inteliquent to look for the cheapest route for their traffic.  However, if an Intermediate Provider or Least-Cost Router is offering a rate that is materially below prevailing rates for a particular destination, it should raise concerns that the Intermediate Provider or Least-Cost Router is engaged in potential fraud, will have degraded service due to insufficient capacity to handle the calls, or that the call will be "looped," rather than completing.  Nevertheless, companies like Defendants continue to route traffic without ensuring adequate call quality in order to save money.  They engage in these practices with full awareness of the harmful effects it will have on their consumers and rural carriers.

**Answer to Paragraph 80:**  Defendant TMUS denies that there is anything improper in routing calls in a cost-efficient manner, denies the allegations in this paragraph to the extent they are directed at Defendant TMUS, and otherwise has insufficient information upon which to form a belief as to the truth of the remaining allegations in this paragraph and therefore denies those allegations.

**Paragraph 81:**  Carriers like T-Mobile and Inteliquent could virtually eliminate rural call completion issues by relying on routes with carriers that are proven effective and by proactively monitoring for call completion problems.  Instead, T-Mobile chooses to act as the "Un-carrier," allowing these problems to persist because it is more profitable for them to do so.  T-Mobile's thirst for profit and willingness to operate beyond the boundaries is brazen, including when it publicly exclaims that "We won't stop breaking the rules of wireless."

**Answer to Paragraph 81:** Defendant TMUS denies the allegations in this paragraph to the extent they are directed at Defendant TMUS and otherwise has insufficient information upon which to form a belief as to the truth of the remaining allegations in this paragraph and therefore denies those allegations.

### b. Evolution Of The Use Of Fake Ring Tones To Mask Excessive LCR Or Deter Call Completion

**Paragraph 82:** At the same time that the number of options and use of LCR was on the rise, so too was the increased use of IP technology, with TDM technology gradually beginning to be phased out. While the use of IP technology presents tremendous opportunities for increased efficiency and flexibility in network architecture, it also presented new challenges.

**Answer to Paragraph 82:** Defendant TMUS has insufficient information upon which to form a belief as to the truth of the allegations in this paragraph and therefore denies those allegations.

**Paragraph 83:** In its earliest days, at least, there were not a set of rigorous, definitive standards that were uniformly adopted across the industry for how IP technology would be routed or how to interpret the call signaling information that accompanies the calls. The result was that some carriers interpreted signaling information on IP traffic differently than other carriers did, causing confusion and the potential for call failures to occur.

**Answer to Paragraph 83:** Defendant TMUS has insufficient information upon which to form a belief as to the truth of the allegations in this paragraph and therefore denies those allegations.

**Paragraph 84:** Call failures can also occur because of errors in the routing tables; insufficient capacity between carriers to handle large, unplanned surges in traffic; or improper IP addresses. For example, a phenomena known as "looping" occurs when a call becomes trapped in an infinite routing loop caused by a regenerating call path between carriers. Simplistically, a carrier in an LCR routing table (Carrier X), redirects the call to a previous carrier (Carrier Y), which in turn routes the call, either directly or indirectly, back to (Carrier X) trapping the call in an infinite loop.

**Answer to Paragraph 84:** Defendant TMUS states that call failures can occur for a variety of reasons, but otherwise has insufficient information upon which to form a belief as to the truth of the remaining allegations in this paragraph and therefore denies those allegations.

**Paragraph 85:** Call failures can also occur, however, when a carrier willfully or intentionally blocks a call, rather than completing it to its intended destination, or drops the call after it has been connected for a short period of time. In short, one bad carrier in the call path can intentionally or

unintentionally lead to a call not being completed to its intended destination or result in poor call quality.

**Answer to Paragraph 85:** Defendant TMUS denies the allegations in this paragraph to the extent they are directed at Defendant TMUS and otherwise has insufficient information upon which to form a belief as to the truth of the remaining allegations in this paragraph and therefore denies those allegations.

**Paragraph 86:** While ring tones should only be heard by the calling party when the call has reached the network of its intended destination, fake ring tones are heard by the calling party before the called party's phone rings. Fake ring tones obscure the delay in finding a route to the called party, or prevents the calling party from learning that the call failed. In other words, fake ring tones can mask post dial delay (PDD).

**Answer to Paragraph 86:** Defendant TMUS states that the FCC has prohibited the conveyance of a ringing indication to a calling party until the terminating provider has signaled that the called party is being alerted to an incoming call, such as by ringing. Defendant TMUS otherwise denies the allegations in this paragraph to the extent they are intended to imply actionable wrongdoing by Defendant TMUS and has insufficient information upon which to form a belief as to the truth of the remaining allegations in this paragraph and therefore denies those allegations.

**Paragraph 87:** The use of fake ring tones can also prevent calls from reaching their intended destination. As discussed more fully below, see *infra* ¶¶ 104, 113-115, the FCC has concluded that the use of fake ring tones causes calls not to be completed because the caller hangs up, believing that no one is home, when the recipient's phone has not even rung. Moreover, the use of fake ring tones interferes with the proper routing of calls by preventing a call from being handed back to the prior provider when a route is not functioning properly. Thus, fake ring tones can cause call failures, which are then masked by the fake ringing.

**Answer to Paragraph 87:** No response is required because the allegations in this paragraph relate to Defendant TMUS's pending motion to dismiss, to which the Court is respectfully referred. To the extent a response is required, Defendant TMUS denies the allegations in this paragraph.

### F. The FCC Requires Carriers To Complete Calls Placed To Customers Of LECs And Prohibits Practices That Restrict Traffic, Including Fake Ring Tone Schemes

**Paragraph 88:**  Despite efforts to ensure universal service, the Commission has, for many years, had to combat the practices of unscrupulous carriers who were intent on reducing the intercarrier compensations charges they paid to rural carriers.  While the FCC has made repeated efforts to prevent rural call completion problems and punish those responsible, its efforts have not been forceful enough to deters carriers like T-Mobile from continuing to cheat the system.

**Answer to Paragraph 88:**  Defendant TMUS denies the allegations in this paragraph to the extent they are directed at Defendant TMUS and otherwise has insufficient information upon which to form a belief as to the truth of the remaining allegations in this paragraph and therefore denies those allegations.

> i. *2001 — The FCC Addresses Carriers' Threats Or Refusals To Deliver Traffic To CLECs*

**Paragraph 89:**  In 2001, the Commission acted to address situations in which IXCs were threatening or refusing to deliver traffic to CLECs:

> IXCs have threatened to stop delivering traffic to, or accepting it from, certain CLECs that they view as over-priced.  Thus, AT&T has notified a number of CLECs that it refused to exchange originating or terminating traffic.  In some instances, AT&T has terminated its relationship with CLECs and is blocking traffic, thus raising various consumer and service quality issues.  These practices threaten to compromise the ubiquity and seamlessness of the nation's telecommunications network and could result in consumer confusion.  Once one or more IXCs refuse to do business with a CLEC, it will become impossible for that CLEC's end users to reach, or receive calls from, some parties outside of the local calling area.  If such refusals to exchange traffic were to become a routine bargaining tool, callers might never be assured that their calls would go through.  We are particularly concerned with preventing such a degradation of the country's telecommunications network.  It is not difficult to foresee instances in which the failure of a call to go through would represent a serious problem, and, in certain circumstances, it could be life-threatening.

*In Re Access Charge Reform*, Seventh Report and Order and Further Notice of Proposed Rulemaking, 16 F.C.C.  Rcd. 9923, 9932-33, ¶ 24 (2001) ("*Seventh Report and Order*").

**Answer to Paragraph 89:**  Defendant TMUS states that the allegations in this paragraph purport to characterize the cited Report and Order, respectfully refers the Court to the cited Report and Order for its contents and context, and denies all inconsistent allegations.  Defendant TMUS otherwise has insufficient information upon which to form a belief as to the truth of the remaining allegations in this paragraph and therefore denies those allegations.

36

### ii.     *2007 — The WCB Issues Its Call Blocking Declaratory Ruling*

**Paragraph 90:**  Acting on its own volition, the Commission's WCB issued the *2007 Call Blocking Declaratory Ruling* to "remove any uncertainty about the scope of the Commission's general prohibition on call blocking and to clarify the obligation of interexchange carriers (IXCs) and commercial mobile radio service (CMRS) providers (collectively carriers) to complete their customers' interexchange calls." Ex. 2, *2007 Call Blocking Declaratory Ruling*, ¶ 1.  In that order, the Bureau concluded that carriers "may not engage in self-help actions such as call blocking." *Id.* It reiterated Commission policy that "the practice of call blocking, coupled with a failure to provide adequate consumer information, is unjust and unreasonable in violation of Section 201(b) of the Act." *Id.* ¶ 6 (quoting *In the Matter of Telecommunications Research and Action Center and Consumer Action v. Central Corporation et al.*, File Nos. E-88-104-108, Memorandum Opinion and Order, 4 F.C.C. Rcd. 2157 (1989)).

**Answer to Paragraph 90:**  Defendant TMUS states that the allegations in this paragraph purport to characterize Exhibit 2 to the SAC, respectfully refers the Court to Exhibit 2 to the SAC for its contents and context, and denies all inconsistent allegations.  Defendant TMUS otherwise has insufficient information upon which to form a belief as to the truth of the remaining allegations in this paragraph and therefore denies those allegations.

### iii.     *2011 — The FCC Hosts A Rural Call Completion Workshop*

**Paragraph 91:**  In 2011, the Commission became alarmed about a rise in complaints from consumers and rural carriers about poor call quality and repeated challenges to receiving long-distance phone calls.  On September 26, 2011, the Commission announced the creation of a Rural Call Completion Task Force to investigate and address the growing problem of calls to rural customers being delayed or failing to connect.[1] The Commission also held a workshop on October 18, 2011 to identify causes and discuss potential solutions with key stakeholders.[2]

**Answer to Paragraph 91:**  Defendant TMUS states that the allegations in this paragraph purport to characterize the cited documents, respectfully refers the Court to the cited documents for their contents and context, and denies all inconsistent allegations.  Defendant TMUS otherwise has

---

[1] *See, e.g.,* FCC Documents, *FCC Launches Rural Call Completion Task Force, Sets Oct. 18 Workshop* (Sept. 26, 2011), https://www.fcc.gov/document/fcc-launches-rural-call-completion-task-force-  sets-oct-18-workshop  (last visited Oct. 10, 2019).

[2] *See* FCC Events, *Rural Call Completion Workshop* (Oct. 18, 2011), https://www.fcc.gov/news-events/events/2011/10/rural-call-completion-workshop (last visited Oct. 10, 2019).

insufficient information upon which to form a belief as to the truth of the remaining allegations in this paragraph and therefore denies those allegations.

### iv. *November 2011 — FCC Issues The Connect America Fund Order*

**Paragraph 92:**  In November of that year, the Commission released an order of great significance to the telecommunication industry, in which it began a process of revising and modernizing the intercarrier compensation regime. *See Connect America Fund Order* (attached hereto as Exhibit 3). Among other things, the Commission adopted rules that began to transition access rates to a "bill-and-keep" model, essentially with the aim of eliminating them. Specifically, the order commenced a phased-in reduction of terminating end office access charges over time, but does not eliminate all costs for terminating traffic in rural America.

**Answer to Paragraph 92:**  Defendant TMUS states that the allegations in this paragraph purport to characterize Exhibit 3 to the SAC, respectfully refers the Court to Exhibit 3 to the SAC for its contents and context, and denies all inconsistent allegations. Defendant TMUS otherwise has insufficient information upon which to form a belief as to the truth of the remaining allegations in this paragraph and therefore denies those allegations.

**Paragraph 93:**  In the *Connect America Fund Order*, the Commission reiterated its "longstanding prohibition on call blocking," while rejecting a proposal to "allow selective call blocking." *Id.* ¶ 734. The Commission also extended the prohibition to traffic exchanged as VoIP traffic. *See id.*, ¶ 972.

**Answer to Paragraph 93:**  Defendant TMUS states that the allegations in this paragraph purport to characterize Exhibit 3 to the SAC, respectfully refers the Court to Exhibit 3 to the SAC for its contents and context, and denies all inconsistent allegations. Defendant TMUS otherwise has insufficient information upon which to form a belief as to the truth of the remaining allegations in this paragraph and therefore denies those allegations.

**Paragraph 94:**  The Commission again recognized that "blocking or the refusal to deliver voice telephone traffic, whether as a means of 'self help' to address perceived unreasonable intercarrier compensation charges or otherwise, risks 'degradation of the country's telecommunications network'" and reiterated that "call blocking is an unjust and unreasonable practice under section 201(b) of the Act." *Id.*

**Answer to Paragraph 94:**  Defendant TMUS states that the allegations in this paragraph purport to characterize Exhibit 3 to the SAC, respectfully refers the Court to Exhibit 3 to the SAC for its contents and context, and denies all inconsistent allegations.  Defendant TMUS otherwise has insufficient information upon which to form a belief as to the truth of the remaining allegations in this paragraph and therefore denies those allegations.

v. <em>2012 — The WCB Issues Its Rural Call Completion Declaratory Ruling</em>

**Paragraph 95:**  A few months later, on February 12, 2012, the WCB, acting on "evidence that there is a pattern of call completion and service quality problems on long distance calls to certain rural areas, and in response to numerous requests," issued a declaratory ruling "to clarify the scope of the Commission's prohibition on blocking, choking, reducing, or restricting telephone traffic" in response to complaints about rural call completion issues from rural associations, state utility commissions, and consumers. *In the Matter of Developing an Unified Intercarrier Comp. Regime Establishing Just & Reasonable Rates for Local Exch. Carriers*, Declaratory Ruling, 27 F.C.C. Rcd. 1351, ¶ 1 (2012) ("*2012 Declaratory Ruling*") (attached hereto as Exhibit 4).  The WCB observed that there were reports of a "sharp increase in complaints that long distance calls and faxes are not reaching" rural locations and that consumers were complaining of "poor call quality, as well as of calls that ring for a prolonged period for the caller but that do not ring, or ring on an extremely delayed basis, on the receiving end." *Id.* ¶ 2.

**Answer to Paragraph 95:**  Defendant TMUS states that the allegations in this paragraph purport to characterize Exhibit 4 to the SAC, denies that the allegations of this paragraph accurately and/or completely describe Exhibit 4 to the SAC, respectfully refers the Court to Exhibit 4 to the SAC for its contents and context, and denies all inconsistent allegations.  Defendant TMUS otherwise has insufficient information upon which to form a belief as to the truth of the remaining allegations in this paragraph and therefore denies those allegations.

**Paragraph 96:** The *2012 Declaratory Ruling* documented significant detrimental effects associated with rural call completion problems:

> Small businesses can lose customers who get frustrated when their calls don't go through.  Urgent long distance calls from friends or family can be missed.  Schools may be unable to reach parents with critical alerts, including school closings due to extreme weather.  And those in need of help may be unable to reach public safety officials.

*Id.*

**Answer to Paragraph 96:** Defendant TMUS states that the allegations in this paragraph purport to characterize Exhibit 4 to the SAC, denies that the allegations of this paragraph accurately and/or completely describe Exhibit 4 to the SAC, respectfully refers the Court to Exhibit 4 to the SAC for its contents and context, and denies all inconsistent allegations. Defendant TMUS otherwise has insufficient information upon which to form a belief as to the truth of the remaining allegations in this paragraph and therefore denies those allegations.

**Paragraph 97:** The *2012 Declaratory Ruling* took several actions to put an end to the unlawful practices of carriers who were interfering with the delivery of calls to rural America, which "adversely affect the ubiquity and reliability of the nation's communications network and threaten commerce, public safety, and the ability of consumers, businesses, and public health and safety officials in rural America to access and use a reliable network." *Id.* ¶ 11.

**Answer to Paragraph 97:** Defendant TMUS states that the allegations in this paragraph purport to characterize Exhibit 4 to the SAC, denies that the allegations of this paragraph accurately and/or completely describe Exhibit 4 to the SAC, respectfully refers the Court to Exhibit 4 to the SAC for its contents and context, and denies all inconsistent allegations. Defendant TMUS otherwise has insufficient information upon which to form a belief as to the truth of the remaining allegations in this paragraph and therefore denies those allegations.

**Paragraph 98:** First, the order made clear that it is "an unjust and unreasonable practice in violation of section 201 of the Act for a carrier that knows or should know that it is providing degraded service to certain areas to fail to correct the problem or to fail to ensure that Intermediate Providers, least-cost routers, or other entities acting for or employed by the carrier are performing adequately." *Id.* ¶ 12. This clarification is important because it requires carriers to ensure the delivery of their calls even when they use third parties, such as IXCs, Intermediate Providers, or Least-Cost Routers, to deliver the traffic for some of the route, rather than handing off the call directly to the local phone company that will terminate the call. In connection with this declaration, the WCB also provided examples of the types of "degraded service" that constitute an unjust and unreasonable practice in violation of the Act, 47 U.S.C. § 201(b):

> This could include, inter alia, unreasonable delay to connect a call, as manifested by prolonged silence ("dead air") and/or prolonged ***ringing in advance of the called phone being alerted***. Prolonged ringing occurs when callers are provided with prolonged audible ringing well before the called party's phone has even been alerted. This causes a caller to hang up because they believe the called entity's phone rang and no one is available to answer.

> *See, e.g.*, Fritz Hendricks, Onvoy Voice Service, "When a person calls a customer in a rural market the [caller's] phone will ring 8 to 10 times before the end office of the ILEC is ever signaled - if it is signaled at all." and "[The caller] will hear ring but the far end will never ring; that is the trouble in approximately 60 to 65 per cent of the time." Rural Call Termination Workshop Video at 13:40, 41:20, viewable at http://www.fcc.gov/events/rural-call-completion-workshop. *See also* Washington Call Termination Issues, Washington Independent Telecommunications Association, presented to WUTC Workshop on Call Termination Issues held August 8, 2011, WUTC docket UT-110866, ("Customer call completion issues: [1] Ring tone with no answer - rings 10-20 times - caller hangs up.") available at http://www.wutc.wa.gov/rms2.nsf/177d98baa5918c7388256a550064a61e/93037ed14bb0cb6f882578e7007442ae! OpenDocument

*Id.* ¶ 12, n.35 (emphasis added). Thus, carriers were on notice by at least 2012 that the use of prolonged fake ring tones was prohibited.

**Answer to Paragraph 98:** Defendant TMUS states that the allegations in this paragraph purport to characterize Exhibit 4 to the SAC, 47 U.S.C. § 201(b), and the other cited documents, denies that the allegations of this paragraph accurately and/or completely describe Exhibit 4 to the SAC, 47 U.S.C. § 201(b), and the other cited documents, respectfully refers the Court to Exhibit 4 to the SAC, 47 U.S.C. § 201(b), and the other cited documents for their contents and context, and denies all inconsistent allegations. Defendant TMUS otherwise denies the allegations in this paragraph to the extent they are intended to imply actionable wrongdoing by Defendant TMUS and has insufficient information upon which to form a belief as to the truth of the remaining allegations in this paragraph and therefore denies those allegations.

**Paragraph 99:** Next, the *2012 Declaratory Ruling* clarified that it is an unjust and unreasonable practice in violation of Section 201(b) of the Act for a carrier to "inform a caller that a number is not reachable or is out of service when the number is, in fact, reachable and in service." *Id.* ¶ 13.

**Answer to Paragraph 99:** Defendant TMUS states that the allegations in this paragraph purport to characterize Exhibit 4 to the SAC, denies that the allegations of this paragraph accurately and/or completely describe Exhibit 4 to the SAC, respectfully refers the Court to Exhibit 4 to the SAC for its contents and context, and denies all inconsistent allegations. Defendant TMUS otherwise

has insufficient information upon which to form a belief as to the truth of the remaining allegations in this paragraph and therefore denies those allegations.

**Paragraph 100:** Third, citing the Communication Act's prohibition against unjust or unreasonable discrimination, the *2012 Declaratory Ruling* concluded that "adopting or perpetuating routing practices that result in lower quality service to rural or high-cost localities than like service to urban or lower cost localities (including other lower cost rural areas) may, in the absence of a persuasive explanation, constitute unjust or unreasonable discrimination in practices, facilities, or services and violate section 202 of the Act." *Id.* ¶ 14 (citing 47 U.S.C. § 202).

**Answer to Paragraph 100:** Defendant TMUS states that the allegations in this paragraph purport to characterize Exhibit 4 to the SAC and 47 U.S.C. § 202, denies that the allegations of this paragraph accurately and/or completely describe Exhibit 4 to the SAC and 47 U.S.C. § 202, respectfully refers the Court to Exhibit 4 to the SAC and 47 U.S.C. § 202 for their contents and context, and denies all inconsistent allegations. Defendant TMUS otherwise has insufficient information upon which to form a belief as to the truth of the remaining allegations in this paragraph and therefore denies those allegations.

**Paragraph 101:** Fourth, and finally, the *2012 Declaratory Ruling* made it inescapably clear that carriers could no longer turn a blind eye to the call completion problems plaguing rural America by passing off their call traffic to an unregulated Intermediate Provider. Specifically, the Commission declared:

> Section 217 of the Act states that a carrier is liable for the acts, omissions, or failures of its agent or other person acting for or employed by the carrier.[ ] Therefore, if an underlying provider is blocking, choking, or otherwise restricting traffic, employing other unjust or unreasonable practices in violation of section 201, engaging in unjust or unreasonable discrimination in violation of section 202, or otherwise not complying with the Act or Commission rules, the carrier using that underlying provider to deliver traffic is liable for those actions if the underlying provider is an agent or other person acting for or employed by the carrier.

*Id.* ¶ 15 (citing 47 U.S.C. § 217).

**Answer to Paragraph 101:** Defendant TMUS states that the allegations in this paragraph purport to characterize Exhibit 4 to the SAC and 47 U.S.C. § 217, denies that the allegations of this

paragraph accurately and/or completely describe Exhibit 4 to the SAC and 47 U.S.C. § 217, respectfully refers the Court to Exhibit 4 to the SAC and 47 U.S.C. § 217 for their contents and context, and denies all inconsistent allegations. Defendant TMUS otherwise has insufficient information upon which to form a belief as to the truth of the remaining allegations in this paragraph and therefore denies those allegations.

### vi. 2013 — The FCC Issues A Rule Prohibiting Fake Ring Tones And A Rural Call Completion Enforcement Advisory

**Paragraph 102:** A year later, on February 7, 2013, with rural completion problems still rampant, the Commission issued a Notice of Proposed Rulemaking, observing that Intermediate Providers "may be failing to deliver a significant number of calls to rural telephone company customers" and that evidence suggested that "retail long-distance providers may not be adequately examining the resultant rural call completion performance." *In the Matter of Rural Call Completion*, Notice of Proposed Rulemaking, 28 F.C.C. Rcd. 1569, ¶ 1 (2013) (attached hereto as Exhibit 5). The Commission reiterated that these rural call competition issues "manifest themselves in lengthy periods of dead air on the calling party's end after dialing a number, audible ringing tones on the calling party's end when the called party's telephone never rings at all, false busy signals, inaccurate intercept messages, and the inability of one or both parties to hear the other when the call does go through." *Id.* ¶ 2. The Commission proposed reporting and data retention requirements that would "aid enforcement action" and permit "review [of] a long distance provider's call performance to specific areas." *Id.* ¶ 3.

**Answer to Paragraph 102:** Defendant TMUS states that the allegations in this paragraph purport to characterize Exhibit 5 to the SAC, denies that the allegations of this paragraph accurately and/or completely describe Exhibit 5 to the SAC, respectfully refers the Court to Exhibit 5 to the SAC for its contents and context, and denies all inconsistent allegations. Defendant TMUS otherwise has insufficient information upon which to form a belief as to the truth of the remaining allegations in this paragraph and therefore denies those allegations.

**Paragraph 103:** Citing its authority to prohibit unjust and unreasonable practices, 47 U.S.C.§ 201(b), the Commission also proposed rules to eliminate entirely the use of "false audible ringing," (*i.e.*, fake ring tones) in which "the originating provider or an intermediate provider prematurely triggers the audible ring tone to the caller before the call setup request has actually reached the terminating rural provide." *Id.* ¶ 39.

**Answer to Paragraph 103:**  Defendant TMUS states that the allegations in this paragraph purport to characterize Exhibit 5 to the SAC and 47 U.S.C.§ 201(b), denies that the allegations of this paragraph accurately and/or completely describe Exhibit 5 to the SAC and 47 U.S.C.§ 201(b), respectfully refers the Court to Exhibit 5 to the SAC and 47 U.S.C.§ 201(b) for their contents and context, and denies all inconsistent allegations.  Defendant TMUS otherwise has insufficient information upon which to form a belief as to the truth of the remaining allegations in this paragraph and therefore denies those allegations.

**Paragraph 104:**  According to the FCC, "false audible ringing" causes a caller to "hear[ ] prolonged ringing" and "finally hang[ ] up—before the rural phone he called has rung at all." *Id*. The FCC further indicated that "once an intermediate provider provides a ringing indication to an originating provider while still processing the call, the call cannot be handed back to the preceding provider for an alternate route." *Id*. In other words, the FCC asserted that the insertion of fake ring tones makes it less likely that a call ultimately reaches its intended destination for at least two reasons: (1) it causes the caller to "hang up" before the called party's phone begins to ring; and (2) it prevents the call from being returned to the preceding carrier so that alternative routes may be attempted and thus serves to block the call from being completed.

**Answer to Paragraph 104:**  No response is required because the allegations in this paragraph relate to Defendant TMUS's pending motion to dismiss, to which the Court is respectfully referred. To the extent a response is required, Defendant TMUS states that the allegations in this paragraph purport to characterize Exhibit 5 to the SAC, denies that the allegations of this paragraph accurately and/or completely describe Exhibit 5 to the SAC, respectfully refers the Court to Exhibit 5 to the SAC for its contents and context, and denies all inconsistent allegations.  Defendant TMUS otherwise denies the remaining allegations in this paragraph.

**Paragraph 105:**  While the Commission gathered and evaluated public comments, it also continued to put carriers on notice of its intention to enforce the rules already in place.  On July 19, 2013, the Enforcement Bureau ("EB") issued an FCC Enforcement Advisory in which it called out carriers who were not adequately investigating and responding to consumer complaints about rural call completion problems.  *See FCC Enforcement Advisory*, Public Notice, 28 F.C.C. Rcd. 10347, (2013) (attached hereto as Exhibit 8).

**Answer to Paragraph 105:** Defendant TMUS states that the allegations in this paragraph purport to characterize Exhibit 8 to the SAC and 47 U.S.C. § 201(b), denies that the allegations of this paragraph accurately and/or completely describe Exhibit 8 to the SAC and 47 U.S.C. § 201(b), respectfully refers the Court to Exhibit 8 to the SAC and 47 U.S.C. § 201(b) for their contents and context, and denies all inconsistent allegations. Further answering, Defendant TMUS states that this paragraph states legal conclusions and that legal conclusions are for the Court to make, but denies that Plaintiffs have any viable claim against TMUS. Defendant TMUS otherwise denies the allegations in this paragraph to the extent they are intended to imply actionable wrongdoing by Defendant TMUS and has insufficient information upon which to form a belief as to the truth of the remaining allegations in this paragraph and therefore denies those allegations.

**Paragraph 106:** Particularly problematic, according to the Commission, were carriers that would "assert, without any explanation, that the called party's rural telephone company is the source of any problems." *Id.* The Commission put carriers on notice that inadequate or insufficient responses to consumer complaints would "provide the basis for further Commission investigation and enforcement action, which may include monetary fines." *Id.* at 10349. The Commission also reiterated that, "a provider's failure to investigate and satisfy such complaints may trigger separate liability under section 201(b) and constitute the basis for additional penalties." *Id.*

**Answer to Paragraph 106:** Defendant TMUS states that the allegations in this paragraph purport to characterize Exhibit 8 to the SAC, denies that the allegations of this paragraph accurately and/or completely describe Exhibit 8 to the SAC, respectfully refers the Court to Exhibit 8 to the SAC for its contents and context, and denies all inconsistent allegations. Defendant TMUS otherwise denies the allegations in this paragraph to the extent they are intended to imply actionable wrongdoing by Defendant TMUS and has insufficient information upon which to form a belief as to the truth of the remaining allegations in this paragraph and therefore denies those allegations.

**Paragraph 107:** Notably, Inteliquent was one of the only parties to argue against the Commission's proposal to prohibit fake ring tones. For example, on both September 26, 2013 and September 30, 2013, Inteliquent met with Commission staff addressing rural call completion issues and made the following assertions:

> With respect to rules addressing "false ringing," we noted that, when the call party is a wireless customer roaming on another provider's network, completing the call may take longer than calls terminating to wireline customers. While the wireless carrier is processing the call and locating the called party, presenting the caller with ringing provides comfort that the call has been dialed correctly and is being processed.

Letter from John Harrington, Inteliquent, to Marlene H. Dortch, Secretary, Federal Communications Commission, WC Docket No. 13-39 (Oct. 1, 2013) (attached hereto as Exhibit 6); Letter from John Harrington, Inteliquent, to Marlene H. Dortch, Secretary, Federal Communications Commission, WC Docket No. 13-39 (Oct. 18, 2013) (attached hereto as Exhibit 7). The FCC later expressly rejected this argument. *See infra.* ¶¶ 117-18.

**Answer to Paragraph 107:** Defendant TMUS states that the allegations in this paragraph purport to characterize Exhibit 6 and 7 to the SAC, denies that the allegations of this paragraph accurately and/or completely describe Exhibit 6 and 7 to the SAC, respectfully refers the Court to Exhibit 6 and 7 to the SAC for their contents and context, and denies all inconsistent allegations. Defendant TMUS otherwise has insufficient information upon which to form a belief as to the truth of the remaining allegations in this paragraph and therefore denies those allegations.

**Paragraph 108:** On September 30, 2013, the same day that Inteliquent was lobbying for the use of fake ringtones, the Commission announced that its Tentative Agenda for its October 2013 Open Meeting included adoption of a Report and Order and Further Notice of Proposed Rulemaking "to address problems associated with completion of long distance calls to rural areas." *See* FCC News Release, *FCC Announces Tentative Agenda for October Open Meeting* (Sept. 30, 2013), *available at:* https://docs.fcc.gov/public/attachments/DOC-323564A1.pdf (last viewed Dec. 10, 2020).

**Answer to Paragraph 108**: Defendant TMUS states that the allegations in this paragraph purport to characterize the cited document, denies that the allegations of this paragraph accurately and/or completely describe the cited document, respectfully refers the Court to the cited document for its contents and context, and denies all inconsistent allegations. Defendant TMUS otherwise has insufficient information upon which to form a belief as to the truth of the remaining allegations in this paragraph and therefore denies those allegations.

**Paragraph 109:** On October 17, 2013, the Commission published its final agenda for the October 28, 2013 Open Meeting. *See Commission Meeting Agenda, FCC to Hold Open Commission*

*Meeting Monday, October 28, 2013* (Oct. 17, 2013), *available at:* https://docs.fcc.gov/public/attachments/DOC-323581A1.pdf (last viewed Dec. 10, 2020).

**Answer to Paragraph 109**: Defendant TMUS states that the allegations in this paragraph purport to characterize the cited document, denies that the allegations of this paragraph accurately and/or completely describe the cited document, respectfully refers the Court to the cited document for its contents and context, and denies all inconsistent allegations. Defendant TMUS otherwise has insufficient information upon which to form a belief as to the truth of the remaining allegations in this paragraph and therefore denies those allegations.

**Paragraph 110:** Upon information and belief, Inteliquent's lobbying in favor of fake ringtones in late September 2013 was in response to being informed that the Commission intended to move forward with adopting the proposed rules to prohibit the practice.

**Answer to Paragraph 110**: Defendant TMUS has insufficient information upon which to form a belief as to the truth of the allegations in this paragraph and therefore denies those allegations.

**Paragraph 111:** Upon information and belief, between September 30, 2013 and the adoption of the order on October 28, 2013, T-Mobile's lobbyist and/or FCC lawyers would also have learned that the FCC's order would include a prohibition against the use of fake ring tones and conveyed this information to T-Mobile.

**Answer to Paragraph 111**: Defendant TMUS states that it received notice of the cited proposed order and otherwise denies the allegations in this paragraph to the extent they are intended to imply actionable wrongdoing by Defendant TMUS. Defendant TMUS otherwise has insufficient information upon which to form a belief as to the truth of the remaining allegations in this paragraph and therefore denies those allegations.

**Paragraph 112:** The Commission adopted the Report and Order and Further Notice of Proposed Rulemaking on October 28, 2013. *See In the Matter of Rural Call Completion*, Report and Order and Further Notice of Proposed Rulemaking, 28 F.C.C. Rcd. 16154 (2013) ("*2013 Rural Call Completion Order*") (attached hereto as Exhibit 9). The Commission concluded that poor call quality in rural parts of the country was directly attributable to carriers seeking to end run the Commission's policies on payment of access charges:

> One key reason for the increased problems in rural areas is that a call to a rural area is often handled by numerous different providers in the call's path.

Given the particularly high rates long-distance providers incur to terminate long-distance calls to rural rate-of-return carriers, long-distance providers have additional incentives to reduce the per-minute cost of calls. For example, the disparity between interstate rates can be 5-6 cents per minute for rate-of-return areas and just over half a cent per minute for price cap areas. As a result, there is greater incentive for the long-distance provider to hand off the call to an intermediate provider that is offering to deliver it cheaply—and potentially less incentive to ensure that calls to rural areas are actually completed properly. The prevalence of these problems accords with providers' incentives to engage in blocking or degrading traffic, or similar behavior, in an effort to minimize their intercarrier compensation payments, which has been long recognized by the Commission. While the Commission's comprehensive reform of intercarrier compensation will alleviate some of these price differences in the long-term, it likely will continue to be more costly to complete calls to rate-of-return carriers while the transition to bill-and-keep is implemented over the next several years.

*Id.* ¶ 17.

**Answer to Paragraph 112:** Defendant TMUS states that the allegations in this paragraph purport to characterize Exhibit 9 to the SAC, denies that the allegations of this paragraph accurately and/or completely describe Exhibit 9 to the SAC, respectfully refers the Court to Exhibit 9 to the SAC for its contents and context, and denies all inconsistent allegations. Defendant TMUS otherwise has insufficient information upon which to form a belief as to the truth of the remaining allegations in this paragraph and therefore denies those allegations.

**Paragraph 113:** In the *2013 Rural Call Completion Order*, the Commission adopted its proposed rule to prohibit the use of fake ring tones. The Commission described the use of fake ring tones as deceptive, explaining that "[f]alse audible ringing can [ ] make it appear to the caller that the terminating rural provider is responsible for the call failure, instead of the originating or intermediate provider," *id.* ¶ 111, and that codifying the rule was intended to address the harm that "consumers mistakenly believe that the terminating rural provider is responsible for the call failure," *id.* ¶ 114.

**Answer to Paragraph 113:** Defendant TMUS states that the allegations in this paragraph purport to characterize Exhibit 9 to the SAC, denies that the allegations of this paragraph accurately and/or completely describe Exhibit 9 to the SAC, respectfully refers the Court to Exhibit 9 to the SAC for its contents and context, and denies all inconsistent allegations. To the extent a further response

is required, Defendant TMUS admits that the quoted language appears in Exhibit 9 to the SAC but denies the allegations in this paragraph insofar as the quoted language is taken out of context and denies that Plaintiffs have any viable claim against TMUS.

**Paragraph 114:** The Commission reiterated that the use of fake ring tones causes the caller to hang up prematurely, "thinking nobody is available to receive the call," and that the use of a fake ring tone prevents the call from being handed "back to the preceding provider for an alternative route" when the call is not able to reach its intended destination. *Id*. ¶ 111. The FCC elaborated on this point:

> As discussed, once an intermediate provider sends a ringing indication to the originating provider while still processing a call, that call cannot be handed back to the preceding provider for an alternate route. We believe prohibiting false audible ringing affects an intermediate provider's incentive to continue processing calls struggling with excessive setup times, allowing them to hand back such calls to the preceding provider.

*Id*., ¶ 114 n.294.

**Answer to Paragraph 114**:  No response is required because the allegations in this paragraph relate to Defendant TMUS's pending motion to dismiss, to which the Court is respectfully referred. To the extent a response is required, Defendant TMUS states that the allegations in this paragraph purport to characterize Exhibit 9 to the SAC, denies that the allegations of this paragraph accurately and/or completely describe Exhibit 9 to the SAC, respectfully refers the Court to Exhibit 9 to the SAC for its contents and context, denies all inconsistent allegations, and otherwise denies the remaining allegations in this paragraph.

**Paragraph 115:** Thus, in the 2013 Rural Call Completion Order the FCC expressly concluded that the use of fake ring tones causes calls not to be completed.

**Answer to Paragraph 115**:  No response is required because the allegations in this paragraph relate to Defendant TMUS's pending motion to dismiss, to which the Court is respectfully referred. To the extent a response is required, Defendant TMUS states that the allegations in this paragraph purport to characterize Exhibit 9 to the SAC, denies that the allegations of this paragraph accurately and/or completely describe Exhibit 9 to the SAC, respectfully refers the Court to Exhibit 9 to the

SAC for its contents and context, denies all inconsistent allegations, and otherwise denies the remaining allegations in this paragraph.

**Paragraph 116:** When calls are not completed because of the use of fake ring tones, the terminating LEC is harmed by not receiving access charges for the termination of that call.

**Answer to Paragraph 116**: No response is required because the allegations in this paragraph relate to Defendant TMUS's pending motion to dismiss, to which the Court is respectfully referred.

To the extent a response is required, Defendant TMUS denies the allegations in this paragraph.

**Paragraph 117:** In the *2013 Rural Call Completion Order*, the Commission rejected arguments, like those that Inteliquent had made, that fake ring tones should not be prohibited because they are meant to "ensure that the calling party does not hang up before the call is answered because the calling party hears a relatively prolonged silence." *Id*. ¶ 113 (citations omitted).

**Answer to Paragraph 117**: No response is required because the allegations in this paragraph relate to Defendant TMUS's pending motion to dismiss, to which the Court is respectfully referred.

