**THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

CRAIGVILLE TELEPHONE CO. d/b/a )
ADAMSWELLS; and CONSOLIDATED )
TELEPHONE COMPANY d/b/a CTC, )
                                  )
        Plaintiffs, )     No. 1:19-cv-07190
                                  )
        vs. )     Judge John Z. Lee
                                  )
T-MOBILE USA, INC.; and )
INTELIQUENT, INC., )
                                  )
        Defendants. )

**PLAINTIFFS' OPPOSITION TO T-MOBILE USA, INC.'S**
**MOTION TO DISMISS PLAINTIFFS' SECOND AMENDED COMPLAINT**

David T.B. Audley (Bar No. 6190602)
Mia D. D'Andrea (Bar No. 6307966)
**CHAPMAN AND CUTLER LLP**
111 West Monroe Street
Chicago, IL 60603-4080
Tel. 312-845-2971
Email: audley@chapman.com
Email: dandrea@chapman.com

Cathy A. Hinger (*pro hac vice*)
G. David Carter (*pro hac vice*)
**WOMBLE BOND DICKINSON (US) LLP**
1200 19th Street, NW, Suite 500
Washington, DC 20036
Tel.: 202-857-4489
Email: cathy.hinger@wbd-us.com
Email: david.carter@wbd-us.com

Kurt D. Weaver (*pro hac vice*)
**WOMBLE BOND DICKINSON (US) LLP**
555 Fayetteville Street, Suite 1100
Raleigh, NC 27601
Telephone: 919-755-8163
Email: kurt.weaver@wbd-us.com

*Counsel for Plaintiffs*

## **TABLE OF CONTENTS**

INTRODUCTION AND SUMMARY OF ARGUMENT ........................................................1

LEGAL STANDARDS ........................................................................................................3

ARGUMENT ......................................................................................................................4

    I.      THE SAC SUFFICIENTLY ALLEGES LOSS OF ACCESS CHARGE DAMAGES. .4

          A.      Plaintiffs Need Only Allege An Economic Injury "Flowing From" The Violation Of The Act. ...........................................................................................................4

          B.      The SAC Sufficiently Alleges Terminating Access Charge Damages Flowing From T-Mobile's Violation Of The Act. ...............................................................5

          C.      The Hobbs Act Prohibits Collateral Attacks On The FCC's Findings. ..................8

          D.      The Court Is Not Bound By Its Prior Order To Dismiss The SAC's Terminating Access Charge Damages Claims. ......................................................................10

          E.      Whether Fake Ring Tones Enhance Or Deter Call Completion Is A Disputed Issue That Cannot Be Resolved On The Pleadings. ........................................................11

          F.      Whether Fake Ring Tones Prevented Calls Placed To Plaintiffs' Customers From Being Handed Back Requires Discovery. ............................................................13

          G.      T-Mobile's Other Arguments For Dismissing Terminating Access Charge Damages Have No Merit. ...............................................................................14

    II.     THE COURT SHOULD DENY T-MOBILE'S MOTION TO DISMISS THE RICO CLAIMS (COUNTS IV-V). ..........................................................................15

    III.    THE SAC PLAUSIBLY ALLEGES THAT T-MOBILE TORTIOUSLY INTERFERRED WITH PROSPECTIVE ECONOMIC ADVANTAGE (COUNT VI). ..................................................................................................17

    IV.   THE SAC STATES A CLAIM FOR VIOLATION OF THE ICFA (COUNT VII). ....20

          A.      The SAC Demonstrates Sufficient Circumstances Related To Disputed Transactions Occurring Primarily And Substantially In Illinois. .........................21

          B.      The SAC Sufficiently Pleads Deception And Unfair Business Practices. .............24

          C.      The SAC Sufficiently Pleads A Consumer Nexus. ...............................................24

CONCLUSION ...................................................................................................................25

**TABLE OF AUTHORITIES**

Other Authorities

768 F.3d 1110 (11th Cir. 2014) ............................................................ 9

958 F.2d 186 (7th Cir. 1992) ............................................................ 20

*Ashcroft v. Iqbal,*
  556 U.S. 662 (2009)............................................................ 3, 11

*Askins v. U.S. Dep't of Homeland Sec.,*
  899 F.3d 1035 (9th Cir. 2018) ............................................................ 10

*ATC Healthcare Servs., Inc. v. RCM Techs.,*
  *282 F. Sup*p. 3d 1043 (N.D. Ill. 2017) ............................................................ 18

*Avery v. State Farm Mut. Auto. Ins. Co.,*
  835 N.E.2d 801 (Ill. 2005) ............................................................ 21

*Beanstalk Group, Inc. v. AM Gen. Corp.,*
  *283* F.3d 856 (7th Cir. 2002) ............................................................ 17

*Bell Atl. Corp. v. Twombly,*
  550 U.S. 544 (2007)............................................................ 3, 12

*Bible v. United Student Aid Funds, Inc.,*
  799 F.3d 633 (7th Cir. 2015) ............................................................ 16

*Chevron* deference. *Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc.,*
  467 U.S. 837 (1984)............................................................ 9

*Cole v. Milwaukee Area Tech. Coll. Dist.,*
  634 F.3d 901 (7th Cir. 2011) ............................................................ 3

*Conboy v. AT&T Corp.,*
  241 F.3d 242 (2d Cir. 2001)............................................................ 4

*Cosmetique, Inc. v. ValueClick, Inc.,*
  753 F. Supp. 2d 716 (N.D. Ill. 2010) ............................................................ 25

*DiLeo v. Ernst & Young,*
  901 F.2d 624 (7th Cir. 1990) ............................................................ 25

*Energy Servs. Air Conditioning & Heating Co., Inc.,* No. 97 C,
  373, 1997 WL 790725 (N.D. Ill. Dec. 22, 1997)............................................................ 18, 19

*Everite Transworld Ltd. v. MIEH, Inc.,*
  No. 19-cv-0678, 2020 WL 887373 (N.D. Ill. Feb. 24, 2020) ............................................................ 20

*Firestone Fin. Corp. v. Meyer,*
  796 F.3d 822 (7th Cir. 2015) ............................................................ 12

*Foster v. Principal Life Ins. Co.,*
  806 F.3d 967 (7th Cir. 2015) ............................................................ 17, 20

*Freedom Mortg. Corp. v. Burnham Mortg., Inc.,*
  720 F. Supp. 2d 978 (N.D. Ill. 2010) ............................................................ 21, 24, 25

*Gen. Elec. Co. v. Uptake Tech, Inc.,*
  394 F. Supp. 3d 815 (N.D. Ill. 2019) ............................................................ 18

*Gibson v. City of Chi.,*
  910 F.2d 1510 (7th Cir. 1990) ............................................................ 3

*Godfrey v. GreatBanc Trust Co.,* No. 18 C,
  7918, 2020 WL 4815906 (N.D. Ill. Aug. 19, 2020) ............................................................ 10

*Gomez v. Ill. State Bd. of Educ.*,
    811 F.2d 1030 (7th Cir. 1987) ........................................................................................ 12

*Goren v. New Vision Int'l, Inc.*,
    156 F.3d 721 (7th Cir. 1998) ......................................................................................... 16

*Health King Enterprise, Inc. v. Dalian Health King Products Co., Ltd.*, No. 19 C 1878,
    2020 WL 1124760 n.4 (N.D. Ill. Mar. 6, 2020).............................................................. 18

*IFC Credit Corp. v. Aliano Bros. General Contractors, Inc.*,
    No. 04 C 6504, 2007 WL 164603 (N.D. Ill. Jan. 12, 2007) ............................................. 22, 23

*In re Wireless Telephone 911 Calls Litigation v. Nokia Corp.*,
    No MDL-1521, 03 C 2597, 02 C 8808, 2005 WL 1564978 (N.D. Ill. June 3, 2005)............. 4, 6

*Interstate Commerce Comm'n v. Union Pac. R.R. Co.*,
    222 U.S. 541 (1912)...................................................................................................... 8

*Iowa Network Servs., Inc. v. Qwest Corp.*,
    385 F. Supp. 2d 850 (S.D. Iowa 2005) ............................................................................ 9

*IPOX Schuster, LLC v. Nikko Asset Mgmt. Co., Ltd.*,
    191 F. Supp. 3d 790 (N.D. Ill 2016) .............................................................................. 21

*Koehler v. Packer Group, Inc.*,
    53 N.E.3d 218 (Ill. App. Ct. 2016) ............................................................................... 19

