# EXHIBIT 1C

# THE UNITED STATES DISTRICT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | | |
|---|---|---|
| CRAIGVILLE TELEPHONE CO. d/b/a ADAMSWELLS; and CONSOLIDATED TELEPHONE COMPANY d/b/a CTC | ) ) ) ) | |
| Plaintiff, | ) ) | No. 1:19-cv-07190 |
| vs. | ) ) | Judge John Z. Lee |
| T-MOBILE USA, INC.; and INTELIQUENT, INC. | ) ) ) ) | |
| Defendants. | ) | |

## PLAINTIFFS' NOTICE OF 30(B)(6) RECORDS CUSTODIAN DEPOSITION OF INTELIQUENT, INC.

TO:  **Custodian(s) of Records for Inteliquent, Inc.**

PLEASE TAKE NOTICE that Plaintiffs Craigville Telephone Co. d/b/a AdamsWells and Consolidated Telephone Company d/b/a CTC, on behalf of themselves and the class of others similarly situated, by counsel and pursuant to FED. R. CIV. P. 30(b)(6) and 45, will take the deposition of the above-named corporation on **November 9, 2021, at 10:00 AM ET, via remote video deposition.** This deposition will be taken for the purpose of discovery or use as evidence at trial. Said deposition shall be taken before a person authorized by law to administer oaths and recorded by video, sound, and/or stenographic means. If, for any reason, this deposition cannot be commenced, or if commenced, cannot be concluded on that day, the deposition will be continued to the following business day at the same time and place.

Pursuant to this Court's February 22, 2021 Minute Order ordering that, "discovery proceed with respect to Counts I, II, III and VIII as to Defendant T-Mobile, and Count VIII as to Defendant Inteliquent," (ECF 110), this Court's March 24, 2021 Minute Order permitting separate Rule

30(b)(6) depositions of the "respective records custodians" of each party "that will last five hours," the accompanying transcript regarding the same ruling[1], this Court's September 1, 2021 Order ordering that, "Plaintiffs can take any and all discovery permitted by Rule 26(b)(1)," (ECF 148), and Rule 30(b)(6) of the Federal Rules of Civil Procedure, the deponent must designate one or more officers, directors, managing agents, or other persons who consent to testify on its behalf regarding each of the designated topics below, and may set forth, for each person designated, the matters on which the person will testify. The person so designated must testify about information known or reasonably available to the organization. Unless otherwise indicated, these Requests cover the time period from January 1, 2013 to the present.

## DEFINITIONS

### Common Terms

1. The term "communications" means any form or transmittal of information, in the form of facts, ideas, inquiries, discussion, exchange of information or opinions, or otherwise, including transmission made in written, oral or other communication, through documents, letters, memoranda, meetings, conferences, telephone conversations, negotiations, and electronic communication, including, but not limited to, email, instant messaging, texting, and Internet-based social media, within Inteliquent as well as communications between Inteliquent and others.

2. The term "document" or "documents" includes the scope of the terms "documents," "writings," "recordings," and "photographs" as used in Fed. R. Civ. P. 34 and Fed. R. Evid. 1001, electronically stored information ("ESI") as that term is defined in these Definitions, and all written or graphic matter including, but not limited to, all writings and recordings, regardless of how produced or reproduced, of every kind and description, regardless of denomination by you, in your

---

[1] During the March 24, 2021 Status Conference, the Court also stated, "I will give the plaintiffs – I'll give you five hours for each records custodian above and beyond the seven hours." (3/24/21 Tr. at 19:14-16.)

2

actual or constructive possession, custody, or control including documents in the possession of your agents or counsel, including, but not limited to, physical, telephonic (*i.e.*, text-based) or online (*i.e.*, Internet-based) correspondence, facsimiles, spreadsheets, engineer's notes, database files, voicemail, e-mail, text messages, instant messages, journal entries, contracts, agreements, papers, including working papers, books, pamphlets, periodicals, accounts, letters, photographs, objects, or filings; notes, sound recordings, or other memorials of any type of personal or telephone conversations, or of meetings, conferences and minutes of directors or committee meetings; memoranda, interoffice communications, records, reports, studies, surveys, written forecasts, analyses, estimates, proposals, licenses, agreements, ledgers, books of account, invoices, vouchers, bank checks, cashier's checks, receipts for cashier's checks, charge slips, account reports, receipts, drafts, charts, graphs, indices, statistical records, cost sheets, price sheets, job or transaction files, data sheets, data processing cards or tapes, computer printouts, videotapes, motion pictures, plans, drawings, specifications, and things similar to any of the foregoing, whether stored in tangible, electronic, mechanical, electric form or representation of any kind including, without limitation: (i) materials stored on or in computer tapes, disks, memory, or an account located in the electronic "cloud" and (ii) backup copies and "deleted" files on computer storage devices or other media, whether located onsite or offsite (including files stored remotely in "cloud"-based servers).

