THE UNITED STATES DISTRICT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| CRAIGVILLE TELEPHONE CO. d/b/a ADAMSWELLS; and CONSOLIDATED TELEPHONE COMPANY d/b/a CTC | ) ) ) ) | |
| Plaintiffs, | ) ) | No. 1:19-cv-07190 |
| vs. | ) ) ) | Judge John Z. Lee Magistrate Judge Jeffrey T. Gilbert |
| T-MOBILE USA, INC.; and INTELIQUENT, INC. | ) ) ) | |
| Defendants. | ) | |

**SECOND JOINT STATUS REPORT REGARDING T-MOBILE'S MOTION FOR PROTECTIVE ORDER CONCERNING CUSTOMER CONTACT (ECF 170)**

Plaintiffs, Craigville Telephone Co. d/b/a AdamsWells ("AdamsWells") and Consolidated Telephone Company d/b/a CTC ("CTC"), on behalf of themselves and a class of similarly-situated companies ("Plaintiffs"), and Defendant T-Mobile USA, Inc. ("T-Mobile" or "TMUS"), pursuant to the Court's comments at the March 25, 2022 hearing ("Hearing") and Minute Entry that followed (*see* ECF 252 and ECF 253 at 74:9–14), and the Court's June 3, 2022 Minute Entry, hereby submit this Second Joint Status Report Concerning T-Mobile's Motion for Protective Order Concerning Customer Contact (ECF 170) to address their post-Hearing negotiations concerning protocols for Plaintiffs' contact with T-Mobile customers whose identity and contact information is made known to Plaintiffs only as a result of Defendants' production of such information in discovery.[1]

---

[1] To limit this Joint Status Report to 15 pages of shared content, each party submits 7.5 pages of briefing after this cover page, with page breaks for each party's sections. Doing so makes the total pages of this document more than 15 but assures the parties share the 15 pages of content equally.

I.      **Plaintiffs' Statement.**

   A. **The Court Identified Elements It Expects In A Customer Contact Protocol.**

The Court found "Some of T-Mobile's customers . . . have relevant information about rural call completion issues, which are at issue in this case." (ECF 253 at 24:14–17.) The Court described the type of T-Mobile customer who may be appropriate to contact as follows:

> From a Rule 26(b)(1) perspective . . . some of T-Mobile's customers ***who experienced local ring back tones*** -- LRBT -- ***and possibly other call completion issues that are relevant in this case*** here had potentially relevant and discoverable information . . . and that discovery . . . is proportional to the needs of the case.

(*Id*. at 25:4–10 (emphasis added); *see also id.* (finding that "the information is relevant," and stating, "I don't think that T-Mobile is seriously disputing that.").)

The Court identified certain elements to be included in the requested protective order. Customers contacted should be "likely to have relevant information." (*Id.* at 41:1). The Court identified people who called about call completion problems as "at least a *potential* universe of people who would have useful or discoverable or relevant information." (*Id*. at 41:4–6 (emphasis added).) The Court expressed that the protocol should identify a universe of potential recipients of Plaintiffs' inquiry without Plaintiffs having to specify to T-Mobile precisely who they were contacting. (*Id*. at 43:4–12.) The Court asked the parties to draft a written communication for Plaintiffs to convey to the customer for the Court to approve, discussing both regular mail and email. (*Id.* at 41:8–16; 56:3–14.) However, the Court stated it was not "averse to … something [] that the parties would come up with for calls," consistent with *Gottstein v. National Association for the Self Employed*, 186 F.R.D. 654 (D. Kan. 1999), if written communication "becomes too cumbersome." (ECF 253 at 56:15–57:4; *see also id*. at 38:14–24.) The Court expected the communication to allow customers to "opt in" to being contacted. (*Id*. at 42:1–10; 50:23–51:2.) Finally, the Court proposed limiting the number of customers to be contacted to 50, though the

Court was "not wedded to any particular number." (*Id*. at 42:11–16; 51:7–8.)

### B. Plaintiffs Proposed A Protocol That Satisfies Each Of These Elements.

After the Hearing, Plaintiffs hosted a meet and confer call on March 29, 2022, during which Plaintiffs proposed implementing the Court's parameters via text message, rather than by U.S. Mail, since: (1) most of the contact information in the documents is mobile phone numbers, (2) texts are a more reliable means to reach the witness, and (3) it would require no additional layers of searching for associated home addresses or emails. (*See* Ex. 1, Mar. 28, 2022 Email from C. Hinger.) Plaintiffs sent T-Mobile a written proposal consistent with the Court's described protocol using text messaging as the initial method of contact, and later elaborated in an email that the texts would be transmitted by a Peer-to-Peer service. (*See* Ex. 2, Apr. 5, 2022 Ltr. from C. Hinger at 4–5; *see also* Ex. 3, Email thread at Apr. 14, 2022 Email from D. Carter.) T-Mobile rejected use of text messages citing a risk of TCPA[2] liability, insisted on contact only by U.S. mail, and the parties engaged in several email exchanges providing some commentary on one anothers' proposals. (*See generally* Ex. 3.) On April 27, 2022, the Parties held an hour long video meet and confer to discuss their competing proposals, thereafter exchanged multiple iterations of proposed orders, and held another half hour video call meet and confer on June 7, 2022. Plaintiffs made a number of modifications to their April 5th proposal in the meet and confer process and Defendants did so as well. Plaintiffs' final proposed Order is set forth in Exhibit 4 hereto. Plaintiffs submit an alternative proposed order, attached hereto as Exhibit 5, for contact by a phone call since, as shown herein, the concept of a first written opt in communication is unreliable and becoming too cumbersome, time consuming, costly, and unwieldy to provide Plaintiffs reliable access to material witnesses. (*See* ECF 253 at 38:14–15; 56:23–57:13.)

