# EXHIBIT 3

womblebonddickinson.com




**June 8, 2022**

Womble Bond Dickinson (US) LLP

271 17th Street, NW
Suite 2400
Atlanta, GA 30363-1017

t: 404.872.7000
f: 404.888.7490

David Carter
Partner
Direct Dial: 404-962-7593
Direct Fax: 202-261-0083
E-mail: David.Carter@wbd-us.com

**VIA EMAIL**
Michael Mervis
PROSKAUER ROSE LLP
1585 Broadway
New York, NY 10036
mmervis@proskauer.com

Michael Pullos
DLA Piper LLP (US)
444 West Lake Street
Suite 900
Chicago, Illinois 60606-0089
michael.pullos@dlapiper.com

**Re:** ***Craigville Telephone Co. et al v. T-Mobile USA, Inc. et al*, 1:19-cv-07190; Meet and Confer Regarding Call Detail Records and Billing Information**

Dear Counsel:

In accordance with Local Rule 37.2, I am writing to request a joint meet and confer process regarding Defendants' requests for call detail records and billing-related information from the Plaintiffs and Plaintiffs' requests for the same types of information, including its anticipated requests for call detail records ("CDRs"). We believe that discussing these similar issues in tandem will help the parties to arrive at a path forward regarding the production of relevant information that is proportional to the needs of the case.

## I. Call Detail Records

### 1. Inteliquent's Requests

**Inteliquent ("IQ") RFP 15 to AdamsWells and IQ RFP 18 to CTC.** "All call detail records relating to any calls to [Plaintiffs'] OCNs, including data sufficient to show calls that You assert did not have call completion problems and calls that You assert did have call completion problems."

#### a. The Request is Overly-Broad as Currently Stated

Inteliquent's request appears to suffer from the same over-breadth and proportionality issues that Defendants lodged as objections to avoid production of several categories of documents sought by Plaintiffs and which the Court ruled upon in its May 12 Order. *See* ECF 257 at 2 ("Although the general subject matter or topic of certain RFPs arguably might be relevant to the claims or defenses in this case, either in whole or in part, even those RFPs cover too much territory with language…to produce "all documents" "that refer or relate to" a particular topic, or "all communications" to the same effect."); *see also id.* at 8 ("RFP Nos. 53–59 are also overbroad as drafted (e.g. "all documents," "referring or relating to," "all filings"); *id.* at 13 ("Plaintiffs are simply not entitled to put TMUS to the burden of producing "all documents" that "refer or relate to" a broad subject matter.")

Therefore, the parties should confer about ways for Inteliquent to appropriately tailor the request. By way of example only, it does not appear relevant or proportional to require Plaintiffs to produce "all" CDRs, particularly when this would include calls that have nothing to do with either Inteliquent or T-Mobile. Thus, assuming that the parties can cooperatively resolve the over-breadth and scope issues of the

Womble Bond Dickinson (US) LLP is a member of Womble Bond Dickinson (International) Limited, which consists of independent and autonomous law firms providing services in the US, the UK, and elsewhere around the world. Each Womble Bond Dickinson entity is a separate legal entity and is not responsible for the acts or omissions of, nor can bind or obligate, another Womble Bond Dickinson entity. Womble Bond Dickinson (International) Limited does not practice law.





request, there remains the practical issue of how Plaintiffs can distinguish between calls that were originated by T-Mobile subscribers and those originated by T-Mobile's competitors. We assume that this can be accomplished by identifying the relevant T-Mobile OCNs that should appear in the CDRs, but would appreciate input from the Defendants about a concrete proposal to identify the relevant CDRs that would be responsive to this request.

Moreover, while we do not interpret the request to impose a burden on Plaintiffs to segregate calls that "did not have call completion problems" from those that did experience such problems, we note that further information from the Defendants would be necessary to perform any such segregation. We also memorialize the obvious fact that it is only Defendants' CDRs that would possess a record of calls that were blocked or never delivered to Plaintiffs' network in the first place because Plaintiffs' CDRs would have no data about calls that never reached their respective network, nor would they have any data about the call paths that preceded delivery to their switches to know when, how, or where a call placed to one of their customers was manipulated, delayed, or failed.

