# EXHIBIT 2

womblebonddickinson.com



WOMBLE
BOND
DICKINSON

**June 7, 2022**

Michael Mervis
PROSKAUER ROSE LLP
1585 Broadway
New York, NY 10036

**Via E-mail [mmervis@proskauer.com]**

Re:      *Craigville Telephone Co., Inc. et al v. T-Mobile USA, Inc. et al.*

Womble Bond Dickinson (US) LLP

2001 K Street, NW
Suite 400 South
Washington, DC 20006

t:   202.467.6900
f:   202.467.6910

Cathy A. Hinger
Partner
Direct Dial:  202-857-4489
E-mail:  Cathy.Hinger@wbd-us.com

Dear Michael,

        I am writing to follow up on Magistrate Judge Gilbert's May 12, 2022 Order (ECF 257 ("Order").) The Court's Order expresses expectations that the parties work in good faith to further meet and confer to narrow the scope of the Requests that were the subject of the Motion to Compel, and we anticipate that T-Mobile will do so.  Previously, we did not have much meaningful discussion about ways to narrow the Requests at issue due to T-Mobile's position that none of the Requests were relevant.  The Court did not sustain T-Mobile's relevance objections across the board, in some cases expressly found the Requests relevant and in many cases encouraged the parties to try to find agreed narrowed scopes for the Requests. Now that the Court has provided guidance for productive discussions on breadth and narrowing, we would like to revisit a number of the Requests with you to attempt to reach consensus on narrowed scopes to which T-Mobile will agree to respond.

        To that end, Plaintiffs have prepared the attached spreadsheet summarizing the Requests that were the subject of the Motion to Compel, the Court's rulings with respect to each, and Plaintiffs' proposals to address the Court's findings or narrow them.  You will find that Plaintiffs will defer further pursuit of certain categories to facilitate narrowing of differences.   We have also provided a column in our spreadsheet for T-Mobile's responses so that we can work collectively off this template as a master plan for how we proceed.

        I would then like to have a comprehensive meet and confer call by video conference with you next week.  Please let me know of your availability for the requested meet and confer call and it would be helpful if you could provide written responses or preliminary positions on each issue in advance.

                        Best regards,

                        **Womble Bond Dickinson (US) LLP**

                        Cathy A. Hinger
                        Partner

Womble Bond Dickinson (US) LLP is a member of Womble Bond Dickinson (International) Limited, which consists of independent and autonomous law firms providing services in the US, the UK, and elsewhere around the world. Each Womble Bond Dickinson entity is a separate legal entity and is not responsible for the acts or omissions of, nor can bind or obligate, another Womble Bond Dickinson entity. Womble Bond Dickinson (International) Limited does not practice law. Please see www.wombledickinson.com/us/legal-notice for further details.



June 7, 2022
Page 2


Enclosure

cc with enclosure (via email only):

David Carter
Kurt Weaver
Victoria Bruno
David T. B. Audley
Mia D'Andrea
Katie Gallagher
Jeremy Baker
Baldo Vinti
Om Alladi
Jennifer Roche
Bradley Ruskin
Nigel Telman
Edward Young
John Hamill
Michael Pullos
Joseph Carey



| From: | Alladi, Om V. |
|---|---|
| To: | Hinger, Cathy; Gallagher, Katie; Nemith, Mike; David T. B. Audley; Bruno, Victoria; Weaver, Kurt; Baker, Jeremy; Mia D. D"Andrea |
| Cc: | Hamill, John; Carey, Joe; Carter, David; Mervis, Michael T.; Pullos, Michael; Vinti, Baldassare; Roche, Jennifer L.; Ruskin, Bradley I.; Telman, Nigel F.; Young, Edward C. |
| Subject: | RE: Craigville Telephone Co. et al v. T-Mobile USA, Inc. et al - Follow Up Meet and Confer regarding Magistrate Judge Gilbert's May 12 Order |
| Date: | Friday, July 8, 2022 9:35:56 PM |
| Attachments: | image001.png |
| | image003.png |
| | image003.png |
| | image004.png |
| | TMUS Responses_Plaintiffs_ Follow Up Meet and Confer Topics Pursuant to Judge Gilbert_s May 12 Order.XLSX |

---

**External (oalladi@proskauer.com)**

Report This Email  FAQ

Cathy,

Please find in column "F" of the attached excel an informal summary of TMUS's positions on Plaintiffs' amended RFPs.  We are happy to discuss next week once you have had a chance to review.

Thanks,

**Om V. Alladi**
Associate

**Proskauer**
Eleven Times Square
New York, NY 10036-8299
d 212.969.3633
f 212.969.2900
oalladi@proskauer.com
greenspaces
Please consider the environment before printing this email.

---

**From:** Hinger, Cathy <Cathy.Hinger@wbd-us.com>
**Sent:** Monday, June 27, 2022 1:31 PM
**To:** Alladi, Om V. <OAlladi@proskauer.com>; Gallagher, Katie <Katie.Gallagher@wbd-us.com>; Nemith, Mike <Mike.Nemith@wbd-us.com>; David T. B. Audley <audley@chapman.com>; Bruno, Victoria <Victoria.Bruno@wbd-us.com>; Weaver, Kurt <Kurt.Weaver@wbd-us.com>; Baker, Jeremy <Jeremy.Baker@wbd-us.com>; Mia D. D'Andrea <dandrea@chapman.com>
**Cc:** Hamill, John <john.hamill@dlapiper.com>; Carey, Joe <joe.carey@dlapiper.com>; Carter, David <David.Carter@wbd-us.com>; Mervis, Michael T. <MMervis@proskauer.com>; Pullos, Michael <michael.pullos@dlapiper.com>; Vinti, Baldassare <BVinti@proskauer.com>; Roche, Jennifer L. <jroche@proskauer.com>; Ruskin, Bradley I. <BRuskin@proskauer.com>; Telman, Nigel F. <NTelman@proskauer.com>; Young, Edward C. <EYoung@proskauer.com>
**Subject:** RE: Craigville Telephone Co. et al v. T-Mobile USA, Inc. et al - Follow Up Meet and Confer regarding Magistrate Judge Gilbert's May 12 Order

**This email originated from outside the Firm.**

Om – For everyone's convenience, I am attaching here a copy of your Declaration.  I plan to start first with the requests discussed in this Declaration as they relate to representations you already made to the Court.

I look forward to our discussion at 3.

Best Regards,
Cathy Hinger

**From:** Hinger, Cathy
**Sent:** Saturday, June 25, 2022 10:35 AM
**To:** 'Alladi, Om V.' <OAlladi@proskauer.com>; Gallagher, Katie <Katie.Gallagher@wbd-us.com>; Nemith, Mike <Mike.Nemith@wbd-us.com>; David T. B. Audley <audley@chapman.com>; Bruno, Victoria <Victoria.Bruno@wbd-us.com>; Weaver, Kurt <Kurt.Weaver@wbd-us.com>; Baker, Jeremy <Jeremy.Baker@wbd-us.com>; Mia D. D'Andrea <dandrea@chapman.com>
**Cc:** Hamill, John <john.hamill@dlapiper.com>; Carey, Joe <joe.carey@dlapiper.com>; Carter, David <David.Carter@wbd-us.com>; Mervis, Michael T. <MMervis@proskauer.com>; Pullos, Michael <michael.pullos@dlapiper.com>; Vinti, Baldassare <BVinti@proskauer.com>; Roche, Jennifer L. <jroche@proskauer.com>; Ruskin, Bradley I. <BRuskin@proskauer.com>; Telman, Nigel F. <NTelman@proskauer.com>; Young, Edward C. <EYoung@proskauer.com>
**Subject:** RE: Craigville Telephone Co. et al v. T-Mobile USA, Inc. et al - Follow Up Meet and Confer regarding Magistrate Judge Gilbert's May 12 Order

Om,
I will send you a calendar invite for Monday at 3.
Best Regards,
Cathy Hinger

---

**From:** Alladi, Om V. <OAlladi@proskauer.com>
**Sent:** Saturday, June 25, 2022 9:05 AM
**To:** Hinger, Cathy <Cathy.Hinger@wbd-us.com>; Gallagher, Katie <Katie.Gallagher@wbd-us.com>; Nemith, Mike <Mike.Nemith@wbd-us.com>; David T. B. Audley <audley@chapman.com>; Bruno, Victoria <Victoria.Bruno@wbd-us.com>; Weaver, Kurt <Kurt.Weaver@wbd-us.com>; Baker, Jeremy <Jeremy.Baker@wbd-us.com>; Mia D. D'Andrea <dandrea@chapman.com>
**Cc:** Hamill, John <john.hamill@dlapiper.com>; Carey, Joe <joe.carey@dlapiper.com>; Carter, David <David.Carter@wbd-us.com>; Mervis, Michael T. <MMervis@proskauer.com>; Pullos, Michael <michael.pullos@dlapiper.com>; Vinti, Baldassare <BVinti@proskauer.com>; Roche, Jennifer L. <jroche@proskauer.com>; Ruskin, Bradley I. <BRuskin@proskauer.com>; Telman, Nigel F. <NTelman@proskauer.com>; Young, Edward C. <EYoung@proskauer.com>
**Subject:** RE: Craigville Telephone Co. et al v. T-Mobile USA, Inc. et al - Follow Up Meet and Confer regarding Magistrate Judge Gilbert's May 12 Order

Hi Cathy,

We can meet with you on Monday afternoon some time between 3:00 pm ET and 6:00 pm ET.

Thanks,

**Om V. Alladi**
Associate

**Proskauer**
Eleven Times Square
New York, NY 10036-8299
d 212.969.3633
f 212.969.2900
oalladi@proskauer.com
greenspaces
Please consider the environment before printing this email.

**From:** Hinger, Cathy <Cathy.Hinger@wbd-us.com>
**Sent:** Thursday, June 23, 2022 12:00 PM
**To:** Alladi, Om V. <OAlladi@proskauer.com>; Gallagher, Katie <Katie.Gallagher@wbd-us.com>; Nemith, Mike <Mike.Nemith@wbd-us.com>; David T. B. Audley <audley@chapman.com>; Bruno, Victoria <Victoria.Bruno@wbd-us.com>; Weaver, Kurt <Kurt.Weaver@wbd-us.com>; Baker, Jeremy <Jeremy.Baker@wbd-us.com>; Mia D. D'Andrea <dandrea@chapman.com>
**Cc:** Hamill, John <john.hamill@dlapiper.com>; Carey, Joe <joe.carey@dlapiper.com>; Carter, David <David.Carter@wbd-us.com>; Mervis, Michael T. <MMervis@proskauer.com>; Pullos, Michael <michael.pullos@dlapiper.com>; Vinti, Baldassare <BVinti@proskauer.com>; Roche, Jennifer L. <jroche@proskauer.com>; Ruskin, Bradley I. <BRuskin@proskauer.com>; Telman, Nigel F. <NTelman@proskauer.com>; Young, Edward C. <EYoung@proskauer.com>
**Subject:** RE: Craigville Telephone Co. et al v. T-Mobile USA, Inc. et al - Follow Up Meet and Confer regarding Magistrate Judge Gilbert's May 12 Order

*This email originated from outside the Firm.*

Om,
Please let me know when you are available for the meet and confer on Monday afternoon.

Best Regards,
Cathy Hinger

---

**From:** Alladi, Om V. <OAlladi@proskauer.com>
**Sent:** Thursday, June 23, 2022 9:06 AM
**To:** Hinger, Cathy <Cathy.Hinger@wbd-us.com>; Gallagher, Katie <Katie.Gallagher@wbd-us.com>; Nemith, Mike <Mike.Nemith@wbd-us.com>; David T. B. Audley <audley@chapman.com>; Bruno, Victoria <Victoria.Bruno@wbd-us.com>; Weaver, Kurt <Kurt.Weaver@wbd-us.com>; Baker, Jeremy <Jeremy.Baker@wbd-us.com>; Mia D. D'Andrea <dandrea@chapman.com>
**Cc:** Hamill, John <john.hamill@dlapiper.com>; Carey, Joe <joe.carey@dlapiper.com>; Carter, David <David.Carter@wbd-us.com>; Mervis, Michael T. <MMervis@proskauer.com>; Pullos, Michael <michael.pullos@dlapiper.com>; Vinti, Baldassare <BVinti@proskauer.com>; Roche, Jennifer L. <jroche@proskauer.com>; Ruskin, Bradley I. <BRuskin@proskauer.com>; Telman, Nigel F. <NTelman@proskauer.com>; Young, Edward C. <EYoung@proskauer.com>
**Subject:** RE: Craigville Telephone Co. et al v. T-Mobile USA, Inc. et al - Follow Up Meet and Confer regarding Magistrate Judge Gilbert's May 12 Order

Cathy – Unfortunately, we don't have any availability on Friday. We can meet with you Sunday or Monday afternoon. As for the balance of your email, we disagree.

**Om V. Alladi**
Associate

Proskauer
Eleven Times Square
New York, NY 10036-8299
d 212.969.3633
f 212.969.2900
oalladi@proskauer.com
greenspaces
Please consider the environment before printing this email.

---

**From:** Hinger, Cathy <Cathy.Hinger@wbd-us.com>
**Sent:** Wednesday, June 22, 2022 9:58 PM
**To:** Alladi, Om V. <OAlladi@proskauer.com>; Gallagher, Katie <Katie.Gallagher@wbd-us.com>; Nemith, Mike <Mike.Nemith@wbd-us.com>; David T. B. Audley <audley@chapman.com>; Bruno, Victoria <Victoria.Bruno@wbd-us.com>; Weaver, Kurt <Kurt.Weaver@wbd-us.com>; Baker, Jeremy <Jeremy.Baker@wbd-us.com>; Mia D. D'Andrea <dandrea@chapman.com>
**Cc:** Hamill, John <john.hamill@dlapiper.com>; Carey, Joe <joe.carey@dlapiper.com>; Carter, David <David.Carter@wbd-us.com>; Mervis, Michael T. <MMervis@proskauer.com>; Pullos, Michael <michael.pullos@dlapiper.com>; Vinti, Baldassare <BVinti@proskauer.com>; Roche, Jennifer L. <jroche@proskauer.com>; Ruskin, Bradley I. <BRuskin@proskauer.com>; Telman, Nigel F. <NTelman@proskauer.com>; Young, Edward C. <EYoung@proskauer.com>
**Subject:** RE: Craigville Telephone Co. et al v. T-Mobile USA, Inc. et al - Follow Up Meet and Confer regarding Magistrate Judge Gilbert's May 12 Order

*This email originated from outside the Firm.*

Om,
I will not schedule a meet and confer after 8 pm tomorrow. That is an unreasonable proposal from a time perspective. Please provide me your availability on Friday.

We do not see the relevance between the timing of our request for a meet and confer and the Court's order. As I have said, we did the heavy lifting preparing the summary and making the proposals to narrow numerous requests. You already know your clients' documents and what would be burdensome to collect or not. If your position is that you can take 26 days to be prepared to respond to a request for meet and confer, we will submit this issue concerning the amount of time it takes for your client to give you authority to participate, prepared and with authority, in meet and confers in the next joint status report the Court just scheduled.

I am available on Friday 9-12 or 1-5.

Best Regards,
Cathy Hinger

---

**From:** Alladi, Om V. <OAlladi@proskauer.com>
**Sent:** Wednesday, June 22, 2022 4:24 PM
**To:** Hinger, Cathy <Cathy.Hinger@wbd-us.com>; Gallagher, Katie <Katie.Gallagher@wbd-us.com>; Nemith, Mike <Mike.Nemith@wbd-us.com>; David T. B. Audley <audley@chapman.com>; Bruno, Victoria <Victoria.Bruno@wbd-us.com>; Weaver, Kurt <Kurt.Weaver@wbd-us.com>; Baker, Jeremy <Jeremy.Baker@wbd-us.com>; Mia D. D'Andrea <dandrea@chapman.com>
**Cc:** Hamill, John <john.hamill@dlapiper.com>; Carey, Joe <joe.carey@dlapiper.com>; Carter, David <David.Carter@wbd-us.com>; Mervis, Michael T. <MMervis@proskauer.com>; Pullos, Michael <michael.pullos@dlapiper.com>; Vinti, Baldassare <BVinti@proskauer.com>; Roche, Jennifer L. <jroche@proskauer.com>; Ruskin, Bradley I. <BRuskin@proskauer.com>; Telman, Nigel F. <NTelman@proskauer.com>; Young, Edward C. <EYoung@proskauer.com>
**Subject:** RE: Craigville Telephone Co. et al v. T-Mobile USA, Inc. et al - Follow Up Meet and Confer regarding Magistrate Judge Gilbert's May 12 Order

Hi Cathy,

We won't have client authorization on all of our positions on your amended RFPs tomorrow. We may have some authority on some of them. Unfortunately, our main point of contact with the client is on vacation and not reachable. If you'd like to have a short meet and confer about the ones for which we have client authorization, we can discuss tomorrow. Unfortunately, because of preexisting commitments on other matters, we can only meet with you at or after 8:00 pm ET.

However, we do think it may make the most sense for us to convene when we are prepared to discuss all of your positions. As we said before, it took Plaintiffs 26 days to put their proposal together, but it has only been 15 days since Plaintiffs sent it to TMUS. We do not feel it is reasonable or fair to demand TMUS have less time to compose their response.

**Om V. Alladi**
Associate

Proskauer
Eleven Times Square

New York, NY 10036-8299
d 212.969.3633
f 212.969.2900
oalladi@proskauer.com
greenspaces
Please consider the environment before printing this email.

---

**From:** Hinger, Cathy <Cathy.Hinger@wbd-us.com>
**Sent:** Tuesday, June 21, 2022 11:11 AM
**To:** Alladi, Om V. <OAlladi@proskauer.com>; Gallagher, Katie <Katie.Gallagher@wbd-us.com>; Nemith, Mike <Mike.Nemith@wbd-us.com>; David T. B. Audley <audley@chapman.com>; Bruno, Victoria <Victoria.Bruno@wbd-us.com>; Weaver, Kurt <Kurt.Weaver@wbd-us.com>; Baker, Jeremy <Jeremy.Baker@wbd-us.com>; Mia D. D'Andrea <dandrea@chapman.com>
**Cc:** Hamill, John <john.hamill@dlapiper.com>; Carey, Joe <joe.carey@dlapiper.com>; Carter, David <David.Carter@wbd-us.com>; Mervis, Michael T. <MMervis@proskauer.com>; Pullos, Michael <michael.pullos@dlapiper.com>; Vinti, Baldassare <BVinti@proskauer.com>; Roche, Jennifer L. <jroche@proskauer.com>; Ruskin, Bradley I. <BRuskin@proskauer.com>; Telman, Nigel F. <NTelman@proskauer.com>; Young, Edward C. <EYoung@proskauer.com>
**Subject:** RE: Craigville Telephone Co. et al v. T-Mobile USA, Inc. et al - Follow Up Meet and Confer regarding Magistrate Judge Gilbert's May 12 Order

<span style="color:red">*This email originated from outside the Firm.*</span>

Om,

We prefer to speak with you when you are prepared and authorized to be in a position to reach agreements on things. How about Thursday at 11 a.m. instead. That would be a full two weeks and two days – that seems to be sufficient time for your client to have given you authority to meet and confer.

Best Regards,
Cathy Hinger

---

**From:** Alladi, Om V. <OAlladi@proskauer.com>
**Sent:** Friday, June 17, 2022 8:11 PM
**To:** Hinger, Cathy <Cathy.Hinger@wbd-us.com>; Gallagher, Katie <Katie.Gallagher@wbd-us.com>; Nemith, Mike <Mike.Nemith@wbd-us.com>; David T. B. Audley <audley@chapman.com>; Bruno, Victoria <Victoria.Bruno@wbd-us.com>; Weaver, Kurt <Kurt.Weaver@wbd-us.com>; Baker, Jeremy <Jeremy.Baker@wbd-us.com>; Mia D. D'Andrea <dandrea@chapman.com>
**Cc:** Hamill, John <john.hamill@dlapiper.com>; Carey, Joe <joe.carey@dlapiper.com>; Carter, David <David.Carter@wbd-us.com>; Mervis, Michael T. <MMervis@proskauer.com>; Pullos, Michael <michael.pullos@dlapiper.com>; Vinti, Baldassare <BVinti@proskauer.com>; Young, Edward C. <EYoung@proskauer.com>
**Subject:** RE: Craigville Telephone Co. et al v. T-Mobile USA, Inc. et al - Follow Up Meet and Confer regarding Magistrate Judge Gilbert's May 12 Order

Cathy, my June 15 email explains why a meet and confer would not be productive at this juncture. That said, we are willing to have a conversation with you on Tuesday regarding your proposals. Please be advised (again) that, for the reasons stated in my June 15 email, we will not be in a position to agree to anything. Given that Monday is a holiday, please let us know what times on Tuesday work for you.

**Om V. Alladi**
Associate

Proskauer
Eleven Times Square
New York, NY 10036-8299
d 212.969.3633
f 212.969.2900
oalladi@proskauer.com
greenspaces
Please consider the environment before printing this email.

---

**From:** Hinger, Cathy <Cathy.Hinger@wbd-us.com>
**Sent:** Thursday, June 16, 2022 1:36 PM
**To:** Alladi, Om V. <OAlladi@proskauer.com>; Gallagher, Katie <Katie.Gallagher@wbd-us.com>; Nemith, Mike <Mike.Nemith@wbd-us.com>; David T. B. Audley <audley@chapman.com>; Bruno, Victoria <Victoria.Bruno@wbd-us.com>; Weaver, Kurt <Kurt.Weaver@wbd-us.com>; Baker, Jeremy <Jeremy.Baker@wbd-us.com>; Mia D. D'Andrea <dandrea@chapman.com>
**Cc:** Hamill, John <john.hamill@dlapiper.com>; Carey, Joe <joe.carey@dlapiper.com>; Carter, David <David.Carter@wbd-us.com>; Mervis, Michael T. <MMervis@proskauer.com>; Pullos, Michael <michael.pullos@dlapiper.com>; Vinti, Baldassare <BVinti@proskauer.com>; Roche, Jennifer L. <jroche@proskauer.com>; Ruskin, Bradley I. <BRuskin@proskauer.com>; Telman, Nigel F. <NTelman@proskauer.com>; Young, Edward C. <EYoung@proskauer.com>
**Subject:** RE: Craigville Telephone Co. et al v. T-Mobile USA, Inc. et al - Follow Up Meet and Confer regarding Magistrate Judge Gilbert's May 12 Order

<span style="color:red">*This email originated from outside the Firm.*</span>

Dear Om,

We still do not have a date from you when we can schedule the requested meet and confer on narrowing Plaintiffs' document requests. I would like to meet and confer either tomorrow or Monday. I am available on Monday at 11 or 1-3. I can also be available any time tomorrow. Please let me know when you can do a call with me tomorrow or Monday.

Best Regards,
Cathy Hinger

---

**From:** Alladi, Om V. <OAlladi@proskauer.com>
**Sent:** Wednesday, June 15, 2022 12:23 PM
**To:** Hinger, Cathy <Cathy.Hinger@wbd-us.com>; Gallagher, Katie <Katie.Gallagher@wbd-us.com>; Nemith, Mike <Mike.Nemith@wbd-us.com>; David T. B. Audley <audley@chapman.com>; Bruno, Victoria <Victoria.Bruno@wbd-us.com>; Weaver, Kurt <Kurt.Weaver@wbd-us.com>; Baker, Jeremy <Jeremy.Baker@wbd-us.com>; Mia D. D'Andrea <dandrea@chapman.com>
**Cc:** Hamill, John <john.hamill@dlapiper.com>; Carey, Joe <joe.carey@dlapiper.com>; Carter, David <David.Carter@wbd-us.com>; Mervis, Michael T. <MMervis@proskauer.com>; Pullos, Michael <michael.pullos@dlapiper.com>; Vinti, Baldassare <BVinti@proskauer.com>; Roche, Jennifer L. <jroche@proskauer.com>; Ruskin, Bradley I. <BRuskin@proskauer.com>; Telman, Nigel F. <NTelman@proskauer.com>; Young, Edward C. <EYoung@proskauer.com>
**Subject:** RE: Craigville Telephone Co. et al v. T-Mobile USA, Inc. et al - Follow Up Meet and Confer regarding Magistrate Judge Gilbert's May 12 Order

Cathy:

1. The Magistrate Judge's order says what it say; there is no need to argue about it anymore.
2. It took you 26 days to send us your proposals. That in itself belies any claim of urgency or accusation of delay on our part.
3. We are not able to discuss your proposals this week because we have a client. We need to ask our client some questions about certain issues raised by your proposals and, ultimately, we need client sign-off on any counterproposals.
4. Once we are in a position to have a constructive dialogue with you about the proposals that took you 26 days to make, we will tell you.

**Om V. Alladi**

Associate

Proskauer
Eleven Times Square
New York, NY 10036-8299
d 212.969.3633
f 212.969.2900
oalladi@proskauer.com
greenspaces
Please consider the environment before printing this email.

---

**From:** Hinger, Cathy <Cathy.Hinger@wbd-us.com>
**Sent:** Tuesday, June 14, 2022 12:56 PM
**To:** Alladi, Om V. <OAlladi@proskauer.com>; Gallagher, Katie <Katie.Gallagher@wbd-us.com>; Nemith, Mike <Mike.Nemith@wbd-us.com>; David T. B. Audley <audley@chapman.com>; Bruno, Victoria <Victoria.Bruno@wbd-us.com>; Weaver, Kurt <Kurt.Weaver@wbd-us.com>; Baker, Jeremy <Jeremy.Baker@wbd-us.com>; Mia D. D'Andrea <dandrea@chapman.com>
**Cc:** Hamill, John <john.hamill@dlapiper.com>; Carey, Joe <joe.carey@dlapiper.com>; Carter, David <David.Carter@wbd-us.com>; Mervis, Michael T. <MMervis@proskauer.com>; Pullos, Michael <michael.pullos@dlapiper.com>; Vinti, Baldassare <BVinti@proskauer.com>; Roche, Jennifer L. <jroche@proskauer.com>; Ruskin, Bradley I. <BRuskin@proskauer.com>; Telman, Nigel F. <NTelman@proskauer.com>; Young, Edward C. <EYoung@proskauer.com>
**Subject:** RE: Craigville Telephone Co. et al v. T-Mobile USA, Inc. et al - Follow Up Meet and Confer regarding Magistrate Judge Gilbert's May 12 Order

*This email originated from outside the Firm.*

Om,

We disagree with your characterization of the Court's order. It did not sustain all of TMUS's objections across the board. The primary objection TMUS advanced in our prior meet and confers and in the motion was relevance – the Court did not sustain TMUS's relevance objections across the board and in many instances found categories relevant. The focus of the order was on breadth and narrowing, which we never discussed in earnest in the prior meet and confers because TMUS took a hard line that all the categories in dispute were not relevant and completely refused to produce anything responsive to the disputed categories. The Court's order now requires that TMUS have the conversation about narrowing, which is what we are asking to discuss with you. We took the laboring oar in preparing the spreadsheet summarizing the rulings and diligently took some time re-reviewing materials to develop ways in which we could propose narrowing given the record available thus far. All that remains is for TMUS to respond as to its willingness, or not, to accept Plaintiffs' very specific proposals for narrowing, or to share its counterproposals.

Can you please explain why you will not schedule a time to discuss these matters this week? For example, if you are on vacation or have a trial or something of that nature, please let us know. Otherwise, we are back to the issue of TMUS pushing off requests for meet and confer for inordinately long times. I have previously proposed that we have a mutual agreement that we honor requests for meet and confer within one week, which TMIS has refused to agree to. And if you will not speak to us about these issues this week, please propose the date when you are proposing the meet and confer take place.

