IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| CRAIGVILLE TELEPHONE CO. d/b/a ADAMSWELLS; and CONSOLIDATED TELEPHONE COMPANY d/b/a/ CTC<br><br>Plaintiffs,<br><br>v.<br><br>T-MOBILE USA, INC.; and INTELIQUENT, INC.<br><br>Defendants. | No. 19 CV 7190<br><br>Magistrate Judge Jeffrey T. Gilbert |

**ORDER**

Presently before the Court is Plaintiffs' Renewed Motion to Compel Production of Certain Documents from T-Mobile USA, Inc. [ECF No. 274] and Plaintiffs' Motion to Supplement Plaintiffs' Renewed Motion to Compel with Related Interrogatories [ECF No. 323]. For the reasons discussed below, Plaintiffs' Motion [ECF No. 274] is granted in part, denied in part, and held in part under advisement. The balance of Plaintiffs' Motion to Supplement [ECF No. 323] is denied without prejudice.[1]

**I.  PROCEDURAL HISTORY AND STANDARD OF REVIEW**

Plaintiffs previously moved to compel Defendant T-Mobile USA, Inc. ("TMUS") to produce documents responsive to multiple Requests for Production ("RFPs") [ECF

---

[1] The Court granted Plaintiffs' Motion to Supplement Plaintiffs' Renewed Motion to Compel with Related Interrogatories [ECF No. 323] insofar as Plaintiffs were given leave to supplement their Renewed Motion to Compel [ECF No. 274] by requesting additional relief regarding Interrogatory Nos. 11 and 12. TMUS responded to Plaintiffs' request for additional relief [ECF No. 327] and the Court is prepared to rule on the merits of that issue in this Order.

No. 199]. The Court granted that motion in limited part and denied it in large part [ECF No. 257]. Plaintiffs now renew their motion with respect to certain RFPs and interrogatories [ECF Nos. 274, 323] directed to TMUS after having attempted to narrow those discovery requests consistent with the Court's guidance on relevance and proportionality under Federal Rule of Civil Procedure 26(b)(1).

A party seeking discovery may file a motion to compel under Federal Rule of Civil Procedure 37 if another party fails to respond to a discovery request or when its response is insufficient. FED.R.CIV.P. 37(a); *see also, Belcastro v. United Airlines, Inc.*, 2019 WL 1651709, at *2 (N.D. Ill. 2019). "Courts have broad discretion in resolving such disputes and do so by adopting a liberal interpretation of the discovery rules." *United States Gypsum Co. v. Ectek Int'l, Inc.*, 2022 WL 1155155, at *2 (N.D. Ill. 2022) (citing *Chicago Reg. Council of Carpenters Pension Fund v. Celtic Floor Covering, Inc.*, 316 F.Supp.3d 1044, 1046 (N.D. Ill. 2018)). To that end, Rule 26(b)(1) provides in pertinent part:

> Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit.

FED.R.CIV.P. 26(b)(1). As the 2015 amendments to Rule 26 emphasize, "[t]he parties and the court have a collective responsibility to consider the proportionality of all discovery and consider it in resolving discovery disputes." FED.R.CIV.P. 26, Advis. Comm. Notes for 2015 Amendments.

## II. ANALYSIS

Narrowed RFP Nos. 53–59 seek information about internal discussions between TMUS and Inteliquent, including communications within their cross-company Revenue Assurance Group. Specifically, Plaintiffs seek (1) the minutes of Revenue Assurance Group meetings from September 2015 to April 2018 (RFP No. 53), (2) documents within those group members' ESI (electronically stored information) that refer to or mention high cost domestic traffic or negative margins (RFP No. 54), (3) three documents referenced in a different litigation, *In the Matter of Rural Call Completion Letter,* that pertain to the Master Services Agreement ("MSA") between TMUS and Inteliquent (RFP No. 55), (4) communications between Adrian Lazar Adler ("Adler"), the TMUS Senior Manager of the Revenue Assurance Group, and his counterparts at Inteliquent regarding the impact of rural or high cost traffic on the economics of the TMUS-Inteliquent contractual relationship (RFP No. 56), (5) an unredacted copy of the Adler Declaration in the *In the Matter of Rural Call Completion Letter* litigation. (RFP No. 57), (6) documents related to Inteliquent's attempt to negotiate a modification of its contract with TMUS and the proposed terms of that modification (RFP No. 58), and (7) documents related to the strategies referenced in a March 29, 2016 email from Ian Neale, Senior Vice President at Inteliquent, "to more aggressively...contain the volume of traffic to high costs codes" (RFP No. 59).

The Court's analysis and rulings as to these RFPs is set forth below.

