IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| CRAIGVILLE TELEPHONE CO. d/b/a ADAMSWELLS; and CONSOLIDATED TELEPHONE COMPANY d/b/a CTC | ) ) ) ) | |
| Plaintiffs, | ) ) | No. 1:19-cv-07190 |
| vs. | ) ) | Judge Sharon Johnson Coleman |
| T-MOBILE USA, INC.; | ) ) ) | Magistrate Judge Jeffrey T. Gilbert |
| Defendant. | ) | |

**PLAINTIFFS' JOINT MOTION TO RESOLVE DISCOVERY DISPUTES
CONCERNING CUSTOMER CONTACT ORDER (ECF 326)**

David T.B. Audley (Bar No. 6190602)
Mia D. D'Andrea (Bar No. 6307966)
**CHAPMAN AND CUTLER LLP**
111 West Monroe Street
Chicago, IL 60603-4080
Tel. 312-845-2971
Email: audley@chapman.com
Email: dandrea@chapman.com

Cathy A. Hinger (*pro hac vice*)
G. David Carter (*pro hac vice*)
Victoria A. Bruno (*pro hac vice*)
Kathleen O. Gallagher (*pro hac vice*)
Jeremy L. Baker (*pro hac vice*)
**WOMBLE BOND DICKINSON (US) LLP**
2001 K Street, NW Suite 400 South
Washington, DC 20006
Tel.: 202-857-4489
Fax: 202-261-0029
Email: cathy.hinger@wbd-us.com
Email: david.carter@wbd-us.com
Email: victoria.bruno@wbd-us.com
Email: katie.gallagher@wbd-us.com
Email: jeremy.baker@wbd-us.com

Kurt D. Weaver (*pro hac vice*)
**WOMBLE BOND DICKINSON (US) LLP**
555 Fayetteville Street, Suite 1100
Raleigh, NC 27601
Telephone: 919-755-8163
Email: kurt.weaver@wbd-us.com

*Counsel for Plaintiffs*

Plaintiffs, Craigville Telephone Co. d/b/a AdamsWells and Consolidated Telephone Company d/b/a CTC, on behalf of themselves and a class of similarly-situated companies ("Plaintiffs"), and Defendant T-Mobile USA, Inc. ("TMUS"), submit this Joint Motion to Resolve Discovery Disputes setting forth the parties' respective positions on Plaintiffs' request that, "the Court revisit the approved method of communication if contact by mail proves wholly ineffective at reaching potential witnesses in this case," as provided in this Court's December 19, 2022 Order Regarding Customer Contact (ECF 326, "Order"). TMUS opposes the relief sought by Plaintiffs.

In accordance with Magistrate Judge Gilbert's September 15, 2021 Order (ECF 158) and preference for joint briefs concerning discovery disputes, the following Joint Motion sets forth both parties' positions on the relief sought by Plaintiffs herein.

Plaintiffs assert this Joint Motion complies with Local Rule 37.2. The meet and confer efforts are detailed in Plaintiffs' Statement below, and include an April 10, 2023 video call attended by Plaintiffs' counsel Katie Gallagher and Lela Ames[1] and TMUS counsel Amy Gordon and Jennifer Roche. During that call, Plaintiffs' counsel asked for TMUS's position regarding whether Plaintiffs could send letters to multiple addresses in those instances where TMUS's records reflected multiple names and addresses for the same phone number, with such letters only counting as contacting one customer for purposes of the Order. TMUS did not consent to this, but said that the parties could revisit the matter if a spreadsheet containing additional data produced on April 10 did not allow Plaintiffs to determine when each of the persons listed for the same number was active on the account. Plaintiffs' counsel also asked whether TMUS would agree to allow Plaintiffs to contact 100 TMUS subscribers via text message, explaining that Plaintiffs have only received one response after sending out over 90 letters. TMUS's counsel was not authorized

---

[1] Ms. Ames attended the call but did not participate. She has not as of yet moved for pro hac vice admission in this case.

to consent to this, as she needed to discuss the request with her colleagues and client before providing a formal response. Plaintiffs' counsel similarly asked whether TMUS would alternatively consent to Plaintiffs contacting additional TMUS customers by mail, and likewise, TMUS's counsel did not consent, as she needed to discuss with her colleagues and client before providing a formal response. On a separate April 14, 2023 meet and confer to discuss deposition scheduling for the April 17, 2023 Joint Status Report, counsel for Plaintiffs, Cathy Hinger, raised the customer contact issue with counsel for TMUS Michael Mervis in the context of addressing that this issue may come up at the April 20, 2023 Status Conference and Mr. Mervis advised that TMUS would not consent to text message contact.