To the extent a response is required, Defendant TMUS states that the allegations in this paragraph purport to characterize Exhibit 9 to the SAC, denies that the allegations of this paragraph accurately and/or completely describe Exhibit 9 to the SAC, respectfully refers the Court to Exhibit 9 to the SAC for its contents and context, denies all inconsistent allegations, and otherwise denies the remaining allegations in this paragraph.

**Paragraph 118:** Instead, the Commission concluded that its new rule prohibiting fake ring tones was essential to ensuring that calls actually reached rural areas:

> As a result of this rule, consumers will no longer prematurely hang up when the call has not even rung on the caller's side, nor will consumers mistakenly believe that the terminating rural provider is responsible for the call failure. Industry will benefit from this rule because intermediate providers will now hand back calls that have excessive set-up time to the preceding provider to find an alternate route, so that the call can ultimately be completed.

*Id*. ¶ 114.

**Answer to Paragraph 118**: No response is required because the allegations in this paragraph relate to Defendant TMUS's pending motion to dismiss, to which the Court is respectfully referred.

To the extent a response is required, Defendant TMUS states that the allegations in this paragraph purport to characterize Exhibit 9 to the SAC, denies that the allegations of this paragraph accurately and/or completely describe Exhibit 9 to the SAC, respectfully refers the Court to Exhibit 9 to the SAC for its contents and context, denies all inconsistent allegations, and otherwise denies the remaining allegations in this paragraph.

**Paragraph 119:** The Commission codified the new rule as follows:

> (a)    A long-distance voice service provider shall not convey a ringing indication to the calling party until the terminating provider has signaled that the called party is being alerted to an incoming call, such as by ringing.
>
>> (1)    If the terminating provider signals that the called party is being alerted and provides an audio tone or announcement, originating providers must cease any locally generated audible tone or announcement and convey the terminating provider's tone or announcement to the calling party.
>>
>> (2)    The requirements in this paragraph apply to all voice call signaling and transmission technologies and to all long-distance voice service providers, including local exchange carriers as defined in § 64.4001(e), interexchange carriers as defined in § 64.4001(d), providers of commercial mobile radio service as defined in § 20.3 of this chapter, providers of interconnected voice over Internet Protocol (VoIP) service as defined in 47 U.S.C. 153(25), and providers of non-interconnected VoIP service as defined in 47 U.S.C. 153(36) to the extent such providers offer the capability to place calls to or receive calls from the public switched telephone network.

47 C.F.R. § 64.2201.

**Answer to Paragraph 119:** Defendant TMUS states that the allegations in this paragraph purport to characterize 47 C.F.R. § 64.2201, respectfully refers the Court to 47 C.F.R. § 64.2201 for its contents and context, and denies all inconsistent allegations. To the extent a further response is required, Defendant TMUS admits that 47 C.F.R. § 64.2201 contains the quoted language, but denies the allegations in this paragraph insofar as the quoted language is taken out of context, and denies that Plaintiffs have any viable claim against TMUS.

**Paragraph 120:** No party successfully challenged the Commission's new fake ring tone rule or its finding in the *2013 Rural Call Completion Order* that the use of fake ring tones causes calls not

to be completed. The Commission's conclusion that use of fake ring tones causes calls not to be completed is, therefore, entitled to *Chevron* deference and, pursuant to the Hobbs Act, 28 U.S.C. § 2342(1), may not now be challenged by either Defendant here. See, e.g., *PDR Network, LLC v. Carlton & Harris Chiropractic, Inc*., 139 S. Ct. 2051, 2055 (2019) (under the Hobbs Act, a

**Answer to Paragraph 120**:  No response is required because the allegations in this paragraph relate to Defendant TMUS's pending motion to dismiss, to which the Court is respectfully referred. To the extent a response is required, Defendant TMUS states that this paragraph states legal conclusions and that legal conclusions are for the Court to make.  To the extent a further response is required, Defendant TMUS denies the allegations in this paragraph.

**Paragraph 121:** The *2013 Rural Call Completion Order* also imposed rural call reporting obligations on "Covered Providers." The Commission concluded that the reporting obligations would "apply to providers of long-distance voice service that make the initial long-distance call path choice for more than 100,000 domestic retail subscriber lines, regardless of whether those providers are facilities-based." *Id*. ¶ 20. "By 'initial long-distance call path choice,' [the Commission] refer[s] to the static or dynamic selection of the path for a long-distance call based on the called number of the individual call." *Id*.

**Answer to Paragraph 121**:  Defendant TMUS states that the allegations in this paragraph purport to characterize Exhibit 9 to the SAC, denies that the allegations of this paragraph accurately and/or completely describe Exhibit 9 to the SAC, respectfully refers the Court to Exhibit 9 to the SAC for its contents and context, and denies all inconsistent allegations.  Further answering, Defendant TMUS states that this paragraph states legal conclusions and that legal conclusions are for the Court to make.  To the extent a further response is required, Defendant TMUS admits that the quoted language appears in Exhibit 9 to the SAC but denies the allegations in this paragraph insofar as the quoted language is taken out of context and denies that Plaintiffs have any viable claim against TMUS.

**Paragraph 122:**  The Commission described several different scenarios in which the "originating provider" may or may not be the "Covered Provider[]" for its traffic. *See id*. For example, if the originating provider hands all of its traffic off to an IXC, that IXC qualifies as the Covered Provider. *Id*. (first example). If the originating carrier selects an IXC based only on the calling party's telephone number, rather than the "called number," the originating carrier would also not be the Covered Provider. *Id*. (emphasis added).

**Answer to Paragraph 122**: Defendant TMUS states that the allegations in this paragraph purport to characterize Exhibit 9 to the SAC, denies that the allegations of this paragraph accurately and/or completely describe Exhibit 9 to the SAC, respectfully refers the Court to Exhibit 9 to the SAC for its contents and context, and denies all inconsistent allegations. To the extent a further response is required, Defendant TMUS admits that the quoted language appears in Exhibit 9 to the SAC but denies the allegations in this paragraph insofar as the quoted language is taken out of context and denies that Plaintiffs have any viable claim against TMUS.

**Paragraph 123:** A carrier that meets the definition of Covered Provider may also be an Intermediate Provider. Thus, the Commission provided that "a covered provider that also serves as an intermediate provider for other providers may—but need not—segregate its originated traffic from its intermediary traffic in its recording and reporting." *Id.*, n.64.

**Answer to Paragraph 123**: Defendant TMUS states that the allegations in this paragraph purport to characterize Exhibit 9 to the SAC, denies that the allegations of this paragraph accurately and/or completely describe Exhibit 9 to the SAC, respectfully refers the Court to Exhibit 9 to the SAC for its contents and context, and denies all inconsistent allegations. Further answering, Defendant TMUS states that this paragraph states legal conclusions and that legal conclusions are for the Court to make. To the extent a further response is required, Defendant TMUS admits that the quoted language appears in Exhibit 9 to the SAC but denies the allegations in this paragraph insofar as the quoted language is taken out of context and denies that Plaintiffs have any viable claim against TMUS.

**Paragraph 124:** In addressing how call attempts should be reported, the Commission concluded that "call attempts that are handed back to the upstream provider" could be excluded "in order to avoid double-counting of the same phone call," *Id.* ¶¶ 57-58. However, the Commission also accepted arguments by Inteliquent that many "CMRS providers" are "'unable to take back a call that an intermediate provider is unable to complete.'" *Id.* ¶ 58. As a result, when a call is attempted but cannot be handed back to the originating CMRS carrier, it should not be excluded from the Covered Provider's report. *See id.*

**Answer to Paragraph 124**:  Defendant TMUS states that the allegations in this paragraph purport to characterize Exhibit 9 to the SAC, denies that the allegations of this paragraph accurately and/or completely describe Exhibit 9 to the SAC, respectfully refers the Court to Exhibit 9 to the SAC for its contents and context, and denies all inconsistent allegations.  Further answering, Defendant TMUS states that this paragraph states legal conclusions and that legal conclusions are for the Court to make, but denies that Plaintiffs have any viable claim against TMUS.  To the extent a further response is required, Defendant TMUS otherwise has insufficient information upon which to form a belief about the remaining allegations in this paragraph and therefore denies those allegations.

### vii.  *From 2013 Through 2016, FCC Takes Limited Enforcement Actions Related To Call Quality And Failure To Oversee Intermediaries*

**Paragraph 125:**  Following adoption of the *2012 Declaratory Ruling* and *2013 Rural Call Completion Order*, the FCC took limited enforcement actions against carriers for failing to comply with the rural call completion obligations.

**Answer to Paragraph 125:**  Defendant TMUS has insufficient information upon which to form a belief as to the truth of the allegations in this paragraph and therefore denies those allegations.

**Paragraph 126:**  In total, five carriers entered into *Consent Decrees* with the FCC between 2013 and 2016, agreeing to fines between $100,000 and $5 million.  T-Mobile and Inteliquent were undoubtedly aware of their illegal conduct but the FCC's limited enforcement efforts and modest penalties in the *Consent Decree*s emboldened them to conclude that their fake ring tone scheme would nevertheless pay off.

**Answer to Paragraph 126:**   Defendant TMUS denies the existence of any "fake ring tone scheme."  Further answering, Defendant TMUS denies the allegations of this paragraph to the extent they are directed to Defendant TMUS and otherwise has insufficient information upon which to form a belief as to the truth of the remaining allegations in this paragraph and therefore denies those allegations.

**Paragraph 127:**  Indeed, during negotiations with the FCC regarding the amount of penalty that the FCC was considering imposing on T-Mobile, T-Mobile expressly relied on its expectation that

its exposure, if caught violating the fake ring tone prohibition, would be limited to a few million dollars, arguing:

> Enforcement action of the magnitude contemplated by the Bureau here is entirely inconsistent with Commission precedent. Prior Commission rural call completion enforcement actions ranged from $100,000 to $5 million. . . . In other words, rural call completion actions topped out at $5 million, even though each of the actions involved threatened or actual sub-par rural call completion performance. A forfeiture [redacted by T-Mobile] times higher than the maximum rural call completion penalty imposed by Chairmen Genachowski and Wheeler has no basis here, particularly given T-Mobile's strong rural call completion record.

Supplemental Response of T-Mobile USA, Inc., File No. EB-IHD-16-00023247, at 7 (Sept. 8, 2017), attached hereto as Exhibit 18. Its reprehensible conduct having been discovered, T-Mobile sought to protect the only thing it truly cares about: T-Mobile's money and profits.

**Answer to Paragraph 127:** Defendant TMUS states that the allegations in this paragraph purport to characterize Exhibit 18 to the SAC, denies that the allegations of this paragraph accurately and/or completely describe Exhibit 18 to the SAC, respectfully refers the Court to Exhibit 18 to the SAC for its contents and context, denies all inconsistent allegations, and otherwise denies the remaining allegations in this paragraph.

### G. Congress Acts To Address The Rural Call Completion Problems Plaguing Rural America

**Paragraph 128:** The FCC, acting alone, has not been successful in eradicating rural call completion problems, in part because it lacks the tools and resources necessary to police the conduct of Intermediate Providers like Inteliquent. Therefore, rural carriers and constituents alike turned to their elected representatives.

**Answer to Paragraph 128:** Defendant TMUS has insufficient information upon which to form a belief as to the truth of the allegations in this paragraph and therefore denies those allegations.

**Paragraph 129:** In February 2018, Congress adopted, and President Trump signed into law, the Improving Rural Call Quality and Reliability Act of 2017, Pub. L. No. 115-129, 132 Stat 329 (2018) ("RCC Act"). The bill was proposed by a bi-partisan group of representatives from rural states, including Rep. David Young (R-IA), Rep. Peter Welch (D-VT), Rep. David Loesback (D-IA), Rep. Sean Duffy (R-WI), Rep. Mark Pocan (D-WI), Rep. Robert Latta (R-OH), Rep. Ron Kind (D-WI), Rep. Richard Nolan (D-MN), Rep. Kristi Noem (R-SD), Rep. Kevin Cramer (R-ND), and Rep. Blaine Luetkemer (R-MO) in the House of Representatives. In the Senate, the RCC Act was sponsored by Sen. Amy Klobuchar (D-MN), Sen. John Thune (R-SD), Sen. Jon Tester

(D-MT), Sen. Angus King (I-ME), Sen. Chuck Grassley (R-IA), Sen Joni Ernst (R-IA), Sen. Al Franken (D-MN), Sen. Mike Round (R-SD), and Sen. Claire McCaskill (D-MO). Marking its overwhelming bi-partisan support, the bill passed the Senate on unanimous consent and in the House by a unanimous voice vote.

**Answer to Paragraph 129:** Defendant TMUS states that the allegations in this paragraph purport to characterize the RCC Act and its passage, denies that the allegations of this paragraph accurately and/or completely describe the RCC Act and its passage, respectfully refers the Court to the RCC Act for its contents and context, and denies all inconsistent allegations. Defendant TMUS otherwise has insufficient information upon which to form a belief as to the truth of the remaining allegations in this paragraph and therefore denies those allegations.

**Paragraph 130:** Among other things, the RCC Act directed the FCC to adopt rules requiring Intermediate Providers to register with the Commission and abide by certain service quality standards, while also prohibiting Covered Providers from using Intermediate Providers that were not registered.

**Answer to Paragraph 130:** Defendant TMUS states that the allegations in this paragraph purport to characterize the RCC Act, denies that the allegations of this paragraph accurately and/or completely describe the RCC Act, respectfully refers the Court to the RCC Act for its contents and context, and denies all inconsistent allegations. Further answering, Defendant TMUS states that this paragraph states legal conclusions and that legal conclusions are for the Court to make, but denies that Plaintiffs have any viable claim against TMUS.

**Paragraph 131:** As demonstrated by the Congressional records, the insertion of fake ring tones and the unscrupulous practices of Intermediate Providers was a clear impetus for the adoption of the RCC Act. For example, the Committee Report on the bill authored by the Senate Committee on Commerce, Science, and Transportation states:

> The FCC has found that there is a frequent and pervasive inability to properly complete long-distance calls to rural areas. The problem, known as ''rural call completion,'' results in lengthy periods of dead air on the calling party's end after dialing a number, *audible ringing tones on the calling party's end when the called party's telephone never rings at all*, false busy signals, inaccurate intercept messages, and the inability of one or both parties to hear the other when the call does go through. The Commission has received examples of life-threatening call failures,

including a situation where an on-call surgeon was unable to receive a call from a hospital for emergency surgery and a 9-1-1 call center was unable to complete emergency call backs. In rural and small-town America, call completion failures have created '''dire consequences' to consumers, economic development, and public safety across the Nation.''

The FCC has determined that one of the main causes of the rural call completion problem is that intermediate providers, companies often hired by long distance providers to route and deliver calls to local telephone providers serving rural areas, are not completing the calls. Higher-than-average rates charged to transport and terminate long-distance calls to rural areas create an incentive for long-distance providers to hand off these calls to intermediate providers that offer to deliver them cheaply. ***Those high rates, though, also create an incentive for those intermediate providers not to complete the calls properly, to avoid paying those higher-than-average transport and termination charges when it is not profitable to do so.***

Practices used for routing calls to rural areas that lead to call termination and quality problems may violate the Communications Act of 1934. The Commission has clarified the applicability of its rules and imposed additional reporting and data retention requirements for local telephone exchange carriers, interexchange carriers (i.e., long distance providers), commercial mobile radio service providers (i.e., cellular providers), and voice over Internet protocol providers, but call completion problems remain.

Report of the Committee on Commerce, Science and Transportation on the Improving Rural Call Quality and Reliability Act of 2017 (S.96) (Mar. 21, 2017) (emphasis added).

**Answer to Paragraph 131:** Defendant TMUS states that the allegations in this paragraph purport to characterize the cited report, denies that the allegations of this paragraph accurately and/or completely describe the cited report, respectfully refers the Court to the cited report for its contents and context, and denies all inconsistent allegations. Defendant TMUS otherwise has insufficient information upon which to form a belief as to the truth of the remaining allegations in this paragraph and therefore denies those allegations. To the extent a further response is required, Defendant TMUS admits that the quoted language appears in Congressional Record Vol. 163, No. 12 (Jan. 23, 2017) but denies the allegations in this paragraph insofar as the quoted language is taken out of context and denies that Plaintiffs have any viable claim against TMUS.

**Paragraph 132:**  The issues were addressed repeatedly during floor debate as well.  For example, Representative Young of Iowa, a co-drafter of the bill, stated:

> Mr. Speaker, I rise in support of H.R. 460, the bipartisan Improving Rural Call Quality and Reliability Act, legislation I introduced with my colleague from Vermont, Congressman Welch.
>
> This bill helps fix the significant problems rural Iowans and other rural Americans face from dropped and poor quality calls.  Reliable communication is critical for our constituents to live their lives, for our businesses to succeed, and for our communities to thrive.  Yet, in rural States and areas across America, phone calls are not getting through or the connection and quality are poor.
>
> Telephone companies often rely on intermediate providers, who are paid to route calls from larger networks to local service providers.  Much of the time, this is to mixed results.
>
> There simply is no excuse for these intermediate providers to not fulfill their contracts and leave our rural constituents with unreliable communication service.  Dropped, looped, or poor quality calls hurt rural America's quality of life, impacting our small businesses, farmers, consumers, and our families who are in need of emergency assistance and public services.  It also gives unfair blame to our essential local service providers when they are not the problem, they are the solution.
>
> A family in rural America should not be disadvantaged because of where they live.  Iowa businesses should have the same communication access to conduct daily businesses as those in urban areas.
>
> Improving rural call completion rates and quality are important to ensuring the survival of small towns and granting Americans the choice to live and thrive in whatever community is best for them and their family, rural, urban, or anywhere in between.
>
> Our bill will help address this problem by requiring providers to register with the FCC in order to meet quality standards and ensure reliable phone service in rural areas.  It also prohibits providers from using intermediary routing services not registered with the FCC.

Congressional Record Vol. 163, No. 12 (Jan. 23, 2017).

**Answer to Paragraph 132:**  Defendant TMUS states that the allegations in this paragraph purport

to characterize Congressional Record Vol. 163, No. 12 (Jan. 23, 2017), denies that the allegations

of this paragraph accurately and/or completely describe Congressional Record Vol. 163, No. 12

(Jan. 23, 2017), respectfully refers the Court to Congressional Record Vol. 163, No. 12 (Jan. 23, 2017) for its contents and context, and denies all inconsistent allegations. To the extent a further response is required, Defendant TMUS admits that the quoted language appears in Congressional Record Vol. 163, No. 12 (Jan. 23, 2017) but denies the allegations in this paragraph insofar as the quoted language is taken out of context and denies that Plaintiffs have any viable claim against TMUS.

**Paragraph 133:** Representative Welch of Vermont, the second co-drafter, stated:

> We often focus on rural broadband accessibility and affordability so that the next generation of technological innovation does not skip rural America and leave it behind. The promise of innovation, like the Internet of things, should not be earmarked just for urban and suburban America, which is why it is backwards and unfortunate that we are still talking about finding ways to ensure that traditional landline telephone calls can be completed without interruption on a consistent basis, but that is exactly what this bill that I worked on with Representative Young is getting at.

> Our bill would require the FCC, the Federal Communications Commission, to establish rules that require third-party providers--or least cost routers, as they are called, which is the problem in the call chain--to register their companies, for the first time, with the FCC and, therefore, have to comply with FCC service quality regulations, just like other companies.

> This legislation would make it easier for the FCC to hold accountable third-party providers. The FCC will finally know who they are and make them comply with those quality standards.

> This is really important in rural areas because we have got companies that do business with urban America. In Vermont, Dakin Farm had rural call completion problems during their busiest times in 2012. That was the Thanksgiving to Christmas holiday period.

> It really hurt their bottom line. It put them at a competitive disadvantage. When people call in and the call is dropped, they think it is bad service from Dakin Farm or the company that they are calling, when it is not. Those folks have to then deal with the reputational harm that is caused.

> It is important in rural school districts like Camels Hump in Vermont that rely on these calls when there is a snowstorm or ice storm--and there is one coming tonight--to check whether, in fact, they have got to get their kids to school or not. So it is a big deal when they need it.

*Id.*

**Answer to Paragraph 133:** Defendant TMUS states that the allegations in this paragraph purport to characterize Congressional Record Vol. 163, No. 12 (Jan. 23, 2017), denies that the allegations of this paragraph accurately and/or completely describe Congressional Record Vol. 163, No. 12 (Jan. 23, 2017), respectfully refers the Court to Congressional Record Vol. 163, No. 12 (Jan. 23, 2017) for its contents and context, and denies all inconsistent allegations. To the extent a further response is required, Defendant TMUS admits that the quoted language appears in Congressional Record Vol. 163, No. 12 (Jan. 23, 2017) but denies the allegations in this paragraph insofar as the quoted language is taken out of context and denies that Plaintiffs have any viable claim against TMUS.

**Paragraph 134:** Representative Lance of New Jersey also explained the harm caused by unscrupulous Intermediate Providers and the need to hold them accountable:

> Consumers expect to be able to pick up the telephone and be connected with businesses, friends, and loved ones across the country. In today's connected world, that should not be a tall request. Unfortunately, for many constituents across the country, particularly in rural areas, call quality and reliability are just not up to par compared to their urban counterparts.
>
> This is due, partly, because of the call routing process where long distance and wireless providers use so-called least cost routers. These inexpensive third-party intermediate providers try to complete calls for the lowest possible price, without taking measures to ensure the call actually goes through.
>
> I am sure that most of us have experienced the annoyance of at least one failed or dropped call. You make a call to someone and it rings over and over again but no one, not even the voicemail, picks up. Or, maybe you place a call, only to hear a prerecorded message telling you that the number you dialed is not in service, even though you know you have the right number. Even in cases where you are able to connect, the sound might be distorted or delayed.
>
> For many constituents, this is more than just an annoyance. These missed connections have significant consequences.

> Folks rely on the networks for more than just staying in touch with loved ones. Our constituents count on reliable networks to run their businesses and receive messages from our community institutions. A failed call can mean a lost sale for a small rural business. Another failed call might mean that a message from your child's school or your medical provider goes undelivered. These are real and harmful impacts. This bill will address this situation through commonsense improvements.
>
> For the most part, consumers are unaware of these intermediate providers, which has allowed them to be held unaccountable. H.R. 460 takes measured steps to bring these intermediate providers out from the shadows and into the light so that we can hold them accountable to the consuming public.

*Id.*

**Answer to Paragraph 134:** Defendant TMUS states that the allegations in this paragraph purport to characterize Congressional Record Vol. 163, No. 12 (Jan. 23, 2017), denies that the allegations of this paragraph accurately and/or completely describe Congressional Record Vol. 163, No. 12 (Jan. 23, 2017), respectfully refers the Court to Congressional Record Vol. 163, No. 12 (Jan. 23, 2017) for its contents and context, and denies all inconsistent allegations. Defendant TMUS otherwise has insufficient information upon which to form a belief as to the truth of the remaining allegations in this paragraph and therefore denies those allegations.

**Paragraph 135:** Representative Michael Doyle of Pennsylvania stated:

> We know that problems with call completion are often related to intermediate providers--the middlemen hired to route calls. This bill requires intermediate providers to register with the FCC and comply with service quality standards. These commonsense steps should make it easier to figure out when providers are cutting corners or not doing their jobs.

Congressional Record Vol. 164, No. 25 (Feb. 8, 2018).

**Answer to Paragraph 135:** Defendant TMUS states that the allegations in this paragraph purport to characterize Congressional Record Vol. 164, No. 25 (Feb. 8, 2018), denies that the allegations of this paragraph accurately and/or completely describe Congressional Record Vol. 164, No. 25 (Feb. 8, 2018), respectfully refers the Court to Congressional Record Vol. 164, No. 25 (Feb. 8,

2018) for its contents and context, and denies all inconsistent allegations. Defendant TMUS otherwise has insufficient information upon which to form a belief as to the truth of the remaining allegations in this paragraph and therefore denies them. To the extent a further response is required, Defendant TMUS denies that the quoted language appears exactly as written in this paragraph in Congressional Record Vol. 164, No. 25 (Feb. 8, 2018).

**Paragraph 136:** Representative Kristi Noem of South Dakota articulated well how Intermediate Providers interrupt calls specifically for the purpose of saving money and the frustration of people living in rural parts of our country:

> Mr. Speaker, I rise today to support the Improving Rural Call Quality and Reliability Act.
>
> Most Americans can rely on their phone service to keep in touch with loved ones. They can respond to urgent work when away from their place of business and respond to emergencies. But many of my constituents in South Dakota continue to have these critical calls dropped with absolutely no warning.
>
> More specifically, companies in the business of routing voice calls sometimes purposely drop long-distance calls headed for remote areas as a way to save money.
>
> While this is inexcusable just for the sheer inconvenience, some of these calls involve emergencies, leaving families in unnecessarily dangerous situations.
>
> The provisions within this bill are simple. We simply direct the FCC to establish basic quality standards for providers that transmit voice calls. This will help ensure businesses, families, and emergency responders can count on phone calls being completed.
>
> Mr. Speaker, I love living in a small town in America. It is where I grew up, and it is where I have chosen to raise my family.
>
> Dependable phone service shouldn't be a question for those who make the choice to live in wide-open spaces, especially when we are making new, amazing technological advances on a daily basis.
>
> Mr. Speaker, I urge my colleagues to pass this legislation and ensure that those in South Dakota and rural areas across the country can rely on their phone calls going through.

*Id.*

**Answer to Paragraph 136:**  Defendant TMUS states that the allegations in this paragraph purport to characterize Congressional Record Vol. 164, No. 25 (Feb. 8, 2018), denies that the allegations of this paragraph accurately and/or completely describe Congressional Record Vol. 164, No. 25 (Feb. 8, 2018), respectfully refers the Court to Congressional Record Vol. 164, No. 25 (Feb. 8, 2018) for its contents and context, and denies all inconsistent allegations.  Defendant TMUS otherwise has insufficient information upon which to form a belief as to the truth of the remaining allegations in this paragraph and therefore denies them.

### H.    In 2018, The FCC Adopted New Rules and Reoriented Prior Practices

**Paragraph 137:**  Since adoption of the RCC Act, the FCC has adopted new rules to further address rural call completion concerns.  *See In the Matter of Rural Call Completion*, Second Report and Order and Third Further Notice of Proposed Rulemaking, 33 F.C.C. Rcd. 4199 (Apr. 17, 2018) ("*2018 Second Report and Order*"); *In the Matter of Rural Call Completion*, Third Report and Order, 33 F.C.C. Rcd. 8400 (Aug. 13, 2018) ("*2018 Third Report and Order*").

**Answer to Paragraph 137:**  Defendant TMUS states that the allegations in this paragraph purport to characterize the cited Reports and Orders, denies that the allegations of this paragraph accurately and/or completely describe the cited Reports and Orders, respectfully refers the Court to the cited Reports and Orders for their contents and context, and denies all inconsistent allegations. Defendant TMUS otherwise has insufficient information upon which to form a belief as to the truth of the remaining allegations in this paragraph and therefore denies those allegations.

**Paragraph 138:**  In the *2018 Second Report and Order*, the Commission stated: "Based on the record before us and our experience over the last five years, we adopt new measures, and seek comment on others, to better tackle the problem of call completion and ensure that calls are indeed completed to all Americans—including those in rural America." *Id*. ¶ 2. The Commission also indicated that it would "reorient" its "existing rural call completion rules to better reflect strategies that have worked to reduce rural call completion problems while at the same time reducing the overall burden of our rules on providers." *Id*. ¶ 11. Such statements reflect an intention by the Commission to implement new measures with prospective application, rather than merely explain prior rulings. Thus, close examination is required to ascertain the Commission's intention.

**Answer to Paragraph 138:**  Defendant TMUS states that the allegations in this paragraph purport to characterize the cited Report and Order, denies that the allegations of this paragraph accurately

and/or completely describe the cited Report and Order, respectfully refers the Court to the cited Report and Order for its contents and context, and denies all inconsistent allegations. Defendant TMUS otherwise has insufficient information upon which to form a belief as to the truth of the remaining allegations in this paragraph and therefore denies those allegations.

**Paragraph 139:** In the *2018 Second Report and Order*, the Commission also expressly affirmed the WCB's conclusions in the *2012 Declaratory Ruling*, thus giving the WCB's findings the imprimatur of the full Commission. Specifically, the Commission observed and agreed that the Bureau had "clarif[ied] the statutory provisions discussed by the WCB," namely, the duties that carriers owe under sections 201, 202, and 217 of the Act. *Id.* ¶ 24. The Commission expressly affirmed the WCB's conclusion that "'it is an unjust and unreasonable practice in violation of section 201 of the Act for a carrier that knows or should know that it is providing degraded service to certain areas to fail to correct the problem or to fail to ensure that intermediate providers, least cost routers, or other entities acting for or employed by the carrier are performing adequately,'" *id.* (quoting *2012 Declaratory Ruling*, ¶ 12) (emphasis added), and that "'adopting or perpetuating routing practices that result in lower quality service to rural or high-cost localities than like service to urban or lower cost localities (including other lower cost rural areas) may, in the absence of a persuasive explanation, constitute unjust or unreasonable discrimination in practices, facilities, or services and violate section 202 of the Act,'" *id.* (quoting *2012 Declaratory Ruling*, ¶ 14).

**Answer to Paragraph 139:** Defendant TMUS states that the allegations in this paragraph purport to characterize the cited Report and Order and Declaratory Ruling, denies that the allegations of this paragraph accurately and/or completely describe the cited Report and Order and Declaratory Ruling, respectfully refers the Court to the cited Report and Order and Declaratory Ruling for their contents and context, and denies all inconsistent allegations. Further answering, Defendant TMUS states that this paragraph states legal conclusions and that legal conclusions are for the Court to make, but denies that Plaintiffs have any viable claim against TMUS. Defendant TMUS otherwise has insufficient information upon which to form a belief as to the truth of the remaining allegations in this paragraph and therefore denies those allegations.

**Paragraph 140:** In the *2018 Second Report and Order*, the Commission also "specifically highlight[ed] that under the 2012 Declaratory Ruling, '*a carrier* that knows or should know that calls are not being completed to certain areas, and that engages in acts (or omissions) that allow or effectively allow these conditions to persist' may be liable for a violation of section 201 of the Act." *Id.* ¶ 25 (emphasis added). The Commission also made clear that "willful ignorance will not excuse a failure by a covered provider *or carrier* to investigate evidence of poor performance to a

rural area, such as repeated complaints, persistent low answer rates, or other indicia identified above." *Id*. (emphasis added). Thus, the Commission affirmed the WCB's 2012 conclusions about what activities would constitute a violation of Sections 201(b) and 202(a) if performed by any "carrier."

**Answer to Paragraph 140:** Defendant TMUS states that the allegations in this paragraph purport to characterize the cited Report and Order and Declaratory Ruling, denies that the allegations of this paragraph accurately and/or completely describe the cited Report and Order and Declaratory Ruling, respectfully refers the Court to the cited Report and Order and Declaratory Ruling for their contents and context, and denies all inconsistent allegations. Further answering, Defendant TMUS states that this paragraph states legal conclusions and that legal conclusions are for the Court to make, but denies that Plaintiffs have any viable claim against TMUS. Defendant TMUS otherwise has insufficient information upon which to form a belief as to the truth of the remaining allegations in this paragraph and therefore denies those allegations.

**Paragraph 141:** The Commission's decision to affirm the WCB's findings from the 2012 Declaratory Ruling as part of a decision adopted pursuant to notice-and-comment rulemaking, had the effect of making those findings a legislative rule, rather than an interpretive rule. As such, the Commission's conclusion that "carriers" violate 201(b) and 202(a) when they engage in the conduct described in the *2012 Declaratory Ruling* is subject to the Hobbs Act and may not be challenged by either Defendant in this proceeding. *See, e.g.*, *PDR Network, LLC*, 139 S. Ct. at 2055 (under the Hobbs Act, a legislative rule adopted by the FCC may not be challenged in subsequent litigation by a party that had a prior adequate opportunity to seek judicial review).

**Answer to Paragraph 141:** No response is required because the allegations in this paragraph relate to Defendant TMUS's pending motion to dismiss, to which the Court is respectfully referred. To the extent a response is required, Defendant TMUS states that this paragraph states legal conclusions and that legal conclusions are for the Court to make, but denies that Plaintiffs have any viable claim against TMUS. To the extent a further response is required, Defendant TMUS denies the allegations in this paragraph.

**Paragraph 142:** The fact that the Commission's *2012 Declaratory Ruling* applied to all carriers is also evidenced by the Consent Decree. The Consent Decree quotes with approval the WCB's conclusion on the *2012 Declaratory Ruling* that:

"a carrier that knows or should know that calls are not being completed to certain areas, and that engages in acts (or omissions) that allow or effectively allow these conditions to persist, may be liable for a violation of section 201 of the Act." Moreover, "it is an unjust and unreasonable practice in violation of section 201 of the Act for a carrier that knows or should know that it is providing degraded service to certain areas to fail to correct the problem or to fail to ensure that intermediate providers, least cost routers, or other entities acting for or employed by the carrier are performing adequately. This is particularly the case when the problems are brought to the carrier's attention by customers, rate-of-return carriers serving rural areas, or others, and the carrier nevertheless fails to take corrective action that is within its power.""

Consent Decree, ¶ 3 (citations omitted).

**Answer to Paragraph 142:** Defendant TMUS states that the allegations in this paragraph purport to characterize the cited Declaratory Ruling and Exhibit 1 to the SAC (the Consent Decree), denies that the allegations of this paragraph accurately and/or completely describe the cited Declaratory Ruling and Exhibit 1 to the SAC (the Consent Decree), respectfully refers the Court to the cited Declaratory Ruling and Exhibit 1 to the SAC (the Consent Decree) for their contents and context, and denies all inconsistent allegations. Further answering, Defendant TMUS states that this paragraph states legal conclusions and that legal conclusions are for the Court to make. To the extent a further response is required, Defendant TMUS admits that the quoted text appears in Exhibit 1 to the SAC but denies the allegations in this paragraph to the extent they are intended to imply actionable wrongdoing by Defendant TMUS and denies that Plaintiffs have any viable claim against TMUS.

**Paragraph 143:** The *2018 Second Report and Order* also adopted new rules that required Covered Providers to undertake both prospective and retrospective monitoring. *See, e.g., id.* ¶¶ 12, 17-30. These new rules apply only to "Covered Providers." In explaining its new rules, the Commission indicated that, on a going forward basis, the requirements included in the *2012 Declaratory Ruling* would constitute "the minimum retrospective monitoring duty of covered providers." *Id.* ¶ 24. The Commission also made clear that the duty imposed by its new rules on Covered Providers included "active monitoring," by either themselves or a contracted third party. *Id.* ¶ 34, n.112.

**Answer to Paragraph 143:** Defendant TMUS states that the allegations in this paragraph purport to characterize the cited Report and Order, denies that the allegations of this paragraph accurately and/or completely describe the cited Report and Order, respectfully refers the Court to the cited Report and Order for its contents and context, and denies all inconsistent allegations. Further answering, Defendant TMUS states that this paragraph states legal conclusions and that legal conclusions are for the Court to make, but denies that Plaintiffs have any viable claim against TMUS. To the extent a further response is required, Defendant TMUS denies the allegations in this paragraph.

**Paragraph 144:** Thus, while the Commission's newly-adopted **rules** established the minimum standards for a "Covered Provider" (which may or may not be a "carrier") to fulfill its "retrospective monitoring requirement," the Commission did not abandon or supersede the WCB's 2012 **statutory interpretation** that it is a violation of Section 201(b) of the Act for any "carrier" "that knows or should know that calls are not being completed to certain areas," to "engage[ ] in acts (or omissions) that allow or effectively allow these conditions to persist." *Id.*, ¶¶ 24 - 25. Rather, the WCB's 2012 conclusions about the duties of "carriers" constitutes a definitive Commission statement on the duties that all carriers owe under Sections 201(b) and 202(a) without regard to whether they are also a Covered Provider.

**Answer to Paragraph 144:** Defendant TMUS states that the allegations in this paragraph purport to characterize the cited Report and Order, denies that the allegations of this paragraph accurately and/or completely describe the cited Report and Order, respectfully refers the Court to the cited Report and Order for its contents and context, and denies all inconsistent allegations. Further answering, Defendant TMUS states that this paragraph states legal conclusions and that legal conclusions are for the Court to make. but denies that Plaintiffs have any viable claim against TMUS To the extent a further response is required, Defendant TMUS denies the allegations in this paragraph.

**Paragraph 145:** In the *2018 Third Report and Order*, the Commission took additional steps to ensure that Covered Providers routed their traffic in a manner that facilitated accountability. The Commission established an intermediate provider registry, that designated the information that must be supplied to the registry, and prohibited Covered Providers from using any unregistered

intermediate provider anywhere in the call path. *2018 Third Report and Order*, 33 FCC Rcd. 8400, ¶¶ 6-8, 25-41.

**Answer to Paragraph 145:**  Defendant TMUS states that the allegations in this paragraph purport to characterize the cited Report and Order, denies that the allegations of this paragraph accurately and/or completely describe the cited Report and Order, respectfully refers the Court to the cited Report and Order for its contents and context, and denies all inconsistent allegations.  Further answering, Defendant TMUS states that this paragraph states legal conclusions and that legal conclusions are for the Court to make, but denies that Plaintiffs have any viable claim against TMUS.  To the extent a further response is required, Defendant TMUS otherwise has insufficient information upon which to form a belief as to the truth of the remaining allegations in this paragraph and therefore denies those allegations.

### I.  The Available Facts Reveal That T-Mobile and Inteliquent Are Each Carriers, Intermediate Providers and Likely Covered Providers

**Paragraph 146:**  Inteliquent is a carrier, an Intermediate Provider, and, depending on whether it "makes the initial long-distance call path choice" (i.e., the "static or dynamic selection of the path for a long-distance call based on the called number of the individual call"), is also a Covered Provider.

**Answer to Paragraph 146:**  Defendant TMUS states that this paragraph states legal conclusions and that legal conclusions are for the Court to make.  Defendant TMUS otherwise has insufficient information upon which to form a belief as to the truth of the remaining allegations in this paragraph and therefore denies those allegations.