*Leyse v. Clear Channel Broad., Inc.*,
    545 F. App'x 444 (6th Cir. 2013) .................................................................................. 8

*Lynch v. City of New York*,
    952 F.3d 67 (2d Cir. 2020)....................................................................................... 12, 13

*Morrison v. YTB Int'l, Inc.*,
    649 F.3d 533 (7th Cir. 2011) ...................................................................................... 3, 21

*Pac. Bell Tel. Co. v. Cal. Pub. Utilities Comm'n*,
    621 F.3d 836 (9th Cir. 2010) ........................................................................................ 9

*Phillips v. Bally Total Fitness Holding Corp.*,
    865 N.E.2d 310 (Ill. App. Ct. 2007) ............................................................................. 21

*Pirelli Armstrong Tire Corp. Retiree Med. Benefits Trust v. Walgreen Co.*,
    No. 10–1686, 2011 WL 183163 (7th Cir. Jan. 21, 2011) ............................................... 14, 15

*Polyad Co. v. Indopco Inc.*, No. 06 C,
    5732, 2008 WL 4287623 (N.D. Ill. Sept. 12, 2008) ........................................................ 20

*Republic Tobacco, L.P. v. N. Atl. Trading Co., Inc.*,
    254 F. Supp. 2d 1007 (N.D. Ill. 2003) ........................................................................... 19

*Samson v. U.S. Dep't of Labor, Admin. Review Bd.*,
    732 F. App'x 444 (7th Cir. 2018) ................................................................................... 9

*Slep-Tone Entm't Corp. v. Coyne*,
    141 F. Supp. 3d 813 (N.D. Ill. 2015) .......................................................................... 18, 19

*Soderlund Bros., Inc. v. Carrier Corp.*,
    663 N.E.2d 1 (Ill. App. Ct. 1995) ................................................................................. 19

*Strosberg v. Brauvin Realty Servs., Inc.*,
    691 N.E.2d 834 (Ill. App. Ct. 1998) ........................................................................... 19, 20

*Sunny Handicraft Ltd. v. Envision This!, LLC*,
    No. 14-CV-1512, 2015 WL 231108 (N.D. Ill. Jan. 16, 2015)......................................... 19, 20

*The Clearing Corp. v. Fin. and Energy Exch. Ltd.*,
    No. 09CV5383, 2010 WL 2836717 & n.5 (N.D. Ill. Jul. 16, 2010) .................................... 22

*Trehan v. Kikkerland Design, Inc.*, Case No. 13 C,
  8023, 2014 WL 1018319 (N.D. Ill. Mar. 17, 2014) ................................................................ 12
*Triad Assocs., Inc. v. Chi. Hous. Auth.*,
  892 F.2d 583 (7th Cir. 1989) .......................................................................................................... 3
*U.S. W. Commc'ns, Inc. v. Hamilton*,
  224 F.3d 1049 (9th Cir. 2000) ...................................................................................................... 9
*United Union Roofers, Waterproofers & Allied Workers Local Union No. 8 v. Great Lakes
  Dredge & Dock Corp.*,
  13 CV 2115, 2014 WL 12780549 (N.D. Ill. Oct. 21, 2014) ..................................................... 16
*Village of Barrington, Ill. v. Surface Transp. Bd.*,
  *892 F.3d 25*2 (7th Cir. 2018) ......................................................................................................... 8
*Vonage Holdings Corp. v. Minn. Pub. Utilities Comm'n*,
  *394* F.3d 568 (8th Cir. 2004) .......................................................................................................... 8
*Voyles v. Sandia Mortg. Corp.*,
  196 Ill. 2d 288 (2001) ...................................................................................................................... 17

Regulations

28 U.S.C. § 2342 .................................................................................................................................. 8
47 U.S.C. § 201(b) ...................................................................................................................... 1, 9
47 U.S.C. § 206 .................................................................................................................................... 4
47 U.S.C. § 402(a) .............................................................................................................................. 8
5 U.S.C. § 706 (E)-(F) ...................................................................................................................... 8
815 ILCS 505/1(f) ............................................................................................................................ 24
section 402(a) of title 47 ................................................................................................................. 8

No table of authorities entries found.

Craigville Telephone Co. d/b/a AdamsWells and Consolidated Telephone Company d/b/a CTC, on behalf of themselves and a class of similarly-situated companies, submit this Opposition to T-Mobile USA, Inc.'s Motion to Dismiss Plaintiff's Second Amended Complaint ("Motion").

## INTRODUCTION AND SUMMARY OF ARGUMENT

The Motion should be denied because the Second Amended Complaint (ECF 94) ("SAC") cures each pleading insufficiency noted in the November 16, 2020 Order (ECF 91) ("Order") granting in part Defendants' motions to dismiss the First Amended Complaint (ECF 19) ("FAC").[1]

The Order ruled that Count I (Communications Act of 1934 ("Act"), 47 U.S.C. § 201(b) – Fake Ring Tones) may proceed with respect to one damages theory, but not the other. The Court recognized that the FCC has found the following harms flow from a carrier's use of fake ring tones:

> First, '***the caller may often hang up, thinking nobody is available to receive the call***.' *Id*. Second, false ringing makes it 'appear to the caller that the terminating rural provider is responsible for the call failure, instead of the originating or intermediate provider.'

(Order, 4 (emphasis added).) The Court also recognized that Plaintiffs alleged "fake ring tones caused consumers to end calls prematurely, diminishing the access charges Plaintiffs might have earned." (*Id.*, 9.) Yet, the Court found that the FAC "contains little support for . . . [this] theory." (*Id.*) The Court then found that lost terminating access charge damages were not adequately pled because the Court, drawing on common sense, expected that "a caller who encountered ringing would have stay[ed] on the line longer than one who met with dead air," and "as a result, fake ring tones improve, not worsen, the odds that calls connect." (*Id.*)

In response to these conclusions, Plaintiffs clarify in the SAC that the FCC has expressly found that fake ring tones cause calls not to be completed, for one of two distinct reasons: (1) they

---

[1] The Complaint was filed on November 1, 2019. (ECF 1.) The FAC was filed on November 25, 2019, to incorporate new facts revealed in the FCC's FOIA production. (FAC, n.1.)

confuse the calling party into thinking the called party is not available to answer a call when, in reality, *that call has not yet reached the terminating carrier's network*; or, (2) they technologically prevent a call that fails to complete on the first call path attempted from being handed back to the prior provider to search for an alternate call path to complete the call (and, as a result, make it impossible for the call to ever complete). (SAC ¶¶ 2-3, 114-18.) Defendants may not now mount a collateral attack on the factual findings made by the FCC when they never challenged those findings in a federal appellate court as required by the Hobbs Act. Even if the Court finds plausible T-Mobile's proffer that fake ring tones encouraged some callers to stay on the line longer, the SAC alleges that fake ring tones caused equally plausible adverse consequences that prevented calls from completing, thereby denying the Plaintiffs' class terminating access charges that they would have been entitled to collect. Courts are required to accept the truth of Plaintiffs' allegations and may not, at this stage, dismiss an entire damages theory simply because it perceives Defendants' explanation for their unlawful conduct as a plausible alternative. The SAC need only allege damages flowing from T-Mobile's violation of the Act, *i.e.*, the use of fake ring tones, which it does by alleging at length that the FCC has found fake ring tones cause calls not to complete.

The Court applied its same conclusion to Counts IV and V (RICO) and reasoned that the intent of T-Mobile's insertion of fake ring tones could not have been to defraud rural LECs, as necessary to establish the scienter element of the RICO predicate acts of wire fraud. (Order, 15-21.) But, the SAC's amendments allege that the FCC expressly found fake ring tones cause calls not to be answered or completed, countering the Court's reason for previously dismissing Counts IV and V.

The SAC also amends Count VI to claim tortious interference with prospective economic advantage and pleads all elements. Plaintiffs also show herein that they need not plead facts to

2

overcome a competitor's privilege defense at the pleading stage, and T-Mobile agrees. If the Court determines that Plaintiffs must plead the competitor's privilege is inapplicable, the SAC certainly does so in all events.

Finally, with respect to Count VII for violations of the Illinois Consumer Fraud and Deceptive Business Practices Act ("ICFA"), the SAC alleges myriad new facts showing that more circumstances related to the fake ring tone scheme occurred primarily and substantially in Illinois than was found sufficient in *Morrison v. YTB Int'l, Inc.*, 649 F.3d 533, 537-38 (7th Cir. 2011), addressing the sole insufficiency the Order identified with this claim. (Order, n.9.)