3. The term "electronically stored information" or "ESI" means information electronically, magnetically, optically or otherwise stored as (i) digital communications (*e.g.*, e-mail, voice mail, instant messaging); (ii) e-mail servers (*e.g.*, Lotus Domino, .NSF or Microsoft Exchange .EDB, Microsoft Outlook PST); (iii) word processed documents (*e.g.*, Word, WordPerfect, Google Docs files and drafts); (iv) spreadsheets and tables (*e.g.*, Excel, Quattro Pro,

or Lotus 123 worksheets); (v) image files (*e.g.*, .PDF, .TIFF, .JPG, .GIF images); (vi) sound recordings (*e.g.*, .WAV and .MP3 files); (vii) video and animation (*e.g.*, .AVI and .MOV files); (viii) databases (*e.g.*, Access, Oracle, SQL Server data, SAP, modeling databases); (ix) presentations (*e.g.*, PowerPoint, Corel Presentations); (x) project management application data; and (xi) backup and archival files (*e.g.*, Veritas, Zip, .GHO).

4. The word "identify," when used with respect to a document, shall mean with respect thereto, to the extent known: (i) its name or title; (ii) the nature and substance of the document with sufficient particularity to enable it to be identified; (iii) the date of preparation; and (iv) the author(s), addressee(s), and recipient(s). When used with respect to a person, the word "identify" shall mean with respect thereto, to the extent known: (i) his or her name; (ii) if a natural person, his or her last-known residential address, telephone number, and e-mail address; and (iii) if a business organization, its last-known complete address and telephone number. With respect to a communication, the word "identify" shall mean with respect thereto, to the extent known: (i) the date and place thereof; (ii) the type of communication (*e.g.*, in-person conversation, e-mail, letter, telephone conversation); (iii) the name, business address, job title, and responsibilities of each person who participated therein, or witnessed or heard any part thereof; (iv) the substance of what was said by each person who participated therein; and (v) the identity of all documents relating thereto. With respect to a thing, the word "identify" shall mean with respect thereto information sufficient to determine the existence, location and custodian of the thing.

5. The term "person" means any natural person or any business, corporation, company, legal entity, association, or governmental entity.

6. The terms "refer" "referring to" "relate" "relating to" "related to" and "reflecting" mean recording, summarizing, embodying, constituting, reflecting, digesting, referring to,

commenting upon, describing, reporting, listing, analyzing, studying, or otherwise discussing in any way a subject matter identified in the Request, and is defined so as to reach all matters within the scope of discovery pursuant to the Federal Rules of Civil Procedure, including all information which, though inadmissible at trial, is reasonably calculated to lead to the discovery of admissible evidence.

**Parties**

7. The term "Plaintiffs" means Craigville Telephone Co. d/b/a AdamsWells ("AdamsWells"), and Consolidated Telephone Company d/b/a CTC ("CTC").

8. The term "T-Mobile" means co-Defendant T-Mobile USA, Inc. and any of its board members, officers, directors, agents, servants, employees, attorneys, investigators, consultants, accountants, representatives, successors, subsidiaries, or any other person or persons acting for or purportedly acting on T-Mobile's behalf.

9. The terms "Defendant" or "Inteliquent" or "you" or "your" or "yours" mean Defendant Inteliquent, Inc. and any of its board members, officers, directors, agents, servants, employees, advisors, attorneys, investigators, consultants, accountants, representatives, predecessors (including, but not limited to, ANPI, LLC, ANPI Business, LLC, Onvoy, LLC, and Neutral Tandem, Inc.), successors, subsidiaries, or any other person or persons acting for or purportedly acting on Inteliquent's behalf.