---

[2] *See* 47 U.S.C. § 227.

### C. Text Messaging Is Most Efficient And Carries No TCPA Risks.

Plaintiffs propose text messages sent through a Peer-to-Peer service with an opt in message offering the customer an opportunity to consent to a call from Plaintiffs' counsel.[3] Plaintiffs oppose being restricted to contacting a T-Mobile customer-witness by regular mail. (*See* ECF 253 at 33–34, 36, 47–49). Mail would require Plaintiffs to either share their work product as to precisely who they want to contact, or, as T-Mobile suggests, notify it of *all* the documents that have customer information which fall within the profile. This would impose enormous burden and expense on Plaintiffs to do a document review to create a new list of documents conforming with the final negotiated protocol. This convoluted proposal would allow T-Mobile to stand over Plaintiffs' shoulders throughout the process, and imposes additional hurdles for Plaintiffs to overcome before contacting customer-witnesses with relevant, discoverable information – fulfilling the Court's concern that a written communication process could become "too cumbersome" and simply calling the witness as in *Gottstein* may be preferable. (ECF 253 at 56:15–57:9; *see also id*. at 38:14–24.) Such list could be hundreds of documents identifying thousands of customers, just to mask which 75 Plaintiffs may contact – such an exercise would defeat the efficiency of having an agreed criteria Plaintiffs could delve into at their discretion without exposing work product. Moreover, the postal addresses T-Mobile has on file may not even be accurate, especially since customers could have since switched carriers. Conversely, the customers' mobile phone numbers that fall within the profile have already been produced and can

---

[3] Peer-to-Peer service is not an automatic telephone dialing system under the TCPA as interpreted by the Supreme Court's decision in *Facebook, Inc. v. Duguid*, 141 S.Ct. 1163 (2021), and the FCC's Declaratory Ruling, *In re: Rules and Regulations Implementing the Tel. Consumer Prot. Act, P2P Alliance Petition for Clarification*, Declaratory Ruling, CG Docket No. 02-278, DA 20-670, at ¶ 8 (FCC June 25, 2020) (clarifying that Peer-to-Peer texting platforms "not capable of making calls or sending texts without a person actively and affirmatively manually dialing each number, is not an autodialer as defined by the TCPA"). *See, e.g.*, https://www.peerlessnetwork.com/p2p-and-a2p/.

be used immediately without Plaintiffs having to identify the precise witnesses they may contact within the profile. (*Id.* at 52). Further, many wireless customers (forty percent according to T-Mobile) keep their mobile numbers when they change carriers. Additionally:

- Short Message Service ("SMS") has a 98% open rate and 45% response rate compared to just 20% and 6-8% respectively for email.[4] Whereas according to the Association of National Advertisers (ANA), the ***average direct mail response rate is a mere 9%***.[5]
- Peer-to-Peer texting boasts a 99% open rate, compared to ***just 8% for direct mail***.[6]
- 90% of Peer-to-Peer text messages are read within the first 5 minutes, and have an average response time from the recipient of 90 seconds.[7]

T-Mobile's argument that regular mail is "more reliable" strains all credulity.[8] *See infra* § II.B.

T-Mobile does not agree to text messaging claiming risk of TCPA lawsuits – this argument is frivolous. First, Peer-to-Peer texts do not violate the TCPA since they are specifically designed ***not to use an automatic telephone dialing system*** ("ATDS"). *See* 47 U.S.C. § 227(b)(1)(A) (only prohibiting a person from making certain calls using an "automatic telephone dialing system" or an artificial or prerecorded voice). In *Facebook*, the Court held a necessary feature of an ATDS,

---

[4] *See* Chris Pemberton, *Tap Into the Marketing Power of SMS*, Gartner, Nov. 3, 2016, https://www.gartner.com/en/marketing/insights/articles/tap-into-the-marketing-power-of-sms; and, https://www.forbes.com/sites/forbescommunicationscouncil/2019/09/13/whats-old-is-new-again-sms-marketing/?sh=3d1f09046734.

[5] *See* Mark Pinard, *Am I Getting Good Direct Mail Response Rates?*, Lob, May 21, 2021, https://www.lob.com/blog/direct-mail-response-rates#:~:text=According%20to%20the%20Association%20of,and%20type%20of%20direct%20mail.

[6] *See Comprehensive Guide To Peer-To-Peer Texting (P2P)*, Peerly, Dec. , 2020, https://peerly.com/comprehensive-guide-to-peer-to-peer-texting-p2p/

[7] *See Why P2P Texting Is On The Rise*, rumbleup, https://rumbleup.com/why-p2p-texting/

[8] T-Mobile's reliance on the USPS Household Diary Study is fundamentally flawed because even the USPS collected attitudinal information for its survey via telephone, specially designed telephone apps, and the internet. *See The Household Diary Study: Mail Use & Attitudes in FY 2020*, USPS, p. 5, 80 (Apr. 2021), https://www.prc.gov/docs/19/19244/Final%20HDS%202020%20Annual%20report.pdf/, which shows even the USPS recognized that mail is not the most efficient means to obtain information from a large group of people. Further, even assuming the USPS 73% read rate for "advertising mail" cited by T-Mobile is accurate, it shows that Plaintiffs are certain to be arbitrarily denied access to potentially dozens of customer witnesses. *See infra* § II.B. T-Mobile's citation to the Simplynoted blog which states direct mail "***can reach***" 90% is not a reliable statistic. Simplynoted generates fake handwritten letters then mails them to people on behalf of others. Its statistics are self-promotional. Regardless, logic dictates that people are far more likely to see and read a text than they are to receive and open a letter sent by an unfamiliar lawyer.