**2. Plaintiffs' Forthcoming CDR Requests:**

We believe that a meet and confer is warranted to try to streamline the process of Plaintiffs seeking relevant CDRs. As you know, the production and analysis of CDRs is commonplace in telecommunications disputes that involve the loss of intercarrier compensation such as this one. *See, e.g.,* 97 Am. Jur. Trials 1, *Telecommunications and Other Litigation: Call Detail Records and Fraud*; 86 Am. Jur. Proof of Facts 3d 217; *Use of Call Detail Record Evidence in Telecommunications "Phantom Traffic" and Other Litigation*. In this case, as evidenced by Inteliquent's own request for CDRs, the parties understand that the analysis of CDRs will be important potential evidence with regard to Plaintiffs' claims and Defendants' defenses. Specifically, Plaintiffs believe that CDR analysis will be relevant and necessary for at least each of the following reasons:

1. **Fake Ring Tones:** T-Mobile has explained that it inserted fake ring tones when a call experienced more than 4 seconds of post-dial delay.[1] *See* T-Mobile April 1, 2017 Response to FCC Letter of Inquiry. While we understand from the records custodian testimony that CDRs do not have a field that expressly indicates whether a fake ring tone was inserted, the call detail records can be used to calculate the post-dial delay. Scorza Tr. 54:19 – 57:11.[2] Therefore, by identifying calls that had more than 4 seconds of post-dial delay, the parties can identify which calls were impacted by fake ring tones. Analysis of the originating CDRs in comparison to the CDRs for the calls that did reach the terminating switch would also allow expert witnesses to quantify the number of calls that failed to reach the terminating carrier, supporting evidence of causation pursuant to Counts I and VIII.

2. **Call Routing Problems/Failure to Oversee:** CDRs are also likely to provide relevant evidence of rural and high cost areas experiencing the type of "persistent poor performance" that T-Mobile failed to promptly resolve that is the type of discriminatory treatment of rural and high cost areas that would give rise to liability under Sections 201(b) and 202(a) as discussed in the FCC's *2018 Order* and pursuant to Counts II, III and VIII. *See* Memorandum Opinion and Order (ECF No. 91), at 11 (citing *In re Rural Call Completion*, 33 FCC Rcd. 4199, 4211 (2018) ("*2018 Order*")).

---

[1] Of course, we continue to await T-Mobile's production of the records showing how it calculated the number of calls impacted by the fake ring tones, which the Court has found are relevant and discoverable.

[2] We would, of course, need to add the time associated with the call transgressing T-Mobile's network to the Inteliquent interconnection, which is not captured by Inteliquent's CDRs.





As T-Mobile has testified, it did not insist on receiving the regular quality performance reporting from Inteliquent that was mandated by Section 10 of the MSA. *See* Blanchard Dep. 73:7 – 74:14 (testifying that formal regular reporting did not start until 2018). Moreover, even with regard to the ad hoc reporting that did occur, whether the reports are actually indicative of Inteliquent's true performance is unknown at this time because [REDACTED] Thus, the CDRs appear to be the most reliable source of information evaluate persistent poor performance.

3. **Damages:** The analysis related to each of the foregoing issues will, of course, be directly relevant to analyzing the amount of lost access charges that will be sought as damages in the case.

4. **Class Certification:** Finally, as shown above, CDR analysis will be relevant to identifying class members with regard to the fake ring tone class under Counts I and VIII, as well as the victims of the unlawful and discriminatory routing practices at issue in Counts II, III, and VIII.[3]

We believe that the meet and confer prior to serving discovery requests for CDRs is warranted in light of the facts learned during the Defendants' record custodian depositions. [REDACTED] Inteliquent has a regular process for restoring backup CDRs because it is a typical activity that the company performs. *Id.*, 40:10 – 41:14.