Best Regards,
Cathy Hinger

**Cathy Hinger**
Partner
Womble Bond Dickinson (US) LLP

d: 202-857-4489
m: 703-585-3620
e: Cathy.Hinger@wbd-us.com

2001 K Street, NW
Suite 400 South
Washington, DC 20006



womblebonddickinson.com



---

**From:** Alladi, Om V. <OAlladi@proskauer.com>
**Sent:** Tuesday, June 14, 2022 12:26 PM
**To:** Gallagher, Katie <Katie.Gallagher@wbd-us.com>; Nemith, Mike <Mike.Nemith@wbd-us.com>; David T. B. Audley <audley@chapman.com>; Bruno, Victoria <Victoria.Bruno@wbd-us.com>; Weaver, Kurt <Kurt.Weaver@wbd-us.com>; Baker, Jeremy <Jeremy.Baker@wbd-us.com>; Mia D. D'Andrea <dandrea@chapman.com>
**Cc:** Hamill, John <john.hamill@dlapiper.com>; Carey, Joe <joe.carey@dlapiper.com>; Hinger, Cathy <Cathy.Hinger@wbd-us.com>; Carter, David <David.Carter@wbd-us.com>; Mervis, Michael T. <MMervis@proskauer.com>; Pullos, Michael <michael.pullos@dlapiper.com>; Vinti, Baldassare <BVinti@proskauer.com>; Roche, Jennifer L. <jroche@proskauer.com>; Ruskin, Bradley I. <BRuskin@proskauer.com>; Telman, Nigel F. <NTelman@proskauer.com>; Young, Edward C. <EYoung@proskauer.com>
**Subject:** RE: Craigville Telephone Co. et al v. T-Mobile USA, Inc. et al - Follow Up Meet and Confer regarding Magistrate Judge Gilbert's May 12 Order

Counsel,

We received your letter proposing various changes to Plaintiffs' RFPs. The Court sustained TMUS's objections to those RFPs on May 12, 2022, and your letter was served approximately a month (26 days) after the Court's Order. We also acknowledge your request to meet and confer this week about those compromises. While we are happy to meet and confer about your letter, we will not be in a position to do so this week.

Thanks,

Om V. Alladi
Associate

Proskauer
Eleven Times Square
New York, NY 10036-8299
d 212.969.3633
f 212.969.2900
oalladi@proskauer.com
greenspaces
Please consider the environment before printing this email.

---

**From:** Gallagher, Katie <Katie.Gallagher@wbd-us.com>
**Sent:** Tuesday, June 7, 2022 5:44 PM
**To:** Mervis, Michael T. <MMervis@proskauer.com>; Vinti, Baldassare <BVinti@proskauer.com>; Alladi, Om V. <OAlladi@proskauer.com>; Roche, Jennifer L. <jroche@proskauer.com>; Ruskin, Bradley I. <BRuskin@proskauer.com>; Telman, Nigel F. <NTelman@proskauer.com>
**Cc:** Hamill, John <john.hamill@dlapiper.com>; Pullos, Michael <michael.pullos@dlapiper.com>; Carey, Joe <joe.carey@dlapiper.com>; Hinger, Cathy <Cathy.Hinger@wbd-us.com>; Carter, David <David.Carter@wbd-us.com>; Weaver, Kurt <Kurt.Weaver@wbd-us.com>; Bruno, Victoria <Victoria.Bruno@wbd-us.com>; David T. B. Audley <audley@chapman.com>; Mia D. D'Andrea <dandrea@chapman.com>; Baker, Jeremy <Jeremy.Baker@wbd-us.com>; Nemith, Mike <Mike.Nemith@wbd-us.com>

**Subject:** Craigville Telephone Co. et al v. T-Mobile USA, Inc. et al - Follow Up Meet and Confer regarding Magistrate Judge Gilbert's May 12 Order

*This email originated from outside the Firm.*

Counsel,

The attached correspondence and enclosure is sent on behalf of Cathy Hinger regarding Plaintiffs' request for a follow up meet and confer regarding Magistrate Judge Gilbert's May 12 Order (ECF 257).

Thank you,

Katie Gallagher

**Katie Gallagher**
Associate
Womble Bond Dickinson (US) LLP

d:  202-857-4451                    2001 K Street, NW
m:  301-520-2878                    Suite 400 South
e:  Katie.Gallagher@wbd-us.com      Washington, DC 20006



 **wombblebonddickinson.com**



This email is sent for and on behalf of Womble Bond Dickinson (US) LLP. Womble Bond Dickinson (US) LLP is a member of Womble Bond Dickinson (International) Limited, which consists of independent and autonomous law firms providing services in the US, the UK, and elsewhere around the world. Each Womble Bond Dickinson entity is a separate legal entity and is not responsible for the acts or omissions of, nor can bind or obligate, another Womble Bond Dickinson entity. Womble Bond Dickinson (International) Limited does not practice law. Please see www.womblebonddickinson.com/us/legal-notice for further details.

**************************************************************************************************************************************
This message and its attachments are sent from a law firm and may contain information that is confidential and protected by privilege from disclosure.
If you are not the intended recipient, you are prohibited from printing, copying, forwarding or saving them.
Please delete the message and attachments without printing, copying, forwarding or saving them, and notify the sender immediately.
**************************************************************************************************************************************



womblebonddickinson.com



**June 8, 2022**

<u>**VIA EMAIL**</u>
Michael Mervis
PROSKAUER ROSE LLP
1585 Broadway
New York, NY 10036
mmervis@proskauer.com

Michael Pullos
DLA Piper LLP (US)
444 West Lake Street
Suite 900
Chicago, Illinois 60606-0089
michael.pullos@dlapiper.com

Womble Bond Dickinson (US) LLP

271 17th Street, NW
Suite 2400
Atlanta, GA 30363-1017

t:  404.872.7000
f:  404.888.7490

David Carter
Partner
Direct Dial: 404-962-7593
Direct Fax: 202-261-0083
E-mail: David.Carter@wbd-us.com

**Re:** ***Craigville Telephone Co. et al v. T-Mobile USA, Inc. et al*, 1:19-cv-07190; Meet and Confer Regarding Call Detail Records and Billing Information**

Dear Counsel:

In accordance with Local Rule 37.2, I am writing to request a joint meet and confer process regarding Defendants' requests for call detail records and billing-related information from the Plaintiffs and Plaintiffs' requests for the same types of information, including its anticipated requests for call detail records ("CDRs"). We believe that discussing these similar issues in tandem will help the parties to arrive at a path forward regarding the production of relevant information that is proportional to the needs of the case.

**I.      Call Detail Records**

**1.   Inteliquent's Requests**

**Inteliquent ("IQ") RFP 15 to AdamsWells and IQ RFP 18 to CTC.** "All call detail records relating to any calls to [Plaintiffs'] OCNs, including data sufficient to show calls that You assert did not have call completion problems and calls that You assert did have call completion problems."

**a.   The Request is Overly-Broad as Currently Stated**

Inteliquent's request appears to suffer from the same over-breadth and proportionality issues that Defendants lodged as objections to avoid production of several categories of documents sought by Plaintiffs and which the Court ruled upon in its May 12 Order.  *See* ECF 257 at 2 ("Although the general subject matter or topic of certain RFPs arguably might be relevant to the claims or defenses in this case, either in whole or in part, even those RFPs cover too much territory with language…to produce "all documents" "that refer or relate to" a particular topic, or "all communications" to the same effect."); *see also id.* at 8 ("RFP Nos. 53–59 are also overbroad as drafted (e.g. "all documents," "referring or relating to," "all filings"); *id.* at 13 ("Plaintiffs are simply not entitled to put TMUS to the burden of producing "all documents" that "refer or relate to" a broad subject matter.")

Therefore, the parties should confer about ways for Inteliquent to appropriately tailor the request. By way of example only, it does not appear relevant or proportional to require Plaintiffs to produce "all" CDRs, particularly when this would include calls that have nothing to do with either Inteliquent or T-Mobile. Thus, assuming that the parties can cooperatively resolve the over-breadth and scope issues of the

Womble Bond Dickinson (US) LLP is a member of Womble Bond Dickinson (International) Limited, which consists of independent and autonomous law firms providing services in the US, the UK, and elsewhere around the world. Each Womble Bond Dickinson entity is a separate legal entity and is not responsible for the acts or omissions of, nor can bind or obligate, another Womble Bond Dickinson entity. Womble Bond Dickinson (International) Limited does not practice law.



June 8, 2022
Page 2

request, there remains the practical issue of how Plaintiffs can distinguish between calls that were originated by T-Mobile subscribers and those originated by T-Mobile's competitors. We assume that this can be accomplished by identifying the relevant T-Mobile OCNs that should appear in the CDRs, but would appreciate input from the Defendants about a concrete proposal to identify the relevant CDRs that would be responsive to this request.

Moreover, while we do not interpret the request to impose a burden on Plaintiffs to segregate calls that "did not have call completion problems" from those that did experience such problems, we note that further information from the Defendants would be necessary to perform any such segregation. We also memorialize the obvious fact that it is only Defendants' CDRs that would possess a record of calls that were blocked or never delivered to Plaintiffs' network in the first place because Plaintiffs' CDRs would have no data about calls that never reached their respective network, nor would they have any data about the call paths that preceded delivery to their switches to know when, how, or where a call placed to one of their customers was manipulated, delayed, or failed.

### 2. Plaintiffs' Forthcoming CDR Requests:

We believe that a meet and confer is warranted to try to streamline the process of Plaintiffs seeking relevant CDRs. As you know, the production and analysis of CDRs is commonplace in telecommunications disputes that involve the loss of intercarrier compensation such as this one. *See, e.g.*, 97 Am. Jur. Trials 1, *Telecommunications and Other Litigation: Call Detail Records and Fraud*; 86 Am. Jur. Proof of Facts 3d 217; *Use of Call Detail Record Evidence in Telecommunications "Phantom Traffic" and Other Litigation*. In this case, as evidenced by Inteliquent's own request for CDRs, the parties understand that the analysis of CDRs will be important potential evidence with regard to Plaintiffs' claims and Defendants' defenses. Specifically, Plaintiffs believe that CDR analysis will be relevant and necessary for at least each of the following reasons:

1. **Fake Ring Tones:** T-Mobile has explained that it inserted fake ring tones when a call experienced more than 4 seconds of post-dial delay.[1] *See* T-Mobile April 1, 2017 Response to FCC Letter of Inquiry. While we understand from the records custodian testimony that CDRs do not have a field that expressly indicates whether a fake ring tone was inserted, the call detail records can be used to calculate the post-dial delay. Scorza Tr. 54:19 – 57:11.[2] Therefore, by identifying calls that had more than 4 seconds of post-dial delay, the parties can identify which calls were impacted by fake ring tones. Analysis of the originating CDRs in comparison to the CDRs for the calls that did reach the terminating switch would also allow expert witnesses to quantify the number of calls that failed to reach the terminating carrier, supporting evidence of causation pursuant to Counts I and VIII.

2. **Call Routing Problems/Failure to Oversee:** CDRs are also likely to provide relevant evidence of rural and high cost areas experiencing the type of "persistent poor performance" that T-Mobile failed to promptly resolve that is the type of discriminatory treatment of rural and high cost areas that would give rise to liability under Sections 201(b) and 202(a) as discussed in the FCC's *2018 Order* and pursuant to Counts II, III and VIII. *See* Memorandum Opinion and Order (ECF No. 91), at 11 (citing *In re Rural Call Completion*, 33 FCC Rcd. 4199, 4211 (2018) ("*2018 Order*")).

---

[1]     Of course, we continue to await T-Mobile's production of the records showing how it calculated the number of calls impacted by the fake ring tones, which the Court has found are relevant and discoverable.

[2]     We would, of course, need to add the time associated with the call transgressing T-Mobile's network to the Inteliquent interconnection, which is not captured by Inteliquent's CDRs.



June 8, 2022
Page 3

As T-Mobile has testified, it did not insist on receiving the regular quality performance reporting from Inteliquent that was mandated by Section 10 of the MSA. *See* Blanchard Dep. 73:7 – 74:14 (testifying that formal regular reporting did not start until 2018). Moreover, even with regard to the ad hoc reporting that did occur, whether the reports are actually indicative of Inteliquent's true performance is unknown at this time because Inteliquent's record custodian does not know how the insertion of fake ring tones impacted QlikView's calculation of the network effectiveness ratios ("NER"). *See* Scorza Tr., 73:17 – 75:25. Thus, the CDRs appear to be the most reliable source of information evaluate persistent poor performance.

3. **Damages:** The analysis related to each of the foregoing issues will, of course, be directly relevant to analyzing the amount of lost access charges that will be sought as damages in the case.

4. **Class Certification:** Finally, as shown above, CDR analysis will be relevant to identifying class members with regard to the fake ring tone class under Counts I and VIII, as well as the victims of the unlawful and discriminatory routing practices at issue in Counts II, III, and VIII.[3]

We believe that the meet and confer prior to serving discovery requests for CDRs is warranted in light of the facts learned during the Defendants' record custodian depositions. First, T-Mobile testified under oath that with regard to any of the time periods relevant to this litigation, it no longer possesses the full and searchable CDRs that three separate systems at T-Mobile (████████████████████████████) and, instead, it now only possesses the extremely limited call records that exist in PDF copies of customer invoices, which cannot be aggregated for large-scale analysis and which omits highly relevant data. Blanchard Tr. 17:20 – 34:1; 99:1 – 102:9. Second, Inteliquent testified that it does possess CDRs for ████████████████████████████████████████████████████████. Scorza Tr. 35:7 – 36:25. The Inteliquent CDRs ████████████████████████████████ ████████████. *Id*. Inteliquent has a regular process for restoring backup CDRs because it is a typical activity that the company performs. *Id.*, 40:10 – 41:14.

To be clear, Plaintiffs believe that T-Mobile had a duty to retain its CDRs related to calls made to rural and high-cost localities (at a minimum) for at least a significant portion of the time periods relevant to this litigation in light of the circumstances surrounding T-Mobile's unlawful practices that harmed Plaintiffs and the putative class or classes, including, but not limited to, T-Mobile's actual or constructive knowledge of: (i) the FCC's ban on fake ring tones that went into effect in January 2014; (ii) the purpose behind the FCC's rural call completion rules, which was to protect Plaintiffs and the putative class or classes from the specific problems that underlie this lawsuit, for example, the "pattern of call completion and service quality problems on long distance calls to certain rural areas . . . where the costs that long distance providers incur to complete calls are generally higher than in non-rural areas," *see* Consent Decree, ¶ 3 (explaining purpose behind *2012 Declaratory Ruling*); *see also id*. at ¶¶ 3-5 (further explaining purpose behind *2012 Declaratory Ruling* and the *2013 Rural Call Completion Order*), as well as long-distance carriers, like T-Mobile, "adopting or perpetuating routing practices that result in lower quality service to rural *or high-cost localities* than like service to urban or lower cost localities (including other lower cost rural areas)," *see 2018 Order*, 33 FCC Rcd. at 4210-4211 (emphasis added); (iii) the FCC's repeated admonitions that insertion of fake ring tones was unlawful in direct communications with T-Mobile's in-house counsel Indra Chalk in 2015 and 2016; (iv) repeated complaints of call completion problems by three Wisconsin ILECs (who are putative class members), which the FCC served on T-Mobile's legal department in 2016; (v) the

---

[3]     The members of the class impacted by the failure to oversee the intermediary are defined by the *2018 Order* and reference to the NECA ILEC and CLEC lists. *See 2018 Order*¸ ¶ 30.



June 8, 2022
Page 4

FCC's investigation of T-Mobile, as documented by the FCC's Letter of Inquiry and Supplemental Letter of Inquiry, which included an investigation into whether T-Mobile may have failed to accurately report data on its Form 480s regarding calls attempted to rural ILECs; (vi) T-Mobile's negotiations with the FCC resulting in T-Mobile's entry into the Consent Decree, admissions that it violated the FCC's rules by inserting fake ring tones and failing to correct problems with Intermediate Providers' delivery of calls to certain rural OCNs, and agreement to pay a $40 million penalty"; and (vii) receipt of our FOIA request from the FCC wherein T-Mobile was expressly advised that our firm represented over 75 local exchange carriers who were investigating and intended to hold T-Mobile accountable for its failure to oversee its intermediary providers and its unlawful insertion of fake ringtones. These circumstances individually and collectively repeatedly put T-Mobile on notice of the potential for litigation with some or all of the putative class members and it would have been readily apparent to anyone in the telecommunications industry that an analysis of CDRs would be performed during the course of such litigation. Given T-Mobile's failure to retain any of the searchable CDRs from any of their various CDR repositories for any part of the relevant time period, Plaintiffs' position is that T-Mobile should bear the costs of reconstructing a database of the lost CDRs at its expense. *See, e.g., Lofton v. Verizon Wireless (VAW) LLC*, 308 F.R.D. 276, 287-91 (N.D. Cal. 2015) (finding that Verizon had a duty to preserve CDRs based on the initiation of earlier litigation, had failed to intervene to ensure the preservation of CDRs, but would not be subject to spoliation sanctions where archived data could be used to reassemble the missing CDRs).

In preparation for a productive meet and confer process, we ask that T-Mobile make inquiry of any other intermediate providers, such as InComm and Level 3, that it may have also routed traffic to during the relevant time period and come prepared to discuss whether those carriers possess relevant CDRs in active or archive format that could be added to the database. We also ask that T-Mobile come prepared to discuss the production of a set of records that would enable Plaintiffs to evaluate the additional post-dial delay associated with the call passing through T-Mobile's network to the Inteliquent hand-off, which would need to be added to the post-dial delay that can be calculated by examining Inteliquent's CDRs.

Consistent with Judge Gilbert's recent order and the position that Defendants have taken about the importance of the meet and confer process, we anticipate that the Defendants will participate in this process in a constructive and good faith manner in order to make the discovery process efficient for all parties. In our view, good faith participation will include having the necessary attorneys and decision makers available on our calls to facilitate the discussion and reach agreements. Similarly, we are prepared to explore agreements that the parties could reach with regard to the reprocessing of the CDRs that could mitigate costs without prejudicing Plaintiffs' ability to evaluate the merits, quantify damages, and establish the class or classes.

## II. Billing-Related Information

### 1. T-Mobile's Document Requests

**T-Mobile RFP 8:** All Documents and Communications concerning the terminating access charges Plaintiffs allege they are entitled, including but not limited to documents concerning the "factors" which "impact the access charges a local carrier may collect" as alleged in ¶¶ 31, 63, and 69 of the SAC.

**T-Mobile RFP 9:** Documents sufficient to show access charges collected by Plaintiffs: (i) before Plaintiffs allege Defendants applied LRBT; and (ii) after Plaintiffs allege Defendants applied LRBT.



June 8, 2022
Page 5

### a. The Requests are Overly-Broad as Currently Stated

T-Mobile's RFPs 8 and 9 contain the same language the Court has recently determined to be impermissibly overbroad and disproportionate as drafted.  *See* ECF 257 at 2.  They seek records that are well beyond the traffic originated by T-Mobile, including traffic originated by T-Mobile's competitors. Accordingly, the parties should meet and confer about alternative means of determining which subsection of Plaintiffs' billing records are actually relevant and proportional to the needs of this case.

RFP 8 seeks documents not in the possession of Plaintiffs, but rather in the possession of Defendants.  *See*, *e.g.* Pl. CTC's Resp. to TMUS Second RFPs at 11-12.  Plaintiffs are in possession of what are known as carrier access billing ("CABs") invoices.  These CABs invoices, however, do not reflect the access charges Plaintiffs allege they are entitled to recover in this case because these invoices reflect only calls that were successfully completed to *their* networks.  Instead, the documents that would reflect the access charges to which Plaintiffs allege they are entitled to in this case are for calls which never reached the Plaintiffs' switch because the calls failed before reaching the Defendants' networks and/or the calls had to be terminated to Inteliquent's network as a work around to address the continuous call completion problems.  *See* Rosenwald Tr. 63:16-24; 126:14-128:7; 135:7-19; 138:5-21.  Thus, we note that RFP No. 8 necessarily requires the analysis of Defendants' CDRs as discussed above.

To the extent that invoices related to calls that were terminated at Plaintiffs' network are responsive to RFP 9, it is evident that identifying the specific carrier(s) that made the final call hand off to Plaintiffs' network would be essential to identifying the responsive records because of the manner in which carrier access billings are generated.  We do not believe that T-Mobile has shown how records regarding calls that were originated by its competitors would be relevant or proportional to the needs of this case.

### 2. Plaintiffs' Document Requests

**Plaintiffs' RFP 52:**  Produce all records of payments made and/or exchanged between you and Inteliquent.[4]

### a. The Court Has Agreed with T-Mobile that the Request is Overly-Broad as Currently Stated

Judge Gilbert has ruled that this request is overly-broad as drafted, even though the economics of the relationship between Inteliquent and T-Mobile is relevant.  We would propose to narrow this request to focus on only on two types of documents: (1) copies invoices that Inteliquent sent to T-Mobile that included traffic terminated to any carrier on Inteliquent's Most Expensive Codes list (EQUINOX00005247) from the time the PSTN Attachment was executed and until the Consent Decree was released; and (2) a ledger of payments made by T-Mobile in response to those invoices.  This narrowing would eliminate any documents for other services that Inteliquent may have provided that do not relate to call delivery, as well as any invoices that do not incorporate charges related to calls made to potential class members.

#         #         #

---

[4]     We will be following up separately about the other requests addressed in Judge Gilbert's order where further meet and confer is anticipated.



June 8, 2022
Page 6

The Court's Opinion and Order generally instructs the parties to meet and confer "more fulsomely" about documents each party "may be entitled to discover, as distinguishable from kitchen sink requests for every piece of paper that might touch a relevant subject matter." ECF 257 at 13. We are prepared to do so and expect that T-Mobile and Inteliquent are each engaging in this same exercise to narrow and limit the scope of their outstanding discovery requests. We believe that the time is appropriate now for the parties to come together to develop a plan for producing the CDRs for the calls at issue in this case in coordination with addressing Defendants' queries about Plaintiffs responding to Defendants' pending requests for similar information. Please let us know when on the afternoon of Tuesday, June 14, 2022, you are available to discuss these matters in a meet and confer.

Best regards,

**Womble Bond Dickinson (US) LLP**

David Carter
Partner

CC via email only:
Baldo Vinti
Jennifer Roche
Om Alladi
John Hamill
Devin Carpenter
Joe Carey
David Audley
Mia D'Andrea
Cathy Hinger
Kurt Weaver
Victoria Bruno
Katie Gallagher
Jeremy Baker



**DLA Piper LLP (US)**
444 West Lake Street
Suite 900
Chicago, Illinois 60606-0089
www.dlapiper.com

Michael S. Pullos
Michael.Pullos@dlapiper.com
T  312.368.3423
F  312.251.5728

June 24, 2022

*Via Email*

David Carter
271 17th Street, NW
Suite 2400
Atlanta, GA 30363-1017
david.carter@wbd-us.com

Re:    **Plaintiffs' June 8, 2022 Letter Requesting Meet and Confer on Call Detail Records and Billing Information**

Dear Mr. Carter:

We write in response to your June 8, 2022 letter ("Letter") requesting to meet and confer on (i) Inteliquent's requests for production about call detail records, (ii) T-Mobile's requests about billing information, and (iii) the plaintiffs' apparently forthcoming requests about call detail records. This response focuses on the issues specific to Inteliquent. As has been true from the start of discovery, Inteliquent remains open to meeting and conferring about discovery requests.

**Responses to Certain Misstatements**

We first must correct some of the many misstatements and inaccurate assumptions in your Letter. We are not going to try to respond to them all, as there are too many for that to be possible or productive. Much of the Letter's problems also concern merits-related topics that should be deferred to later stages.

▪ **Inteliquent's CDRs Do Not Show T-Mobile Post-Dial Delay.** You wrote: "While we understand from the records custodian testimony that CDRs do not have a field that expressly indicates whether a fake ring tone was inserted, the call detail records can be used to calculate post-dial delay." (Letter at 2 (citing Scorza Dep. Tr. 54:19-57:11).) You then wrote: "Therefore, by identifying calls that had more than 4 seconds of post-dial delay, the parties can identify which calls were impacted by fake ring tones." (*Id.*) Please note that Mr. Scorza was clear that *Inteliquent's* CDRs would *not* have any post-dial delay field showing the time from when the call originated on the T-Mobile end. He testified that "[t]here are timestamps in the CDR which would allow us to calculate the post-dial



Page Two

delay *only from our perspective*." (Scorza Dep. Tr. 54:25-55:4) (emphasis added).)[1] We make this clarification to ensure there is no confusion about what CDRs from Inteliquent can and cannot be used to ascertain.

▪ **There Was No Poor Performance, Let Alone *Persistent* Poor Performance.** You refer multiple times to supposed "persistent poor performance" or "continuous call completion problems." (Letter at 2, 3, and 5.) The documents already produced show Inteliquent's call completion to rural areas was stellar. (ECF 230 at 6, 7 n.10, and 9.)

▪ **High-Cost Codes Are Irrelevant.** Your Letter refers to supposed issues related to "high cost" codes. (Letter at 2.) Those high-cost codes have nothing to do with the plaintiffs' claims. (ECF 230 at 10-13.) Your characterization of an Excel spreadsheet produced by Equinox is incorrect. (Letter at 5 (citing EQUINOX00005247).) Your proposal to supposedly "narrow" your request to T-Mobile for payment records to the data listed in that spreadsheet is not narrow. The cited spreadsheet has over *178,000* rows of data and lists thousands of different OCNs. The spreadsheet is also irrelevant. The cover email attaching that spreadsheet shows that it contained a universe of numbers to monitor for alerts of activity potentially showing indicia of fraud. (*See also* ECF 230 at 10-13.) We note you quickly shifted from a focus on Equinox to Empirix in your briefing on the motion to compel. (ECF 243-1 at 2-3.)

▪ **Conspiracy Liability Is About an *Agreement*.** Your Letter confirms that the conspiracy claim is meritless. Without ever mentioning "conspiracy" or an "agreement," you wrote that liability under Count VIII (the civil conspiracy claim) could arise from T-Mobile supposedly failing to promptly resolve supposed "persistent poor performance" to rural and high-cost areas and a supposed "failure to oversee" Inteliquent or other intermediate providers. (Letter at 2, 3.n.3, and 4.) Conspiracy liability is about an *agreement*. (ECF 243-1 at 1-2.) None of what you state in those portions has anything to do with an agreement. It therefore cannot bear on the issues in the case against Inteliquent.

▪ **Inteliquent Produced Voluminous Monthly NER and ASR Reports It Provided to T-Mobile.** Inteliquent produced to plaintiffs months and months of the NER and ASR data reports that it provided to T-Mobile, including during the relevant period before T-Mobile disabled LRBT and after. (ECF 230 at 6-7.) Your Letter objects to the format and timing of reports that Inteliquent provided to T-Mobile as inconsistent with the contract between Inteliquent and T-Mobile (*not* the plaintiffs). (Letter at 3.) There is no claim that would give standing for such an objection. Your Letter speculates about whether the produced reports in fact show what they show. Your speculation is solely based on Mr. Scorza's

---

[1] Elsewhere, the plaintiffs seem to acknowledge this. (Letter at 2 n.2 and 4.) So, it is unclear what exactly the plaintiffs even mean by this statement.



Page Three

records custodian deposition, as to which that entire line of questions was both improper and not answered (because it was beyond the proper subject matter and the witness's knowledge and preparation).

**Plaintiffs' Forthcoming CDR Requests**

There are no formal Rule 34 requests from the plaintiffs about CDRs. It is therefore difficult for Inteliquent to respond to the non-existent requests for CDRs. That said, without waiving any objection to the plaintiffs' apparently forthcoming requests, Inteliquent is open to discussing any potential request for CDRs with the plaintiffs to "try to streamline the process[.]" (Letter at 2.) Like all discovery, the potential production of CDRs (if any) would have to be limited to "relevant information that is proportional to the needs of the case." (*Id.* at 1.)

**Inteliquent's CDR Requests**

Consistent with the immediately above paragraph, we agree that sensible approaches to the potential production of CDRs are important for all parties. That said, we are uncertain of where the plaintiffs stand with respect to their own productions.

You represented on May 19, 2021 that the plaintiffs would produce CDRs in response to Inteliquent's requests. (Plaintiffs' Response and Objection to Inteliquent's RFP 15 to AdamsWells; Plaintiffs' Response and Objection to Inteliquent's RFP 18 to CTC.) We have been patiently waiting. More than a year later, the plaintiffs have seemingly gone back on what they told Inteliquent they would produce. The plaintiffs never amended their responses to Inteliquent's requests. Nor did they otherwise represent that they would not be producing CDRs. Inteliquent thus requests that the plaintiffs clarify whether they are in fact refusing to produce the CDRs that they previously represented they would produce.