**RFP Nos. 53, 54, 56, and 57.** Motion denied. These RFPs are overbroad and seek documents that are not relevant and proportional to the needs of this case. Plaintiffs rely on a declaration from Adler, the TMUS Senior Manager on the Revenue Assurance Group, that was submitted in an unrelated litigation to establish that the Revenue Assurance Group discussed "negative margins associated with high cost traffic, which is spot on with the conspiracy allegations and relevant to the economics of the relationship." [ECF No. 275] at 7. The Court disagrees with the "spot on" characterization. Information related to the general subject matter of "negative margins associated with high cost traffic" is not "spot on" with the claims and defenses at issue in this litigation, which involve high cost codes and negative margins only insofar as they relate to TMUS's purported scheme to insert local ring-back tones ("LRBT") in rural or high-cost areas. Plaintiffs point to no evidence, in the Adler Declaration from *In the Matter of Rural Call Completion Letter* litigation or otherwise, suggesting the Revenue Assurance Group dealt with calls between individuals as opposed to third parties engaged in traffic pumping or access stimulation.

As Adler explained in a declaration submitted in this litigation, the Revenue Assurance Group focused on "improper practices by third party traffic pumpers, scammers and certain [LECs], not individual subscribers placing calls to rural or non-rural areas on the TMUS network." [ECF No. 235-3] at ¶¶ 3, 8. Plaintiffs' all-encompassing request for the Revenue Assurance Group's meeting minutes over a three-year period, as well as all documents from any group member's ESI that

4

mention the broad subject matter of high-cost domestic traffic or negative margins, therefore is overbroad, not relevant, and disproportionate to the needs of this case as currently framed by Plaintiffs' Second Amended Complaint. It is difficult to see why this information is important for Plaintiffs to be able to move this case forward.

**RFP No. 55.** Motion remains under advisement. TMUS's general objection to RFP No. 55 is that "the work of the RA group is wholly irrelevant here," [ECF No. 307] at 6, but it is not clear to the Court that the documents at issue were generated by the Revenue Assurance Group, or that they were created in the context of the group's role to reduce "improper practices by third party traffic pumpers, scammers and certain [LECs], not individual subscribers placing calls to rural or non-rural areas on the TMUS network." [ECF No. 235-3] at ¶ 3.[2] The Court has reviewed the references in the *In the Matter of Rural Call Completion Letter* litigation to the three specific documents now sought by RFP No. 55, [ECF No. 94-16] at 6–8, and those documents do not, on their face, seem to be limited to the third-party issues described in the Adler Declaration. Rather, they potentially may relate to, or at least affect, "regular calls placed by TMUS subscribers for legitimate purposes to friends, family or businesses located in rural areas" in the same manner as the LRBT issues that underly Plaintiffs' Complaint. *Id.* at ¶ 8. That may or may not mean that the information in those documents is relevant to Inteliquent's alleged implementation

---

[2] *See also* [ECF No. 307] at 6 ("The RA group focused on preventing fraudulent or illegal activity...Both Plaintiffs have denied engaging in traffic pumping and objected to producing any documents regarding access stimulation because that information *"is irrelevant to any claim or defense."*) (emphasis in original, citations omitted).

of LRBT at TMUS's direction. But the Court needs more information to make that determination or, conversely, to reject it.

The first document sought is a March 29, 2016 email from a Senior Vice President at Inteliquent to TMUS promising to "develop[] a series of strategies/initiatives to more aggressively work with you all to contain the volume of traffic to high costs codes" and expressing confidence that their "collaborative efforts will yield a reduction in volume to these codes...." [ECF No. 94-16] at 6. It is not clear from the parties' briefing whether this email was generated in the context of the Revenue Assurance Group's work. Whether this email relates to third-party traffic pumping or legitimate calls placed by TMUS subscribers to individuals located in rural areas also is not clear. In the absence of further clarification by TMUS, which does not appear to be contained in the briefing on this issue, the Court cannot determine whether the document is relevant to the conspiracy claims outlined in Plaintiffs" Second Amended Complaint, or whether production of the document would be proportional to the needs of this case or, instead, would allow discovery to proceed down a path that would be only tangentially related to the central issues in this case.

The second document, a PowerPoint presentation dated April 8, 2016, also is arguably relevant and proportional to the claims and defenses in this case. Although the document includes some recommendations to reduce high-cost traffic caused by access stimulation, or third-party traffic pumping, that are irrelevant for the same reasons outlined above with regard to RFP Nos. 53 and 54, certain recommendations posited by Inteliquent in the PowerPoint presentation involve calls between

6

individuals, not third parties, and arguably overlap with the conspiracy claims raised by Plaintiffs in this case regarding LRBT. *See, e.g.,* [ECF No. 94-16] at 6 ("On all traffic to high cost codes, T-Mobile or Inteliquent inserts a whisper message warning the caller and forcing them to enter a digit before the call is allowed to go through."). Again, the Court needs more information before it can determine whether the document should be produced.