**I.        Plaintiffs' Statement.**

      **A.        Introduction.**

As briefed long ago, in October of 2021, the impact of fake ring tones on TMUS's subscribers is a central issue in this case. (*See* ECF 170 at 21-25.) The Court recognized that TMUS subscribers may have relevant information and by a March 25, 2022 Minute Entry, set in motion an action plan to permit Plaintiffs to contact them. (*See generally* ECF 252; *see also* 3/25/22 Hr'g Tr. at 38:10 – 11 ("But I get that these are people who have relevant information."), 44:1-2 ("I think I agree with [Plaintiffs' counsel] that they should be entitled to talk to witnesses.").) More than a year later, Plaintiffs still have had no meaningful contact with any TMUS subscribers they learned experienced fake ring tones through discovery produced by TMUS because (1) U.S. mail is not a reliable mode of contact; and (2) relying on TMUS for current and accurate U.S. mail contact information for the vast number of subscribers whose phone numbers appear in discovery documents has proven unreliable and unworkable. These are the precise concerns Plaintiffs raised during the hearing on these issues and in their briefings leading up to the

customer contact Order. (*See* ECF 170 at 32-33; ECF 262 at 3-9; *see also* 3/25/22 Hr'g Tr. at 49:1-3 ("And I'm concerned about the speculativeness of the letters actually getting to places they belong.").) Given that the Court recognized in its Order that these contingencies could come to fruition (ECF 326 at 2), and left the door open to revisit the mode of contact, Plaintiffs respectfully request that the Court revise the customer contact Order and implement the peer to peer text opt in method of contact previously proposed by Plaintiffs. (*See* ECF 262 at 3-9.)

### B. TMUS's Production of Customer Contact Information Has Been Ambiguous, Confusing, and Unreliable.

On December 19, 2022, the Court entered the Order providing that "TMUS will produce the mailing addresses and names associated with numbers of the customers identified in TMUS's document productions" so that Plaintiffs could select TMUS customers to contact via U.S. mail. (Order at 2.) After multiple requests, TMUS provided Plaintiffs with a spreadsheet of customer contact information on January 13, 2023, followed by a second such spreadsheet on January 19, 2023, with the spreadsheets each marked Confidential under the Agreed Protective Order. (Ex. 1, Email Chain at Jan. 13 and Jan. 19, 2023 Emails; Ex. 2, Excerpt from Jan. 13, 2023 Spreadsheet; Ex. 3, Jan. 19, 2023 Spreadsheet.) The first spreadsheet contains 9,263 rows, while the second spreadsheet contains an additional 832 rows, for a total of over 10,000 entries.[2]

The spreadsheets reflect multiple columns of data with headings that defy explanation, such as "SUB_STATUS", "NAME_EFF_DATE", "NAME_EXP_DATE", "ADR_EFF_DATE", and "ADR_EXP_DATE", among others. Even more confusing, there are many instances where TMUS's spreadsheets list contact information for multiple individuals for the same phone number, in overlapping date ranges, making it impossible for Plaintiffs to determine which customer they

---

[2] The January 13, 2023 spreadsheet is incredibly voluminous, and thus, Plaintiffs have only included an excerpt from this spreadsheet as Exhibit 2. If the Court wishes to view the entire spreadsheet, Plaintiffs will provide an electronic or hard copy file to the Court, whichever the Court prefers.