**Paragraph 147:**  Inteliquent is a carrier. Inteliquent has repeatedly represented itself as a carrier. *See, e.g., Inteliquent, Inc. v. Free Conferencing Corp., et al.*, 1:16-cv-06976 (N.D. Ill.), Complaint, ¶ 3 (ECF No. 1) ("Inteliquent is a telecommunications carrier based in Chicago with facilities in Chicago. . .."). Specifically with regard to its relationship with T-Mobile, Inteliquent has described its role as that of an IXC. *Inteliquent, Inc. v. Free Conferencing Corp., et al.*, 1:16-cv-06976, Inteliquent, Inc.'s Fed. R. Civ. P. 56.1 Statement of Undisputed Material facts, ¶ 1 (ECF No. 585) ("For pertinent purposes of this case, Inteliquent is a long-distance carrier, also known as an interexchange carrier or 'IXC' under telecommunications terminology.").

**Answer to Paragraph 147:** Defendant TMUS states that the allegations of this paragraph purport to characterize the cited litigation documents, denies that the allegations of this paragraph accurately and/or completely describe those litigation documents, respectfully refers the Court to those litigation documents for their contents and context, and denies all inconsistent allegations. To the extent a response is required, Defendant TMUS admits that Inteliquent is a carrier.

**Paragraph 148:** As a carrier, Inteliquent is, and all times since 2012 has been, prohibited from engaging in acts or omissions that allow or effectively allow calls not to be completed to certain areas, and from providing degraded service to certain areas, failing to correct problems, or failing to ensure that intermediate providers, least cost routers, or other entities acting for or employed by the carrier are performing adequately, pursuant to the WCB's findings that Sections 201(b) and Sections 202(a) of the Act prohibit such conduct.

**Answer to Paragraph 148:** Defendant TMUS states that this paragraph states legal conclusions and that legal conclusions are for the Court to make, but denies that Plaintiffs have any viable claim against TMUS. To the extent a response is required, Defendant TMUS otherwise has insufficient information upon which to form a belief about the truth of the remaining allegations in this paragraph and therefore denies those allegations.

**Paragraph 149:** Inteliquent and its subsidiaries Onvoy and Neutral Tandem are listed on the Intermediate Provider Registry, which is available for download from the FCC's website at: https://fccprod.servicenowservices.com/ipr_ext. Each entity identifies Richard Monto, Inteliquent's General Counsel, and Randy Frederick as their points of contact. Both individuals have work addresses in Chicago, Illinois. Moreover, it is evident from the 2015 MSA that Inteliquent met the operative definition of Intermediate Provider in effect at that time: "any entity that carries or processes traffic that traverses or will traverse the PSTN at any point insofar as that entity neither originates nor terminates that traffic." 47 C.F.R. § 64.1600(f) (effective Dec. 29, 2011 to January 1, 2018).

**Answer to Paragraph 149:** Defendant TMUS states that this paragraph purports to characterize a URL address, the Intermediate Provider Registry, and 47 C.F.R. § 64.1600(f). Defendant TMUS respectfully refers the Court to that cited URL address, the Intermediate Provider Registry, and regulation for their contents and context, and denies all inconsistent allegations. Further answering, Defendant TMUS states that this paragraph states legal conclusions and that legal

conclusions are for the Court to make, but denies that Plaintiffs have any viable claim against TMUS. To the extent a further response is required, Defendant TMUS otherwise has insufficient information upon which to form a belief about the truth of the remaining allegations in this paragraph and therefore denies those allegations.

**Paragraph 150:** Just because Inteliquent was an Intermediate Provider does not preclude it from also being a Covered Provider with regard to some or all of T-Mobile's traffic. Upon information and belief, Inteliquent was a Covered Provider with regard to some or all of T-Mobile's traffic based on the FCC's guidance in paragraph 20 of the *2013 Rural Call Completion Order*. *See supra* ¶ 122. This assertion is based on the following facts:

a. The FCC's rules provide that a "covered provider may be," inter alia, "an interexchange carrier." 47 C.F.R. § 64.2101.

b. Inteliquent lists on its website a rural call completion point of contact as FCC rule require for Covered Providers. *See* 47 C.F.R. § 64.2113; see also https://www.inteliquent.com/getmedia/9de720c1-e755-4d17-8c7b-6d0f3ae6eef5/Rural-Call-Completion-Point-of-Contact.pdf.aspx (last viewed: Dec. 9, 2020). The rural call completion contact is Randy Frederick. Mr. Frederick's LinkedIn profile indicates that he is Senior Director of Network Services located in the Greater Chicago Area. See https://www.linkedin.com/in/randy-frederick-08164b85/ (last viewed Dec. 9. 2020).

c. In 2016, Inteliquent's 10-K reported that it utilized a "patented proprietary software tool . . . to manage the complicated routing scenarios required to terminate traffic to hundreds of millions of telephone numbers." Given that Inteliquent has "patented proprietary software" to manage routing scenarios, this statement strongly suggests that Inteliquent was the party responsible for selecting routes for the delivery of some or all of T-Mobile's calls. *Id*. p. 5

d. The 2015 MSA indicates that T-Mobile will deliver all traffic to Inteliquent, with the exception of certain "Excluded PSTN Traffic." 2015 MSA, p. 3.

e. The 2015 MSA imposes obligations on Inteliquent with regard to the routing of calls, except when expressly instructed otherwise by a written communication from T-Mobile. *See id*., pp. 8-9.

f. The 2015 MSA requires Inteliquent to share with T-Mobile "a copy of any report or form filed, or prepared for filing, with the Federal Communications Commission ("FCC") to comply with the FCC's rural call completion rules, including, but not limited to, the requirements set forth *In the Matter of Rural Call Completion*, Report and Order and Further Notice

of Proposed Rulemaking, WC Docket No. 13-39 (rel. Nov. 8, 2013)" and thus contemplates that Inteliquent will prepare and file the reports the FCC required Covered Providers to file. *Id.*, pp. 11-12. Thus, the 2015 MSA indicates that Inteliquent would file Rural Call Completion reports for traffic it routed for T-Mobile. Such reports are to be filed by "Covered Providers."

g.    The MSA also requires that, if there is any instance in which Inteliquent is not required to file the rural call completion reports with the FCC, Inteliquent has an obligation to "concurrently provide T-Mobile with verification regarding Provider's collection and retention for a period of at least six (6) months of required information (as well as the information itself if T-Mobile so requests). . . ." *Id.* Six months is the period that the FCC required Covered Providers to retain call detail records. See *2013 Declaratory Ruling*, ¶¶ 61-64.

h.    As part of the FCC's investigation of call routing and failure problems that led to the Consent Decree and the exposure of the fake ring tone scheme, *see infra*. ¶¶ 102-124, T-Mobile repeatedly made the following representation or a substantially similar representation to the FCC: "T-Mobile opened a trouble ticket with Inteliquent, which Inteliquent resolved by changing the route used to terminate the call to the rural carrier." This statement shows that in those instances, Inteliquent was the first party to make a "static or dynamic selection of the path for a long distance call based on the called number of the individual call." *2013 Rural Call Completion Order*, ¶ 20.

**Answer to Paragraph 150:**  No response is required because the allegations in this paragraph relate to Defendant TMUS's pending motion to dismiss, to which the Court is respectfully referred.  Further answering, Defendant TMUS states that the allegations of this paragraph purport to characterize the regulations, Exhibit 9 to the SAC, and the 2015 MSA, denies that the allegations of this paragraph accurately and/or completely describe those documents, respectfully refers the Court to the documents for its contents and context, and denies all inconsistent allegations.  Further answering, Defendant TMUS states that this paragraph states legal conclusions and that legal conclusions are for the Court to make, but denies that Plaintiffs have any viable claim against TMUS.  To the extent a further response is required, Defendant TMUS denies the existence of any

"fake ring tone scheme," and otherwise has insufficient information upon which to form a belief as to the truth of the remaining allegations in this paragraph and therefore denies those allegations.

**Paragraph 151:** Thus, Inteliquent was a Covered Provider for the T-Mobile traffic for which it made the initial long-distance call path choice (i.e., the "static or dynamic selection of the path for a long-distance call based on the called number of the individual call"). Discovery will be required to ascertain the scope and breadth of those calls. Moreover, if T-Mobile is one of the CMRS providers that Inteliquent referred to when it informed that FCC that many "CMRS providers" are "'unable to take back a call that an intermediate provider is unable to complete,'" *2013 Rural Call Completion Order*, ¶ 58, it follows that such call attempts would have to be reported in Inteliquent's rural call completion reports. *See id.*

**Answer to Paragraph 151:** No response is required because the allegations in this paragraph relate to Defendant TMUS's pending motion to dismiss, to which the Court is respectfully referred. To the extent a response is required, Defendant TMUS states that the allegations of this paragraph purport to characterize Exhibit 9 to the SAC, denies that the allegations of this paragraph accurately and/or completely describe that document, respectfully refers the Court to the documents for its contents and context, and denies all inconsistent allegations. Further answering, Defendant TMUS states that this paragraph states legal conclusions and that legal conclusions are for the Court to make, but denies that Plaintiffs have any viable claim against TMUS. To the extent a further response is required, Defendant TMUS denies the allegations in this paragraph.

**Paragraph 152:** T-Mobile is also a carrier, a Covered Provider, and an Intermediate Provider.

**Answer to Paragraph 152:** No response is required because the allegations in this paragraph relate to Defendant TMUS's pending motion to dismiss, to which the Court is respectfully referred. To the extent a response is required, Defendant TMUS states that it has acted as a carrier to the extent it provided telephone service. Further answering, Defendant TMUS states that this paragraph states legal conclusions and that legal conclusions are for the Court to make, but denies that Plaintiffs have any viable claim against TMUS. Defendant TMUS otherwise denies the

remaining allegations in this paragraph to the extent they are intended to imply actionable wrongdoing by Defendant TMUS.

**Paragraph 153:** In the Consent Decree, the Commission indicated that "T-Mobile is a wireless telecommunications carrier and a 'covered provider' under the Commission's rural call completion rules." Consent Decree, ¶ 6.

**Answer to Paragraph 153:** Defendant TMUS states that the allegations of this paragraph purport to characterize Exhibit 1 to the SAC (the Consent Decree), denies that the allegations of this paragraph accurately and/or completely describe Exhibit 1 to the SAC, respectfully refers the Court to Exhibit 1 to the SAC for its contents and context, and denies all inconsistent allegations. To the extent a further response is required, Defendant TMUS admits that the quoted language appears in Exhibit 1 to the SAC but denies the allegations in this paragraph insofar as the quoted language is taken out of context and denies that Plaintiffs have any viable claim against TMUS.

**Paragraph 154:** As a carrier, T-Mobile has at all times since 2012 been bound by the WCB's conclusion that Sections 201(b) and Sections 202(a) of the Act prohibit carriers from engaging in acts or omissions that allow or effectively allow calls not to be completed to certain areas, and prohibits providing degraded service to certain areas, failing to correct problems, or failing to ensure that intermediate providers, least cost routers, or other entities acting for or employed by the carrier are performing adequately.

**Answer to Paragraph 154:** Defendant TMUS states that it has made good faith efforts to abide by all applicable legal obligations as a carrier and that this paragraph purports to characterize statutory and regulatory provisions. Defendant TMUS denies that the allegations of this paragraph accurately and/or completely describe those statutory and regulatory provisions, respectfully refers the Court to those statutory and regulatory provisions for their contents and context, and denies all inconsistent allegations. Further answering, Defendant TMUS states that this paragraph states legal conclusions and that legal conclusions are for the Court to make, but denies that Plaintiffs have any viable claim against TMUS. To the extent a further response is required, Defendant TMUS denies the remaining allegations in this paragraph.

**Paragraph 155:** In addition, T-Mobile is a Covered Provider. As noted, the Consent Decree specifically describes T-Mobile as a "covered provider." Moreover, as discussed more fully below, T-Mobile submitted Form 480 reports, which are the rural call completion reports required of Covered Providers. *See infra* ¶ 297 (discussing the FCC's investigation of T-Mobile's submitting false information on several Form 480s and T-Mobile's subsequent admission that all of its Form 480s had contained inaccurate information). Thus, following the June 11, 2018 effective date of the 2018 *Second Report and Order*, T-Mobile has been obligated by Commission rules as a Covered Provider to engage in both prospective and retrospective monitoring. *See* 47 C.F.R. § 64.2111.

**Answer to Paragraph 155:** Defendant TMUS states that it submitted Form 480 reports to the FCC, and that this paragraph purports to characterize an FCC investigation, an FCC Report and Order and regulations. Defendant TMUS denies that the allegations of this paragraph accurately and/or completely describe that investigation or those documents, respectfully refers the Court to that investigation and the cited documents for their contents and context, and denies all inconsistent allegations. Further answering, Defendant TMUS states that this paragraph states legal conclusions and that legal conclusions are for the Court to make, but denies that Plaintiffs have any viable claim against TMUS. Defendant TMUS otherwise denies the remaining allegations in this paragraph.

**Paragraph 156:** Discovery will be required to ascertain whether T-Mobile's Form 480s, as subsequently revised, included all of the traffic originated by T-Mobile and its subsidiaries (i.e., MetroPCS) or whether it incorporated only a portion of T-Mobile's originated traffic. Because the FCC has indicated that "a covered provider that also serves as an intermediate provider for other providers may—but need not—segregate its originated traffic from its intermediary traffic in its recording and reporting," it is not possible without discovery to determine whether traffic originated on T-Mobile's network (and that of its subsidiaries) are reported exclusively in TMobile's Form 480s, any Form 480s prepared by Inteliquent, or both.

**Answer to Paragraph 156:** Defendant TMUS states that this paragraph purports to characterize an FCC statement, denies that the allegations of this paragraph accurately and/or completely describe that statement, respectfully refers the Court to that statement for its contents and context, and denies all inconsistent allegations. Defendant TMUS otherwise denies the remaining allegations in this paragraph.

**Paragraph 157:** T-Mobile is also listed on the Intermediate Provider Registry, which is available for download from the FCC's website at: https://fccprod.servicenowservices.com/ipr_ext. While T-Mobile could not have acted in the capacity as an Intermediate Provider for traffic it originated directly, see 47 C.F.R. § 64.1600(f) (effective Dec. 29, 2011 to Jan. 1, 2018), discovery will be required to ascertain to what extent T-Mobile's role as an Intermediate Provider is relevant to any traffic at issue in this case. That discovery will include examination of whether T-Mobile operated in the capacity as an Intermediate Provider during the time period relevant to this dispute, and, if so, for which entities. For example, based on the applicable definitions, it is possible that T-Mobile determined that it was classified as an Intermediate Provider for traffic originating on the network of its subsidiaries.

**Answer to Paragraph 157:** No response is required because the allegations in this paragraph relate to Defendant TMUS's pending motion to dismiss, to which the Court is respectfully referred. To the extent a response is required, Defendant TMUS states that the allegations in this paragraph purport to characterize the cited regulation and Intermediate Provider Registry, denies that the allegations of this paragraph accurately and/or completely describe the cited regulation and Intermediate Provider Registry, respectfully refers the Court to the regulation and Intermediate Provider Registry for their contents and context, and denies all inconsistent allegations. Further answering, Defendant TMUS states that this paragraph states legal conclusions and that legal conclusions are for the Court to make, but denies that Plaintiffs have any viable claim against TMUS. To the extent a further response is required, Defendant TMUS denies the allegations in this paragraph to the extent they are intended to imply actionable wrongdoing by Defendant TMUS.

### J. T-Mobile Was Incentivized To Reduce Intercarrier Compensation Payments At The Expense Of Rural Carriers And Consumers Nationwide

**Paragraph 158:** The conclusion reached by the FCC in the *2013 Rural Call Completion Order* that some carriers are willing to engage in "blocking or degrading traffic" to rural America "in an effort to minimize their intercarrier compensation payments" comes as little surprise. Ex. 9, *2013 Rural Call Completion Order* at 16163, ¶ 17.

**Answer to Paragraph 158:** Defendant TMUS states that the allegations of this paragraph purport to characterize Exhibit 9 to the SAC, denies that the allegations of this paragraph accurately and/or

completely describe that document, respectfully refers the Court to the documents for its contents and context, and denies all inconsistent allegations. Further answering, Defendant TMUS states that this paragraph states legal conclusions and that legal conclusions are for the Court to make, but denies that Plaintiffs have any viable claim against TMUS. To the extent a further response is required, Defendant TMUS otherwise has insufficient information upon which to form a belief as to the truth of the remaining allegations in this paragraph and therefore denies those allegations.

**Paragraph 159:** Defendant T-Mobile, like many of its competitors, adopted an "unlimited" long-distance plan model. *See, e.g.*, T-Mobile Cell Phone Plans, https://www.t-mobile.com/cell-phone-plans (last visited Dec. 9, 2020). It advertises those plans as "A whole lot more than just talk-at no extra cost." *See, e.g.*, T-Mobile Home Page, https://www.t-mobile.com/ (last visited Aug. 23, 2019).

**Answer to Paragraph 159:** Defendant TMUS state that the allegations of this paragraph purport to characterize the cited URL addresses, denies that the allegations of this paragraph accurately and/or completely describe the webpages at those URL addresses, respectfully refers the Court to the URL addresses for their contents and context, and denies all inconsistent allegations. To the extent a further response is required, Defendant TMUS states that it offers a variety of plans that could be considered "unlimited," and otherwise has insufficient information upon which to form a belief as to the truth of the remaining allegations in this paragraph and therefore denies those allegations.

**Paragraph 160:** While T-Mobile's service is widely available, T-Mobile has focused significant attention on marketing its services to lower-income and elderly people. *See, e.g,* Chairman Frank Pallone, Jr., *Memorandum to Committee on Energy & Commerce, to Subcommittee on Communications and Technology Members and Staff*, (Feb. 8, 2019) at 3, https://energycommerce.house.gov/sites/democrats.energycommerce.house.gov/files/documents/CAT%20Briefing%20Memo%20for%20Hearing%20on%20Merger%20of%20T-Mobile%20and%20Sprint_2019.02.13_UPDATE_0.pdf (last visited Dec. 9, 2020); T-Mobile Senior Discount Unlimited Plans, https://www.t-mobile.com/cell-phone-plans/unlimited-55-senior-discount-plans (last visited Dec. 9, 2020) ("T-Mobile and Sprint are competitors in the prepaid market, mostly populated by low-income consumers and those with poor credit, and each company has a significant share of the market."); Douglas A. McIntrye, *T-Mobile Offers Plan for Old People*, YAHOO! FINANCE (Aug. 8, 2017), https://finance.yahoo.com/news/t-mobile-offers-plan-old-102048853.html (last visited Dec. 9, 2020).

**Answer to Paragraph 160:** Defendant TMUS states that the allegations of this paragraph purport to characterize the cited URL addresses, denies that the allegations of this paragraph accurately and/or completely describe the webpages at those URL addresses, respectfully refers the Court to the URL addresses for their contents and context, and denies all inconsistent allegations. To the extent a further response is required, Defendant TMUS states that its services are widely available, and otherwise denies the allegations in this paragraph.

**Paragraph 161:** For example, T-Mobile purchased MetroPCS, a brand that focuses heavily on the prepaid market segment in 2013. *See, e.g.*, City of New York, *City Sues T-Mobile for Violating Consumer Protection Law* (Sept. 5, 2019), https://www1.nyc.gov/office-of-the-mayor/news/415-19/city-sues-t-mobile-violating-consumer-protection-law (last visited Dec. 9, 2020). T-Mobile also receives federal funds under the Lifeline program to subsidize service to low income individuals. *See, e.g.*, Joan Engebretson, *T-Mobile, Cleartalk Get Go-Ahead on Low-Income Services*, Telecompetitor (Aug. 20, 2012), https://www.telecompetitor.com/t-mobile-cleartalk-get-go-ahead-on-low-income-services/ (last visited Dec. 9, 2020).

**Answer to Paragraph 161:** Defendant TMUS states that the allegations of this paragraph purport to characterize the cited URL addresses, denies that the allegations of this paragraph accurately and/or completely describe the webpages at those URL addresses, respectfully refers the Court to the URL addresses for their contents and context, and denies all inconsistent allegations. To the extent a further response is required, Defendant TMUS states that it purchased MetroPCS in 2013, and that MetroPCS offered prepaid service plans.

**Paragraph 162:** Unlimited calling plans are clearly attractive to consumers, but these fixed cost plans fail to reflect the realities of T-Mobile's cost structure. That is, while T-Mobile receives a fixed fee from its consumers, access charges reflect a variable cost that is paid to terminate the calls.

**Answer to Paragraph 162:** No response is required because the allegations in this paragraph relate to Defendant TMUS's pending motion to dismiss, to which the Court is respectfully referred. To the extent a response is required, Defendant TMUS states that it offers a variety of plans that could be considered "unlimited" and denies the allegations in this paragraph to the extent they are intended to imply actionable wrongdoing by Defendant TMUS.

**Paragraph 163:** As a result, one of the most effective means for T-Mobile to increase profit margins is to decrease the variable costs it pays by blocking or degrading its customers' high cost calls.

**Answer to Paragraph 163:** No response is required because the allegations in this paragraph relate to Defendant TMUS's pending motion to dismiss, to which the Court is respectfully referred.

To the extent a response is required, Defendant TMUS denies the allegations in this paragraph.

**Paragraph 164:** This strategy is particularly effective for calls to rural areas where consumers are likely to assume that any problems with call quality or call completion are the fault of the much smaller and generally locally owned rural telephone company, rather than a corporate behemoth like T-Mobile.

**Answer to Paragraph 164:** No response is required because the allegations in this paragraph relate to Defendant TMUS's pending motion to dismiss, to which the Court is respectfully referred.

To the extent a response is required, Defendant TMUS denies the allegations in this paragraph.

**Paragraph 165:** The practice of blocking and degrading calls to rural areas is particularly pernicious because of the ripple effects that are experienced by others in the industry. First, when a consumer regularly experiences difficulty in reaching family, friends, or businesses in rural areas, over time they become trained to not make those calls using that service. So, for example, when a T-Mobile consumer cannot reach their elderly parents in rural Indiana on her T-Mobile phone, she may be conditioned to start making those calls using a landline or other alternative service provider. This saves T-Mobile the expense of the access charges associated with the calls, even though T-Mobile continues to collect its full monthly subscription fee from its customers.

**Answer to Paragraph 165:** No response is required because the allegations in this paragraph relate to Defendant TMUS's pending motion to dismiss, to which the Court is respectfully referred.

To the extent a response is required, Defendant TMUS denies the allegations in this paragraph.

**Paragraph 166:** Second, it often causes consumers to place blame for the failure on the rural telephone company, rather than the carrier that originated the call. Here again, when T-Mobile does not deliver its calls to rural areas, most consumers assume that the problem lies with the rural carrier, not with the nationally-known and well-funded carrier.

**Answer to Paragraph 166:** Defendant TMUS denies that it has engaged in any practices designed to block or degrade calls and otherwise has insufficient information upon which to form a belief as to the truth of the allegations in this paragraph and therefore denies those allegations.

**Paragraph 167:**  Third, and finally, by failing to abide by the same rules that other mobile carriers are required to follow, T-Mobile is able to unfairly compete by offering lower fees for its monthly subscriptions.  Thus, by illegally reducing its costs, T-Mobile covertly manipulated a unique competitive advantage, allowing itself to compete unfairly in the marketplace.  And, while T-Mobile has repeatedly touted its "unlimited" long distance plan and assured consumers that it has a comparable, if not superior, product offering to its competitors, the reality is that T-Mobile has offered consumers an inferior product and acted unlawfully to cheat its way to a competitive advantage.

**Answer to Paragraph 167:**  Defendant TMUS denies the allegations in this paragraph.

> **K.      T-Mobile Admits To Engaging In An Illegal Fake Ring Tone Scheme That Impacted Hundreds Of Millions Of Calls Annually And Pays A $40,000,000 Fine To The U.S. Treasury**

**Paragraph 168:**  On April 16, 2018, the FCC's EB announced that it had entered into the *Consent Decree* with T-Mobile in which T-Mobile admitted to violating the Commission's rural call completion rules by insert false ring tones into hundreds of millions of calls annually and for failing to supervise its Intermediate Providers delivering calls to rural areas.  *See* Ex. 1, *Consent Decree*.

**Answer to Paragraph 168:**  Defendant TMUS states that this paragraph purports to characterize Exhibit 1 to the SAC, denies that the allegations of this paragraph accurately and/or completely describe Exhibit 1 to the SAC, respectfully refers the Court to Exhibit 1 to the SAC for its contents and context, and denies all inconsistent allegations.  To the extent a further response is required, Defendant TMUS denies that it intended to violate any FCC rules.

**Paragraph 169:**  T-Mobile voluntarily agreed to pay a $40 million civil penalty to the United States Treasury.  *See id.* 24.

**Answer to Paragraph 169:**  Defendant TMUS states that this paragraph purports to characterize Exhibit 1 to the SAC, denies that the allegations of this paragraph accurately and/or completely describe Exhibit 1 to the SAC, respectfully refers the Court to Exhibit 1 to the SAC for its contents and context, and denies all inconsistent allegations.  To the extent a further response is required, Defendant TMUS denies that it intended to violate any FCC rules.

**Paragraph 170:**  Beginning in June and continuing through the summer of 2016, the FCC received complaints from three rural incumbent LECs in Wisconsin. *Id.* ¶ 7.  These complaints, which were filed in the Commission's rural call completion e-mail box, alleged over 40 incidents in which T-Mobile customers were unable to complete calls to consumers served by these three rural

providers. *Id.* Many of the complaints reported that the calling party heard ring tones on call attempts that failed to reach the rural customers. *Id.*

**Answer to Paragraph 170:** Defendant TMUS states that this paragraph purports to characterize Exhibit 1 to the SAC, denies that the allegations of this paragraph accurately and/or completely describe Exhibit 1 to the SAC, respectfully refers the Court to Exhibit 1 to the SAC for its contents and context, and denies all inconsistent allegations. Defendant TMUS otherwise has insufficient information upon which to form a belief as to the truth of the remaining allegations in this paragraph and therefore denies those allegations.

**Paragraph 171:** "The [EB] served these complaints on T-Mobile and requested that [T-Mobile] contact the complainants, investigate and resolve the problems, and submit reports of its investigations to the [EB]." *Id.*

**Answer to Paragraph 171:** Defendant TMUS states that this paragraph purports to characterize Exhibit 1 to the SAC, denies that the allegations of this paragraph accurately and/or completely describe Exhibit 1 to the SAC, respectfully refers the Court to Exhibit 1 to the SAC for its contents and context, and denies all inconsistent allegations. To the extent a further response is required, Defendant TMUS admits that the quoted language appears in Exhibit 1 to the SAC but denies the allegations in this paragraph insofar as the quoted language is taken out of context and denies that Plaintiffs have any viable claim against TMUS.

**Paragraph 172:** "In two instances, the [EB] pointed out to T-Mobile that the Commission's rules prohibit sending ring tones to the calling party before the called party is alerted to an incoming call." *Id.*

**Answer to Paragraph 172:** Defendant TMUS states that this paragraph purports to characterize Exhibit 1 to the SAC, denies that the allegations of this paragraph accurately and/or completely describe Exhibit 1 to the SAC, respectfully refers the Court to Exhibit 1 to the SAC for its contents and context, and denies all inconsistent allegations. To the extent a further response is required, Defendant TMUS admits that the quoted language appears in Exhibit 1 to the SAC but denies the

allegations in this paragraph insofar as the quoted language is taken out of context and denies that Plaintiffs have any viable claim against TMUS.

**Paragraph 173:** "T-Mobile subsequently filed with the Bureau reports of its investigations of the complaints. In each instance, T-Mobile reported that it had handed the call off to an Intermediate Provider for delivery, and that any reported problems had been 'resolved.' T-Mobile stated that it believed that the actions taken by Intermediate Providers in response to each complaint had remedied all problems." *Id.* ¶ 8.

**Answer to Paragraph 173:** Defendant TMUS states that this paragraph purports to characterize Exhibit 1 to the SAC, denies that the allegations of this paragraph accurately and/or completely describe Exhibit 1 to the SAC, respectfully refers the Court to Exhibit 1 to the SAC for its contents and context, and denies all inconsistent allegations. To the extent a further response is required, Defendant TMUS admits that the quoted language appears in Exhibit 1 to the SAC but denies the allegations in this paragraph insofar as the quoted language is taken out of context and denies that Plaintiffs have any viable claim against TMUS.

**Paragraph 174:** In its original responses to the EB, T-Mobile did not specifically address the ring tone issue raised in some of the complaints. *See id.*

**Answer to Paragraph 174:** Defendant TMUS states that this paragraph purports to characterize Exhibit 1 to the SAC and Defendant TMUS's responses to the EB, denies that the allegations of this paragraph accurately and/or completely describe Exhibit 1 to the SAC or its responses to the EB, respectfully refers the Court to Exhibit 1 to the SAC and its responses to the EB for their contents and context, and denies all inconsistent allegations. To the extent a further response is required, Defendant TMUS denies the allegations in this paragraph to the extent they are intended to imply actionable wrongdoing by Defendant TMUS.

**Paragraph 175:** In addition to the rural carrier complaints filed in the Commission's rural call completion e-mail box, in August 2016, three T-Mobile customers filed informal complaints against [T-Mobile] with the Commission's Consumer and Governmental Affairs Bureau ("CGB"). *Id.* ¶ 9. CGB served these informal complaints on T-Mobile pursuant to Section 208 of the Act and Section 1.717 of the Commission's Rules. *See id.* All three complaints described ongoing problems reaching landline phones in a particular exchange. *See id.* Records subsequently

obtained by the EB from T-Mobile show that these consumers called T-Mobile at least 13 times between June 5 and August 18.  *See id.*

**Answer to Paragraph 175:**  Defendant TMUS states that this paragraph purports to characterize Exhibit 1 to the SAC, denies that the allegations of this paragraph accurately and/or completely describe Exhibit 1 to the SAC, respectfully refers the Court to Exhibit 1 to the SAC for its contents and context, and denies all inconsistent allegations.  Defendant TMUS otherwise has insufficient information upon which to form a belief as to the truth of the allegations in this paragraph and therefore denies those allegations.

**Paragraph 176:**  On December 27, 2016, the Bureau issued a Letter of Inquiry ("LOI") to T-Mobile.  *Id.* ¶ 10.  The purpose of the LOI was to investigate whether T-Mobile violated the Commission's Rules governing rural call completion, including whether [T-Mobile] may have provided degraded telephone service on calls placed to rural areas and conveyed false ring tones to its customers.  *See id.*

**Answer to Paragraph 176:**  Defendant TMUS states that this paragraph purports to characterize Exhibit 1 to the SAC, denies that the allegations of this paragraph accurately and/or completely describe Exhibit 1 to the SAC, respectfully refers the Court to Exhibit 1 to the SAC for its contents and context, and denies all inconsistent allegations.  Defendant TMUS otherwise has insufficient information upon which to form a belief as to the truth of the allegations in this paragraph and therefore denies those allegations.

**Paragraph 177:**  "The Bureau issued a Supplemental LOI on April 3, 2017, to clarify responses provided by [T-Mobile]."  *Id.*

**Answer to Paragraph 177:**  Defendant TMUS states that this paragraph purports to characterize Exhibit 1 to the SAC.  Defendant TMUS denies that the allegations of this paragraph accurately and/or completely describe Exhibit 1 to the SAC, respectfully refers the Court to Exhibit 1 to the SAC for its contents and context, and denies all inconsistent allegations.  To the extent a further response is required, Defendant TMUS admits that the quoted language appears in Exhibit 1 to the

SAC but denies the allegations in this paragraph insofar as the quoted language is taken out of context and denies that Plaintiffs have any viable claim against TMUS.

**Paragraph 178:** "With respect to the fake ring tones, T-Mobile reported that in 2007 it began using servers that included a 'Local Ring Back Tone' ("LRBT") for calls from certain customers that took more than a certain amount of time to complete." *Id.* ¶ 11.

**Answer to Paragraph 178:** Defendant TMUS states that this paragraph purports to characterize Exhibit 1 to the SAC. Defendant TMUS denies that the allegations of this paragraph accurately and/or completely describe Exhibit 1 to the SAC, respectfully refers the Court to Exhibit 1 to the SAC for its contents and context, and denies all inconsistent allegations. To the extent a further response is required, Defendant TMUS admits that the quoted language appears in Exhibit 1 to the SAC but denies the allegations in this paragraph insofar as the quoted language is taken out of context, denies that it intended to violate any FCC rules, and denies that Plaintiffs have any viable claim against TMUS.

**Paragraph 179:** "[T-Mobile] further reported that in 2013, as it migrated to different servers, it began using the LRBT only for out-of-network calls from its customers that were routed via Session Initiation Protocol ("SIP") trunks and that took more than a certain amount of time to complete." *Id.* The use of SIP trunks is synonymous with traffic being routed using IP protocol.

**Answer to Paragraph 179:** Defendant TMUS states that this paragraph purports to characterize Exhibit 1 to the SAC, denies that the allegations of this paragraph accurately and/or completely describe Exhibit 1 to the SAC, respectfully refers the Court to Exhibit 1 to the SAC for its contents and context, and denies all inconsistent allegations. To the extent a further response is required, Defendant TMUS admits that routing via SIP trunks may involve routing via the Internet Protocol but denies that Exhibit 1 to the SAC contains the quoted language exactly as stated in this paragraph.

**Paragraph 180:** T-Mobile admitted that it continued its practice of using fake ring tones on such calls after the FCC's rules expressly prohibiting the practice went into effect in January 2014. *See id.*

**Answer to Paragraph 180:** Defendant TMUS states that this paragraph purports to characterize Exhibit 1 to the SAC, denies that the allegations of this paragraph accurately and/or completely describe Exhibit 1 to the SAC, respectfully refers the Court to Exhibit 1 to the SAC for its contents and context, and denies all inconsistent allegations. Defendant TMUS denies that it intended to violate any FCC rules and denies that Plaintiffs have any viable claim against TMUS.

**Paragraph 181:** T-Mobile admitted that it expanded the use of fake ring tones to calls on additional SIP routes sometime after the practice became unequivocally illegal in January 2014. *See id.*

**Answer to Paragraph 181:** Defendant TMUS states that this paragraph purports to characterize Exhibit 1 to the SAC, denies that the allegations of this paragraph accurately and/or completely describe Exhibit 1 to the SAC, respectfully refers the Court to Exhibit 1 to the SAC for its contents and context, and denies all inconsistent allegations. Defendant TMUS denies that it intended to violate any FCC rules and denies that Plaintiffs have any viable claim against TMUS.

**Paragraph 182:** T-Mobile admitted that it used fake ring tones on a nationwide basis. *Id.*

**Answer to Paragraph 182:** Defendant TMUS states that this paragraph purports to characterize Exhibit 1 to the SAC, denies that the allegations of this paragraph accurately and/or completely describe Exhibit 1 to the SAC, respectfully refers the Court to Exhibit 1 to the SAC for its contents and context, and denies all inconsistent allegations. Defendant TMUS denies that it intended to violate any FCC rules and denies that Plaintiffs have any viable claim against TMUS.

**Paragraph 183:** "Because T-Mobile applied this practice to out-of-network calls from its customers on SIP routes that took more than a certain amount of time on a nationwide basis and without regard to time of day, T-Mobile admitted that the LRBT was likely injected into hundreds of millions of calls each year." *Id.*

**Answer to Paragraph 183:** Defendant TMUS states that this paragraph purports to characterize Exhibit 1 to the SAC, denies that the allegations of this paragraph accurately and/or completely describe Exhibit 1 to the SAC, respectfully refers the Court to Exhibit 1 to the SAC for its contents

and context, and denies all inconsistent allegations. Defendant TMUS denies that Exhibit 1 to the SAC contains the quoted language exactly as stated in this paragraph, denies that it intended to violate any FCC rules, and denies that Plaintiffs have any viable claim against TMUS.

**Paragraph 184:** It was not until the release of the FCC's *Consent Decree* that any of the Plaintiffs learned that T-Mobile was responsible (directly or indirectly) for inserting fake ring tones on calls originated by T-Mobile subscribers.

**Answer to Paragraph 184:** Defendant TMUS states that this paragraph purports to characterize Exhibit 1 to the SAC, denies that the allegations of this paragraph accurately and/or completely describe Exhibit 1 to the SAC, respectfully refers the Court to Exhibit 1 to the SAC for its contents and context, and denies all inconsistent allegations. Defendant TMUS otherwise denies the allegations in this paragraph.

**Paragraph 185:** In response to an LOI inquiry requesting details of any complaints received in 2016 regarding problems with T-Mobile customer calls completing to rural areas that the Company had received from sources independent of the Commission, T-Mobile submitted a list of complaints that had been made directly to it by its customers and rural carriers related to problems with calls placed on behalf of its customers completing to rural areas, some which involved concerns addressed by the Rural Call Completion Rules. *Id.* ¶ 12. T-Mobile later supplemented this list. *Id.*

**Answer to Paragraph 185:** Defendant TMUS states that this paragraph purports to characterize Exhibit 1 to the SAC, denies that the allegations of this paragraph accurately and/or completely describe Exhibit 1 to the SAC, respectfully refers the Court to Exhibit 1 to the SAC for its contents and context, and denies all inconsistent allegations. To the extent a further response is required, Defendant TMUS admits the allegations in this paragraph but denies that Plaintiffs have any viable claim against TMUS.

**Paragraph 186:** The list of complaints T-Mobile provided to the EB revealed, among other things, that during the time period from June 9 to October 5, 2016, T-Mobile had received 71 complaints about problems with calls completing to just one of the three Wisconsin LECs that had filed complaints with the Commission. *See id.* at n. 27.

**Answer to Paragraph 186:** Defendant TMUS states that this paragraph purports to characterize Exhibit 1 to the SAC, denies that the allegations of this paragraph accurately and/or completely describe Exhibit 1 to the SAC, respectfully refers the Court to Exhibit 1 to the SAC for its contents and context, and denies all inconsistent allegations. To the extent a further response is required, Defendant TMUS admits the allegations in this paragraph but denies that Plaintiffs have any viable claim against TMUS.