For these and other reasons set forth below, T-Mobile's Motion should be denied.

## LEGAL STANDARDS[2]

A Rule 12(b)(6) motion is meant to "test the sufficiency of the complaint, not to decide the merits" of the case. *Gibson v. City of Chi.*, 910 F.2d 1510, 1520 (7th Cir. 1990) (quoting *Triad Assocs., Inc. v. Chi. Hous. Auth.*, 892 F.2d 583, 586 (7th Cir. 1989)). In evaluating a Rule 12(b)(6) motion, the Court must accept all well-pleaded allegations as true and draw all reasonable inferences in Plaintiffs' favor. *Cole v. Milwaukee Area Tech. Coll. Dist.*, 634 F.3d 901, 903 (7th Cir. 2011). The Court may grant a Rule 12(b)(6) motion only if a complaint lacks "enough facts to state a claim [for] relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 697 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678 (citing *Twombly*, 550 U.S. at 556).

---

[2] T-Mobile asserts that its Motion is also brought pursuant to Rule 12(b)(1), which appears to relate to the ICFA claim. The relevant pleading standards are the same. (Order, n.4.)

## ARGUMENT

**I.    THE SAC SUFFICIENTLY ALLEGES LOSS OF ACCESS CHARGE DAMAGES.[3]**

### A.    Plaintiffs Need Only Allege An Economic Injury "Flowing From" The Violation Of The Act.

The Act provides that a carrier in violation of its provisions is liable for damages "sustained in consequence" of the violation. 47 U.S.C. § 206.  Courts find that this means plaintiffs must allege economic damages "flowing from" violations of the Act.  *Conboy v. AT&T Corp.*, 241 F.3d 242, 250-51 (2d Cir. 2001).  Presumed damages for emotional distress and mental anguish are not recoverable.  *Id.*  In *In re Wireless Telephone 911 Calls Litigation v. Nokia Corp.*, No MDL-1521, 03 C 2597, 02 C 8808, 2005 WL 1564978, at *7 (N.D. Ill. June 3, 2005) ("*911 Litigation*"), the court denied the wireless carriers' motion to dismiss that made similar arguments to those made by T-Mobile.  The plaintiffs alleged that defendants' wireless phones failed to comply with FCC rules requiring 911 calls to complete within 17 seconds.  *Id.* at *1.  The defendants argued that since no plaintiff attempted to make a 911 call, let alone suffered injury from a call not completing in a timely manner, they failed to adequately allege injury flowing from a violation of the Act.  *Id.* at *7.  The court rejected the defendants' argument that plaintiffs must have actually tried to dial 911 and failed, was unpersuaded by their invitation to be skeptical as to plaintiffs' ability to prove the alleged injury, and found that "Plaintiffs are entitled to the opportunity of proving this allegation of diminished value."  *Id.*

The *911 Litigation* shows that Plaintiffs in this case, in which economic damages are more directly alleged, are entitled to undertake discovery necessary to prove the amount of access charges that T-Mobile and Inteliquent's scheme deprived them of.  The *911 Litigation* defendants'

---

[3] Plaintiffs' reubttal arguments made in this section apply equally to the same argument made by Inteliquent's Motion to Dismiss the SAC.  (ECF 98, 1, 7-9.)

argument that no injury could be pled because the plaintiffs did not allege a specific 911 call that failed to connect parallels T-Mobile's argument that the SAC "fails to identify even a single access charge Plaintiffs lost, or a single call that did not connect." (ECF 101, 11.) Here, however, Plaintiffs have drawn a much clearer nexus between Defendants' unlawful conduct and the lost access charges Plaintiffs and other rural class members experienced, by specifically alleging that the scheme was created for the very purpose of reducing the amounts Defendants paid rural carriers for access charges. As in the *911 Litigation*, this Court should rule that Plaintiffs are entitled to an opportunity to prove loss of access charge damages through discovery, despite Defendants' asserted skepticism of such injury.

**B.      The SAC Sufficiently Alleges Terminating Access Charge Damages Flowing From T-Mobile's Violation Of The Act.**

To respond to the Court's finding that the FAC contained "little support" for Plaintiffs' allegations "that fake ring tones caused consumers to end calls prematurely, diminishing the access charges Plaintiffs might have earned," (Order, 9), the SAC alleges, with much greater particularity than the FAC, the FCC's relevant findings:

> ***The [FCC] has found that the use of fake ring tones causes calls not to be completed because it confuses callers into prematurely hanging up***, wrongfully believing their call has been successfully connected but that the recipient of the call is simply not answering. The FCC has also found that insertion of fake ring tones prevents calls that are not completing from being handed back to the preceding intermediate carrier to try another route. ***Every time a call is not completed because of these direct consequences of fake ring tones, the terminating LEC is directly harmed by not receiving access charges for the termination of that call.***

(SAC ¶¶ 2, 120 (emphasis added).) It also alleges:

> T-Mobile's fake ring tone scheme ***injured the class members' businesses by depriving them of opportunities to seek intercarrier compensation for calls the scheme blocked from connecting to the Plaintiffs' switches***, . . . .

(*Id.* ¶ 3 (emphasis added); *see also id.* ¶ 14 ("Plaintiffs have been damaged through the loss

of access charge revenues . . . .").)  Further, it states:

> The use of fake ring tones can also prevent calls from reaching their intended destination.  As discussed more fully below, *see infra* ¶¶ 104, 113-115, **the FCC has concluded that the use of fake ring tones causes calls not to be completed because the caller hangs up, believing that no one is home, when the recipient's phone has not even rung**.  Moreover the use of fake ring tones interferes with the proper routing of calls by preventing a call from being handed back to the **prior provider** when a route is not functioning properly.  Thus, fake ring tones can cause call failures, which are then masked by the fake ringing.

(*Id.* ¶ 87) (emphasis added).  Next, citing and quoting from the 2013 Notice of Proposed

Rulemaking ("NPRM") attached to the SAC as Exhibit 5, the SAC alleges:

> According to the FCC, "false audible ringing" causes a caller to "hear[ ] prolonged ringing" and "finally hang[ ] up—before the rural phone he called has rung at all." *Id.*  The FCC further indicated that "once an intermediate provider provides a ringing indication to an originating provider while still processing the call, the call cannot be handed back to the preceding provider for an alternate route."  *Id*.  In other words, **the FCC asserted that the insertion of fake ring tones makes it less likely that a call ultimately reaches its intended destination for at least two reasons:  (1) it causes the caller to "hang up" before the called party's phone begins to ring; and (2) it prevents the call from being returned to the preceding carrier so that alternative routes may be attempted and thus serves to block the call from being completed**.

(*Id.* ¶ 104 (emphasis added)*; see also* SAC Ex. 5, ¶ 40 (same).)  The SAC also shows that the FCC

reiterated these findings in the *2013 Rural Call Completion Order*, as follows:

> **The Commission reiterated that the use of fake ring tones causes the caller to hang up prematurely**, "thinking nobody is available to receive the call," and that the use of a fake ring tone prevents the call from being handed "back to the preceding provider for an alternative route" when the call is not able to reach its intended destination.

(SAC Ex. 9, ¶ 111) (emphasis added).)  The Order's text supporting this allegation states:

> False Audible Ringing . . . An originating or intermediate provider may do this to mask the silence that the caller would otherwise hear during excessive call setup time.  **As a result, the caller may often hang up, thinking nobody is available to receive the call.**

(*Id.* (emphasis added).)  It also states:

> Consumer expectation is simple: if a calling party hears audible ringing, the calling party believes the called party's phone is ringing or otherwise being alerted in the same timeframe. ***As a result of this rule, consumers will no longer prematurely hang up when the call has not even rung on the caller's side***, . . . .

(SAC Ex. 9, ¶ 114; *see also* SAC ¶ 118 (quoting same) (emphasis added).) And,

> It is an unreasonable practice to send misleading ring sounds to customers making long-distance calls, ***as it may cause them to believe that the called party is not answering when in fact the call has not yet been connected***, . . . .