**Other Terms**

10. The term "2013 Rural Call Completion Order" refers to *In the Matter of Rural Call Completion*, Report and Order and Further Notice of Proposed Rulemaking, 28 F.C.C. Rcd. 16154 (2013), attached to the SAC as Exhibit 9.

11. The term "2015 MSA" means the Master Services Agreement between T-Mobile and Inteliquent.

12. The term "CDR" or "Call Detail Record" means any form of data record produced by communications equipment that documents the details of a telephone call or other telecommunications (including SIP) transactions that passes through that facility or device.

13. The term "Consent Decree" refers to the April 16, 2018 Order and Consent Decree entered into by T-Mobile and the FCC attached to the SAC as Exhibit 1. *See In The Matter of T-Mobile USA, Inc.*, Order and Consent Decree, DA 18-373, FCC Rcd. 3737 (2018).

14. The term "Covered Employee" refers to the term Covered Employee as it is defined in the Consent Decree, Section (I)(g) and as the term is used in Paragraph 19 of the Consent Decree.

15. The term "Compliance Manual" refers to the Compliance Manual referenced in Paragraph 19(C) of the Consent Decree.

16. The term "Compliance Training Program" refers to the Compliance Training Program referenced in Paragraph 19(D) of the Consent Decree.

17. The term "Compliance Reports" refers to the Compliance Reports referenced in Paragraph 21 of the Consent Decree.

18. The term "fake ring tones" refers to ring tones heard by a calling party before the called party's phone rings and may also be referred to as an LRBT.

19. The term "FCC" means the Federal Communications Commission, all of its bureaus and offices, and any of its commissioners, officers, directors, agents, servants, employees, attorneys, investigators, consultants, representatives, or any other person or persons acting for or purportedly acting on its behalf.

20. The term "FCC Investigation File" means the file that became FCC File No. EB-IHD-16-00023247.

21. The term "FOIA Request" refers to the February 25, 2019 Freedom of Information Act request Plaintiffs' counsel submitted to the FCC requesting that the Commission disclose certain categories of documents related to the Consent Decree.

22. The term "Form 480 Reports" refers to the rural call completion compliance reports the FCC previously required covered providers to submit to it four times a year pursuant to the Report and Order and Further Notice of Proposed Rulemaking adopted by the FCC on October 28, 2013. *See In The Matter of Rural Call Completion, Report and Order and Further Notice of Proposed Rulemaking*, 28 F.C.C. Rcd. 16154, 16184 (2013) ("2013 Rural Call Completion Order").

23. The term "Intermediate Provider" means any entity that carries or processes traffic that traverses or will traverse the PSTN at any point insofar as that entity neither originates nor terminates that traffic.

24. The term "Lawsuit" means the civil action titled, *Craigville Telephone Co. et al. v. T-Mobile USA, Inc. et al*, that is currently pending in the United States District Court for the Northern District of Illinois, Case No. 1:19-cv-07190.

25. The term "LRBT" means Local Ring Back Tone.

26. The term "MSC" means Mobile Switching Centers.

27. The term "PSTN Services Attachment" refers to the PSTN Services Attachment entered into by T-Mobile and Inteliquent on June 23, 2015, attached to the SAC as Exhibit 13.

28. The term "SAC" means the Second Amended Complaint filed in the above-captioned Lawsuit, *Craigville Telephone Co. et al v. T-Mobile USA, Inc. et al*, Case No. 1:19-cv-07190 on December 10, 2020 [ECF No. 94].

29. The term "SIP" or "Session Initiation Protocol" means a signaling protocol used for initiating, maintaining, and terminating real-time sessions that include voice, video or messaging applications.

30. The term "SS7" or "Signaling System 7" means an international telecommunication protocol standard that defines how the network elements in a public switched telephone network (PSTN) exchange information and control signals.

## TOPICS TO BE COVERED BY THE CUSTODIAN(S) OF RECORDS

### I. Email

1. Inteliquent's policies and practices related to storage, retention periods, and retention of its employees' email, either in active status or in an archive accessible to the user.

2. Inteliquent's policies, practices and systems for the preservation of email related to active or anticipated litigation, and any litigation holds in place that have extended the ordinary email retention periods for emails of any employees identified by Plaintiffs in their Initial Disclosures.