"is the capacity to use a random or sequential number generator to either store or produce phone numbers to be called." 141 S.Ct. 1163, 1173 (2021). Plaintiffs will not retain a vendor using a random or sequential number generator because they will be asking the vendor to send texts to specifically selected numbers.[9] Second, T-Mobile would not be the sender of the texts. Plaintiffs would arrange for the texts to be sent by a Peer-to-Peer service vendor, therefore T-Mobile would not be the maker of the text or call. The notion that T-Mobile will be sued under the TCPA for texts it did not send or calls it did not make, from a system that by court order cannot use a random or sequential number generator, is irrational. Third, lawsuits are not a risk because T-Mobile includes mandatory arbitration provisions in all of its subscriber agreements, eliminating its risk of federal class actions and deterring the TCPA plaintiffs' bar from initiating such proceedings.[10] Fourth, but quite importantly, Subway Restaurants recently established for T-Mobile that the wireless carrier exemption protects it from TCPA liability for texts sent to its customers. (*See* Ex. 3 at Apr. 15, 2022 D. Carter email (discussing *Warciak v. Subway Rests., Inc.*, 949 F.3d 354, 357-58 (7th Cir. Feb. 5, 2020).) *Warciak* also clearly demonstrates that T-Mobile has used text messaging to communicate with its customers about things as trivial as free subs without the concerns of TCPA liability it raises here. Fifth, T-Mobile's reference to other laws that "may

---

[9] Plaintiffs added to their Proposed Order that they cannot use an ATDS or system with capacity to use a random or sequential number generator to further assuage T-Mobile's alleged concerns. (*See* Ex. 4 ¶ 1.)
[10] The examples T-Mobile provides of class actions being filed against it despite its arbitration agreements are not persuasive. T-Mobile provided no incidence where it has been sued under the TCPA as a result of a **third party** texting or calling its customers. *See infra* § II.B. Rather, the lawsuits it cites involved text messages or calls placed by T-Mobile, or T-Mobile **selling** its customers' real-time location information to third-parties. *See Smith v. T-Mobile USA Inc. et al.*, No. 8:22-cv-00748 (M.D. Fla. 2022) (concerning robocalls allegedly placed by T-Mobile); *Christie v. T-Mobile USA, Inc.*, No. 4:21-cv-880 (W.D. Miss. 2021) (involving a text message sent by T-Mobile to its customers); *Sadrgilany v. T-Mobile USA, Inc.*, No. 4:21-cv-879 (W.D. Miss. 2021) (same); *Vash v. T-Mobile U.S., Inc.*, No. 1:21-cv-3384 (N.D. Ga. 2021) (same); *Ray v. T-Mobile U.S. Inc.*, No. 1:19-cv-01299 (D. Md. 2019) (relating to third-parties purchasing T-Mobile customers' real-time location information); *Rahmany et al. v. T-Mobile USA Inc.*, No. 2:16-cv-01416 (W.D. Wa. 2016) (alleging T-Mobile sent an unsolicited marketing text message to Plaintiff); *Aboudi v. T-Mobile USA, Inc.*, No. 12-cv-2169 (S.D. Cal. 2012) (concerning robocalls made by T-Mobile).

prohibit text solicitations" is unconvincing. T-Mobile has not identified any such law that Plaintiffs' proposed protocol would violate, and Plaintiffs' texts or calls would not violate state nonsolicitation laws because the purpose of the texts or calls would not be for the purpose of solicitations, they would be for the purpose of obtaining evidence from potential witnesses.[11] T-Mobile identifies no state laws that prohibit lawyers from using the telephone numbers of witnesses to seek information from them in litigation. In sum, T-Mobile's TCPA liability concerns are hyperbolic and unrealistic.

### D. Plaintiffs' Proposal Satisfies The Court's Numerical Limit Expectation.

Plaintiffs propose contacting up to 75 customers based on their review of the documents produced as of May 1, 2022. Given the speculative nature of Plaintiffs speaking with any of the customers, 75 is proportional to the Court's proposal. Given that FOIA 422-504, which the parties have agreed contains information about customers that may be contacted, has over 400 lines of customer call completion complaint data alone, and T-Mobile has produced spreadsheets reflecting thousands of lines of apparent trouble ticket data disclosing countless more customers, 75 is a very modest initial limiter.