To be clear, Plaintiffs believe that T-Mobile had a duty to retain its CDRs related to calls made to rural and high-cost localities (at a minimum) for at least a significant portion of the time periods relevant to this litigation in light of the circumstances surrounding T-Mobile's unlawful practices that harmed Plaintiffs and the putative class or classes, including, but not limited to, T-Mobile's actual or constructive knowledge of: (i) the FCC's ban on fake ring tones that went into effect in January 2014; (ii) the purpose behind the FCC's rural call completion rules, which was to protect Plaintiffs and the putative class or classes from the specific problems that underlie this lawsuit, for example, the "pattern of call completion and service quality problems on long distance calls to certain rural areas . . . where the costs that long distance providers incur to complete calls are generally higher than in non-rural areas," *see* Consent Decree, ¶ 3 (explaining purpose behind *2012 Declaratory Ruling*); *see also id*. at ¶¶ 3-5 (further explaining purpose behind *2012 Declaratory Ruling* and the *2013 Rural Call Completion Order*), as well as long-distance carriers, like T-Mobile, "adopting or perpetuating routing practices that result in lower quality service to rural *or high-cost localities* than like service to urban or lower cost localities (including other lower cost rural areas)," *see 2018 Order*, 33 FCC Rcd. at 4210-4211 (emphasis added); (iii) the FCC's repeated admonitions that insertion of fake ring tones was unlawful in direct communications with T-Mobile's in-house counsel Indra Chalk in 2015 and 2016; (iv) repeated complaints of call completion problems by three Wisconsin ILECs (who are putative class members), which the FCC served on T-Mobile's legal department in 2016; (v) the

[3] The members of the class impacted by the failure to oversee the intermediary are defined by the *2018 Order* and reference to the NECA ILEC and CLEC lists. *See 2018 Order*¸ ¶ 30.



FCC's investigation of T-Mobile, as documented by the FCC's Letter of Inquiry and Supplemental Letter of Inquiry, which included an investigation into whether T-Mobile may have failed to accurately report data on its Form 480s regarding calls attempted to rural ILECs; (vi) T-Mobile's negotiations with the FCC resulting in T-Mobile's entry into the Consent Decree, admissions that it violated the FCC's rules by inserting fake ring tones and failing to correct problems with Intermediate Providers' delivery of calls to certain rural OCNs, and agreement to pay a $40 million penalty"; and (vii) receipt of our FOIA request from the FCC wherein T-Mobile was expressly advised that our firm represented over 75 local exchange carriers who were investigating and intended to hold T-Mobile accountable for its failure to oversee its intermediary providers and its unlawful insertion of fake ringtones. These circumstances individually and collectively repeatedly put T-Mobile on notice of the potential for litigation with some or all of the putative class members and it would have been readily apparent to anyone in the telecommunications industry that an analysis of CDRs would be performed during the course of such litigation. Given T-Mobile's failure to retain any of the searchable CDRs from any of their various CDR repositories for any part of the relevant time period, Plaintiffs' position is that T-Mobile should bear the costs of reconstructing a database of the lost CDRs at its expense. *See, e.g., Lofton v. Verizon Wireless (VAW) LLC*, 308 F.R.D. 276, 287-91 (N.D. Cal. 2015) (finding that Verizon had a duty to preserve CDRs based on the initiation of earlier litigation, had failed to intervene to ensure the preservation of CDRs, but would not be subject to spoliation sanctions where archived data could be used to reassemble the missing CDRs).

In preparation for a productive meet and confer process, we ask that T-Mobile make inquiry of any other intermediate providers, such as InComm and Level 3, that it may have also routed traffic to during the relevant time period and come prepared to discuss whether those carriers possess relevant CDRs in active or archive format that could be added to the database. We also ask that T-Mobile come prepared to discuss the production of a set of records that would enable Plaintiffs to evaluate the additional post-dial delay associated with the call passing through T-Mobile's network to the Inteliquent hand-off, which would need to be added to the post-dial delay that can be calculated by examining Inteliquent's CDRs.

Consistent with Judge Gilbert's recent order and the position that Defendants have taken about the importance of the meet and confer process, we anticipate that the Defendants will participate in this process in a constructive and good faith manner in order to make the discovery process efficient for all parties. In our view, good faith participation will include having the necessary attorneys and decision makers available on our calls to facilitate the discussion and reach agreements. Similarly, we are prepared to explore agreements that the parties could reach with regard to the reprocessing of the CDRs that could mitigate costs without prejudicing Plaintiffs' ability to evaluate the merits, quantify damages, and establish the class or classes.

## II. Billing-Related Information

### 1. T-Mobile's Document Requests

**T-Mobile RFP 8:** All Documents and Communications concerning the terminating access charges Plaintiffs allege they are entitled, including but not limited to documents concerning the "factors" which "impact the access charges a local carrier may collect" as alleged in ¶¶ 31, 63, and 69 of the SAC.