A brief recounting of the actual discovery responses may help for context. Inteliquent requested CDRs specific to the named plaintiffs. (Inteliquent's RFP 15 to AdamsWells; Inteliquent's RFP 18 to CTC.) In response, the plaintiffs responded that they would produce CDRs:

> Plaintiff[s] will produce CDRs for the relevant time period in [their] custody, possession, or control located after a reasonable search; however they will not show the calls that were not delivered to [the respective named plaintiffs'] switch.

(Plaintiffs' Response and Objection to Inteliquent's RFP 15 to AdamsWells; Plaintiffs' Response and Objection to Inteliquent's RFP 18 to CTC.)

Nowhere did the plaintiffs make any objection or response specific to their supposed inability to "distinguish between calls that were originated by T-Mobile subscribers and those originated by



Page Four

T-Mobile's competitors." (Letter at 2.) After all, the plaintiffs filed a complaint alleging that the supposed problems were caused by T-Mobile. Documents that the plaintiffs produced show the plaintiffs analyzing calls over different carriers' networks to assess any potential problems as far back as 2013. (*See, e.g.*, Plaintiffs_0000021112.) Documents produced by the plaintiffs also show test calls, including test calls related to T-Mobile, again as far back as 2013. The T-Mobile calls apparently performed great, according to the plaintiffs' own produced documents. (*See, e.g.*, Plaintiffs_0000042237.)

But the plaintiffs now argue—after saying that they would produce CDRs and after producing documents that show them analyzing calls differentiated by carriers—that a supposed inability to identify what calls came from which carrier justifies wholesale refusal to produce *any* CDRs. This strikes us as exceedingly odd. The plaintiffs seem to be retroactively limiting what they said they would produce in retaliation to an adverse ruling on their motion to compel against T-Mobile. That is not how the federal rules on discovery work.

But Inteliquent is still willing to meet and confer—again because we acknowledge that production of this type of data ought to be sensibly approached. For example, depending on the particular parameters, Inteliquent might be open, for now, to an initial production of CDRs for (i) the calls to specific customers that the plaintiffs referenced in their complaint and any other customer that complained about rural call-completion issues; (ii) the time-period the plaintiffs allege they were supposedly forced to expend more customer service resources to respond to supposed rural call-completion issues; and (iii) the specific CDRs the plaintiffs must have examined that led them to conclude that Inteliquent was responsible for the supposed harms they suffered and that justified bringing these claims in this lawsuit.

Best regards,

*/s/ Michael S. Pullos*

Michael S. Pullos

CC: Counsel for Inteliquent, Counsel for T-Mobile, Counsel for Plaintiffs

womblebonddickinson.com



**July 5, 2022**

Michael Pullos
DLA Piper LLP (US)
444 West Lake Street
Suite 900
Chicago, Illinois 60606-0089

Womble Bond Dickinson (US) LLP

271 17th Street, NW
Suite 2400
Atlanta, GA 30363-1017

t:   404.872.7000
f:   404.888.7490

David Carter
Partner
Direct Dial: 404-962-7593
Direct Fax: 202-261-0083
E-mail: David.Carter@wbd-us.com

Re:     **Meet and Confer Regarding Call Detail Records and Billing
Information**

Dear Michael:

Thank you for your letter of June 24, 2022.

I first address what you have incorrectly described as "misstatements" from my June 8, 2022 letter. As I articulate fully below, there were no misstatements in my letter. Unfortunately, many of the positions you have articulated in your June 24, 2022 letter appear to be disconnected from both the record and the law. I address each point in turn below.

- **Post-Dial Delay:** We have no disagreement about the fact that the measurement of post-dial delay from Inteliquent's CDRs is, standing alone, insufficient to know the entire post-dial delay experienced by a caller. That is why my letter highlighted the importance of obtaining T-Mobile CDRs as well because it would be only through an examination of those CDRs in tandem that we could ascertain the full post-dial delay from the time the call was initiated until it reached the terminating carrier (assuming, of course, the call did get completed and was not dropped or looped).

- **Poor Performance:** I am surprised to see you continue to represent that Inteliquent's call completion performance to rural areas was "stellar." Your representation of stellar performance hinges entirely on the accuracy of the NER scores, but your witness testified under oath that he had no ability to understand whether the NER score was accurate or whether it was artificially inflated by T-Mobile's injection of fake ringtones. And, indeed, there is strong evidence that T-Mobile's injection of fake ringtones in September 2015 had the effect of artificially inflating NER scores across the board. The story that T-Mobile's Form 480 reports tell[1] is that injecting the fake ringtones triggered more than a twenty percent increase in the NER score immediately.

---

[1]     We must rely on T-Mobile's Form 480 reports for this discussion because, as explained further below, Inteliquent has failed to produce any NER data for key time periods before the fake ringtones were expanded on a nationwide basis.

        In that regard, I note that while the MSA and PSTN Attachment was not executed until June 2015, evidence produced in discovery reveals ████████████████████████████████████████████████████

Womble Bond Dickinson (US) LLP is a member of Womble Bond Dickinson (Interna ional) Limited, which consists of independent and autonomous law firms providing services in the US, the UK, and elsewhere around the world. Each Womble Bond Dickinson entity is a separate legal entity and is not responsible for the acts or omissions of, nor can bind or obligate, ano her Womble Bond Dickinson entity. Womble Bond Dickinson (International) Limited does not practice law. Please see www.womblebonddickinson.com/us/legal-notice for further details.



July 5, 2022
Page 2



Other data also shows that Inteliquent's Answer-Seizure Ratio ("ASR") for rural areas consistently underperformed the ASR for urban areas. The most evident explanation for this chronic underperformance of rural areas was that far more calls placed to rural areas were not reaching their intended destination.

In short, the evidence strongly suggests that, just as the fake ringtones masked call completion problems, Inteliquent has been relying on falsely inflated NER scores to similarly mask its poor performance and that, in reality, its performance to rural and high cost areas was consistently below its performance to lower cost and urban areas. This conclusion is, of course, bolstered by the fact that T-Mobile required Inteliquent to develop a Rural Call Completion Remediation Plan when the FCC made clear to T-Mobile that it was going to impose the largest rural call completion fine in history against the company. If Inteliquent's performance was "stellar," there would be nothing to remediate.

- **High-Cost Codes:** Your letter erroneously asserts that High-Cost Codes are irrelevant to Plaintiffs' claims. Apparently Inteliquent has not carefully read the FCC's 2012 and 2018 Orders. In *In re: Rural Call Completion,* WC Docket No- 13-39 (FCC 18-45) (Apr. 17, 2018), the FCC reaffirmed the 2012 Order's monitoring obligation, which applies to both rural and high-cost localities:

  > We interpret the retrospective monitoring requirement as encompassing, at minimum, the duties under sections 201, 202, and 217 of the Act set forth in the 2012 Declaratory Ruling. In that decision, the Bureau clarified that "it is an unjust and unreasonable practice in violation of section 201 of the Act for a carrier that knows or should know that it is providing degraded service

---

███████████████████████████████████████████████████

*See* TMUS00015522.



July 5, 2022
Page 3

to certain areas to fail to correct the problem or to fail to ensure that intermediate providers, least-cost routers, or other entities acting for or employed by the carrier are performing adequately." The Bureau further clarified that "adopting or perpetuating routing practices that result in lower quality service **to rural or high-cost localities** than like service to urban or lower cost localities (including other lower cost rural areas) may, in the absence of a persuasive explanation, constitute unjust or unreasonable discrimination in practices, facilities, or services and violate section 202 of the Act." Finally, the Bureau, relying on section 217 of the Act, stated that "if an underlying provider is blocking, choking, or otherwise restricting traffic, employing other unjust or unreasonable practices in violation of section 201, engaging in unjust or unreasonable discrimination in violation of section 202, or otherwise not complying with the Act or Commission rules, the carrier using that underlying provider to deliver traffic is liable for those actions if the underlying provider is an agent or other person acting for or employed by the carrier." **We both affirm the *2012 Declaratory Ruling* as a clarification of the statutory provisions discussed by the Bureau and clarify that under the rule we adopt, the 2012 Declaratory Ruling sets forth the minimum retrospective monitoring duty of covered providers.**

*Id. (emphasis added); see In the Matter of Developing an Unified Intercarrier Comp. Regime Establishing Just & Reasonable Rates for Loc. Exch. Carriers,* 27 F.C.C. Rcd. 1351, 1357–58 (2012) ("We further clarify that adopting or perpetuating routing practices that result in lower quality service to **rural or high-cost localities** than like service to urban or lower cost localities (including other lower cost rural areas) may, in the absence of a persuasive explanation, constitute unjust or unreasonable discrimination in practices, facilities, or services and violate section 202 of the Act.") (emphasis added); *see also* Second Amended Complaint (ECF 94), ¶¶ 2, 9, 14, 30, 73, 74, 100, 139, 163, 191, 235-42, 264-66, 351, 368(g), 395, 396, 416, 417, 465.

- **An *Agreement* Can Be Proven Through *Circumstantial Evidence*:** "Because a civil conspiracy is almost never susceptible to direct proof, the conspiracy is usually established through circumstantial evidence and inferences drawn from the evidence." *McClure v. Owens Corning Fiberglas Corp.,* 188 Ill.2d 102, 133, 241 Ill.Dec. 787, 720 N.E.2d 242, 258 (1999). Accordingly, the fact that Inteliquent developed a list of "high cost codes" to target at the same time that T-Mobile was expanding fake ringtones on a nationwide basis, which drastically boosted Inteliquent's NERs, is certainly circumstantial evidence of a conspiracy. And, of course, discovery is far from complete in this matter. We'll have to see what the rest of the evidence reveals once the parties actually undertake to produce documents from **all** of the relevant custodians, including searching for and producing Skype messages, meeting minutes, and other items that are noticeably absent from the production to date.

- **Inteliquent's Missing NER Reports:** While your letter represents that Inteliquent has produced "voluminous" NER and ASR reports, it certainly does not (and cannot) represent that Inteliquent has produced *all* of the NER and ASR reports contemplated by the Master Services Agreement. Indeed, what is most striking, is the lack of production of reports for the time period **before** T-Mobile activated the fake ringtones on a nationwide basis in

July 5, 2022
Page 4



September 2015, as well as the absence of several NER reports during critical time periods. Below is a table reflecting the missing reports:

| | ASR or NER | Bates | File Name |
|---|---|---|---|
| Jul-15 | ASR | **Missing** | **Missing** |
| Jul-15 | NER | **Missing** | **Missing** |
| Aug-15 | ASR | **Missing** | **Missing** |
| Aug-15 | NER | **Missing** | **Missing** |
| Sep-15 | ASR | INQT0000067 | TMobile_ASR_201509.xls |
| Sep-15 | NER | **Missing** | **Missing** |
| Oct-15 | ASR | INQT0000076 | TMobile_ASR_201510.xlsx |
| Oct-15 | NER | **Missing** | **Missing** |
| Nov-15 | ASR | INQT0000078 | TMobile_ASR_201511.xlsx |
| Nov-15 | NER | **Missing** | **Missing** |
| Dec-15 | ASR | INQT0000088 | TMobile_ASR_201512.xlsx |
| Dec-15 | NER | **Missing** | **Missing** |
| Jan-16 | ASR | INQT0000074 | TMobile_ASR_201601.xlsx |
| Jan-16 | NER | **Missing** | **Missing** |
| Feb-16 | ASR | INQT0000082 | TMobile_ASR_201602.xls |
| Feb-16 | NER | **Missing** | **Missing** |
| Mar-16 | ASR | INQT0000062 | TMobile_ASR_201603.xlsx |
| Mar-16 | NER | **Missing** | **Missing** |
| Apr-16 | ASR | INQT0000077 | TMobile_ASR_201604.xlsx |
| Apr-16 | NER | **Missing** | **Missing** |
| May-16 | ASR | INQT0000063 | TMobile_ASR_201605.xls |
| May-16 | NER | INQT0000098 | TMobile_NER_201605.xls |
| Jun-16 | ASR | INQT0000068 | TMobile_ASR_201606.xls |
| Jun-16 | NER | INQT0000114 | TMobile_NER_201606.xls |
| Jul-16 | ASR | INQT0000092 | TMobile_ASR_201607.xls |
| Jul-16 | NER | INQT0000097 | TMobile_NER_201607.xls |
| Aug-16 | ASR | INQT0000091 | TMobile_ASR_201608.xls |
| Aug-16 | NER | INQT0000100 | TMobile_NER_201608.xls |
| Sep-16 | ASR | INQT0000080 | TMobile_ASR_201609.xls |
| Sep-16 | NER | INQT0000113 | TMobile_NER_201609.xls |
| Oct-16 | ASR | INQT0000083 | TMobile_ASR_201610.xls |
| Oct-16 | NER | INQT0000094 | TMobile_NER_201610.xls |
| Nov-16 | ASR | INQT0000073 | TMobile_ASR_201611.xls |
| Nov-16 | NER | INQT0000104 | TMobile_NER_201611.xls |
| Dec-16 | ASR | INQT0000069 | TMobile_ASR_201612.xls |



July 5, 2022
Page 5

| Dec-16 | NER | INQT0000095 | TMobile_NER_201612.xls |
|---|---|---|---|
| Jan-17 | ASR | INQT0000079 | TMobile_ASR_201701.xls |
| Jan-17 | NER | INQT0000116 | TMobile_NER_201701.xls |
| Feb-17 | ASR | INQT0000093 | TMobile_ASR_201702.xls |
| Feb-17 | ASR | INQT0000084 | TMobile_ASR_201702-2.xls |
| Feb-17 | NER | INQT0000099 | TMobile_NER_201702.xls |
| Mar-17 | ASR | **Missing** | **Missing** |
| Mar-17 | NER | INQT0000107 | TMobile_NER_201703.xlsx |
| Apr-17 | ASR | INQT0000066 | TMobile_ASR_201704.xlsx |
| Apr-17 | NER | INQT0000110 | TMobile_NER_201704.xlsx |
| May-17 | ASR | INQT0000071 | TMobile_ASR_201705.xlsx |
| May-17 | NER | INQT0000105 | TMobile_NER_201705.xlsx |
| Jun-17 | ASR | INQT0000085 | TMobile_ASR_201706.xlsx |
| Jun-17 | NER | INQT0000117 | TMobile_NER_201706.xlsx |
| Jul-17 | ASR | INQT0000070 | TMobile_ASR_201707.xlsx |
| Jul-17 | NER | INQT0000106 | TMobile_NER_201707.xlsx |
| Aug-17 | ASR | INQT0000087 | TMobile_ASR_201708.xlsx |
| Aug-17 | NER | INQT0000096 | TMobile_NER_201708.xlsx |
| Sep-17 | ASR | INQT0000081 | TMobile_ASR_201709.xlsx |
| Sep-17 | NER | INQT0000112 | TMobile_NER_201709.xlsx |
| Oct-17 | ASR | INQT0000075 | TMobile_ASR_201710.xlsx |
| Oct-17 | NER | INQT0000101 | TMobile_NER_201710.xlsx |
| Nov-17 | ASR | INQT0000086 | TMobile_ASR_201711.xlsx |
| Nov-17 | NER | INQT0000102 | TMobile_NER_201711.xlsx |
| Dec-17 | ASR | INQT0000064 | TMobile_ASR_201712.xlsx |
| Dec-17 | NER | INQT0000115 | TMobile_NER_201712.xlsx |
| Jan-18 | ASR | INQT0000072 | TMobile_ASR_201801.xlsx |
| Jan-18 | NER | INQT0000108 | TMobile_NER_201801.xlsx |
| Feb-18 | ASR | INQT0000089 | TMobile_ASR_201802.xlsx |
| Feb-18 | NER | INQT0000103 | TMobile_NER_201802.xlsx |
| Mar-18 | ASR | INQT0000090 | TMobile_ASR_201803.xlsx |
| Mar-18 | NER | INQT0000109 | TMobile_NER_201803.xlsx |
| Apr-18 | ASR | INQT0000065 | TMobile_ASR_201804.xlsx |
| Apr-18 | NER | INQT0000111 | TMobile_NER_201804.xlsx |

Certainly, we would like to know why Inteliquent has not produced NER reports for the time periods before the fake ringtones were activated or for the month of September, reports which would allow the parties to more fully explore the impact of the fake ringtones on the



July 5, 2022
Page 6

calculation of NER values.  We assume that those documents may reveal a very different picture about Inteliquent's so-called "stellar" performance.

**The Requests for CDRs**

Plaintiffs stand by their objections and responses in response to Inteliquent's requests for CDRs, which indicated that the requests were "overly broad and unduly burdensome" but Plaintiffs intended to provide a production of CDRs.  As indicated by my letter, as you seem to agree, a meet and confer is appropriate. Plaintiffs believe that the parties need to engage in a good faith meet and confer to agree on the appropriate scope of production.  This is not "in retaliation" for the Court's ruling – we have advised all along that a records custodian deposition followed by discussion about the CDR data would be warranted.

Further, the assertion that "[d]ocuments that the plaintiffs produced show the plaintiffs analyzing calls over different carriers' networks to assess any potential problems as far back as 2013. (*See, e.g.*, Plaintiffs_0000021112.)" is factually inaccurate.  The documents cited on page four of your letter show analysis that is being directed by Fritz Hendricks at Onvoy (now Inteliquent).  For example, Plaintiffs_000021105 states that "Onvoy will be placing test calls from various originating sources and [long distance] carriers to your office Wednesday's between 8:30 and 9:00am CDT starting Wednesday 7/17/2013."  This document serves only to underscore the accuracy of our position that Inteliquent possesses the upstream data necessary to analyze the source of calls.

And, of course, the fact that the performance of T-Mobile test calls performed in 2013 – before Inteliquent became primarily responsible for the delivery of T-Mobile's long-distance traffic and the September 2015 insertion of fake ringtones on a nationwide basis to mask call completion failures – certainly should not provide comfort for your client in this case.

Given that class discovery has not been bifurcated, we certainly would anticipate that the scope of CDR discovery will extend to all LECs on Inteliquent's high-cost code list.  We are open to considering whether, without prejudice to seeking more CDRs, the parties could agree to a sampling of certain months both before and after the introduction of fake ringtones as an efficient next step.

Best regards,

**Womble Bond Dickinson (US) LLP**

David Carter
Partner





Proskauer Rose LLP   Eleven Times Square   New York, NY 10036-8299

Michael T. Mervis
Member of the Firm
d +1.212.969.3565
f 212.969.2900
mmervis@proskauer.com
www.proskauer.com

July 7, 2022

**By Email**
David Carter
Womble Bond Dickinson (US) LLP
271 17th Street, NW
Suite 2400
Atlanta, GA 30363-1017
david.carter@wbd-us.com

   Re: *Craigville Telephone Co. et al. v. T-Mobile USA, Inc. et al.*, 1:19-cv-07190

Dear David:

We write in response to the issues raised in your June 8, 2022 letter regarding Plaintiffs'
forthcoming requests for call detail records ("CDRs"). TMUS is willing to meet and confer
about those requests prospectively, despite Plaintiffs previously having objected to meeting and
conferring in advance of TMUS propounding certain of its discovery. Plaintiffs vaguely refer to
a supposed duty to retain CDRs "related to calls made to rural and high-cost localities (at a
minimum) for at least a significant portion of the time periods relevant to this litigation." To the
extent TMUS understands the scope of duty alleged, no such duty existed.

Plaintiffs assert TMUS had a duty to preserve CDRs prior to the filing of this litigation "in light
of the circumstances surrounding T-Mobile's unlawful practices that harmed Plaintiffs and the
putative class or classes." This wrongly presumes that TMUS believed it had harmed Plaintiffs.
It did not. But in any event, the duty to preserve evidence "requires more than just the mere
possibility of future litigation." *AOT Holding AG v. Archer Daniels Midland Co.*, No. 19-2240,
2021 WL 6118175, at *6 (C.D. Ill. Sept. 3, 2021). A party must be on notice that litigation is
probable or imminent. *Id.* at *5 ("Generally 'a party has a duty to preserve evidence because it
knew, or should have known that litigation was *imminent.*'") (emphasis added); *see also FTC v.
Lights of Am. Inc.*, No. SACV 10-1333 JVS, 2012 WL 695008, at *3 (C.D. Cal. Jan. 20, 2012)
("duty to preserve relevant documents attaches when future litigation is 'probable,' which means
'more than a possibility.").

And, a party is only required to preserve evidence "expected to be relevant and proportional to
the claims or defenses" in the specific actual or reasonably anticipated litigation. *Hollis v. CEVA
Logistics U.S., Inc.*, No. 19 CV 50135, 2022 WL 1591731, at *4 (N.D. Ill. May 19, 2022) (duty
to preserve is only triggered "when litigation is commenced or reasonably anticipated"); *see also*

**Proskauer**»

July 7, 2022
Page 2

*Does 1-5 v. City of Chicago*, No. 18-CV-03054, 2019 WL 2994532, at *5 (N.D. Ill. July 9, 2019) (a party must preserve only what it "reasonably knew or could foresee was material" to anticipated litigation). The obligation to preserve ESI "does not exist in a vacuum"; it must be evaluated through the "lens of reasonableness" based on specific circumstances and facts because "a party's duty to preserve specific types of documents does not arise unless the party controlling the documents has notice of those documents' relevance." *Id.* Here, an obligation to preserve ESI depends upon whether (and, if so, when) TMUS could reasonably have anticipated Plaintiffs would bring the claims they now assert *and* that the particular ESI might be material to this litigation. Plaintiffs can hardly contend TMUS was on notice of the supposed need to preserve CDRs when Plaintiffs never sent a preservation letter to TMUS to demand they be preserved.

Plaintiffs seem to presume that CDRs would be relevant to any dispute involving intercarrier compensation, asserting analysis of CDRs "is commonplace in telecommunications disputes that involve the loss of intercarrier compensation such as this one." That assumes the FCC investigation put TMUS on reasonable notice that there would one day be litigation arising from the investigation related to intercarrier compensation. It did not. Indeed, TMUS is unaware of any cases (and your letter fails to identify any cases) involving CDR evidence in any remotely similar context (*i.e.*, where a LEC asserted it was entitled to compensation for calls that did not connect to the LEC's network).

Plaintiffs cite several supposedly distinct events that they contend would have provided notice to TMUS to preserve its CDRs in anticipation of this lawsuit. These essentially boil down to: (i) FCC promulgations; (ii) TMUS's Consent Decree with the FCC; (iii) the FCC's inquiry regarding TMUS's Form 480s; and (iv) receipt of Plaintiffs' FOIA request in March 2019.

Taking the events Plaintiffs cite in turn, the mere fact that the FCC made certain rulings or orders could not have caused TMUS to reasonably anticipate the claims made in this litigation. The mere fact that certain regulatory pronouncements are made could hardly cause any party to anticipate (much less reasonably so) an imminent litigation. Importantly, the duty to preserve is owed only to a particular party with respect its claims—there isn't a "free-floating" duty to preserve in the event that *some* litigation that may be related to a government inquiry eventually materializes. *See Point Blank Sols., Inc. v. Toyobo Am., Inc.*, No. 09-61166-CIV, 2011 WL 1456029, at *1 (S.D. Fla. Apr. 5, 2011) (concluding no duty was owed to plaintiffs because "the alleged destruction of evidence arose primarily when Defendants were under a duty to others (such as government officials who issued subpoenas), but not necessarily these Plaintiffs").

The Consent Decree also did not cause TMUS to reasonably anticipate litigation brought by LECs seeking "lost" access fees. Indeed, courts have repeatedly found that a government investigation does not create a duty to preserve with respect to later civil litigation because it is not certain that litigation will follow. *See AOT Holding*, 2021 WL 6118175 at *6. That is particularly the case here because Plaintiffs' claims are so far afield from anything addressed in the Consent Decree or that the FCC said. As an initial matter, the FCC did not ever ask TMUS for CDRs during the course of the investigation. In any case, the Consent Decree addressed two

**Proskauer》》**

July 7, 2022
Page 3

discrete issues: use of LRBT and TMUS's failure to adequately supervise intermediate carriers' delivery of calls to certain rural OCNs. There is no suggestion in the Consent Decree of a program to block calls to rural areas, let alone a conspiracy to do so. TMUS could not have reasonably anticipated such farfetched claims as they are contrary to TMUS's business interests and did not occur in any case. Similarly, the use of LRBT could not have put TMUS on reasonable notice that Plaintiffs would someday assert a need for CDRs: CDRs do not track LRBT and LRBT do not cause call completion issues. TMUS could not have reasonably anticipated that Plaintiffs would assert a causal connection between the use of LRBT and LECs failure to receive access charges. Likewise with respect to the failure to supervise, the FCC's investigation concerned complaints from specific LECs and TMUS customers that *were resolved*. Neither the Consent Decree nor the LOI reference a failure to pay access charges or intercarrier compensation in this regard.

Nor can Plaintiffs rely on the FCC's inquiry regarding TMUS's Form 480s to put TMUS on notice of Plaintiffs' eventual claims. That inquiry concerned an algorithm error that affected reporting to the FCC of calls to rural OCNs—it was not an inquiry into actual call completion issues. TMUS is unaware of a cause of action that could arise, much less that could have reasonably been anticipated, from making Form 480 filings to the FCC that contained errors.

Plaintiffs' March 2019 FOIA request also did not provide notice of a duty to preserve records during the period relevant to this litigation. The FOIA request sought information related to the FCC's investigation that resulted in the Consent Decree and, for the reasons stated above, the Consent Decree did not make it reasonably foreseeable that Plaintiffs would assert the types of claims they have since alleged. Further, the FOIA request makes an unsupportable leap from the discrete subjects of the Consent Decree to an unfounded and false assertion that TMUS was engaged in call blocking. Again, because LRBT does not affect whether a call reaches the terminating carrier, Plaintiffs' baseless assertion that TMUS inserted LRBT to restrict traffic to rural OCNs did not make Plaintiffs' alleged need for CDRs foreseeable. Moreover, the FOIA request refers to materials the FCC obtained during its investigation, but, as noted above, the FCC did not ask TMUS for CDRs.

Finally, we do not understand what Plaintiffs mean when they assert TMUS should "bear the cost of reconstructing a database of the lost CDRs." Obviously, TMUS cannot reconstruct records that do not exist. Regardless, because there was no duty to preserve CDRs, TMUS rejects Plaintiffs' position that TMUS should bear costs associated with reconstructing a database of any CDRs when TMUS could not have reasonably anticipated Plaintiffs would assert the claims made in this case. Plaintiffs' reliance on *Lofton v. Verizon Wireless (VAW) LLC,* 308 F.R.D. 276 (N.D. Cal. 2015) is inapt. In *Lofton,* defendant conceded the CDRs were relevant to the plaintiff's claim, defendant was on notice of its duty to preserve the call logs at least by the filing of the plaintiff's complaint, and the defendant allowed the documents to be deleted during the pendency of the litigation. The case bears no resemblance to the situation here.

Proskauer»

July 7, 2022
Page 4

In sum, because TMUS had no duty to preserve CDRs, Plaintiffs' complaints are unfounded.