The third document sought – an August 11, 2016 PowerPoint presentation – also may be relevant to the conspiracy allegations depending upon the scope of that alleged conspiracy. The document alludes to TMUS altering traffic between individual TMUS consumers in rural or high-cost areas, but it does not seem to directly involve the insertion of LRBT. *See, e.g.,* [ECF No. 94-16] at 7–8 ("T-Mobile is going to meter the traffic…Similar to checking the "I'm not a robot" button"). The relationship between this document and Plaintiffs' allegations that TMUS used LRBT to stifle traffic to rural or high-cost areas is unknown, and so allowing discovery to go down this path may not be proportional to the needs of this case.

For all these reasons, the Motion remains under advisement as described above. The Court will set the Motion for further hearing in a subsequent order.

**RFP Nos. 58.** Motion granted. TMUS represents that it has "produced the MSA itself and its executed amendments, and email communications between Inteliquent and TMUS regarding Inteliquent's performance under the MSA, including how the parties handled trouble tickets (i.e., records of consumer service complaints)." [ECF No. 307] at 7. In the Court's view, Plaintiffs are entitled to

7

discover more about the economics of the TMUS-Inteliquent relationship than simply the end result of the MSA negotiations. Inteliquent's incentive, if any, to buttress the profitability of its relationship with TMUS by implementing LRBT is relevant to the conspiracy claims in this case as pled, and to TMUS's and Inteliquent's defense against the same. But the universe of relevant and responsive documents is limited to documents that relate to how LRBT impacts the economics of the relationship between TMUS and Inteliquent. Absent any assertion of privilege, TMUS should produce those documents, if any, to Plaintiffs within thirty (30) days of this Order.

**RFP No. 59.** Motion denied. Plaintiffs' Motion [ECF No. 274] fails to substantively address RFP No. 59 and what narrowed universe of documents related to the March 29, 2016 Ian Neale email they are seeking. Plaintiffs' reply says only that "Plaintiffs proposed the same narrowed language for both RFP 58 and 59, so they were collapsed." [ECF No. 315] at 4 n. 3. To the extent Plaintiffs "collapsed" RFP No. 59 into RFP No. 58, notwithstanding that they appear to deal with different subject matters, the Court orders production of documents relevant to RFP No. 58 only for the reasons discussed above. If Plaintiffs seek documents relevant to a narrowed version of RFP No. 59, that issue has not been adequately teed up as of now and the Court declines to compel production of those documents.

**RFP No. 10.** Motion denied with respect to categories 1, 2, and 3, and granted with respect to category 4. As the Court previously indicated, actions TMUS took in response to the Letter of Inquiry ("LOI"), with perhaps some additional subject

limiters, may comprise more palatable and proportional discovery in the context of this case.

Category 1, which seeks all instant messages (Skype or Slack communications) that mention the LOI or the FCC during a one-month period, exceeds the scope of the Court's intended limit described above and is neither relevant nor proportional to the needs of this case right now. The isolated reaction of an employee in an instant message regarding the broad subject matter requested by Plaintiffs – anything involving the LOI or FCC – is too far removed from the relevant universe of actions TMUS took in response to the FCC's investigation.

Regarding categories 2 and 3, TMUS already has produced a substantial volume of responsive discovery. *See* [ECF No. 307] at 10–11. It is unduly burdensome and disproportionate to the needs of this case to send TMUS back to the drawing board to develop additional custodians to search for different drafts or versions of an Inteliquent-created document that there is no indication TMUS has in its possession.

Category 4, however, seeks documents that directly target the heart of Plaintiffs' claims of a conspiracy between TMUS and Inteliquent. Again, whether those allegations have merit remains to be seen, but Plaintiffs have established at least the relevance and proportionality of discovering any communications that occurred between TMUS and Inteliquent about the LOI or FCC investigation, notwithstanding TMUS's protestations that no such communications exist. A targeted ESI search for relevant documents from a narrow list of TMUS custodians (likely already identified from other of TMUS's document productions) is proportional

9

to the needs of this case and not unduly burdensome, especially if, as TMUS says, there will be nothing to discover or produce. Within thirty (30) days of this Order, TMUS and Plaintiffs shall meet and confer about a narrow list of search terms or custodians related to category 4 and TMUS shall produce responsive documents, if any, to Plaintiffs within a reasonable time thereafter.