3

should contact. (*See* Ex. 1, Email Chain at Mar. 27, 2023 Email (providing examples of 6 individuals with the same number during overlapping time periods).)[3]

### C. The Data From T-Mobile Is Unworkable.

Starting in late January and continuing through April, Plaintiffs sought clarification on these issues from TMUS, culminating in a meet and confer via WebEx with counsel for Plaintiffs and TMUS on April 10, 2023. (Ex. 1, Email Chain at Jan. 22, Feb. 3, Feb. 23, Mar. 23, Mar. 27, and Apr. 6, 2023 Emails.) TMUS provided additional information on April 10, containing another 1,300 rows of data, but this information continued to be unworkable and incomplete. (*See id.* at Apr. 10, 2023, 12:45 pm Email; Ex. 4, Apr. 10, 2023 Four Column Spreadsheet; Ex. 5, Apr. 10 2023 Five Column Spreadsheet.)[4]

The April 10 supplemental information provided, for the first time, information regarding several customers that Plaintiffs previously identified as missing from TMUS's January spreadsheets. (*See* Ex. 1, Email Chain at Mar. 30 and Apr. 10, 2023 Emails.) However, key information necessary to determine whether these individuals comply with the limitations on contact set forth by the Order has still not been provided by TMUS, such as the dates these individuals were T-Mobile customers. (*See* Ex. 4, Apr. 10, 2023 Four Column Spreadsheet.) Unfortunately, during the parties' April 10 meet and confer, TMUS could not provide an estimate

---

[3] Following months of requesting clarification on TMUS's information, TMUS provided new information on April 10 purportedly aimed at addressing this concern, and clarifying, for the first time, that the time periods for this one example were not, in fact overlapping, but rather that the number was associated with different subscribers in 2010, 2011, 2018, and 2019, but evidently not associated with any subscriber during the relevant 2016 timeframe. This number, however, appears in TMUS's document production in connection with an email from the FCC relaying call completion complaints in June 2016, and thus, it remains unclear which individual had the number in 2016. TMUS's original data created this confusion in the first instance.

[4] The April 10 supplemental spreadsheets appear incomplete on their face as the January spreadsheets contained 18 columns of data fields while the April 10 supplemental spreadsheets only contain four and five columns, respectfully.

of when it would supplement this information. As of the date of this filing, two weeks later, TMUS has still not supplemented this information.

TMUS provided its longer April 10 spreadsheet to purportedly explain those instances where multiple names are listed for the same phone number during overlapping time periods. To confirm this, Plaintiffs must cross-reference the April 10 spreadsheet against the prior two voluminous spreadsheets to determine the dates when each individual was "active" on the account. (*See* Ex. 5, Apr. 10, 2023 Five Column Spreadsheet.) But again, this data is proving unreliable, as TMUS could not confirm during the meet and confer whether these dates would be accurate in all instances, such as whether the dates would reflect when a subscriber is suspended and later reinstated. Moreover, for the example Plaintiffs previously provided, this data also does not show which individual was assigned to the phone number during the time identified in the corresponding document produced in discovery. (*See* Ex. 6, April 12, 2023 Email.) Because of the confusion created by TMUS's information, Plaintiffs have been prejudiced by being unable to send letters to customers where there are multiple individuals assigned to a phone number in apparently overlapping periods. Plaintiffs have not sent letters to any customers associated with these phone numbers to avoid making speculative choices as to which of the individuals should receive a letter based on the confusing data, and to avoid running afoul of the Court's Order.

In those instances where there are multiple names for the same phone number, Plaintiffs have asked TMUS to agree that Plaintiffs may send a letter to each of the names listed, with these letters only counting as Plaintiffs contacting one customer for purposes of the 100 limitation in the Order. (*See* Ex. 1, Email Chain at Mar. 23, Mar. 27, and Apr. 6, 2023 Emails.) Given the imprecision and ambiguity of TMUS's customer contact information, Plaintiffs should not be forced to pick between one of several potentially relevant customers. To date, TMUS has not

5

agreed to this accommodation. Such an accommodation would not be necessary but for TMUS's failure to clearly identify which customer was assigned to which phone number at the relevant times.