**Paragraph 187:** The EB sorted these complaints by the individual rural ILEC's OCNs that are published in the annual NECA list. In evaluating the complaint data, the EB found patterns of complaints alleging the failure of T-Mobile to complete calls to numbers within at least seven rural OCNs, in addition to the three Wisconsin OCNs that had been the subject of the complaints filed with the Commission by rural carriers and consumers during the summer of 2016. *Id.*

**Answer to Paragraph 187:** Defendant TMUS states that this paragraph purports to characterize Exhibit 1 to the SAC, denies that the allegations of this paragraph accurately and/or completely describe Exhibit 1 to the SAC, respectfully refers the Court to Exhibit 1 to the SAC for its contents and context, and denies all inconsistent allegations. To the extent a further response is required, Defendant TMUS admits the allegations in this paragraph but denies that Plaintiffs have any viable claim against TMUS.

**Paragraph 188:** The seven rural OCNs identified by the EB have not been identified publicly.

**Answer to Paragraph 188:** Defendant TMUS, upon information and belief, admits the allegations in this paragraph.

**Paragraph 189:** T-Mobile admitted that it violated the prohibition against the insertion of fake ring tones codified at 47 C.F.R. § 64.2201. *Id.* ¶ 17.

**Answer to Paragraph 189:** Defendant TMUS states that this paragraph purports to characterize Exhibit 1 to the SAC and 47 C.F.R. § 64.2201, denies that the allegations of this paragraph accurately and/or completely describe Exhibit 1 to the SAC and 47 C.F.R. § 64.2201, respectfully refers the Court to Exhibit 1 to the SAC and 47 C.F.R. § 64.2201 for their contents and context,

and denies all inconsistent allegations. Defendant TMUS denies that it intended to violate any FCC rules and denies that Plaintiffs have any viable claim against TMUS.

**Paragraph 190:** T-Mobile also admitted that it "did not correct problems with its Intermediate Providers' delivery of calls to consumers in certain rural OCNs," which the 2012 Rural Call Completion Declaratory Ruling declared an unjust and unreasonable practice. *Id.*

**Answer to Paragraph 190:** Defendant TMUS states that this paragraph purports to characterize Exhibit 1 to the SAC, denies that the allegations of this paragraph accurately and/or completely describe Exhibit 1 to the SAC, respectfully refers the Court to Exhibit 1 to the SAC for its contents and context, and denies all inconsistent allegations. Defendant TMUS denies that it intended to violate any FCC rules and denies that Plaintiffs have any viable claim against TMUS.

### L. Inserting Fake Ring Tones On Hundreds Of Millions Of T-Mobile's Customers' Calls Per Year Required Sophisticated Technological Support And A Centralized Policy Server

**Paragraph 191:** Upon information and belief, and as described in more detail below, the failure to deliver calls to rural areas and the effort to mask these failures by the expanded use of fake ring tones was a scheme developed and implemented with knowledge and participation of Defendants T-Mobile, Inteliquent and other Doe Defendants in order to mask the excessive use of LCR and for the intent and purpose of reducing liability for access charges for terminating calls to high cost codes and improving profit margins.

**Answer to Paragraph 191:** No response is required because the allegations in this paragraph relate to Defendant TMUS's pending motion to dismiss, to which the Court is respectfully referred. To the extent a further response is required, Defendant TMUS otherwise denies the allegations in this paragraph, including that there was any "fake ringtone scheme."

**Paragraph 192:** The facts set forth in the *Consent Decree* regarding the insertion of fake ring tones can be correlated to publicly available information regarding T-Mobile's relationship with Inteliquent.

**Answer to Paragraph 192:** Defendant TMUS states that this paragraph purports to characterize Exhibit 1 to the SAC, denies that the allegations of this paragraph accurately and/or completely describe Exhibit 1 to the SAC, respectfully refers the Court to Exhibit 1 to the SAC for its contents

and context, and denies all inconsistent allegations. To the extent a further response is required, Defendant TMUS denies the allegations in this paragraph to the extent they are intended to imply actionable wrongdoing by Defendant TMUS.

**Paragraph 193:** First, according to the *Consent Decree*, T-Mobile reported that it began inserting ring tones "for calls from certain customers that took more than a certain amount of time to complete" in 2007. *Id.* ¶ 11. According to a revised Form S-1 filed by Inteliquent's predecessor Neutral Tandem, Inc. ("Neutral Tandem") with the Securities and Exchange Commission on March 27, 2008, in preparation for becoming a publicly-traded company, T-Mobile was one of 78 major competitive carriers and non-carriers connected to Neutral Tandem's network as of December 31, 2007. T-Mobile represented 14% of Neutral Tandem's total revenue for 2007. Neutral Tandem's Amendment No. 2 to Form S-1 at 50 (Mar. 27, 2008) (attached hereto as Exhibit 10).

**Answer to Paragraph 193:** Defendant TMUS states that this paragraph purports to characterize Exhibits 1 and 10 to the SAC, denies that the allegations of this paragraph accurately and/or completely describe Exhibits 1 and 10 to the SAC, respectfully refers the Court to Exhibits 1 and 10 to the SAC for their contents and context, and denies all inconsistent allegations. To the extent a further response is required, Defendant TMUS admits that the quoted language appears in Exhibits 1 and 10 to the SAC but denies the allegations in this paragraph insofar as the quoted language is taken out of context and denies that Plaintiffs have any viable claim against TMUS.

**Paragraph 194:** Based on total reported traffic volumes, Plaintiffs estimate that Neutral Tandem carried approximately 6.88 billion minutes of traffic for T-Mobile in 2007.

**Answer to Paragraph 194:** Defendant TMUS has insufficient information upon which to form a belief as to the truth of the allegations in this paragraph and therefore denies those allegations.

**Paragraph 195:** According to the Master Services Agreement between T-Mobile and Neutral Tandem ("NT MSA"), which was also filed with the SEC by Neutral Tandem, Neutral Tandem agreed to "provide transit and access services to [T-Mobile] under this Agreement." NT MSA, "Services" (attached hereto as Exhibit 11.)

**Answer to Paragraph 195:** Defendant TMUS states that this paragraph purports to characterize Exhibit 11 to the SAC, denies that the allegations of this paragraph accurately and/or completely describe Exhibit 11 to the SAC, respectfully refers the Court to Exhibit 11 to the SAC for its

contents and context, and denies all inconsistent allegations. To the extent a further response is required, Defendant TMUS admits that the quoted language appears in Exhibit 11 to the SAC but denies the allegations in this paragraph insofar as the quoted language is taken out of context and denies that Plaintiffs have any viable claim against TMUS.

**Paragraph 196:** Transit Service is defined, in pertinent part, as "a local or intraLATA call." NT MSA, Service Order Exhibit 1 – Chicago Market. LATA is an acronym for Local access and transport area, a term used in U.S. telecommunications regulation that previously reflected an area in which a divested Regional Bell Operating Company offered local phone service. Typically, calls that originate and terminate in the same LATA (intraLATA) are included in a customer's local calling area. Thus, Transit Service relates to the delivery of what is commonly understood as a "local" call.

**Answer to Paragraph 196:** Defendant TMUS states that this paragraph purports to characterize Exhibit 11 to the SAC, denies that the allegations of this paragraph accurately and/or completely describe Exhibit 11 to the SAC, respectfully refers the Court to Exhibit 11 to the SAC for its contents and context, and denies all inconsistent allegations. Defendant TMUS otherwise has insufficient information upon which to form a belief as to the truth of the allegations in this paragraph and therefore denies those allegations.

**Paragraph 197:** Access Service is defined in pertinent part as "any interLATA call." NT MSA, Service Order Exhibit 1 – Chicago Market. Calls that originate and terminate in different LATAs (interLATA) have historically been treated as long-distance calls for which consumers paid separate long-distance fees. Thus, Access Service relates to the delivery of what is commonly understood as "long-distance traffic."

**Answer to Paragraph 197:** Defendant TMUS states that this paragraph purports to characterize Exhibit 11 to the SAC, denies that the allegations of this paragraph accurately and/or completely describe Exhibit 11 to the SAC, respectfully refers the Court to Exhibit 11 to the SAC for its contents and context, and denies all inconsistent allegations. Defendant TMUS otherwise has insufficient information upon which to form a belief as to the truth of the allegations in this paragraph and therefore denies those allegations.

**Paragraph 198:** The NT MSA states that "[T-Mobile] agrees that it will . . . (f) *accept* terminating traffic properly bound for [T-Mobile] (*e.g.* LNP dip accomplished) from [Neutral Tandem] within 30 days of notice from [Neutral Tandem] that the connection with [Neutral Tandem] is operational; . . . [and] (h) *send to* [Neutral Tandem] only Authorized Transit and Access Services ("Services"), as defined in [Neutral Tandem Tariffs] and shall not terminate non-Authorized traffic to [Neutral Tandem], including but not limited to: 911, 411, 976, 311, 611, 500, 950, 700, Directory Assistance, 0+ local. . . NT MSA, Customer Obligations. Thus, the NT MSA contemplates that: (1) Neutral Tandem will deliver calls to T-Mobile that were originated by other carriers and intended for T-Mobile's customers; and (2) that Neutral Tandem will pick up calls from T-Mobile that are originated by T-Mobile's subscribers and intended for another carrier. Pursuant to clause (h) of this paragraph, the calls that Neutral Tandem would pick up from T-Mobile were either "Transit" or "Access Services" traffic. Thus, Neutral Tandem contracted to pick up from T-Mobile both local *and* long-distance calls for delivery to other carriers.

**Answer to Paragraph 198:** Defendant TMUS states that this paragraph purports to characterize Exhibit 11 to the SAC, denies that the allegations of this paragraph accurately and/or completely describe Exhibit 11 to the SAC, respectfully refers the Court to Exhibit 11 to the SAC for its contents and context, and denies all inconsistent allegations. To the extent a further response is required, Defendant TMUS admits that the quoted language appears in Exhibit 11 to the SAC but denies the allegations in this paragraph insofar as the quoted language is taken out of context. Defendant TMUS otherwise denies the remaining allegations in this paragraph and denies that Plaintiffs have any viable claim against TMUS.

**Paragraph 199:** The Service Order Exhibits to the NT MSA, which are arranged based on various geographic markets, reveal that the only geographic market in which "Access Service" (*i.e.*, long-distance traffic) would be picked up by Neutral Tandem under the NT MSA was the Chicago, Illinois market. In other geographic markets, only "transit services" (*i.e.*, local calls) were to be exchanged. Thus, the NT MSA established Chicago, Illinois as the sole place in which Neutral Tandem could pick up long-distance traffic originated by T-Mobile subscribers for delivery to carriers nationwide.

**Answer to Paragraph 199:** Defendant TMUS states that this paragraph purports to characterize Exhibit 11 to the SAC, denies that the allegations of this paragraph accurately and/or completely describe Exhibit 11 to the SAC, respectfully refers the Court to Exhibit 11 to the SAC for its contents and context, and denies all inconsistent allegations. To the extent a further response is required, Defendant TMUS admits that the quoted language appears in Exhibit 11 to the SAC but

denies the allegations in this paragraph insofar as the quoted language is taken out of context and denies that Plaintiffs have any viable claim against TMUS.

**Paragraph 200:**  Second, according to the *Consent Decree*, T-Mobile reported that, "in 2013, as it migrated to different servers, it began using the LRBT only for out-of-network calls from its customers that were routed via SIP trunks and that took more than a certain amount of time to complete." Ex. 1, *Consent Decree*, ¶ 11.

**Answer to Paragraph 200:**  Defendant TMUS states that this paragraph purports to characterize Exhibit 1 to the SAC, denies that the allegations of this paragraph accurately and/or completely describe Exhibit 1 to the SAC, respectfully refers the Court to Exhibit 1 to the SAC for its contents and context, and denies all inconsistent allegations.  To the extent a further response is required, Defendant TMUS admits that the quoted language appears in Exhibit 1 to the SAC but denies the allegations in this paragraph insofar as the quoted language is taken out of context, denies that it intended to violate any FCC rules, and denies that Plaintiffs have any viable claim against TMUS.

**Paragraph 201:**  By this point in time, Inteliquent's annual 10-K reported that it "provide[d] voice telecommunications services primarily on a wholesale basis . . . using an all-IP network." Inteliquent, Inc.'s Form 10-K ("2013 Form 10-K") at 3 (Dec. 31, 2013), https://www.sec.gov/Archives/edgar/data/1292653/000119312514093913/d667806d10k.htm (last visited Dec 9, 2020) (attached hereto as Exhibit 12). Inteliquent described how its "managed service offering includes technologically advanced IP switching platforms manufactured by Sonus Networks, Inc. linked together by an IP backbone." *Id.* at 5. Inteliquent also stated that it utilized "a patented proprietary software tool . . . to manage the complicated routing scenarios required to terminate traffic to hundreds of millions of telephone numbers and support our network.  The software allows us to quickly identify new routing opportunities between carriers and to help optimize our customers' interconnection costs . . . ." *Id.* at 6.

**Answer to Paragraph 201:**  Defendant TMUS states that this paragraph purports to characterize Exhibit 12 to the SAC, denies that the allegations of this paragraph accurately and/or completely describe Exhibit 12 to the SAC, respectfully refers the Court to Exhibit 12 to the SAC for its contents and context, and denies all inconsistent allegations.  Defendant TMUS otherwise has insufficient information upon which to form a belief as to the truth of the remaining allegations in this paragraph and therefore denies those allegations.

**Paragraph 202:** During this same time period, Inteliquent publicly advocated for use of fake ring tones as part of the FCC's RCC rulemaking process. Specifically, in a filing made by Inteliquent with the FCC on October 18, 2013, summarizing *ex parte* conversations Inteliquent had with FCC staff in September 2013, Inteliquent stated in relevant part as follows:

> With respect to rules addressing "false ringing," we noted that, when the called party is a wireless customer roaming on another provider's network, completing the call may take longer than calls terminating to wireline customers. While the wireless carrier is processing the call and locating the called party, presenting the caller with ringing provides comfort that the call has been dialed correctly and is being processed.

Ex. 7, Letter from Inteliquent to Marlene H. Dortch at 2. As noted previously, the FCC later rejected Inteliquent's argument. *See supra* ¶¶ 117-18.

**Answer to Paragraph 202:** Defendant TMUS states that this paragraph purports to characterize Exhibit 7 to the SAC, denies that the allegations of this paragraph accurately and/or completely describe Exhibit 7 to the SAC, respectfully refers the Court to Exhibit 7 to the SAC for its contents and context, and denies all inconsistent allegations. Defendant TMUS otherwise has insufficient information upon which to form a belief as to the truth of the remaining allegations in this paragraph and therefore denies those allegations.

**Paragraph 203:** Upon information and belief, Inteliquent's FCC advocacy reflected both its technical ability to insert fake ring tones and its desire to use fake ring tones.

**Answer to Paragraph 203:** Defendant TMUS has insufficient information upon which to form a belief as to the truth of the allegations in this paragraph and therefore denies those allegations.

**Paragraph 204:** Third, according to the *Consent Decree*, T-Mobile reported that at some unspecified time after the FCC's rules expressly prohibiting fake ring tones became effective in January 2014, it *expanded* the use of fake ring tones on more routes. *Consent Decree*, ¶ 11.

**Answer to Paragraph 204:** Defendant TMUS states that this paragraph purports to characterize Exhibit 1 to the SAC, denies that the allegations of this paragraph accurately and/or completely describe Exhibit 1 to the SAC, respectfully refers the Court to Exhibit 1 to the SAC for its contents and context, and denies all inconsistent allegations. Defendant TMUS denies that it intended to violate any FCC rules and denies that Plaintiffs have any viable claim against TMUS.

**Paragraph 205:** The FCC's November 6, 2019 FOIA production confirms that the expanded use of fake ring tones occurred in September 2015. However, these materials fail to provide any additional details regarding the expanded use of fake ringtones on "all remaining SIP routes". The only substantive declaration from any T-Mobile employee included in the FOIA production, that of Kathleen Foster, T-Mobile's Director of Network Technology, omits entirely any discussion of the expanded use of fake ringtones in September 2015.

**Answer to Paragraph 205:** Defendant TMUS states that this paragraph purports to characterize the cited documents, denies that the allegations of this paragraph accurately and/or completely describe the cited documents, respectfully refers the Court to the cited documents for their contents and context, and denies all inconsistent allegations. Defendant TMUS denies that it intended to violate any FCC rules and denies that Plaintiffs have any viable claim against TMUS.

**Paragraph 206:** In the second half of 2015, T-Mobile was engaged in a major network transition in which its out-of-network traffic would be routed through Inteliquent, whose network relies almost exclusively on SIP trunking. On June 23, 2015, Defendants T-Mobile and Inteliquent entered into a new contract whereby Inteliquent would become the nearly-exclusive router of T-Mobile's out-of-network traffic. On August 17, 2015, Inteliquent publicly announced the new three-year Telecom Master Services Agreement and a related services agreement ("PSTN Agreement," or, collectively with the Master Services Agreement, the "2015 MSA") with T-Mobile, under which Inteliquent would provide a range of services to carry local, long distance and toll-free voice traffic between T-Mobile's network and the PSTN (attached hereto as Exhibit 13).

**Answer to Paragraph 206:** Defendant TMUS states that it entered into a three-year Telecom Master Services Agreement and related services agreement with Inteliquent. Defendant TMUS states that this paragraph purports to characterize Exhibit 13 to the SAC, denies that the allegations of this paragraph accurately and/or completely describe Exhibit 13 to the SAC, respectfully refers the Court to Exhibit 13 to the SAC for its contents and context, and denies all inconsistent allegations. To the extent a further response is required, Defendant TMUS denies the allegations in this paragraph to the extent they are intended to imply actionable wrongdoing by Defendant TMUS.

**Paragraph 207:** The 2015 MSA provided that T-Mobile would generally use Inteliquent as its sole provider of voice interconnection services for all calls exchanged between T-Mobile and nearly all other voice providers in the United States, with limited exception. Accordingly,

Inteliquent expected the 2015 MSA to result in a significant increase in the volume of traffic that it carried on its network for T-Mobile.

**Answer to Paragraph 207:** Defendant TMUS states that this paragraph purports to characterize the 2015 MSA, denies that the allegations of this paragraph accurately and/or completely describe the 2015 MSA, respectfully refers the Court to the 2015 MSA for its contents and context, and denies all inconsistent allegations. Defendant TMUS has insufficient information upon which to form a belief as to the truth of the remaining allegations in this paragraph and therefore denies those allegations.

**Paragraph 208:** The 2015 MSA was signed by David Lopez, SVP of Global Sales at Inteliquent. Mr. Lopez's LinkedIn profile indicates that he is a Telecom Executive Leader in the Greater Chicago, Illinois area. *Id.*, p. 25.

**Answer to Paragraph 208:** No response is required because the allegations in this paragraph relate to Defendant TMUS's pending motion to dismiss, to which the Court is respectfully referred. To the extent a response is required, upon information and belief, Defendant TMUS admits the allegations in this paragraph.

**Paragraph 209:** The 2015 MSA requires T-Mobile to submit trouble reports to the Inteliquent NOC, which is located in Chicago, Illinois. *Id.*, Schedule 2, pp. 28-29.

**Answer to Paragraph 209:** No response is required because the allegations in this paragraph relate to Defendant TMUS's pending motion to dismiss, to which the Court is respectfully referred. To the extent a response is required, Defendant TMUS states that this paragraph purports to characterize the 2015 MSA, denies that the allegations of this paragraph accurately and/or completely describe the 2015 MSA, respectfully refers the Court to the 2015 MSA for its contents and context, and denies all inconsistent allegations. Upon information and belief, Defendant TMUS admits that Defendant TMUS submits trouble reports to Inteliquent under the 2015 MSA, but has insufficient information upon which to form a belief as to the truth of the remaining allegations in this paragraph and therefore denies those allegations.

**Paragraph 210:** The 2015 MSA requires Inteliquent to provide reports to T-Mobile within ten business days of issuing each monthly invoice. *Id*., pp. 10-11. Those reports include information regarding, inter alia, trouble tickets and service disruptions, as well as information specifically related to the delivery of calls to Rural OCNs. *See id*. Upon information and belief, those reports would have been prepared by Inteliquent using data maintained primarily in Chicago, Illinois and by personnel working primarily in Inteliquent's headquarters located in Chicago, Illinois.

**Answer to Paragraph 210:**  No response is required because the allegations in this paragraph relate to Defendant TMUS's pending motion to dismiss, to which the Court is respectfully referred.  To the extent a response is required, Defendant TMUS states that this paragraph purports to characterize the 2015 MSA, denies that the allegations of this paragraph accurately and/or completely describe the 2015 MSA, respectfully refers the Court to that agreement for its contents and context, and denies all inconsistent allegations.  Defendant TMUS otherwise has insufficient information upon which to form a belief as to the truth of the remaining allegations in this paragraph and therefore denies those allegations.

**Paragraph 211:** The 2015 MSA also requires Inteliquent to provide T-Mobile with copies of any reports that Inteliquent will file with the FCC to comply with the *2013 Declaratory Ruling* relating to calls made to rural and non-rural OCNs. *Id*., p. 11. Included in those reports "[f]or each Rural OCN" was "the total number of attempted [interstate] calls, the number of attempted calls that were answered, the number of attempted calls that were not answered . . ." *Id*. Upon information and belief, such reports would have been prepared by Inteliquent using data maintained primarily in Chicago, Illinois and by personnel working primarily in Inteliquent's headquarters located in Chicago, Illinois.

**Answer to Paragraph 211**:  No response is required because the allegations in this paragraph relate to Defendant TMUS's pending motion to dismiss, to which the Court is respectfully referred.  To the extent a response is required, Defendant TMUS states that this paragraph purports to characterize the 2015 MSA, denies that the allegations of this paragraph accurately and/or completely describe the 2015 MSA, respectfully refers the Court to that agreement for its contents and context, and denies all inconsistent allegations.  Defendant TMUS otherwise has insufficient information upon which to form a belief as to the truth of the remaining allegations in this paragraph and therefore denies those allegations.

**Paragraph 212:** In the event that Inteliquent does not have to submit to the FCC certain data as part of its rural call completion reports, the 2015 MSA nevertheless required Inteliquent to maintain such data for a period of at least six months and to verify to T-Mobile its collection and retention of such data. Upon information and belief, such data would have been maintained primarily in Chicago, Illinois. *Id.*, pp. 11-12.

**Answer to Paragraph 212:** No response is required because the allegations in this paragraph relate to Defendant TMUS's pending motion to dismiss, to which the Court is respectfully referred. To the extent a response is required, Defendant TMUS states that this paragraph purports to characterize the 2015 MSA, denies that the allegations of this paragraph accurately and/or completely describe the 2015 MSA, respectfully refers the Court to that agreement for its contents and context, and denies all inconsistent allegations. Defendant TMUS otherwise has insufficient information upon which to form a belief as to the truth of the remaining allegations in this paragraph and therefore denies those allegations.

**Paragraph 213:** The 2015 MSA sets forth the rates that Inteliquent will bill to T-Mobile for the services provided pursuant to the MSA. *See id.*, p. 9 & Schedule 4. Upon information and belief, Inteliquent sends invoices to T-Mobile from its headquarters in Chicago, Illinois.

**Answer to Paragraph 213:** No response is required because the allegations in this paragraph relate to Defendant TMUS's pending motion to dismiss, to which the Court is respectfully referred. To the extent a response is required, Defendant TMUS states that this paragraph purports to characterize the 2015 MSA, denies that the allegations of this paragraph accurately and/or completely describe the 2015 MSA, respectfully refers the Court to that agreement for its contents and context, and denies all inconsistent allegations. Defendant TMUS otherwise has insufficient information upon which to form a belief as to the truth of the remaining allegations in this paragraph and therefore denies those allegations.

**Paragraph 214:** Upon information and belief, T-Mobile delivered payment for services billed pursuant to the 2015 MSA to Inteliquent's bank accounts controlled by Inteliquent in Chicago, Illinois.

**Answer to Paragraph 214:** No response is required because the allegations in this paragraph relate to Defendant TMUS's pending motion to dismiss, to which the Court is respectfully referred. To the extent a response is required, Defendant TMUS otherwise has insufficient information upon which to form a belief as to the truth of the remaining allegations in this paragraph and therefore denies those allegations.

**Paragraph 215:** According to a sworn declaration provided by T-Mobile's Senior Manager for Revenue Assurance, Adrian Lazar Adler, "[s]tarting in 2015 and through present . . . [a]lmost all domestic calls that leave the T-Mobile network destined to other carriers are routed through Inteliquent. Inteliquent is responsible for completing the calls, and Inteliquent bills T-Mobile for the services it provides under a contract between the two companies." *Inteliquent, Inc. v. Free Conferencing Corporation, et al.*, Declaration of Adrian Lazar Adler, No. 1:16-cv-06976, ¶ 10 (Feb. 18, 2019 N.D. Ill.) (ECF. No. 503-2) ("Adler Declaration") (attached hereto as Exhibit 14).

**Answer to Paragraph 215:** Defendant TMUS states that this paragraph purports to characterize a declaration from another litigation (Exhibit 14 to the SAC). Defendant TMUS denies that the allegations of this paragraph accurately and/or completely describe that declaration, respectfully refers the Court to that declaration for its contents and context, and denies all inconsistent allegations. To the extent a further response is required, Defendant TMUS denies that Exhibit 14 to the SAC contains the quoted language exactly as stated in this paragraph.

**Paragraph 216:** Fourth, according to the *Consent Decree*, the fake ring tones were still in effect on a nationwide basis in June and continuing through the summer of 2016 when the FCC received numerous complaints and began its investigation of T-Mobile's practices. *Consent Decree* ¶¶ 7-9.

**Answer to Paragraph 216:** Defendant TMUS states that this paragraph purports to characterize Exhibit 1 to the SAC, denies that the allegations of this paragraph accurately and/or completely describe Exhibit 1 to the SAC, respectfully refers the Court to Exhibit 1 to the SAC for its contents and context, and denies all inconsistent allegations. Defendant TMUS denies that it intended to violate any FCC rules and denies that Plaintiffs have any viable claim against TMUS.

**Paragraph 217:** Therefore, fake ring tones were in effect on SIP routes on a nationwide basis after Inteliquent told the SEC that "T-Mobile will generally use Inteliquent as its sole provider of voice interconnection services for all calls exchanged between T-Mobile and nearly all other voice

providers in the United States (excluding certain traffic, including among other things, that is exchanged with other providers over peering arrangements, etc.)." Inteliquent, Inc.'s Form 8-K at Item 1.01 (Aug. 13, 2015), https://www.sec.gov/Archives/edgar/data/1292653/ 000119312515293613M54428d8k.htm (last visited Oct. 10, 2019) (attached hereto as Exhibit 15).

**Answer to Paragraph 217:**  Defendant TMUS states that this paragraph purports to characterize Exhibit 15 to the SAC, denies that the allegations of this paragraph accurately and/or completely describe Exhibit 15 to the SAC, respectfully refers the Court to Exhibit 15 to the SAC for its contents and context, and denies all inconsistent allegations.  Defendant TMUS denies that it intended to violate any FCC rules and denies that Plaintiffs have any viable claim against TMUS.

**Paragraph 218:**  In 2015, T-Mobile accounted for 14% of Inteliquent's revenues.  However, the total traffic volumes that Inteliquent carried in 2015 far exceeded the volumes that Neutral Tandem had carried in 2007.  Plaintiffs estimate that Inteliquent may have carried as much as 21.8 billion minutes of traffic for T-Mobile in 2015.

**Answer to Paragraph 218:**  Defendant TMUS has insufficient information upon which to form a belief as to the truth of the allegations in this paragraph and therefore denies those allegations.

**Paragraph 219:**  Thus, the expanded use of the fake ring tones on T-Mobile traffic coincided with T-Mobile's decision to use Inteliquent to deliver "[a]lmost all domestic calls that leave the T-Mobile network destined to other carriers. . . ." Ex. 14, Adler Declaration, ¶ 10.

**Answer to Paragraph 219:**  Defendant TMUS states that this paragraph purports to characterize a declaration from another litigation (Exhibit 14 to the SAC), denies that the allegations of this paragraph accurately and/or completely describe that declaration, respectfully refers the Court to that declaration for its contents and context, and denies all inconsistent allegations.  Defendant TMUS otherwise denies the allegations in this paragraph.

**Paragraph 220:**  Also potentially relevant is the statement in Inteliquent's 10-K that it had deployed "advanced IP switching platforms manufactured by Sonus Networks, Inc."  2013 Form 10-K at 5 (Ex. 12). Sonus Networks, Inc. ("Sonus"), now known as Ribbon Communications ("Ribbon"), has developed perhaps the world's most sophisticated IP switching equipment.  The equipment developed by Sonus/Ribbon is capable of inserting "Local Ring Back Tones" or LRBTs on calls that have not reached their intended destination.  Indeed, Sonus/Ribbon uses the exact same terminology T-Mobile used when describing its illegal fake ring tone scheme, as reflected in the FCC's *Consent Decree.*

**Answer to Paragraph 220:**  Defendant TMUS states that this paragraph purports to characterize Exhibits 1 and 12 to the SAC, denies that the allegations of this paragraph accurately and/or completely describe Exhibits 1 and 12 to the SAC, respectfully refers the Court to Exhibits 1 and 12 to the SAC for their contents and context, and denies all inconsistent allegations.  Defendant TMUS denies the existence of a "fake ring tone scheme," and otherwise has insufficient information upon which to form a belief as to the truth of the allegations in this paragraph and therefore denies those allegations.

**Paragraph 221:**  One of the products Ribbon offers is a "PSX Policy Server."  According to a news release available on Ribbon Communication's website, Neutral Tandem (now Inteliquent) installed a "full suite of Sonus' IMS (IP Multimedia Subsystem)-ready solutions, including the GSX9000™, the PSX™ Policy Server, and the Sonus Insight™ Management System."[3]

**Answer to Paragraph 221:**  Defendant TMUS state that the allegations of this paragraph purport to characterize the cited URL addresses, respectfully refers the Court to the URL addresses for their contents and context, and denies all inconsistent allegations.  Defendant TMUS otherwise has insufficient information upon which to form a belief as to the truth of the allegations in this paragraph and therefore denies those allegations.

**Paragraph 222:**  A PSX Policy Server "provides a single, central point of provisioning for all routing and policy in either a service provider or enterprise network, greatly simplifying network management while offering unmatched scalability," according to Ribbon Communications materials.  *The Ribbon Communications Centralized Policy Server* (2017), https://www.videnda.ie/download/Ribbon-PSX_DL1.pdf (last visited Dec. 9, 2020).

**Answer to Paragraph 222:**  Defendant TMUS state that the allegations of this paragraph purport to characterize the cited URL addresses, respectfully refers the Court to the URL addresses for their contents and context, and denies all inconsistent allegations.  Defendant TMUS otherwise

---

[3] Ribbon Press Releases, *Neutral Tandem to Complete IP Voice Network Transformation with Sonus Networks Next Generation IP Voice Network Now Serves 100 Markets in the United States* (Feb. 24, 2009), https://ribboncommunications.com/company/media-center/press-releases/neutral-tandem-complete-ip-voice-network-transformation-sonus-networks (last visited Dec. 9, 2020).

has insufficient information upon which to form a belief as to the truth of the allegations in this

paragraph and therefore denies those allegations.

**Paragraph 223:**   A PSX Policy Server could be utilized to direct the injection of fake ring tones on hundreds of millions of calls annually on a nationwide basis from a single, centralized location. The insertion of fake ring tones would be activated merely by toggling a switch on the Tone and Announcement Profile section of the Ribbon user interface:



**Answer to Paragraph 223:** Defendant TMUS has insufficient information upon which to form a

belief as to the truth of the allegations in this paragraph and therefore denies those allegations.

**Paragraph 224:**  Upon information and belief, insertion of fake ring tones into this volume of calls on a nationwide basis could be performed by Inteliquent from its primary data center near Chicago, Illinois.  First, a centralized or "master" PSX Policy Server would be programmed by a human to effectuate the fake ring tone scheme.  The master PSX Policy Server, in turn, would push those instructions out to "slave" policy servers, which would be located at geographic points throughout the network.  The slave policy servers would then operate in connection with Session Border Controllers ("SBCs"), which are roughly equivalent to the IP version of TDM switches, to insert the fake ring tones when call setup is being delayed or the call has failed.

**Answer to Paragraph 224:** Defendant TMUS denies the existence of any "fake ring tone scheme," and otherwise has insufficient information upon which to form a belief as to the truth of the allegations in this paragraph and therefore denies those allegations.

**Paragraph 225:** Upon information and belief, Inteliquent operates a network capable of inserting fake ring tones on hundreds of millions of calls annually.

**Answer to Paragraph 225:** Defendant TMUS has insufficient information upon which to form a belief as to the truth of the allegations in this paragraph and therefore denies those allegations.

**Paragraph 226:** Upon information and belief, whether or not Inteliquent directly inserted the fake ring tones or not, it was Inteliquent's routing practices that T-Mobile sought to mask through its use of illegal fake ring tones. T-Mobile's admission that it "did not correct problems with its Intermediate Providers' delivery of calls to consumers in certain rural OCNs" is an admission that Inteliquent engaged in, or participated in, routing practices that impeded the delivery of calls to rural America.

**Answer to Paragraph 226:** No response is required because the allegations in this paragraph relate to Defendant TMUS's pending motion to dismiss, to which the Court is respectfully referred.

To the extent a response is required, Defendant TMUS denies the allegations in this paragraph.

**Paragraph 227:** Even if additional Doe Defendant intermediate providers to which Inteliquent handed off T-Mobile calls engaged in tactics that caused T-Mobile to also insert fake ring tones and/or not complete, as the primary Intermediate Provider carrying "almost all" of T-Mobile's long distance traffic, Inteliquent knew or should have known that grossly disproportional numbers of calls placed by T-Mobile customers to high cost rural areas were not being completed, as compared to lower cost traffic in urban or more heavily populated areas, to the economic benefit of both T-Mobile and Inteliquent.

**Answer to Paragraph 227:** No response is required because the allegations in this paragraph relate to Defendant TMUS's pending motion to dismiss, to which the Court is respectfully referred.

To the extent a response is required, Defendant TMUS denies the allegations in this paragraph.

> **M.** **T-Mobile Used Its Association With Inteliquent For Legitimate Business Purposes And For The Illicit Purpose Of Carrying Out The Fake Ring Tone Scheme**

**Paragraph 228:** As described in the section below, T-Mobile's association with Inteliquent has been used for both legitimate and illegitimate purposes, namely to carry out the fake ring tone scheme.

**Answer to Paragraph 228:** Defendant TMUS denies the allegations in this paragraph, including that there was any "fake ringtone scheme."

> **i.** *Inteliquent Provides Legitimate Intermediary Carrier Services To T-Mobile*

**Paragraph 229:** Inteliquent provides reporting and measurement services to T-Mobile, in addition to its Intermediate Provider carrier services. According to the Adler Declaration:

> Starting in 2015 and through the present, Inteliquent has served as an independent vendor to T-Mobile. Almost all domestic calls that leave the T-Mobile network destined to other carriers are routed through Inteliquent. Inteliquent is responsible for completing the calls, and Inteliquent bills T-Mobile for the services it provides under a contract between the two companies. In addition, calls routed through the public switched network towards T-Mobile numbers are routed through the Inteliquent network and then delivered to T-Mobile.

Ex. 14, Adler Decl. ¶ 10.

**Answer to Paragraph 229:** Defendant TMUS states that this paragraph purports to characterize a declaration from another litigation (Exhibit 14 to the SAC), denies that the allegations of this paragraph accurately and/or completely describe that declaration, respectfully refers the Court to that declaration for its contents and context, and denies all inconsistent allegations. To the extent a further response is required, Defendant TMUS admits that the quoted language appears in Exhibit 14 to the SAC but denies the allegations in this paragraph insofar as the quoted language is taken out of context and denies that Plaintiffs have any viable claim against TMUS.

**Paragraph 230:** "Inteliquent is T-Mobile's key network vendor for domestic voice traffic." *Id.* ¶ 11.

**Answer to Paragraph 230:** Defendant TMUS states that this paragraph purports to characterize a declaration from another litigation (Exhibit 14 to the SAC), denies that the allegations of this paragraph accurately and/or completely describe that declaration, respectfully refers the Court to that declaration for its contents and context, and denies all inconsistent allegations. To the extent a further response is required, Defendant TMUS admits that the quoted language appears in Exhibit

14 to the SAC but denies the allegations in this paragraph insofar as the quoted language is taken

out of context and denies that Plaintiffs have any viable claim against TMUS.

**Paragraph 231:** On the face of this relationship, the association is for the legitimate purpose of facilitating T-Mobile's completion of long-distance traffic and Inteliquent acting as an ordinary Intermediate Provider.

**Answer to Paragraph 231:** Defendant TMUS states that Inteliquent is an Intermediate Provider

used by TMUS. Defendant TMUS denies the allegations in this paragraph to the extent they imply

that Inteliquent serves any improper role for TMUS.

**Paragraph 232:** As part of this relationship, Inteliquent provides T-Mobile with call detail records ("CDR"). "There is a T-Mobile database that receives a download of Inteliquent CDRs for all domestic long distance calls." *Id.* ¶ 14. Upon information and belief, Inteliquent transmits these CDRs to T-Mobile electronically via a wire.

**Answer to Paragraph 232:** Defendant TMUS states that this paragraph purports to characterize

a declaration from another litigation (Exhibit 14 to the SAC), denies that the allegations of this

paragraph accurately and/or completely describe that declaration, respectfully refers the Court to

that declaration for its contents and context, and denies all inconsistent allegations. No response

is required to the last sentence of this paragraph because the allegations in it relate to Defendant

TMUS's pending motion to dismiss, to which the Court is respectfully referred.

**Paragraph 233:** Upon information and belief, Inteliquent's copies of the T-Mobile CDRs is maintained in its primary data center located in or near Elgin, Illinois.