(SAC Ex. 9, ¶ 116) (emphasis added).) Based on these express FCC findings, the SAC alleges, "[t]hus, in the *2013 Rural Call Completion Order* the FCC expressly concluded that the use of fake ring tones causes calls not to be completed." (SAC ¶ 115.) "When calls are not completed because of the use of fake ring tones, the terminating LEC is harmed by not receiving access charges for the termination of that call." (*Id.* ¶ 116.)[4]

Taken as a whole, the SAC shows that even if fake ring tones did not impose the same harm on every single call, it is clearly plausible that their use resulted in some calls not being completed and access charges not being collected. The fake ring tones tricked the calling party into prematurely hanging up on calls that had never reached the terminating carrier's network because they believed the called party was not home. Indeed, fake ring tones made it appear that some calls which were never going to connect had actually reached the intended recipient. This is because fake ring tones prevent calls that are not able to be completed on an initial route from being handed back to a prior provider to search for a different call path. Every time a call was not completed due to these consequences of fake ring tones, the terminating LEC was directly harmed by not receiving access charges for termination of those calls. (SAC ¶¶ 2, 10, 14, 86-87.)

---

[4] The SAC alleges that Inteliquent made the same argument to the FCC that T-Mobile makes here – fake ring tones provide comfort to the calling party – but, "the FCC later expressly rejected this argument." (SAC ¶¶ 107, 117.) Inteliquent's former CEO, Fritz Hendricks, supported the FCC's finding that fake ring tones cause callers to prematurely hang up. (*Id.* ¶¶ 98, 355-57.)

### C. The Hobbs Act Prohibits Collateral Attacks On The FCC's Findings.

On a motion to dismiss, Defendants cannot challenge in this Court the FCC's factual findings alleged in the SAC and summarized above because the court of appeals had exclusive jurisdiction to hear any such challenge. (*Id.* ¶ 120.) FCC decisions are insulated from collateral attack in federal district court litigation as a result of the Administrative Orders Review Act, also known as the Hobbs Act, 28 U.S.C. § 2342, *et seq*. "The Hobbs Act and the [ ] Communications Act work in tandem to confine the jurisdiction of federal courts over efforts to invalidate certain actions by the FCC." *Leyse v. Clear Channel Broad., Inc.*, 545 F. App'x 444, 447 (6th Cir. 2013); *Vonage Holdings Corp. v. Minn. Pub. Utilities Comm'n*, 394 F.3d 568, 569 (8th Cir. 2004) (the Hobbs Act "prescribes the sole conditions under which the courts of appeals have jurisdiction to review the merits of FCC orders"). The Act provides that "[a]ny proceeding to enjoin, set aside, annul, or suspend any order of the Commission under this chapter . . . shall be brought as provided by and in the manner prescribed in . . . [the Hobbs Act]." 47 U.S.C. § 402(a). The Hobbs Act, in turn, provides that "[t]he court of appeals . . . has exclusive jurisdiction to enjoin, set aside, suspend (in whole or in part), or to determine the validity of (1) all final orders of the [FCC] made reviewable by section 402(a) of title 47." 28 U.S.C. § 2342; *see also id.*, § 2344 (providing 60 days to file a petition for review in the court of appeals).

Under the Administrative Procedures Act, a basis to challenge an FCC order is that the agency's factual findings are "unsupported by substantial evidence" or "unwarranted by the facts." 5 U.S.C. § 706 (E)-(F). And, for more than a century, it has been recognized that an agency's factual findings are subject to *appellate* review only "to determine whether there was substantial evidence to sustain the order." *Interstate Commerce Comm'n v. Union Pac. R.R. Co.*, 222 U.S. 541, 548 (1912); *Village of Barrington, Ill. v. Surface Transp. Bd.*, 892 F.3d 252, 268-69 (7th Cir.

2018) (discussing the requirement to uphold agency decisions supported by substantial evidence); *Samson v. U.S. Dep't of Labor, Admin. Review Bd.*, 732 F. App'x 444, 446 (7th Cir. 2018) (same).

Accordingly, if Defendants desired to challenge the FCC's conclusion that the use of fake ring tones is an unjust and unreasonable practice that violates Section 201(b),[5] or its underlying factual findings that fake ring tones cause callers to hang up prematurely and prevent calls from being handed back for an alternate path, their sole avenue was to file a petition for review in a court of appeals within 60 days of entry.  They did not do so.  Respectfully, this Court should not substitute its view of common sense for factual findings made by the FCC under the authority delegated to it by Congress to interpret and enforce the Act.[6]  As the Eleventh Circuit explained in *Mais v. Gulf Coast Collection Bureau, Inc.*:

> Hobbs Act jurisdictional analysis looks to the "practical effect" of a proceeding, not the plaintiff's central purpose for bringing suit.  The district courts lack jurisdiction to consider claims to the extent they depend on establishing that all or part of an FCC order subject to the Hobbs Act is "wrong as a matter of law" or is "otherwise invalid."  . . .  In other words, "[w]hichever way it is done, to ask the district court to decide whether the regulations are valid violates the statutory requirements."  . . .  And "[a] defensive attack on the FCC regulations is as much an evasion of the exclusive jurisdiction of the Court of Appeals as is a preemptive strike."

768 F.3d 1110, 1119-20 (11th Cir. 2014) (internal citations omitted).

---

[5] The FCC's conclusion that the use of fake ring tones is an unjust and unreasonable practice and thus violates Section 201(b) of the Communications Act, 47 U.S.C. § 201(b), is entitled to *Chevron* deference.  *Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 844-46 (1984).

[6] *See, e.g.*, *Pac. Bell Tel. Co. v. Cal. Pub. Utilities Comm'n*, 621 F.3d 836, 843 n.10 (9th Cir. 2010) ("Under the Hobbs Act, this court lacks jurisdiction to rule on a collateral attack of an FCC order."); *U.S. W. Commc'ns, Inc. v. Hamilton*, 224 F.3d 1049, 1055 (9th Cir. 2000) (even if a court "doubt[s] the soundness of the FCC's interpretation", it is "not at liberty to review that interpretation"); *Iowa Network Servs., Inc. v. Qwest Corp.*, 385 F. Supp. 2d 850, 884, n.46 (S.D. Iowa 2005), *aff'd*, 466 F.3d 1091 (8th Cir. 2006) ("[T]he Hobbs Act . . . bar[s] collateral attacks by nonparties as well as parties to the agency proceeding.  'A challenge to an [agency] order need not be direct' to invoke these statutory provisions; 'all that is required is that the effect of the prayed for relief contradict a Commission order.'") (internal citations omitted).

In sum, since litigants cannot collaterally attack the FCC's orders in private litigation, it is manifest that, for purposes of a Rule 12(b)(6) motion to dismiss, Plaintiffs' allegations premised on the FCC's factual findings ought not be disregarded as implausible. *See, e.g.*, *supra* n.6.

**D.    The Court Is Not Bound By Its Prior Order To Dismiss The SAC's Terminating Access Charge Damages Claims.**

Defendants' arguments presume that the Court is bound by the Order's rationale for dismissing the lost access charge damages as if it were the law of the case, but neither cites any legal precedent supporting this presumption, and it is wrong.  (ECF 98, 7-9; ECF 101, 2, 9-10.) Where an amended complaint contains more particularized factual allegations, as the SAC does here, the Court should fully consider those new allegations.  *See Godfrey v. GreatBanc Trust Co.*, No. 18 C 7918, 2020 WL 4815906, at *6 (N.D. Ill. Aug. 19, 2020).  In *Godfrey*, the court denied a motion to dismiss a second amended complaint where it "include[d] more particularized factual allegations [that] . . . , unlike those in the first amended complaint, support a plausible inference" that the defendants were liable.  *Id.* (finding ruling did not run afoul of the law of the case doctrine). The upshot of *Godfrey* is that a court may rule differently on a motion to dismiss an amended complaint than it did on the prior pleading.  The Ninth Circuit explained it well:

> [W]hen an original complaint is dismissed without prejudice, the filing of an amended complaint does not ask the court to reconsider its analysis of the initial complaint. The amended complaint is a new complaint, entitling the plaintiff to judgment on the complaint's own merits; we do not ask whether the plaintiff is "precluded" or "barred" by the prior ruling . . . .  The district court is not, however, bound by any law of the case.