### II. Text Messages and Other Messaging Services

3. Inteliquent's policies and practices related to providing employees with mobile phones and/or mobile phone service for purposes of conducting business.

4. Inteliquent's policies and practices related to storage and retention of text messages sent or received by employees, including the retention periods for any such messages.

5. Inteliquent's policies and practices related to employees' use of text messages for business communications.

6. Inteliquent's policies and practices related to Inteliquent's access to text messages sent or received by employees.

7. Any system available to employees to facilitate intra-company messaging (e.g., slack, jabber, etc.) during the Relevant Time Periods.

**8.** Inteliquent's policies and practices related to storage, retention and retention periods for messages sent on any intra-company messaging service.

### III. Call Detail Records

9. The identity of all employees or custodians of records, including third parties if applicable, responsible for oversight, storage, maintenance, handling, organization, preservation or other management of CDRs, and whether each such custodian is a current or former employee, or employed by a third party.

10. The identity, including physical location, of any systems Inteliquent uses or used to receive, record, store, retain, share or preserve call detail data from January 1, 2013 through April 16, 2018 that include: calls placed to rural OCNs into which fake ring tones were or may have been inserted; and calls placed to rural OCNs impacted by T-Mobile's admission that it failed to adequately oversee its intermediate provider's delivery of calls to rural OCNs.

11. Inteliquent's processes, systems, practices and procedures for collection and storage of CDRs from January 1, 2013 through April 16, 2018, including written policies related to the retention periods of CDRs.

12. The identity of all servers or other data storage facilities where CDRs for calls originated by T-Mobile subscribers and transmitted to Inteliquent pursuant to the MSA were stored

from January 1, 2013 through April 16, 2018, including any factors that would determine why a particular CDR was stored in a particular server or data storage facility.

13. The format or formats (EMI, Ciber, TAP, etc.) that Inteliquent uses for the storage of CDRs.

14. The source(s) of any data that are stored or reflected in each field of Inteliquent's CDRs, including whether the data is part of the original call stream or added through other processes.

15. Steps Inteliquent took to preserve call detail records related to rural carriers after it became aware that the FCC was investigating T-Mobile's use of fake ring tones.

16. The physical location of any data storage facilities where CDRs are stored.

17. The identity of any systems Inteliquent use(d) from January 1, 2013 through April 16, 2018 to analyze call detail records for anomalies, such as potential network failures, rural call completion issues, or suspected fraud, including the physical location of such systems and whether such systems are or were operated or managed by third-party vendors.

18. The identity and nature of services performed by any third-party vendors from January 1, 2013 through April 16, 2018 that involve(d) the analysis of call detail or other network information for anomalies, such as potential network failures, rural call completion issues, or suspected fraud.

19. The manner in which such third-party vendors obtain(ed) access to CDRs or other network information for purposes of performing analysis, including the physical location of any copies of, or shared data storage source for, CDRs made available to such third-party vendors.

20. Whether Inteliquent participated, voluntarily or otherwise, in any program in which it provided "bulk" call detail records to the National Security Agency or any other agency of the

United States Government.[2] If yes, the agency or agencies to which bulk CDRs have been provided and the manner in which those CDRs are made available.

21. The identity and functionality of any systems that monitored or estimated the amount of post-dial delay experienced by T-Mobile callers on traffic that T-Mobile delivered to Inteliquent pursuant to the MSA.

22. The point or points of interconnection for T-Mobile's exchange of traffic with Inteliquent.

23. The Service Evaluation System (SES) (aka Quality of Service (QoS)) systems in place at Inteliquent that are or were utilized to conduct quality assessment of network service and to implement quality control activities.

## IV. Call Signaling Systems

24. The protocols used to pass signaling information to, or receive signaling responses from, T-Mobile.

25. The point or points of interconnection for your exchange of signaling information with T-Mobile.

26. Whether Inteliquent has or had any systems in place that record SIP response codes for calls initiated on T-Mobile's network that were routed through Inteliquent's network to any third-party for termination.

27. Whether Inteliquent has or had any systems in place that are intended to detect anomalies in SS7 or SIP signaling, including, but not limited to, unusually high numbers of 300, 400, 500, or 600 series SIP response codes.