### E. Plaintiffs' Proposal Identifies Categories Of Customers The Court Found Relevant.

---

[11] During the meet and confer process, T-Mobile identified a sample list of such state laws it was allegedly concerned about, but all of them addressed solicitations for sales of goods or services, which would not be applicable to Plaintiffs' contact with the T-Mobile customer witnesses. *See* Colo. Rev. Stat. Ann. §§ 6-1-903(10)(a), 6-1-904(1)(a) (prohibiting "telephone solicitation" to encourage the purchase or rental of, or investment in, property, goods, or services); Fla. Stat. Ann. §§ 501.059(1)((j), 501.059(4) (prohibiting "telephonic sales call" to solicit a sale of consumer goods or services or an extension of credit); Ind. Code Ann. §§ 24-4.7-4-1, 24-4.7-2-9(a) (prohibiting "telephonic sales calls" to solicit a sale of consumer goods or services or a charitable contribution); La. Stat. Ann. §§ 45:844.31(A), 45:844.31B(2)(a) (same); 201 Mass. Code Regs. 12.01, 12.02(1) (same ); Miss. Code. Ann. §§ 77-3-705(d), 77-3-707(1) and (2) (same); Mo. Ann. Stat. §§ 407.1095(3), 407.1098 (same); Okla. Stat. Ann. tit. 15, §§ 775B.2, 775B.6 (same); 73 Pa. Stat. Ann. §§ 2242, 2245.2(a) (same); Tenn. Comp. R. & Regs. 1220-04-11-.01(19), 1220-04-11-.07(1) (same); 16 Tex. Admin. Code § 26.37(b)(2), (c)(7), (d)(1) (same); Wyo. Stat. Ann. §§ 40-12-301(a)(ix) and (xii), 40-12-302(b) (same).

Plaintiffs' Proposed Order (Ex. 4), sets forth four categories of customers that fall within the "universe" of customers the Court already described as relevant that Plaintiffs would be allowed to contact. (*See* ECF 253 at 25:4–10, 41:1–6, 43:4–12.) Plaintiffs have agreed to limit the customers to only those who were subscribers during the relevant time period who attempted to make a call to a landline recipient (Ex. 4 at ¶ 2(a)-(b)), and where there is indicia in the documents that the customer was associated with a complaint (*id*. at ¶ 2(c)).[12] Assuming a customer meets all of these threshold criteria, the customer must then also fall within one of four other criteria: (d)(i) customers identified in T-Mobile's response to one of the FCC's Letter of Inquiry requests for information about call completion complaints to rural areas identified as FOIA 422-504[13]; (d)(ii) customers where there was a complaint about their call(s) that the FCC referred to either Defendant as a rural call completion complaint; (d)(iii) customers disclosed by *any* document T-Mobile produced containing evidence that that customer heard a fake ring tone[14]; and (d)(iv) customers that the documents show had problems with completion of calls to a landline served by a rural local exchange carrier ("LEC") or a LEC serving a high cost locality. It is Plaintiffs' understanding through the meet and confer process that T-Mobile does not object to any of these categories.

### F. The Parties Are Close To Agreement On The Required Statements.

---

[12] Plaintiffs understand that T-Mobile is in agreement with the form of these limiters.
[13] This document is an 82 page table summarizing call completion complaints made by T-Mobile customers and T-Mobile's alleged acts to resolve them.
[14] In response to T-Mobile's reservation of rights, Plaintiffs assert that they should not be limited to only contacting customers who attempted calls to customers of rural LECs or customers of LECs in high cost localities. Any customer experiencing fake ring tones may have evidence that undermines T-Mobile's position that fake ring tones do not deceive callers into prematurely terminating calls. (*See* ECF 94 ¶¶ 2, 87.) All calls impacted by fake ring tones are relevant to Count I and the putative class alleged. (*Id.* at ¶ 362.) Calls placed to rural LECs or LECs in "high cost localities" are the subject of Count III, which is predicated in part on the Commission's prohibition on routing practices that result in lower quality service to rural or high-cost localities. (*Id.* at ¶¶ 395, 396, 400.) This language comes expressly from the FCC's 2018 Declaratory Ruling which the Court has found applicable. (*Id.* ¶ 395; ECF 147 at 11–12.)

The parties are close to consensus on language for the agreed statements. (*See* Ex. 3 at Apr. 14, 2022 C. Hinger Email and Apr. 14, 2022 O. Alladi Email; *see also* Ex. 4 at ¶¶ 3–4.) However, Plaintiffs oppose T-Mobile's proposal that Plaintiffs' counsel advise T-Mobile's customers that they are not potential class members in this case. (Ex. 6 ¶ 3.) Plaintiffs' counsel cannot provide strangers such legal advice because laypersons may misperceive the advice as creating an attorney-client relationship, and it could be misleading to customers who could have claims against their carrier as a result of the same illegal practices. T-Mobile's specification that the customers are not members of any class in "this case" does not minimize the risk that a layperson may not appreciate such a nuance and could be misled to believe they do not have any personal claims, even though they may. Plaintiffs' counsel also cannot, as T-Mobile's order would require, give its customers legal advice about the consequences of speaking with Plaintiffs' counsel and the potential for depositions, for Plaintiffs' counsel will not know at the preliminary statement stage whether the customer is a potential deponent or not. These statements demanded by T-Mobile have nothing to do with protecting the customers' privacy and go far beyond any of the minimal introductory language required in *Gottstein*.

II.     **Defendant T-Mobile's Statement**:

TMUS respectfully requests that the Court enter TMUS's Proposed Order (**Exhibit 6**) ("TMUS's Protocol") to govern the manner by which Plaintiffs can contact TMUS customers identified as potentially having relevant information to this case.[15] To preserve those customers' privacy interests, TMUS's Protocol permits Plaintiffs to mail up to 50 potential witnesses to ask them to "opt in" to further communications. TMUS's Protocol enables Plaintiffs to seek relevant information while protecting customer privacy.