**T-Mobile RFP 9:** Documents sufficient to show access charges collected by Plaintiffs: (i) before Plaintiffs allege Defendants applied LRBT; and (ii) after Plaintiffs allege Defendants applied LRBT.





**a. The Requests are Overly-Broad as Currently Stated**

T-Mobile's RFPs 8 and 9 contain the same language the Court has recently determined to be impermissibly overbroad and disproportionate as drafted. *See* ECF 257 at 2. They seek records that are well beyond the traffic originated by T-Mobile, including traffic originated by T-Mobile's competitors. Accordingly, the parties should meet and confer about alternative means of determining which subsection of Plaintiffs' billing records are actually relevant and proportional to the needs of this case.

RFP 8 seeks documents not in the possession of Plaintiffs, but rather in the possession of Defendants. *See*, *e.g.* Pl. CTC's Resp. to TMUS Second RFPs at 11-12. Plaintiffs are in possession of what are known as carrier access billing ("CABs") invoices. These CABs invoices, however, do not reflect the access charges Plaintiffs allege they are entitled to recover in this case because these invoices reflect only calls that were successfully completed to *their* networks. Instead, the documents that would reflect the access charges to which Plaintiffs allege they are entitled to in this case are for calls which never reached the Plaintiffs' switch because the calls failed before reaching the Defendants' networks and/or the calls had to be terminated to Inteliquent's network as a work around to address the continuous call completion problems. *See* Rosenwald Tr. 63:16-24; 126:14-128:7; 135:7-19; 138:5-21. Thus, we note that RFP No. 8 necessarily requires the analysis of Defendants' CDRs as discussed above.

To the extent that invoices related to calls that were terminated at Plaintiffs' network are responsive to RFP 9, it is evident that identifying the specific carrier(s) that made the final call hand off to Plaintiffs' network would be essential to identifying the responsive records because of the manner in which carrier access billings are generated. We do not believe that T-Mobile has shown how records regarding calls that were originated by its competitors would be relevant or proportional to the needs of this case.

**2. Plaintiffs' Document Requests**

**Plaintiffs' RFP 52:** Produce all records of payments made and/or exchanged between you and Inteliquent.[4]

**a. The Court Has Agreed with T-Mobile that the Request is Overly-Broad as Currently Stated**

Judge Gilbert has ruled that this request is overly-broad as drafted, even though the economics of the relationship between Inteliquent and T-Mobile is relevant. We would propose to narrow this request to focus on only on two types of documents: (1) copies invoices that Inteliquent sent to T-Mobile that included traffic terminated to any carrier on Inteliquent's Most Expensive Codes list (EQUINOX00005247) from the time the PSTN Attachment was executed and until the Consent Decree was released; and (2) a ledger of payments made by T-Mobile in response to those invoices. This narrowing would eliminate any documents for other services that Inteliquent may have provided that do not relate to call delivery, as well as any invoices that do not incorporate charges related to calls made to potential class members.

# # #

---

[4] We will be following up separately about the other requests addressed in Judge Gilbert's order where further meet and confer is anticipated.





The Court's Opinion and Order generally instructs the parties to meet and confer "more fulsomely" about documents each party "may be entitled to discover, as distinguishable from kitchen sink requests for every piece of paper that might touch a relevant subject matter." ECF 257 at 13. We are prepared to do so and expect that T-Mobile and Inteliquent are each engaging in this same exercise to narrow and limit the scope of their outstanding discovery requests. We believe that the time is appropriate now for the parties to come together to develop a plan for producing the CDRs for the calls at issue in this case in coordination with addressing Defendants' queries about Plaintiffs responding to Defendants' pending requests for similar information. Please let us know when on the afternoon of Tuesday, June 14, 2022, you are available to discuss these matters in a meet and confer.

Best regards,

**Womble Bond Dickinson (US) LLP**

G. David Carter

David Carter
Partner

CC via email only:
Baldo Vinti
Jennifer Roche
Om Alladi
John Hamill
Devin Carpenter
Joe Carey
David Audley
Mia D'Andrea
Cathy Hinger
Kurt Weaver
Victoria Bruno
Katie Gallagher
Jeremy Baker