Sincerely,

*/s/ Michael T. Mervis*

Michael T. Mervis

cc:     Counsel for Inteliquent, Inc.

wemblebonddickinson.com



July 17, 2022

<u>**VIA EMAIL**</u>
Michael Mervis
PROSKAUER ROSE LLP
1585 Broadway
New York, NY 10036
mmervis@proskauer.com

Re:  ***Craigville Telephone Co. et al v. T-Mobile USA, Inc. et al,*** 1:19-cv-
     07190; Meet and Confer Regarding Call Detail Records

Womble Bond Dickinson (US) LLP

271 17th Street, NW
Suite 2400
Atlanta, GA 30363-1017

t:  404.872.7000
f:  404.888.7490

David Carter
Partner
Direct Dial: 404-962-7593
Direct Fax: 202-261-0083
E-mail: David.Carter@wbd-us.com

Dear Michael:

We are responding to your letter of July 8, 2022,[1] that addresses some, but not all, of the issues raised in our letter of June 8, 2022, regarding Plaintiffs' forthcoming discovery requests for call detail records ("CDRs") from T-Mobile USA, Inc. ("T-Mobile").  You state that you are willing to meet and confer on this subject, but still have not proposed any dates when you are available despite our repeated requests for this information so that we can schedule a meet and confer promptly and, if necessary, move forward with requesting the Court's assistance to resolve any remaining disputes.  Moreover, your letter does not address the question of whether T-Mobile has inquired with any of its intermediate providers other than Inteliquent about their preservation of CDRs and whether such records could be made available to fill in the pieces that are missing as a result of T-Mobile's destruction of its CDRs.  We believe that a good faith meet and confer should be informed by that information. Please advise us (1) whether you have made such inquiry or are refusing to do so; and (2) when you will make yourself available for the meet and confer that we have been waiting for more than a month for you to schedule.

To facilitate the meet and confer process and narrow the issues in advance, we respond to the points raised in your letter below.

We understand T-Mobile's position to be that it had no duty to preserve CDRs, including CDRs "related to calls made to rural and high-cost localities," until Plaintiffs filed this lawsuit because, prior to that time, T-Mobile could not reasonably have anticipated that Plaintiffs would sue or assert claims for lost terminating access charges or that CDRs would be relevant to these claims.  More specifically, T-Mobile asserts that it was not under a duty to preserve CDRs because Plaintiffs "never sent a preservation letter to TMUS to demand they be preserved."  Such sweeping propositions are not tenable under the facts or the law, including the cases on which T-Mobile relies in its letter.

The duty to preserve can arise before suit is filed, and that duty persists even though suit does not immediately follow.  That was the result in three of the cases you cited in support of T-Mobile's position. *See AOT Holding AG v. Archer Daniels Midland Co.*, Case No. 19-2240, 2021 WL 6118175, at *6 (C.D. Ill. Sept. 3, 2021); *Does 1-5 v. City of Chicago*, No. 18-cv-03054, 2019 WL 2994532, at *4-5 (N.D. Ill. July 9, 2019); *Hollis v. CEVA Logistics U.S., Inc.*, No. 19 CV 50135, 2022 WL 1591731, at *4 (N.D. Ill. May 19, 2022).  In *AOT*, the duty to preserve documents relevant to the litigation challenging the defendant's trading

---

[1]     T-Mobile's letter is dated July 7, 2022, but was not delivered to Plaintiffs until the following day.

Womble Bond Dickinson (US) LLP is a member of Womble Bond Dickinson (International) Limited, which consists of independent and autonomous law firms providing services in the US, he UK, and elsewhere around the world. Each Womble Bond Dickinson entity is a separate legal entity and is not responsible for the acts or omissions of, nor can bind or obligate, another Womble Bond Dickinson entity. Womble Bond Dickinson (International) Limited does not practice law.



July 17, 2022
Page 2

activity, as well as two underlying investigations into the same subject matter by the Commodities Futures Trading Commission and the local commodity exchange's self-governing body, arose eight months before suit was filed and "continued unabated" up to and through the filing of the lawsuit. 2021 WL 6118175, at *6. *AOT* also undercuts T-Mobile's assertion that no duty existed because Plaintiffs never sent a preservation notice for CDRs. "[I]t is not the plaintiff's responsibility to trigger a defendant's duty to preserve." *Id*.

If T-Mobile continues to assert no duty to preserve CDRs arose at any point before suit was filed, Plaintiffs are entitled to challenge that assertion. T-Mobile's testimony under oath that it no longer possesses the full and searchable CDRs that three separate systems at T-Mobile (EventLink, Quantum, and 1 Data) retain for two years puts at issue when the duty to preserve CDRs arose. The answer to that question is also relevant to the scope of discovery Plaintiffs may take because, if T-Mobile failed to preserve CDRs after its duty was triggered, Plaintiffs will have "a sufficient factual basis to explore what steps were taken to preserve [CDRs] and why they no longer exist." *Id.* at *5. That, in turn, is relevant to Plaintiffs' entitlement to spoliation sanctions. *See Hollis*, 2022 WL 1591731, at *2 (explaining that curative sanctions are available only if the spoliating party acted with intent to deprive the seeking party of the discovery or the seeking party is prejudiced).

The question of when the duty to preserve arose is "based on the specific circumstances and facts and whether those facts give rise to a reasonable foreseeability that litigation will ensue." *Sonrai Sys., LLC v. Romano*, No. 16 C 3371, 2021 WL 1418405, at *10 (N.D. Ill. Jan. 20, 2021), *report and recommendation adopted*, No. 1:16-CV-03371, 2021 WL 1418403 (N.D. Ill. Mar. 18, 2021) (citing *Trask-Morton v. Motel 6 Operating L.P.*, 534 F.3d 672, 681 (7th Cir. 2008)). Here, it is highly probable that T-Mobile was on notice of a duty to preserve CDRs at multiple points before suit was filed based on the circumstances set forth in our June 8 letter (which was not intended to be exhaustive), as well as new information that we have learned during discovery. For instance, since we sent our June 8 letter, T-Mobile served its privilege log which purports to assert that T-Mobile is entitled to withhold as work product numerous documents pre-dating this suit that concern putative class members and rural call completion complaints. This Court narrowly construes work product as extending only where there is an actual anticipation of litigation. *See Baxter Int'l, Inc. v. AXA Versicherung*, 224 F. Supp. 3d 648, 655 (N.D. Ill. 2016) (Gilbert, J.) ("If [s]ome articulable claim, likely to lead to litigation arose and "served as the primary motivating purpose behind the creation of a document," then the work production doctrine will apply") (internal quotation marks omitted). For example, TMUS 16479-82 is heavily redacted, T-Mobile's privilege log claims work product protection, and the unredacted portions show that the work product is related to rural call completion complaints that

████████████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████ " Based on this and other similar work product claims, it appears then that T-Mobile anticipated litigation with rural LECs like Plaintiffs before suit was filed, which contradicts T-Mobile's assertion that it had no reason to anticipate Plaintiffs' claims until suit was filed. We plan to address this contradiction at the meet and confer. Two options, based on the cases cited in T-Mobile's letter, is for T-Mobile to withdraw its work product designation on these documents, *see FTC v. Lights of Am. Inc.*, CV 10-1333 JVS, 2012 WL 695008, at *4 (C.D. Cal. Jan. 20, 2012) (party accused of failing to preserve documents after the duty was triggered opted to withdraw work product designation and produce documents on its log), or alternatively, submit them for *in camera* review, *see AOT*, 2021 WL 6118175, at *5, n.5 (noting that court ordered production of documents designated as work product on defendant's privilege log as part of court's inquiry into when the duty to preserve arose). The bottom line is that we do not believe that T-Mobile can contend it did not anticipate litigation until 2019 while it simultaneously invokes work product based on anticipation of litigation with other putative class members to avoid



July 17, 2022
Page 3

producing discovery information from 2016 that is also relevant to the question of when it reasonably anticipated litigation.

This also applies to basic facts about T-Mobile's litigation holds issued in connection with the FCC investigation and this lawsuit, including the sender, the recipients (and identification of custodians of CDRs), the date of issue, the general categories covered, and the description/scope of any CDRs covered. T-Mobile's attorneys instructed its designated representative at the records custodian deposition not to answer questions about litigation holds on the ground of privilege. However, discovery of this information is "routine" because it is not considered privileged. *See, e.g., In re Ceasars Entm't Operating Co., Inc*., Case No. 15 B 1145, 2018 WL 2431636, at *13 (Bankr. N.D. Ill. May 29, 2018)); *Major Tours, Inc. v. Colorel*, Civil No. 05–3091, 2009 WL 2413631, at *2 (D.N.J. Aug. 4, 2009); *In re eBay Seller Antitrust Litig*., No. C 07-01882 JF (RS), 2007 WL 2852364, at *2 (N.D. Cal. Oct. 2, 2007)). And, more importantly, courts rely on this information in determining when a party's duty to preserve arose, as evidenced by three of the cases T-Mobile cites. *See FTC*, 2012 WL 695008, at *3 (court considered information about litigation holds disclosed in written discovery responses and a joint stipulation); *AOT*, 2021 WL 6118175, at *6, n.6 (same as to information provided in declarations); *Point Blank Solutions, Inc. v. Toyobo Am., Inc*., No. 09-61166-CIV, 2011 WL 1456029, at *27, n.22 (S.D. Fla. Apr. 5, 2011) (same as to information provided during live testimony at an evidentiary hearing on plaintiff's motion for spoliation sanctions). We plan to discuss at the meet and confer whether T-Mobile is willing to produce redacted copies of its litigation holds, stipulate to the basic facts about its litigation holds, or provide another form of written or oral sworn testimony.

We also believe that a number of other assertions in T-Mobile's letter have no merit for the following reasons.

T-Mobile glossed over several important facts identified in our June 8 letter that must be considered as part of the totality of the circumstances, which is the approach that the Northern District of Illinois takes in deciding when the duty to preserve is triggered. *See, e.g., Does 1-5*, 2019 WL 2994532, at *5 (addressing whether facts "in combination" put defendant on notice of the duty to preserve); *Hollis*, 2022 WL 1591731, at *4 (same). T-Mobile's attempt to trivialize the fact that it had knowledge of the FCC's express ban on fake ring tones is unpersuasive. This ban was not some ordinary regulatory pronouncement, as T-Mobile contends, but a fundamental industry-wide change in agency policy that telecommunications stakeholders, including Inteliquent, Inc., actively lobbied against. The seriousness of that ban, ███████████████████ – both before and after the nationwide expansion of fake ringtones in September 2015 - ███████████████████████,[2] and the fact that the purpose behind the FCC's rural call completion rules was to protect Plaintiffs and the putative class or classes from the specific problems that underlie this lawsuit – all of which T-Mobile ignores in its letter – are highly relevant to when it was reasonably foreseeable that Plaintiffs would sue T-Mobile. So, too, is the fact that T-Mobile received repeated complaints in 2016 of call completion problems by three Wisconsin LECs involving fake ring tones. T-Mobile dismisses these claims because they were "resolved," (a fact that is in dispute), but only in the sense that T-Mobile may have ceased unlawful routing practices as to

---

[2]     *See, e.g.,* Email from Margaret Dailey (FCC) to Indra Chalk (T-Mobile) (Feb. 9, 2015) (TMUS00004503_U); Email from Margaret Dailey (FCC) to Indra Chalk (T-Mobile) (Mar. 1, 2016) (TMUS00004571_U); Email from Margaret Dailey (FCC) to Indra Chalk (T-Mobile) (Mar. 4, 2016) (TMUS00004536_U); Email from Margaret Dailey (FCC) to Indra Chalk (T-Mobile) (June 30, 2016) (TMUS00004615_U); Email from Margaret Dailey (FCC) to Indra Chalk (T-Mobile) (July 15, 2016) (TMUS00016481_U).



July 17, 2022
Page 4

calls placed to these LECs' particular customers after being served with the complaints by the FCC. Of course, even if it corrected routing problems, T-Mobile still did not resolve the unlawful fake ring tone practices that continued to infect calls routed to these LECs, so its contention that it resolved its illegal practices as to these LECs is inaccurate and hollow. ████████████████████████████████

████████ (*see* TMUS 17298),T-Mobile had ample notice that these LECs, who are putative class members, would seek money damages for past harms. Had they preserved CDRs at the time of the Dailey emails, given T-Mobile's two year CDR preservation policy, most of the relevant CDRs would not have been destroyed.

With regard to the FCC's investigation, T-Mobile cites *AOT* for the proposition that "courts have repeatedly found that a government investigation does not create a duty to preserve with respect to later civil litigation because it is not certain that litigation will follow." *AOT* held the opposite. Before the plaintiffs filed their civil lawsuit, the defendant's duty to preserve documents was triggered by formal inquiries from the local commodity exchange's self-governing body into the defendant's trading activity, and then the scope of that duty expanded when the Commodities Futures Trading Commission issued a subpoena to the defendant on its trading activity. *See AOT*, 2021 WL 6118175, at *6. More importantly, the defendant's duty to preserve that was triggered when suit was eventually filed encompassed documents relevant to these prior investigations that were subject to the earlier-triggered duty to preserve: the duty to preserve "continued unabated." *Id.* The point is that, while a government investigation does not create a *per se* duty to preserve evidence with respect to later civil litigation, the particular circumstances surrounding a government investigation and the litigation's relationship to that investigation can trigger the duty to preserve that runs to private litigants. That is the case here.

None of T-Mobile's arguments regarding the Consent Decree has merit. T-Mobile insists that the FCC did not ask for CDRs, which is a fact that Plaintiffs have no ability to address because T-Mobile continues to withhold significant amounts of information about the FCC investigation, including communications and negotiations between WBK and the FCC. Further, there is evidence that T-Mobile not only failed to preserve CDRs, but that it may have departed from its ordinary ██████ CDR preservation practices in response to the FCC investigation, accelerating loss of CDRs. T-Mobile's July 2017 Response to the FCC's Supplemental LOI states, in response to the FCC's request for the "total number of calls attempted by T-Mobile customers for which call set-up took more than four seconds," that "T-Mobile is unable to provide a response to this question using actual data" and instead used a sample of then current data. At that time though, given its ██████ retention of CDRs, T-Mobile should have had actual data from 2015 and 2016 from which it could have calculated its response to the FCC. This all begs the question when and whether T-Mobile chose to preserve CDRs in response to the FCC's Letter of Inquiry and/or Supplemental Letter of Inquiry. Production of redacted copies of T-Mobile's litigation holds would answer this question, which bears directly on when a duty to preserve arose.

There are also a number of problems with T-Mobile's argument that it was not on notice that Plaintiffs would assert a need for CDRs, which T-Mobile additionally contends are irrelevant because they do not track fake ring tones.[3] Whether T-Mobile's CDRs contain a field that "tracks" the insertion of fake

---

[3]     T-Mobile also argues that and fake ring tones do not cause call completion problems. That argument is not tenable in light of the FCC's conclusion that fake ring tones cause calls not to be completed because the caller prematurely hangs up and prevent calls from being handed back to the prior provider so that they can be re-routed and completed. *See* Second Amended Complaint ¶¶ 104,113-115.



ring tones is not the issue. As explained in our June 8 letter, CDRs contain other data that is relevant to determining the post-dial delay caused by the insertion of fake ring tones, which can be used to calculate the number of calls impacted. Moreover, as we have articulated, a comparison of T-Mobile's CDRs with the terminating carriers' would reveal the number of calls that failed to reach the terminating carrier, a matter directly relevant to damages.[4] Analysis of CDRs is also relevant to a number of other disputed factual issues described in our June 8 letter, which T-Mobile does not address. Thus, T-Mobile's overly narrow view of the relevance of CDRs is not tenable. Nor is it consistent with the cases T-Mobile cites. For example, as *Point Blank* observes, the definition of relevance for purposes of determining which categories of documents fall within the duty to preserve is the same as that for discovery, which is extremely broad. *See Point Blank*, 2011 WL 1456029, at *11.

Lastly, T-Mobile's contention that Plaintiffs' February 25, 2019 FOIA request did not provide notice of a duty to preserve is simply not credible. The FOIA request provided T-Mobile with all the salient facts necessary to put it on notice that it was potentially liable to a class of LECs. That request, when it was served on T-Mobile by the FCC, advised T-Mobile that this firm was "litigation counsel to over seventy-five rural telephone carriers from states across the country who have joined forces to investigate and address T-Mobile's abusive practice of inserting fake ring tones into calls destined for their customers and T-Mobile's failure to adequately oversee the intermediate carrier it contracted to deliver T-Mobile's calls to these rural destinations." The letter informed the FCC and T-Mobile of the belief that "by inserting illegal false ring tones and/or engaging in routing practices that had the effect of restricting traffic, T-Mobile likely avoided tens or hundreds of millions of dollars in terminating access charges it was required to pay." Therefore, these carriers intended to "pursue their own remedies." The letter further pointed out that T-Mobile had information about the volume of calls impacted by the fake ring tones and the calls that did not get completed to the putative class members, because there is no way for a terminating carrier to "know[ ] the volume of calls that were never completed," and expressly called for the production of any and all of "**T-Mobile's Call Detail Records (CDRs)** reflecting call answer rates for rural OCNs, documentation of the OCNs affected by the false ring tone practice and the basis for the basis for the Consent Order's estimation that T-Mobile, 'likely injected [false ring tones] into hundreds of millions of calls each year." The FOIA request unquestionably triggered a duty to preserve CDRs that were in T-Mobile's possession at that time, which certainly would have included Q1 and Q2 2017 CDRs relevant to its calculation of the number of calls impacted by fake ring tones that T-Mobile reported to the FCC in July 2017 based on then current data.

\*   \*   \*

---

[4]     Your letter quarrels with the representation in our June 8, 2022 letter that CDRs are routinely needed in telecommunications litigation as not being supported by case law. While the proposition is beyond reasonable dispute, we nevertheless are happy to provide you with citations. *See Telecommunications and Other Litig.: Call Detail Records and Fraud*, 97 Am. Jur. Trial 1 (May 2022 Update) (collecting cases); *Use of Call Detail Record Evidence in Telecommunications "Phantom Traffic" and Other Litigation*, 86 Am. Jur. Proof of Facts 3d 317 (April 2022 Update) (collecting cases and noting that CDRs are useful when "fraud [ ] occur[s] in the business tort context, such as fraud by one telecom carrier against another in the payment of intercarrier compensation"); *In re: Tier 1 JEG Telecommunications Cases*, 4:07-cv-00043, 2016 WL 7508831, at *3 (S.D. Iowa July 14, 2016) (overruling Qwest's objection to producing CDRs and noting the different carriers in the call flow will possess different information in the call flow, making it appropriate for a plaintiff to obtain access to CDRs from the other carriers); *Katz v. Liberty Power Corp., LLC*, No. 18-cv-10506, 2020 WL 3492469, at *1 (D. Mass. June 26, 2020).



July 17, 2022
Page 6

For the foregoing reasons and those stated in our letter of June 8, T-Mobile was under a duty to preserve CDRs at one or more points in time before suit was filed. We anticipate that T-Mobile will come to the meet and confer prepared to discuss a plan for cooperatively assembling the CDRs that are available from other sources, including Inteliquent and other intermediate providers. Please provide a date and time this week for this video meeting.

Best regards,

**Womble Bond Dickinson (US) LLP**

David Carter
Partner

CC via email:

Cathy Hinger
Kurt Weaver
Victoria Bruno
David Audley
Mia D'Andrea
Katie Gallagher
Jeremy Baker
Baldo Vinti
Jennifer Roche
Om Alladi



Proskauer Rose LLP   Eleven Times Square   New York, NY 10036-8299

Michael T. Mervis
Member of the Firm
d +1.212.969.3565
f 212.969.2900
mmervis@proskauer.com
www.proskauer.com

July 26, 2022

**By Email**
David Carter
Womble Bond Dickinson (US) LLP
271 17th Street, NW
Suite 2400
Atlanta, GA 30363-1017
david.carter@wbd-us.com

Re:   *Craigville Telephone Co. et al. v. T-Mobile USA, Inc. et al.*, 1:19-cv-07190

Dear Mr. Carter:

We write in response to your July 17, 2022 letter.  Your letter is riddled with misstatements and
fallacious arguments.  We do not intend to address all of them here, as it would not be productive
to do so.  Below we address a number of them but, to be clear, all of them are rejected.

You again argue TMUS was under a duty to preserve CDRs in connection with this litigation as
far back as the FCC's ban on early ring tones.  As explained more fully in TMUS's July 8, 2022
letter, a duty to preserve does not arise in a vacuum, but only when a party can reasonably
anticipate litigation and has notice that the specific ESI at issue could be material to *that*
litigation.  *Does 1-5 v. City of Chicago*, No. 18-CV-03054, 2019 WL 2994532, at *5 (N.D. Ill.
July 9, 2019).  The FCC's so-called "industry-wide change in agency policy" could not have led
TMUS to reasonably anticipate that Plaintiffs or other LECs would assert claims for purported
lost access charges due to the use of early ring tones.  In this regard, Plaintiffs wrongly assert that
"the purpose behind the FCC's rural call completion rules was to protect Plaintiffs and the
[putative class]."  This ipse dixit is unsupported and contradicted by the FCC orders, which show
the purpose of the rules was to benefit consumers in rural areas by improving call completion
performance.  They neither say nor suggest the prohibition on early ring tones was meant to
protect LECs from losing access charge revenue.

Likewise, the fact that TMUS received call completion complaints by three Wisconsin LECs
cannot support Plaintiffs' claim that TMUS should have reasonably anticipated *this* litigation.
Plaintiffs assert TMUS "had ample notice that these LECs . . . would seek money damages for
past harms," but fail to explain why.  In fact, none of the complainants even suggested they had
lost access charges as a result of anything TMUS did or did not do.  This is not surprising, since
Plaintiffs' claims in this case are both entirely novel and completely illogical.

Proskauer»

David Carter
July 26, 2022
Page 2

TMUS also disagrees that any of the "new information" supposedly learned in discovery supports Plaintiffs' assertion of a pre-litigation duty to preserve CDRs. TMUS's assertion of work product protection in its privilege log is not relevant. TMUS properly asserted work product protection as to documents prepared in anticipation of potential litigation *with the FCC*, not any rural LECs. Notably, the FCC never contended any rural LECs had lost access fees as a result of anything the agency investigated, nor did the agency request any CDRs from TMUS.

Plaintiffs' argument with respect to TMUS's litigation hold notices is also not well-taken and mischaracterizes the law on which it purportedly relies. First, the authorities cited in your letter do not stand for the proposition that discovery about litigation holds is "routine." In fact, they reject that position and hold that "[a]s a general matter hold letters are not discoverable, particularly when a party has made an adequate showing that the letters include material protected under attorney-client privilege or the work product doctrine." *Major Tours, Inc. v. Colorel*, No. CIV 05-3091(JBS/JS), 2009 WL 2413631, at *2 (D.N.J. Aug. 4, 2009). Nor do the cases suggest, as you posit, that courts consider litigation hold notices to determine when a duty to preserve arose. To the contrary, in *FTC v. Lights of Am. Inc.*, for example, the court first determined when the duty to preserve arose, and only *after* making that determination did the court consider the litigation hold notice and determine it was timely issued. *FTC v. Lights of Am. Inc.*, CV 10-1333 JVS, 2012 WL 695008, at *4 (C.D. Cal. Jan. 20, 2012).

Moreover, any litigation hold notice issued in connection with the FCC investigation—in which no contention was made remotely resembling Plaintiffs' claims in this case and which was concluded years ago—are irrelevant to this litigation. Any duty to preserve CDRs in connection with the FCC's inquiry, if one existed, was owed only to that agency. *Point Blank Sols., Inc. v. Toyobo Am., Inc.*, No. 09-61166-CIV, 2011 WL 1456029, at *1 (S.D. Fla. Apr. 5, 2011) (concluding no duty was owed to plaintiffs even when defendants were under a duty to government officials who issued subpoenas). And, as noted, the FCC never requested CDRs from TMUS. Likewise, Plaintiffs' claim that TMUS may have "accelerat[ed] loss of CDRs" in connection with the FCC's LOI is not only wrong, but puts the cart before the horse: first there must be a duty to preserve, and only if a duty to preserve CDRs in anticipation of Plaintiffs' litigation existed in 2017 (it did not) would TMUS's preservation practices at that time be relevant.

We have already addressed your arguments regarding the FOIA letter and will not repeat in full what we've said before here. Even assuming, for the sake of argument, that the FOIA letter triggered a duty to preserve CDRs from the period prior to the discontinuation of LRBT (and it did not), under TMUS's record retention policies no such records existed when the FOIA letter was received. Your claim that the FOIA request "expressly called for the production of any and all of 'T-Mobile's Call Detail Records (CDRs)'" is also false. The FOIA request asked the FCC to disclose "the materials obtained during investigation," including CDRs. As previously indicated, the FCC did not request any CDRs from TMUS.

Proskauer »

David Carter
July 26, 2022
Page 3

Finally, you ask whether TMUS will inquire of intermediate carriers other than Inteliquent whether they have retained CDRs for the relevant period. TMUS declines to do so. For all the reasons discussed above and in our prior correspondence, TMUS had no duty to preserve CDRs and thus has no obligation to investigate whether other parties still have them.

We are available to meet and confer about these issues at various times during the week of August 1.


Sincerely,

*/s/ Michael T. Mervis*

Michael T. Mervis

Cc:     Counsel for Inteliquent, Inc.
        Counsel for Plaintiffs



womblebonddickinson.com



**October 7, 2022**

Michael S. Pullos, Esq.
DLA PIPER LLP (US)
444 West Lake Street, Suite 900
Chicago, Illinois 60606

**Re:** *Craigville Telephone Co., Inc. et al v. T-Mobile USA, Inc. et al.*

Womble Bond Dickinson (US) LLP

2001 K Street, NW
Suite 400 South
Washington, DC 20006

t: 202.467.6900
f: 202.467.6910

Cathy A. Hinger
Partner
Direct Dial: 202-857-4489
E-mail: Cathy.Hinger@wbd-us.com

Dear Mike,

I am writing in response to your September 29, 2022 email to me. It appears from your response to my email that Inteliquent remains unwilling to discuss compromising on its rigid position to only produce the limited documents on the topics that Inteliquent defined in your October 14, 2021 email to me. Your offer to meet solely for the purpose of discussing topics Plaintiffs would withdraw is not a productive use of time since if Plaintiffs were to withdraw any requests, there would be nothing left to discuss. As I have indicated, however, if Inteliquent desires to revisit any of its numerous relevance objections, Plaintiffs would then be in a position to evaluate whether any narrowing of the remaining requests would be warranted.

That said, in the course of preparing Plaintiffs' response to Inteliquent's Surreply, we have identified a few requests that, due to the passage of time or production of new information, can be modified or withdrawn. We plan to advise the Court of such in Plaintiffs' response to avoid the Court expending time on RFPs that appear to have been mooted at this time.

- Plaintiffs will withdraw RFP 1 without prejudice to renewing it should a need arise because Inteliquent's records custodian, Brett Scorza, testified about retention periods during the May 4, 2022 records custodian deposition of Inteliquent.

- Plaintiffs will withdraw RFP 2 without prejudice to renewing it should a need arise because Inteliquent's records custodian, Brett Scorza, testified about the storage, maintenance and preservation of CDRs, etc. during the May 4, 2022 records custodian deposition of Inteliquent.

- Plaintiffs will withdraw RFP 4 without prejudice to renewing it should a need arise because T-Mobile produced compliance reports it submitted to the FCC on August 10, 2022.

- Plaintiffs will withdraw RFP 5 without prejudice to renewing it should a need arise because on August 11, 2022 and August 30, 2022, T-Mobile produced certain documents regarding its compliance training program. Though Plaintiffs do not agree that production fully satisfies the information sought by RFP 5, Plaintiffs are engaged in meet and confer with T-Mobile and will follow up further with T-Mobile on this topic now that T-Mobile has agreed to produce some of the documents requested on this topic.

- Plaintiffs will withdraw RFP 10 without prejudice to renewing it should a need arise because third party Ribbon Communications produced certain product manual information about the Sonus PSX Policy Server in response to a third-party subpoena Plaintiffs served on it. Please note that this third party readily produced this limited group of documents without need for motions practice. These materials could have just as easily been produced by Inteliquent. Its refusal to do so imposed extra expense on Plaintiffs.

- RFP 14 could be resolved if Inteliquent produced a sworn statement from a person with knowledge attesting to its assertion that it had no involvement in the insertion of fake ring tones into traffic it carried for T-Mobile after January 1, 2014, and swearing under oath that none of the equipment T-Mobile used to insert fake ring tones into calls Inteliquent carried for T-Mobile was located in an Inteliquent facility, a location to which Inteliquent had access, or a location under Inteliquent's control. T-Mobile has repeatedly refused to identify the precise street address locations of the servers that inserted the fake ring tones, whereas it appears to have had servers in locations where Inteliquent may also house equipment. If Inteliquent truly wants to narrow this issue, please provide a sworn statement.