**RFP Nos. 36-37.** Motion denied. On the subject of the Form 480 requirements of the 2013 Rural Call Completion Order, TMUS already has produced technical documentation explaining how the Form 480 reports were created and identifying the data sources used to create them. [ECF No. 307] at 13. TMUS also has responded to Plaintiffs' interrogatories about the reports. *Id.* Plaintiffs now seek additional discovery into the time and resources TMUS expended to comply with the Form 480 requirements to "test [Kathleen] Foster's implausible claim that this sophisticated telecommunications company was so feverishly attempting to comply with one part of this historic Order that it forgot about the other parts by obtaining documents showing when and whether TMUS was implementing the Form 480 compliance plan." [ECF No. 275] at 14.

This discovery is overbroad and not proportional to the needs of this case. Simply because Kathleen Foster referred to expending "considerable time" to collect and report the RCC information required by the Form 480 requirements of the 2013 Rural Call Completion Order does not open up broad discovery into Kathleen Foster's time management. Absent a more specific showing of relevance and proportionality regarding the "when and whether" of TMUS's compliance with the Form 480

10

requirements, the Court agrees with TMUS that its production in response to RFP Nos. 36 and 37 is adequate at this time.

**RFP Nos. 24–25 and Interrogatory Nos. 11-12.** Motion denied without prejudice. The parties generally agree, consistent with the Court's prior determination, that information responsive to Interrogatory Nos. 11 and 12 and RFP Nos. 24 and 25, which seek the methodology used to calculate the actual or estimated number of calls involving the LRBT parameter provided to the FCC and the data used to calculate each of those estimates, is relevant to the claims and defenses in this case. [ECF No. 327] at 4; *see also* May 12, 2022 Order [ECF No. 257] at 18. To that end, the parties reached a partial agreement about the production of information responsive to Interrogatory Nos. 11 and 12 and RFP Nos. 24 and 25.

For its part, TMUS agreed to produce a written description of the methodology used to arrive at the LRBT call estimates, and the data used to calculate them, to the extent still available, but only if Plaintiffs would agree production of that information and those documents does not constitute a subject matter waiver of TMUS's asserted attorney-client privilege and Plaintiffs waive their ability to challenge TMUS's claims that the attorney-client privilege and the work product doctrine cover information and documents relating to the call estimates. Plaintiffs do not agree to TMUS's proposal. In addition, and somewhat non-responsively, Plaintiffs say they "have no intention of asserting disclosure of the methodology or data used to create the estimates creates a subject matter waiver of the attorney-client privilege waiver because Plaintiffs do not believe this information is privileged in the first place." [ECF

11

No. 323] at 5, n.1. Nevertheless, the Court takes from this that Plaintiffs apparently want to reserve the right to challenge TMUS's assertion of the attorney-client privilege and the work product doctrine over the materials and documents used to arrive at the call estimates in the future.

The exact parameters of the TMUS's proposal are not perfectly clear to the Court, and perhaps not to Plaintiffs either. But on the surface, the proposal seems to make some sense here. Plaintiffs, however, do not have to accept it even though it would allow them to obtain the information TMUS is willing to provide relatively soon without a privilege fight. Under TMUS's proposal, as the Court understands it, Plaintiffs get the information they want, they forego a challenge to a privilege claim they do not think exists, and they do not have to litigate whether the work product doctrine otherwise would protect TMUS against disclosure of the information being produced. It is not clear how much, if anything, Plaintiffs would be giving up if they accepted TMUS's proposal, other than the opportunity to litigate attorney-client privilege and work product claims in the future which they may or may not want to litigate if the information they get now from TMUS is sufficient for their purposes. In addition, if they need more information along the lines of what they are asking for concerning the call estimates, it is possible they can obtain that additional information with a similar non-waiver agreement in the future once they see what TMUS produces in the first go-around.

As stated above, however, Plaintiffs do not have to proceed as TMUS has suggested. If the parties cannot come to an agreement regarding TMUS's response to

Plaintiffs' Interrogatory Nos. 11 and 12 and RFP Nos. 24 and 25, then the Court is inclined to appoint a special master to help the parties work through the privilege and work product claims, assess those claims if the parties are unable to reach closure, and then make a recommendation to the Court concerning a way forward. Within twenty-one (21) days from entry of this Order, the parties shall file a joint report stating whether they have been able to work out this issue. If they have not been able to do so, the Court will consider whether to appoint a special master to address this issue.

    It is so ordered.

_____
Jeffrey T. Gilbert
United States Magistrate Judge

Dated:   January 23, 2023