### D. Contacting T-Mobile's Customers By Mail Has Proven Wholly Ineffective.

Despite these cumbersome issues with the customer contact data TMUS provided, and because at the time discovery had been scheduled to close on March 15, 2023, Plaintiffs sent over 90 letters to TMUS customers, reserving a handful pending attempts at resolving the foregoing issues. As Plaintiffs anticipated though, regular mail is proving to be a highly ineffective method for contacting customers. Plaintiffs have only received one customer response that did not yield any useful information. Multiple customer letters have also been returned to sender, validating the imprecision and lack of reliability associated with TMUS providing in 2023 addresses for customer phone numbers in use during 2015 – 2016 when the fake ring tones were in effect. At this time and unless any additional letters are returned to sender, Plaintiffs have six more letters that they may send out under the current limitations of the Order.[5] Given the extremely low response rate to date, assuming any of these letters are even reaching the 2015 and 2016 owners of the phone numbers, it is highly unlikely that six additional letters will result in reliable contact with any TMUS subscriber witnesses whose experience addresses TMUS's causation contention that fake ring tones did not cause callers to prematurely terminate calls.

The Order expressly provides that Plaintiffs "may petition the Court to revisit the approved method of communication if contact by mail proves wholly ineffective at reaching potential witnesses in this case." (Order at 2.) As anticipated and now established by the course of events over the past four months, contacting TMUS's customers by mail is wholly ineffective.

---

[5] Plaintiffs have not yet sent these six letters because they want clear customer information from TMUS before selecting these individuals.

The process has proven to be "unreliable" and "too cumbersome, time consuming, costly, and unwieldy to provide Plaintiffs reliable access to material witnesses." (ECF 262 at 3.)[6] Permitting Plaintiffs to contact TMUS's customers by text message is the logical next step, as this method of communication has a 45% response rate, compared to a mere 9% response rate for direct mail. (*Id.* at 5.) This would not necessarily mean that the number of customers that Plaintiffs would contact would "double," as TMUS contends, since Plaintiffs' peer to peer vendor could send text messages to some of the same witnesses who received letters, which would be reasonable since people are five times more likely to respond to texts.[7] Moreover, text messages will eliminate the issue of TMUS not having accurate addresses for its former subscribers, which likely contributed to the low response rate. Moreover, the number is irrelevant – TMUS has demonstrated no adverse impact to it from its customers receiving Plaintiffs' letters.

TMUS's purported concerns regarding the TCPA continue to be a red herring. As Plaintiffs' previously briefed, this argument is frivolous, among other reasons, because peer to peer texting is not an automatic dialing system prohibited by the TCPA. (*See* ECF 262 at 4-7.)[8]

---

[6] During the March 25, 2022 Status Conference, the Court noted Plaintiffs' concern that this would become "a costly process" and questioned whether a phone bank would be less costly. (*See* ECF 253, Mar. 25, 2022 Tr. at 50:18-22.) Unfortunately, the cost of this process has already exceeded Plaintiffs' expectations, with continuing uncertainty in the contact information provided by TMUS adding to the delay and costs.

[7] As Plaintiff have explained and as this Court agreed, (ECF 253 at 38:16-17 ("I agree with you on how much the defendants are over your shoulder when you're doing something like this.")), precisely which customers Plaintiffs choose is a matter protected by work product. *See also* ECF 253 at 43:4-12 ("defendant would know who is in the wings. And they wouldn't know everybody you talked to. They would actually -- you know, they would know the universe, though, of who these people are being -- who is being sent a written communication because the only way to get that is with some cooperation from T-Mobile with contact information.").

[8] Contrary to TMUS's assertion, when counsel inquired whether Plaintiffs proposed texting the phone numbers listed in the discovery documents, Plaintiffs answered that those are the only phone numbers available to Plaintiffs absent TMUS presenting some other, more current contact information. However, Plaintiffs would not simply send such texts—they would first conduct the necessary due diligence to confirm that the subscribers met the requirements of the Order.

Plaintiffs respectfully request that the Court amend the Order to permit Plaintiffs to contact 100 TMUS customers falling within the same profile in the Order by opt in text message sent by a peer to peer vendor as Plaintiffs previously proposed.