**Answer to Paragraph 233:** No response is required because the allegations in this paragraph

relate to Defendant TMUS's pending motion to dismiss, to which the Court is respectfully referred.

To the extent a response is required, upon information and belief, Defendant TMUS denies the

allegations in this paragraph.

**Paragraph 234:** The senior manager on T-Mobile's revenue assurance group interacts regularly with counterparts at Inteliquent and often relies on information and analyses that Inteliquent provides. *See id.* ¶ 16.

**Answer to Paragraph 234:** Defendant TMUS states that this paragraph purports to characterize

a declaration from another litigation (Exhibit 14 to the SAC), denies that the allegations of this

paragraph accurately and/or completely describe that declaration, respectfully refers the Court to

that declaration for its contents and context, and denies all inconsistent allegations. To the extent

a further response is required, Defendant TMUS admits the allegations in this paragraph.

**Paragraph 235:** T-Mobile has asserted that its costs for calls are "dependent on the rates billed
by Inteliquent." *Id.* "High cost traffic has a negative margin" for T-Mobile. *Id.* ¶ 18. "One of the
costs is the rate that T-Mobile paid to Inteliquent to deliver outbound domestic long-distance
calls." *Id.* T-Mobile has also asserted that "[u]nder [T-Mobile's] agreement with Inteliquent, the
rates [T-Mobile] paid differed depending on the percentage of calls" T-Mobile subscribers placed
to certain high cost rural OCNs. *Id.*

**Answer to Paragraph 235:** Defendant TMUS states that this paragraph purports to characterize

a declaration from another litigation (Exhibit 14 to the SAC), denies that the allegations of this

paragraph accurately and/or completely describe that declaration, respectfully refers the Court to

that declaration for its contents and context, and denies all inconsistent allegations. To the extent

a further response is required, Defendant TMUS admits that the quoted language appears in Exhibit

14 to the SAC but denies the allegations in this paragraph insofar as the quoted language is taken

out of context and denies that Plaintiffs have any viable claim against TMUS.

**Paragraph 236:** Upon information and belief, however, T-Mobile's 2015 MSA with Inteliquent
has not always allowed Inteliquent to recoup its costs for termination of calls to certain high cost
rural OCNs. As a result, Inteliquent lost money, or stood to lose money, on its contract with T-
Mobile when too much traffic terminated to high cost areas.

**Answer to Paragraph 236:** Defendant TMUS has insufficient information upon which to form a

belief as to the truth of the allegations in this paragraph and therefore denies those allegations.

> ### ii. *Inteliquent Provides Illegitimate Intermediary Carrier Services To T-Mobile*

**Paragraph 237:** T-Mobile has a "Revenue Assurance Team [that] analyzes T-Mobile's revenues
and margins, with the goal of helping the Company be more profitable." *Id.* ¶ 2. Areas of focus
for this team include "negative margin" and "high-cost, domestic calls." *Id.* Negative margin calls
can be any of the following: (1) "calls for which there are high per-minute costs to complete" the

call; (2) calls that generate high volumes of minutes; or (3) a combination of both high per-minute costs and high volumes. *Id.*

**Answer to Paragraph 237:** Defendant TMUS states that this paragraph purports to characterize a declaration from another litigation (Exhibit 14 to the SAC), denies that the allegations of this paragraph accurately and/or completely describe that declaration, respectfully refers the Court to that declaration for its contents and context, and denies all inconsistent allegations. To the extent a further response is required, Defendant TMUS admits that the quoted language appears in Exhibit 14 to the SAC but denies the allegations in this paragraph insofar as the quoted language is taken out of context and denies that Plaintiffs have any viable claim against TMUS.

**Paragraph 238:** Because "high-cost calls have historically not produced incremental revenue and created a negative margin," T-Mobile has "focused on identifying ways to reduce [its] costs or increase [its] revenues with respect to this traffic." *Id.*

**Answer to Paragraph 238:** Defendant TMUS states that this paragraph purports to characterize a declaration from another litigation (Exhibit 14 to the SAC), denies that the allegations of this paragraph accurately and/or completely describe that declaration, respectfully refers the Court to that declaration for its contents and context, and denies all inconsistent allegations. To the extent a further response is required, Defendant TMUS admits that the quoted language appears in Exhibit 14 to the SAC but denies the allegations in this paragraph insofar as the quoted language is taken out of context and denies that Plaintiffs have any viable claim against TMUS.

**Paragraph 239:** After Inteliquent became "responsible for completing" "[a]lmost all domestic calls that leave the T-Mobile network" in 2015, *id.* ¶ 10, T-Mobile and Inteliquent began to have "weekly calls," *id.* ¶ 22. Those calls focused on at least four distinct issues: (1) fraud; (2) a practice known as "traffic pumping"; (3) prevention of inbound scam and robocalls; and (4) "***high-cost traffic in various forms***" *Id.* (emphasis added).

**Answer to Paragraph 239:** Defendant TMUS states that this paragraph purports to characterize a declaration from another litigation (Exhibit 14 to the SAC), denies that the allegations of this paragraph accurately and/or completely describe that declaration, respectfully refers the Court to

that declaration for its contents and context, and denies all inconsistent allegations. To the extent a further response is required, Defendant TMUS admits that the quoted language appears in Exhibit 14 to the SAC but denies the allegations in this paragraph insofar as the quoted language is taken out of context and denies that Plaintiffs have any viable claim against TMUS.

**Paragraph 240:** The senior manager on T-Mobile's revenue assurance group "regularly communicated with [her] counterparts at Inteliquent about things that would impact the volumes of calls that T-Mobile routed to Inteliquent." *Id.* ¶ 19. "Inteliquent was focused on the quantity of calls because it impacted its costs relating to network planning and management." *Id.* ¶ 18.

**Answer to Paragraph 240:** Defendant TMUS states that this paragraph purports to characterize a declaration from another litigation (Exhibit 14 to the SAC). Defendant TMUS denies that the allegations of this paragraph accurately and/or completely describe that declaration, respectfully refers the Court to that declaration for its contents and context, and denies all inconsistent allegations. To the extent a further response is required, To the extent a further response is required, Defendant TMUS denies that the quoted language appears exactly as written in this paragraph in Exhibit 14 to the SAC.

**Paragraph 241:** Upon information and belief, among the topics that T-Mobile employees discussed with Inteliquent was measures that either or both parties could take to reduce the volume of T-Mobile traffic terminating to areas with higher terminating access rates.

**Answer to Paragraph 241:** No response is required because the allegations in this paragraph relate to Defendant TMUS's pending motion to dismiss, to which the Court is respectfully referred. To the extent a response is required, Defendant TMUS denies the allegations in this paragraph.

**Paragraph 242:** Upon information and belief, these measures included the use of fake ring tones to reduce the volume of calls routed to areas with higher terminating access rates and/or mask call completion failures.

**Answer to Paragraph 242:** No response is required because the allegations in this paragraph relate to Defendant TMUS's pending motion to dismiss, to which the Court is respectfully referred. To the extent a response is required, Defendant TMUS denies the allegations in this paragraph.

### iii. *T-Mobile And Inteliquent Knew Fake Ring Tones Were Unlawful And That They Had The Duty To Deliver Calls To All LECs, Including Those In Rural Areas*

**Paragraph 243:**  Upon information and belief, T-Mobile and Inteliquent employees discussed the use of fake ring tones despite knowing that any form of the practice had been expressly declared unlawful by the FCC in January 2014.

**Answer to Paragraph 243:**  Defendant TMUS denies the allegations in this paragraph.

**Paragraph 244:**  Both T-Mobile and Inteliquent were active participants in matters before the FCC and regularly utilize outside counsel and lobbyists to advocate for policy changes at the FCC. Thus, both were well aware that fake ring tone schemes were unlawful and of the FCC's efforts to address rural call completion problems.

**Answer to Paragraph 244:**  Defendant TMUS admits that, at times, it has participated in matters before the FCC and has advocated for policy changes in certain instances, denies any implication of actionable conduct on its part and otherwise has insufficient information upon which to form a belief as to the truth of the allegations in this paragraph and therefore denies them. Further answering, Defendant TMUS denies the existence of any "fake ring tone scheme."  Defendant TMUS denies that it intended to violate any FCC rules and denies that Plaintiffs have any viable claim against TMUS.

**Paragraph 245:**  As discussed above, Inteliquent directly argued in the FCC's RCC Rulemaking docket in favor of permitting the use of fake ring tones but those arguments were rejected by the FCC.

**Answer to Paragraph 245:**  Defendant TMUS states that the allegations of this paragraph purport to characterize Exhibits 6 and 7 to the SAC, denies that the allegations of this paragraph accurately and/or completely describe Exhibits 6 and 7 to the SAC, respectfully refers the Court to Exhibits 6 and 7 to the SAC for their contents and context, and denies all inconsistent allegations. Defendant TMUS otherwise has insufficient information upon which to form a belief as to the truth of the remaining allegations in this paragraph and therefore denies those allegations.

**Paragraph 246:**  Moreover, the 2015 MSA specifically referenced the FCC's order which made it unlawful to use fake ring tones, imposing reporting and compliance obligations on Inteliquent:

In addition to, and without limiting, any other obligation of [Inteliquent] under the GTCs or SA, Provider shall, as soon as reasonably possible, provide T-Mobile with a copy of any report or form filed, or prepared for filing, with the Federal Communications Commission ("FCC") to comply with the FCC's rural call completion rules, including, but not limited to, the requirements set forth *In the Matter of Rural Call Completion*, Report and Order and Further Notice of Proposed Rulemaking, WC Docket No. 13-30 (rel. Nov. 8, 2013), including, but not limited to, filing the mandated quarterly reports with the FCC that contain, at a minimum, the following information:

i.      For each Rural OCN:

(1)     The OCN and the state, and

(2)     For attempted interstate calls:  the total number of attempted calls, the number of attempted calls that were answered, the number of attempted calls that were not answered (reported separately for call attempts signed as busy, ring no answer, or unassigned number).

(3)     For attempted intrastate calls:  the total number of attempted calls, the number of attempted calls that were answered, the number of attempted calls that were not answered (reported separately for call attempts signed as busy, ring no answer, or unassigned number).

ii.     For each non-Rural OCN, the aggregate information for attempted intrastate calls:  the total number of attempted calls, the number of attempted calls that were answered, the number of attempted calls that were not answered (reported separately for call attempts signed as busy, ring no answer, or unassigned number).

For purposes of this SA, the term "Rural OCN" means the Operating Carrier Number ("OCN") associated with an end office switch of a rural local exchange carrier ("RLEC") that is identified on the list published by the National Exchange Carrier Association ("NECA"), as updated from time to time, excluding any OCNs mutually agreed to by the Parties.

*        *        *

[Inteliquent] shall provide T-Mobile with a draft of any report or form that [Inteliquent] intends to file with the FCC or any other governmental authority as soon as possible but no later than five (5) business days before the intended filing date (unless the deadline is shorter than five (5) business days) if the filing of such draft report might reasonably be interpreted as evidence that T-Mobile may not be in full compliance with applicable Law; *provided*, *however*, that [Inteliquent] shall provide T-Mobile with written notice of intent to file a report pursuant to this Section if [Inteliquent] will

108

not, for any reason, be able to provide T-Mobile with the draft of such report five (5) business days before the filing deadline.

Ex. 13, PSTN at 11-12.

**Answer to Paragraph 246:**  Defendant TMUS states that the allegations of this paragraph purport to characterize Exhibit 13 to the SAC, denies that the allegations of this paragraph accurately and/or completely describe the Exhibit 13 to the SAC, respectfully refers the Court to Exhibit 13 to the SAC for its contents and context, and denies all inconsistent allegations.  To the extent a further response is required, Defendant TMUS denies that the quoted language appears exactly as stated in this paragraph in Exhibit 13 to the SAC.

**Paragraph 247:**  Accordingly, T-Mobile and Inteliquent were both aware of and shared joint responsibility for complying with the FCC's rural call completion orders.

**Answer to Paragraph 247:**  Defendant TMUS states that the allegations of this paragraph purport to characterize the 2015 MSA, denies that the allegations of this paragraph accurately and/or completely describe the 2015 MSA, respectfully refers the Court to the 2015 MSA for its contents and context, and denies all inconsistent allegations.  Further answering, Defendant TMUS states that this paragraph states legal conclusions and that legal conclusions are for the Court to make.  To the extent a further response is required, Defendant TMUS states that it had notice of the referenced FCC orders, denies that it intended to violate them, denies that Plaintiffs have any viable claim against TMUS, and has insufficient information upon which to form a belief as to the truth of the allegations in this paragraph regarding Inteliquent and therefore denies those allegations.

### iv.    *Inteliquent Has Collaborated With T-Mobile On A Different Scheme To Deter Completion Of Certain Calls Placed By T-Mobile Customers*

**Paragraph 248:**  The fake ring tone scheme is not the only way Inteliquent has worked with T-Mobile on a strategy to reduce the volume of high cost calls placed by T-Mobile subscribers to avoid liability for high cost access charges.

**Answer to Paragraph 248:** No response is required because the allegations in this paragraph relate to Defendant TMUS's pending motion to dismiss, to which the Court is respectfully referred. To the extent a response is required, Defendant TMUS otherwise denies the allegations in this paragraph, including that there was any "fake ringtone scheme."

**Paragraph 249:** Inteliquent is currently a party to litigation pending in this Court that involved claims that Inteliquent and T-Mobile jointly developed and instituted a scheme to deter T-Mobile subscribers from completing calls to certain high volume, and/or high cost, phone numbers tied to rural OCNs. *See Inteliquent, Inc. v. Free Conferencing Corp. et al.,* Case No. 1:16-CV-06976 ("Inteliquent Litigation").

**Answer to Paragraph 249:** Defendant TMUS states that the allegations of this paragraph purport to characterize the pleadings in another litigation, denies that the allegations of this paragraph accurately and/or completely describe those pleadings, respectfully refers the Court to the pleadings for their contents and context, and denies all inconsistent allegations. Further answering, Defendant TMUS otherwise denies the allegations in this paragraph, including that there was any "fake ringtone scheme."

**Paragraph 250:** The scheme alleged in the Inteliquent Litigation was called the "One-Cent Policy," which involved T-Mobile and Inteliquent interrupting calls placed by T-Mobile subscribers to intentionally selected telephone numbers and inserting a message advising the caller that they would be charged a penny a minute if they completed the call.

**Answer to Paragraph 250:** Defendant TMUS states that the allegations of this paragraph purport to characterize the pleadings in another litigation, denies that the allegations of this paragraph accurately and/or completely describe those pleadings, respectfully refers the Court to the pleadings for their contents and context, and denies all inconsistent allegations. Further answering, Defendant TMUS otherwise denies the allegations in this paragraph, including that there was any "fake ringtone scheme."

**Paragraph 251:** The alleged purpose of this message was to confuse the caller and coerce T-Mobile's subscribers to hang up high cost calls before they were connected.

**Answer to Paragraph 251:** Defendant TMUS states that the allegations of this paragraph purport to characterize the pleadings in another litigation, denies that the allegations of this paragraph accurately and/or completely describe those pleadings, respectfully refers the Court to the pleadings for their contents and context, and denies all inconsistent allegations. Defendant TMUS otherwise denies the remaining allegations in this paragraph.

**Paragraph 252:** According to court documents, the parties in the Inteliquent Litigation estimate that tens of thousands of telephone numbers were subject to the One-Cent Policy. *See id.*, Dkt. No. 491, at 11 n.10.

**Answer to Paragraph 252:** Defendant TMUS states that the allegations of this paragraph purport to characterize the documents from another litigation, denies that the allegations of this paragraph accurately and/or completely describe those documents, respectfully refers the Court to the documents for their contents and context, and denies all inconsistent allegations. Defendant TMUS otherwise denies the remaining allegations in this paragraph.

**Paragraph 253:** The defendants in the Inteliquent Litigation served third party subpoenas on T-Mobile seeking, among other things, documents that would reflect Inteliquent's involvement and participation in the execution of the One-Cent Policy.

**Answer to Paragraph 253:** Defendant TMUS states that it was served with a subpoena in the referenced litigation, states that the allegations of this paragraph purport to characterize that subpoena, respectfully refers the Court to the subpoena for its contents and context, and denies all inconsistent allegations.

**Paragraph 254:** The subpoenas to T-Mobile included requests for information T-Mobile submitted to the FCC in the *Consent Decree* investigation. The parties issuing the subpoenas contend the call blocking to high cost rural OCNs at issue in the Inteliquent Litigation overlaps with the *Consent Decree's* finding that T-Mobile failed to oversee its Intermediate Providers (*i.e.* Inteliquent). Those parties contend the *Consent Decree* investigation documents are relevant to the One-Cent Policy because both practices have the same purpose: to confuse callers and coerce them to hang up.

**Answer to Paragraph 254:** Defendant TMUS states that the allegations in this paragraph purport to characterize the cited documents from another litigation, respectfully refers the Court to the

111

cited documents for their contents and context, and denies all inconsistent allegations. Defendant TMUS otherwise denies the allegations in this paragraph.

**Paragraph 255:** T-Mobile filed a Motion to Quash in the Inteliquent Litigation and has vigorously contested production of any of the materials it submitted to the FCC in the *Consent Decree* investigation.

**Answer to Paragraph 255:** Defendant TMUS states that it filed a Motion to Quash in the referenced litigation, respectfully refers the Court to that motion for its contents and context, and denies all inconsistent allegations. Defendant TMUS otherwise denies the remaining allegations in this paragraph.

**Paragraph 256:** T-Mobile also moved for relief from producing any documents that might reveal its collaboration with Inteliquent on either the One-Cent Policy or fake ring tone scheme, claiming Inteliquent was not involved in the development and implementation of the One-Cent Policy and that all information submitted to the Commission is confidential.

**Answer to Paragraph 256:** Defendant TMUS states that it filed a Motion to Quash in the referenced litigation, respectfully refers the Court to that motion for its contents and context, and denies all inconsistent allegations. To the extent a further response is required, Defendant TMUS denies the allegations in this paragraph to the extent they are intended to imply actionable wrongdoing by Defendant TMUS, and denies the existence of any "fake ring tone scheme."

**Paragraph 257:** T-Mobile's Motion to Quash was supported by an affidavit of Mike Taylor, a T-Mobile upper management employee, who attested, in at least ten different ways, that Inteliquent had nothing to do with the One-Cent Policy, and he appears to have testified to the same at his deposition. *See id.*, Dkt. No. 491 at 4 (summarizing statements); *see also id.*, Dkt. No. 491 at 6 (discussing a second Taylor affidavit contending T-Mobile acted independently from Inteliquent in the One-Cent Policy).

**Answer to Paragraph 257:** Defendant TMUS states that it submitted an affidavit of its employee Mike Taylor in support of its Motion to Quash filed in another litigation, respectfully refers the Court to that affidavit for its contents and context, and denies all inconsistent allegations. To the extent a further response is required, Defendant TMUS denies the allegations in this paragraph to the extent they are intended to imply actionable wrongdoing by Defendant TMUS.

**Paragraph 258:** T-Mobile's lawyers also argued to this Court that Inteliquent had nothing to do with the One-Cent Policy. *See id.*, Dkt. No. 491 at 5.

**Answer to Paragraph 258:** Defendant TMUS states that the allegations of this paragraph purport to characterize the document Plaintiffs cite from another litigation, respectfully refers the Court to the document for its contents and context, and denies all inconsistent allegations. To the extent a further response is required, Defendant TMUS denies the allegations in this paragraph to the extent they are intended to imply actionable wrongdoing by Defendant TMUS.

**Paragraph 259:** Just sixteen days before the close of discovery in the Inteliquent Litigation, an Inteliquent employee revealed the truth in her deposition – Inteliquent and T-Mobile witnesses who testified before her that there was no collaboration between Inteliquent and T-Mobile on the One-Cent Policy were lying. *See generally id.*, Dkt. No. 485. This witness exposed that Inteliquent and T-Mobile had over one hundred meetings discussing the One-Cent Policy and that there were meeting notes concerning this collaboration that had not been produced previously by Inteliquent or T-Mobile in discovery.

**Answer to Paragraph 259:** Defendant TMUS states that the allegations of this paragraph purport to characterize the document Plaintiffs cite from another litigation, denies that that the allegations of this paragraph accurately and/or completely describe that document, respectfully refers the Court to the document for its contents and context, and denies all inconsistent allegations. Defendant TMUS otherwise denies the allegations in this paragraph.

**Answer to Paragraph 259**

**Paragraph 260:** This led to discovery of additional documents about these meetings and collaboration on the One-Cent Policy that T-Mobile and Inteliquent had been concealing.

**Answer to Paragraph 260:** Defendant TMUS denies the allegations in this paragraph.

**Paragraph 261:** Inteliquent also attempted, unsuccessfully, to move for a protective order preventing discovery of its communications with Mobileum, a third party software vendor T-Mobile hired in connection with the One-Cent Policy. Discovery from Mobileum further confirmed that T-Mobile and Inteliquent set up an FTP site or other file transfer mechanism for T-Mobile to access call data directly from Inteliquent to facilitate the One-Cent Policy.

**Answer to Paragraph 261:** Defendant TMUS has insufficient information upon which to form a belief as to the truth of the allegations in this paragraph and therefore denies those allegations.

**Paragraph 262:** Though much of the information in the Inteliquent Litigation has been filed under seal or appears to be subject to protective orders or confidentiality agreements, publicly available evidence reflects that shortly after Inteliquent entered into the 2015 MSA with T-Mobile, it became apparent to Inteliquent that the MSA was not going to generate the financial performance Inteliquent expected and would quickly become unprofitable. As a result, Inteliquent, at the behest of its Board, embarked on business strategies aggressively aimed at preventing completion of high cost traffic.

**Answer to Paragraph 262:** Defendant TMUS has insufficient information upon which to form a belief as to the truth of the allegations in this paragraph and therefore denies those allegations.

**Paragraph 263:** Some information from the case has become public, including portions of an email from the CEO of Inteliquent in February 2016, Matthew Carter, which states:

> As it relates to peering, I understand we have no direct control over this outcome. If TMO is going to potentially cost us $6-9MM in EBITDA, what are the alternative solutions we are looking at to make up for this lost (*sic*)? I think we should at least identify, from the mundane to crazy hair ball ideas, how to chip away at this variance. This does not mean we will sign up as a commitment for low probability initiatives but I don't think we should accept as a given this outcome either.

Stephen Wald, *Letter to FCC Secretary Marlene Dortch*, NATIONAL EXCHANGE CARRIER ASSOCIATION (Aug. 7, 2018), https://prodnet.www.neca.org/publicationsdocs/wwpdf/8718carrier.pdf (last visited Oct 10, 2019) (attached hereto as Exhibit 16).

**Answer to Paragraph 263:** Defendant TMUS states that the allegations of this paragraph purport to characterize Exhibit 16 to the SAC, denies that the allegations of this paragraph accurately and/or completely describe Exhibit 16 to the SAC, respectfully refers the Court to Exhibit 16 to the SAC for its contents and context, and denies all inconsistent allegations. To the extent a further response is required, Defendant TMUS admits that the quoted language appears in Exhibit 16 to the SAC but otherwise has insufficient information upon which to form a belief as to the truth of the remaining allegations in this paragraph and therefore denies those allegations and denies that Plaintiffs have any viable claim against TMUS.

**Paragraph 264:** On March 23, 2016, CEO Carter wrote:

> [T]his is a quick update on our ongoing negotiations with TMO and other related EBITDA impacting activities.

Last week the team met with TMO to discuss options to improve the current high costs destination codes and understanding their timeline on peering. The options that are under consideration are:

- Implement a cost+ model whereas we charge above the costs to protect ourselves from unprofitable traffic.

- Limit the number of high destination codes by 50% by TMO cutting off the first minute of this traffic. The goal would be to eventually eliminate as much as 80% by forcing those calls to listen to a recording asking for a credit card to continue the call.

*Id.*

**Answer to Paragraph 264:** Defendant TMUS states that the allegations of this paragraph purport to characterize Exhibit 16 to the SAC, denies that the allegations of this paragraph accurately and/or completely describe Exhibit 16 to the SAC, respectfully refers the Court to Exhibit 16 to the SAC for its contents and context, and denies all inconsistent allegations. To the extent a further response is required, Defendant TMUS admits that the quoted language appears in Exhibit 16 to the SAC but denies the allegations in this paragraph insofar as the quoted language is taken out of context and denies that Plaintiffs have any viable claim against TMUS.

**Paragraph 265:** On March 29, 2016, Ian Neale, a Senior Vice President at Inteliquent, wrote:

[A]s I discussed with [Mike Taylor of T-Mobile] on Friday, we are currently developing a series of strategies/initiatives to more aggressively work with you all to contain the volume of traffic to high costs codes, we plan to have a document finalized that we can share with you both early next week. I am confident that we will bring much more focus to this issue going forward and I am sure that our collaborative efforts will yield a reduction in volume to these codes . . . .

*Id.*

**Answer to Paragraph 265:** Defendant TMUS states that the allegations of this paragraph purport to characterize Exhibit 16 to the SAC, denies that the allegations of this paragraph accurately and/or completely describe Exhibit 16 to the SAC, respectfully refers the Court to Exhibit 16 to the SAC for its contents and context, and denies all inconsistent allegations. To the extent a further

response is required, Defendant TMUS admits that the quoted language appears in Exhibit 16 to the SAC but denies the allegations in this paragraph insofar as the quoted language is taken out of context and denies that Plaintiffs have any viable claim against TMUS.

**Paragraph 266:** Inteliquent's participation in failing to deliver calls to their intended destination, and masking this failure through the use of fake ring tones is consistent with its Board's directive to reduce the volume of high cost traffic it completes for T-Mobile.

**Answer to Paragraph 266:** Defendant TMUS denies the allegations in this paragraph.

**Paragraph 267:** On November 30, 2020, the Court issued a Memorandum Opinion and Order in the Inteliquent Litigation finding no triable issues against Inteliquent; however, T-Mobile was not a party in that case and this Court did find that T-Mobile and Inteliquent, "work[ed] together to reduce traffic . . . to high cost locations." *See Inteliquent Litigation*, ECF No. 722, p. 8. The opinion also found, as alleged herein, that in October 2015, "Inteliquent's T-Mobile contract became less profitable." *Id*.

**Answer to Paragraph 267:** Defendant TMUS states that the allegations of this paragraph purport to characterize the Memorandum Opinion and Order, denies that the allegations of this paragraph accurately and/or completely describe the decision, respectfully refers the Court to the document for its contents and context, and denies all inconsistent allegations. To the extent a further response is required, Defendant TMUS denies the allegations in this paragraph to the extent they are intended to imply actionable wrongdoing by Defendant TMUS.

**Paragraph 268:** T-Mobile's efforts to hide the evidence of its collaboration with Inteliquent in the One-Cent Policy, and further efforts in this Court to block discovery of evidence of the *Consent Decree* investigation, is yet another indicator of Defendants' high degree of moral culpability, deliberate oppression and wonton disregard of the rights of others with respect to implementing strategies intended to reduce traffic to high cost codes in violation of the Commission's express prohibitions on doing so.

**Answer to Paragraph 268:** Defendant TMUS denies the allegations in this paragraph.

**N.    T-Mobile Blocked Plaintiffs' Access To Evidence Of Its Illegal Conduct In FOIA Litigation**

**Paragraph 269:** On February 25, 2019, Plaintiffs' counsel, as Requestor, acting on behalf of Plaintiffs and over seventy-five rural carriers, submitted a FOIA Request to the Commission requesting that the Commission disclose three categories of documents related to the *Consent Decree:* (1) all documents in the Commission's *Consent Decree* file; (2) all compliance reports

submitted by T-Mobile to the Commission pursuant to the *Consent Decree*; and (3) all Form 480 Reports (Rural Call Completion Data Filing) and supporting information submitted by T-Mobile to the Commission.

**Answer to Paragraph 269:**  Defendant TMUS states that the allegations of this paragraph purport to characterize the cited FOIA request, denies that the allegations of this paragraph accurately and/or completely describe that document, respectfully refers the Court to the document for its contents and context, and denies all inconsistent allegations.  To the extent a further response is required, upon information and belief, Defendant TMUS admits the allegations in this paragraph.

**Paragraph 270:**  On March 22, 2019, the Commission notified T-Mobile of the FOIA Request because it previously requested confidential treatment of the *Consent Decree* investigation files pursuant to various FOIA exemptions.

**Answer to Paragraph 270:**  Defendant TMUS states that the allegations of this paragraph purport to characterize the cited response, denies that the allegations of this paragraph accurately and/or completely describe that document, respectfully refers the Court to the document for its contents and context, and denies all inconsistent allegations.  To the extent a further response is required, Defendant TMUS admits the allegations in this paragraph.

**Paragraph 271:**  On April 1, 2019, T-Mobile filed its response to the FOIA Request with the Commission, asserting its grounds for requesting confidential treatment of all documents in the Commission's file.  T-Mobile initially only agreed that one *post-Consent Decree* compliance report was not exempt.

**Answer to Paragraph 271:**  Defendant TMUS states that the allegations of this paragraph purport to characterize the cited April 1 letter, denies that the allegations of this paragraph accurately and/or completely describe the April 1 letter, respectfully refers the Court to the April 1 letter for its contents and context, and denies all inconsistent allegations. To the extent a further response is required, Defendant TMUS admits the allegations in this paragraph.

**Paragraph 272:**  T-Mobile's April 1 letter to the Commission reflects that, among the documents and information it submitted to the Commission, there was evidence concerning the amount of T-Mobile calls answered or completed from April 2016 through December 2016, names of T-Mobile's Intermediate Providers, the specific percentages of T-Mobile out-of-network traffic

sent via trunks using SIP technology for periods between 2013 and 2016, and other data concerning calls attempted by T-Mobile customers sent via trunks using SIP technology taking more than four seconds for call setup. T-Mobile's descriptions of the documents it submitted to the Commission reflect that evidence of T-Mobile's and Inteliquent's participation in the fake ring tone scheme should be found within the FCC's *Consent Decree* file.

**Answer to Paragraph 272:** Defendant TMUS states that the allegations of this paragraph purport to characterize the cited April 1 letter, denies that the allegations of this paragraph accurately and/or completely describe the April 1 letter, respectfully refers the Court to the April 1 letter for its contents and context, and denies all inconsistent allegations. To the extent a further response is required, Defendant TMUS otherwise denies the allegations in this paragraph, including that there was any "fake ringtone scheme."

**Paragraph 273:** T-Mobile's April 1 letter to the Commission also asserted that documents that disclosed the identities of T-Mobile's Intermediate Providers warrant confidential treatment because T-Mobile supposedly treats the identity of its intermediaries as confidential.

**Answer to Paragraph 273:** Defendant TMUS states that the allegations of this paragraph purport to characterize the cited April 1 letter, denies that the allegations of this paragraph accurately and/or completely describe the April 1 letter, respectfully refers the Court to the April 1 letter for its contents and context, and denies all inconsistent allegations. To the extent a further response is required, Defendant TMUS admits the allegations in this paragraph, but denies that Plaintiffs have any viable claim against TMUS.

**Paragraph 274:** On April 11, 2019, Requestor served a response to T-Mobile's response to the FOIA Request, rebutting each of T-Mobile's purported justifications for its requests for confidential treatment. Among its rebuttal points, Requestor pointed out to the Commission that the identity of T-Mobile's primary intermediary, Inteliquent, is not at all confidential but is publicly available information that was disclosed by Inteliquent via press releases as well as in an SEC filing.

**Answer to Paragraph 274:** Defendant TMUS states that the allegations of this paragraph purport to characterize the cited response, denies that the allegations of this paragraph accurately and/or completely describe that document, respectfully refers the Court to the document for its contents

and context, and denies all inconsistent allegations. To the extent a further response is required, Defendant TMUS has insufficient information upon which to form a belief as to the truth of the remaining allegations in this paragraph and therefore denies those allegations.

**Paragraph 275:** The Commission took no further action on the FOIA Request, so on June 10, 2019, Plaintiffs' counsel filed a Complaint for Declaratory Relief Pursuant to FOIA Compelling the Production Of Documents Related To T-Mobile USA Inc.'s Unjust And Unreasonable Rural Call Completion Practices in the United States District Court for the District of Columbia. *See Womble Bond Dickinson (US) LLP v. FCC*, No. 1:19-cv-01690-RDM (D.D.C.) ("FOIA Litigation").

**Answer to Paragraph 275:** Defendant TMUS states that the allegations of this paragraph purport to characterize the cited complaint, denies that the allegations of this paragraph accurately and/or completely describe the cited complaint, respectfully refers the Court to the cited complaint for its contents and context, and denies all inconsistent allegations. To the extent a further response is required, Defendant TMUS otherwise has insufficient information upon which to form a belief as to the truth of the remaining allegations in this paragraph and therefore denies those allegations.

**Paragraph 276:** T-Mobile did not concede that the identity of its primary Intermediate Provider is not confidential information until months later, in a July 9, 2019 submission to the Commission. Nevertheless, T-Mobile continued to claim confidentiality over substantial portions of the evidence it submitted to the Commission related to the fake ring tone scheme.

**Answer to Paragraph 276:** Defendant TMUS states that the allegations of this paragraph purport to characterize the cited submission and other documents, denies that the allegations of this paragraph accurately and/or completely describe the cited submission and other documents, respectfully refers the Court to the cited submission and other documents for their contents and context, and denies all inconsistent allegations. Defendant TMUS otherwise denies the allegations in this paragraph, including that there was any "fake ringtone scheme."

**Paragraph 277:** By doing so, T-Mobile suppressed Plaintiffs' access to information about the precise OCNs affected by its illegal practices, the identities and roles of each participant in this scheme, how many calls were impacted, precisely how the fake ring tones were inserted, and the magnitude of terminating access charges it deprived LECs of the opportunity to charge for and collect as a result of its illegal practice.

**Answer to Paragraph 277:** No response is required because the allegations in this paragraph relate to Defendant TMUS's pending motion to dismiss, to which the Court is respectfully referred. To the extent a response is required, Defendant TMUS denies the allegations in this paragraph.

**Paragraph 278:** On October 8, 2019, the Commission produced the following two categories of documents pursuant to an agreement between the Commission and Plaintiffs' counsel concerning resolution of the FOIA disputes: (1) T-Mobile's *post-Consent Decree* compliance reports; and (2) documents sufficient to identify T-Mobile's intermediate carriers. The latter category was produced in the form of a chart that T-Mobile produced to the Commission during the investigation, which lists a series of 2017 customer complaints T-Mobile received reporting failures of calls placed to rural call recipients.

**Answer to Paragraph 278:** Defendant TMUS states that the allegations of this paragraph purport to characterize the cited compliance reports and chart, denies that the allegations of this paragraph accurately and/or completely describe the cited compliance reports and chart respectfully refers the Court to the cited compliance reports and chart for their contents and context, and denies all inconsistent allegations. To the extent a further response is required, Defendant TMUS otherwise has insufficient information upon which to form a belief as to the truth of the remaining allegations in this paragraph and therefore denies those allegations.

**Paragraph 279:** The only Intermediate Providers identified by T-Mobile's customer complaint chart during the time period relevant to the Commission's investigation were Inteliquent and Level 3 Communications LLC ("Level 3"), which was acquired in or about November 2017 by CenturyLink, Inc. ("CenturyLink"), which, upon information and belief is now Level 3's parent company. Inteliquent is mentioned in the majority of the customer complaint log entries as T-Mobile's "long-distance carrier partner" while Level 3 is only referenced in two of the call complaint log entries produced. In one instance, Level 3 was identified as "the LEC that was immediately before Loretto in the call chain" and in the other, T-Mobile refers to Level 3 as its "long-distance carrier partner." The complaint logs reflect a pattern of customer complaints being resolved by Inteliquent, and in only one case Level 3, "changing the route used to terminate the call to the rural carrier." These descriptions of Inteliquent's role in resolving rural call completion complaints show that Inteliquent had the capacity to change the routes used to terminate calls to rural carriers and was routinely the resource T-Mobile relied upon to resolve rural call completion failures that its customers were able to identify.

**Answer to Paragraph 279:** Defendant TMUS states that the allegations of this paragraph purport to characterize the cited complaint logs and chart, denies that the allegations of this paragraph

accurately and/or completely describe the cited complaint logs and chart, respectfully refers the Court to the cited complaint logs and chart for their contents and context, and denies all inconsistent allegations. Defendant TMUS otherwise denies the remaining allegations in this paragraph.

**Paragraph 280:** The role of Level 3 in the fake ring tone scheme, and whether it is one of the Intermediate Providers whose problems with delivery of calls to consumers in certain rural OCN's T-Mobile admitted it failed to correct, remains to be seen, but it appears that Level 3 may also be a co-conspirator, or one of the Doe Defendants, which Plaintiffs will investigate further in discovery and reserve the right to accordingly amend their pleadings.

**Answer to Paragraph 280:** Defendant TMUS otherwise denies the allegations in this paragraph, including that there was any "fake ringtone scheme."

**Paragraph 281:** The November 6, 2019 FOIA production reveals that on August 2, 2017, in response to a Supplemental Letter of Inquiry which, *inter alia*, asked about specific instances of call completion problems, T-Mobile informed the FCC that calls were routed through "Inteliquent and West." Upon information and belief, the reference by T-Mobile to West refers to West Corporation, a telecommunications service provider based in Omaha, Nebraska. The specific role of West in the fake ring tone scheme, and whether it was responsible for rural call completion failures that T-Mobile failed to correct, is not explained in the FOIA production, but West may also be a co-conspirator, or one of the Doe Defendants, which Plaintiffs will investigate further in discovery and reserve the right to accordingly amend their pleadings.

**Answer to Paragraph 281:** Defendant TMUS states that the allegations of this paragraph purport to characterize the cited document, denies that the allegations of this paragraph accurately and/or completely describe the cited document, respectfully refers the Court to the document for its contents and context, and denies all inconsistent allegations. Further answering, Defendant TMUS otherwise denies the allegations in this paragraph, including that there was any "fake ringtone scheme."