*Askins v. U.S. Dep't of Homeland Sec.*, 899 F.3d 1035, 1043 (9th Cir. 2018).  Therefore, the Court is not bound by its prior Order and should consider the SAC anew.[7]

---

[7] T-Mobile cites several inapposite cases for the proposition that a court may dismiss an amended complaint that does not cure the insufficiencies identified by the court.  (ECF 101, 7-8.)  None

**E.      Whether Fake Ring Tones Enhance Or Deter Call Completion Is A Disputed Issue That Cannot Be Resolved On The Pleadings.**

Despite the FCC's express finding to the contrary, T-Mobile argues, without any evidence, that Plaintiffs' terminating access charge damages theory should be dismissed because common sense dictates that "hearing the ringing sound . . . would keep a caller on the line longer than if the caller simply heard dead air" pending completion of a call.  (ECF 101, 1-2, 8-11.)  This argument cannot justify eliminating terminating access charge damages from the case on a motion to dismiss. T-Mobile has produced no evidence proving that every fake ring tone enhanced rural call completion, and that no fake ring tone ever deterred, blocked, or caused a caller to prematurely hang up on a call placed to a rural destination.  Importantly, the SAC alleges that both Plaintiffs detected calls placed by T-Mobile subscribers who heard ring tones, but the calls never hit their switches.  (SAC ¶¶ 317-18, 323.)  It is not plausible that fake ring tones "enhanced" completion of those calls.  It is plausible, however, that fake ring tones either tricked the callers into hanging up believing no one was available on the other end to answer or, alternatively, technically interfered with the call being handed back to find a route that would have allowed it to complete.

Although the Court may draw on judicial experience and common sense, *Iqbal*, 556 U.S. at 679, *Iqbal* does not stand for the proposition that a plaintiff loses on the pleadings simply because a defendant proffers a competing explanation for its misconduct.  Common sense plausibility determinations are tempered by longstanding precedent holding that a district court must accept as true all of the factual allegations contained in the complaint.  *Id.* at 678.

> [T]he plausibility standard does not allow a court to question or otherwise disregard nonconclusory factual allegations *simply because they seem unlikely*. . . .  Rather, 'a well-pleaded complaint may proceed *even if it strikes a savvy judge that actual proof of those facts is improbable*, and that a recovery is very remote and *unlikely*.'

---

involved amendments to clarify a damages claim the court initially found to be insufficiently alleged.

*Firestone Fin. Corp. v. Meyer*, 796 F.3d 822, 827 (7th Cir. 2015) (internal citations omitted) (emphasis added). In *Firestone*, the Seventh Circuit reversed dismissal of a counterclaim the district court found "facially implausible" because it was predicated on factual allegations that Firestone, a sophisticated lender, orally committed to make a loan to a startup business in a "handshake" deal. *Id.* at 824-27. The district court's conclusion constituted "an erroneous application of *Twombly* and *Iqbal*." *Id.* at 827. *Firestone* illustrates that T-Mobile's motion should likewise be denied.

Similarly, in *Trehan v. Kikkerland Design, Inc*., Case No. 13 C 8023, 2014 WL 1018319, at *3 (N.D. Ill. Mar. 17, 2014), the Illinois district court rejected a defendant's attempt to assert a factually disputed defense at the pleading stage, just as T-Mobile is attempting to do here:

> As the Seventh Circuit explained approximately 27 years ago, 'the defendant cannot, in presenting its 12(b)(6) challenge, attempt to refute the complaint or to present a different set of allegations. The attack is on the sufficiency of the complaint, and the defendant cannot set or alter the terms of the dispute, but must demonstrate that the plaintiff's claim, as set forth by the complaint, is without legal consequence.'

*Id.* (quoting *Gomez v. Ill. State Bd. of Educ*., 811 F.2d 1030, 1039 (7th Cir. 1987), and explaining that this principle still holds true after *Twombly* and *Iqbal*).

Rule 12(b)(6) does not countenance dismissals based on a court's belief that the defendant's interpretation may also be a plausible explanation. *Twombly*, 550 U.S. at 556. "[A] given set of actions may well be subject to diverging interpretations, each of which is plausible. . . . The choice between two plausible inferences that may be drawn from factual allegations is not a choice to be made by the court on a Rule 12(b)(6) motion." *Lynch v. City of New York*, 952 F.3d

67, 75 (2d Cir. 2020). In sum, it is impermissible to credit T-Mobile's proffered, unproven defense[8] that fake ring tones improved rural call completion when the SAC alleges the opposite.

### F. Whether Fake Ring Tones Prevented Calls Placed To Plaintiffs' Customers From Being Handed Back Requires Discovery.

T-Mobile argues that the SAC's allegations that fake ring tones prevent calls that are not completing from being handed back to a preceding provider cannot support terminating access charge damages. (ECF 101, 11-13.) This argument in no way justifies dismissal at the pleadings stage of Plaintiffs' terminating access charge damages theory. It is based not on any legal authority, but rather on premature assertions of disputed defenses that will be subject to discovery.

First, T-Mobile hypothesizes that since it is an "originating carrier" and not an "intermediate provider," fake ring tones could not have prevented it from handing back any calls. (*Id.*) This argument ignores the SAC's allegations that T-Mobile can also be an intermediate provider, and that discovery will be required to determine when and whether T-Mobile was operating in its capacity as an intermediate provider. (SAC ¶¶ 152, 157.)[9] Second, T-Mobile's argument ignores that discovery will be required to determine which co-conspirator physically inserted the fake ring tones. The SAC alleges that Inteliquent advocated for the use of fake ring

---

[8] In the Order, the Court credited T-Mobile's proffer, citing, "Am. Compl. ¶¶ 14, 82, 155," but none of these paragraphs alleged that T-Mobile's intent was merely to mask "connection issues." (Order, 9.) Paragraph 14 alleged T-Mobile deceived "Plaintiffs with the use of fake ring tones in order to mask their shoddy service and unscrupulous *practices aimed at avoiding completion of high cost calls*." (FAC ¶ 14 (emphasis added).) Paragraph 82 does not address why T-Mobile inserted fake ring tones. (*Id.* ¶ 82.) Paragraph 155 alleges Defendants' intent in using fake ring tones was to "mask the excessive use of LCR *with the ultimate goal of reducing costs* and improving profit margins." (*Id.* ¶ 155 (emphasis added).) Thus, these allegations assert that T-Mobile's purpose was to deny rural LECs terminating access charges, not to mask dead air.

[9] For rebuttal to T-Mobile's assertion that intermediate providers did not have any specific duties to complete calls under the Act until the FCC created rules in March 2019, *see* Plaintiff's Opposition to Inteliquent's Motion to Dismiss SAC at Section III.

13

tones, T-Mobile's expanded use of fake ring tones coincided with its decision to use Inteliquent to deliver almost all of its domestic long distance calls, Inteliquent had equipment capable of inserting fake ring tones, and that in the FOIA process, T-Mobile suppressed Plaintiffs' access to information about how the fake ring tones were inserted. (SAC ¶¶ 202-03, 219-25, 277.) It is therefore impossible for Plaintiffs to allege now who was prevented by fake ring tones from handing back calls placed to Plaintiffs' customers that were not completing, because Defendants are the holders of that information. Such specificity is not required. *See Pirelli Armstrong Tire Corp. Retiree Med. Benefits Trust v. Walgreen Co*., No. 10–1686, 2011 WL 183163, at *5 (7th Cir. Jan. 21, 2011) (permitting pleading on information and belief where facts constituting fraud are not accessible and plaintiff has grounds for his suspicions).

### G. T-Mobile's Other Arguments For Dismissing Terminating Access Charge Damages Have No Merit.

T-Mobile's criticism that the FCC did not do a study of how long callers stay on the line with fake ring tones, versus with dead air, is irrelevant since the FCC already made its findings on this issue. (ECF 101, 10.) This argument is precisely the type of impermissible collateral attack on the FCC's findings that is prohibited by the Hobbs Act. Even if entertained, the argument would equally thwart T-Mobile's contrary position, for T-Mobile does not cite any study to support its alternative proffer that fake ring tones caused customers to stay on the line longer.

T-Mobile also argues that "Plaintiffs' entire theory rests on the (implausible) assumption that a caller who heard LRBT and hung up before the call connected would *never try again*. . ." (ECF 101, 11 (emphasis in original).) Whether callers did or did not attempt their calls again is a

hypothetical defense Defendants can explore in discovery. This is yet another argument that has no place in a motion to dismiss and impermissibly second-guesses the FCC's findings.[10]

T-Mobile also argues the "SAC fails to identify even a single access charge Plaintiffs lost, or a single call that did not connect, as a result of the insertion of LRBT." (*Id.*, 11.) This assertion is factually wrong because both Plaintiffs allege incidences where T-Mobile subscribers attempted to place calls to their customers, and where the T-Mobile subscriber heard ringing but the call never hit the Plaintiffs' switches. (SAC ¶¶ 317-18, 323.) These are calls for which Plaintiffs were plausibly denied the opportunity to charge terminating access fees. What makes the fake ring tone scheme so devious is that it was inherently undetectable to the LECs and T-Mobile subscribers who were victimized by it. Defendants' repeated demands for Plaintiffs to allege facts that are known only to Defendants are wholly inconsistent with Plaintiffs' notice pleading obligations.