---

[2] *See, e.g,* https://www.aclu.org/legal-document/nsa-foia-documents-quarterly-reports-intelligence-oversight-board-nsa-activities.

## V. Fake Ringtones

28. The identity, including physical location, functionality, and current location and preservation of any equipment related to T-Mobile or any other person's introduction of LRBT on calls initiated by T-Mobile subscribers at any time since 2007.

29. The identity, including physical location, of any equipment used to stop, end or disable the use of fake ringtones in January 2017.

30. Whether any of the systems used to expand the use of fake ringtones on T-Mobile traffic in September 2015 are located in any facilitate owned, operated, or under the direct or indirect control of Inteliquent.

31. The identity of any Inteliquent employee who, in September 2015, aided or assisted T-Mobile in "determin[ing] that the four-second LRBT was not in service on all SIP routes," and the locations of ESI for which they are custodians. (Plaintiffs_0000000183.)

32. The nature and location of any records in the custody, possession, or control of Inteliquent that reflect or memorialize the authorization or implementation of fake ringtones on "all remaining SIP routes in September 2015" and the identity of all custodians or potential custodians of such records, including emails. (Plaintiffs_0000000183.)

33. The identity of any Inteliquent employees that took actions to terminate the use of fake ringtones in January 2017 and the locations of ESI for which they are custodians.

34. The source of any data in Inteliquent's custody, possession, or control that could be used to estimate the percentage of T-Mobile traffic that was sent via out-of-network SIP routes as stated on Plaintiffs_0000000183.

35. The source of any data in Inteliquent's custody, possession, or control that could be utilized to estimate the number of T-Mobile calls where a fake ringtone was played. (Plaintiffs_0000000272, n.62.)

36. The identity of any Inteliquent employee involved in assisting T-Mobile prepare any estimate of the number of calls where a fake ringtone was played and the locations of ESI for which they are custodians.

## VI. Trouble Reports From Rural Carriers

37. The system or systems Inteliquent use(d) to document complaints or concerns that other carriers made regarding either call completion, call quality, or prolonged ringing.

38. The types of data, including called party's number or terminating carrier, that is or was captured in any such system.

39. The ability to query such systems to identify records related to rural carriers.

## VII. Systems Used to Communicate Trouble Tickets/Complaints to Inteliquent

40. The system or systems T-Mobile and/or MetroPCS used to communicate to Inteliquent when it had received a trouble ticket or complaint from a consumer or other carrier that suggested a call completion problem.

41. The system or systems that Inteliquent used to communicate with T-Mobile and/or MetroPCS about the actions it took, including routing changes, in response to such complaints.

42. Inteliquent's preservation of records related to any such systems.

43. The nature and location of any records that Inteliquent provided to T-Mobile concerning the performance of any third parties (carrier or intermediate providers) that Inteliquent used or relied on as part of its routing of traffic on behalf of T-Mobile.

44. The nature and location of any analysis performed by T-Mobile regarding the performance of any third parties (carrier or intermediate providers) used by Inteliquent.

**VIII. Least Cost Routing of T-Mobile's Traffic**

45. With regard to traffic T-Mobile delivered to Inteliquent for termination pursuant to the MSA:

   a. the identity of any least-cost routing or other system that determined which carrier or intermediate provider Inteliquent would utilize to deliver a call for termination;

   b. the locations and custodians of any audit trail or other type of records of changes made to Inteliquent's routing tables over time;

   c. the locations and types of records that would show carrier performance metrics for those carriers or intermediate provider listed in the tables (e.g., answer-seizure ratio (ASR) or network effectiveness ratio (NER));

   d. the nature and location of any records that T-Mobile had access to that would allow it to understand, evaluate, or monitor the performance of the carriers or intermediate providers in Inteliquent's routing tables;

   e. The ability to query any records related to the foregoing.

46. The location of any records reflecting Inteliquent's compliance with the Implementation Timeline set forth in the MSA. SAC, Ex. 13, pp. 7-8.

47. The location of any records reflecting T-Mobile's election to use Inteliquent to route traffic that would otherwise fit within the definition of "Excluded PSTN Traffic" under the MSA. SAC, Ex. 13, p.3.