The protocol Plaintiffs propose ("Plaintiffs' Proposal") differs from TMUS' Protocol in two significant ways.[16] First, Plaintiffs propose the "opt in" communication should be by text message rather than mail. But that would pose a material risk that TMUS will be exposed to lawsuits for claimed violations of federal and state laws governing communications by text. Even if, as Plaintiffs' contend, such claims would not be meritorious, that does not protect TMUS from having to incur defense costs to address them. Second, Plaintiffs object to customers being told they (i) are not eligible for compensation as class members (and they are not, since the putative class is comprised of wireline telephone companies), and (ii) may be required to give testimony as a witness if Plaintiffs think they have relevant information (which they may well be). Plaintiffs argue this would be providing "legal advice." As explained below, it would not.

   **A.  Background**

TMUS filed its protective order motion concerning customer information on October 20,

---

[15] TMUS agrees to be bound to a protocol that imposes symmetrical limitations governing TMUS's contact with Plaintiffs' customers. However, as TMUS does not yet intend to contact Plaintiffs' customers, TMUS has not conveyed the specifics to Plaintiffs.

[16] The terms of Plaintiffs' Proposal are set forth in Exhibit 4 hereto. In Exhibit 5, Plaintiffs propose a protocol to allow them to call customers directly without prior notice to them. This should be rejected out of hand, for the reasons articulated by the Court during the Hearing. ECF 253 at 25:3-10, 25:22-26:3, 41:8-42:10, 44:1-7.

10

2021. ECF 170. During the Hearing on March 25, the Court proposed a protocol to govern initial contact with customers in order to preserve their privacy interests:

> My proposal is that the parties jointly agree, draft a written communication with language that I ultimately would approve. And if there are disputes about that language, I would resolve those disputes. And those written communications would be sent by plaintiffs to these customers, inquiring whether they would be willing to speak to plaintiffs' counsel.

ECF 253 at 41:8-13. Following a break in the proceedings, TMUS stated it was amenable to the Court's proposal, subject to counsel confirming one point with her client. ECF 253 at 52:1-9. Plaintiffs, however, had a different reaction. They called the Court's proposal "premature" (*id.* at 46:1-4), and elaborated that (*id.* at 49:12-19):

> [W]e're thinking that maybe if we can get to the place where they [TMUS] do need to unredact, let us see what it looks like. We can agree to hold on making customer contact other than those that we know of. And let's get the trouble ticket data completely. Not partially, completely. Let's get to the CDRs **and then** revisit a method for contacting the customers **to the extent that we determine we need to contact the customers after we see the CDR data and our experts look at it**.[17]

Then, on March 28, 2022, <u>only one business day following the Hearing</u> and <u>before</u> TMUS even had a chance to produce the unredacted information, Plaintiffs asked TMUS to meet and confer over a customer contact protocol they were now advocating in which text messages would be sent to customers. Never mind what Plaintiffs—<u>following a break in the proceedings so they could consider their position</u> (*id*. at 44:12-22)—had told the Court just three calendar days earlier about how they needed to have their experts look at information not yet produced to even decide whether it was necessary for them to contact TMUS' customers.[18] Over the course of several meet

---

[17] The referenced redactions were of customer personal identifiable information ("PII"). The Court (i) correctly observed that TMUS had long ago offered to produce the PII unredacted so long as Plaintiffs would agree not to contact the customers until the parties could work out a protocol and (ii) rightly termed Plaintiffs' comments about the redactions "a false issue." ECF 253 at 49:21-50:10.

[18] Plaintiffs' swift reversal was accompanied by repeated unexplained claims of urgency and accusations TMUS was "delaying" Plaintiffs' ability to contact TMUS customers. Ex. 7 (Apr. 5, 2022 Email from O. Alladi; Apr. 5, 2022 Email from C. Hinger; Apr. 13, 2022 Email from C. Hinger; Apr. 14, 2022 Email from O. Alladi; Apr. 14, 2022 Email from C. Hinger). Plaintiffs made a similar claim of urgency during the

11

and confers, the parties reached impasse over the method (texting vs. letter) and aspects of substance of the opt-in communication, as well as who should be eligible for contact.

### B. Mail is a Reasonable and Efficient Method of Communication and Does Not Carry the Unnecessary Litigation Risks Posed by Text Messaging

The parties first dispute the method of opt-in communication with customers. Plaintiffs want to use text messages, whereas TMUS endorses the Court's original suggestion that communication be by mail. As Plaintiffs acknowledged in their proposal to TMUS made on April 22, 2022 (*see* Ex. 2 at 5 (C. Hinger Letter, suggesting the Court could "authorize" "compliance with the TCPA")), engaging in an unsolicited texting campaign without the prior consent of recipients may be impermissible under the TCPA. *See* 47 U.S.C. § 227(b)(1). The cost of violating the TCPA is potentially steep ($500 statutory fine, or $1500 for a willful violation), and TCPA settlements are expensive, as Plaintiffs' counsel (Womble Bond) has itself acknowledged.[19]

Plaintiffs argue a TCPA lawsuit against TMUS would lack merit, but that misses the point. Whether or not TMUS would have a meritorious defenses to TCPA class actions,[20] that would not

---

parties' meet and confer discussions on the most recent joint status report (ECF 258), insisting that the instant joint status report be filed by "no later than 5:00 p.m. ET on May 23, 2022." *Id*. at 7. As Plaintiffs acknowledge, though, after that unilaterally selected May 23 'deadline,' the parties met and conferred and were able to further narrow the areas of dispute. Ex. 8 (6/9/2022 Email from O. Alladi).