- RFP 31 seeks information that T-Mobile has now partially produced. On August 8, 2022, T-Mobile produced documents reflecting invoicing and payments between T-Mobile and Inteliquent related to services from September 2015 through April of 2018. Plaintiffs will withdraw RFP 31 if Inteliquent will produce three more sets of these invoices related to invoicing between T-Mobile and Inteliquent for services rendered in June through August 2015. If Inteliquent will produce these three invoicing documents by October 11, 2022, Plaintiffs will also represent to the Court that RFP 31 is withdrawn without prejudice to renewing it should a need arise.

Please let us know if you have any responses to this by Monday October 10, 2022.

Best regards,

**Womble Bond Dickinson (US) LLP**

Cathy A. Hinger
Partner

CAH/mdc

cc:   John Hamill
      Devin Carpenter
      Joey Carey
      David Carter
      Kurt Weaver
      Victoria Bruno
      Katie Gallagher
      Jeremy Baker



**DLA Piper LLP (US)**
444 W. Lake Street, Suite 900
Chicago, IL 60606-0089
www.dlapiper.com

Michael S. Pullos
Michael.pullos@us.dlapiper.com
**T** 312.368.3423
**F** 312.251.5809

October 10, 2022

*VIA EMAIL*

Cathy Hinger
Womble Bond Dickinson (US) LLP
2001 K Street, NW
Suite 400 South
Washington, D.C. 20006
Cathy.Hinger@wbd-us.com

**Re:     Plaintiffs' Motion to Compel**

Dear Cathy:

We write in response to your October 7, 2022 letter regarding your motion to compel (ECF 287). We generally are not going to engage in substantive disputes through discovery correspondence and stand by our positions stated elsewhere.

Please note that your letter incorrectly states that our email from nearly a year ago—October 14, 2021—identified the only documents we produced. We actually produced much more than what was identified there. Nor has our discovery position ever been "rigid," and it was you that moved to compel without further substantive meet-and-confers.

We understand you are withdrawing **RPFs 1, 2, 4, 5,** and **10**. We are glad to hear it. Please note we continue to track all unnecessary discovery costs you have imposed upon Inteliquent.

We understand you agreed to withdraw **RFP 31** if Inteliquent produces three more months of invoices reflecting "services rendered in June through August 2015." (Letter at 2.) We reiterate that this request is neither relevant to nor proportional to the needs of the case. Solely for compromise, we agree to produce these three months of invoices. We cannot commit to produce these documents by October 11, 2022, but we will do so expeditiously, with the intent of doing so within the next ten days.

You state you will continue to pursue **RFP 14**, which requests "all documents identifying the physical location of any equipment owned or controlled by Inteliquent that played any role in injecting LRBTs into T-Mobile calls beginning in or around September 2015." As we responded, Inteliquent "had no involvement in the implementation or use of LRBT as alleged in the complaint,



Cathy Hinger
October 10, 2022
Page Two

nor did Inteliquent have 'any role in injecting LRBTs'[.]"  Our response also included that Inteliquent was "currently unaware of any documents responsive to this request[.]"  Judge Gilbert has directed that you are not entitled to sworn testimony to confirm that we "don't have documents or [we] were not doing something during a particular period of time."  (ECF 253 at 82:1-11.)  You now say you will only agree to withdraw **RFP 14** if we provide a sworn statement that Inteliquent was not involved in the insertion of LRBT and that "none of the equipment T-Mobile used to insert fake ring tones into calls Inteliquent carried for T-Mobile was located in an Inteliquent facility, a location to which Inteliquent had access, or a location under Inteliquent's control."  (Letter at 2.)

We admit to being intrigued by that proposal.  What is the reason for it?  You long have had overwhelming information confirming the truth of what you propose we further substantiate by affidavit.  Surely the significance of an affidavit should be greater than just dropping an RFP that seeks confirmation of information you already know to be true.  How about this:  will you agree to drop your claims against Inteliquent if we provide such a statement?  And will you say as much to Judge Gilbert in the submission that you are filing?  We look forward to your thoughtful response.

To those ends, we suggest you provide a copy of this letter with any submission.  And while so doing, we likewise suggest you update Judge Gilbert with the information other parties have provided about Inteliquent's similar lack of involvement with the Form 480s and lack of Inteliquent's involvement in T-Mobile's Elgin location.

We look forward to your updating Judge Gilbert on those points.  Once again we continue to monitor such statements and their impact on Inteliquent.

Very truly yours,

*/s/ Michael Pullos*

Michael Pullos


cc:  Counsel Service Distribution List



| | |
|---|---|
| **From:** | Hinger, Cathy |
| **To:** | Pullos, Michael |
| **Cc:** | Carter, David; Weaver, Kurt; Bruno, Victoria; Baker, Jeremy; Gallagher, Katie; Mia D. D"Andrea - Chapman and Cutler LLP (dandrea@chapman.com); David T. B. Audley; Carey, Joe; Hamill, John; Carpenter, Devin |
| **Subject:** | RE: Craigville v. T-Mobile - Discovery Correspondence re Pl. RFP"s to IQNT |
| **Date:** | Monday, October 10, 2022 11:56:33 PM |
| **Attachments:** | image001.png |
| | image002.png |
| | image003.png |
| | image004.png |

Mike,

I'm writing in reply to your letter. I will attach it to our response to the Surreply tomorrow which will update the Court on the few RFPs that are now mooted.

To respond to a few of your points in the letter:

- Your reference to unnecessary costs regarding RFPs 1, 2, 4, 5 and 10 is improper. Our letter identified specific events or information that have come to light over the passage of time that mooted them.
- Please let us know when you can produce the three invoice documents you are agreeing to produce with respect to RFP number 31. I will include that in the list of RFPs we will represent to the Court are mooted based on your representation.
- I am happy to have a call with you tomorrow to discuss in further detail the issues concerning RFP 14, and respond to the many mischaracterizations and unproductive comments in your letter. I am available after 4 p.m. Eastern time for such a call. Please let me know if that works for you.

Best Regards,
Cathy Hinger

**From:** Pullos, Michael <Michael.Pullos@us.dlapiper.com>
**Sent:** Monday, October 10, 2022 9:14 PM
**To:** Hinger, Cathy <Cathy.Hinger@wbd-us.com>
**Cc:** Carter, David <David.Carter@wbd-us.com>; Weaver, Kurt <Kurt.Weaver@wbd-us.com>; Bruno, Victoria <Victoria.Bruno@wbd-us.com>; Baker, Jeremy <Jeremy.Baker@wbd-us.com>; Gallagher, Katie <Katie.Gallagher@wbd-us.com>; Mia D. D'Andrea - Chapman and Cutler LLP (dandrea@chapman.com) <dandrea@chapman.com>; David T. B. Audley <audley@chapman.com>; Carey, Joe <Joe.Carey@us.dlapiper.com>; Hamill, John <John.Hamill@us.dlapiper.com>; Carpenter, Devin <Devin.Carpenter@us.dlapiper.com>
**Subject:** RE: Craigville v. T-Mobile - Discovery Correspondence re Pl. RFP's to IQNT

External (michael.pullos@us.dlapiper.com)

Report This Email  FAQ

Cathy:

Please see the attached correspondence.

Thanks,
Michael

---

**From:** Hinger, Cathy <Cathy.Hinger@wbd-us.com>
**Sent:** Friday, October 7, 2022 12:04 PM
**To:** Pullos, Michael <Michael.Pullos@us.dlapiper.com>; Carpenter, Devin <Devin.Carpenter@us.dlapiper.com>; Hamill, John <John.Hamill@us.dlapiper.com>; Carey, Joe <Joe.Carey@us.dlapiper.com>
**Cc:** Carter, David <David.Carter@wbd-us.com>; Weaver, Kurt <Kurt.Weaver@wbd-us.com>; Bruno, Victoria <Victoria.Bruno@wbd-us.com>; Baker, Jeremy <Jeremy.Baker@wbd-us.com>; Gallagher, Katie <Katie.Gallagher@wbd-us.com>; Mia D. D'Andrea - Chapman and Cutler LLP (dandrea@chapman.com) <dandrea@chapman.com>; David T. B. Audley <audley@chapman.com>
**Subject:** Craigville v. T-Mobile - Discovery Correspondence re Pl. RFP's to IQNT

 EXTERNAL MESSAGE

Mike – Please see the attached correspondence.

Best Regards,
Cathy Hinger

**Cathy Hinger**
Partner
Womble Bond Dickinson (US) LLP

**d:** 202-857-4489
**m:** 703-585-3620
**e:** Cathy.Hinger@wbd-us.com

2001 K Street, NW
Suite 400 South
Washington, DC 20006



**womblebonddickinson.com**

  

This email is sent for and on behalf of Womble Bond Dickinson (US) LLP. Womble Bond Dickinson (US) LLP is a member of Womble Bond Dickinson (International) Limited, which consists of independent and autonomous law firms providing services in the US, the UK, and elsewhere around the world. Each Womble Bond Dickinson entity is a separate legal entity and is not responsible for the acts or omissions of, nor can bind or obligate, another Womble Bond Dickinson entity. Womble Bond Dickinson (International) Limited does not practice law. Please see www.womblebonddickinson.com/us/legal-notice for further details.

The information contained in this email may be confidential and/or legally privileged. It has been sent for the sole use

of the intended recipient(s). If the reader of this message is not an intended recipient, you are hereby notified that any unauthorized review, use, disclosure, dissemination, distribution, or copying of this communication, or any of its contents, is strictly prohibited. If you have received this communication in error, please reply to the sender and destroy all copies of the message. To contact us directly, send to postmaster@dlapiper.com. Thank you.

womblebonddickinson.com



**November 4, 2022**

Michael Mervis
PROSKAUER ROSE LLP
1585 Broadway
New York, NY 10036

**Via E-mail [mmervis@proskauer.com]**

**Re:    T-Mobile USA, Inc.'s Discovery Deficiencies Relating to Document
        Preservation, Call Detail Records, and Call Estimates**

Womble Bond Dickinson (US) LLP

2001 K Street, NW
Suite 400 South
Washington, DC 20006

t:   202.467.6900
f:   202.467.6910

Cathy A. Hinger
Partner
Direct Dial: 202-857-4489
Direct Fax: 202-261-0029
E-mail: Cathy.Hinger@wbd-us.com

Dear Michael:

I write pursuant to Local Rule 37.2 to meet and confer to address a number of deficiencies with T-Mobile USA, Inc.'s ("T-Mobile") discovery responses relating to T-Mobile's document preservation, the Call Detail Records ("CDRs"), and estimates of the number of calls impacted by fake ringtones ("FRTs" or "LRBTs") specifically, this letter addresses:

(1) Ms. Blanchard's failure to respond to deposition questions and improper instructions issued to her not to respond to certain questions under claims of privilege during the Rule 30(b)(6) records custodian deposition;

(2) T-Mobile's refusal to respond to Plaintiffs' First Set of Interrogatories ("Interrogatories") Nos. 11-14, 19, and 20, directed at T-Mobile's loss of CDRs, failure to preserve documents, any litigation hold efforts, and how T-Mobile calculated the estimates of the number of calls into which it inserted FRTs, as reported to the FCC; and

(3) T-Mobile's refusal to respond to Plaintiffs' Second Requests for Production of Documents ("Second RFPs") Nos. 17-24, relating to T-Mobile's failure to preserve CDR data, and its litigation hold efforts in relation to CDRs.

**I.    <u>Background</u>**

As you are aware, in December 2016, the FCC issued a Letter of Inquiry ("LOI") to investigate, among other things, T-Mobile's apparent violations of the FCC's rules, including its use of FRTs and poor rural call completion practices.  In response to the FCC's inquiries, on July 13, 2017, T-Mobile told the FCC it did not have the actual data necessary to calculate the number of calls infected with FRTs.  (FOIA_000074, 7/13/2017 LOI response at No. 26.)  Instead, T-Mobile told the FCC it used "a sample of current data," from January 1 to December 31, 2016, to determine that T-Mobile applied fake ring tones to more than 670.8 million calls.  (*Id.*)  Thereafter, on September 8, 2017, T-Mobile corrected and increased that estimate to approximately one

Womble Bond Dickinson (US) LLP is a member of Womble Bond Dickinson (International) Limited, which consists of independent and autonomous law firms providing services in the US, the UK, and elsewhere around the world. Each Womble Bond Dickinson entity is a separate legal entity and is not responsible for the acts or omissions of, nor can bind or obligate, another Womble Bond Dickinson entity. Womble Bond Dickinson (Interna ional) Limited does not prac ice law. Please see www.womblebonddickinson.com/us/legal-notice for further details.



November 4, 2022
Page 2

billion calls in 2016 alone, using "an estimation approach based on samples of 2017 data." (FOIA_000155, 9/8/2017 LOI response at 13 n.62.)

T-Mobile's records custodian, Ellen Blanchard ("Ms. Blanchard"), revealed that although T-Mobile issued a litigation hold relating to the LOI, T-Mobile nevertheless failed to preserve CDRs covering the period when T-Mobile used FRTs. (Blanchard Dep. Tr. at 17:20 – 34:1; 99:1 – 102:9.) She also testified that ███████████████████████████████████████ meaning that if T-Mobile had complied with its own retention policy, it should have had CDR data for ███████████████████████████████████████████████████████████████████████ (*Id.* at 24:3-25:19.) The CDRs T-Mobile had under its normal retention period would have spanned far back into the fake ring tone period enabling T-Mobile to use the CDR data to estimate the number of calls impacted by FRTs. Indeed, even under the 2013 Rural Call Completion Order's mandatory six-month retention period for CDRs, T-Mobile would have still had December 2016 to January 2017 CDRs as actual data upon which to predicate it analysis for the FCC. Thus, it is puzzling why T-Mobile would rely on 2017 data for the period after the FRTs were disabled to estimate the number of calls impacted by FRTs. Nevertheless, T-Mobile's recent Opposition to Plaintiffs' Renewed Motion to Compel confirms it did not base its analysis on information obtained from CDRs. Instead, T-Mobile's response to Interrogatory No. 13 indicates that it used "trace data" and asserts that it did not have "trace data" from 2015 or 2016 pursuant to the retention periods for that information. This response does not, however, answer fully the Interrogatory which asks for an explanation why T-Mobile was unable to use the CDRs that it should have had from 2015 and 2016 under its retention policy to provide the requested estimates. A complete answer would have admitted whether these CDRs were destroyed prematurely and in deviation from the company's document retention policy or explain why T-Mobile did not or could not use the CDRs to identify calls to rural OCNs with more than four seconds of Post-Dial Delay ("PDD"). And, Ms. Blanchard made no mention of "trace data" or its retention period in her deposition.

In sum, T-Mobile did not preserve its CDRs and has been clear in multiple writings that it contends it had no obligation to do so because it did not anticipate litigation with Plaintiffs. While this is an issue we expect will need to be resolved by the Court, we nevertheless summarize here Plaintiffs' positions concerning their entitlement to answers to questions posed to Ms. Blanchard and other discovery requests aimed at preservation issues and substitute evidence T-Mobile used to prepare its estimates for the FCC.

## II.    Discovery Deficiencies

### 1.    T-Mobile's Failure To Answer Questions At Records Custodian Deposition

Throughout the deposition of its records custodian, T-Mobile refused to allow Ms. Blanchard to respond to proper questions regarding T-Mobile's document preservation and litigation hold(s) under claims of privilege. As shown here, T-Mobile's privilege claims are improper. Therefore, T-Mobile should make Ms. Blanchard available for a follow-up deposition to address topics 1, 2, 4, 8-11, 15-18, 36, 56 in Plaintiffs' Second Amended Notice of 30(b)(6) Records Custodian Deposition.

Throughout the deposition, Ms. Blanchard maintained that whether T-Mobile preserved CDRs and other documents in connection with a litigation hold was somehow a "privileged fact." (Blanchard Dep. Tr. at 26:12-16.) In response to questions regarding the CDRs and facts



November 4, 2022
Page 3

concerning T-Mobile's document preservation efforts, counsel repeatedly "caution[ed] . . . Ms. Blanchard, not to reveal any attorney-client communications[,]" with Ms. Blanchard, who is an attorney, then proceeded to refuse to answer questions on privilege grounds. (*Id.* at 25:20-27:6; *see also id.* at 28:21-29:25, 31:20-32:5, 80:6-15.) Despite repeated questioning, Ms. Blanchard refused to provide any information regarding the facts surrounding the litigation hold, such as whether T-Mobile actually preserved data in response to the FCC's LOI or this litigation and if so, what types of records T-Mobile preserved. (*Id.* at 29:7-16, 31:20-32:5, 80:6-15.)

T-Mobile's assertions of privilege at this deposition were improper and do not withstand scrutiny. Facts are not privileged. *See Upjohn Co. v. United States*, 449 U.S. 383, 395, (1981) ("The privilege only protects disclosure of communications; it does not protect disclosure of the underlying facts by those who communicated with the attorney"); *Eagle Compressors, Inc. v. HEC Liquidating Corp.*, 206 F.R.D. 474, 478–79 (N.D. Ill. 2002) (concluding that even though letter from counsel was "classic opinion work product because it contains an attorney's mental impressions, conclusions, opinions and legal theories . . . . [t]he underlying facts contained in the letter [we]re discoverable"). Facts regarding litigation hold and document preservation efforts are no exception. *See, e.g.*, *Oleksy v. Gen. Elec. Co.*, No. 06 C 1245, 2013 WL 3944174, at *6, 8, 12 (N.D. Ill. July 31, 2013) (overruling objections and denying motion to vacate magistrate judge's order requiring the production of litigation hold letters, document retention policies, documents relevant to implementing the hold, and a description of all relevant purged data). Courts routinely hold that the facts and "circumstances of a company's litigation hold [are] not privileged . . . ." *Cohen v. Trump*, No. 13-CV-2519-GPC (WVG), 2015 WL 3617124, at *7 (S.D. Cal. June 9, 2015).

At the deposition, Ms. Blanchard refused to answer questions regarding whether T-Mobile preserved data and what actions T-Mobile took (if any) to preserve data in response to the FCC's LOI. (Blanchard Dep. Tr. at 25:20-27:6, 28:21-29:25, 31:20-32:5, 80:15). Ms. Blanchard maintained that the "scope and implementation" of the litigation hold "all of that would be privileged." (*Id.* at 80:14-15.) Ms. Blanchard's assertion and understanding of privilege with respect to litigation holds is incorrect. *See In re: Caesars Entm't Operations Co.*, No. 15 B 1145, 2018 WL 2431636, at *11, 14 (Bankr. N.D. Ill. May 29, 2018) (ordering deposition on topics of litigation hold, document retention policies and practices, and steps to respond to document requests). There is no *per se* rule that privilege applies to litigation hold notices. *Oleksy*, 2013 WL 3944174, at *8. At a minimum, and contrary to Ms. Blanchard's assertions, the "*facts surrounding* Defendant's preservation efforts[,]" such as the names of those receiving litigation hold notices, the date each notice was issued, the categories of data "targeted for preservation as well as the steps Defendant has taken to date to preserve this data" are not privileged. *Boyington v. Percheron Field Servs, LLC*, No 3:14-CV-90, 2016 WL 6068813, at *12 (W.D. Pa. Oct. 14, 2016) (emphasis in original); *see also United Illuminating Co.* v. *Whiting-Turner Contracting Co.*, No. 3: 18 CV 327 (RNC), 2020 WL 8611045, at *3 (D. Conn. Oct. 20, 2020) (allowing discovery of names of individuals who received litigation hold notices and discovery of actions taken in response to these notices); *see also Major Tours, Inc. v. Colorel*, No. CIV 05-3091(JBS/JS), 2009 WL 2413631, at *2 (D.N.J. Aug. 4, 2009) ("[P]laintiffs are entitled to know which categories of electronic storage information employees were instructed to preserve and collect, and what specific actions they were instructed to undertake to that end."). Simply put, "the parties may investigate the adequacy of one another's preservation efforts" through discovery. *EPAC Techs., Inc. v. HarperCollins Christian Publ'g, Inc.*, No. 3:12-CV-00463, 2018 WL 3342931, at *2 (M.D. Tenn. Mar. 29, 2018), *aff'd sub nom. EPAC Techs., Inc. v. Thomas Nelson, Inc.*, No. 3:12-CV-00463, 2018 WL 3322305 (M.D. Tenn. May 14, 2018).



November 4, 2022
Page 4

Here, a second deposition is warranted because T-Mobile's privilege assertions were improper, especially given the revelation during Ms. Blanchard's deposition that T-Mobile failed to preserve its CDRs. *See, e.g.*, *In re Caesars,* WL 2431636, at *11, 14 (granting motion for leave to take second 30(b)(6) deposition on topics of litigation hold, document retention policies and practices, and steps to respond to document requests when party's prior deposition raised concerns regarding completeness of document productions); *Le v. Diligence, Inc.*, 312 F.R.D. 245, 246 (D. Mass. 2015) (noting that a second 30(b)(6) deposition is "generally allowed" when "new information is unearthed only after the initial deposition."); *Illiana Surgery & Med. Ctr. LLC v. Hartford Fire Ins. Co.*, No. 2:07 CV 3, 2012 WL 2049828, at *4 (N.D. Ind. June 5, 2012), *objections overruled*, No. 2:07-CV-3 JVB, 2012 WL 4120381 (N.D. Ind. Sept. 18, 2012) (denying motion for protective order and granting motion to compel deposition regarding retention policies). Specifically, Plaintiffs are entitled to a second deposition on T-Mobile's litigation hold and document preservation activities to understand when litigation hold notices were sent; to whom; the categories of documents and instructions covered by the notice(s) and whether CDRs were included; the actions T-Mobile took to preserve documents; and why the CDRs were not available to T-Mobile to calculate the number of calls impacted by FRTs in response to the FCC's request for this information, even though the CDRs should have been preserved both under T-Mobile's document retention policies, as well as the FCC's own rules.

## 2. T-Mobile's Failure To Answer Interrogatories

### A. Interrogatory Nos. 11 and 12

These interrogatory responses raise similar issues as those before the Court on Plaintiffs' Renewed Motion to Dismiss; but, since we have not met and conferred on the Interrogatories on this topic yet, we outline anew here Plaintiffs' grounds for challenging T-Mobile's failure to answer these Interrogatories.

T-Mobile has refused to answer questions regarding the methodology and data used to calculate the number of FRTs for the FCC, on faulty privilege grounds, even though it previously said it would respond to an "appropriate interrogatory," claiming that "the documents which support the response to this Interrogatory are intertwined with privileged attorney client communications and/or attorney work product." The attorney-client relationship "does not create '(a) cloak of protection (which is) draped around all occurrences and conversations which have any bearing, direct or indirect, upon the relationship of the attorney with his client.'" *Matter of Walsh*, 623 F.2d 489, 494 (7th Cir. 1980) (alterations in original). T-Mobile's contention that information is "intertwined" with attorney client privileged information is not a valid ground to relieve it from answering these interrogatories. *See Miller UK Ltd. v. Caterpillar, Inc.*, No. 10 C 3770, 2015 WL 13652752, at *1 (N.D. Ill. Feb. 11, 2015) (a party "may not refuse to disclose any relevant non-privileged document or fact within his knowledge merely because he incorporated a statement of such fact into his communication to his attorney").

If any privilege truly exists and applies, then T-Mobile is required to include these claims on a privilege log and provide a response containing all non-privileged information. *See RBS Citizens, N.A. v. Husain*, 291 F.R.D. 209, 218 (N.D. Ill. 2013) ("Courts in this district have required that a privilege log identify 'for *each* separate document the following information: the date, the author, and all recipients, along with their capacities, the subject matter of the document, the



November 4, 2022
Page 5

purpose for its production and a specific explanation of why the document is privileged.'" (emphasis in original)). If the parties are unable to come to an agreement, then it will be for the Court to ultimately decide the validity of T-Mobile's privilege claim through T-Mobile's log and perhaps an *in camera* review. We do not believe T-Mobile has logged all of the responsive information it is withholding – if you have, please advise us of the range in the privilege log for these communications and confirm there are no more entries to log. Plaintiffs strongly suspect, though, that the information "intertwined" is not actually privileged, especially if it is factual information, which is why Plaintiffs will not waive privilege challenges in order to obtain partially responsive information. *See Medallion Prod., Inc. v. H.C.T.V. Inc.*, No. 06 C 2597, 2008 WL 11516548, at *2 (N.D. Ill. May 5, 2008) ("Whatever the merits of the dispute between the parties as to otherwise privileged documents . . . it is clear that there is no justification for Plaintiffs' continued withholding of all other documents, data and information they are required to disclose").

### B. Interrogatory No. 13

This Interrogatory asks T-Mobile to explain why it "was unable to provide a response to the FCC's request" for the total number of calls with FRTs "'using actual data' . . . ." T-Mobile objected on relevancy and ambiguity grounds and refused to address the loss of CDRs in its answer. The term CDR is clearly defined in the Interrogatories, as well as Plaintiffs' 30(b)(6) notice of deposition. The CDRs are important for Plaintiffs' causation, damages, and class certification proofs. Accordingly, what happened to the CDRs and why these materials no longer exist is highly relevant. Ms. Blanchard testified that T-Mobile does not have the CDRs, despite ████████████████████████████████████. (Blanchard Dep. Tr. at 25:7-19, 28:9-20, 30:23-31:13, 99:1-102:9.) T-Mobile also told the FCC in July 2017 that it lacked actual data to determine the number of calls with FRTs and instead had to rely on sample data. The CDRs should have been available based on T-Mobile's own policies, and a litigation hold notice for this litigation should have captured the CDRs dating back to 2017. Given the sworn deposition testimony and Plaintiffs' serious concerns regarding what appears to be premature destruction of highly relevant CDRs, Plaintiffs are entitled to an answer to this Interrogatory.

### C. Interrogatory No. 14

This Interrogatory asks for the identity of all persons who prepared T-Mobile's estimate of the number of calls with FRTs. T-Mobile's response is deficient because it does not identify the counsel involved, even though it acknowledges attorneys were involved; such information is not privileged and would need to be included in a privilege log in any event. Please supplement this response with the names of all of the attorneys. At a minimum, we need to know this information to decipher which entries on the privilege log may be applicable to this issue.

In addition, this answer discloses the involvement of Hitachi Consulting ("Hitachi"), a third party, in the preparation of these estimates. It appears that T-Mobile has not produced documents generated or created by Hitachi. Please confirm (1) whether T-Mobile has access to these third-party documents, either through actual possession or a contractual or other right of access, and (2) whether T-Mobile is claiming that every single Hitachi document is privileged or protected work product, even if the information is in Hitachi's files to which T-Mobile has no access, and even if it is factual information T-Mobile provided to Hitachi. If T-Mobile contends that the documents are privileged, please articulate the basis for this claim and produce the engagement agreement with Hitachi that establishes the purported basis for such a privilege.



November 4, 2022
Page 6

### D. Interrogatory No. 19

This Interrogatory seeks to confirm whether T-Mobile deleted the relevant CDRs and the factual circumstances of this deletion. These are facts. T-Mobile objects based on relevancy, proportionality, and what it claims is an incorrect assumption regarding T-Mobile's document retention policies. None of these objections excuse, or provide a legitimate basis for, T-Mobile's refusal to provide any substantive response. Ms. Blanchard repeatedly testified that the retention period was ███████████████████████████████████████████ (Blanchard Dep. at Tr. 25:7-19, 28:9-20, 30:23-31:13.) It appears that T-Mobile prematurely purged the CDRs because it told the FCC that it did not have "actual data" to estimate the number of calls with FRTs – T-Mobile has provided no reason why it did not use or consider its CDRs actual data it could use to prepare the estimates. Nor has it explained why it used what its Opposition to Plaintiffs' Renewed Motion to Compel refers to as "trace data" to prepare the estimates. Discovery regarding any deviation from a retention period is proper, particularly when material has been lost and there is thus a need to determine whether the loss was intentional or negligent. *See Gross v. Chapman*, No. 19 C 2743, 2020 WL 4336062, at *2 (N.D. Ill. July 28, 2020) (discovery on discovery is permissible "when one party's discovery compliance has reasonably been drawn into question" so "there is 'an adequate factual basis' for an inquiry."); *see also In re Caesars*, 2018 WL 2431636, at *13 (same). That is the case here. Accordingly, T-Mobile must fully answer this Interrogatory.