## II. T-Mobile's Statement.

### A. Introduction.

On December 19, 2022, this Court entered the Order Regarding Customer Contact ("Customer Contact Order"), permitting Plaintiffs to contact, by letter, up to 100 TMUS customers identified in documents produced by TMUS so long as the customer met the criteria specified in the Order. *See generally* ECF No. 326. The Court balanced the parties' respective arguments, weighing Plaintiffs' alleged need to contact customers for information related to the "impact of fake ring tones on TMUS's subscribers" (*see* ECF No. 170 at 15) against the infringement on individual privacy rights, finding that contacting TMUS customers by text or telephone is "intrusive and fraught with potential problems" and therefore not proportional to the needs of the case. *See* ECF No. 326 at 1. Anticipating "a likely lower response rate if contact is by mail," the Court "expanded" the number of customers Plaintiffs were permitted to contact "beyond the number requested by either party," permitting Plaintiffs to contact a total of 100 TMUS customers. ECF No. 326 at 1-2.

Disappointed in the low response rate and a response "that did not yield any useful information" (*supra* at 8) Plaintiffs ask the Court to reevaluate its prior decision and permit Plaintiffs to contact an additional 100 TMUS customers by text message—i.e., 25 more customers than Plaintiffs originally requested to contact by text and double the number of customer contacts the Court already permitted. However, Plaintiffs' arguments for their renewed request to send text

8

messages do not overcome the legal and privacy considerations the Court evaluated when it declined to permit contact by text the first time around.[9]

*First*, Plaintiffs' claim that the customer contact information TMUS produced was "unworkable" is contradicted by the fact that Plaintiffs have already used this information to send letters to *94* TMUS customers, and they have offered no reason to believe that, other than the "handful"[10] of letters returned to sender, the letters did not reach their targets. It is not the fault of the data that only one person responded, but rather factors outside of TMUS's control, including that the customers do not wish to engage with lawyers relating to a lawsuit in which they have no interest about years old phone calls or do not have any relevant information. Moreover, for the six allotted contacts Plaintiffs have not yet used, as explained below, TMUS has provided Plaintiffs with all the data they need to link a phone number with the customer to which it belonged at the relevant period (i.e., when a rural call complaint was made).

*Second*, any supposed data issues are not resolved by using text messages. Plaintiffs would still need to rely on TMUS's customer data to verify that phone numbers remain associated with the same customer who held the number at the time of the rural call complaints. Otherwise, Plaintiffs would fail to comply with the criteria set forth in the Customer Contact Order and could be contacting people who never made any complaint about rural call completion.

Balancing the same consumer privacy interests and TMUS's customer relationships that the Court already considered, against the now greater lack of countervailing need[11] and seemingly

---

[9] TMUS has already briefed these issues and respectfully directs the Court to its prior statements about them. *See* ECF No. 170 at 1-13, ECF No. 253 at 24-60, ECF No. 262 at 10-17.

[10] In their Statement Plaintiffs vaguely state that "[m]ultiple" letters have been returned to sender (*supra* at 6), but during the April 10 meet and confer Plaintiffs characterized the "multiple letters" as only a "handful."

[11] As TMUS has pointed out before, the harms Plaintiffs allege are not harms to either Plaintiffs' or TMUS's customers, and neither side's customers are class members. ECF No. 170 at 1. Nevertheless, Plaintiffs claimed they needed to collect anecdotal evidence from individual customers regarding whether TMUS

9

unlikely chance Plaintiffs will obtain relevant evidence, Plaintiffs request to contact 100 additional TMUS customers by text message (or otherwise) should be denied.

Here it bears emphasizing TMUS's valid concern that text messages could lead to TCPA litigation against TMUS. *See* ECF No. 262 at 12-13. The issue is not whether such litigation would have any merit, but rather that any litigation would require TMUS to incur the costs of defending. Although Plaintiffs denigrate this concern, neither they nor their counsel have offered to indemnify TMUS from such potential litigation.