**Paragraph 282:** The November 6, 2019 FOIA Production also reveals that T-Mobile informed the Commission that fake ring tones were implemented by Ericsson on Ericsson Mobile Switching Centers at T-Mobile's direction. *See* Declaration of Kathleen Foster (Exhibit 19), ¶ 7. The Foster Declaration does not explain: (1) why Ericsson would agree to implement fake ringtones in October 2013, the same time that the FCC announced it was prepared to adopt an order, which would ultimately codify the prohibition of using fake ringtones; (2) whether Ericsson was aware of T-Mobile's continued use of the fake ring tones after the FCC's *2013 Rural Call Completion*

*Order* became effective; and (3) whether Ericsson had any role in the expanded use of fake ringtones in September 2015. Ericsson may also be a co-conspirator, or one of the Doe Defendants, which Plaintiffs will investigate further in discovery and reserve the right to accordingly amend their pleadings.

**Answer to Paragraph 282:** Defendant TMUS states that the allegations of this paragraph purport to characterize Exhibit 19 to the SAC, denies that the allegations of this paragraph accurately and/or completely describe Exhibit 19 to the SAC, respectfully refers the Court to Exhibit 19 to the SAC for its contents and context, and denies all inconsistent allegations. Defendant TMUS otherwise denies the remaining allegations in this paragraph.

### O. T-Mobile's Actions Show No Remorse

**Paragraph 283:** T-Mobile's CEO at the time of the *Consent Decree*, John Legere often referred to T-Mobile's competitors, AT&T and Verizon, as dumb and dumber. He said that they are not "interested in their customers." *T-Mobile's Legere on Customer Growth, Strategy and Competition*, YOUTUBE (Feb. 8, 2018), https://www.youtube.com/watch?v=NSEph9pCX5Y (last visited Dec. 9, 2020). Legere made these types of statements while simultaneously downplaying or refusing to discuss T-Mobile's fraudulent conduct that harms its own customers.

**Answer to Paragraph 283:** Defendant TMUS states that the allegations of this paragraph purport to characterize the cited video, denies that the allegations of this paragraph accurately and/or completely describe the video, respectfully refers the Court to the video for its contents and context, and denies all inconsistent allegations. Defendant TMUS denies the remaining allegations in this paragraph to the extent they are intended to imply actionable wrongdoing by Defendant TMUS.

**Paragraph 284:** For example, during testimony before the House Energy and Commerce Committee, the following exchange between Legere and Congressman Peter Welch of Vermont took place:

> REP. WELCH: Last February Congress passed and the president signed some bi-partisan legislation that I worked on with David Young – improving rural call quality. And it turned out that shortly after that bill became law T-Mobile and Sprint – the FCC announced that T-Mobile agreed to pay forty million dollars. Forty million dollars in a fine for violating FCC rules with a practice of faking ring tones. I mean, this is a big deal for us in Vermont. Dacon farms and the Christmas season depends

on those calls. Camel's Hump School gets the word out that it's been cancelled because weather. And in the settlement T-Mobile acknowledged that it had injected false ring tones into hundreds of millions of calls. I mean that's really upsetting to us and I'm struggling to see how this past gives me confidence about the future so Mr. Legere can you explain how T-Mobile did fail to abide by the basic call quality standards and not connecting hundreds of millions of calls in rural America but very briefly because we don't have much time.

LEGERE: Yeah, so you know the details associated with the settlement associated with that action are far more complex and I'm not sure we could go into the process here.

REP. WELCH: Maybe offline we could do that.

LEGERE: I'd be glad to.

REP. WELCH: Because that's incredible. What is – your admitting to, T-Mobile admitted to is that actually had the system of false ring tones.

LEGERE: ***There was no admission to a willingness participation of any kind***.

REP. WELCH: Well that's, you and I both know that's sort of the deal but it happened.

House Committee on Energy & Commerce, Subcommittee on Communications and Technology, *Hearing on "Protecting Consumers and Competition: An Examination of the T-Mobile and Sprint Merger"* (Feb. 13, 2019), https://energycommerce.house.gov/committee-activity/hearings/hearing-on-protecting-consumers-and-competition-an-examination-of-the-t (last visited Dec. 9, 2020) (emphasis added).

**<u>Answer to Paragraph 284:</u>** Defendant TMUS states that the allegations of this paragraph purport to characterize the cited testimony before the House Energy and Commerce Committee, denies that the allegations of this paragraph accurately and/or completely describe the cited testimony before the House Energy and Commerce Committee, respectfully refers the Court to the cited testimony before the House Energy and Commerce Committee for its contents and context, and denies all inconsistent allegations. Defendant TMUS otherwise denies the remaining allegations in this paragraph.

**Paragraph 285:** T-Mobile refers to itself as the "Un-carrier" to suggest that it is different and better than its competitors. It pledges to operate as a "maverick." Memorandum from Chairman Frank Pallone, Jr., Committee on Energy & Commerce, to Subcommittee on Communications and Technology Members and Staff at 3 (Feb. 8, 2019).

**Answer to Paragraph 285:** Defendant TMUS states that the allegations of this paragraph purport to characterize the cited document, denies that the allegations of this paragraph accurately and/or completely describe the document, respectfully refers the Court to the websites and document for its contents and context, and denies all inconsistent allegations. Defendant TMUS otherwise denies the remaining allegations in this paragraph.

**Paragraph 286:** In reality, however, T-Mobile has repeatedly engaged in unfair and deceptive practices. For example, in addition to its fake ring tone scheme and rural call completion failures, T-Mobile previously agreed to pay a $90 million fine and restitutions to settle an investigation by the FCC into its wireless cramming practices, in which T-Mobile charged consumers for third party services that the customers had not authorized. *See* FCC Documents, *T-Mobile to Pay $90M to Settle Wireless Cramming Investigation* (Dec. 19, 2014), https://www.fcc.gov/document/t-mobile-pay-90m-settle-wireless-cramming-investigation (last visited Dec. 9, 2020). In September 2019, the City of New York announced that it had sued T-Mobile and its MetroPCS brand in New York for engaging in "multiple deceptive practices, including selling used phones as new, enrolling customers in expensive financing plans without their consent, deceiving consumers about its refund policy, overcharging customers and failing to provide customers with legal receipts City of New York, *City Sues T-Mobile for Violating Consumer Protection Law* (Sept. 5, 2019), https://www1.nyc.gov/office-of-the-mayor/news/415-19/city-sues-t-mobile-violating-consumer-protection-law (last visited Dec. 9, 2020); *City of New York et al v T-Mobile USA et al*, Case No. 451540/2019 (NY Cty. Sup. Ct.). Motions to Dismiss filed by T-Mobile and MetroPCS were denied in March 2020.

**Answer to Paragraph 286:** Defendant TMUS states that the allegations of this paragraph purport to characterize the cited websites and documents, denies that the allegations of this paragraph accurately and/or completely describe the websites and documents, respectfully refers the Court to the websites and documents for their contents and context, and denies all inconsistent allegations. Defendant TMUS otherwise denies the allegations in this paragraph, including that there was any "fake ringtone scheme" or "rural call completion failures."

**Paragraph 287:** T-Mobile is "intent on kicking the asses of [its] competitors." *John Legere*, *CEO of T-Mobile, The Brave Ones* at 14:50-57, YOUTUBE (Oct. 28, 2017), https://www.youtube.com/watch?v=U nb5JJeIgJI (last visited Dec. 9, 2020). T-Mobile's CEO,

John Legere, has accused other wireless carriers of "raping" their customers "for every penny" and "hat[ing]" people. *Id.* at 14:17-26. According to Legere, other "Carriers just want to screw [people]," while T-Mobile "just want[s] to take you to dinner and a movie." *E.g., id.* at 20:48-54. Far from taking its customers to dinner and a movie, however, T-Mobile has taken its customers for a ride, taking their hard earned money while intentionally failing to deliver their calls to their intended destination and intentionally and fraudulently deceiving them through the use of fake ring tones.

**Answer to Paragraph 287:** Defendant TMUS states that the allegations of this paragraph purport to characterize the cited websites, denies that the allegations of this paragraph accurately and/or completely describe the websites, respectfully refers the Court to the websites for their contents and context, and denies all inconsistent allegations. Defendant TMUS otherwise denies the remaining allegations in this paragraph.

**Paragraph 288:** T-Mobile cultivated an image of itself as a rule-breaker. *See, e.g.*, Lucy Handley, *The Brave Ones, John Leger: T-Mobile's rule breaker*, CNBC (Nov. 27, 2017), https://www.cnbc.com/2017/11/24/t-mobile-ceo-john-legere-on-twitter-his-rivals-and-being-an-uncarrier.html (last visited Dec. 9, 2020). This mentality that it is ok to break the rules, even the law, permeates T-Mobile's culture. And, the company has utilized aggressive class action waivers and arbitration provisions in its service agreements to avoid being held responsible by its customers for this fraudulent conduct. *See, e.g.*, T-Mobile Terms and Conditions ("By accepting these T&Cs, you are agreeing to resolve any dispute with us through binding arbitration or small claims dispute procedures (unless you opt out), and to waive your rights to a jury trial and to participate in any class action suit."), https://www.t-mobile.com/responsibility/legal/terms-and-conditions (last visited Dec. 9, 2020).

**Answer to Paragraph 288:** Defendant TMUS states that the allegations of this paragraph purport to characterize the cited news article and website, denies that the allegations of this paragraph accurately and/or completely describe the news article and website, respectfully refers the Court to the news article and website for their contents and context, and denies all inconsistent allegations. Defendant TMUS otherwise denies the remaining allegations in this paragraph.

**Paragraph 289:** Thus, despite the $40 million forfeiture paid to the U.S. Treasury as a result of the *Consent Decree*, and its admission of wrongdoing, T-Mobile has undertaken no effort to compensate affected customers. *See, e.g.*, Jon Brodkin, *T-Mobile deceived customers with "false ring tones" on failed phone calls*, ARS TECHNICA (Apr. 16, 2018, 6:30 PM), https://arstechnica.com/information-technology/2018/04/t-mobile-deceived-customers-with-false-ring-tones-on-failed-phone-calls/ (last visited Dec. 9, 2020). It did not even issue a press release to apologize to its customers for its unlawful conduct.

**Answer to Paragraph 289:**  Defendant TMUS states that the allegations of this paragraph purport to characterize the cited news article, denies that the allegations of this paragraph accurately and/or completely describe the cited news article, respectfully refers the Court to the cited news article for its contents and context, and denies all inconsistent allegations.  Defendant TMUS otherwise denies the remaining allegations in this paragraph.

**Paragraph 290:**  Indeed, Commissioner Mignon Clyburn took issue with the *Consent Decree* for this very reason, stating, in relevant part:

> I wish that I could celebrate today's settlement as a victory for consumers and a moment in which the Commission championed consumer protection. Unfortunately, I cannot.  With today's item, the Chairman has missed an opportunity to protect consumers and betrayed his own self-professed values when it comes to process.
>
> Today's *Consent Decree* attempts to address massively deceptive and harmful violations of the Commission's rules likely impacting billions— yes, billions—of telephone calls to rural areas over the past several years. According to the *Consent Decree*, T-Mobile admits to inserting false ringtones into calls that failed to connect.  This may have affected 'hundreds of millions of calls each year' after the practice was expressly prohibited by the Commission in January 2014.[4] This meant that consumers making calls to certain rural areas would hear ringing on their end even if the call was not actually connecting and the phone was not actually ringing at the called party's premises.  The deception made it difficult to pinpoint the problem and resolve it—consumers would think that their service was working and that the person at the other end just did not pick up.
>
> How many times was a loved one calling to check on the wellbeing of an elderly relative, only to have the phone ring and ring with no answer? How many times did a consumer try calling his or her doctor for an urgent refill of an important prescription, only to think that nobody was picking up on the other end of the call? Childcare providers, employers, local businesses, old friends—what critical information was missed?
>
> How did the Commission address this situation? With a severely mismatched *Consent Decree*, negotiated by the Chairman's office.  The $40 million civil penalty, which will be paid to the U.S. Treasury, is dwarfed by larger, unpaid fines recently proposed against individual robocallers—and the volume of potential violations here outpaces any robocalling action the

---

[4] *T-Mobile USA, Inc.,* Order and Consent Decree, DA 18-373 (Apr. 2018).

Commission has taken. And the compliance plan does not contain any concessions that would explain such a massive discount.

Perhaps most importantly, there is absolutely nothing in this *Consent Decree* to compensate consumers. Prior *Consent Decrees* have included direct-to-consumer benefits, such as refunds or discounts, or notifications to customers who have been impacted.[5] Despite demonstrating a clear and tangible consumer harm, in this *Consent Decree*, consumers are treated as a mere afterthought.

(Attached hereto as Exhibit 17, Commissioner Clyburn Statement of False Ringtones *Consent Decree* (Apr. 16, 2018).)

**Answer to Paragraph 290:** Defendant TMUS states that the allegations of this paragraph purport to characterize Exhibit 17 to the SAC, denies that the allegations of this paragraph accurately and/or completely describe the Exhibit 17 to the SAC, respectfully refers the Court to the Exhibit 17 to the SAC for its contents and context, and denies all inconsistent allegations. To the extent a further response is required, Defendant TMUS admits that the quoted language appears in Exhibit 17 to the SAC but denies the allegations in this paragraph insofar as the quoted language is taken out of context and denies that Plaintiffs have any viable claim against TMUS.

**Paragraph 291:** On November 6, 2019, following T-Mobile's objections to the FCC's production of almost every document in the Commission's investigatory file, the Commission produced 501 additional pages of documents in response to the FOIA request. Several of the documents include redactions. According to the Commission, prior to disclosing the documents to requestors, T-Mobile was given an opportunity to request modifications to those redactions and the Commission acquiesced to T-Mobile's changes. The Commission has also withheld 376 pages of relevant materials in full due to T-Mobile's objections.

**Answer to Paragraph 291:** Defendant TMUS states that it was given the opportunity to request modifications to the redactions in the FCC's production, and that the FCC withheld and/or redacted certain documents. Defendant TMUS has insufficient information upon which to form a belief as to the truth of the remaining allegations in this paragraph and therefore denies those allegations.

---

[5] *See, e.g., T-Mobile USA, Inc.,* Order and Consent Decree, 31 F.C.C .Rcd .11410 (EB 2016); *Birch Communications, Inc.,* Order and Consent Decree, 31 F.C.C. Rcd. 13510 (EB 2016); *AT&T Services, Inc.,* Order and Consent Decree, 31 F.C.C. Rcd. 8540 (EB 2016); *AT&T Mobility LLC,* Order and Consent Decree, 29 F.C.C. Rcd. 11803 (EB 2014).

**Paragraph 292:** The November 6, 2019 FOIA Production also reveals that T-Mobile repeatedly provided false, incomplete, or misleading information to the Commission during the course of its investigation. For example, two key documents produced by the FCC illustrate that T-Mobile tried to hide key information from the FCC and proffered implausible excuses for its egregious violation of the FCC's ban on the use of fake ring tones. The first document is T-Mobile's July 12, 2017 response to the Enforcement Bureau's April 3, 2017 Supplemental Letter of Inquiry ("LOI"), attached hereto as Exhibit 20 ("July LOI Response"). In the July LOI Response, T-Mobile revised the response it previously provided to the Commission about its use of fake ring tones.

**Answer to Paragraph 292:** Defendant TMUS states that the allegations of this paragraph purport to characterize Exhibit 20 to the SAC, denies that the allegations of this paragraph accurately and/or completely describe the Exhibit 20 to the SAC, respectfully refers the Court to the Exhibit 20 to the SAC for its contents and context, and denies all inconsistent allegations. Defendant TMUS otherwise denies the remaining allegations in this paragraph.

**Paragraph 293:** T-Mobile's July LOI Response explained T-Mobile's intentional activation and use of the fake ring tones as follows:

> In 2007, T-Mobile began using Alcatel Lucent call servers that included as a default a five-second Local Ring Back Tone ("LRBT"). That LRBT covered **all** traffic originating on T-Mobile networks. In late 2008, T-Mobile began using Ericsson call servers in Puerto Rico and North and South Carolina, and in early 2009 it began using Ericsson call servers in New York and California. In July 2013, T-Mobile began migrating its remaining markets to Ericsson call servers, a migration that T-Mobile completed in July 2014. The Ericsson call servers did not initially include LBRT (*sic*). However, **at T-Mobile's request, Ericsson modified the call servers by adding a four-second LRBT feature. The rollout of the four-second LRBT on Ericsson equipment began in October 2013 and was likely completed by the end of 2013.** The four-second LRBT on Ericsson equipment **applied to all** out-of-network traffic originating on T-Mobile networks (i.e., calls from T-Mobile customers to non-T-Mobile customers) that was routed via Session Initiation Protocol (SIP) trunks. By the end of July 2015, MetroPCS traffic had fully migrated to the T-Mobile networks and was thus subject to the four-second LRBT on out-of-network traffic routed via SIP trunks. **In September 2015**, after T-Mobile determined that the four-second LRBT was not in service on all SIP routes, T-Mobile **implemented it on all remaining** SIP routes.

*Id.* (emphasis added).

**Answer to Paragraph 293:** Defendant TMUS states that the allegations of this paragraph purport to characterize Exhibit 20 to the SAC, denies that the allegations of this paragraph accurately and/or completely describe Exhibit 20 to the SAC, respectfully refers the Court to Exhibit 20 to the SAC for its contents and context, and denies all inconsistent allegations. Defendant TMUS denies the allegations in this paragraph to the extent they imply there was any intent by Defendant TMUS to violate FCC rules, and denies that Plaintiffs have any viable claim against TMUS.

**Paragraph 294:** The second is a declaration from Kathleen Foster dated September 8, 2017 and attached hereto as Exhibit 19. Ms. Foster was a Senior Manager of Core Network Engineering until she became Director of Network Technology in May 2015. *Id.*

**Answer to Paragraph 294:** Defendant TMUS states that the allegations of this paragraph purport to characterize Exhibit 19 to the SAC, denies that the allegations of this paragraph accurately and/or completely describe Exhibit 19 to the SAC, respectfully refers the Court to Exhibit 19 to the SAC for its contents and context, and denies all inconsistent allegations. To the extent a further response is required, Defendant TMUS admits the allegations in this paragraph.

**Paragraph 295:** Ms. Foster's declaration states in relevant part as follows:

> 5. In my current role, I oversee the engineers who design and manage the operation of the voice core of T-Mobile's Network, including the Mobile Switching Centers (MSCs). In that role, I was responsible for the integration of Ericsson MSCs (servers) into T-Mobile's Network, including the addition to those servers, and continued use on those servers, of the "early ringing tone" (also referred to as "Local Ring Back Tone," or LRBT) parameter during the 2013-January 2017 period.

> 6. During the period in which T-Mobile began to swap its Alcatel - Lucent (ALU) MSCs for those provided by Ericsson, an inter-networking problem arose such that, for certain calls originating on Ericsson servers but connecting using ALU servers, no ring tone was transmitted back to the calling party even after a call was delivered to the terminating carrier and the called party received a ring tone. Specifically, for certain calls, the calling party did not hear a ring tone even when the call had been delivered to the terminating carrier and the called party's phone was ringing. Rather, the calling party heard dead air until the called party answered the call or the call went to the called party's voice mail.

7.      To address this problem, **on or about October 14, 2013, we made a request to Ericsson that the early ringing tone be implemented in the Ericsson MSCs**.  The **LRBT parameter was expanded** after the completion of the ALU-Ericsson migration, consistent with the company's practice of having various features and parameters uniformly applied throughout its network to the extent possible.

8.      **I now realize that I and others on my team had received notifications beginning in early 2014 about the FCC's 2013 Rural Call Completion Order (RCC Order) and its contents, including the ban on early ringtone use for voice calls.**  At that time, my team and I were very focused on the reporting and recordkeeping aspects of the RCC Order because the company itself was focused on ensuring that it would be ready to collect and report the required data when the record-keeping, reporting, and retention requirements became effective.   T-Mobile did not have mechanisms in place to report this data when the RCC Order was released in 2013.  **Over the course of the next two years, I and other T-Mobile personnel expended considerable time and resources to develop the systems necessary to collect and report such data**.

9.      When I was contacted internally about the FCC's Letter of Inquiry in early January 2017, I focused for the first time on the RCC Order's early ringing tone ban.  We immediately began to disable the LRBT parameter.

10.      That **neither I nor anyone on my team became consciously aware of the RCC Order's early ringtone ban** after it went into effect in 2014 was the result of a good-faith mistake.   T-Mobile's use of the LRBT parameter was not the result of any malice, ill -intent or conscious scheme to harm consumers.  I had no intent to ignore or circumvent the early ringtone rule, nor was I ever asked or directed to do so by anyone at T-Mobile.

*Id.* (emphasis added).

**Answer to Paragraph 295:**  Defendant TMUS states that the allegations of this paragraph purport to characterize Exhibit 19 to the SAC, denies that the allegations of this paragraph accurately and/or completely describe Exhibit 19 to the SAC, respectfully refers the Court to Exhibit 19 to the SAC for its contents and context, and denies all inconsistent allegations.  To the extent a further response is required, Defendant TMUS admits that the quoted language appears in Exhibit 19 to the SAC but denies the allegations in this paragraph insofar as the quoted language is taken out of context and denies that Plaintiffs have any viable claim against TMUS.

**Paragraph 296:**  When reviewed together, the July LOI Response and Foster Declaration show the following:

- T-Mobile's engineering team affirmatively asked Ericsson to implement the fake ring tones on its Ericsson servers in October 2013, and Ericsson complied with this request, despite publication about the Commission's proposal to ban fake ring tones and its announcement that the issue was on the October 2013 agenda.  Upon information and belief, T-Mobile's, as well as Ericsson's, legal and regulatory compliance professionals must have been aware of the impending fake ring tone ban.  It made no sense to implement fake ring tones on all out-of-network T-Mobile traffic during the last three months of 2013 when the practice was being banned.  The timing of T-Mobile's implementation of the fake ring tones, with the assistance of Ericsson, reflects willful intent by T-Mobile to violate the ban.

- T-Mobile omitted material information from its LOI responses concerning how it expanded the use of the fake ring tones in September 2015, and who else was involved.  T-Mobile told the FCC it implemented the fake ring tones on "all" out-of-network traffic originating on T-Mobile networks in 2014, but separately and inconsistently reported that "[i]n September 2015, after T-Mobile determined that the four-second LRBT was *not* in service on *all* SIP routes, T-Mobile implemented it on all remaining SIP routes."  (Emphasis added).  Yet T-Mobile's LOI Response does not indicate whether this "implementation" of the fake ring tones was done over more Ericsson servers or through some other servers, perhaps Inteliquent's servers.  It also fails to speak to whether the September 2015 "implementation" of the fake ring tones on more SIP routes coincides with Inteliquent becoming T-Mobile's exclusive nationwide intermediate provider on SIP routes under the PSTN Agreement at the same time.  T-Mobile's failure to provide any details to the FCC about who, where, and why fake ring tones were expanded in September 2015 obfuscated the identity of a co-conspirator.

- Ms. Foster's testimony to the FCC proffers an implausible excuse for T-Mobile's violation of the fake ring tone ban – her entire team was too focused on developing systems to comply with the Commission's rural call completion reporting requirements for anyone to notice that they had to stop using fake ring tones, despite multiple "notifications" regarding the ban.  In addition to it being unfathomable that T-Mobile overlooked the fake ring tone ban, given its presumptive keen awareness of the ban through its highly competent inside and outside legal, regulatory and compliance staff, Ms. Foster's excuse is incompatible with the PSTN Agreement's delegation to Inteliquent of the responsibility to collect the data required to comply with the rural call completion reporting requirements.

**Answer to Paragraph 296:**  Defendant TMUS states that the allegations of this paragraph purport

to characterize the cited declaration and response, denies that the allegations of this paragraph

accurately and/or completely describe the declaration or response, respectfully refers the Court to

131

the declaration and response for their contents and context, and denies all inconsistent allegations.

Defendant TMUS otherwise denies the remaining allegations in this paragraph.

**Paragraph 297:** The FOIA production also revealed for the first time that in addition to the call routing and fake ringtone issues, the FCC's investigation into T-Mobile also included investigation of T-Mobile providing false information on the Form 480 rural call completion reports that T-Mobile submitted to the FCC. Specifically, T-Mobile's Form 480 reports represented that there were zero call attempts made to some of the rural LECs in Wisconsin who were experiencing significant call completion issues, which had prompted the FCC's investigation. T-Mobile admitted that "algorithms used to compute call attempts by T-Mobile customers for purposes of generating its quarterly Form 480 reports contained errors that results in the reports for the second and third quarters of 2016 reporting zero call attempts to certain rural OCNs." According to subsequent responses from T-Mobile, T-Mobile eventually admitted that *all* of its Form 480 reports prior to the FCC's investigation included inaccurate information.

**Answer to Paragraph 297:** Defendant TMUS states that the allegations of this paragraph purport to characterize the cited Form 480 reports, denies that the allegations of this paragraph accurately and/or completely describe the cited Form 480 reports, respectfully refers the Court to the cited Form 480 reports for their contents and context, and denies all inconsistent allegations. Defendant TMUS denies that it intended to provide any inaccurate information to the FCC.

**Paragraph 298:** In another instance, it became clear that T-Mobile's original response to the FCC's Letter of Inquiry omitted complaints from MetroPCS subscribers. By this time, however, MetroPCS had been acquired by T-Mobile, its traffic had migrated to T-Mobile's network, and the issues experienced by T-Mobile subscribers impacted MetroPCS subscribers as well. The failure to include complaint information related to MetroPCS subscribers concealed the impact on those consumers.

**Answer to Paragraph 298:** Defendant TMUS states that the allegations of this paragraph purport to characterize the cited document, denies that the allegations of this paragraph accurately and/or completely describe the document, respectfully refers the Court to the document for their contents and context, and denies all inconsistent allegations. Defendant TMUS otherwise denies the remaining allegations in this paragraph to the extent they are intended to imply actionable wrongdoing by Defendant TMUS.

**Paragraph 299:** The FCC proposed slapping "one of the highest proposed forfeitures in the agency's history" on T-Mobile in response to its flagrant violation of FCC's rules. In order to

avoid such a significant forfeiture penalty, T-Mobile's lawyers argued that T-Mobile's "behavior did not cause consumer harm of the type the [fake ringtone rule] was designed to prevent." *See* Supplemental Response of T-Mobile USA, Inc. (Sept. 8, 2017), Exhibit 18, at 4-5. This argument is specious. As the Commission concluded in the *2013 Rural Call Completion Order*, a consumer is harmed any time he or she is deceived into believing that his or her call has reached the intended destination when, in fact, it has not, or when a consumer wrongly concludes that the rural carrier is responsible for the call failure. And, as T-Mobile admitted, "early audible ringing is by its nature deceptive." *Id.* at 12, n.54. The ban against the use of fake ring tones was specifically intended to stop CMRS carriers, like T-Mobile, from deceiving consumers into believing that "the terminating rural provider is responsible for the call failure." *2013 Rural Call Completion Order*, ¶ 114.

**Answer to Paragraph 299:** Defendant TMUS states that the allegations of this paragraph purport to characterize Exhibits 9 and 18 to the SAC, denies that the allegations of this paragraph accurately and/or completely describe Exhibits 9 and 18 to the SAC, respectfully refers the Court to Exhibits 9 and 18 to the SAC for their contents and context, and denies all inconsistent allegations. Further answering, Defendant TMUS states that this paragraph states legal conclusions and that legal conclusions are for the Court to make, but denies that Plaintiffs have any viable claim against TMUS.

**Paragraph 300:** The evidence demonstrates that even after the FCC's fake ringtone ban was implemented, T-Mobile not only violated the FCC's rules but also continued to falsely represent to its customers that rural carriers like Plaintiffs were to blame for call failures. Thus, T-Mobile appears to have engaged in deception during the course of the Commission's investigation in an effort order to avoid "the highest proposed forfeitures in the agency's history."

**Answer to Paragraph 300:** Defendant TMUS denies the allegations in this paragraph.

**Paragraph 301:** T-Mobile has undertaken no effort to compensate the carriers that it harmed by its defiance of the Commission's rules.

**Answer to Paragraph 301:** Defendant TMUS denies the allegations in this paragraph.

**Paragraph 302:** In contrast to its potential exposure of violations of the FCC's rules, the $40 million T-Mobile paid to the U.S Treasury is a paltry sum. Congress has invested the Commission with substantial power to impose steep forfeiture penalties. *See* 47 U.S.C. § 503.

**Answer to Paragraph 302:** Defendant TMUS states that the allegations of this paragraph purport to characterize 47 U.S.C. § 503, denies that the allegations of this paragraph accurately and/or

completely describe 47 U.S.C. § 503, respectfully refers the Court to 47 U.S.C. § 503 for its contents and context, and denies all inconsistent allegations. Further answering, Defendant TMUS states that this paragraph states legal conclusions and that legal conclusions are for the Court to make, but denies that Plaintiffs have any viable claim against TMUS.

**Paragraph 303:** In 2018, a common carrier could be assessed a forfeiture of $196,387 *per violation. See* 47 C.F.R. § 1.80(b)(9)(i)-(ii); *In the Matter of Amendment of Section 1.80(B) of the Commission's Rules*, 33 FCC Rcd. 46 (Jan. 5 2018) (Attachment A; 2018 Maximum Forfeiture Penalty for 47 U.S.C. § 503(b)(2)(B)).

**Answer to Paragraph 303:** Defendant TMUS states that the allegations of this paragraph purport to characterize the cited statute and decision, denies that the allegations of this paragraph accurately and/or completely describe the cited statute and decision, respectfully refers the Court to the cited statute and decision for their contents and context, and denies all inconsistent allegations. Further answering, Defendant TMUS states that this paragraph states legal conclusions and that legal conclusions are for the Court to make, but denies that Plaintiffs have any viable claim against TMUS.

**Paragraph 304:** CMRS providers, like T-Mobile, "will be treated as common carriers for purposes of Section 503 of the Act and [the Commission's] forfeiture guidelines." *In the Matter of the Commission's Forfeiture Policy Statement and Amendment of Section 1.89 of the Rules to Incorporate the Forfeiture Guidelines*, Report and Order, 12 F.C.C. Rcd. 17087, 17096, ¶ 16 (July 28, 1997).

**Answer to Paragraph 304:** Defendant TMUS states that the allegations of this paragraph purport to characterize the cited document, denies that the allegations of this paragraph accurately and/or completely describe the cited document, respectfully refers the Court to the cited document for its contents and context, and denies all inconsistent allegations. Further answering, Defendant TMUS states that this paragraph states legal conclusions and that legal conclusions are for the Court to make, but denies that Plaintiffs have any viable claim against TMUS.

**Paragraph 305:** The Commission has adopted a series of "base forfeiture amounts," for specific violations while recognizing that the list is not exhaustive and that for "large or highly profitable

communications entities, the base forfeiture amounts . . . are generally low." *Id.* at 17099, ¶¶ 22-24. The Commission has recognized, therefore, the forfeitures generally should be higher for larger entities in order to ensure that "forfeitures issued against large or highly profitable entities are not considered merely an affordable cost of doing business." *Id.* at 17099, ¶ 24. The Commission will "take into account the subject violator's ability to pay in determining the amount of a forfeiture" and forfeitures against them will "in many cases be above, or even well above, the relevant base amount." *Id.* at 17099-17100, ¶ 24.

**Answer to Paragraph 305:** Defendant TMUS states that the allegations of this paragraph purport to characterize the cited document, denies that the allegations of this paragraph accurately and/or completely describe the cited document, respectfully refers the Court to the cited document for its contents and context, and denies all inconsistent allegations. Further answering, Defendant TMUS states that this paragraph states legal conclusions and that legal conclusions are for the Court to make, but denies that Plaintiffs have any viable claim against TMUS.

**Paragraph 306:** In establishing a forfeiture, the Commission will also "consider factors such as 'the degree of culpability, any history of prior offenses, ability to pay, and such other factors as justice may require." *Id.* at 17100, ¶ 27 (quoting 47 U.S.C. § 503(b)(2)(E)).

**Answer to Paragraph 306:** Defendant TMUS states that the allegations of this paragraph purport to characterize the cited regulation and statute, denies that the allegations of this paragraph accurately and/or completely describe the cited regulation and statute, respectfully refers the Court to the cited regulation and statute for their contents and context, and denies all inconsistent allegations.

**Paragraph 307:** Based on Commission precedent, each insertion of a fake ringtone by T-Mobile would constitute a separate violation of the Commission's rule and the Communication Act that could result in a separate forfeiture penalty.

**Answer to Paragraph 307:** Defendant TMUS states that this paragraph states legal conclusions and that legal conclusions are for the Court to make, but denies that Plaintiffs have any viable claim against TMUS. To the extent that a response is required, Defendant TMUS denies the allegations in this paragraph.

**Paragraph 308:** The Communications Act also provides that "any carrier who knowingly violates" 47 U.S.C. § 202(a)'s prohibition against unjust or unreasonable discrimination shall "forfeit to the United States the sum of $[12,081] for each such offense." 47 U.S.C. § 202(c); 47 C.F.R. § 1.80(b)(9)(ii) (adjusted for inflation).

**Answer to Paragraph 308:** Defendant TMUS states that the allegations of this paragraph purport to characterize the cited regulations, denies that the allegations of this paragraph accurately and/or completely describe the cited regulations, respectfully refers the Court to the cited regulations for its contents and context, and denies all inconsistent allegations.

**Paragraph 309:** In comparison to the meager $40 million T-Mobile voluntarily paid, the Commission recently imposed a fine of $120 million against a company and its founder after concluding that that company had made more than 96 million spoofed robocalls during a three-month period in violation of the Truth in Caller ID Act of 2009. *See In the Matter of Adrian Abramovich, et al.*, Notice of Apparent Liability for Forfeiture, 32 F.C.C. Rcd. 5418 (June 22, 2017) ("*NAL*"); *In the Matter of Adrian Abrmovich, et al.*, Forfeiture Order, 33 F.C.C. Rcd. 4663 (May 10, 2018) ("*Forfeiture Order*"). In calculating this amount, the Commission considered that it had specifically examined 80,000 calls that involved unlawful caller ID spoofing and applied a base forfeiture amount of $1,000 per spoofed call, totaling $80 million, "well below the maximum" that it could have imposed. *NAL*, 32 F.C.C. Rcd. at 5426, ¶ 25. Then, the Commission determined that the "circumstances in this case merit a significant upward adjustment," and concluded that an additional $40 million forfeiture should be added. *Id.* at 5427, ¶ 26. The Commission rejected arguments from Abramovich that the forfeiture violated his due process rights or was excessive in light of his inability to pay. *See Forfeiture Order*, ¶¶ 23 – 30.

**Answer to Paragraph 309:** Defendant TMUS states that the allegations of this paragraph purport to characterize the cited Forfeiture Order, denies that the allegations of this paragraph accurately and/or completely describe the cited Forfeiture Order, respectfully refers the Court to the cited Forfeiture Order for its contents and context, and denies all inconsistent allegations. Defendant TMUS further denies that the payment it made under the terms of the Consent Decree was "meager."

**Paragraph 310:** T-Mobile argued to the FCC that it should not have a similar penalty imposed on it. *See* Supplemental Response of T-Mobile USA, Inc. (Sept. 8, 2017), Exhibit 18, at 7-10. According to T-Mobile, Abramovich's conduct was more egregious because it included false representations and misled consumers. *Id.* As T-Mobile has admitted, however, "early audible ringing is by its nature deceptive." *Id.* at 12, n.54. T-Mobile deceived consumers, tricked them into blaming rural carriers, and did so all in order reduce its liability for access charges for high cost codes. This selfish, self-serving, and deceptive conduct is all the more despicable for a

company that utilizes the public airwaves to provide its services and is already making billions of dollars annually. It is pure greed.

**Answer to Paragraph 310:** No response is required because the allegations in this paragraph relate to Defendant TMUS's pending motion to dismiss, to which the Court is respectfully referred. To the extent that a response is required, Defendant TMUS states that the allegations of this paragraph purport to characterize the cited document, denies that the allegations of this paragraph accurately and/or completely describe the cited document, respectfully refers the Court to the cited document for its contents and context, and denies all inconsistent allegations. Further answering, Defendant TMUS states that this paragraph states legal conclusions and that legal conclusions are for the Court to make, but denies that Plaintiffs have any viable claim against TMUS. To the extent a further response is required, Defendant TMUS denies the allegations in this paragraph.

**Paragraph 311:** Indeed, according to recent news reports, T-Mobile's former CEO John Legere, despite overseeing illegal conduct and what appears to have been the largest fraud ever perpetuated against telecommunications subscribers, left his post with the company shortly after this case was filed. But, rather than publicly condemning his failures, T-Mobile's board is rewarded him with a $96 million exit package according to news reports.

**Answer to Paragraph 311:** Defendant TMUS states that its former CEO John Legere was provided with an exit package consistent with his compensation agreement. Defendant TMUS denies the remaining allegations in this paragraph.

**Paragraph 312:** Given the magnitude and longevity of T-Mobile's illegal conduct, its high degree of moral culpability, its substantially greater ability to pay, and the fact that it violated both 47 U.S.C. § 201 and 47 U.S.C. § 202, T-Mobile could have easily faced penalties totaling hundreds of billions of dollars.

**Answer to Paragraph 312:** Defendant TMUS states that the allegations of this paragraph purport to characterize the cited regulations, denies that the allegations of this paragraph accurately and/or completely describe the cited regulations, respectfully refers the Court to the cited regulations for its contents and context, and denies all inconsistent allegations. Further answering, Defendant

TMUS states that this paragraph states legal conclusions and that legal conclusions are for the Court to make, but denies that Plaintiffs have any viable claim against TMUS. Defendant TMUS denies the remaining allegations in this paragraph.

**Paragraph 313:** While T-Mobile did not incur proportionate penalties at the FCC, the FCC extracted something far more valuable from T-Mobile, its admission of violation of the Commission's rules, which opens the door to the courthouse for the Plaintiffs so they may recover for the harm that T-Mobile and Inteliquent have caused them.