In sum, the Motion to dismiss all terminating access charge damages should be denied.

## II. THE COURT SHOULD DENY T-MOBILE'S MOTION TO DISMISS THE RICO CLAIMS (COUNTS IV-V).

T-Mobile's Motion to dismiss the RICO claims should be denied because the SAC adequately alleges that T-Mobile acted with intent to defraud. (SAC ¶¶ 423-24.) The SAC also clarifies that the FCC found fake ring tones are deceptive because they cause callers to hang up prematurely, bolstering Plaintiffs' allegations that T-Mobile acted with intent to defraud. (*Id.* ¶¶ 2, 113-14, 379.) The Order dismissed the FAC's RICO claims only for insufficiency of pleading intent to defraud. (Order, 19-20.) This ruling rested entirely on the Court's finding that it was implausible that fake ring tones influenced callers to hang up prematurely. (*Id.*) As shown above,

---

[10] Moreover, the SAC explains that when consumers regularly experience call failures, they become trained to not make those calls using that service. (SAC ¶ 165.) Accordingly, factual issues preclude the Court from crediting T-Mobile's self-serving hypothesis that terminating access charges would not be lost because callers would call again until their call went through.

the SAC's amendments highlighting that the FCC banned fake ring tones for the very reason that they cause call failures undercuts T-Mobile's contention that fake ring tones enhance call completion is more plausible. *See, e.g.*, *United Union Roofers, Waterproofers & Allied Workers Local Union No. 8 v. Great Lakes Dredge & Dock Corp.*, 13 CV 2115, 2014 WL 12780549, at *3 (N.D. Ill. Oct. 21, 2014) (denying motion to dismiss PSLRA claim where plaintiff's inference of scienter was as likely as defendants' opposing inference).

T-Mobile incorrectly advocates that the intent to defraud element must be pled with heightened Rule 9(b) specificity, citing *Goren v. New Vision Int'l, Inc.*, 156 F.3d 721, 726 (7th Cir. 1998). (ECF 101, 16.) T-Mobile misstates the law. Although Rule 9(b) pleading requirements apply to the allegations of fraud in a civil RICO complaint (*id.*), Rule 9(b) plainly states that "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Thus, because the defect identified by the Court was with sufficiency of pleading intent to defraud, it need only be alleged generally. *See Bible v. United Student Aid Funds, Inc.*, 799 F.3d 633, 657 (7th Cir. 2015).

In *Bible*, in which student borrowers asserted a class action against a loan guaranty agency, the Seventh Circuit reversed the district court's dismissal of a RICO claim, finding it should have credited the plaintiffs' general allegations of fraudulent intent. *Id.* at 657-59. In response to the defendant's argument that fraudulent intent was implausible, the Seventh Circuit advised:

> Whether Bible can eventually come forward with evidence of fraudulent intent is a question for the district court on remand. . . . The question of USA Funds' intent also cannot be decided on the pleadings. At this stage of the litigation, Bible has plausibly alleged that USA Funds intended to deceive her.

*Id.* at 658. The same rationale is applicable here and requires denial of T-Mobile's Motion.[11]

---

[11] Plaintiffs also incorporate all arguments they made showing the sufficiency of the RICO claims in their opposition to T-Mobile's motion to dismiss the FAC, including, specifically, the availability of punitive damages, which T-Mobile's current motion raises. (ECF 66, 14-23.)

III.   **THE SAC PLAUSIBLY ALLEGES THAT T-MOBILE TORTIOUSLY INTERFERED WITH PROSPECTIVE ECONOMIC ADVANTAGE (COUNT VI).**

The SAC expanded Plaintiffs' allegations in Count VI, for tortious interference with prospective economic advantage, to allege that T-Mobile, through its illegal fake ring tone scheme, intentionally interfered with Plaintiffs' known business relationships with third-party carriers or IXCs, such as Inteliquent, by denying Plaintiffs their reasonable expectation of being paid access charges for termination of calls T-Mobile's subscribers place to Plaintiffs' customers, and as a result damaged Plaintiffs. (SAC ¶¶ 2-4, 9, 13-14, 104, 113-18, 168, 179-83, 189-91, 216-19, 225-26, 293-96, 299-300, 317-33, 339-53, 360, 374-82, 384-92, 394-402, 449-52, 460-61.) These amendments satisfy each element necessary to state a claim. *See Voyles v. Sandia Mortg. Corp*., 196 Ill. 2d 288, 300-01 (2001) (setting forth elements).

T-Mobile challenges only the sufficiency of the SAC's allegations as to the third element that the interference was intentional and unjustified, and asserts that Plaintiffs have failed to satisfy this element because the SAC does not allege facts showing that T-Mobile had a "desire to harm" them. (ECF 101, 17-18.) This assertion is flawed because the third element requires only that the defendant's interference was intentional and unjustified. *See Foster v. Principal Life Ins. Co.*, 806 F.3d 967, 971-72 (7th Cir. 2015) (reversing dismissal and holding that allegations that defendants "intentionally and improperly" interfered by issuing "unauthorized instructions" to stop paying plaintiff satisfied third element). Under Illinois law, a claim for tortious interference does not require a showing that the interference is malicious; "it's enough if it's intentional and unjustified." *Beanstalk Group, Inc. v. AM Gen. Corp.*, 283 F.3d 856, 863 (7th Cir. 2002). The SAC satisfies the third element by alleging that T-Mobile intentionally inserted fake ring tones and intentionally failed to correct call failures, and that its actions were unjustified because they were an unlawful violation of the FCC's rural call completion and fake ring tone regulations and, thus, a violation

17

of the Act.  (SAC ¶¶ 2, 4, 9, 13-14, 104, 113-18, 168, 183, 189-91, 226, 293-96, 299-300, 374-82, 384-92, 394-402, 449-52, 460-61.)

Showing a desire to harm the plaintiff, also referred to as "actual malice," becomes an issue only when the defendant raises privilege as an affirmative defense.  *See Health King Enterprise, Inc. v. Dalian Health King Products Co., Ltd.*, No. 19 C 1878, 2020 WL 1124760, at *3 n.4 (N.D. Ill. Mar. 6, 2020) (Lee, J.) (recognizing that "actual malice is not a relevant concern until the [competitor's] privilege has been found to apply") (citation omitted); *see also Energy Servs. Air Conditioning & Heating Co., Inc.*, No. 97 C 373, 1997 WL 790725, at *13 (N.D. Ill. Dec. 22, 1997).  T-Mobile has not answered the tortious interference claim or raised any affirmative defenses to it.  (ECF 102, 170, 172-75.)  Thus, no allegations of actual malice are needed for Plaintiffs' claims to survive the motion to dismiss.[12]

Nevertheless, in response to the Court seeming to raise a question about the application of the competitor's privilege by citing *Slep-Tone Entm't Corp. v. Coyne*, 141 F. Supp. 3d 813, 834 (N.D. Ill. 2015) (Order, 22), the SAC also alleges that T-Mobile is not entitled to any privilege defenses.  (SAC ¶¶ 453-60.)  In *Slep-Tone*, the court granted summary judgment to the defendant on the ground that no valid contact was shown and, on the alternative ground, that the counter-claim plaintiff failed to come forward with any evidence that would refute the conclusion that the

---

[12] T-Mobile asserts that the Court need not evaluate the competitor's privilege at this stage because it is an "affirmative defense."  (ECF 101, 18.)  Plaintiffs agree that they have no burden to anticipate or plead around an affirmative defense.  *See, e.g.*, *ATC Healthcare Servs., Inc. v. RCM Techs.*, 282 F. Supp. 3d 1043, 1053 (N.D. Ill. 2017) ("[T]he Illinois Supreme Court classifies the competitor's privilege as an affirmative defense.  [A Plaintiff] is generally not required to plead around an affirmative defense to survive a motion to dismiss."); *Gen. Elec. Co. v. Uptake Tech, Inc.*, 394 F. Supp. 3d 815, 836 (N.D. Ill. 2019) (same).  Plaintiffs respectfully note that, in other cases, the Court has agreed that a plaintiff has no duty to plead actual malice or an intent to harm to overcome the affirmative defense.  *Health King*, 2020 WL 1124760, at *3 n.4.  If the Court agrees that the competitor's privilege need not be considered now, then it may deny T-Mobile's Motion on the ground that an intent to harm is not a required element under Illinois law.