48. The location and custodian of any records referring or relating to T-Mobile's obligations under the MSA to send "traffic that is generally consistent with its overall retail traffic origination profile (*e.g.*, no disproportionate traffic to high cost codes) over the Trunks." SAC, Ex. 13, p.4.

49. The nature and custodian of any records referring or reflecting any time in which T-Mobile directed Inteliquent to route traffic to codes other than "the published codes in the LERG." SAC, Ex. 13, p.8.

50. The location of any records provided to T-Mobile as required by Section 10 of the MSA. SAC, Ex. 13, pp.10-12.

51. The identity and location of any systems used by Inteliquent to measure its compliance with the Service Levels set forth in the MSA. *See* SAC, Ex. 13, pp.14-15; 17-25.

52. The identity of any custodian that would have records related to T-Mobile's enforcement or waiver of any Service Credits pursuant to the MSA. *See* SAC, Ex. 13, pp.15-17.

## IX. Form 480 and Other FCC Reporting

53. The location of any system built or utilized by Inteliquent to comply with the FCC's RCC reporting obligations, including, not limited to, Form 480 reports.

54. Whether and to what extent Inteliquent submitted Form 480 reports that incorporated data regarding calls originated on T-Mobile's network (including MeroPCS).

55. To the extent that Inteliquent's Form 480 reports incorporated data regarding calls originated on T-Mobile's network (including MeroPCS), the manner in which Inteliquent complied with its duty under the MSA to show such drafts to T-Mobile prior to their submission to the FCC and the location of records reflecting the exchange and approval of such drafts.

56. With regard to Form 480 reports submitted to the FCC by T-Mobile and MetroPCS, whether T-Mobile relied on data, drafts or any other information provided to it by Inteliquent, and if so, the nature and locations of such data and means by which it was shared.

57. Whether T-Mobile provided any data to Inteliquent to assist in preparing Form 480s and, if so, the nature and locations of such data and means by which it was shared.

58. The nature and location of any communications that Inteliquent had with T-Mobile regarding Form 480 data collection and reporting, including, but not limited to, T-Mobile's admission to the FCC that its Form 480 reports, as originally filed, were inaccurate.

Dated: October 25, 2021

David T.B. Audley (Bar No. 6190602)
Mia D. D'Andrea (Bar No. 6307966)
**CHAPMAN AND CUTLER LLP**
111 West Monroe Street
Chicago, IL 60603-4080
Tel. 312-845-2971
Email: audley@chapman.com
Email: dandrea@chapman.com

Cathy A. Hinger (*pro hac vice*)
G. David Carter (*pro hac vice*)
**WOMBLE BOND DICKINSON (US) LLP**
2001 K Street, NW Suite 400 South
Washington, DC 20006
Tel.: 202-857-4489
Email: cathy.hinger@wbd-us.com
Email: david.carter@wbd-us.com

Kurt D. Weaver (*pro hac vice*)
**WOMBLE BOND DICKINSON (US) LLP**
555 Fayetteville Street, Suite 1100
Raleigh, NC 27601
Telephone: 919-755-8163
Email: kurt.weaver@wbd-us.com

*Counsel for Plaintiffs*

# CERTIFICATE OF SERVICE

The undersigned, an attorney, hereby certifies that on October 26, 2021, he caused a true and correct copy of the foregoing **PLAINTIFFS' NOTICE OF 30(B)(6) RECORDS CUSTODIAN DEPOSITION OF INTELIQUENT, INC**, to be served upon the following attorneys by U.S. mail, postage prepaid:

**Nigel F. Telman**
**Edward Chester Young**
PROSKAUER ROSE LLP
Three First National Plaza
70 W. Madison
Suite 3800
Chicago, IL 60602

**Baldassare Vinti**
**Michael T. Mervis**
PROSKAUER ROSE LLP
1585 Broadway
New York, NY 10036

**Bradley I. Ruskin**
**Om V. Alladi**
**Tiffany M. Woo**
PROSKAUER ROSE LLP (New York)
11 Times Square
New York, NY 10036

**John J. Hamill , Jr.**
**Devin James Carpenter**
**Michael S. Pullos**
DLA PIPER LLP (US)
444 West Lake Street
Suite 900
Chicago, IL 60606

/s/ David T.B. Audley
David T.B. Audley

4181939/BEJ