[19] *See What a TCPA Lawsuit Can Cost You*, Contact Center Compliance Corporation, https://www.dnc.com/news/what-tcpa-lawsuit-can-cost-you ("Womble Bond Dickinson put the average cost of a TCPA class action settlement during the first 10 months of 2018 at $6.6 million.").

[20] Plaintiffs' Proposal states that Plaintiffs will not use an autodialer. But the authorities Plaintiffs cite reflect uncertainty about what constitutes an autodialer under the TCPA. *See Facebook, Inc. v. Duguid*, 141 S.Ct. 1163 (2021) (holding only that Facebook's notification system is not an autodialer and not referencing Peer-to-Peer at all); *In re: Rules and Regulations Implementing the Tel. Consumer Prot. Act, P2P Alliance Petition for Clarification*, Declaratory Ruling, CG Docket No. 02-278, DA 20-670 at 4 (FCC June 25, 2020) ("We do not rule on whether any particular P2P text platform is an autodialer . . . ."). Plaintiffs proposal therefore does not eliminate the risk that the system the vendor they select ultimately uses be used will later be held to be subject to the TCPA. Likewise, the wireless carrier exemption Plaintiffs discuss was determined to not apply in identical circumstances to the *Warciak* case upon which Plaintiffs rely. *See Fishman v. Subway*, 2019 WL 6135030, at *8 (C.D. Cal. Nov. 19, 2019). And here, the exemption may not apply if former (as opposed to current) TMUS customers receive text messages. (Notably, TMUS adopted texting policy changes in light of these very *Subway* lawsuits.)

stop suits from being filed and TMUS having to incur significant defense costs to attempt to dismiss (or compel to arbitration of) such suits. The same is the case for Plaintiffs' assertion that mandatory individual arbitration clauses in TMUS's customer terms and conditions would prevent class actions from being filed. Indeed, even though TMUS has mandatory individual arbitration clauses in its terms and conditions, it frequently faces customer class actions.[21] Although TMUS has generally been successful in making motions to compel arbitration, such motions can be costly and are not riskless. *See, e.g.*, ECF 58, *Ohanian v. Apple Inc.*, No. 20-cv-5162 (S.D.N.Y. Mar. 25, 2021) (ordering bench trial over enforceability of TMUS's arbitration clause).

Moreover, while Plaintiffs focus on the TCPA, there are other federal and state laws implicated by unsolicited text messaging.[22] Plaintiffs do not claim to have conducted a 50-state survey[23] and, more to the point, can provide no assurance that the means of texting they propose will not lead to litigation (and the associated defense costs and exposure) against TMUS.

---

[21] Indeed, TMUS more than 50 lawsuits have recently been filed against TMUS notwithstanding the existence of mandatory individual arbitration clauses. *T-Mobile: 'Significant Portion' of Data Breach Class Members Subject to Arbitration*, Law.com (Jan. 25, 2022), https://www.law.com/2022/01/25/t-mobile-significant-portion-of-data-breach-class-members-subject-to-arbitration/. Other examples (including TCPA suits) are plentiful. *See, e.g.*, *Smith v. T-Mobile USA Inc. et al.*, No. 8:22-cv-00748 (M.D. Fla. 2022) (TCPA); *Christie v. T-Mobile USA, Inc.*, No. 4:21-cv-880 (W.D. Miss. 2021) (putative class action); *Sadrgilany v. T-Mobile USA, Inc.*, No. 4:21-cv-879 (W.D. Miss. 2021) (same); *Vash v. T-Mobile U.S., Inc.*, No. 1:21-cv-3384 (N.D. Ga. 2021) (same); *Ray v. T-Mobile U.S. Inc.*, No. 1:19-cv-01299 (D. Md. 2019); *Rahmany et al. v. T-Mobile USA Inc.*, No. 2:16-cv-01416 (W.D. Wa. 2016) (TCPA); *Aboudi v. T-Mobile USA, Inc.*, No. 12-cv-2169 (S.D. Cal. 2012) (same). While Plaintiffs dismiss these examples because they either did not involve the TCPA or a third party initiating the text, that is not the point. There are many class action plaintiff's lawyers who can and do bring all manner of class action suits that some may view as objectively frivolous. But a company sued in such a case must incur defense costs. There is no reason why TMUS should bear that risk when mail is a perfectly sufficient means of communication.

[22] *See generally U.S. State Anti-Spam Laws: Introduction and Broader Framework, Legal Information Institute*, Cornell Law, https://www.law.cornell.edu/wex/inbox/state_anti-spam_laws (collecting state laws that may prohibit text solicitations).

[23] While Plaintiffs provide a cursory reading of <u>some</u> states' non-solicitation laws (n.11), it is by no means all of them (*see* Cornell Law, *supra*). In any event, the merits would make little difference if a lawsuit is brought on the basis of such laws for which TMUS must still incur costs to defend against. It is easy for Plaintiffs to say that will never happen, but class action lawsuits based on novel and strained statutory interpretations are hardly uncommon.