### E. Interrogatory No. 20

This Interrogatory inquires about what T-Mobile did to preserve CDRs upon receipt of the March 22, 2019 FOIA Request, which, according to Ms. Blanchard's testimony that T-Mobile had a ███████████████████████████████████, but does not have any relevant CDRs, indicates TMUS ███████████████████████████████████ before its failure to oversee admission. (Blanchard Dep. Tr. at 25:7-19, 28:9-20, 30:23-31:13, 99:1-102:9.) T-Mobile objects on the grounds of "Proportionality," but this objection is not well founded. *See In re Caesars*, 2018 WL 2431636, at *12 (rejecting argument that deposition regarding document retention policies and practices and efforts to respond to discovery was disproportionate in case involving less than $3.6 million). This case involves billions of calls infected by fraudulent FRTs, whereas and T-Mobile could respond to this Interrogatory in a paragraph or two. The proportionality objection is boilerplate and not supported. T-Mobile's repetitive assertions that the term CDR is ambiguous is also not credible – the parties have been discussing CDR discovery since one of the early hearings with Judge Lee, and no one from the Defendants claimed ambiguity over those discussions. Indeed, Plaintiffs questioned T-Mobile about the CDRs at Ms. Blanchard's deposition. Plaintiffs defined the CDRs, and Ms. Blanchard fully understood what was meant by the term CDRs. (Blanchard Dep. Tr. at 17:20-18:14.)

T-Mobile's contention that it had no duty to preserve the CDRs is also not a proper objection. If T-Mobile did not do anything to preserve the CDRs when it issued its litigation hold because it did not believe it had a duty to preserve, then that is T-Mobile's answer to this Interrogatory. Disputing whether there is a duty or not is not a substitute for the facts – whether there was a duty will be a matter for the Court to decide after Plaintiffs have made these efforts to collect information about the circumstances of the loss of CDRs.

The information requested by this Interrogatory is not protected by privilege or work product, as it seeks purely factual information relating to T-Mobile's document retention, such as



November 4, 2022
Page 7

dates, custodians, time frames, and general instructions. *See supra* § (II)(1). Plaintiffs cited multiple cases in this Interrogatory showing that it is a proper topic for discovery, whereas and tellingly, T-Mobile's objections are bereft of any supporting authorities. Nevertheless, T-Mobile in this Interrogatory refused to even answer whether it issued a litigation hold or not, a fact that is clearly not privileged. *See Roytlender v. D. Malek Realty, LLC*, No. 21-CV00052(MKB)(JMW), 2022 WL 5245584, at *4 (E.D.N.Y. Oct. 6, 2022) ("The Court finds no authority, and Plaintiff does not cite to any, which supports a finding that questions concerning whether a litigation notice was ever sent violates any attorney-client privilege."). T-Mobile's claim of work product is also inconsistent with its assertion that it did not have a duty to preserve documents; if this was the case, then there is no anticipated litigation and nothing for T-Mobile to claim privilege over. T-Mobile cannot have it both ways.

### 3. T-Mobile's Failure To Respond To Second RFPs

#### A. Second RFP Nos. 17-20

These Requests seek the CDRs themselves. Plaintiffs obviously served these requests to confirm what it learned at the 30(b)(6) deposition that the relevant CDRs no longer exist. For each request, T-Mobile provided the equivocal response that "per TMUS's Records Management Policies and Retention Schedules, it *believes* no responsive records exist." (emphasis added.) These responses fall far short of T-Mobile's discovery obligations. "An objection must state whether any responsive materials are being withheld on the basis of that objection." Fed. R. Civ. P. 34(b)(2)(C). This is necessary to "facilitate an informed discussion of the objection." Fed. R. Civ. P. 34, 2015 Amendment Advisory Committee Notes. "An objection that states the limits that have controlled the search for responsive and relevant materials qualifies as a statement that the materials have been 'withheld.'" *Id.*

T-Mobile has neither stated that it is withholding documents, nor has it explained any limitations placed on its searches for responsive documents, as required by the Rules. *See Romero v. Atchison*, No. 1:15-CV-00713, 2019 WL 13155647, at *3 (N.D. Ill. Jan. 24, 2019) (granting sanctions where defendants failed to produce all responsive and relevant documents and "never made clear that responsive documents were being withheld," and thus, plaintiff "[could] not be expected to move to compel documents that he does not know exist."); *see also Cage v. Harper*, No. 17-CV-7621, 2020 WL 1248685, at *23 (N.D. Ill. Mar. 16, 2020) (response to subpoena was "non-compliant with the discovery rules because the [third party] failed to identify whether any documents were withheld on the basis of an objection for undue burden."). Indeed, from its response, it appears that T-Mobile has not actually searched for documents, but simply reviewed its document retention policies and schedules, which is not consistent with Ms. Blanchard's more definitive testimony indicating T-Mobile has no more CDRs from the relevant time period. T-Mobile must either state definitively that it has no responsive documents to this Request, or it must conduct a thorough search, explain any limitations it placed on such searches, and if it has not located any responsive documents, clearly state so in response to these Requests. Equivocal beliefs are an insufficient response.

#### B. Second RFP No. 21

This Request calls for the production of CDRs from T-Mobile's intermediate providers, such as Inteliquent. In response, T-Mobile states that it "reasonably anticipates that it would be



November 4, 2022
Page 8

withholding documents based on the foregoing objections." As explained in Section (II)(3)(A) *supra*, T-Mobile must definitively state whether it is withholding documents based on its objections or not. T-Mobile's opaque response fails to comply with Rule 34 and the law in this District. *See supra* § (II)(3)(A). Moreover, T-Mobile's response that it *may* be withholding documents strongly suggests that, contrary to Ms. Blanchard's testimony, it does have responsive CDRs in its possession, custody, or control—otherwise, there would be nothing for T-Mobile to withhold. This calls into question the veracity of Ms. Blanchard's testimony that T-Mobile does not have any relevant CDRs. (Blanchard Dep. Tr. 99:1-102:9.) T-Mobile has not asserted any valid objections over this key evidence and must produce it immediately. Please be prepared in meet and confer to explain how T-Mobile can anticipate withholding records that its records custodian testified it does not have.

### C. Second RFP Nos. 22 and 23

Request No. 22 seeks redacted copies of the litigation hold notices, the cover emails to particular custodians of CDRs of the hold notices, and a description of the CDRs covered by the notices. Likewise, Request No. 23 seeks documents showing whether CDR custodians received a litigation hold notice in connection with the FCC investigation or this lawsuit. Again, T-Mobile's response that it "reasonably anticipates" withholding documents is deficient. *See supra* § (II)(3)(A).

T-Mobile's blanket privilege claim is also improper. "[L]itigation hold notices and document retention policies are not *per se* privileged." *Oleksy*, 2013 WL 3944174, at *8. Rather, as the party resisting discovery, T-Mobile "bears the burden of establishing the existence of the privilege[,]" *id.*, a burden that we do not believe T-Mobile has satisfied. Like any other document, "the content and circumstances of [a litigation hold notice's] issuance, as well as the context of the litigation, will determine applicability of any privilege or work product protection." *Pearlstein v. BlackBerry Ltd.*, No. 13-CV07060(CM)(KHP), 2019 WL 1259382, at *19 (S.D.N.Y. Mar. 19, 2019). Here, T-Mobile has failed to provide basic information regarding its litigation hold notices, such as the author, date, and recipients, that would allow Plaintiffs, or the Court, to assess the validity of T-Mobile's privilege claims. Such information may very well reveal that the litigation hold was not intended to be kept confidential or merely restates T-Mobile's document retention policies, and thus, does not warrant privilege protection. *See United States ex rel. Barko v. Halliburton Co.*, 74 F. Supp. 3d 183, 188 (D.D.C. 2014) (concluding "that numerous litigation hold notices [we]re not privileged as they were not intended to be kept confidential and [we]re not protected work product because they merely describe [the party's] document retention practices."). Given the materiality of T-Mobile's failure to preserve its CDRs, the reasons for the production of the redacted litigation hold notice are particularly compelling. *See Oleksy*, 2013 WL 3944174, at *8 (ordering discovery of litigation hold letter where there were allegations of destruction of documents).

Even in those instances where courts have concluded that the litigation hold notice itself is privileged, the facts and circumstances surrounding the litigation hold are not. *See supra* § (II)(1). Accordingly, T-Mobile must produce the documents requested, reflecting the dates, recipients, titles, and description of the CDRs covered by the notice. *See, e.g.*, *Oleksy*, 2013 WL 3944174, at *8-9; *Boyington*, 2016 WL 6068813, at *12 (granting motion to compel facts of document preservation, including the individuals who received litigation hold notices, the date each notice was issued, the categories of data "targeted for preservation as well as the steps

November 4, 2022
Page 9



Defendant has taken to date to preserve this data."); *Major Tours*, 2009 WL 2413631, at *2 ("plaintiffs are entitled to know which categories of electronic storage information employees were instructed to preserve and collect, and what specific actions they were instructed to undertake to that end."); *In re eBay Seller Antitrust Litig.,* No. C 07-01882 JF (RS), 2007 WL 2852364, at *2, 3 (N.D. Cal. Oct. 2, 2007) ("plaintiffs are entitled to know what kinds and categories of ESI eBay employees were instructed to preserve and collect, and what specific actions they were instructed to undertake to that end[,]" as well the "names and job titles" of all employees receiving such notices).

Any concerns regarding relevancy or "discovery on discovery" ring hollow given the loss of the CDRs. *See Gross*, 2020 WL 4336062, at *2 (discovery on discovery is permissible when "discovery compliance has reasonably been drawn into question"); *see also In re Caesars*, 2018 WL 2431636, at *13 (same). T-Mobile had three, distinct opportunities to preserve CDRs from portions of the time period at issue —the FCC's issuance of the LOI to T-Mobile on December 26, 2016, the FCC's April 2018 Release of the Consent Decree, and Plaintiffs' counsel's March 2019 FOIA request. T-Mobile's failure to preserve CDRs at any of these stages, could be evidence of bad faith or willfulness. These documents are also relevant because T-Mobile is claiming work product and privileged over documents and information concerning the factual estimates it provided to the FCC of the number of calls impacted by FRTs. If T-Mobile did not issue a litigation hold in connection with the FCC investigation, then it necessarily follows that T-Mobile did not anticipate litigation and cannot rely on work product protections and perhaps that T-Mobile intended to deviate from its normal document retention period. And, if it did issue a litigation hold in connection with the FCC investigation, its scope may also be relevant to the scope of anticipated litigation, which in turn is relevant to informing the duty to preserve and scope of potential work product.

### D.  Second RFPs No. 24

This Request asks for CDRs or data summaries based on CDR data used by experts, including any CDRs obtained from a third party. T-Mobile responded "that it is not aware of any documents that exist responsive to this Request at this time." This response, however, is seemingly inconsistent with T-Mobile's response to Request No. 21 that T-Mobile anticipates withholding CDRs from its intermediate providers from production. Please clarify whether T-Mobile's response to Request No. 24 is simply because T-Mobile does not yet have a testifying expert for the analysis of these materials or if there is another reason for this discrepancy.

***



November 4, 2022
Page 10

      For the reasons stated above, Plaintiffs are entitled to seek an order from the Court seeking a second 30(b)(6) deposition, supplemental answers to the Interrogatories, and supplemental responses and productions of documents to the Second RFPs. Please let me know when you are available for a meet and confer on November 8, 10 or 12 to discuss these matters.

Best regards,

**Womble Bond Dickinson (US) LLP**

Cathy A. Hinger
Partner

cc (via email):

David Carter
Kurt Weaver
Victoria Bruno
David T. Audley
Mia D'Andrea
Katie Gallagher
Jeremy Baker
Baldo Vinti
Om Alladi
Jennifer Roche
Bradley Ruskin
Nigel Telman





Proskauer Rose LLP   Eleven Times Square   New York, NY 10036-8299

Michael T. Mervis
Member of the Firm
d +1.212.969.3565
f 212.969.2900
mmervis@proskauer.com
www.proskauer.com

November 18, 2022

<u>**By Email**</u>
Cathy A. Hinger
Womble Bond Dickinson (US) LLP
2001 K Street, NW
Suite 400 South
Washington, DC 2006
cathy.hinger@wbd-us.com

      Re:    *Craigville Telephone Co. et al. v. T-Mobile USA, Inc. et al.*, 1:19-cv-07190

Dear Cathy:

      We write in response to your November 4, 2022 letter alleging supposed discovery deficiencies regarding CDRs and allegedly related matters.  Your letter repeats many of the same misstatements and fallacious arguments made in previous correspondence concerning preservation of CDRs, all of which we have previously rejected, and which are addressed and rejected again below.  We disagree there are circumstances warranting a second deposition of Ms. Blanchard, or that TMUS's responses to the identified Interrogatories and RFPs are deficient.

I.      **BACKGROUND**

      A.      **TMUS Did Not "Fail to Preserve" CDRs in connection with the FCC Investigation**

      Plaintiffs continue to wrongly insist TMUS "failed to preserve" CDRs from January 2015 through January 2017, including the period during which LRBT were in use.  As TMUS has explained on multiple occasions, at no point in the FCC's investigation—including in connection with the letters of inquiry issued by the FCC in December 2016 and April 2017—did the agency request or did TMUS provide any CDRs.  Thus, there was no "failure to preserve" CDRs because TMUS owed no duty to preserve them in connection with the FCC's investigation. *Does 1-5 v. City of Chicago*, No. 18-CV-03054, 2019 WL 2994532, at *5 (N.D. Ill. July 9, 2019) (a duty to preserve does not arise in a vacuum, but only when a party can reasonably anticipate litigation and has notice that the specific ESI could be material to *that* litigation).



Cathy A. Hinger
November 18, 2022
Page 2

Moreover, any duty to preserve CDRs in connection with the FCC's inquiry, had one existed, would have been owed only to that agency (not to Plaintiffs). *Point Blank Sols., Inc. v. Toyobo Am., Inc.*, No. 09-61166-CIV, 2011 WL 1456029, at *1 (S.D. Fla. Apr. 5, 2011) (concluding no duty was owed to plaintiffs even when defendants were under a duty to government officials who issued subpoenas). Any duty owed to the FCC in connection with its investigation cannot be imputed to Plaintiffs.

### B. Plaintiffs Cannot Challenge Alleged Deficiencies in TMUS's Response to the FCC Investigation

To the extent Plaintiffs believe TMUS had a duty to preserve CDRs in connection with *this litigation*, TMUS's retention policies and practices concerning the FCC's LOI and investigation are irrelevant. Not only are the claims Plaintiffs assert concerning supposed lost access fees far afield of the FCC's inquiries, that investigation—and any obligation to preserve data owed to the FCC—concluded more than a year before Plaintiffs filed their lawsuit. Plaintiffs are not entitled to "discovery on discovery" concerning the FCC investigation that was not about their purported losses. None of Plaintiffs' authority suggests otherwise. Even if TMUS had failed to comply with its own retention policy in 2017 (it did not), there would be no relief available to Plaintiffs because TMUS did not owe Plaintiffs a duty to preserve *any* data at that time.

In connection with their speculative, conspiratorial claims of discovery misconduct, Plaintiffs repeatedly refer to the fact that TMUS did not use CDRs when responding to the FCC's April 2017 request for the number of calls to which LRBT were applied. Plaintiffs continue to labor (or are pretending to labor) under the erroneous assumption that CDRs were a necessary or even the most appropriate data source to answer the question posed by the FCC. Plaintiffs assert, for example, it is "puzzling" why TMUS relied on 2017 trace data to estimate the number of calls during which LRBT were played. But there is nothing puzzling about it. TMUS explained in its response to Plaintiffs' Interrogatory No. 13, and restates below, exactly why TMUS used 2017 trace data—not CDRs—for its estimates.[1] In this regard, Plaintiffs' attempts to impugn TMUS by suggesting it "prematurely purged" CDRs in connection with the FCC's investigation are therefore unfounded and unwarranted. Moreover, even if TMUS had had a ▮▮▮▮ retention period for CDRs when it received the FCC's LOI,[2] the CDRs Plaintiffs claim were "prematurely purged" would have been deleted in the ordinary course by ▮▮▮▮▮▮▮▮▮▮

---

[1] When Ms. Blanchard referred to "tower data" at her deposition, she was referring to "trace data"—tower data is a colloquial term. Plaintiffs declined to question Ms. Blanchard further about tower data.

[2] Plaintiffs rely on Ms. Blanchard's testimony in which she was asked ▮▮▮▮▮▮▮▮▮▮ for certain systems that maintain CDRs. ▮▮▮▮▮▮▮▮▮▮ Plaintiffs could have asked Ms. Blanchard what the retention period was for these systems in 2015 and 2016. They did not.



Cathy A. Hinger
November 18, 2022
Page 3

With this background, TMUS responds to the alleged deficiencies identified in Plaintiffs' letter.

## II.     Plaintiffs Have No Grounds for a Second Deposition of Ms. Blanchard

Plaintiffs' demand for a second deposition of Ms. Blanchard is premised on case law permitting a further deposition of a witness only when new information is unearthed *after* the initial deposition.  *See, e.g., Le v. Diligence, Inc.*, 312 F.R.D. 245, 246 (D. Mass. 2015) (a court may exercise its discretion to re-open a deposition where "new information is unearthed only after the initial deposition"); *In re Caesars Entm't Operations Co.*, No. 15 B 1145, 2018 WL 2431636, at *11, 14 (Bankr. N.D. Ill. May 29, 2018) (further deposition permitted when counsel sent opposing party a letter stating no litigation hold had been issued after two witnesses had each given conflicting answers to that question).  No such facts are present here.  The testimony at issue (Blanchard Dep. Tr. 25:20-27:6, 28:21-29:25, 31:20-32:5) concerns questions regarding any litigation holds TMUS issued for the retention of CDRs in connection with the FCC's investigation.  Ms. Blanchard's declination to answer those questions after being properly advised by counsel does not provide grounds for a second deposition because Plaintiffs learned *at that deposition* that CDRs from the period preceding the FCC's investigation were not retained by TMUS.[3]  Plaintiffs themselves acknowledge they learned *during Ms. Blanchard's deposition* that TMUS has not retained CDRs for the period during which LRBT parameter was enabled (i.e., before January 25, 2017).  There is no "new information" warranting a second deposition.

Further, the questions Ms. Blanchard was asked concerning TMUS's preservation of CDRs do not relate to TMUS's actions *in this lawsuit*—but rather, the scope of TMUS's litigation holds in connection with the FCC's investigation.  Plaintiffs have no standing to investigate TMUS's preservation efforts concerning the long-concluded FCC investigation.  None of the cases Plaintiffs cite suggest otherwise.

Moreover, the cases cited by Plaintiffs stand only for the proposition that discovery about litigation holds *may be* permitted when there is evidence of improper discovery conduct.  *See, e.g., Oleksy v. Gen. Elec. Co.*, No. 06 C 1245, 2013 WL 3944174, at *6, 8, 12 (N.D. Ill. July 31, 2013) (discovery permitted when defendant admittedly failed to preserve data that was subject to a litigation hold); *Cohen v. Trump*, No. 13-CV-2519-GPC (WVG), 2015 WL 3617124, at *7 (S.D. Cal. June 9, 2015 (defendant ordered to provide declaration regarding litigation hold upon evidence that defendants had failed to produce all relevant documents within their possession, custody and control); *Boyington v. Percheron Field Services, LLC*, No. 3:14-CV-90) 2016 WL 6068813, at *12 (W.D. Pa., Oct. 14, 2016) (defendant ordered to describe certain preservation efforts given "legitimate concerns" regarding adequacy of preservation efforts in that litigation).  Any suggestion of misconduct (and there was none) concerning CDRs that existed at the time of

---

[3] In their letter, Plaintiffs repeatedly accuse Ms. Blanchard of "refusing" to answer questions.  This gratuitous personal attack on the witness is unwarranted.  Ms. Blanchard was appropriately following the advice of counsel.



Cathy A. Hinger
November 18, 2022
Page 4

FCC's investigation is untenable because TMUS owed no duty to Plaintiffs to preserve *any* data in connection with the FCC's inquiries.

The only testimony Plaintiffs reference concerning document preservation *in this litigation* (Blanchard Dep. Tr. at 80:6-15) relates to whether "records relating to the performance of third parties have been preserved." That has nothing to do with the preservation of CDRs. Moreover, Plaintiffs do not identify any supposed discovery deficiencies in connection with "records relating to the performance of third parties" and Plaintiffs' letter omits entirely the discussion that follows the cited testimony, during which Ms. Blanchard *answered* Plaintiffs' questions regarding where such records are maintained.

### III. Plaintiffs Have Not Demonstrated Any Deficiencies in TMUS's Responses to Interrogatories Nos. 11-14, 19 and 20

Plaintiffs' arguments that TMUS's responses to the specified Interrogatories are deficient rely on unfounded conspiratorial innuendo and speculation concerning TMUS's supposed misconduct both during the FCC's investigation and this case. Plaintiffs also misrepresent or omit relevant information showing their contentions to be meritless. We address the Interrogatories specified in Plaintiffs' letter in turn.

Interrogatories Nos. 11-12: These Interrogatories seek the methodology and data used to "calculate[ ] the actual or estimated number of calls involving the LRBT parameter," which estimates were provided to the FCC. As Plaintiffs know, TMUS agreed to provide the information sought in these Interrogatories *as a compromise* to resolve the parties' dispute concerning Plaintiffs' RFPs 24 and 25, and TMUS's concerns that Plaintiffs would seek to invade privilege and attorney work product concerning the estimates provided to the FCC. As Plaintiffs also know, and yet omit to state, TMUS's offer was conditioned upon Plaintiffs' agreement that disclosure of this information would not constitute a subject-matter waiver and Plaintiffs would not otherwise challenge TMUS's privilege claims concerning documents responsive to RFPs 24 and 25. Plaintiffs refused. Whether Plaintiffs will be permitted to obtain the requested information in light of TMUS's privilege claims is currently pending before the Court in connection with Plaintiffs' Renewed Motion to Compel.

Plaintiffs also contend TMUS is required to include its privilege claims on a privilege log. TMUS has already logged the privileged materials responsive to RFPs 24 and 25. *See* 2022.08.10 TMUS Revised Privilege Log, Nos. 17, 27-35, 239-240, 379-381, 386, 388-402, 404-421, 443, 455, 463-466, 474-475, 539-548. Plaintiffs' suspicions to the contrary are without basis. It is unclear what more Plaintiffs believe they are entitled to, as there is no obligation to "log" claims of privilege made in response to an interrogatory.

Interrogatory No. 13: This Interrogatory asks TMUS to explain why it was unable to provide to the FCC an estimate of calls for which the LRBT parameter was applied "using actual data." TMUS explained in its response that whether LRBT applied to a particular call depended



Cathy A. Hinger
November 18, 2022
Page 5

on the timing of SIP invite and response codes, and the only data source available to TMUS that tracked when SIP codes were sent and received was trace data. Because TMUS did not retain 2015 and 2016 trace data at the time of FCC's request in April 2017, it could not use 2015 and 2016 trace data for its estimates. TMUS has provided a complete response to this Interrogatory.[4]

Interrogatory No. 14: This Interrogatory asks TMUS to identify all persons responsible for the estimates provided to the FCC of the number of calls during which the LRBT parameter was used. TMUS responded by identifying the relevant persons and entities who are not counsel. Plaintiffs assert TMUS must identify the names of all attorneys, supposedly to determine which entries on TMUS's privilege log may be applicable to this issue. The names of the involved attorneys are apparent from the face of TMUS's privilege log. *See also supra* re Interrogatories No. 11-12.

With respect to Hitachi, all of the work it performed and work product it generated as a consulting expert is immune from discovery. Plaintiffs' demand for the engagement agreement is baseless.

Interrogatory No. 19: This Interrogatory asks whether any CDRs for the period January 1, 2014 to January 25, 2017 were deleted from the ████████████████ systems earlier than two years after their date of creation and, if so, to state the scope of CDRs that were deleted, the date such CDRs were deleted, and all reasons for their deletion. Plaintiffs wrongly presume TMUS "prematurely purged" the CDRs because TMUS did not have "actual data" for the estimates provided to the FCC. Again, Plaintiffs' misconception that CDRs were a necessary or the most appropriate data source on which to base the estimates provided to the FCC does not demonstrate any discovery misconduct. TMUS explained in response to Interrogatory No. 13 why trace data was used for the estimates. Plaintiffs' assertion to the contrary is simply wrong.

Plaintiffs also wrongly contend they are entitled to discovery regarding any supposed deviation from TMUS's retention period concerning CDRs generated—at the latest—by January 25, 2017. This too is wrong. First, as stated in the response to Interrogatory No. 19, Plaintiffs incorrectly assume TMUS's retention policy at the time ███████████████████████████████████████████████████████████████ TMUS also referred Plaintiffs to TMUS's retention policy in effect at the time. *See* TMUS00002608, TMUS00002615; *see also supra* n.2. Moreover, even assuming a ████████ retention period applied, the last of the records described in the Interrogatory would have been deleted by ████████ ████████ TMUS's compliance with its own retention period during the course of the FCC's investigation—a retention period which expired for these CDRs well in advance of this litigation—is irrelevant to this case. As Plaintiffs' authority recognizes, courts must strictly scrutinize requests for "discovery on discovery" and the circumstances under which it will be

---

[4] Furthermore, if the FCC had concerns regarding the data TMUS used to calculate the estimates, it was the FCC's right to raise those concerns (not Plaintiffs'). The FCC did not raise any such concerns.



Cathy A. Hinger
November 18, 2022
Page 6

permitted "are limited."  Plaintiffs' speculative, conspiratorial accusations have not reasonably "drawn into question" TMUS's discovery compliance in this litigation.  *See Gross v. Chapman*, No. 19 C 2743, 2020 WL 4336062, at *2 (N.D. Ill. July 28, 2020) (recognizing "mere speculation" does not provide an "adequate factual basis" for discovery on discovery.)

Interrogatory No. 20:  This Interrogatory asks whether and how TMUS preserved so-called "full, searchable" CDRs, and for detailed information about any litigation hold issued, when TMUS received a copy of counsel's FOIA request.  As the case cited by Plaintiffs plainly holds: "Instructions to preserve documents by way of formal litigation hold notices exchanged between attorneys and their clients are privileged communications and generally immune from discovery."  *Roytlender v. D. Malek Realty, LLC*, No. 21CV00052MKBJMW, 2022 WL 5245584, at *4 (E.D.N.Y., Oct. 6, 2022).  Thus, Plaintiffs' request for information concerning any litigation hold, including the scope and time frame of materials covered and instructions on how to preserve data, is improper.

TMUS's relevance and proportionality objections are also well-founded.  As explained in prior letters, only if a duty to preserve existed could the existence and scope of a litigation hold be relevant.  *See* 2022.07.26 Letter from M. Mervis to D. Carter; *FTC v. Lights of Am. Inc.*, CV 10-1333 JVS, 2012 WL 695008, at *4 (C.D. Cal. Jan. 20, 2012) (court considered litigation hold notice only *after* it determined whether and when a duty to preserve arose).  As has also been explained previously, the FOIA request asked the FCC to disclose "the materials obtained during investigation."  Although the request also mentioned CDRs, the fact is the FCC did not request from TMUS,[5] nor did TMUS provide to the FCC, any CDRs.  TMUS had no duty to, and so did not, preserve CDRs upon receipt of the FOIA request.

## IV.  Plaintiffs Have Not Demonstrated Any Deficiencies in TMUS's Responses to Plaintiffs Second RFPs Nos 17-24

What Plaintiffs disingenuously characterize as TMUS's "failure to respond" to certain of Plaintiffs' RFPs are primarily questions Plaintiffs purport to have about TMUS's responses to those RFPs, in which TMUS stated it does not have documents responsive to the requests.  To the extent the identified RFPs seek documents concerning TMUS's litigation hold notices, such materials are privileged and the requests for them are improper, as explained above.