**B.     TMUS's Production of Customer Contact Information Satisfied its Purpose of Allowing Plaintiffs to Contact Customers.**

Following the entry of the Customer Contact Order, on January 3, 2023, Plaintiffs requested the names and mailing addresses associated with the numbers identified in TMUS's document productions. TMUS promptly reviewed the documents it had produced, identified the telephone numbers appearing to belong to TMUS customers, and produced the names and addresses associated with those numbers to Plaintiffs ten days after they requested it (January 13). That same day TMUS made another document production, and six days later (January 19), provided Plaintiffs with contact information for the numbers identified in that subsequent document production. As Plaintiffs concede, they used the information produced in January to send letters to 94 of their allotted 100 contacts.[12]

---

customers "were influenced to prematurely hang up on calls where they heard" LRBT. *Id.* at 15, 17. There is no evidentiary value to contacting a customer, describing what LRBT is, informing them that TMUS used it, and asking the customer to think back to a call made well over six years ago to speculate about whether they would have ended the call sooner or later if there had been dead air instead of LRBT (assuming they actually heard LRBT years earlier). *Id.* at 6. This is even more true now that Plaintiffs have begun receiving call detail records (CDRs) from Inteliquent, which will show which calls had LRBT and whether those calls were terminated "prematurely," without invoking the same privacy and legal concerns as anecdotal memories from individual customers.

[12] As of today, TMUS has produced the names and addresses for nearly *700* unique telephone numbers—not all of which would meet the criteria set forth in the Customer Contact Order (i.e., rural call completion complaint made during the relevant period).

On March 2, 2023, in response to questions from Plaintiffs, TMUS provided additional information about the customer data (which was contained in spreadsheets), explaining that the data fields identify whether a customer's account is active versus cancelled, and which names and addresses are effective versus expired, as phone numbers can change hands and addresses may change. At the same time, TMUS asked Plaintiffs to provide examples of instances where Plaintiffs claimed, "different individuals with different addresses are listed as sharing the same SUBSCRIBER_NO [telephone number] during an overlapping time period." (Ex. 1, Email Chain at Feb. 3 and Mar. 2, 2023 Emails.) Plaintiffs did not respond for three weeks, and then only to decline to provide examples, claiming (dubiously) attorney work product and strategy. (*Id.* at Mar. 23, 2023 Email.) TMUS then undertook "to identify its own examples and investigate further." (*Id.* at Mar. 25, 2023 Email.)

On March 27, Plaintiffs provided TMUS with one example of a situation where a telephone number was associated with multiple people and addresses. (*Id.* at Mar. 27, 2023 Email.) Contrary to Plaintiffs' suggestion, the multiple individuals did *not* share the same telephone number "during an overlapping time period." (*See id.* at Mar. 23 and Mar. 27, 2023 Emails.) Additional data TMUS produced on April 10, 2023 showed when each customer was active on this particular account (and thus, whether a particular customer was associated with the phone number at the time of a call completion issue), and explained to Plaintiffs how they should use this data. (*Id.* at Apr. 10, 2023, 12:45 pm Email.)

Later that day the parties engaged in a meet and confer, during which counsel for Plaintiffs admitted to having already contacted over 90 TMUS customers out of the 100 they are permitted to contact. Through this Joint Motion, TMUS learned Plaintiffs had contacted 94 TMUS customers (*supra* at 6). In other words, Plaintiffs were able to use the data TMUS had produced

11

in January to contact *nearly all* the 100 customers they were allotted, needing the additional information provided on April 10 only to determine for the six remaining allotted contacts which customer was active on a given phone number at the relevant time. During this meet and confer, TMUS did not agree to Plaintiffs' proposal that T-Mobile "not consider it a violation of the Court's Order if Plaintiffs send letters to all names listed for the same phone number (within the time period described in the Court's Order) and that these letters will count as Plaintiffs contacting only one customer." (Ex. 1, Email Chain at Mar. 27, 2023 Email.) First, the proposal ran afoul of the Court's Customer Contact Order because Plaintiffs would undoubtedly be contacting customers who did not make a complaint and therefore do not have discoverable information. *See* ECF No. 326 at 2-3. Second, as described above, TMUS had provided Plaintiffs with sufficient data they can use for their remaining six permitted contacts to determine whether a particular customer was associated with a particular phone number at the time of the call completion issue. For example, on pages 3-4, *supra*, Plaintiffs cite an instance where multiple individuals are associated with the same phone number. The data TMUS provided on April 10 shows that these individuals were not active on the same phone number at the same time.[13]