**Answer to Paragraph 313:** Defendant TMUS states that the allegations of this paragraph purport to characterize Exhibit 1 to the SAC (the Consent Decree), denies that the allegations of this paragraph accurately and/or completely describe Exhibit 1 to the SAC, respectfully refers the Court to Exhibit 1 to the SAC for its contents and context, and denies all inconsistent allegations. Further answering, Defendant TMUS states that this paragraph states legal conclusions and that legal conclusions are for the Court to make, but denies that Plaintiffs have any viable claim against TMUS. Defendant TMUS denies the remaining allegations in this paragraph.

> **P.** **Factual Allegations Relating To Named Plaintiffs**
>
> **i.** ***Plaintiff Craigville Telephone Co. Experienced T-Mobile Call Completion Problems Consistent With The Fake Ring Tone Scheme***

**Paragraph 314:** Plaintiff Craigville Telephone Company operates both an ILEC and a CLEC in northeastern Indiana. Craigville does business as AdamsWells Internet Telecom TV in and around Craigville, Indiana. The ILEC serves about 50 square miles with approximately 800 customers. Its CLEC servers an adjoining area to the north with about 2,000 customers.

**Answer to Paragraph 314:** Defendant TMUS has insufficient information upon which to form a belief as to the truth of the allegations in this paragraph and therefore denies those allegations.

**Paragraph 315:** AdamsWells has worked to combat systemic RCC problems for many years. As AdamsWells's General Manager wrote in a letter to the FCC's Commissioners in 2013:

> My wife's father, grandfather, and great-grandfather (and their wives) all worked extremely hard to keep this small rural company alive. Now, will this FCC promote or kill rural communications? In your hands is great responsibility.

Literally, our survival depends on whether our business customers can receive calls from their customers. By your lack of enforcement of **"rural call termination"** you may single-handedly destroy the viability of our company and others like us. If business customers pull their service from our network, the end will come for us and there is not one thing I can do to stop it.

I have spent much of this week in meetings, or on the phone, with business owners trying to explain our dilemma – I can't make a carrier (least cost router) deliver a call to you. They almost don't believe me!

\* \* \*

One of our largest business customers (300+ employees) informed me this week that they can no longer accept not receiving calls from their customers. They plan to move their telecom services back to a large national carrier. If this continues rural communications (and life in general) for our company and employees will never be the same.

**Answer to Paragraph 315:**  Defendant TMUS states the allegations of this paragraph purport to characterize a letter, denies that the allegations of this paragraph accurately and/or completely describe the letter, respectfully refers the Court to the letter for its contents and context, and denies all inconsistent allegations.  To the extent a response is required, Defendant TMUS has insufficient information upon which to form a belief as to the truth of the allegations in this paragraph and therefore denies those allegations.

**Paragraph 316:**  As relayed by Larry Landis, a Commissioner on the Indiana Utility Regulatory Commission, in a letter to the FCC Commissioners dated October 24, 2013:

Increasingly, rural providers are having to resort to extraordinary 'workarounds' in order to assure that the calls directed to them are ultimately delivered to their customers. In a last ditch effort for business customers bedeviled by call termination problems, Craigville Telephone has ported about 30 of its customer numbers to Indigital Telecom (Craigville is a minor shareholder) in Fort Wayne, Indiana. (Indigital Telecom has a Certificate of Territorial Authority from the IURC to operate as a CLEC, toll reseller, and wireless provider in Indiana.) The General Manger explains that Indigital call forwards a newly assigned (temporary) number back to the Craigville Telephone switching network and Craigville delivers the call to the customer. While this is a painful and time consuming process, they have no other alternative which will assure call delivery for these customers.

> There is no other way to describe the actions of the manipulative least cost routers than to characterize them for what they are: a perversion to the marketplace, illegal activity motivated by greed and reckless disregard for those attempting to play by the rules. Such activity must be crushed.

**Answer to Paragraph 316:** Defendant TMUS states the allegations of this paragraph purport to characterize a letter, denies that the allegations of this paragraph accurately and/or completely describe the letter, respectfully refers the Court to the letter for its contents and context, and denies all inconsistent allegations. To the extent a response is required, Defendant TMUS denies that the quoted language appears exactly as written in this paragraph in the cited letter but otherwise has insufficient information upon which to form a belief as to the truth of the allegations in this paragraph and therefore denies those allegations.

**Paragraph 317:** AdamsWells had significant and prolonged problems with calls originating on T-Mobile's network. During the period of February 2015 to April 2016, a T-Mobile subscriber located in Minneapolis, Minnesota experienced significant problems reaching her elderly parents who resided in Bluffton, Indiana and were subscribers to AdamsWells's telephone service. The T-Mobile subscriber maintained detailed records of her call completion problems, logging a total of 109 call attempts during this time period. Of those 109 call attempts, 56 of the calls were not completed. Several of the calls that were completed were dropped in less than a minute, according to the call logs maintained by the T-Mobile subscriber.

**Answer to Paragraph 317:** Defendant TMUS has insufficient information upon which to form a belief as to the truth of the allegations in this paragraph and therefore denies those allegations.

**Paragraph 318:** The T-Mobile subscriber reported several events that were consistent with the fake ring tone scheme. For example, the caller informed T-Mobile and AdamsWells that:

> I have to make repeated attempts to connect hearing one or two rings and dead air, ring no answer with no rings on my Parent's end, sometimes a single ring on their end and then no one or a dial tone, music, messages such as "you are unable to make long distance calls", and faint dial tones. Often when I do connect, the calls drop after a very short time and there are long delays such that we are speaking over one another.

**Answer to Paragraph 318:** Defendant TMUS denies the existence of a "fake ring tone scheme". Defendant TMUS has insufficient information upon which to form a belief as to the truth of the remaining allegations in this paragraph and therefore denies those allegations.

**Paragraph 319:** On March 14, 2015, the T-Mobile subscriber reported that she had "not received a call back from T-Mobile after contacting them regarding this issue for the 4th time."

**Answer to Paragraph 319:** Defendant TMUS has insufficient information upon which to form a belief as to the truth of the allegations in this paragraph and therefore denies those allegations.

**Paragraph 320:** On March 16, 2015, the T-Mobile subscriber again reported her problems to T-Mobile. According to an email sent by the T-Mobile subscriber to AdamsWells, T-Mobile suggested "one of the carriers between T-Mobile and Adamswells" may be responsible:

> I contacted T-Mobile again and my ticket was escalated to the Solutions Center and I spoke with Daniel. He spoke with the engineers and returned my call. They are contacting one of the carriers between T-Mobile and Adamswells where the calls are being routed to see if they can resolve this issue.

**Answer to Paragraph 320:** Defendant TMUS states the allegations of this paragraph purport to characterize an email, respectfully refers the Court to the email for its contents and context, and denies all inconsistent allegations. To the extent a response is required, Defendant TMUS has insufficient information upon which to form a belief as to the truth of the allegations in this paragraph and therefore denies those allegations.

**Paragraph 321:** When the T-Mobile subscriber did not receive an adequate response from T-Mobile, AdamsWells submitted a rural call completion ticket on her behalf to the FCC on March 17, 2015.

**Answer to Paragraph 321:** Defendant TMUS has insufficient information upon which to form a belief as to the truth of the allegations in this paragraph and therefore denies those allegations.

**Paragraph 322:** On March 24, 2015, Leah Tokar, part of the Executive Response team in the Office of T-Mobile's President/CEO, John Legere, wrote to Kurt Oliver at AdamsWells in response to the complaint submitted by AdamsWells on behalf of the T-Mobile subscriber, summarizing a conversation that occurred that same day. According to the letter, "T-Mobile engineering is working with a third party, Incomm in resolving" the concerns.

**Answer to Paragraph 322:** Defendant TMUS states the allegations of this paragraph purport to characterize a letter, respectfully refers the Court to the cited letter for its contents and context, and denies all inconsistent allegations. To the extent a response is required, Defendant TMUS has

insufficient information upon which to form a belief as to the truth of the allegations in this paragraph and therefore denies those allegations.

**Paragraph 323:**  On April 6, 2015, the T-Mobile subscriber spoke with Jordan at T-Mobile. According to notes provided by the T-Mobile subscriber:

> [Jordan] explained how calls are passed to intermediary parties to make the connection.  He worked with a company called InComm.  We did a test call where it rang 9 times and then failed.  My parent's said their phone rang twice and when they picked it up no one was there.

**Answer to Paragraph 323:**  Defendant TMUS states the allegations of this paragraph purport to characterize notes, respectfully refers the Court to the emails and calls for their contents and context, and denies all inconsistent allegations.  To the extent a response is required, Defendant TMUS has insufficient information upon which to form a belief as to the truth of the allegations in this paragraph and therefore denies those allegations.

**Paragraph 324:**  Routing changes made by Jordan seemed to resolve the issue for a period of time.   However, a few days later, on April 18, 2015, the T-Mobile subscriber reported that the problems had returned.  She reported several call attempts with "rings and dead air."  The T-Mobile subscriber also reported escalating her concerns to "Leah at the executive office of T-Mobile."

**Answer to Paragraph 324:**  Defendant TMUS has insufficient information upon which to form a belief as to the truth of the allegations in this paragraph and therefore denies those allegations.

**Paragraph 325:**  On June 1, 2015, the T-Mobile subscriber reported additional problems and a new trouble ticket was opened by T-Mobile.  When AdamsWells staff contacted T-Mobile to try to trouble shoot these issues, Jesse, a T-Mobile technician, was unable to assist, could not provide contact information for an escalation department, and suggested AdamsWells proceed with filing another complaint with the FCC.  As a result, AdamsWells filed another complaint with the FCC on behalf of the T-Mobile subscriber.

**Answer to Paragraph 325:**  Defendant TMUS has insufficient information upon which to form a belief as to the truth of the allegations in this paragraph and therefore denies those allegations.

**Paragraph 326:**  One June 12, 2015, the T-Mobile subscriber called T-Mobile and spoke with an individual named Brian.  According to notes maintained by the T-Mobile subscriber,

> [Brian] stated that Engineering had a successful test and closed the ticket
> and directed me to a retail store to check the sim card on my phone but it
> was most likely a network routing issue and re-opened a ticket. He said he
> would return my call the next day at 9AM which did not happen. Up until
> this point, T-Mobile seemed genuinely interested to attempting to resolve
> this issue even given how frustrating it had been. I have remained
> professional with T-Mobile throughout this process.

**Answer to Paragraph 326:** Defendant TMUS states that the allegations of this paragraph purport

to characterize notes, respectfully refers the Court to the cited notes for their contents and context,

and denies all inconsistent allegations. To the extent a further response is required, Defendant

TMUS has insufficient information upon which to form a belief as to the truth of the remaining

allegations in this paragraph and therefore denies those allegations.

**Paragraph 327:** On June 22, 2015, the T-Mobile subscriber again spoke with a T-Mobile
representative. This representative provided false and misleading information about the ring tones,
failed to acknowledge T-Mobile's fake ring tone scheme that inserts ring tones before the call
reaches the terminating carrier's network, and also placed blame on AdamsWells:

> I received a call from Stephanie at T-Mobile as a result of them sending a
> Customer Satisfaction Survey and being concerned with the results.
>
> She made a test call from her business cell phone to my parents number and
> after a few attempts was able to connect. ***She said once the phone starts
> ringing, the call is within [AdamsWell's] network.*** Just because I hear a
> phone ringing, does not mean my parent's phone is ringing. She researched
> my issue and indicated that their engineering team have done numerous tests
> and troubleshooting and have found no issues with the T-Mobile Network.
> ***They are pointing the issue towards Adamswells stating that I am not the
> only one in my family with this issue, and this is a known issue with other
> members of the Adamswells network according to some web research***. I
> am the only one in my family that uses T-Mobile. Others include AT&T,
> Sprint, and Cellular One. ***T-Mobile have closed my issue and are not going
> to provide me with further support on this matter***. I expressed my
> frustration with the ongoing problems since February and their failure to
> reply back from 3 members of their team since June 1st. I requested a letter
> in writing, which I will forward if you would like to have a copy for your
> records.
>
> Stephanie made 3 attempts to contact my parent's number at approximately
> 5:30 CST. She did not provide me with the number she called from. On
> one of the attempts, she heard one ring and then a recorded message to leave
> a voicemail message. The other attempt was ring no answer. I informed

her that my parent's do not have an electronic prompt greeting, but my father's voice.

I called my parents at 5:42 CST and the call dropped after 34 seconds. again at 5:43 that dropped after 32 seconds, again at 5:45 that dropped after 7 seconds, and again at 6:09 with ring no answer. These are some examples you should be able to research on your end.

**Answer to Paragraph 327:** Defendant TMUS denies the existence of a "fake ring tone scheme" and, upon information and belief, denies that any T-Mobile representative intentionally provided false or misleading information. Defendant TMUS has insufficient information upon which to form a belief as to the truth of the remaining allegations in this paragraph and therefore denies those allegations

**Paragraph 328:** In other notes regarding this call, the T-Mobile subscriber wrote:

6/22 - Stephanie from T-Mobile 651-674-3238 called me in response to the customer satisfaction survey. I was on the phone with her for approximately 1 hour. She had 3 failed attempts in reaching my parents with rings and dead air as well as recorded messages and succeeded on the 4 try. She also had me on hold while speaking with other contacts at T-Mobile. ***Her response to me was this was this was a known issue with Adamswells and there is not a problem with the T-Mobile Network. She said once the phone starts ringing, it is out of T-Mobile's network and is not their problem. She said this issue was closed with T-Mobile and I was to make no further problem requests regarding this issue.*** I requested a letter in writing explaining what T-Mobile had done to resolve this issue so I had something to work with as I was not provided with any contact information with the intermediary parties. She placed me on hold while speaking with her manager and replied stating that I should receive a letter within 7 business days. She offered me 1 month of service at no charge which was done.

**Answer to Paragraph 328:** Defendant TMUS states that the allegations of this paragraph purport to characterize notes, respectfully refers the Court to the cited notes for their contents and context, and denies all inconsistent allegations. To the extent a further response is required, Defendant TMUS has insufficient information upon which to form a belief as to the truth of the remaining allegations in this paragraph and therefore denies those allegations.

**Paragraph 329:** In a series of email exchanges in August 2015, T-Mobile personnel reported to the T-Mobile subscriber, among other things, that they were:

- "open[ing] a ticket with our long distance carrier";

- "mak[ing] sure the problematic carriers are identified and then circumvented to alleviate these issues";

- having "[its] carrier investigate" and that the carrier "made changes"; and

- "continu[ing] to drive this matter with [T-Mobile's] carrier until this issue is permanently resolved."

**Answer to Paragraph 329:** Defendant TMUS states that the allegations of this paragraph purport to characterize the cited email(s), denies that the allegations of this paragraph accurately and/or completely describe the cited email(s), respectfully refers the Court to the cited email(s) for their contents and context, and denies all inconsistent allegations. To the extent a further response is required, Defendant TMUS has insufficient information upon which to form a belief as to the truth of the remaining allegations in this paragraph and therefore denies those allegations.

**Paragraph 330:** On September 4, 2015, T-Mobile reported to its subscriber that "[a]s of now, we have all of this traffic routing over a different carrier." Later that day, T-Mobile wrote that "the routing over this new carrier is now in place permanently. The only time that it may default back to the other carrier is in the event of congestion or other network outage affect the new carrier, but that would be very rare."

**Answer to Paragraph 330:** Defendant TMUS states that the allegations of this paragraph purport to characterize the cited communication(s), denies that the allegations of this paragraph accurately and/or completely describe the cited communication(s), respectfully refers the Court to the cited communication(s) for their contents and context, and denies all inconsistent allegations. To the extent a further response is required, Defendant TMUS has insufficient information upon which to form a belief as to the truth of the remaining allegations in this paragraph and therefore denies those allegations.

**Paragraph 331:** In early 2016, the T-Mobile subscriber's problems resurfaced again. On April 1, 2016, the T-Mobile subscriber informed T-Mobile and AdamsWells of several call issues in

reaching her parents in February and March 2016. William Rowe at T-Mobile pulled call records for five calls attempted on April 1, 2016. AdamsWells reviewed its call records as well. AdamsWells's records revealed that only one of the five calls actually reached its switch, meaning the other four call attempts were never delivered to AdamsWells.

**Answer to Paragraph 331:** Defendant TMUS states that the allegations of this paragraph purport to characterize the cited communications, denies that the allegations of this paragraph accurately and/or completely describe the cited communications, respectfully refers the Court to the cited communications for their contents and context, and denies all inconsistent allegations. To the extent a further response is required, Defendant TMUS has insufficient information upon which to form a belief as to the truth of the remaining allegations in this paragraph and therefore denies those allegations.

**Paragraph 332:** Staff at AdamsWells spent considerable time and resources attempting to trouble shoot the problems identified by the T-Mobile subscriber, responding to emails and calls from the subscribers as well as T-Mobile, and reporting issues to the FCC.

**Answer to Paragraph 332:** Defendant TMUS states that the allegations of this paragraph purport to characterize the cited emails and calls, denies that the allegations of this paragraph accurately and/or completely describe the cited emails and calls, respectfully refers the Court to the cited emails and calls for their contents and context, and denies all inconsistent allegations. To the extent a further response is required, Defendant TMUS has insufficient information upon which to form a belief as to the truth of the remaining allegations in this paragraph and therefore denies those allegations.

**Paragraph 333:** A review of call detail records reveals that some of the T-Mobile subscriber's calls that did reach AdamsWells and were delivered to the caller's parents were carried by Inteliquent as T-Mobile's IXC. Accordingly, upon information and belief, many of the calls that did not reach their intended destination, but which were subjected to fake ring tones, were also carried by Defendant Inteliquent. Discovery will be required to ascertain whether Inteliquent or T-Mobile made "the initial long-distance call path choice" (i.e., the "static or dynamic selection of the path for a long-distance call based on the called number of the individual call") with regard to these calls (and others to AdamsWells' network into which fake ring tones were inserted) and is, therefore, the Covered Provider.

146

**Answer to Paragraph 333:**  No response is required because the allegations in this paragraph relate to Defendant TMUS's pending motion to dismiss, to which the Court is respectfully referred.  To the extent a response is required, Defendant TMUS states that the allegations of this paragraph purport to characterize call detail records, denies that the allegations of this paragraph accurately and/or completely describe the cited call detail records, respectfully refers the Court to the cited call detail records for its contents and context, and denies all inconsistent allegations.  To the extent a further response is required, Defendant TMUS has insufficient information upon which to form a belief as to the truth of the allegations in this paragraph and therefore denies those allegations.

**Paragraph 334:**  AdamsWells does not have any means of knowing how many calls made by other T-Mobile subscribers to an AdamsWells subscriber were never delivered to its network.

**Answer to Paragraph 334:**  Defendant TMUS has insufficient information upon which to form a belief as to the truth of the allegations in this paragraph and therefore denies those allegations.

**Paragraph 335:**  AdamsWells did not know until the *Consent Decree* was released by the FCC that T-Mobile was responsible for the insertion of fake ring tones on calls destined for AdamsWells's subscribers and that T-Mobile had failed to correct known problems with its Intermediate Providers' delivery and completion of calls.

**Answer to Paragraph 335:**  Defendant TMUS has insufficient information upon which to form a belief as to the truth of the allegations in this paragraph and therefore denies those allegations.

> ii.    *Plaintiff Consolidated Telephone Company Experienced T-Mobile Call Completion Problems Consistent With The Fake Ring Tone Scheme*

**Paragraph 336:**  CTC is located in Brainerd, Minnesota and operates in both CLEC and ILEC areas.  It serves over 7,000 business phone lines, and almost 1,700 residential phone lines, in its CLEC area.  It serves approximately 650 business phone lines, and approximately 5,600 residential phone lines, in its ILEC area.  As a whole, CTC has approximately 15,000 access lines, of which approximately half are business customers.

**Answer to Paragraph 336:**  Defendant TMUS has insufficient information upon which to form a belief as to the truth of the allegations in this paragraph and therefore denies those allegations.

**Paragraph 337:** CTC's CLEC area includes Brainerd, Baxter and communities with a larger business presence than the ILEC area, so its business strategies always focus on growing the number of subscribers, and in particular businesses customers, in the CLEC area where there is opportunity to compete for new business.

**Answer to Paragraph 337:** Defendant TMUS has insufficient information upon which to form a belief as to the truth of the allegations in this paragraph and therefore denies those allegations.

**Paragraph 338:** CTC struggled for years with poor call completion of inbound calls to its subscribers in both the CLEC and ILEC areas. However, complaints from business customers, particularly in the CLEC area, regarding call completion problems were the most prevalent.

**Answer to Paragraph 338:** Defendant TMUS has insufficient information upon which to form a belief as to the truth of the allegations in this paragraph and therefore denies those allegations.

**Paragraph 339:** For example, on November 22, 2013, CTC received a customer complaint from the owner of a barbeque take out restaurant called Louie's Bucket of Bones located in Ironton, Minnesota. Louie's Bucket of Bones was a small business serving a rural community and was a CTC subscriber in its CLEC area.

**Answer to Paragraph 339:** Defendant TMUS has insufficient information upon which to form a belief as to the truth of the allegations in this paragraph and therefore denies those allegations.

**Paragraph 340:** The owner of Louie's Bucket of Bones reported to CTC that a patron came into her restaurant and said that she had been trying to call all day regarding an order she wanted to place, but her calls were not connecting. The patron was a T-Mobile customer and had been using her T-Mobile wireless service to place calls to Louie's Bucket of Bones.

**Answer to Paragraph 340:** Defendant TMUS has insufficient information upon which to form a belief as to the truth of the allegations in this paragraph and therefore denies those allegations.

**Paragraph 341:** The owner of Louie's Bucket of Bones called CTC about this problem and was extremely upset with CTC over this interference with her business which depended upon receiving calls for carryout, catering and delivery orders. The owner reported that some calls from her customers connected to her business, but others did not.

**Answer to Paragraph 341:** Defendant TMUS has insufficient information upon which to form a belief as to the truth of the allegations in this paragraph and therefore denies those allegations.

**Paragraph 342:** CTC obtained the phone number of the patron whose calls to Louie's Bucket of Bones did not connect, and CTC determined that no calls from her phone number hit CTC's switch, indicating these calls were being halted upstream from CTC.

**Answer to Paragraph 342:** Defendant TMUS has insufficient information upon which to form a belief as to the truth of the allegations in this paragraph and therefore denies those allegations.

**Paragraph 343:** CTC advised the owner of Louie's Bucket of Bones and its patron to call T-Mobile about the call failure. They reported back to CTC that T-Mobile claimed it made multiple test calls and they all went through to Louie's Bucket of Bones. Nevertheless, the patron reported that when she had called Louie's Bucket of Bones, she heard a message indicating the number was out of reach. T-Mobile resolved the issue for Louie's Bucket of Bones without sharing why the T-Mobile customer's call failed to complete or how the issue was resolved.

**Answer to Paragraph 343:** Defendant TMUS admits that it resolved the issue and denies this paragraph to the extent it is intended to imply actionable wrongdoing. Further answering, TMUS has insufficient information upon which to form a belief as to the truth of the allegations in this paragraph and therefore denies those allegations.

**Paragraph 344:** The Louie's Bucket of Bones incident was but one of many such instances. Prior to and throughout 2013, CTC observed that apparent call blocking to rural OCNs had become a prevalent practice, not only by T-Mobile, but by other carriers as well. This imposed tremendous economic and reputational burden on CTC, which had to dedicate the full time of 1.5 employees to respond to customer complaints dominated by rural call completion failures.

**Answer to Paragraph 344:** Defendant TMUS denies the allegations in this paragraph to the extent they are intended to imply wrongdoing by Defendant TMUS, including that TMUS engaged in any "call blocking to rural OCNs"." Defendant TMUS otherwise has insufficient information upon which to form a belief as to the truth of the remaining allegations in this paragraph and therefore denies those allegations.

**Paragraph 345:** CTC, like all other impacted carriers, had no way of determining how many times a T-Mobile customer may have attempted to place a call to one of its customers that was not completed, nor was there any way for CTC to know whether T-Mobile was using fake messages, or other call blocking tactics, to deter completion of certain calls. Such information has been kept confidential by T-Mobile.

**Answer to Paragraph 345:** Defendant TMUS denies the allegations in this paragraph to the extent they are intended to imply wrongdoing by Defendant TMUS including that TMUS used "fake messages, or other call blocking tactics, to deter completion of certain calls." Defendant

TMUS otherwise has insufficient information upon which to form a belief as to the truth of the remaining allegations in this paragraph and therefore denies those allegations.

**Paragraph 346:** Kevin Beyer, General Manager of Minnesota's Federated Telephone Cooperative, once described the industry's inability to determine why rural calls are dropped in a 2015 article, stating, "you know where the call originated, but you can't tell where it went to [in] Never Neverland." Jim Spencer, *Rural phone woes persist in Minnesota, across the country*, STAR TRIBUNE (Apr. 18, 2015, 12:35 PM) ("Star Tribune Article"), http://www.startribune.com/rural-phone-woes-persist-in-minnesota-across-the-country/300369541/ (last visited Dec. 9, 2020).

**Answer to Paragraph 346:** Defendant TMUS states that the allegations of this paragraph purport to characterize the cited news article, denies that the allegations of this paragraph accurately and/or completely describe the cited news article, respectfully refers the Court to the cited news article for its contents and context, and denies all inconsistent allegations. Defendant TMUS otherwise has insufficient information upon which to form a belief as to the truth of the allegations in this paragraph and therefore denies those allegations.

**Paragraph 347:** CTC submitted complaints to the FCC pursuant to its rural call completion complaint portal.

**Answer to Paragraph 347:** Defendant TMUS has insufficient information upon which to form a belief as to the truth of the allegations in this paragraph and therefore denies those allegations.

**Paragraph 348:** CTC felt discriminated against due to the imbalance of power and leverage the large carriers like T-Mobile appeared to be exerting over rural carriers like CTC.

**Answer to Paragraph 348:** Defendant TMUS denies that it improperly exerted power or leverage over CTC or any other rural carrier. Defendant TMUS has insufficient information upon which to form a belief as to the truth of the remaining allegations in this paragraph and therefore denies those allegations.

**Paragraph 349:** Months before the Louie's Bucket of Bones incident, in or about April 2013, CTC had begun working on troubleshooting its call completion problems with Onvoy, Inc. ("Onvoy"), which at the time was a wholesale provider of telecommunications services to other carriers, resellers and service providers. Onvoy's then President, Fritz Hendricks, worked directly with CTC on this project. Mr. Hendricks developed, participated in, and oversaw a call testing

process that included testing calls placed to CTC phone lines from T-Mobile test lines, as well as test calls from other carriers' test lines.

**Answer to Paragraph 349:** Defendant TMUS has insufficient information upon which to form a belief as to the truth of the allegations in this paragraph and therefore denies those allegations.

**Paragraph 350:** For some test calls Onvoy and CTC placed to CTC's customers, they heard no ring back tone and the call did not complete. For others, calls would initially have no sound for up to ten seconds, then they would hear a ring tone without the calls hitting CTC's switch. Sometimes the test calls resulted in the caller hearing a message in Spanish with the call not completing.

**Answer to Paragraph 350:** Defendant TMUS has insufficient information upon which to form a belief as to the truth of the allegations in this paragraph and therefore denies those allegations.

**Paragraph 351:** CTC believes T-Mobile and other carriers engaging in these types of call blocking strategies did not want to complete calls to its OCNs to avoid high cost intercarrier compensation payments. Mr. Hendricks told CTC he shared in this belief.

**Answer to Paragraph 351:** Defendant TMUS denies that it engaged in any "call blocking strategies" and denies that it did not want to complete calls to OCNs. Defendant TMUS has insufficient information upon which to form a belief as to the truth of the remaining allegations in this paragraph and therefore denies those allegations.

**Paragraph 352:** Unable to solve the call completion problems themselves, Mr. Hendricks and CTC developed a work-around solution. Since they perceived that calls placed to CTC's OCNs were being intentionally blocked or deterred from completion by upstream carriers, CTC ported hundreds of its business customers' phone numbers to Onvoy to make it look to the large carriers like these business customer phone numbers were owned by Onvoy, which had lower intercarrier compensation rates. Doing so dramatically reduced CTC's call completion complaints and the man-hours CTC was devoting to customer call completion complaints.

**Answer to Paragraph 352:** Defendant TMUS has insufficient information upon which to form a belief as to the truth of the allegations in this paragraph and therefore denies those allegations.

**Paragraph 353:** CTC had to pay Onvoy for this work-around service and it reduced the volume of calls for which CTC could otherwise seek intercarrier compensation revenue. CTC felt it had no better alternative due to the significant man-hours it was devoting to call completion complaints that it could not resolve, the harm being imposed on its business reputation and the loss of customer goodwill resulting from the persistent call completion failures.

**Answer to Paragraph 353:**  Defendant TMUS has insufficient information upon which to form a belief as to the truth of the allegations in this paragraph and therefore denies those allegations.

**Paragraph 354:**  CTC believes many other LECs in Minnesota adopted the same practice of porting their customer's numbers to Onvoy for a fee and surrendering the opportunity to collect inter-carrier compensation revenue to Onvoy.  CTC presently continues this practice.

**Answer to Paragraph 354:**  Defendant TMUS has insufficient information upon which to form a belief as to the truth of the allegations in this paragraph and therefore denies those allegations.

**Paragraph 355:**  Two years prior to this trouble-shooting project, Mr. Hendricks spoke at the 2011 Rural Call Completion workshop and was critical of carriers engaged in rural call blocking or fake ring tone practices.  As he explained at the workshop:

> When a person calls a customer in a rural market the [caller's] phone will ring 8 to 10 times before the end office of the ILEC is ever signaled – if it is signaled at all. . . [The caller] will hear [] ring but the far end will never ring; that is the trouble in approximately 60 to 65 per cent of the time.

And:

> The originating carrier is not owning the service responsibility to deliver to the consumer that purchased it from them.  Rather, the worse yet, we've found that the originating carrier is deflecting the responsibility for the service quality to a rural carrier that has not even been called in the troubleshooting process to help identify what went wrong on a particular call the customer called them about – ***and it vilifies the LEC***.

*See* 2012 Rural Call Completion Declaratory Ruling at nn. 35, 40 (emphasis added).

**Answer to Paragraph 355:**  Defendant TMUS states that the allegations of this paragraph purport to characterize Exhibit 4 to the SAC, denies that the allegations of this paragraph accurately and/or completely describe Exhibit 4 to the SAC, respectfully refers the Court to Exhibit 4 to the SAC for its contents and context, and denies all inconsistent allegations. To the extent a further response is required, Defendant TMUS denies that the quoted language appears exactly as written in this paragraph in Exhibit 4 to the SAC, but otherwise has insufficient information upon which to form a belief as to the truth of the allegations in this paragraph and therefore denies those allegations.

**Paragraph 356:** Mr. Hendricks's quotes were so influential, they were included in the footnotes of the *2012 Rural Call Completion Declaratory Ruling.*

**Answer to Paragraph 356:** Defendant TMUS states that the allegations of this paragraph purport to characterize Exhibit 4 to the SAC, denies that the allegations of this paragraph accurately and/or completely describe Exhibit 4, respectfully refers the Court to Exhibit 4 for its contents and context, and denies all inconsistent allegations. Defendant TMUS otherwise has insufficient information upon which to form a belief as to the truth of the allegations in this paragraph and therefore denies those allegations.

**Paragraph 357:** In 2015, Mr. Hendricks, still President of what by then had become Onvoy, LLC, was quoted in an article discussing the lack of oversight and regulation of intermediaries that may drop calls, as saying, "you can go buy a computer any place and publish a long-distance rate deck, and it will be used[.]" *See* Star Tribune Article. He also confirmed that among the ways companies try to avoid connecting rural calls is by what Mr. Hendricks called, "false ring-backs," explaining further, "Carriers provide ringing before you are connected on the far end . . . . It's actually not ringing where you're trying to call, but you've heard it ring nine or ten times. So you think the person is not in." *Id.*

**Answer to Paragraph 357:** Defendant TMUS states that the allegations of this paragraph purport to characterize the cited news article, denies that the allegations of this paragraph accurately and/or completely describe the cited news article, respectfully refers the Court to the cited news article for its contents and context, and denies all inconsistent allegations. Defendant TMUS otherwise has insufficient information upon which to form a belief as to the truth of the allegations in this paragraph and therefore denies those allegations.

**Paragraph 358:** On February 10, 2017, GTCR, a private equity firm that owns Onvoy, LLC, created a wholly owned single purpose entity that merged with Inteliquent. The surviving company maintained the Inteliquent name. Inteliquent became wholly owned by Onvoy, LLC.

**Answer to Paragraph 358:** Defendant TMUS has insufficient information upon which to form a belief as to the truth of the allegations in this paragraph and therefore denies those allegations.

**Paragraph 359:** In connection with the Inteliquent/Onvoy merger, Fritz Hendricks became the President of Inteliquent and remained its President until Feburary 7, 2020, when he was succeeded by Ed O'Hara who had been the company's Chief Financial Officer. Therefore, Inteliquent's

immediate-past President is a fact witness in this case because, *inter alia*, he: (1) investigated suspected call blocking strategies used by T-Mobile during the same time period in which T-Mobile used fake ring tones to mask Inteliquent's rural call completion failures; and (2) has provided regulatory testimony regarding the tremendous harm experienced by rural carriers caused by rural call blocking strategies, including the use of fake ring tones.

**Answer to Paragraph 359:** Defendant TMUS denies that it engaged in "call blocking strategies" or used LRBT to mask any rural call completion failures. Defendant TMUS has insufficient information upon which to form a belief as to the truth of the remaining allegations in this paragraph and therefore denies those allegations.

**Paragraph 360:** CTC continues to have hundreds of business phone numbers ported to Inteliquent, which took over the ported numbers following the merger. To this day, CTC and likely many other rural LECs who ported their numbers to Onvoy pay Inteliquent to receive its business customers' calls to avoid inbound long distance call completion problems. Thus, Inteliquent and T-Mobile continue to benefit from the fruits of their fake ring tone and call blocking scheme at the expense of small rural carriers.

**Answer to Paragraph 360:** Defendant TMUS denies that it has been involved in a "fake ring tone and call blocking scheme." Defendant TMUS has insufficient information upon which to form a belief as to the truth of the remaining allegations in this paragraph and therefore denies those allegations.

**Paragraph 361:** Inteliquent's retention of the phone numbers ported to its OCN and continued collection of revenue from CTC and other similarly situated LECs who implemented the same work-around reflects Defendants' high degree of moral culpability, deliberate oppression and wonton disregard of the rights of others.

**Answer to Paragraph 361:** Defendant TMUS denies the allegations in this paragraph.

## V.    CLASS ALLEGATIONS

**Paragraph 362:** Plaintiffs bring this action on behalf of themselves and as a class action, pursuant to the provisions of Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure, on behalf of the following class (collectively, the "Class"):

> All local exchange carriers that had calls placed to their customers from a T-Mobile customer which had fake ring tones inserted into the call that masked the blocked or delayed delivery of the call to the local exchange carrier's network.

**Answer to Paragraph 362:** Defendant TMUS states that this paragraph states legal conclusions and that legal conclusions are for the Court to make, but denies that Plaintiffs have any viable claim against TMUS. To the extent a further response is required, Defendant TMUS denies that this lawsuit is suitable to proceed as a class action.

**Paragraph 363:** Plaintiffs reserve the right to propose subclasses or modify the above class definition based on the evidence adduced in discovery, or as necessary and appropriate.

**Answer to Paragraph 363:** Defendant TMUS states that this paragraph states legal conclusions and that legal conclusions are for the Court to make, but denies that Plaintiffs have any viable claim against TMUS. To the extent a further response is required, Defendant TMUS denies that this lawsuit is suitable to proceed as a class action.

**Paragraph 364:** Excluded from the Class are T-Mobile and Inteliquent and any of their subsidiaries and affiliates; and all entities who make a timely election to be excluded from the Class. Plaintiffs reserve the right to revise the Class definition based upon information learned through discovery.

**Answer to Paragraph 364:** Defendant TMUS states that this paragraph states legal conclusions and that legal conclusions are for the Court to make, but denies that Plaintiffs have any viable claim against TMUS. To the extent a further response is required, Defendant TMUS denies that this lawsuit is suitable to proceed as a class action.

**Paragraph 365:** Certification of Plaintiffs' claims for class-wide treatment is appropriate because Plaintiffs can prove the elements of their claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claim.

**Answer to Paragraph 365:** Defendant TMUS states that this paragraph states legal conclusions and that legal conclusions are for the Court to make, but denies that Plaintiffs have any viable claim against TMUS. To the extent a further response is required, Defendant TMUS denies that this lawsuit is suitable to proceed as a class action.

**Paragraph 366:** This action has been brought and may be properly maintained on behalf of the Class proposed herein under Federal Rule of Civil Procedure 23.

**Answer to Paragraph 366:** Defendant TMUS states that this paragraph states legal conclusions and that legal conclusions are for the Court to make, but denies that Plaintiffs have any viable claim against TMUS. To the extent a further response is required, Defendant TMUS denies that this lawsuit is suitable to proceed as a class action.

**Paragraph 367:** *Numerosity*. Federal Rule of Civil Procedure 23(a)(1): The members of the Class are so numerous and geographically dispersed that individual joinder of all Class members is impracticable. For purposes of this complaint, Plaintiffs allege that there are estimated to be over 2,000 local exchange carriers operating within the United States. The precise number of Class members is unknown to Plaintiffs but may be ascertained from records possessed by the Commission and/or Defendants. Class members may be notified of the pendency of this action by recognized, Court-approved notice dissemination methods, which may include U.S. Mail, electronic mail, Internet postings, and/or published notice.

**Answer to Paragraph 367:** Defendant TMUS states that this paragraph states legal conclusions and that legal conclusions are for the Court to make, but denies that Plaintiffs have any viable claim against TMUS. To the extent a response is required, Defendant TMUS denies the allegations in this paragraph, and TMUS denies that this lawsuit is suitable to proceed as a class action.