18

underlying conduct was "privileged" because it related to protecting the defendant's own economic interests in its intellectual property rights. *Slep-Tone*, 141 F. Supp. 3d at 834. But that is not the situation in the case at bar because Plaintiffs allege that T-Mobile's aggressive cost savings strategy was accomplished through fraudulent and illegal means and, as such, cannot be privileged under Illinois law.

The economic interest or competitor's privilege at issue in *Slep-Tone* may be overcome in one of two ways: the interference "must have been *improper* in the sense that it was accomplished by wrongful means, or was motivated by malice and not simply economic self-interest." *Republic Tobacco, L.P. v. N. Atl. Trading Co., Inc.*, 254 F. Supp. 2d 1007, 1012 (N.D. Ill. 2003); *see also Soderlund Bros., Inc. v. Carrier Corp.*, 663 N.E.2d 1, 9-10 (Ill. App. Ct. 1995). For example, in *Energy Servs., Inc.*, the court denied the defendants' motion to dismiss a tortious interference with prospective economic advantage claim, concluding: "Since plaintiff alleges that defendants employed wrongful means, plaintiff does not need to allege 'actual malice', on the part of defendants." *Energy Servs.*, 1997 WL 790725, at *13 (citations omitted); *see also Strosberg v. Brauvin Realty Servs., Inc.*, 691 N.E.2d 834, 845 (Ill. App. Ct. 1998) ("[M]alice does not require a showing of ill will, hostility or intent to injure; rather, it requires a showing that the defendant acted intentionally and without just cause.") (citations omitted); *Koehler v. Packer Group, Inc.*, 53 N.E.3d 218, 239 (Ill. App. Ct. 2016) (same).

T-Mobile's cases are actually in accord with these principles and support denial of its Motion. *Sunny Handicraft Ltd. v. Envision This!, LLC*, No. 14-CV-1512, 2015 WL 231108 (N.D. Ill. Jan. 16, 2015), states that a plaintiff must allege the interference was either "improper in the sense that it was accomplished by wrongful means, *or* was motivated by malice and not simply economic self-interest." *Id*. at *9 (emphasis added). *Capital Options Invs. v. Goldberg Bros.*

*Commodities, Inc.* observes that showing actual malice unrelated to economic interest is but one way to overcome the privilege. 958 F.2d 186, 189 (7th Cir. 1992). T-Mobile's cases are also distinguishable because, unlike here, none involved allegations that the conduct at issue was carried out by illegal means. *See, e.g.*, *Sunny Handicraft*, 2015 WL 231108, at *9 (asking for direct payment); *Capital Options*, 958 F.2d at 189-90 (exercising contractual rights).

In short, T-Mobile's conduct is not privileged because it involved conduct that the FCC declared unlawful and amounts to fraud and misrepresentation. *See Strosberg*, 691 N.E.2d at 845; *Polyad Co. v. Indopco Inc.*, No. 06 C 5732, 2008 WL 4287623, at *4 (N.D. Ill. Sept. 12, 2008); *Foster*, 806 F.3d at 971-72 (unauthorized acts that amounted to breach of fiduciary duty); *Everite Transworld Ltd. v. MIEH, Inc.*, No. 19-cv-0678, 2020 WL 887373, at *5 (N.D. Ill. Feb. 24, 2020) (false representations). Therefore, to the extent required, the SAC now provides substantial facts showing that the economic interest and/or competitor's privilege does not apply because T-Mobile's interference was carried out by unlawful means, namely, by illegally inserting, or causing the insertion of, fake ring tones and unlawfully failing to fulfill its duty to adequately supervise the third-party carriers in violation of Section 201(b) and 202(a) of the Act, and unlawfully conspiring to do the same. (SAC ¶¶ 452, 455, 458, 460.) For this additional reason, T-Mobile's Motion to Dismiss should be denied.

## IV. THE SAC STATES A CLAIM FOR VIOLATION OF THE ICFA (COUNT VII).

Count VII of the SAC asserts that Defendants have engaged in deceptive acts and practices through their fake ring tone scheme. (SAC ¶¶ 228-47, 465-71.) Defendants' deceptive acts were material, involved trade and commerce, were intended to be relied upon, and proximately caused actual damage to Plaintiffs, the public and consumers at large. (*Id.* ¶¶ 466-72.) These allegations

satisfy each element necessary to state a claim. *See Freedom Mortg. Corp. v. Burnham Mortg., Inc.*, 720 F. Supp. 2d 978, 1003 (N.D. Ill. 2010) (setting forth elements).

Defendants argue the ICFA claim should be dismissed because: (1) alleging Inteliquent's corporate headquarters is in Illinois, and that predictable activities occur there, is insufficient to show that the disputed transactions occurred primarily and substantially in Illinois; (2) Plaintiffs do not plead that any Illinois consumers heard fake ring tones and were deceived, or that any injury occurred, in Illinois; and (3) Plaintiffs do not sufficiently allege a nexus between themselves and Illinois consumers. (ECF 101, 19-21; ECF 98, 14-15.) Each of these arguments fails.

### A.    The SAC Demonstrates Sufficient Circumstances Related To Disputed Transactions Occurring Primarily And Substantially In Illinois.

This Court granted leave to amend after observing that "alleging only that 'a scheme to defraud was disseminated from [the defendant's Illinois] headquarters is insufficient to establish the necessary connection.'" (Order, 22). The Court drew a comparison between the allegations in the FAC and the allegations in *Morrison*, where the plaintiff pled more facts involving Illinois, including that it was the place where the underlying deal was executed, payments were sent, and complaints were resolved. (*Id.*, n.9).

The ICFA is "liberally construed" and courts consider nexus on a case-by-case basis under multiple factors. *Avery v. State Farm Mut. Auto. Ins. Co.*, 835 N.E.2d 801, 852-54 (Ill. 2005). There is "'no single formula or bright-line test for determining whether a transaction occurs within this state. Rather, each case must be decided on its own facts.'" *Phillips v. Bally Total Fitness Holding Corp.*, 865 N.E.2d 310, 315 (Ill. App. Ct. 2007) (quoting *Avery*, 835 N.E.2d at 854.)

In addition to those noted in *Morrison*, other decisions have recognized what *Morrison* called "mark[s] in plaintiffs' favor" when analyzing facts for a "primarily and substantially" determination. *Morrison*, 649 F.3d at 536-537. *See, e.g., IPOX Schuster, LLC v. Nikko Asset*

*Mgmt. Co., Ltd.*, 191 F. Supp. 3d 790, 808 (N.D. Ill 2016) (denying dismissal and using communications between parties "by email and telephone" as a relevant factor); *The Clearing Corp. v. Fin. and Energy Exch. Ltd.*, No. 09CV5383, 2010 WL 2836717, at *6 & n.5 (N.D. Ill. Jul. 16, 2010) (denying dismissal and citing communications to/from a defendant's Chicago office, conference calls, and payments as relevant factors); *IFC Credit Corp. v. Aliano Bros. General Contractors, Inc.*, No. 04 C 6504, 2007 WL 164603, at *3 (N.D. Ill. Jan. 12, 2007) (denying dismissal and noting the existence and performance of an agreement executed and performed in Illinois as a relevant factor).

The SAC highlights overwhelming facts that establish a nexus to Illinois, beyond Inteliquent's headquarters, that entitles the ICFA claim to proceed to discovery:

- Defendants entered into two Master Service Agreements ("MSAs"). The 2004 MSA picked Chicago as "the sole place in which [Inteliquent] could pick up long distance traffic originated by T-Mobile's subscribers." (SAC ¶¶ 195-99.) The 2015 MSA made Inteliquent the near-exclusive router of T-Mobile out-of-network traffic. (*Id.* ¶ 206; SAC Ex. 13.)

- Inteliquent performed these pick-up and delivery services at two (perhaps three) Inteliquent "switch sites" located throughout the Chicago area. (SAC ¶¶ 195-99, 220; SAC Ex. 10, at 59.)[13] Routing decisions for T-Mobile calls would have been made by Inteliquent's PSX policy server located in Illinois. (SAC ¶¶ 220-26.) The switching would result in service fees paid by T-Mobile to Inteliquent. (*Id.* ¶ 62; SAC Ex. 11, at 6-7.)