Conversely, mail communication carries no such potential legal risks or costs. Rather, courts have repeatedly found mail to be a reasonable means of reaching relevant parties, *e.g.*, in the context of contacting class members. *See, e.g.*, *In re Herff Jones Data Breach Litig.*, 2022 WL 474696, at *5 (S.D. Ind. Jan. 12, 2022) (approving class notice by mail); *Fath v. Am. Honda Motor Co.*, 2019 WL 6799796, at *6 (D. Minn. Dec. 13, 2019) (same); *Butler v. Am. Cable & Tel., LLC*, 2011 WL 4729789, at *14 (N.D. Ill. Oct. 6, 2011) (same).

Plaintiffs cite statistics taken from blog posts they claim show direct mail is ineffective. But they do not help Plaintiffs because none of them reliably compare the responsiveness rate of direct mail to texting.[24] More reliable is the U.S. Postal Service's most recent annual report, which confirms that direct mailing continues to be opened and read. *See The Household Diary Study: Mail Use & Attitudes in FY 2020*, USPS, 44 (Apr. 2021), https://www.prc.gov/docs/119/119244/Final%20HDS%202020%20Annual%20report.pdf ("Households read or scanned 73% of all advertising mail, a share unchanged since 2018.").

Plaintiffs also make a number of speculative arguments, each of which are unpersuasive. First, they speculate the addresses TMUS has for its customers may now be inaccurate. But that might be true for any PII in TMUS's production[25] and hardly justifies the legal risk and defense

---

[24] The Pemberton, Forbes, Pinard, and rumbleup articles (n.4-5 & 7) do not compare text messages to direct mail at all. Indeed, Plaintiffs cite only one article that actually compares text messaging and mail head-to-head: Peerly (n.11). But the Peerly article is authored by the business marketing the very Peer-to-Peer service Plaintiffs propose using, and Plaintiffs' cited statistic is taken from an advertising graphic that contains no explanation of how the data was collected. Ex. 9 (website graphic snapshot). Direct-mail oriented businesses cite contrary statistics. *See, e.g.*, Direct Mail Response Rates In 2021, Simply Noted, https://simplynoted.com/blogs/news/direct-mail-response-rates (citing sources indicating direct mail open rates can reach 90% for ordinary mail and 99% for handwritten mail). Plaintiffs' response—that Simply Noted's statistics are "self-promotional"—is equally applicable to its own source, Peerly, and a reason the Court should take comfort in the more reliable USPS study, which provides the methodology it used to reach its findings. Tellingly, Plaintiffs do not challenge the USPS's study findings as unreliable.

[25] For example, despite Plaintiffs' assertions to the contrary, data suggests that only 40% of customers who change carriers keep their number. *See* Singh, Seema M., Consumer Advisory: "To Port or Not to Port," N.J. Division of the Ratepayer Advocate, https://www.state.nj.us/rpa/Number_Portability.htm.

cost exposure posed by using text messages. Second, Plaintiffs suggest it would take too long for TMUS to produce addresses. Not so. Provided that Plaintiffs give reasonable advance notice of when they will be asking for customer address information, TMUS can provide it within a week of the request. Plaintiffs also suggest it would it would be costly for them to send letters. This is not a serious argument, especially given the way Plaintiffs are litigating (and overcomplicating) this case. *See* ECF 253 at 50:12-17. Plaintiffs present no evidence of a significant cost for paper, printing, envelopes, and postage, and (relative to the potential cost to TMUS to deal with TCPA or other similar lawsuits) there is none.

Finally, Plaintiffs claim that TMUS's proposal would either require them to share work product or impose on them the "enormous burden and expense" of performing "a document review to create a new list of documents conforming with the final negotiated protocol." To be clear, there will be no sharing of work product; TMUS is not asking Plaintiffs to identify which customers they intend to mail. Rather, Plaintiffs need only identify the particular documents containing numbers of such customers and TMUS will then provide name and address information for <u>all</u> of the customers identified in those particular documents. Plaintiffs' decision to contact any subset of those customers that meet the parties' agreed criteria will not be disclosed to TMUS.

Plaintiffs' "burden and expense" argument has no merit. They will need to review the documents anyway in order to determine which contain phone numbers for any customers who fit the criteria (indeed, it is evident Plaintiffs have already at least started to do so). The only "list" Plaintiffs would need to compile is of Bates numbers.[26] Plaintiffs' "burden and expense" argument is no more credible than the argument they made during the Hearing about the supposed cost of

---

[26] Nor does this require Plaintiffs to engage in a far ranging search. All of the documents containing customer information are in TMUS's two most recent productions made on April 5 and 23.

15

using mail. See ECF 253 at 50:12-17.