RFPs Nos. 17-20:  These RFPs ask TMUS to produce CDRs contained in certain TMUS systems as of December 27, 2016.  TMUS responded that, pursuant to its Records Management Policies and Retention Schedules, it believes no responsive records exist and it will not produce any documents in response.  Plaintiffs complain TMUS has neither stated it is withholding documents nor explained any limitations on its searches for responsive documents.  TMUS's response is appropriate based on the breadth of the term "call detail record" and the request for

---

[5] For that reason, the FOIA requests themselves did not call for the FCC to provide CDRs.



Cathy A. Hinger
November 18, 2022
Page 7

*any* CDRs that were contained in the TMUS systems as of December 27, 2016. As a
telecommunications company, TMUS uses CDRs in a variety of ways and it is theoretically
possible, however remotely, that *some* CDRs for that period could exist outside of the relevant
systems. TMUS did confirm, however, that such CDRs were not maintained on the relevant
systems beyond the applicable retention period and that none of the custodians for the systems
that maintain CDRs have any responsive documents. That fulfilled TMUS's discovery
obligations.

RFP No. 21: This RFP asks TMUS to produce any CDRs maintained by its intermediate
providers as of December 27, 2016. Plaintiffs complain TMUS's objection that any such CDRs
are not in TMUS's possession, custody or control is inconsistent with TMUS's response that it
may withhold documents based on its objections. Not so. Should Plaintiffs contend TMUS must
try to obtain responsive CDRs (if any), its intermediate providers may have, TMUS anticipates it
would withhold documents based on the objections stated in response to RFP No. 21. There is
no inconsistency, nor does the response call into question Ms. Blanchard's testimony that TMUS
does not have any responsive CDRs.[6]

RFPs Nos. 22-23: These RFPs ask TMUS to produce copies of any litigation hold
notices and cover emails provided to certain custodians of CDRs, including a description of
CDRs in the litigation hold notices, and documents sufficient to show whether any custodians of
CDRs received a litigation hold notice related to either the FCC's investigation or this lawsuit.
These materials are irrelevant, for the reasons described above, and litigation hold notices are
"generally immune from discovery." And, Plaintiffs are not entitled to challenge TMUS's
conduct in connection with the FCC's investigation in all events. *See, e.g., Roytlender* 2022 WL
5245584, at *4 (litigation hold notices are privileged); *Gross*, 2020 WL 4336062, at *2
(recognizing discovery on discovery is permitted only in "limited circumstances" not present
here).

To the extent Plaintiffs contend TMUS's privilege claim is improper with respect to
litigation hold notices issued *in this case*, Plaintiffs have failed to make any showing that TMUS
failed to comply with its discovery or data preservation obligations. The cases cited by Plaintiffs
do not support production of litigation hold notices absent such a showing. *See, e.g., Oleksy*,
2013 WL3944174, at *8-9 (defendant's litigation hold notice was at issue where defendant
admitted it had not preserved data covered by hold notice); *Boyington*, 2016 WL 6068813, at *12
(W.D. Pa., Oct. 14, 2016) (court affirmed privilege of hold notice and allowed inquiry into
certain preservation efforts given "legitimate concerns" regarding adequacy of preservation
efforts in that litigation); *Major Tours, Inc. v. Colorel*, No. CIV 05-3091(JBS/JS), 2009 WL
2413631, at *2 (D.N.J. Aug. 4, 2009) (court permitted partial discovery of hold letters after
preliminary showing of spoliation); *In re eBay Seller Antitrust Litigation,* No. 07–CV–01882

---

[6] Plaintiffs' repeated questioning of the honesty of TMUS witnesses and its counsel cross the line of
professionalism. These constant *ad hominem* attacks accomplish nothing and are entirely counterproductive.



Cathy A. Hinger
November 18, 2022
Page 8

(RS), 2007 WL 2852364, at *2 (N.D.Cal. Oct.2, 2007) (finding defendant had shown document retention notices were privileged and work product). *See also In re 3M Combat Arms Earplug Prod. Liab. Litig.*, No. 3:19-MD-2885, 2020 WL 1321522, at *7–8 (N.D. Fla. Mar. 20, 2020) (finding the prevailing view is that litigation hold notices are discoverable only if there is a preliminary showing of spoliation because unlike normal business activities, litigation hold notices are prepared because of the prospect of litigation and therefore are "textbook work product").

Plaintiffs' purported justification for the material sought by these RFPs does not pass muster. Plaintiffs reference three so-called "opportunities" to preserve CDRs: the FCC's LOI in December 2016, the April 2018 Consent Decree, and your law firm's March 2019 FOIA request. But there is no such thing as an "opportunity" to preserve data—either TMUS owed Plaintiffs a duty to preserve CDRs or it did not. As we have repeatedly communicated, none of the events Plaintiffs identify gave rise to a duty owed to Plaintiffs to preserve CDRs, so any attorney instruction regarding CDRs is not only privileged, but irrelevant.

Plaintiffs' assertion that TMUS's litigation hold notices are relevant to TMUS's work product claims is illogical. TMUS does not claim work product over CDRs, and whether TMUS anticipated litigation with the FCC during the agency's investigation can hardly be questioned. For the reasons explained above, Plaintiffs are not entitled to discovery on TMUS's data preservation activities in connection with the FCC's investigation.

To the extent Plaintiffs contend they need to know whether any custodians of CDRs received a litigation hold notice in response to the Consent Decree or counsel's FOIA request, TMUS has already explained that it did not have a duty to, and therefore did not, preserve CDRs based on either event.

<u>RFP No. 24</u>: This RFP asks TMUS for any CDRs or CDR data summaries used by any TMUS expert. Plaintiffs complain TMUS's response that it is not aware of any responsive documents is inconsistent with TMUS's response to RFP No. 21 that it anticipates withholding CDRs based upon its objections to RFP No. 21. Not so. TMUS explained its response to RFP No. 21 above. There is no "discrepancy" and TMUS has provided a complete response to this RFP.

* * * * *



Cathy A. Hinger
November 18, 2022
Page 9

In sum, and for the reasons stated above, TMUS rejects Plaintiffs' claimed entitlement to a second deposition of Ms. Blanchard, and the assertions of deficiencies concerning the identified discovery responses. If you would like to discuss these matters further, please let us know when you are available to meet and confer.

Sincerely,

*/s/ Michael T. Mervis*

Michael T. Mervis



womblebonddickinson.com



WOMBLE
BOND
DICKINSON

**November 14, 2022**

Womble Bond Dickinson (US) LLP

2001 K Street, NW
Suite 400 South
Washington, DC 20006

Michael Pullos
DLA Piper LLP (US)
444 West Lake Street
Suite 900
Chicago, IL 60606-0089

t:  202.467.6900
f:  202.467.6910

**Via E-mail [michael.pullos@dlapiper.com]**

**Re:  *Craigville Telephone Co. et al. v. T-Mobile USA, Inc. et al.*, 1:19-cv-07190: CDR Sampling**

Cathy A. Hinger
Partner
Direct Dial: 202-857-4489
Direct Fax: 202-261-0029
E-mail: Cathy.Hinger@wbd-us.com

Dear Michael:

On Monday, November 7, 2022, we had a video/telephonic meet and confer to discuss an agreed plan for Inteliquent's production of a sampling of CDRs.  We discussed the following during the meet and confer:

1.  Inteliquent has an internal Inteliquent server that runs software developed by Inteliquent that restores its CDR backup tapes.  Each backup tape contains a month's worth of CDRs and it can take the system 1-2 weeks to restore a tape.  You did not provide a specific number of days or explain any variables that impact how long it takes to restore a single tape.  Such information would be helpful in plotting out a production schedule.  Hopefully, Inteliquent can provide additional detail on this point.

2.  You explained that the system that restores CDRs can restore only one tape at a time and that there is a "queue" of tapes that will have to be restored for other business purposes before Inteliquent will start restoring CDRs for production in this litigation.  You mentioned, for example, that Inteliquent sometimes receives requests from regulatory agencies for CDRs.  You did state that Inteliquent has already added August 2015 to the "queue" since that was a month we had all already agreed to.  You stated that due to this backlog of other CDRs being restored for other purposes, it would be mid-to-late December before Inteliquent will start restoring CDRs for production in this case.

3.  You expressed that Inteliquent is willing to produce a sampling of approximately 4 months of CDRs per year.[1]  We understand from you that there is no more burden to restoring any particular month's CDRs than another, and that the work and burden is equivalent no matter which month's CDRs are restored.  You then proposed that Plaintiffs select approximately 4 months of CDRs per year for Inteliquent to restore as an agreed limited scope of CDRs to be produced by Inteliquent in this case.

---

[1] You previously indicated in a prior meet and confer that Inteliquent would isolate the data from each month's CDRs to T-Mobile traffic only for purposes of the data that will be produced in discovery.  Plaintiffs agree that the scope of data from each month's CDRs should be limited to T-Mobile traffic only.

Womble Bond Dickinson (US) LLP is a member of Womble Bond Dickinson (International) Limited, which consists of independent and autonomous law firms providing services in the US, the UK, and elsewhere around the world. Each Womble Bond Dickinson entity is a separate legal entity and is not responsible for the acts or omissions of, nor can bind or obligate, another Womble Bond Dickinson entity. Womble Bond Dickinson (International) Limited does not practice law. Please see www.womblebonddickinson.com/us/legal-notice for further details.



November 14, 2022
Page 2

4. In response to this new information, I raised the following issues: (1) that the timeframes you laid out for the time it will take to restore each tape and the limitations on the system only being capable of restoring one tape at a time is incompatible with the current close of discovery in March of 2023, so an agreed plan along the lines of what Inteliquent is proposing will require all parties to consent to seek an extension of discovery again; (2) that Plaintiffs will need time after CDR production for depositions because they expect the CDRs will provide significant factual evidence necessary to their questioning of Defendants' witnesses; (3) that Plaintiffs would need to consider and discuss these limitations with their expert consultants to determine whether the number of CDRs Inteliquent is willing to produce would be compatible with a statistically significant sample for purposes of their anticipated analysis; and (4) that due to the delays and risks created by the proposal, Plaintiffs would require a stipulation concerning the limited scope of CDRs not being a sufficient sample and that the entire agreement and production plan should be memorialized in a joint status report or other form of court filing.

5. The parties then agreed Plaintiffs should confer with their experts and respond with a formal proposal. Plaintiffs have done so and propose the following compromises.

Plaintiffs appreciate Inteliquent coming forward with this plan to mitigate perceived burden and Plaintiffs are generally amenable to the proposal, provided that the compromise is appropriately documented and agreed to by all parties as constituting an adequate sampling plan.

Plaintiffs propose the following:

**Production Scope and Schedule:** Plaintiffs propose the following months with the following production schedule, which may be adjusted only on a showing of good cause. Plaintiffs also will agree to Inteliquent's rolling production so long as Defendants will consent to Plaintiffs' request that Magistrate Judge Gilbert schedule periodic status hearings on CDR production so that we can keep the schedule on track and avoid further delays. Please note that, if Inteliquent takes two full weeks to restore and produce each tape, it will be mid-April before CDR production is complete. Since you suggested it takes 1-2 weeks to restore a tape, it appears feasible for it to be done within one week. Therefore, we are proposing 1.5-week intervals for productions as follows:

| CDR Month and Year | Production Date (on or before) |
|---|---|
| July 2015 | December 30, 2022 |
| August 2015 | January 10, 2023 |
| September 2015 | January 20, 2023 |
| October 2015 | January 31, 2023 |
| May 2016 | February 10, 2023 |
| December 2016 | February 21, 2023 |
| February 2017 | March 3, 2023 |
| March 2016 | March 15, 2023 |

**Discovery Schedule Extension:** As you can see, Inteliquent's proposal will leave no time before the close of discovery for Plaintiffs to depose any witnesses with the benefit of the data from the CDRs. We reasonably anticipate that the CDRs will reveal things like the volume of calls impacted by fake ring tones, identification and confirmation of putative class members, the prevalence of calls that were not delivered to putative class members' switches, the prevalence of calling party voluntary terminations of calls impacted by fake ring tones after prolonged ringing, and the volume of calls not being delivered to the



November 14, 2022
Page 3

named class members impacting their customer complaints and associated costs and depriving them of terminating access charges. Therefore, in exchange for accommodating Inteliquent's proposal limiting the number of tapes to be restored and produced and timing, Plaintiffs propose that the parties file a Consent Motion to Continue Schedule and for Entry of CDR Sample Production Plan, a proposed form of which is attached, disclosing and explaining to the Court the necessity of another discovery extension and entering the CDR production schedule as an enforceable order to prevent further delays. Plaintiffs also propose that, except for extraordinary circumstances (*e.g.* anticipated future unavailability of a witness), depositions occur on or after April 1, 2023 so that the they may proceed in an orderly fashion that is more likely to avoid disputes and unnecessary motions practice during the time CDR production is underway.

| Event | Current Deadline | Proposed New Deadline |
|---|---|---|
| Deadline to Amend Pleadings and Join Parties | December 26, 2022 | April 28, 2023 |
| Close of Fact Discovery | March 15, 2023 | July 14, 2023 |

**Stipulation Concerning Limited Scope of CDRs:** In exchange for agreeing to Inteliquent's sampling proposal, Plaintiffs require assurances that the Defendants will not challenge the sample size as statistically insignificant. *See, e.g.*, *Quintana v. Claire's Boutiques, Inc.*, No. 5:13-CV-00368-PSG, 2014 WL 234219, at *2 (N.D. Cal. Jan. 21, 2014) ("However, the sampling regime itself may not serve as a basis upon which to challenge the statistical sufficiency of the evidence.") Therefore, we propose the following stipulated language be included in the CDR Production Schedule filed with the Court: !

> In exchange for Plaintiffs agreeing to limit production of CDRs to only 8 months, Defendants will not challenge the validity or admissibility of Plaintiffs' damages calculations on the grounds that they did not use a sufficient number of months of CDRs to prepare their damages calculation or that the sample data lack representativeness. Defendants reserve all rights though to challenge Plaintiffs' damages calculation on any other grounds.

!  Please provide your response to this plan as quickly as possible so that we can avoid further delays. And regardless of any minor negotiations we may have over these details, please add all of these proposed months to Inteliquent's "queue" for CDR restoration immediately in the order proposed above so that no additional time is lost.

Best regards,

**Womble Bond Dickinson (US) LLP**

Cathy A. Hinger
Partner

Enclosure



November 14, 2022
Page 4


cc:     Via email only
        Michael Mervis
        Baldo Vinti
        Jennifer Roche
        Om Alladi
        John Hamill
        Devin Carpenter
        Joe Carey
        David Audley
        Mia D'Andrea
        Kurt Weaver
        Victoria Bruno
        David Carter
        Katie Gallagher
        Jeremy Baker





Proskauer Rose LLP    Eleven Times Square    New York, NY 10036-8299

Michael T. Mervis
Member of the Firm
d +1.212.969.3565
f 212.969.2900
mmervis@proskauer.com
www.proskauer.com

November 23, 2022

**By Email**
Cathy A. Hinger
Womble Bond Dickinson (US) LLP
2001 K Street, NW
Suite 400 South
Washington, DC 2006
cathy.hinger@wbd-us.com

   Re: *Craigville Telephone Co. et al. v. T-Mobile USA, Inc. et al.*, 1:19-cv-07190

Dear Cathy:

   We write in response to your November 14, 2022 letter concerning the restoration of Inteliquent's CDRs.  TMUS agrees generally with the views expressed by Inteliquent in its letter to you of even date.  Below we amplify a few points.

   As an initial matter, TMUS does not agree that CDRs will "reveal" the matters Plaintiffs identify in their letter, including, for example, the volume of calls "impacted" by LRBT (there *was no* adverse impact on Plaintiffs) and the identification of putative class members.  It is nonetheless puzzling, given Plaintiffs' (albeit erroneous) allegations that LRBT caused calls not to complete, that Plaintiffs have selected seven months of CDRs to restore during the period in which LRBT was enabled, and only one month—February 2017—after LRBT was disabled.  TMUS believes there are other months that should be restored and that the parties should agree on the order in which all of them will be restored.

   TMUS recognizes that to accommodate the restoration of CDRs will require an extension of the fact discovery deadline.  We have raised that issue with our client and will revert with a definitive position.  We observe, however, that despite Plaintiffs' repeated claims that CDRs are a necessary component of their case, Plaintiffs did not try to obtain CDRs from any party until years into the litigation.  As we have repeatedly observed, Plaintiffs have charted a peculiar, needlessly expensive, and time consuming path in this case.  There was no reason to delay a discussion of CDRs pending the so-called "records custodian" depositions (which were largely a waste of time and money) and no reason for Plaintiffs to delay for many months after Judge Lee authorized those depositions to actually take them.  In short, any need to further extend the

Beijing | Boca Raton | Boston | Chicago | Hong Kong | London | Los Angeles | New Orleans | New York | Paris | São Paulo | Washington, DC

11/23/2022 4:38 PM



Cathy A. Hinger
November 23, 2022
Page 2

discovery schedule is solely the result of Plaintiffs' ill-conceived tactics. We also question whether an extension of the fact discovery deadline to July 15, 2023 would be sufficient.

We also address certain limitations proposed in your letter. Like Inteliquent, TMUS rejects any assertion that CRDs covering traffic from other carriers should not be used in this case. We also disagree with Plaintiffs that the selected CDRs must be restored before *any* depositions can proceed, and do not agree to that proposed limitation. TMUS also rejects the proposed stipulation purporting to limit challenges to expert analysis and opinions based on the sampling of CDRs.

Finally, TMUS does not understand the need for periodic status hearings with the Court. They would almost certainly be an unnecessary burden on the parties and the Court.

Sincerely,

*/s/ Michael T. Mervis*

Michael T. Mervis





**DLA Piper LLP (US)**
444 W. Lake Street, Suite 900
Chicago, IL 60606-0089
www.dlapiper.com

Michael S. Pullos
Michael.pullos@us.dlapiper.com
**T** 312.368.3423
**F** 312.251.5809

November 23, 2022
*Via Email*

Cathy Hinger
Womble Bond Dickinson LLP
2001 K Street, NW
Suite 400 South
Washington, D.C. 20006
Cathy.Hinger@wbd-us.com

**Re:    Production of CDRs**

Dear Cathy:

We are not sure of the purpose of the three-page "protocol" letter you sent on November 14, 2022. It is not what we discussed on the call, and we respectfully decline to enter into the proposed terms. We stand by the points we made on our November 7th call.

To reiterate:  (1) we agree a reasonable and proportional CDR production is an appropriate discovery request under the Rules (though we may disagree with your bases for the request); (2) we will produce in monthly batches, not by isolated days; (3) we are going to start restoration with the first month (July 2015) that you selected and will then proceed with the restoration of months on an alternating basis, which will include additional months that the defendants select; (4) we have a specific and limited set of resources to provide CDRs and those resources have competing demands; (5) those resources must yield to government requests and this case may not always get priority on the use of those resources; and (6) we anticipate being able to begin restoration of July 2015 in January 2023.

We have one update, which we did not discuss on our call.  Prior to the production of CDRs, Inteliquent will need Womble Bond Dickinson LLP to sign an agreement to maintain CNPI in compliance with all laws, rules and regulations with respect to personal information.  We will send it separately.

As for the rest of your letter, we said what we said on our call and reject any contrary statement. We generally disagree with all of your substantive positions, but (as before) we are not going to engage in merits debates in discovery letters.

For the avoidance of confusion, we highlight a few points in your letter that require correction.



Cathy Hinger
November 23, 2022
Page Two

1. **Not our delay.** We have been ready to have a CDR discussion since discovery commenced. You waited very long to take a largely unnecessary records custodial deposition and even longer to serve a request for CDRs (October 7, 2022). (You first reached out to us regarding CDRs on August 4, 2022 to discuss sampling, nearly three years after you filed the lawsuit.)

2. **The CDR process.** It works as we have told you. Again, the one server at Inteliquent that restores CDRs is loaded and in demand through December 2022. Again, the restoration process for this case cannot begin until early 2023. Again, the process for restoring one month of CDRs (or one tape) takes up to a couple of weeks. There is no specific number of days that we can provide to restore a given period.

3. **CDRs not the only data.** We reject any implication that CDRs are the only relevant data for the case (or even the most important). For example, ASR and NER reports contain relevant information and cover a fuller set of months than CDRs will cover.

4. **Stipulation on expert analysis.** We do not agree to the proposed stipulation that purports to limit challenges to expert analysis and opinions.

5. **Court involvement.** A regular check-up strikes us as unnecessary. But we have no objection to it if Judge Gilbert and TMUS are okay with it.

6. **Discovery end date.** We are fine with moving the discovery end date back. We do not agree with the draft consent motion as currently worded. We also do not agree to embodying any CDR-related production dates in orders. Again, for reasons we discussed and as stated above, that is impracticable and unfeasible.

7. **Data involving other carriers.** We do not agree that data involving other carriers (apart from TMUS) is not usable in this case. Your footnote 1 is substantially incorrect.

8. **Depositions.** We disagree that CDRs are required for many depositions. We do not agree to a blanket limitation that no depositions can proceed before April 1, 2023.

9. **Schedule.** Again, the restoration process and its timing are uncontrollable. Once the parties have a complete set of months selected, we will put those months into the queue and then production can take place on a rolling basis. Your letter inaccurately proposes that only your side is proposing months, which is inconsistent with our discussion (as is



Cathy Hinger
November 23, 2022
Page Three

your statement about 4 months per year). If Inteliquent gets dismissed from this case, we will agree to provide this information, but we will expect you to pay for it.

10. **TMUS input.** We assume TMUS will also have CDR requests as well and we will coordinate with them.

Very truly yours,

*/s/ Michael Pullos*

Michael Pullos

cc: Counsel Service Distribution List



| | |
|---|---|
| **From:** | Alladi, Om V. |
| **To:** | Hinger, Cathy |
| **Cc:** | Bruno, Victoria; Carter, David; Weaver, Kurt; Mervis, Michael T.; Ruskin, Bradley I.; Vinti, Baldassare; Roche, Jennifer L.; Gordon, Amy B.; Gallagher, Katie; Baker, Jeremy |
| **Subject:** | RE: Craigville, et al. v. TMUS, et al.: 12.9.22 Letter to Om Alladi Regarding TMUS Responses to 2nd RFPs.nrl |
| **Date:** | Tuesday, January 10, 2023 4:49:43 PM |
| **Attachments:** | image001.png<br>image002.png<br>image003.png<br>image004.png |

---

External (oalladi@proskauer.com)

Report This Email   FAQ

Cathy,

First, we disagree with your assertions that there has been any undue delay.  Nor is it correct that anything we have done has contributed to what Judge Coleman is seeing on the docket.  Should we be required to litigate another motion for the appointment of a Special Master, we will prove any argument to the contrary to be false.  It is also misleading to suggest that T-Mobile "will not consent to extending the March 5 close of discovery."  You are correct that T-Mobile has not consented, but we have been clear about the reason why.  Your continued needless wrangling with Inteliquent over a CDR restoration protocol is an unfortunate choice on your part.

Second, your assertions regarding a purported lack of follow-up are mistaken.  We have responded to all of the inquiries regarding the RFPs in your email (with one non-substantive exception that I clarify below) and have not delayed doing so, despite the false urgency imposed by Plaintiffs during the holiday season.  Please review the below identify what in your view is still outstanding.

- RFPs 25-28 – These RFPs relate to TMUS's request or receipt of service credits.  We objected to any production on the grounds set forth in our responses and objections, which we reiterated during the meet and confer, explaining, among other things, that service credits were irrelevant, and there were not likely to be email communications about service credits.  You thereafter requested that we consult the individuals who TMUS's records custodian identified would know about service credits.  We responded to your inquiries concerning service credits in my 12/28 email, explaining that we had consulted those custodians.  **To the extent that there has been a disconnect and to avoid any further ambiguity, we are at impasse on these RFPs.**

- RFP 31 – During our meet and confer, Plaintiffs asked for the January and February 2014 Ericsson Weekly Core Status Presentations.  Thereafter, we did search for those two presentations.  We produced them on 12/19 and communicated this to Plaintiffs.  In my email, I stated: "TMUS completed its review of Weekly Core Status Meeting Presentations from January and February 2014 not captured by initial parameters.  This production includes the presentations we found that are responsive to Second RFP 31."  **We are not aware of any other outstanding requests concerning this RFP.**

- RFP 36 – This RFP concerns documents related to DCR meetings.  I explained during the meet and confer that TMUS was not withholding documents that were responsive, though there were instances where "DCR" was referenced but it was not relevant to the request (*i.e.*, not responsive).  You asked whether we would be willing to produce a sample of such non-responsive documents for Plaintiffs to review.  In TMUS's 12/8 letter to Plaintiffs, we stated: "Plaintiffs asked that the material determined not to be responsive to this RFP but otherwise referencing a DCR meeting should be produced.  TMUS will not produce non-responsive material."  **We are not aware of any other outstanding requests concerning this RFP.**

- RFP 37 – During our meet and confer, we explained that we were not withholding documents responsive to this request but were still in the process of reviewing.  TMUS has produced documents responsive to this RFP, and intends to include responsive documents in its supplemental privilege log or production. **We are not aware of any outstanding inquiry regarding this RFP.**

- RFP 39-41 – These documents seek AER/NER data and communications regarding the same.  When we met and conferred, we noted that this was one item where we were still searching for documents.  Plaintiffs asked that we tell them when we had produced documents related to those RFPs.  TMUS made that production on 12/19, and in my email that same day to Plaintiffs, I stated: "This production includes documents responsive to RFPs 39-41."  **We are not aware of any outstanding inquiry regarding this RFP.**

**Om V. Alladi**
Associate

**Proskauer**
Eleven Times Square
New York, NY 10036-8299
d 212.969.3633
f  212.969.2900
oalladi@proskauer.com
greenspaces
Please consider the environment before printing this email.

---

**From:** Hinger, Cathy <Cathy.Hinger@wbd-us.com>
**Sent:** Monday, January 9, 2023 6:44 PM
**To:** Alladi, Om V. <OAlladi@proskauer.com>; Mervis, Michael T. <MMervis@proskauer.com>; Ruskin, Bradley I. <BRuskin@proskauer.com>; Vinti, Baldassare <BVinti@proskauer.com>; Roche, Jennifer L. <jroche@proskauer.com>; Gordon, Amy B. <AGordon@proskauer.com>
**Cc:** Bruno, Victoria <Victoria.Bruno@wbd-us.com>; Carter, David <David.Carter@wbd-us.com>; Weaver, Kurt <Kurt.Weaver@wbd-us.com>; Gallagher, Katie <Katie.Gallagher@wbd-us.com>; Baker, Jeremy <Jeremy.Baker@wbd-us.com>
**Subject:** RE: Craigville, et al. v. TMUS, et al.: 12.9.22 Letter to Om Alladi Regarding TMUS Responses to 2nd RFPs.nrl

*This email originated from outside the Firm.*

Om,

Today marks a month that has passed since my December 9, 2022 letter following up on the status of Plaintiffs' Second Set of RFP's meet and confer.  I have not received any follow up communication from you on the outstanding items concerning RFPs 25-28, 31, 36, 37, 39-41 as outlined in my letter.  Plaintiffs intend to move to compel responses to RFPs 1-2 which we determined as of your December 8th letter were at an impasse.  If we do not have responses to the remaining issues by Wednesday night, we will proceed with the motion to compel on RFPs 1-2 alone and reserve our rights to move to compel on any of the others that are not resolved later.  However, we cannot continue to wait an entire month for follow ups on meet and confers while TMUS is at the same time taking the position that it will not consent to extending the March 15 close of discovery.  This is precisely the type of delay the Court is not seeing on the record that supports Plaintiffs' position that the Court should appoint a special master.