Plaintiffs characterize the April 10 data as "unreliable" by incorrectly asserting that counsel for TMUS said that she could not confirm that dates would be accurate in all instances (*supra* at

---

[13] Plaintiffs acknowledge this in their email dated April 12, 2023. *See* Ex. 6, Apr. 12, 2023 Email. In it they also unsuccessfully try to cast doubt on the April 10 data by saying none of the customers' effective dates line up with the date of the document in which the phone number was identified (TMUS00004614), which is June 24, 2016. *Id.* However, that document is simply an email from the FCC to TMUS asking TMUS to confirm whether certain phone numbers, including the one Plaintiffs identify, are TMUS numbers. It does not mention a rural call completion issue or suggest that a complaint was made on that date. In any event, this is the only phone number, out of nearly 700, that Plaintiffs have identified where they are not to be able to link a call complaint to a particular customer. Moreover, as described below in Section C, contact by text will not resolve this supposed issue because Plaintiffs would not be able to contact the customer associated with this phone number without first confirming whether the customer who had the phone number at the time of the FCC email is the same customer Plaintiffs would reach if they texted the phone number today.

12

5).[14] To be clear, TMUS affirmatively states that the dates included in the additional data are accurate in all instances to the best of its knowledge.

Counsel for Plaintiffs also reference the customer contact information that TMUS provided to Plaintiffs on April 10 (*supra* at 4) for a mere *11* telephone numbers inadvertently omitted from TMUS's January spreadsheets, which contained close to *700* telephone numbers. In the one instance where there are multiple names associated with a number, TMUS will provide the additional data for Plaintiffs to determine whether each individual meets the criteria set forth by this Court. To the extent Plaintiffs want to send letters to the six remaining customers allotted to them, they have more than enough information to do so.

Plaintiffs' claim that TMUS's production of its customer contact information has been "ambiguous, confusing, and unreliable," and that the data is "unworkable," is directly contradicted by Plaintiffs' admission that they have been able to use the data to send letters to *94* TMUS customers out of the 100 they are allowed to contact (*supra* at 6). Plaintiffs make the baseless assertion (*supra* at 7) that TMUS does not have accurate addresses for its former subscribers, speculating that is why the TMUS customers to whom they sent letters did not express an interest in involving themselves in Plaintiffs' litigation. But except for a "handful" of return to sender responses, there is no reason to believe contact has not been successful. Plaintiffs have not made a cogent argument for why they should now be able to contact 100 *additional* customers *by text*, which is fraught with significant privacy and TCPA litigation concerns.

Plaintiffs assert the number of contacts they now seek is "irrelevant." *Supra* at 7. That assertion contradicts the careful balancing in which the Court already engaged when it permitted

---

[14] Counsel for Plaintiffs asked a question about how the data would reflect instances where a customer's account was canceled or suspended and then reinstated, which counsel for Plaintiffs said she would investigate.

13

Plaintiffs to contact 100 TMUS customers by letter. Moreover, whether Plaintiffs intend to contact an entirely new set of 100 TMUS customers, the privacy concerns the Court acknowledged are in no way diminished. If Plaintiffs' request to text 100 customers were granted, they would either invade the privacy of a new set of TMUS customers, or they would contact by text TMUS customers with whom they have already communicated—and those customers have indicated they are not interested in participating in the litigation by declining to respond to Plaintiffs' letters. Allowing Plaintiffs to double those communications by texting the same customers would border on harassment, and should not be permitted where Plaintiffs have no reason to believe the letters they sent, other than the handful that were returned to sender, did not reach the intended recipients.

TMUS's production of its customer contact information satisfied its purpose of allowing Plaintiffs to contact, by mail, 100 customers whose numbers were identified in TMUS's productions. Plaintiffs are simply disappointed that they have not been able to find the "useful" anecdotal evidence they desire, which is not surprising given there is no upside to the customers' participation in a lawsuit brought by rural LECs and the LRBT software was deactivated in January 2017—six years ago.