**Paragraph 368:** *Commonality and Predominance:* Federal Rule of Civil Procedure 23(a)(2) and 23(b)(3): This action involves common questions of law and fact, which predominate over any questions affecting individual Class members, including, without limitation:

    a. Whether T-Mobile and Inteliquent jointly violated the Commission's rule prohibiting the insertion of false or fake ring tones, 47 C.F.R. § 64.2201;

    b. Whether T-Mobile failed to correct problems or delays associated with its Intermediate Providers' delivery of calls in violation of the Commission's 2012 Declaratory Ruling;

    c. Whether T-Mobile, Inteliquent and/or Doe Defendants inserted fake ring tones in calls placed to subscribers of Plaintiffs and which fake ring tones masked calls either being delayed or not completed;

    d. Whether T-Mobile, Inteliquent and/or Doe Defendants are liable to Plaintiffs for violations of the Communications Act of 1934, as amended, including but not limited to 47 U.S.C. § 201(b) and 47 U.S.C. § 202(a);

    e. Whether T-Mobile's, Inteliquent's or Doe Defendants' conduct violates the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962(c);

    f.      Whether T-Mobile's, Inteliquent's and/or Doe Defendants' conduct violates the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962(d);

    g.      Whether T-Mobile, Inteliquent and/or Doe Defendants unlawfully conspired to reduce costs associated with the delivery of high cost calls and relied on the use of fake ring tones to mask those efforts;

    h.      Whether T-Mobile is liable and responsible for the acts of Inteliquent and/or Doe Defendants as authorized agents and/or pursuant to 47 U.S.C. § 217;

    i.      Whether T-Mobile's, Inteliquent's and/or Doe Defendants' conduct constitutes tortious interference with prospective economic advantage under Illinois law;

    j.      Whether T-Mobile's, Inteliquent's and/or Doe Defendants' conduct violated the Illinois Consumer Fraud And Deceptive Business Practices Act, 815 Ill. Comp. Stat. 505/1, *et seq.* (2007).

    k.      Whether Plaintiffs and the Class are entitled to compensatory and treble and/or punitive damages, attorneys' fees, and other monetary relief and, if so, in what amount.

**Answer to Paragraph 368:** Defendant TMUS states that this paragraph states legal conclusions and that legal conclusions are for the Court to make, but denies that Plaintiffs have any viable claim against TMUS. To the extent a response is required, Defendant TMUS denies the allegations in this paragraph, and TMUS denies that this lawsuit is suitable to proceed as a class action.

**Paragraph 369:** *Typicality:* Federal Rule of Civil Procedure 23(a)(3): Plaintiffs' claims are typical of the other Class members' claims because, among other things, all Class members were comparably injured through T-Mobile's, Inteliquent's and/or Doe Defendants' wrongful conduct as described herein.

**Answer to Paragraph 369:** Defendant TMUS states that this paragraph states legal conclusions and that legal conclusions are for the Court to make, but denies that Plaintiffs have any viable claim against TMUS. To the extent a response is required, Defendant TMUS denies the allegations in this paragraph.

**Paragraph 370:** No individual inquiry is necessary since the focus is only on T-Mobile, Inteliquent and/or Doe Defendants' wrongful conduct.

**Answer to Paragraph 326:** Defendant TMUS states that this paragraph states legal conclusions and that legal conclusions are for the Court to make, but denies that Plaintiffs have any viable claim against TMUS. To the extent a response is required, Defendant TMUS denies the allegations in this paragraph, and TMUS denies that this lawsuit is suitable to proceed as a class action.

**Paragraph 371:** *Adequacy:* Federal Rule of Civil Procedure 23(a)(4): Plaintiffs are adequate Class representatives because their interests do not conflict with the interests of the other members of the Class they seek to represent; Plaintiffs have retained counsel competent and experienced in telecommunications law, complex litigation and class action litigation; and Plaintiffs intend to prosecute this action vigorously. The Class's interests will be fairly and adequately protected by Plaintiffs and their counsel.

**Answer to Paragraph 371:** Defendant TMUS states that this paragraph states legal conclusions and that legal conclusions are for the Court to make, but denies that Plaintiffs have any viable claim against TMUS. To the extent a response is required, Defendant TMUS denies the allegations in this paragraph, and TMUS denies that this lawsuit is suitable to proceed as a class action.

**Paragraph 372:** *Superiority:* Federal Rule of Civil Procedure 23(b)(3): A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The damages or other financial detriment suffered by Plaintiffs and the other Class members are relatively small compared to the burden and expense that would be required to individually litigate their claims against T-Mobile and Inteliquent, so it would be impracticable for the members of the Class to individually seek redress for their wrongful conduct. Even if Class members could afford individual litigation, the court system could not. Individualized litigation creates a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

**Answer to Paragraph 372:** Defendant TMUS states that this paragraph states legal conclusions and that legal conclusions are for the Court to make, but denies that Plaintiffs have any viable claim against TMUS. To the extent a response is required, Defendant TMUS denies the allegations in this paragraph, and TMUS denies that this lawsuit is suitable to proceed as a class action.

## VI.    CLAIMS

### COUNT I
### Violation Of Section 201(b) Of The Communications Act Of 1934, As Amended
### (Against T-Mobile) (Fake Ring Tones)

**Paragraph 373:** The allegations of paragraphs 1 - 372 are incorporated by reference as though fully set forth herein.

**Answer to Paragraph 373:** No response is required because the allegations in this paragraph relate to Defendant TMUS's pending motion to dismiss, to which the Court is respectfully referred. To the extent a response is required, the answers to paragraphs 1-372 are incorporated by reference as if fully set forth in this answer to this paragraph.

**Paragraph 374:** Section 201(b) of the Act makes it unlawful for any carrier to assess any "charge" or engage in any "practice, classification, or regulation that is unjust or unreasonable . . . ." 47 U.S.C. § 201(b).

**Answer to Paragraph 374:** No response is required because the allegations in this paragraph relate to Defendant TMUS's pending motion to dismiss, to which the Court is respectfully referred. To the extent a response is required, Defendant TMUS states that this paragraph purports to characterize 47 U.S.C. § 201(b), denies that the allegations of this paragraph accurately and/or completely describe 47 U.S.C. § 201(b), respectfully refers the Court to 47 U.S.C. § 201(b) for its contents and context, and denies all inconsistent allegations. Further answering, Defendant TMUS states that this paragraph states legal conclusions and that legal conclusions are for the Court to make, but denies that Plaintiffs have any viable claim against TMUS. To the extent a further response is required, Defendant TMUS denies the allegations in this paragraph.

**Paragraph 375:** The insertion of fake ring tones is a practice that the Commission has declared to be unjust and unreasonable in accordance with section 201(b) of the Act. Ex. 9, *Rural Call Completion Order* at 16200, ¶ 116.

**Answer to Paragraph 375:** No response is required because the allegations in this paragraph relate to Defendant TMUS's pending motion to dismiss, to which the Court is respectfully referred.

To the extent a response is required, Defendant TMUS states this paragraph states legal conclusions and that legal conclusions are for the Court to make, but denies that Plaintiffs have any viable claim against TMUS. To the extent a further response is required, Defendant TMUS denies the allegations in this paragraph.

**Paragraph 376:** T-Mobile has admitted that it violated the Commission's prohibition against the insertion of fake ring tones, 47 C.F.R. § 64.2201. *See* Ex. 1, *Consent Decree*, ¶ 17.

**Answer to Paragraph 376:** No response is required because the allegations in this paragraph relate to Defendant TMUS's pending motion to dismiss, to which the Court is respectfully referred. To the extent a response is required, Defendant TMUS states that this paragraph purports to characterize Exhibit 1 to the SAC, denies that the allegations of this paragraph accurately and/or completely describe Exhibit 1 to the SAC, respectfully refers the Court to Exhibit 1 to the SAC for its contents and context, and denies all inconsistent allegations. Defendant TMUS denies that it intended to violate any FCC rules and denies that Plaintiffs have any viable claim against TMUS.

**Paragraph 377:** T-Mobile's admission that it violated the Commission's prohibition against the insertion of fake ring tones is also an admission that it violated Section 201(b) of the Act.

**Answer to Paragraph 377:** No response is required because the allegations in this paragraph relate to Defendant TMUS's pending motion to dismiss, to which the Court is respectfully referred. To the extent a response is required, Defendant TMUS states that this paragraph purports to characterize Exhibit 1 to the SAC, denies that the allegations of this paragraph accurately and/or completely describe Exhibit 1 to the SAC, respectfully refers the Court to Exhibit 1 to the SAC for its contents and context, and denies all inconsistent allegations. Defendant TMUS denies that it intended to violate any FCC rules and denies that Plaintiffs have any viable claim against TMUS. To the extent a response is required, Defendant TMUS denies the allegations in this paragraph.

**Paragraph 378:** Insofar as those fake ring tones were inserted directly or indirectly by one or more of T-Mobile's agents, including, but not limited to Inteliquent, Level 3, Ericsson or Doe

160

Defendants, T-Mobile is fully liable for the acts, omissions, or failures of those agents pursuant to Section 217 of the Act. 47 U.S.C. § 217.

**Answer to Paragraph 378:**  No response is required because the allegations in this paragraph relate to Defendant TMUS's pending motion to dismiss, to which the Court is respectfully referred. Further answering, Defendant TMUS states that this paragraph purports to characterize 47 U.S.C. § 217, denies that the allegations of this paragraph accurately and/or completely describe 47 U.S.C. § 217, respectfully refers the Court to 47 U.S.C. § 217 for its contents and context, and denies all inconsistent allegations.  Defendant TMUS further states this paragraph states legal conclusions and that legal conclusions are for the Court to make, but denies that Plaintiffs have any viable claim against TMUS.  To the extent a further response is required, Defendant TMUS denies the allegations in this paragraph.

**Paragraph 379:**  The Commission described the use of fake ring tones as deceptive, explaining that fake ring tones make it appear to the caller that the terminating rural provider is responsible for the call failure, instead of the originating or intermediate provider and that consumers mistakenly believe that the terminating rural provider is responsible for the call failure.

**Answer to Paragraph 379:**  No response is required because the allegations in this paragraph relate to Defendant TMUS's pending motion to dismiss, to which the Court is respectfully referred. Further answering, Defendant TMUS states that the allegations in this paragraph purport to characterize the Commission's statements, denies that the allegations of this paragraph accurately and/or completely describe the Commission's statements, respectfully refers the Court to the Commission's statements for their contents and context, and denies all inconsistent allegations. To the extent a further response is required, Defendant TMUS denies the allegations in this paragraph.

**Paragraph 380:**  The FCC also determined that the insertion of fake ring tones make it less likely that a call ultimately reaches its intended destination for at least two reasons: (1) it causes the caller to "hang up" before the called party's phone begins to ring; and (2) it prevents the call from being returned to the preceding carrier so that alternative routes may be attempted and thus serves to block the call from being completed. *See supra* ¶¶ 104, 113-15.

**Answer to Paragraph 380:**  No response is required because the allegations in this paragraph relate to Defendant TMUS's pending motion to dismiss, to which the Court is respectfully referred. Further answering, Defendant TMUS states that the allegations in this paragraph purport to characterize Exhibits 5 and 9 to the SAC, denies that the allegations of this paragraph accurately and/or completely describe Exhibits 5 and 9 to the SAC, respectfully refers the Court to Exhibits 5 and 9 to the SAC for their contents and context, and denies all inconsistent allegations.  To the extent a further response is required, Defendant TMUS denies the allegations in this paragraph.

**Paragraph 381:**  When calls are not completed, Plaintiffs are damaged because they are unable to collect access charges for the calls they were otherwise intended to receive and terminate.

**Answer to Paragraph 381:**  No response is required because the allegations in this paragraph relate to Defendant TMUS's pending motion to dismiss, to which the Court is respectfully referred. Further answering, Defendant TMUS states this paragraph states legal conclusions and that legal conclusions are for the Court to make, but denies that Plaintiffs have any viable claim against TMUS.  To the extent a response is required, Defendant TMUS denies the allegations in this paragraph.

**Paragraph 382:**  T-Mobile's unjust and unreasonable practices have damaged Plaintiffs.

**Answer to Paragraph 382:**  No response is required because the allegations in this paragraph relate to Defendant TMUS's pending motion to dismiss, to which the Court is respectfully referred. Further answering, Defendant TMUS states this paragraph states legal conclusions and that legal conclusions are for the Court to make, but denies that Plaintiffs have any viable claim against TMUS.  To the extent a response is required, Defendant TMUS denies the allegations in this paragraph.

**COUNT II**
**Violation Of Section 201(b) Of The Communications Act Of 1934, As Amended**
**(Against T-Mobile, Inteliquent, and Certain Doe Defendants) (Failure to Ensure Delivery of Calls)**

**Paragraph 383:** The allegations of paragraphs 1 - 382 are incorporated by reference as though fully set forth herein.

**Answer to Paragraph 383:** The answers of paragraphs 1-382 are incorporated by reference as if fully set forth in this answer to this paragraph.

**Paragraph 384:** Section 201(b) of the Act makes it unlawful for any carrier to assess any "charge" or engage in any "practice, classification, or regulation that is unjust or unreasonable. . . ." 47 U.S.C. § 201(b).

**Answer to Paragraph 384:** Defendant TMUS states that this paragraph purports to characterize 47 U.S.C. § 201(b), denies that the allegations of this paragraph accurately and/or completely describe 47 U.S.C. § 201(b), respectfully refers the Court to 47 U.S.C. § 201(b) for its contents and context, and denies all inconsistent allegations. Further answering, Defendant TMUS states that this paragraph states legal conclusions and that legal conclusions are for the Court to make, but denies that Plaintiffs have any viable claim against TMUS. To the extent a further response is required, Defendant TMUS denies the allegations in this paragraph.

**Paragraph 385:** "[A] carrier that knows or should know that calls are not being completed to certain areas, and that engages in acts (or omissions) that allow or effectively allow these conditions to persist, may be liable for a violation of section 201 of the Act." *2012 Declaratory Ruling* at 1355, ¶¶ 11. Moreover, "it is an unjust and unreasonable practice in violation of section 201 of the Act for a carrier that knows or should know that it is providing degraded service to certain areas to fail to correct the problem or to fail to ensure that intermediate providers, least-cost routers, or other entities acting for or employed by the carrier are performing adequately." *Id.* at 1355-56, ¶ 12.

**Answer to Paragraph 385:** Defendant TMUS states that this paragraph purports to characterize the 2012 Declaratory Ruling, denies that the allegations of this paragraph accurately and/or completely describe the 2012 Declaratory Ruling, respectfully refers the Court to the 2012 Declaratory Ruling for its contents and context, and denies all inconsistent allegations. To the extent a further response is required, Defendant TMUS admits that the quoted language appears in 2012 Declaratory Ruling but denies the allegations in this paragraph insofar as the quoted language is taken out of context and denies that Plaintiffs have any viable claim against TMUS.

**Paragraph 386:** In the *2018 Second Report and Order*, the Commission affirmed the WCB's conclusions in the *2012 Declaratory Ruling*, thus giving the WCB's findings the imprimatur of the full Commission. The Commission observed that the Bureau had "clarif[ied] the statutory provisions discussed by the WCB," including the duties that carriers owe under section 201(b) of the Act. *Id.* ¶ 24. The Commission expressly affirmed the WCB's conclusion that "'it is an unjust and unreasonable practice in violation of section 201 of the Act for *a carrier* that knows or should know that it is providing degraded service to certain areas to fail to correct the problem or to fail to ensure that intermediate providers, least-cost routers, or other entities acting for or employed by the carrier are performing adequately,'" *id.* (quoting *2012 Declaratory Ruling*, ¶ 12) (emphasis added.

**Answer to Paragraph 386:** Defendant TMUS states that this paragraph purports to characterize the 2018 Report and Order and 2012 Declaratory Ruling, denies that the allegations of this paragraph accurately and/or completely describe the 2018 Report and Order and 2012 Declaratory Ruling, respectfully refers the Court to the 2018 Report and Order and 2012 Declaratory Ruling for their contents and context, and denies all inconsistent allegations. To the extent a further response is required, Defendant TMUS admits that the quoted language appears in 2012 Declaratory Ruling but denies the allegations in this paragraph insofar as the quoted language is taken out of context and denies that Plaintiffs have any viable claim against TMUS.

**Paragraph 387:** Both T-Mobile and Inteliquent are carriers that had a duty not to provide degraded service to certain areas, to fail to correct the problem, or to fail to ensure that intermediate providers, least-cost routers, or other entities are performing adequately.

**Answer to Paragraph 387:** Defendant TMUS states that this paragraph states legal conclusions and that legal conclusions are for the Court to make, but denies that Plaintiffs have any viable claim against TMUS. To the extent a further response is required, Defendant TMUS denies the allegations in this paragraph to the extent they are intended to imply actionable wrongdoing by Defendant TMUS and has insufficient information upon which to form a belief about the truth of the allegations concerning Defendant Inteliquent and therefore denies those allegations.

**Paragraph 388:** T-Mobile has admitted that it did not correct problems with its Intermediate Providers' delivery of calls to consumers in rural areas. *See* Ex. 1, *Consent Decree*, ¶ 17. T-Mobile's admission that it failed to correct problems with its Intermediate Providers' delivery of calls to consumers in rural areas is also an admission that it violated Section 201(b) of the Act.

**Answer to Paragraph 388:** Defendant TMUS states that this paragraph purports to characterize Exhibit 1 to the SAC, denies that the allegations of this paragraph accurately and/or completely describe Exhibit 1 to the SAC, respectfully refers the Court to Exhibit 1 to the SAC for its contents and context, and denies all inconsistent allegations. Further answering, Defendant TMUS states that this paragraph states legal conclusions and that legal conclusions are for the Court to make, but denies that Plaintiffs have any viable claim against TMUS. Defendant TMUS otherwise denies the remaining allegations of this paragraph and denies that it intended to violate any FCC rules.

**Paragraph 389:** According to the sworn declaration of Adrian Adler, "[s]ince 2015 . . . [a]lmost all domestic calls that leave T-Mobile's network destined to other carriers are routed through Inteliquent" and "Inteliquent is responsible for completing the calls." Ex. 14, Adler Declaration, ¶ 10. Thus, upon information and belief, T-Mobile's admission of failing to ensure that its Intermediate Provider delivered traffic in accordance with the FCC's requirements relates directly to Inteliquent's degraded service.

**Answer to Paragraph 389:** Defendant TMUS states that this paragraph purports to characterize a declaration from another litigation, denies that the allegations of this paragraph accurately and/or completely describe that declaration, respectfully refers the Court to that declaration for its contents and context, and denies all inconsistent allegations. Further answering, Defendant TMUS states that this paragraph states legal conclusions and that legal conclusions are for the Court to make, but denies that Plaintiffs have any viable claim against TMUS. Defendant TMUS otherwise denies the remaining allegations of this paragraph and denies that it intended to violate any FCC rules.

**Paragraph 390:** Moreover, T-Mobile's rural call completion complaint log produced by the FCC confirms Inteliquent's ability to manipulate the route used to terminate calls to rural carriers, and easily change the routing to an effective path when a T-Mobile customer complained. Therefore, Inteliquent failed to deliver T-Mobile's calls to consumers in rural areas and engaged in an unjust and unreasonable practice.

**Answer to Paragraph 390:** Defendant TMUS states that this paragraph purports to characterize a document produced by the FCC, denies that the allegations of this paragraph accurately and/or

completely describe that document, respectfully refers the Court to that document for its contents and context, and denies all inconsistent allegations.  Further answering, Defendant TMUS states that this paragraph states legal conclusions and that legal conclusions are for the Court to make, but denies that Plaintiffs have any viable claim against TMUS.  Defendant TMUS otherwise denies the remaining allegations in this paragraph.

**Paragraph 391:**  T-Mobile is fully liable for the acts, omissions, or failures of those Intermediate Providers, including, but not limited to Inteliquent, Level 3, or any other Doe Defendants who are Intermediate Providers, pursuant to Section 217 of the Act. 47 U.S.C. § 217.

**Answer to Paragraph 391:**  Defendant TMUS states that this paragraph purports to characterize 47 U.S.C. § 217, denies that the allegations of this paragraph accurately and/or completely describe 47 U.S.C. § 217, respectfully refers the Court to 47 U.S.C. § 217 for its contents and context, and denies all inconsistent allegations.  Defendant TMUS states that this paragraph states legal conclusions and that legal conclusions are for the Court to make, but denies that Plaintiffs have any viable claim against TMUS.  To the extent a further response is required, Defendant TMUS denies the allegations in this paragraph.

**Paragraph 392:**  Defendants' unjust and unreasonable practices damaged Plaintiffs.

**Answer to Paragraph 392:**  Defendant TMUS states that this paragraph states legal conclusions and that legal conclusions are for the Court to make, but denies that Plaintiffs have any viable claim against TMUS.  To the extent a further response is required, Defendant TMUS denies the allegations in this paragraph.

## COUNT III
### Violation Of Section 202(a) Of The Communications Act Of 1934, As Amended
### (Against T-Mobile, Inteliquent, and Certain Doe Defendants)

**Paragraph 393:**  The allegations of paragraphs 1 - 392 are incorporated by reference as though fully set forth herein.

**Answer to Paragraph 393:**  The answers of paragraphs 1-392 are incorporated by reference as if fully set forth in this answer to this paragraph.

**Paragraph 394:**  Section 202(a) of the Act makes it "unlawful for any common carrier to make any unjust or unreasonable discrimination in charges, practices, classifications, regulations, facilities, or services . . . or to make or give any undue or unreasonable preference or advantage to any particular person, class of persons, or locality, or to subject any particular person, class of persons, or locality to any undue or unreasonable prejudice or disadvantage."  47 U.S.C. § 202(a).

**Answer to Paragraph 394:**  Defendant TMUS states that this paragraph purports to characterize 47 U.S.C. § 202(a), denies that the allegations of this paragraph accurately and/or completely describe 47 U.S.C. § 202(a), respectfully refers the Court to 47 U.S.C. § 202(a) for its contents and context, and denies all inconsistent allegations.  Further answering, Defendant TMUS states that this paragraph states legal conclusions and that legal conclusions are for the Court to make, but denies that Plaintiffs have any viable claim against TMUS.

**Paragraph 395:**  The WCB and Commission have repeatedly declared that carriers that "'adopt[] or perpetuat[e] routing practices that result in lower quality service to rural or high-cost localities than like service to urban or lower cost localities (including other lower cost rural areas) may, in the absence of a persuasive explanation, constitute unjust or unreasonable discrimination in practices, facilities, or services and violate section 202 of the Act,'" *2018 Second Report and Order*, ¶ 24 (quoting *2012 Declaratory Ruling*, ¶ 14).

**Answer to Paragraph 395:**  Defendant TMUS states that this paragraph purports to characterize the 2018 Report and Order and 2012 Declaratory Ruling, denies that the allegations of this paragraph accurately and/or completely describe the 2018 Report and Order and 2012 Declaratory Ruling, respectfully refers the Court to the 2018 Report and Order and 2012 Declaratory Ruling for their contents and context, and denies all inconsistent allegations.  To the extent a further response is required, Defendant TMUS admits that the quoted language appears in the 2018 Report and Order but denies the allegations in this paragraph insofar as the quoted language is taken out of context and denies that Plaintiffs have any viable claim against TMUS.

**Paragraph 396:**  T-Mobile and Inteliquent are both carriers that had a duty not to adopt or perpetuate routing practices that resulted in lower quality service to rural or high cost localities.

**Answer to Paragraph 396:** Defendant TMUS states that this paragraph states legal conclusions and that legal conclusions are for the Court to make, but denies that Plaintiffs have any viable claim against TMUS. To the extent a further response is required, Defendant TMUS denies the allegations in this paragraph to the extent they are intended to imply actionable wrongdoing by Defendant TMUS and has insufficient information upon which to form a belief about the truth of the allegations concerning Defendant Inteliquent and therefore denies those allegations.

**Paragraph 397:** T-Mobile has admitted that it did not correct problems with its Intermediate Providers' delivery of calls to consumers in rural areas. *See* Ex. 1, *Consent Decree*, ¶ 17.

**Answer to Paragraph 397:** Defendant TMUS states that this paragraph purports to characterize Exhibit 1 to the SAC, denies that the allegations of this paragraph accurately and/or completely describe Exhibit 1 to the SAC, respectfully refers the Court to Exhibit 1 to the SAC for its contents and context, and denies all inconsistent allegations. Further answering, Defendant TMUS states that this paragraph states legal conclusions and that legal conclusions are for the Court to make. Defendant TMUS denies that it intended to violate any FCC rules, denies the allegations of this paragraph to the extent they are intended imply actionable wrongdoing by Defendant TMUS, and denies that Plaintiffs have any viable claim against TMUS.

**Paragraph 398:** According to the sworn declaration of Adrian Adler, "[s]tarting in 2015 . . . [a]lmost all domestic calls that leave the T-Mobile network destined to other carriers are routed through Inteliquent" and "Inteliquent is responsible for completing the calls." Ex. 14, Adler Declaration,¶ 10. Therefore, Inteliquent failed to deliver T-Mobile's calls to consumers in rural areas and engaged in unjust and unreasonable discrimination against those rural areas.

**Answer to Paragraph 398:** Defendant TMUS states that this paragraph purports to characterize a declaration from another litigation, denies that the allegations of this paragraph accurately and/or completely describe that declaration, respectfully refers the Court to that declaration for its contents and context, and denies all inconsistent allegations. Further answering, Defendant TMUS states that this paragraph states legal conclusions and that legal conclusions are for the Court to

make.  Defendant TMUS denies that it intended to violate any FCC rules, denies the allegations of this paragraph to the extent they are intended imply actionable wrongdoing by Defendant TMUS, and denies that Plaintiffs have any viable claim against TMUS.

**Paragraph 399:**  The 2015 MSA and T-Mobile's submissions to the FCC during the course of the investigation that led to the Consent Decree repeatedly demonstrated that T-Mobile relied on Inteliquent to make routing decisions.

**Answer to Paragraph 399:**  Defendant TMUS states that this paragraph purports to characterize the 2015 MSA and T-Mobile's submissions to the FCC, denies that the allegations of this paragraph accurately and/or completely describe the 2015 MSA and T-Mobile's submissions to the FCC, respectfully refers the Court to the 2015 MSA and T-Mobile's submissions to the FCC for their contents and context, and denies all inconsistent allegations.  To the extent a further response is required, Defendant TMUS denies the allegations in this paragraph to the extent they are intended to imply actionable wrongdoing by Defendant TMUS and denies that Plaintiffs have any viable claim against TMUS.

**Paragraph 400:**  T-Mobile's admission that it failed to correct problems with its Intermediate Providers' delivery of calls to consumers in rural areas is also an admission that it violated Section 202(a) of the Act.

**Answer to Paragraph 400:**  Defendant TMUS states that this paragraph purports to characterize Exhibit 1 to the SAC, denies that the allegations of this paragraph accurately and/or completely describe Exhibit 1 to the SAC, respectfully refers the Court to Exhibit 1 to the SAC for its contents and context, and denies all inconsistent allegations.  Further answering, Defendant TMUS states that this paragraph states legal conclusions and that legal conclusions are for the Court to make, but denies that Plaintiffs have any viable claim against TMUS.  Defendant TMUS otherwise denies the remaining allegations of this paragraph and denies that it intended to violate any FCC rules.

**Paragraph 401:**  T-Mobile is fully liable for the acts, omissions, or failures of those Intermediate Providers, including, but not limited to Inteliquent, Level 3, or any other Doe Defendants who are Intermediate Providers, pursuant to Section 217 of the Act. 47 U.S.C. § 217.

169

**Answer to Paragraph 401:**  Defendant TMUS states that this paragraph states legal conclusions and that legal conclusions are for the Court to make, but denies that Plaintiffs have any viable claim against TMUS.  To the extent a further response is required, Defendant TMUS denies the allegations in this paragraph.

**Paragraph 402:**  Defendants' unjustly and unreasonably discriminatory practices have damaged Plaintiffs.

**Answer to Paragraph 402:**  Defendant TMUS states that this paragraph states legal conclusions and that legal conclusions are for the Court to make, but denies that Plaintiffs have any viable claim against TMUS.  To the extent a further response is required, Defendant TMUS denies the allegations in this paragraph.

## COUNTS IV-VII

Defendant TMUS has moved to dismiss the claims in Counts IV through VII in their entirety.  Defendant TMUS therefore reserves answering the allegations in paragraphs 403-471 unless and until the Court rules on the pending motion to dismiss, and then only if the Court permits Plaintiffs to proceed on those claims.  Defendant TMUS expressly reserves each and every defense that Defendant TMUS could assert against these claims as pleaded against Defendant TMUS.

## COUNT VIII
## Civil Conspiracy
## (Against All Defendants)

**Paragraph 473:** The allegations of paragraphs 1 - 472 are incorporated by reference as though fully set forth herein.

**Answer to Paragraph 473:** The answers of paragraphs 1-472 are incorporated by reference as if fully set forth in this answer to this paragraph.

**Paragraph 474:**  Defendants agreed to perpetrate the scheme against Plaintiffs and those similarly situated.

**Answer to Paragraph 474:** Defendant TMUS denies the allegations in this paragraph.

**Paragraph 475:** Defendants agreed on the objective and method to perpetrate their scheme.

**Answer to Paragraph 475:** Defendant TMUS denies the allegations in this paragraph.

**Paragraph 476:** The scheme was unlawful.

**Answer to Paragraph 476:** Defendant TMUS denies the allegations in this paragraph.

**Paragraph 477:** Each Defendant committed an overt act in furtherance of the scheme.

**Answer to Paragraph 477:** Defendant TMUS denies the allegations in this paragraph.

**Paragraph 478:** Plaintiffs have been injured by the conspiracy.

**Answer to Paragraph 478:** Defendant TMUS denies the allegations in this paragraph.

**Paragraph 479:** Punitive damages should be awarded because Defendants' conduct evinces a high degree of moral culpability, their conduct was committed with fraud, actual malice, deliberate oppression, and they acted willfully and with wanton disregard of the rights of others.

**Answer to Paragraph 479:** Defendant TMUS denies the allegations in this paragraph.

### Prayer for Relief

WHEREFORE, Plaintiffs and the Class request the following relief:

1. That the Court enter an order certifying the Class and appointing either or both Plaintiffs as the representative(s) of the Class, and appointing counsel for Plaintiffs as lead counsel for the respective class;

2. That the Court enter judgment against all Defendants jointly and severally, in an amount no less than $750,000,000, premised on the requests for relief set forth herein;

3. That the Court enter judgment against all Defendants and in favor of Plaintiffs and the Class, for all economic, monetary, actual, consequential and compensatory damages caused by their wrongful conduct;

4. That the Court enter judgment against all Defendants and in favor of Plaintiffs and the Class in an amount sufficient to disgorge Defendants of the significant costs and expenses they avoided by their wrongful conduct;

5. That the Court award Plaintiffs and the Class treble damages;

6. That the Court award Plaintiffs and the Class punitive damages;

7. That the Court award Plaintiffs and the Class the costs and expenses, as well as reasonable attorneys' fees, they incurred in prosecuting this action;

8.      That the Court award Plaintiffs and the Class pre-and post-judgment interest;

9.      That the Court award such other and further relief as may be necessary or appropriate.

**Answer to Prayer for Relief**: No response is required because portions of this "Prayer for Relief" relate to Defendant TMUS's pending motion to dismiss, to which the Court is respectfully referred. To the extent a response is required, Defendant TMUS denies that Plaintiffs are entitled to the relief requested in this "Prayer for Relief" or any other relief whatsoever. Defendant TMUS therefore requests that the Court enter judgment in favor of Defendant TMUS and against Plaintiffs, and grant any such other relief as the Court shall deem just and equitable.

## GENERAL DENIAL

Except to the extent than an allegation is specifically and expressly admitted, TMUS's answers to the headings, allegations, claims, prayers for relief, and all other statements in this Answer shall be construed as denials.

## AFFIRMATIVE DEFENSES

TMUS alleges and states the following affirmative defenses to Counts I, II, III, and VIII of the SAC, without assuming the burden of production or persuasion with respect to any issue as to which the applicable law places the burden of proof on Plaintiffs. TMUS reserves the right to supplement and amend these defenses after further investigation and discovery in this matter.

## FIRST AFFIRMATIVE DEFENSE

Plaintiffs' claims, and any claims of the putative class, fail to state a claim upon which relief can be granted in whole or in part.

## SECOND AFFIRMATIVE DEFENSE

Plaintiffs' claims, and any claims of the putative class, are barred in whole or in part because their own conduct or the conduct of their agents caused or contributed to their own alleged damages.

## THIRD AFFIRMATIVE DEFENSE

Plaintiffs' claims, and any claims of the putative class, are barred, in whole or in part, because recovery on such claims would result in unjust enrichment to the plaintiffs and the putative classes. Plaintiffs pray for relief that is duplicative and exceeds any injury alleged in the complaint. Defendants deny any injury exists or has been alleged. Awarding the plaintiffs or putative class members the relief requested would unjustly enrich the plaintiffs and putative class members.

## FOURTH AFFIRMATIVE DEFENSE

Plaintiffs' claims, and any claims of the putative class, are barred in whole or in part because they failed to mitigate their damages.

## FIFTH AFFIRMATIVE DEFENSE

Plaintiffs' claims, and any claims of the putative class, are barred in whole or in part because they failed to plead fraud with required specificity.

## SIXTH AFFIRMATIVE DEFENSE

Plaintiffs' claims, and any claims of the putative class, are barred in whole or in part by the applicable statutes of limitation. Plaintiffs commenced this lawsuit on November 1, 2019. By that time, the statutes of limitation for each of the claims asserted had already run. 47 U.S.C. § 415 (Communication Act: 2 years; statutory period commenced on November 1, 2017); *Jones v. Burge*, 2012 WL 2192272, at \*3 (N.D. Ill. June 13, 2012) (RICO: 4 years; statutory period commenced on November 1, 2015); *Tartan Constr., LLC v. New Equip. Servs. Corp.*, 2018 WL 4563079, at \*2

(N.D. Ill. Sept. 24, 2018) (ICFA: 3 years; statutory period commenced on November 1, 2016); *Lakin v. Skaletsky*, 2008 WL 4662846, at *4 (N.D. Ill. Oct. 15, 2008), *aff'd*, 327 F. App'x 636 (7th Cir. 2009) (Civil Conspiracy: 3 years; statutory period commenced on November 1, 2014).

## SEVENTH AFFIRMATIVE DEFENSE

To the extent Defendant TMUS is found liable to Plaintiffs or putative class members, any award should be offset by any amount due from Plaintiffs or putative class members to Defendant TMUS.

## EIGHTH AFFIRMATIVE DEFENSE

Plaintiffs' claims, and any claims of the putative class, are barred in whole or in part to the extent that any injuries to Plaintiffs were caused by third parties without the knowledge, control or consent of Defendant TMUS.

## NINTH AFFIRMATIVE DEFENSE

Plaintiffs' claims, and any claims of the putative class, for punitive damages cannot be sustained because an award of punitive damages would violate Defendant TMUS's due process rights guaranteed by the Fourteenth Amendment to the United States Constitution and by the due process provisions of the state constitution.

## TENTH AFFIRMATIVE DEFENSE

Any award of punitive damages in this case would violate Defendant TMUS's rights under the substantive and procedural Due Process Clause of the United States Constitution and corresponding provisions of the state constitution, the Excessive Fines Clause of the Eight Amendment to the United States Constitution, the contract clause of Article Two of the United States Constitution, and the Equal Protection Clause of the United States Constitution and corresponding provisions of the state constitution.

## ELEVENTH AFFIRMATIVE DEFENSE

The imposition of punitive damages in this case based upon theories of respondeat superior, agency, vicarious liability or joint and several liability violates the Due Process Clause of the Fourteenth Amendment of the United States Constitution.

## TWELFTH AFFIRMATIVE DEFENSE

Plaintiffs' state law claims, and any state law claims of the putative class, are preempted by the Federal Communication Act. *See Bastien v. AT&T Wireless Servs., Inc.*, 205 F.3d 983, 987 (7th Cir. 2000) (state law claims based on "poor" "service quality" are preempted by 47 U.S.C. 332(c)(3)(A)).

## THIRTEENTH AFFIRMATIVE DEFENSE

Plaintiffs' claims, and any claims of the putative class, are barred, in whole or in part, because all conduct of TMUS alleged in the Complaint was conducted in good faith.

Dated: January 12, 2021

Respectfully submitted,

*/s/ Nigel F. Telman*
Nigel F. Telman
Edward C. Young
PROSKAUER ROSE LLP
Three First National Plaza
70 West Madison, Suite 3800
Chicago, IL 60602
(312) 962-3550
(312) 962-3551 (fax)
ntelman@proskauer.com

Bradley I. Ruskin (admitted *pro hac vice*)
Michael T. Mervis (admitted *pro hac vice*)
Baldassare Vinti (admitted *pro hac vice*)
PROSKAUER ROSE LLP
11 Times Square
New York, New York 10036
(212) 969-3249
(212) 969-2900

bruskin@proskauer.com
mmervis@proskauer.com
bvinti@proskauer.com

*Counsel for Defendant TMUS*

**CERTIFICATE OF SERVICE**

     I, Nigel F. Telman, one of the attorneys for Defendant T-Mobile USA, Inc., certify that I caused a copy of the foregoing T-MOBILE USA, INC.'S ANSWER AND AFFIRMATIVE DEFENSES TO PLAINTIFFS' SECOND AMENDED COMPLAINT to be served by email via the Court's ECF System, upon counsel for Plaintiffs:

David T.B. Audley
Mia D. D'Andrea
Chapman and Cutler LLP
111 West Monroe Street
Chicago, IL 60603-4080
Email: audley@chapman.com
Email: dandrea@chapman.com

Cathy A. Hinger
G. David Carter
Womble Bond Dickinson (US) LLP
1200 19th Street, NW, Suite 500
Washington, DC 20036
Email: cathy.hinger@wbd.us.com
Email: david.carter@wbd.us.com

Kurt Weaver
Womble Bond Dickinson (US) LLP
555 Fayetteville Street, Suite 1100
Raleigh, NC 27061
Email: kurt.weaver@wbd-us.com

this 12th day of January, 2021.

                                             /s/ Nigel F. Telman