- Both MSAs were at least partially executed in Illinois (SAC ¶ 206, Ex. 11, Ex. 13), and resulted in:
  - T-Mobile payments being routed to Illinois (SAC ¶¶ 210, 213, 214, 229; SAC Ex. 11, ¶¶ 9-10, at 10-11);
  - T-Mobile call service complaints being routed to Illinois (SAC ¶ 209; SAC Ex. 13, ¶ 10(A), at 11);
  - T-Mobile data maintenance and reporting obligations being fulfilled in Illinois (SAC ¶¶ 212, 232-33);
  - T-Mobile directing its conduct to Inteliquent employees in Illinois (*id.* ¶¶ 234, 230-40);

---

[13] The Inteliquent/Neutral Tandem Amended Form S-1 filed with the SEC notes two switch sites of 4,347 sq. foot and 5,263 sq. foot and a separate 10,000 sq. foot sublet in Chicago, Illinois. (SAC Ex. 10, at 59.)

- o Inteliquent participating from Illinois in weekly discussions with T-Mobile to identify ways to curb "high-cost traffic in various forms" and "reduce the volume of T-Mobile traffic terminating to areas with higher terminating access rates. (*id.*, ¶¶ 239-41); and
- o Craigville's and CTC's connection problems being addressed by T-Mobile and routed through Inteliquent's Illinois locations (*id.*, ¶¶ 330-33, 349, 358-61).

The conduct in identifying, routing, and using fake ring tones goes well beyond normal, routine activities associated with "merely" having a headquarters in Illinois. As a result, not only does the SAC exceed the factors enumerated in *Morrison*, the performance of the 2004 and 2015 MSAs between Defendants align the facts in Plaintiffs' favor with the decision in *IFC Credit Corp.* In *IFC Corp.*, a New Jersey company brought an ICFA counterclaim. *See* 2007 WL 164603, at *2. The counterclaim defendant relied on *Avery* to argue that the disputed transactions occurred outside of Illinois and should be dismissed. *Id.* at *3. The court noted that because a "master program agreement" (executed and performed in Illinois) existed between the counterclaim defendant and another party and the counterclaimant's damages were alleged to have arisen from actions taken in Illinois, there was ample nexus to state an ICFA claim. *Id.*[14]

Illinois has been the primary and substantial location where the relationship between Defendants developed beginning in 2004 and, importantly, in September 2015 when T-Mobile admitted that it expanded fake ring tones on a nationwide basis. (SAC ¶¶ 180-82, 206-24, 216-471.) All the factors and marks lean in Plaintiffs' favor and are more than sufficient to allow the ICFA claim to proceed.

---

[14] Plaintiffs' case is much more than mere "dissemination" outside of Illinois like the cases T-Mobile cites. (ECF 101, 20.) Here, the wrongful conduct occurred in Illinois when fake ring tones were injected into calls headed for rural OCNs and routed through Inteliquent, which T-Mobile charged with collecting and reporting on its rural call completion data. (SAC ¶¶ 211-12.)

**B.** **The SAC Sufficiently Pleads Deception And Unfair Business Practices.**

Defendants' argument that the SAC does not plead that any Illinois consumers heard fake ring tones and were affected or deceived or that any injury occurred in Illinois also fails. (ECF 101, 20; ECF 98, 14.)[15]  The application of the ICFA is proper here since this case plainly implicates "thing[s] of value *wherever situated*, and . . . include[s] any trade or commerce *directly or indirectly affecting* the people of [Illinois]," 815 ILCS 505/1(f) (emphasis added), especially T-Mobile's subscribers and those that did not receive calls from T-Mobile's subscribers.[16] (SAC ¶¶ 468, 470.)  And, T-Mobile admitted the use of fake ring tones is "by its nature deceptive." (SAC Ex. 18, at 12 n.54; *see also* SAC ¶ 290 (characterizing T-Mobile's conduct as "deception").)  *See supra* Section II.

**C.** **The SAC Sufficiently Pleads A Consumer Nexus.**

T-Mobile argues the SAC fails to allege a consumer nexus. (ECF 101, 21.)  This too was raised previously by T-Mobile (ECF 55, 26), and fully addressed by Plaintiffs (ECF 66, 26-27.)

In addition, T-Mobile makes a new argument which improperly conflates the heightened pleading requirements of Rule 9(b) and the elements of an ICFA claim.  T-Mobile relies on *Freedom Mortg. Corp.*, 720 F. Supp. 2d at 1004, to argue that Plaintiffs' pleading burden includes *how* consumers and consumer protection concerns are implicated. (ECF 101, 21.)  T-Mobile's application of *Freedom Mortg. Corp.* not only distorts the ICFA pleading requirements, but is of no moment since the SAC contains all necessary factual allegations, where the complaint in *Freedom Mortg. Corp.* did *not* contain the necessary allegations. *Freedom Mortg. Corp.*, 720 F.

---

[15] This argument was previously made by Defendants and considered by the Court without comment. (ECF 55, 27-28; ECF 48, 15.)

[16] Given that T-Mobile inserted fake ring tones into billions of calls, it is inescapable that they were heard by Illinois consumers. (SAC ¶ 290.)

Supp. 2d at 1004 ("Ticor is not alleged to have [deceived] the general public. Further, the allegation is conclusory and clearly does not establish an implication of consumer protection concerns.")

The SAC plainly sets out with particularity the "who, what, when, where, and how" of the fraud and deception Defendants committed. *DiLeo v. Ernst & Young*, 901 F.2d 624, 627 (7th Cir. 1990); *Freedom Mortg. Corp.*, 720 F. Supp. 2d at 1004. In addition, the SAC adequately alleges that the deceptions occurred in the course of conducting trade and commerce and that "the [general] public and consumers at large" were harmed by the deception. (SAC ¶¶ 468, 470.) Clearly, consumer protection concerns were implicated when T-Mobile *admitted* to the FCC that its insertion of fake ring tones likely impacted "hundreds of millions of calls" each year they were in place. (*Id.* ¶¶ 2, 168, 183.) *Cosmetique, Inc. v. ValueClick, Inc.*, 753 F. Supp. 2d 716, 719-20 (N.D. Ill. 2010) (plaintiff sufficiently plead defendants attempted to "deceive the public generally" by relying on a recent FTC investigation and settlement involving defendant). Moreover, the SAC is replete with factual allegations about how Defendants' misconduct has harmed and implicated consumer protection concerns. (*See, e.g.*, SAC ¶¶ 6, 13, 14, 41, 89, 175, 226, 290, 299, 310.)

For all of these reasons, the Motion to dismiss Count VII should be denied.

## **CONCLUSION**

T-Mobile has failed to offer any reason why this Court should accept its self-serving explanations for the use of fake ring tones on a Motion to Dismiss. The Court should accept the SAC's well-pleaded allegations, which are consistent with the FCC's findings in declaring fake ring tones unlawful, and allow all of Plaintiffs' claims to move forward into discovery. For the foregoing reasons, T-Mobile's Motion should be denied in its entirety.

/s/   David T.B. Audley
David T.B. Audley (Bar No. 6190602)
Mia D. D'Andrea (Bar No. 6307966)
**CHAPMAN AND CUTLER LLP**
111 West Monroe Street
Chicago, IL 60603-4080
Tel. 312-845-2971
Fax: 312-516-3971
Email: audley@chapman.com
Email: dandrea@chapman.com

Cathy A. Hinger (*pro hac vice*)
G. David Carter (*pro hac vice*)
**WOMBLE BOND DICKINSON (US) LLP**
1200 19th Street, NW, Suite 500
Washington, DC 20036
Tel.: 202-857-4489
Fax: 202-261-0029
Email: cathy.hinger@wbd-us.com
Email: david.carter@wbd-us.com

Kurt D. Weaver (*pro hac vice*)
**WOMBLE BOND DICKINSON (US) LLP**
555 Fayetteville Street, Suite 1100
Raleigh, NC 27601
Telephone: 919-755-8163
Facsimile: 919-755-6770
Email: kurt.weaver@wbd-us.com

*Counsel for Plaintiffs*

26

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this the 5th day of February, 2021, I served the foregoing **Plaintiffs' Opposition to T-Mobile USA, Inc.'s Motion to Dismiss Plaintiffs' Second Amended Class Action Complaint** via the ECF system on parties that have consented to the same in accordance with applicable Federal Rules of Civil Procedure and the Local Rules of the U.S. District Court for the Northern District of Illinois.


By:    */s/  David T.B. Audley*