### C. The Parties Have Reached Agreement on the Proposed Universe of Customers Plaintiffs are Permitted to Contact, Subject to a Reservation of Rights

The parties initially disagreed on what kinds of customers may be contacted, due to differing interpretations of the breadth of Plaintiffs' claims and the relevance of certain customers. Through the meet and confer process, TMUS made a number of concessions in an effort to resolve this part of the dispute. *See, e.g.*, Ex. 10 (June 3, 2022 Email from O. Alladi).[27] The parties have now reached an agreement on the criteria that a customer must meet, while reserving all rights to object to any evidence obtained through the protocol based on its materiality, relevance, admissibility or for any other reason. *See* TMUS's Protocol ¶ 2.[28]

### D. TMUS's Proposed Text for the Opt-In Communication Properly Notifies Customers of the Nature and Implications of Potential Involvement

Finally, the parties disagree on the content of the opt-in communication. TMUS proposes it should state that the customers: (i) are not members of the class in this case and thus not eligible for compensation as such; and (ii) may be required to testify at a deposition (or trial if they live within the Court's subpoena power) if they do have relevant information. These statements are informative, truthful, and helpful to customers who are considering whether to "opt in." Plaintiffs object, claiming it requires them to offer legal advice to non-clients. This is a phantom concern:

> Courts and professional associations are frequently called upon to consider whether "legal advice" has been rendered in order to decide questions of, inter alia, attorney client privilege, the unauthorized practice of law, and the bounds of professional conduct. Such opinions routinely state or presuppose that "legal advice" is not merely general advice that

---

[27] For example, TMUS initially objected that calls made to non-rural areas are irrelevant, but it has now agreed to include calls to "high-cost localities." Notably, it appears the FCC sometimes uses that term interchangeably with "rural."

[28] The parties continue dispute whether the number of customers with whom that Plaintiffs be permitted to contact should be limited to 50 or 75. TMUS endorses the Court's original suggestion that 50 customers is sufficient for now. If, after exhausting those contacts, Plaintiffs have a good faith basis to argue the universe should be expanded, they will have an opportunity to raise the issue again at that time. *See* TMUS's Protocol at ¶ 6.

> mentions the law or legal principles (otherwise bar exam preparation courses would create tens of thousands of attorney client relationships every summer), but rather the application of legal principles to someone's personal predicament.

*Small Bus. Bodyguard Inc. v. House of Moxie, Inc.*, 2015 WL 1290897, at *4 (S.D.N.Y. Mar. 20, 2015).[29]  Here, accurate statements advising customers they are not members of Plaintiffs' proposed class and thus are not eligible for compensation in this case,[30] and the possibility that they may be required to testify in the litigation if they opt in, does not involve the application of general principles to specific facts.[31]  Moreover, a properly worded disclaimer would resolve Plaintiffs' claimed concern.[32]

---

[29] *See also Matter of Rowe*, 80 N.Y.2d 336, 342 (1992) (article that "sought only to present the state of the law" is not legal advice); *State v. Winder*, 42 A.D.2d 1039, 1039 (4th Dep't 1973) (same)).

[30] In their opposition to TMUS's motion for a protective order, Plaintiffs admitted "TMUS customers are not potential class members whose communications with Plaintiffs might warrant special consideration." ECF 170 at 9.  There is no reason to believe individual customers are likely to part of Plaintiffs putative "class of similarly situated *companies*," as Plaintiffs has oft characterized it.  ECF 211 at 1 (emphasis added).  Furthermore, the disclosure proposed by TMUS does not say customers cannot be part of *any* class action, only that they are not within the class in this already-pending case.

[31] Plaintiffs say it could be "wrong" to inform customers of the possibility of being required to give testimony in deposition or at trial because Plaintiffs haven't yet decided who they want to testify.  But TMUS's proposed statement is properly qualified to inform customers that they *may* be required to testify, not that they *will* be.  Plaintiffs had no reluctance telling the Court about that possibility.  *See* ECF 170 at 18 ("testimony from the subscribers could be very powerful and persuasive evidence for the jury to consider"), 253 at 33 ("a jury may want to hear from some customers").  Plaintiffs also suggest the statement has nothing to with privacy interests.  But unwittingly winding up in a deposition or a courtroom as a result of agreeing to speak with attorneys is indeed an invasion of privacy, at least in the colloquial sense.

[32] *See, e.g.*, Terms and Conditions, Womble Bond Dickinson https://www.womblebonddickinson.com/us/terms-and-conditions ("Nothing on our Site constitutes legal . . . advice and nothing on our Site should be taken or construed as such.  You should consult a suitably qualified lawyer . . . on any specific problem or matter.").

Submitted on this 10th day of June 2022.

    /s/ David T.B. Audley
David T.B. Audley (Bar No. 6190602)
Mia D. D'Andrea (Bar No. 6307966)
Chapman and Cutler LLP
111 West Monroe Street
Chicago, IL 60603-4080
Tel. 312-845-2971
Fax: 312-516-3971
Email: audley@chapman.com
Email: dandrea@chapman.com

Cathy A. Hinger (*pro hac vice*)
G. David Carter (*pro hac vice*)
Victoria A. Bruno (*pro hac vice)*
Kathleen O. Gallagher (*pro hac vice)*
Womble Bond Dickinson (US) LLP
2001 K Street, NW Suite 400 South
Washington, DC 20006
Tel.: 202-857-4489
Fax: 202-261-0029
Email: cathy.hinger@wbd-us.com
Email: david.carter@wbd-us.com
Email: victoria.bruno@wbd-us.com
Email: katie.gallagher@wbd-us.com

Kurt D. Weaver (*pro hac vice*)
Womble Bond Dickinson (US) LLP
555 Fayetteville Street, Suite 1100
Raleigh, NC 27601
Tel: 919-755-8163
Fax: 919-755-6770
Email: kurt.weaver@wbd-us.com

Jeremy L. Baker (pro hac vice)
Womble Bond Dickinson (US) LLP
8350 Broad Street, Suite 1500
Tysons, VA 22102
Tel: 703-790-3310
Fax: 703-790-2623
Email: jeremy.baker@wbd-us.com

*Counsel for Plaintiffs*