Best Regards,
Cathy Hinger

---

**From:** Hinger, Cathy <Cathy.Hinger@wbd-us.com>
**Sent:** Friday, December 9, 2022 6:01 PM
**To:** Alladi, Om V. <OAlladi@proskauer.com>; Mervis, Michael T. <MMervis@proskauer.com>; Ruskin, Bradley I. <BRuskin@proskauer.com>; Vinti, Baldassare <BVinti@proskauer.com>; Roche, Jennifer L. <jroche@proskauer.com>; Gordon, Amy B. <AGordon@proskauer.com>
**Cc:** Bruno, Victoria <Victoria.Bruno@wbd-us.com>; Carter, David <David.Carter@wbd-us.com>; Weaver, Kurt <Kurt.Weaver@wbd-us.com>; Gallagher, Katie <Katie.Gallagher@wbd-us.com>; Baker, Jeremy <Jeremy.Baker@wbd-us.com>
**Subject:** Craigville, et al. v. TMUS, et al.: 12.9.22 Letter to Om Alladi Regarding TMUS Responses to 2nd RFPs.nrl

Om,
Please see the attached in response to your letter concerning our narrowing of issues on Plaintiffs' Second Set of RFPs.

Best Regards,
Cathy Hinger

**Cathy Hinger**
Partner
Womble Bond Dickinson (US) LLP

**d:**  202-857-4489
**m:** 703-585-3620
**e:**  Cathy.Hinger@wbd-us.com

2001 K Street, NW
Suite 400 South
Washington, DC 20006

**wombledonddickinson.com**

   

This email is sent for and on behalf of Womble Bond Dickinson (US) LLP. Womble Bond Dickinson (US) LLP is a member of Womble Bond Dickinson (International) Limited, which consists of independent and autonomous law firms providing services in the US, the UK, and elsewhere around the world. Each Womble Bond Dickinson entity is a separate legal entity and is not responsible for the acts or omissions of, nor can bind or obligate, another Womble Bond Dickinson entity. Womble Bond Dickinson (International) Limited does not practice law. Please see www.womblebonddickinson.com/us/legal-notice for further details.

*************************************************************************
*********************************************************************
This message and its attachments are sent from a law firm and may contain information that is confidential and protected by privilege from disclosure.
If you are not the intended recipient, you are prohibited from printing, copying, forwarding or saving them.
Please delete the message and attachments without printing, copying, forwarding or saving them, and notify the sender immediately.
*************************************************************************
*********************************************************************



womblebonddickinson.com



**December 30, 2022**

Devin Carpenter
Joseph Carey
DLA Piper LLP (US)
444 West Lake Street
Suite 900
Chicago, IL  60606-0089

Via E-mail [devin.carpenter@dlapiper.com; joseph.carey@dlapiper.com]

**Re:**    ***Craigville Telephone Co. et al. v. T-Mobile USA, Inc. et al., 1:19-cv-07190*: Follow Ups from Meet and Confer**

Womble Bond Dickinson (US) LLP

2001 K Street, NW
Suite 400 South
Washington, DC 20006

t:  202.467.6900
f:  202.467.6910

Victoria Bruno
Partner
Direct Dial: 202-857-4420
Direct Fax: 202-261-0020
E-mail: Victoria.Bruno@wbd-us.com

Dear Devin and Joe:

I am writing regarding the status of our meet and confers on Inteliquent's responses to Plaintiffs' Second Request for Production of Documents ("Second RFPs") and First Set of Interrogatories ("Interrogatories").  Below summarizes Plaintiffs' understanding of the follow ups from our meetings and where we are at impasse:

A.  INTERROGATORIES

1.    **No. 1 (concerning identification of Rule 26(a)(2)(C) witnesses who do not provide a written report):**  impasse.

2.    **No. 2 (concerning identification of engineers on core networking team or involvement in management of Inteliquent's voice core):**  impasse.

3.    **No. 3 (concerning identification of Inteliquent personnel responsible for various aspects of routing of TMUS at the operational, finance, and senior leadership level):**  Inteliquent will consider whether there are other operational-level people to identify, and whether there was uniformity in the criteria Inteliquent used to make routing decisions to resolve Inteliquent's objections to the term "Subject LECs."  Otherwise, we are at impasse.

4.    **No. 4 (concerning a description of Inteliquent's downstream call path decisions for TMUS traffic and retention of third parties to assist with routing):**  Inteliquent will consider whether to provide additional information to explain Value Base Routing and how Inteliquent used it.  Otherwise, we are at impasse.

5.    **No. 5 (concerning identification of LECS to which Inteliquent routed TMUS traffic using last cost routing):**  impasse.

6.    **No. 6 (concerning an explanation of Inteliquent's methodology used to calculate ASR and NER for TMUS traffic for Subject LECs):**  Inteliquent will consider whether

Womble Bond Dickinson (US) LLP is a member of Womble Bond Dickinson (International) Limited, which consists of independent and autonomous law firms providing services in the US, the UK, and elsewhere around the world. Each Womble Bond Dickinson entity is a separate legal entity and is not responsible for the acts or omissions of, nor can bind or obligate, another Womble Bond Dickinson entity. Womble Bond Dickinson (International) Limited does not practice law. Please see www.womblebonddickinson.com/us/legal-notice for further details.



December 30, 2022
Page 2

to provide additional information or, alternatively, produce documents, on two issues:  whether the ROUTE_LABEL=GNCT code is specific or unique to Inteliquent as we have not been able to locate it, and what that code means; and what is the "uncommon" exception referenced in Inteliquent's answer, what factors trigger it, how often it was triggered, etc.

7.    **No. 7 (concerning identification of Inteliquent personnel responsible for investigating and/or responding to rural call completion issues):**  Inteliquent will review the documents it referenced to answer this Interrogatory under Rule 33(d) to determine if there are other individuals not identified in these documents that should be identified.

8.    **No. 8 (concerning identification of downstream carriers Inteliquent used to deliver TMUS traffic to Wisconsin LECs):**  During our meet and confers, Plaintiffs agreed to revisit Exhibit A to Inteliquent's answer to see if it is sufficient to resolve Plaintiffs' concerns that Inteliquent's answer is incomplete, and Inteliquent agreed to revisit TMUS0000470 and IQNT0000051, also referenced in Inteliquent's answer to determine whether either of these documents contains responsive information because neither appears to identify downstream carriers.  We have taken another look at Exhibit A and conclude that it does not sufficiently answer this Interrogatory because of Inteliquent's qualifications that the downstream carriers listed merely "could have been one of the carriers . . . depending on a number of factors" that Inteliquent does not explain.  Plaintiffs' position is that Inteliquent should amend its answer to identify which of the downstream carriers on Exhibit A were used to deliver TMUS traffic to the Wisconsin LECs.

9.    **No. 9 (concerning identification of downstream carriers Inteliquent used to deliver TMUS traffic before and after implementing the Gold Standard for Routing for Rural America):**  During our meet and confer sessions, we discussed Inteliquent's objection based on what it argued was an inaccurate "binary" premise in this Interrogatory because it asks about the periods before and after the Gold Standard was implemented.  After reviewing our notes, Plaintiffs understand Inteliquent's position to be that there was a continuation of Inteliquent's business practices that straddled the periods both before and after the Gold Standard was implemented.  The fact that there may be some degree of overlap in the downstream carriers Inteliquent used to delivery TMUS traffic during these two periods, however, does not excuse Inteliquent from responding fully as to each time period.  We also reiterate that, with respect to Inteliquent's objection that TMUS4944 referenced in the Interrogatory is not the final version of the Gold Standard rather TMUS6855 is, these two documents are dated only one day apart.  Thus, it does not seem that the distinction Inteliquent is drawing is meaningful for purposes of answering this Interrogatory.  Plaintiffs' position remains that Inteliquent should amend its answer accordingly, and with respect to all Subject LECs, not only the two named Plaintiffs.  If Inteliquent disagrees, then we are at impasse.

10.   **No. 10 (concerning identification of employees and third persons who received, accessed, or analyzed ASR and NER data for TMUS traffic):**  Inteliquent will consider amending its answer in three respects.  First, Plaintiffs asked what is meant by the qualification "in the regular course of business" as that leaves open the question as to whether Inteliquent was using ASR and NER data outside the regular course of business that is relevant



December 30, 2022
Page 3

to this case. Inteliquent said it was not aware of any other uses, and Plaintiff asked whether Inteliquent would amend to remove that qualification. Second, Inteliquent stated that it was not aware of any third parties responsive to this Interrogatory, and Plaintiffs asked Inteliquent to consider amending to so state that there were no third parties. Third, Inteliquent did not answer the portion of the Interrogatory asking for the scope of knowledge and responsibilities of any persons identified. Inteliquent agreed to consider amending to add the requested information.

11. **No. 11 (concerning identification of persons who developed, drafted, or implemented the Gold Standard for Routing for Rural America, and who participated in discussion with TMUS referenced in October 24, 2017 email):** Inteliquent will consider whether to amend to clarify that Tim Schneberger was the only person responsible for developing, drafting, and implementing the Gold Standard for Routing for Rural America, and verify whether he was present at the referenced meeting.

12. **No. 13 (concerning services credits and who was involved in making/negotiating them):** impasse.

13. **No. 14 (concerning identification of persons who attended calls, meetings, and proposed meetings with TMUS referenced in TMUS5118-22, including attorneys):** Inteliquent will consider whether to amend its answer to clarify that TMUS5118-22 accurately reflects everyone who attended the referenced meeting(s), and that there were no other meetings that occurred later. Inteliquent also will verify if it is withholding the identities of attorneys who attended on the basis of a privilege claim, and if not, will consider whether to amend to identify them.

B. 2nd RFPs

1. **2nd RFP 1 (concerning how SIP codes were translated when LRBT is inserted):** Inteliquent responded that no responsive documents exist. Plaintiffs referred Inteliquent to Exhibit 2 to Mr. Scorza's deposition, which is the document that he was testifying about in the portion of his deposition cited in this RFP. Inteliquent will consider Exhibit 2 and provide its final position on whether it has responsive documents. If it does have responsive documents, but Inteliquent is not willing to produce them, then we are at impasse.

2. **2nd RFP 2 (concerning CDRs and CDR summaries restored, reviewed, analyzed, or relied on by testifying experts):** impasse.

3. **2nd RFPs 4-6 (concerning service credits TMUS received and/or waived):** impasse.

4. **2nd RFP 7 (concerning Inteliquent's satisfaction of service level requirements in the PSTN services agreement):** impasse.

5. **2nd RFP 8 (concerning service level reviews with TMUS):** impasse.



December 30, 2022
Page 4

6.  **2nd RFPs 9-10 (concerning Inteliquent's compliance with reporting requirements in the PSTN services agreement):**  Inteliquent will review the 2018 Order and Judge Lee's ruling with respect to the 2018 Order, and provide its final position on whether it will produce documents responsive to these requests.  If not, we are at impasse.

7.  **2nd RFPs 11-16 (concerning additional trouble ticket information, including internal communications and communications with TMUS and downstream carriers about call completion complaints):**  Our notes indicate that we are at impasse on RFPs 11-16.  However, RFPs 11 and 16 ask for documents using the Ringtone Search Terms that were attached to the Second RFPs.  Please advise as to whether Inteliquent will consider the revised Ringtone Search Terms that Plaintiffs and TMUS have agreed to in the context of their meet and confers, a copy of which is attached to this letter.  If Inteliquent does not agree to run these search terms, then it appears that we are at impasse on RFPs 11 and 16, as well.  However, Inteliquent indicated during the meet and confer sessions that it would "rewrite" the search terms.  If that remains the case, we are at impasse.

8.  **2nd RFPs 17-21 (concerning reports from the Protector, Telelink, and Empirix systems and related communications):**  impasse.

9.  **2nd RFP 22 (concerning communications between Inteliquent and TMUS's Revenue Assurance Team):**  impasse.

10.  **2nd RFPs 23-26 (concerning Inteliquent's Remediation Plan and Gold Standard for Routing for Rural America):**

    a.  2nd RFP 23:  Inteliquent will consider whether limiting this RFP to TMUS traffic will resolve the dispute.  If not, we are at impasse.

    b.  2nd RFPs 24-26:  impasse.

11.  **2nd RFP 27 (concerning Inteliquent's knowledge that TMUS customers heard LRBT):**  Inteliquent will consider the narrowed Ringtone Search Terms that Plaintiffs and TMUS have agreed to during their meet and confers, a copy of which is attached to this letter.  If Inteliquent does not agree to run these search terms or to provide a counterproposal, then we are at impasse.

12.  **2nd RFPs 28-31 (concerning ASR and NER data and calculations Inteliquent provided to TMUS and the calculation methodology):**

    a.  2nd RFP 28:  During the meet and confers, we discussed whether Plaintiffs are still seeking the transmittal communications for ASR and NER reports Inteliquent sent to TMUS in light of Mr. Scorza's testimony that they were sent via FTP link.  Plaintiffs understand that typically ASR and NER data were transmitted via FTP



December 30, 2022
Page 5

link without transmittal communication.  However, Inteliquent and TMUS's productions to date show that ASR and NER data also was sent via email. Plaintiffs request that Inteliquent search for and produce responsive transmittal emails.  If Inteliquent will not search for or produce such email transmittals, then we are at impasse on both portions of this RFP seeking the reports and the transmittal communications.

b.  2nd RFPs 29-31:  impasse.

13.  **2nd RFPs 32-33 (concerning the average length of calls for calls with LRBT):** impasse.

14.  **2nd RFPs 34-35 (concerning the post dial delay for calls with LRBT):**

a.  2nd RFP 34:  Plaintiffs clarified that they are not asking Inteliquent to create responsive documents.  Inteliquent will confirm whether it has any contemporaneous, responsive documents.  If it does have responsive documents, but Inteliquent is not willing to produce them, then we are at impasse.

b.  2nd RFP 35:  Inteliquent will confirm whether it has responsive documents to produce.  If it does, but Inteliquent is not willing to produce them, then we are at impasse.

15.  **2nd RFP 36 (concerning monthly measurements referenced in John Bullock's April 16, 2017 email):** Inteliquent will confirm whether it has responsive documents to produce. If it does, but Inteliquent is not willing to produce them, then we are at impasse.

16.  **2nd RFPs 37-51 (concerning additional documents and communications on the economics of the PSTN services agreement):**  impasse.

17.  **2nd RFP 52 (concerning records documenting Inteliquent and TMUS's monthly performance review meetings, including agendas, notes, meeting minutes, etc.):** impasse.

18.  **2nd RFPs 53-59 (concerning Inteliquent's least cost routing):**  impasse.

19.  **2nd RFPs 60-61 (concerning communications between Inteliquent and TMUS regarding compliance with LERG routing tables and changes to routing different from LERG routing tables):**  impasse.

20.  **2nd RFPs 62-63 (concerning audit trails where routing changes were made and how Inteliquent determined the call path):**  impasse.



December 30, 2022
Page 6

21. **2nd RFPs 64-66 (concerning agreements and payments records for Inteliquent's porting of calls):** impasse.

As you know, we have now participated in six video conference calls on Dec. 13, 14, 15, 19, 22, and 29, lasting a total of seven hours on Inteliquent's discovery responses. We appreciate your prompt response next week regarding the follow ups from those calls outlined above.

Best regards,

**Womble Bond Dickinson (US) LLP**

Victoria Bruno
Partner

cc:     Via email only
        John Hamill
        Michael Pullos
        David Audley
        Mia D'Andrea
        Cathy Hinger
        David Carter
        Kurt Weaver
        Katie Gallagher
        Jeremy Baker

## REVISED RINGBACK SEARCH TERMS

| | | |
|---|---|---|
| call W/10 reach~<br>OR<br>reach~ W/10 switch<br>AND<br>never OR "did not" OR didn't | call W/10 reach~<br>OR<br>reach~ W/10 far end<br>AND<br>never OR "did not" OR didn't<br>OR actually | call W/10 reach~<br>OR<br>reach~ W/10 term carrier<br>AND<br>never OR "did not" OR didn't<br>OR actually |
| call W/10 reach~<br>OR<br>reach~ W/10 term carrier's switch<br>AND<br>never OR "did not" OR didn't | "DCR 98" or DCR98 or "DCR-98" | "earl* w/3 audible ring*" |
| "false w/3 answer*" | "earl* w/3 ring* feature*" | "earl* w/3 ring* tone*" |
| "ISUP ACM" | "TOIW1" | "Long Ring Back Tone" or "Long w/3 ring*" |
| "LRBT 1" or LRBT1 or "LRBT-1" | LRBT* | (LRBT* and "ring tone*" or "ringtone*") |
| "local RBT" | "local ringback" | "local ringback" or "local ring back") |
| "MSC 75" or MSC75 or "MSC-75" | "No" w/5 "RBT" | "No" w/3 "ring* back tone" |
| "NRBT" w/3 "issue*" | %RBT% | "Ringback" |
| "Ringback" w/3 "tone" | ("SIP" or "RBT" and ("timer" or "expiry*")) | "timer" w/5 "expiry*" |
| "Tiw2" w/5 "timer" | "TOIW2" | "Tone" and "local ringback" or "local ring back" |
| "WSMD-13900" or "WSMD 13900" | | |



**DLA Piper LLP (US)**
444 W. Lake Street, Suite 900
Chicago, IL 60606-0089
www.dlapiper.com

Devin J. Carpenter
Devin.carpenter@us.dlapiper.com
312.368.2149

January 11, 2023
*VIA EMAIL*

Victoria Bruno
Womble Bond Dickinson LLP
2001 K Street, NW
Suite 400 South
Washington, D.C. 20006
victoria.bruno@wbd-us.com

Re:     *Craigville v. T-Mobile, 1:19-cv-07190:* **Follow Ups from Meet and Confer**

Dear Victoria:

We write in response to your Friday December 30, 2022 letter sent at 5:02 p.m. We address each interrogatory or request for production that has follow up below.

As for those which you assert as being at impasse, we disagree that the plaintiffs have met their burden to establish relevancy in the first place. Your attempts during the extensive meet and confer discussions to rebut our positions concerning relevance and proportionality were conclusory and boilerplate. We do not believe we can be at an impasse where you have not provided a substantive response. We should not be reviewing your substantive positions for the first time in motion practice. To the extent you are not going to provide more substantive information, we would have little choice but to agree that—with exceptions noted below—the parties are at an impasse for the interrogatories and requests for production identified in your letter.

**A.     Interrogatories**

**Rog 1.**  We stand by our objection to this interrogatory as premature. Our response complies with Federal Rule of Civil Procedure 26(a)(2). Please explain what you are even seeking at this juncture in the litigation. We do not have such an explanation from you and we should not see one for the first time in motion practice. We will further consider this issue when the Court sets a date for the disclosure of expert testimony.

**Rog 2.**  We stand by our objection and answer to this interrogatory. You did not provide an explanation for how your request to identity every potential engineer that works at Inteliquent meets the requirements of relevance and proportionality. We do not have such an explanation from you and we should not see one for the first time in motion practice.



Victoria Bruno
January 11, 2023
Page Two

**Rog 3.** Our answer provided the principal persons knowledgeable about Inteliquent operations—including operations of routing specifically—during the period identified. If there is anything else you wish to pursue on this topic, these are matters for depositions, not for continued interrogatories. Nothing more is required.

**Rog 4.** Our answer is sufficient and provides the requisite information. We provide the following additional information you requested to resolve any potential dispute and as a showing of good faith. We will not be supplementing our interrogatory answer, as that is not how discovery should work in these circumstances. Value Based Routing (or "VBR") is the name of the Sonus/Ribbon tool that Inteliquent uses to manage routing for off-net traffic. Off-net traffic is traffic for which Inteliquent does not have a direct connection to the destination carrier. If there is anything else you wish to pursue on this topic, these are matters for depositions, not for continued interrogatories.

**Rog 5.** We stand by our objections and answer to this interrogatory, which provided you with the information you requested in an accurate way. Your interrogatory was flawed but we answered it in the way that we could. If there is anything else you wish to pursue on this topic, these are matters for depositions, not for continued interrogatories.

**Rog 6.** Our answer is entirely sufficient and provides the requisite information. We provide the following additional information you requested to resolve any potential dispute and as a showing of good faith. We will not be supplementing our interrogatory answer, as that is not how discovery is supposed to work in these circumstances. When Inteliquent routes a call, routing occurs based on the NPANXX (i.e., the first six digits of the call). There are multiple "routes" available for that code. If we do not have a route available for that code, the CDR will populate "route_label=GNCT" meaning that Inteliquent could not attempt to route the call. In that scenario, Inteliquent rejects the call because there simply is no existing route for that code. If there is anything else you wish to pursue on this topic, these are matters for depositions, not for continued interrogatories.

**Rog 7.** Our answer directed you pursuant to Rule 33(d) to the following documents, which identify Inteliquent employees who were involved in resolving call related issues for certain rural destinations, including the "Wisconsin LECs": INQT0000118-INQT0000789. Those documents identified at least 18 Inteliquent employees—more than proportional to the needs of the case. Our answer additionally described how Inteliquent's Network Operations Center is responsible for, among other things, identifying, troubleshooting, and solving network related issues and problems. Our answer also specifically identified two persons—John Bullock and Randy Frederick—as employees during the relevant time period with responsibility for issues relating to rural call issues



Victoria Bruno
January 11, 2023
Page Three

and the Network Operations Center. If there is anything else you wish to pursue on this topic, these are matters for depositions, not for continued interrogatories. Nothing more is required.

**Rog 8.** Our answer incorporated an Exhibit A that provided a list by year of downstream carriers that would have been the downstream carriers involved in completing calls to the so-called Wisconsin LECs. We noted that which of those carriers in Exhibit A carried any particular call at any particular time would depend on a number of factors. You now request that we amend our answer and "identify which of the downstream carriers on Exhibit A were used to deliver TMUS traffic to the Wisconsin LECs." But our answer already does that (even though the Wisconsin LECs are not the plaintiffs here). If you are requesting we identify what particular downstream carriers were used for every call to the Wisconsin LECs, such a request is irrelevant, impossibly overbroad, unduly burdensome, and disproportional to the needs of the case. Nothing more is required.

**Rog 9.** Our answer directed the plaintiffs to TMUS00006630, which shows Inteliquent's then "current routing of NECA codes" as of February 2017. That was before Inteliquent's Gold Standard Routing. Our answer also directed the plaintiffs to TMUS00006855, which identified specific carriers included in the routing process with the Gold Standard Routing. Your suggestion that we are not "responding fully as to each time period" (i.e., before and after Gold Standard Routing) is incorrect. The interrogatory has been answered accurately. Nothing more is required. If there is anything else you wish to pursue on this topic, these are matters for deposition, not for continued interrogatories.

**Rog 10.** Our answer provided that the "individuals primarily responsible for Inteliquent's ASR or NER data in the regular course of business between July 2015 and April 2018 were Brett Scorza, John Bullock, Randy Frederick, and Heather King." The interrogatory has been thoroughly and accurately answered. Your letter continues to focus on our answer's use of the phrase "in the regular course of business." But we already explained in the meet and confer that that phrase was not meant to limit our response. Nor is there any person who we would additionally identify if that phrase was removed, so it will not be removed. As for the scope of knowledge and responsibilities of the persons we identified, each employee identified were those primarily responsible for receiving, accessing and analyzing Inteliquent ASR or NER data for calls originating from T-Mobile's network. If there is anything else you wish to pursue on this topic, these are matters for depositions, not for continued interrogatories. Nothing more is required.



Victoria Bruno
January 11, 2023
Page Four

**Rog 11.**  We have determined that John Bullock worked on developing and implementing Inteliquent's Gold Standard Routing.  We do not think this requires an "amendment," but if it is important to you then we will send an amended page with that addition.

**Rog 13.**  We stand by our objections and answer to this interrogatory, which identifies the specific service level credits.  If there is anything else you wish to pursue on this topic, these are matters for depositions, not for continued interrogatories.

**Rog 14.**  Our answer directed the plaintiffs pursuant to Rule 33(d) to TMUS00005118, which contains information showing persons who attended certain meetings T-Mobile identified.  You now request we identify "everyone who attended the referenced meeting(s)" and confirm "there were no other meetings that occurred later."  It is neither relevant nor proportional to identify every potential person—including attorneys, which you specifically request—who may have attended a call or meeting that took place months after T-Mobile turned off LRBT.  If there is anything else you wish to pursue on this topic, these are matters for depositions, not for continued interrogatories. Nothing more is required.

**B.      Second RFPs**

**RFP 1 [40].**  We have nothing, and can add nothing, more to our response.  Inteliquent has no documents responsive to Request 1.

**RFPs 9-10 [48-49].**  Your side argued in the meet and confer that every requirement in the 2018 Order—even specific requirements expressly adopted for the first time in 2018—could somehow apply to conduct from 2015-2017.  The 2018 Order clearly states expressly and repeatedly that the newly adopted requirements did not apply retrospectively.  Those newly adopted 2018 requirements do not establish relevance for materials that unquestionably predate them.  Nothing more is required.

**RFPs 11-16 [50-55].**  We maintain our objection to your proposed search terms (and revised search terms) as duplicative, overbroad, unduly burdensome, and neither relevant to the claims or defenses nor proportional to the needs of the case.  The revised search terms you attached to your December 27 letter actually hit on *more* documents (*thousands* more) than the original search terms you attached to your second set of RFPs.  As explained, Inteliquent has *already* reviewed and produced the relevant documents hitting on a broad array of "ringback" search terms.  (*See* Nov. 24, 2021 email from M. Pullos, attached here as Exhibit 1.)  These search terms were broad,



Victoria Bruno
January 11, 2023
Page Five

directly responsive to the plaintiffs' allegations, and more than proportional to the needs of the case. Nothing more is required.

**RFPs 17-19 [56-58].** Inteliquent does not agree that the parties are at an impasse as to RFPs 17-19. During our meet and confer, you stated that the plaintiffs would consider these RFPs resolved if Inteliquent provided clarification that Telelink and Protector were used solely for fraud detection purposes. We investigated this matter and have again confirmed that Telelink and Protector are used solely for fraud detection purposes. Protector is a long-distance fraud management tool that is applied to smaller customers that have no fraud detection capabilities of their own. Its use was very limited. Telelink is likewise a fraud management tool used for detecting fraudulent activity for higher volume customers. Neither Telelink nor Protector bear any relevance to the claims and defenses in this case. We trust that we can now consider RFPs 17, 18, and 19 to be fully resolved.

**RFP 23 [62].** We do not agree to your overly broad search terms proposed in RFP 23. For example, when Inteliquent searched its custodians' documents for just one of the plaintiffs' requested search terms—"QOS"—it would have required Inteliquent to review thousands of documents related to the generic topic of "quality of service." The request is also overbroad in that it asks for "documents and communications (including without limitation Skype or Slack messages or other forms of instant messages) that relate to T-Mobile traffic and either of" two things that were after T-Mobile removed its LRBT capability. This is not proportional to the needs of the case. We have already produced the Gold Standard Routing for Rural America document. Nothing more is required.

**RFP 27 [66].** We incorporate our above response to RFPs 11-16 here.

**RFP 28 [67].** You have been provided counsel's assurance on *multiple* occasions *in writing* that Inteliquent's monthly ASR and NER reports were provided by FTP link, not transmittal emails. The plaintiffs deposed Inteliquent's records custodian, who likewise testified that Inteliquent's ASR and NER reports were transmitted by FTP link. (INQT Records Custodian Dep., 89:5-91:4.) You even acknowledged the manner in which the reports were provided to T-Mobile in their Response to Inteliquent, Inc.'s Surreply and declared this issue "mooted." (ECF 302 at 12.) But now you are again seeking transmittal emails that do not exist. We cannot provide things that do not exist and we view the continued pressing on this point to have reached the point of harassment.

**RFPs 31 [70].** We further investigated RFP 31, and Inteliquent does not have any ASR or NER data and calculation from any Downstream Carrier of Inteliquent. We trust RFP 31 is now resolved.



Victoria Bruno
January 11, 2023
Page Six

**RFP 34 [73] and 35 [74].**  Inteliquent will be producing CDRs related to the traffic at issue in this case, pursuant to the parties' meet and confer on that issue.  Inteliquent's CDRs will include a post-dial delay field, which is more than sufficient and proportional for the needs of this case.  We trust that RFPs 34 and 35 are now full resolved.

**RFP 36 [75].**  The "monthly measurements" referenced in TMUS0000006424 are the monthly ASR and NER reports Inteliquent sent to T-Mobile via FTP link that Inteliquent has already produced.  (*See,* INQT0000062-INQT0000117.)  We trust that RFP 36 is now full resolved.

Very truly yours,

*/s/ Devin J. Carpenter*

Devin J. Carpenter

cc:  Counsel Service Distribution List