      **C.    Any Alleged Efficacy Issues Will Not be Resolved by Texting, and Will Only Increase the Risk of Harm.**

Contacting customers by text message will not resolve the supposed issues associated with the customer data. The problem with the data, according to Plaintiffs, is there are "many instances" where phone numbers are associated with multiple names and addresses (*supra* at 3). One reason for this is that TMUS customers can cancel their phone service, and if for example, they switch to another carrier but do not port their number, that number may be given to a new person. Accordingly, the phone numbers listed in documents TMUS produced, which are anywhere from five to ten years old, may no longer be associated with the customers who made the complaint

years ago. If Plaintiffs do not reference TMUS's customer data produced on April 10, which shows when each customer associated with a single phone number was active on the particular account, to determine whether the person who is currently active on the account is the same person who was active on the account at the time the rural call complaint was made, they could end up contacting a person who never experienced issues completing calls to rural areas or who never attempted to call a rural area.[15] Doing so would run afoul of the Customer Contact Order, the purpose of which is to protect customer's privacy interests and ensure that Plaintiffs contact only customers who "potentially have discoverable information" by limiting the people Plaintiffs can contact to those who had rural call completion issues during the relevant time period. *See generally* ECF No. 326 at 2-3; ECF No. 253 at 42:1-10. Moreover, there is no reason to believe that an individual will be any more willing to engage with counsel for Plaintiffs if they receive a text about a call completion issue made and likely resolved up to a decade ago, versus a letter in the mail.

In short, contrary to their assertion (*supra* at 5), Plaintiffs have not been "prejudiced" by the fact that some phone numbers—through no fault of TMUS—have been associated with more than one individual at different times. Despite this unsurprising circumstance, Plaintiffs were able to identify and send letters to more than 90 of their allotted contacts. In any event, Plaintiffs cannot contact a customer—by any means—without confirming that the customer they would be contacting today is the same individual who was assigned the phone number at the time of the complaint. Therefore, Plaintiffs' unjustified protestations that the so-called "confusing" data means they should be permitted to text 100 TMUS customers rings hollow.

---

[15] At the April 10 meet and confer, Plaintiffs' counsel stated that if TMUS agreed to its proposal to text TMUS customers, Plaintiffs intended to simply text the numbers that appeared in the documents TMUS produced. Plaintiffs did not suggest they would undertake further inquiry, by using the additional data TMUS produced on April 10 as described above, to confirm the numbers still belonged to the customers who had made complaints.

Submitted on this 26th day of April 2023.

/s/ David T.B. Audley
David T.B. Audley (Bar No. 6190602)
Mia D. D'Andrea (Bar No. 6307966)
**CHAPMAN AND CUTLER LLP**
111 West Monroe Street
Chicago, IL 60603-4080
Tel. 312-845-2971
Email: audley@chapman.com
Email: dandrea@chapman.com

Cathy A. Hinger (*pro hac vice*)
G. David Carter (*pro hac vice*)
Victoria A. Bruno (*pro hac vice*)
Kathleen O. Gallagher (*pro hac vice*)
Jeremy L. Baker (*pro hac vice*)
**WOMBLE BOND DICKINSON (US) LLP**
2001 K Street, NW Suite 400 South
Washington, DC 20006
Tel.: 202-857-4489
Fax: 202-261-0029
Email: cathy.hinger@wbd-us.com
Email: david.carter@wbd-us.com
Email: victoria.bruno@wbd-us.com
Email: katie.gallagher@wbd-us.com
Email: jeremy.baker@wbd-us.com

Kurt D. Weaver (*pro hac vice*)
**WOMBLE BOND DICKINSON (US) LLP**
555 Fayetteville Street, Suite 1100
Raleigh, NC 27601
Tel.: 919-755-8163
Email: kurt.weaver@wbd-us.com

*Counsel for Plaintiffs*

**CERTIFICATE OF SERVICE**

      I hereby certify that on this the 26th day of April, 2023, I served the foregoing **Plaintiffs' Joint Motion To Resolve Discovery Disputes Concerning Customer Contact Order (ECF 326)** via the ECF system on parties that have consented to the same in accordance with applicable Federal Rules of Civil Procedure and the Local Rules of the U.S. District Court for the Northern District of Illinois.

      By:   <u>/s/ David T.B. Audley</u>